IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DKT INTERNATIONAL, INC. )<br>)<br>**Plaintiff,** )<br>)<br>v.    )<br>)<br>UNITED STATES AGENCY FOR )<br>INTERNATIONAL DEVELOPMENT )<br>)<br>-and-    )<br>)<br>ANDREW S. NATSIOS, in his )<br>Official Capacity as ADMINISTRATOR, )<br>U.S. AGENCY FOR INTERNATIONAL )<br>DEVELOPMENT.    )<br>)<br>**Defendants.** ) | **Civil Action Case No.** |

MEMORANDUM OF LAW IN SUPPORT OF
DKT INTERNATIONAL'S MOTION FOR
A PRELIMINARY INJUNCTION

DKT International has been engaged in family-planning and HIV/AIDS work overseas for more than fifteen years, and has received grants from USAID for some of this work for more than fifteen years. In June of this year, for the first time ever, DKT was advised that unless it would certify that it had a policy "explicitly opposing prostitution," DKT would no longer be eligible to participate in USAID funding for HIV/AIDS programs. Believing that the government is not permitted to compel a private organization to adopt policies, especially policies that bind the entire organization, and believing the policy to be a harmful one with

which it disagreed, DKT refused to so certify.  As a consequence, DKT has been informed that

the USAID funds that had previously been committed to a DKT proposal would not be available,

and further, that the organization is entirely banned from receiving the USAID funds it has

received for years to carry out HIV/AIDS programs.  Because the statute and regulation

requiring it to adopt such a policy violate the First Amendment, DKT seeks to enjoin the

government from enforcing this unconstitutional law.


## STATEMENT OF FACTS

DKT International is a private, not-for-profit U.S. organization that has pioneered family-

planning efforts using social marketing techniques overseas for fifteen years.  It currently

provides services to just under 10 million couples in eleven countries, and is one of the largest

providers of such services.  Because of its expertise in developing markets for, and in

distributing, condoms, DKT has been an active partner with USAID in the U.S. government's

efforts to prevent and control the spread of HIV and AIDS in many of those countries.  Over the

past twelve years, DKT in Vietnam has received about 13% of its funding in grants or subgrants

from USAID to carry out HIV/AIDS programs.  Declaration of Lawrence Holzman, ¶ 6.

(Attached as Exhibit 1)  However, DKT also receives significant funding from other sources,

including private donors, foundations, and other governments.[1]  USAID funding to DKT

represents about 16 percent of DKT's total budget in all countries in which it operates.

In the summer of 2005, DKT in Vietnam contacted Family Health International ("FHI")

another U.S. non-governmental organization active in Vietnam, through which DKT had

---

[1] DKT also receives funds from the Packard Foundation, the German, Dutch, Irish, Indian, and
Indonesian governments, and the Hewlett Packard and Gates Foundations.  The program in
Vietnam is funded by the Asian Development Bank, the British Government, FHI/USAID, the
German government, UNAIDS, the World Bank, and the World Health Organization.

previously received USAID funds for HIV/AIDS projects. DKT requested that an already-existing condom distribution project be extended without cost for two months to allow DKT to use all the money that had been allocated to it. Holzman Dec. ¶ 7, 8. In addition, DKT had earlier proposed that FHI fund a project that would market lubricant with condoms to increase condom efficacy by reducing breakage. *Id.* at ¶ 13. On June 27, 2005, FHI responded to both requests, responding that that it had received permission from USAID for the no-cost extension and that USAID had made funds available for the condom lubricant proposal. *Id.* at ¶ 9,14. DKT and FHI met the next day, June 28, and FHI informed DKT that USAID would fund the condom lubricant project with $60,000. *Id.* at ¶ 14. FHI also delivered an already-signed amendment authorizing the no-cost extension on the pre-existing condom distribution project. DKT's Country Representative in Vietnam, Larry Holzman, signed the no-cost extension. However, when he reviewed the attachments, he realized that DKT was required by FHI and USAID to certify that

> DKT INTERNATIONAL hereby certifies that it has a policy explicitly opposing prostitution and sex trafficking.

In addition, the amendment provided, "This certification is an express term and condition of the agreement and any violation of it shall be grounds for unilateral termination of the agreement by FHI or USAID prior to the end of its term." Holzman Dec. at ¶ 9.

Upon realizing that he was required to certify that DKT had adopted a policy explicitly opposing prostitution, Mr. Holzman immediately voided his signature, and sought a waiver of that condition. *Id.* at ¶ 10. Within a few days, FHI responded that "FHI will not be able to execute the no-cost extension unless DKT is able to sign the anti-prostitution statement. Furthermore, *we would not be able to support DKT for any activities with USAID funds if this is not signed.*" *Id.* at ¶ 11. (emphasis added).

- 3 -

Several days later, FHI advised DKT that it had misinterpreted the USAID policy, and that FHI would be allowed to authorize the no-cost extension since those funds had been dispersed before the USAID guidance. Holzman Dec. at ¶ 12. But FHI's earlier position that DKT could no longer have access to USAID funds in the absence of the certification remained unchanged. Consequently, on July 28, 2005, FHI confirmed that unless DKT would certify that it had a policy in place opposing prostitution, FHI would not be able to go forward with the proposal to market and distribute condom lubricants, or with any other project involving USAID funding. Holzman Dec. at ¶ 15. The denial, sent to Larry Holzman by Steve Mills of FHI, stated,

> Further to our discussions regarding the development of packaging of lubricants and condoms, I have consulted with FHI's headquarters, and it will not be possible for FHI to fund DKT to carry out this work.

> It is FHI's policy that its subrecipients commit, among other things, to not promoting the legalization or practice of prostitution or sex trafficking. You have indicated that DKT declines to sign the certification form provided to you to that effect.

> The FHI policy and certification requirement is in compliance with FHI's Agreement with USAID, including USAID Acquisition and Assistance Policy Directive 05-04 issued June 9, 2005. Thus, FHI is unable to provide additional funding to DKT.

Ex. G to Holzman Dec.

Thus, solely because it has refused to adopt a government-dictated policy, DKT has been denied a USAID grant that and USAID and FHI had previously agreed to fund and it has become ineligible for any future USAID funding..

As an organization, DKT International has no policy either opposing or supporting prostitution. Holzman Dec. ¶ 18. Different people in the organization may have divergent views on the controversial subject of whether prostitution should be legalized or decriminalized, either as a matter of public health policy, or as a matter of fundamental beliefs about self-

determination. It has not been a subject that DKT felt it needed or wanted to address in an organizational policy. As a matter of carrying out its family-planning and HIV/AIDS work, DKT believes a policy explicitly opposing prostitution will likely result in stigmatizing many of the people most vulnerable to HIV/AIDS—the sex workers—and would result in limiting its access to that vulnerable group it is trying to reach. Holzman Dec. ¶¶ 19-21. DKT objects to, and will not adopt a policy "opposing prostitution." Holzman Dec. at ¶ 18.

The requirement of adopting this specific policy flows from the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Global Aids Act") 22 U.S.C. § 7601 *et seq.* Although the Act itself applies to all USAID recipients or grantees, it was initially applied only to foreign organizations acting overseas. This was because the Justice Department advised the Department of Health and Human Services that requiring United States private organizations to adopt the policy would likely be unconstitutional. DOJ Letter (attached as Ex. A to Declaration of Maurice Middleberg, which is attached as Ex. 4). However, in September 2004, the Justice Department reversed itself, and decided that there were "reasonable arguments" to support the requirement's constitutionality. *Id.* Accordingly, in June 2005, USAID issued a revised Acquisition & Assistance Policy Directive, AAPD 05-04, which mandates that the anti-prostitution policy requirement be included in "any grant or cooperative agreement or subagreement funded with FY04-FY08 HIV/AIDS funds," and requires recipients of grants to "insert this provision, which is a standard provision, in all subagreements." AAPD 05-04 (attached as Ex 2). Thus, by policy and regulation, USAID required FHI to demand that DKT adopt such a policy before DKT could receive any USAID funds.

Solely as a consequence of DKT's refusal to be coerced into adopting a policy which it finds highly objectionable, DKT has been excluded from eligibility for participation in USAID

- 5 -

grant programs. Indeed, FHI has confirmed that the denial of the grant is based on DKT's
refusal to adopt the required policy. Holzman Dec. at ¶ 15.

Nor is DKT's exclusion from USAID grants limited to the particular subgrant cancelled
by FHI pursuant to the USAID policy. Even though DKT has operated and intends to continue
operating HIV/AIDS prevention programs of the sort that would otherwise qualify for USAID
funding, DKT's refusal to adopt the U.S. government's policy on prostitution has rendered it
ineligible to compete for any such funding, threatening DKT with the loss of a significant portion
of its budget.

## ARGUMENT

To obtain the preliminary injunction it seeks here, DKT must show that (1) it is
substantially likely to succeed on the merits; (2) in the absence of an injunction, it will suffer
irreparable harm for which there is no adequate legal remedy; (3) the injunction would not
substantially harm other parties; and (4) the injunction would not significantly harm the public
interest. *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1505, 1506 (D.C. Cir. 1995) (citing
*Wagner v. Taylor,* 836 F.2d 566, 575 (D.C. Cir. 1987)); *National Wildlife Fed'n v. Burfurd*, 835
F.2d 305, 318 (D.C. Cir. 1987); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
559 F.2d 841, 842-43 (D.C. Cir. 1977).

I.    DKT IS SUBSTANTIALLY LIKELY TO SUCCEED BECAUSE THE STATUTE
      COMPELLING GRANTEES TO ADOPT AN EXPLICIT, GOVERNMENT-
      DICTATED POLICY AS A CONDITION OF RECEIVING FUNDS VIOLATES THE
      FIRST AMENDMENT.

By statute and regulation, the U.S. government requires private organizations to certify
that they have adopted "a policy explicitly opposing prostitution and sex trafficking," as a

condition of entering into an agreement (or sub-agreement) with USAID to provide funding for

HIV/AIDS prevention work. 22 U.S.C. § 7631(f); USAID AAPD 05-04. This requirement

plainly compels viewpoint-based speech as a condition of participating in a government

program. Because the requirement cannot satisfy strict scrutiny, it is invalid.

A. The Certification Requirement Constitutes Viewpoint-Based Discrimination.

Content-based, and especially viewpoint-based, restrictions of speech raise immediate red

flags, and are subject to the highest scrutiny. "A regulation of speech that is motivated by

nothing more than a desire to curtail expression on a particular point of view on controversial

issues of general interest is the purest example of a 'law . . . abridging the freedom of speech or

of the press.'" *League of Women Voters*, 468 U.S. at 383-84 (quotation marks omitted; alteration

in original). Moreover,

> restrictions on the basis of a particular viewpoint are even more suspect than
> viewpoint-neutral content-based restrictions. When the government targets
> particular viewpoints taken by speakers, 'the violation of the First Amendment is
> all the more blatant.' Viewpoint discrimination is 'an egregious form of content
> discrimination,' and '[d]iscrimination against speech because of its messages is
> presumed to be unconstitutional.'

*ACLU v. Mineta*, 319 F. Supp. 2d 69, 77-78 (D.D.C. 2004) (citations omitted; alteration in

originall) (invalidating statute denying funding to federal transit grantees involved "directly or

indirectly" in any activity that "promotes" the legalization or medical use of any controlled

substance).

Given the requirement that grantees adopt a policy "explicitly opposing prostitution,"

thus precluding them from maintaining silence or neutrality, or adopting a policy explicitly

favoring, for example, the legalization of prostitution, there can be little question that the statute

and regulation are viewpoint-specific. And while viewpoint-based funding restrictions may

sometimes be upheld when the government is the speaker, *see Board of Regents of University. of Wisconsin. System v. Southworth*, 529 U.S. 217, 229 (2000), such restrictions are impermissible when they restrict private speech. Thus, in *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), the Court invalidated a statute prohibiting funding of LSC grantees who took positions opposing existing law on behalf of their indigent clients. Concluding that the LSC's advice to a client and advocacy to the courts could not be classified as "governmental speech," the Court invalidated the viewpoint-specific restriction. It stated, "Where private speech is involved, even Congress' antecedent funding decisions cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Id.* at 548-49.

Here, of course, as discussed further in Section C below, there can be no argument that a private grantee's organizational policy constitutes government speech. *See Rust v. Sullivan*, 500 U.S. 173 (1991). This is especially true where the grantee has substantial activities funded by private, non-U.S.-government, sources. Thus, the government bears the burden of proving that the statutory restriction is narrowly tailored to further a compelling government interest. *Pacific Gas & Elec. Co. v. Public Utils. Comm'n of Ca.*, 475 U.S. 1, 19 (1986).

> B.     The USAID Requirement Compelling Private
> Organizations To Adopt The Government's Position As a
> Condition of Receiving Funding Is Not Narrowly Tailored to
> Further a Compelling Government Interest.

The Supreme Court has repeatedly held that government may *not* compel individuals or organizations to speak as a condition of participating in a government program: the right of free speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard,* 430 U.S. 705, 714 (1977). In *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), the Court held that the state could not compel children to recite the pledge of allegiance as a condition of receiving a public school education. Likewise, in

- 8 -

*Speiser v. Randall*, 357 U.S. 513 (1958), the Court struck a state statute compelling veterans to declare that they did not support the forcible overthrow of the government in order to receive a property tax exemption. And in *Wooley,* the Court held that New Hampshire could not compel drivers to display license plates bearing the motto "Live free or die." 430 U.S. 705. In short, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matter of opinion or force citizens to confess by word or act their faith therein." *Barnette,* 319 U.S. at 642.

Nor does the fact that there is no "right" to participate in a government grant dictate a different result. In *Perry v. Sinderman,* 408 U.S. 593, 597 (1972), the Court reiterated its long-held view that

> even though a person has no 'right' to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.

*Id.; see also O'Hare Truck Service v. City of Northlake,* 518 U.S. 712, 716-17 (1996) (Supreme Court refused to countenance removal of tow truck operator from city's rotation list when he refused to support mayor's re-election).

Thus, there can be no question that this statute and regulation implicate First Amendment interests, and, especially since they are view-point based, they must pass the highest level of First Amendment scrutiny. The government cannot come close to meeting this burden.

First, the statute and regulations do not result from any compelling government interest sufficient to outweigh the grantee organizations' right to be silent, or to choose what policies they will adopt that apply to their non-U.S.-government funded speech and activities. The Global Aids Act declares: "The United States has the capacity to lead and enhance the effectiveness of the international community's response by . . . (D) *encouraging* governments

- 9 -

and faith-based and community-based organizations *to adopt policies* that treat HIV/AIDS as a

multisectoral public health problem affecting . . . the family and society." 22 U.S.C. § 7601(22)

(emphasis added). The Act continues that "Prostitution and other sexual victimization are

degrading to women and children and it should be the policy of the United States to eradicate

such practices." *Id.* § 7601(23). Thus, the apparent interest of the government is in

"encouraging" NGOs to adopt policies that parrot the government's policies. While many NGOs

may share the government's view, there can be no compelling interest in the government *forcing*

an NGO to adopt that view by conditioning. Especially where the compelled speech is not

ideologically neutral (as it certainly is not here), "where the [government's] interest is to

disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an

individual's First Amendment right to avoid becoming the courier for such message." *Wooley*,

430 U.S. at 717.

     Moreover, any argument that Congress had any interest in all NGOs speaking with one

voice, with regard to the HIV/AIDS work, is belied by another provision in the same statute. In

22 U.S.C. § 7631(d), the statute provides that an organization otherwise eligible for HIV/AIDS

funding from USAID "shall not be required, as a condition of receiving the assistance, to endorse

or utilize a multisectoral approach to combating HIV/AIDS or to endorse, utilize, or participate

in a prevention method or treatment program to which the organization has a religious or moral

objection." Thus Congress has specifically provided for a diversity of views among private

organizations receiving USAID funds, and provided further that that diversity should not keep

organizations from working with USAID.

     Further, even if the government could identify some compelling interest, it could not

demonstrate that its requirement forcing private organizations to adopt an organizational policy

that applies to both federally funded programs and non-federally funded programs is sufficiently narrowly tailored to satisfy the First Amendment. Thus, the statute and the regulation violate the First Amendment and are invalid.

The government simply cannot dictate that a private organization adopt a viewpoint-specific policy as a condition of obtaining government funding. Were the law otherwise, Congress could require all schools receiving federal funds to adopt a policy explicitly opposing women working outside the home to further Congress's goal of encouraging at-home child rearing. Or, it could require all political candidates receiving federal funds to adopt a policy explicitly opposing the death penalty to further its interest in saving the significant cost of the lengthy appeals process. Though such restrictions might be convenient to help Congress accomplish its goals, that sort of public conscription of private persons or organizations is forbidden by the First Amendment. Congress cannot force others to be the couriers of its ideas or ideology Nor can it forbid private organizations from disseminating dangerous or disfavored ideas as a condition of receiving federal funds. Conditions tied to government largesse may not be aimed "at the suppression of dangerous ideas." *League of Women Voters*, 468 U.S. at 407 (quotation marks omitted).

> C.    The Government May Not Require Private Organizations to Limit Their Privately Funded Speech As a Condition of Receiving Federal Funds.

Supreme Court precedent holds that when the government spends taxpayer funds, it can put limits on those funds to ensure that those funds accomplish the task the government intends. *Rust v. Sullivan*, 500 U.S. 173 (1991). This case does not challenge that principle. Indeed, the government separately seeks to accomplish precisely that goal in the USAID programs by

providing that "None of the funds made available under this agreement may be used to promote or advocate the legalization or practice of prostitution or sex-trafficking." AAPD 05-05, § II(a).[2]

But the requirement that organizational grantees adopt a policy "explicitly opposing prostitution" goes well beyond limiting the use of government funds. By requiring a private organization to articulate an explicit policy, the government effectively *precludes* the organization from taking any other position on this issue in any other context, *even with wholly private funds*. And this the government may not do. *FCC v. League of Women Voters of Colo.*, 468 U.S. 364 (1984) (invalidating statute forbidding non-commercial radio stations who accept any federal funds from editorializing, even with wholly private funds); s*ee also Federal Election Commission v. International Funding Institute, Inc.*, 969 F.2d 1110, 1115 (D.C. Cir. 1992) (noting that the Supreme Court "has consistently scrutinized more closely statutes that condition the receipt of a government benefit upon the recipient's altering its independently funded activities ... than it scrutinizes statutes that restrict only the use to which the recipient may put the government benefit.").

Indeed, even *Rust v. Sullivan*, the government's leading funding case, plainly shows that the statute and regulations here violate the First Amendment because they apply to the grantee, and not to the particular project covered by federal funds. In *Rust*, a group of doctors sought to overturn HHS regulations prohibiting doctors employed in Title X programs from providing counseling about abortion as a method of family planning. The doctors argued that the regulations violated their First Amendment rights. The Court distinguished the unconstitutional

---

[2] Although not the focus of this preliminary injunction, DKT has raised in its complaint substantial concerns about the *vagueness* of this requirement. Much of the HIV/AIDS work supported by USAID funds is centered on sex-workers, since that is where HIV infection rates and danger of spreading are often highest. In that context, it is quite unclear what it means to "promote . . . the practice of prostitution."

condition cases because those cases involved situations in which the "Government has placed a

condition on the *recipient* of the subsidy rather than on a particular program or service, thus

effectively prohibiting the recipient from engaging in the protected conduct outside the scope of

the federally funded program." 500 U.S. at 197. The Court then relied on that distinction to

support its conclusion that the regulations were valid:

> the regulations do not force the Title X grantee to give up abortion-related speech;
> they merely require that the grantee keep such activities separate and distinct from
> Title X activities. Title X expressly distinguishes between a Title X *grantee* and a
> Title X *project*. The grantee, which normally is a health-care organization, may
> receive funds from a variety of sources for a variety of purposes. The grantee
> receives Title X funds, however, for the specific and limited purpose of
> establishing and operating a Title X project. The regulations govern the scope of
> the Title X *project's* activities, and leave the grantee unfettered in its other
> activities.

*Id.* at 196 (internal citations omitted). But the prostitution policy statute and regulations at issue

here make very clear that the *grantee* is required to explicitly adopt the government's policy, and

that *grantee* is thus bound by that policy statement with regard to all its other activities, even

those outside the scope of the government project. Thus, the government seeks to foreclose all

discussion by its grantees that might oppose, or even just question, the government's policy. The

policy does not leave any organization "unfettered," but precludes all participation on one side of

any public debate on the controversial issue of the effects of prostitution.

Thus, it is clear that the statute and regulation burden DKT's First Amendment interests.

Again, the government can identify no compelling interest sufficient to meet its very high burden

to justify forcing an organization to articulate the government's policy position as its own,

against its own wishes, as a condition of receiving federal funds. Indeed, the Supreme Court has

never held that government funding buys the right to hijack private grantees' rights to determine

and adopt the policies they deem appropriate for their organizations' purposes. Nor could the

government show that this policy is narrowly tailored to serve any compelling interest.

II.     IN THE ABSENCE OF A PRELIMINARY INJUNCTION, DKT WILL CONTINUE
        TO SUFFER IRREPARABLE HARM.

        The USAID statute and regulations create a stark choice for DKT and other private

organizations who do not want to have a policy about prostitution:  They can sacrifice their First

Amendment rights (and their ability to do their work without compromise) to ensure access to

funds for the often life-saving programs they are running, or they can stand on their First

Amendment rights by refusing to adopt the government's policy, and therefore lose both

immediate funding and their eligibility for future funding.  In either event, they suffer serious

injury.  Putting organizations to that choice itself constitutes irreparable injury.

        The statute and regulation cause First Amendment harm in two ways.  First, they compel

an organization to utter publicly a specific opinion on a matter of public policy.   Then, once that

opinion has become codified as the organization's "policy," the fact of the policy (and the

possible consequences of deviating from it) precludes the organization from speaking in ways

inconsistent with that policy, even outside the government program.  Thus, once it has been

forced to adopt the policy, the injury continues, and even increases, since the compelled policy

actually limits the organization's speech.  These threatened First Amendment harms constitute

irreparable injury.[3]

---

[3] In addition to this First Amendment harm, DKT would suffer programmatic harm.  As DKT's
Vietnam Country Representative noted in his Declaration, DKT has worked closely with local
organizations in Vietnam since 1993, distributing more than 400 million condoms throughout the
country's sixty-four provinces.  Indeed, it is the largest distributor of condoms in the country.
The organization has focused on vulnerable populations, such as sex workers, in an effort to
prevent the spread of HIV-AIDS.  Women and men working in the sex industry suffer
stigmatization and abuse in Vietnam and around the world, and sex workers in Vietnam, who
currently suffer from an HIV infection rate of 5.2 percent, face a threat of forced rehabilitation.
Holzman Dec. at ¶ 21.  Their legitimate fear of state authorities renders this group difficult to
contact and to engage.  Effective behavioral change in this population is essential in preventing
the spread of HIV/AIDS in Vietnam.  *Id.*  But adopting the policy the U.S. government requires
would force DKT to participate in further stigmatizing the community of sex workers.

The loss of First Amendment freedoms, even for a minimal period, "unquestionably constitutes irreparable "injury". *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *see also Wagner,* 836 F.2d at, 576 n.76. Indeed, "purposeful government penalization of First Amendment rights," precisely what the U.S. government has done here, constitutes irreparable injury. *Olmeda v. Schneider,* 889 F. Supp. 228, 231 (D. V.I. 1995); *Johnson v. Bergland,* 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of [F]irst [A]mendment rights constitute per se irreparable injury."); *Beal v. Stern,* 184 F.3d 117, 123 (2d Cir. 1999) ("A statute that threatened freedom of speech to a significant degree by its nature gives rise to irreparable injury.") Plainly, forcing a private organization otherwise eligible for USAID funds to make the choice of surrendering their First Amendment rights as a condition of keeping that eligibility constitutes irreparable injury as well. "'It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.'" *Elrod,* 427 U.S. at 361 (quoting *Sherbert v. Verner,* 374 U.S. 398, 404 (1963)); *Newsom v. Albemarle County School Bd.,* 354 F.3d 249 (4th Cir. 2003) (irreparable injury justifying preliminary injunction when student was forced to choose between wearing shirt inside out and going home from school when shirt violated overbroad school dress code). As the Supreme Court stated:

> For at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's belief should be shaped by his mind and his conscience rather than coerced by the state.

*Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 234-35 (1977).

---

Moreover, a change in DKT's approach to the community would rupture the carefully-crafted relationships built over the past decade, relationships that have served to increase condom use and prevent the spread of the disease. It is this alienation of partners that DKT seeks to avoid.

III.    A PRELIMINARY INJUNCTION WILL NOT SUBSTANTIALLY HARM OTHER
        PARTIES.

The community of nongovernmental organizations providing public health services to

HIV/AIDS-affected communities around the world greeted the U.S. government's anti-

prostitution pledge policy with overwhelming condemnation and outrage. As the attached

declarations from various non-governmental organizations attest, many organizations object to

the policy on First Amendment and programmatic grounds.

Far from harming other parties, an injunction in this case may help *protect* the many

other grantees who find themselves compelled to surrender their First Amendment rights or

suffer major funding cuts. While some grantees have refused to sign the required certification,

Declaration of Dr. Carol Jenkins (attached as Exhibit 3), some have yielded to the government's

coercive tactics, fearing that a failure to sign the anti-prostitution certification would irreparably

harm the patients and communities they serve in the field. Others, such as EngenderHealth, have

signed under protest. Declaration of Maurice Middleberg (attached as Exhibit 4). The sacrifice

of First Amendment rights by those organizations financially coerced to sign the certifications

should not be misunderstood – these groups will suffer the same harms that DKT would confront

if it acceded to the government's demand.

As the attached declarations from seven NGOs and individuals eloquently demonstrate,

many organizations offering HIV/AIDS prevention and treatment believe strongly that this

policy "goes beyond the Government's legitimate right to regulate the use of federal funds by

dictating speech and the use of non-federal funds." Ex. 4, Middleberg Dec. ¶ 9. Moreover,

many such organizations foresee significant harm to their non-government-funded efforts to

prevent and treat HIV/AIDS. In February of 2005, thirteen leading public health organizations

(including CARE, EngenderHealth, International Rescue Committee, PATH, Save the Children,

Mercy Corps, Pathfinder International, and the Population Council) wrote to Ambassador

Tobias, the Global AIDS Coordinator at the Department of State to express their deep concerns

about the harms the required anti-prostitution policy would cause.  In addition to expressing

concern about the effect of the policy on the First Amendment rights of affected organizations,

they stated:

> Our research and experience tells us that contributing to the
> stigmatizing of populations that are at risk, infected, or affected by
> HIV/AIDS greatly undermines the success of AIDS prevention,
> testing, and care efforts.  Our ability to remain neutral on the issue
> of prostitution enables us to inform individuals that they are at risk,
> reduces barriers to testing, and increases the likelihood of
> prevention and treatment.

Ex. 4, Middleberg Dec. Ex. D.

As EngenderHealth has reiterated here, "The impact of issuing a policy statement

opposing prostitution may be to ally EngenderHealth with the stigmatization of sex workers and

their clients." Ex. 4, Middleberg Dec. ¶ 16(b).  Moreover, the organization is concerned that

because of the required policy, "USAID Missions, host governments, local organizations, and

our own staff will avoid developing or supporting innovative programs for sex workers that may

be construed as inadequately 'anti-prostitution', rather than risk losing USAID funding." *Id.* at

¶ 16(c).  Likewise, Dr. Carol Jenkins, formerly a Senior Advisor for USIAD,  notes that her

experience has taught her that the most effective ways to help sex workers avoid HIV/AIDS

includes "accepting them, non-judgmentally, as fellow human beings.  Having a policy

'opposing prostitution' undermines that relationship of trust."  Ex. 3, Jenkins Dec. at ¶ 11;

Declaration of Carmen Barroso, Regional Director for International Planned Parenthood

Federation/Western Hemisphere Region (attached as Ex. 5) at ¶ 5 (same); Declaration of Jodi L.

Jacobson, Executive Director of the Center for Health and Gender Equity (attached as Exhibit 6)

(reporting that "Public statements against prostitution can also fuel public opprobrium against

men and women in prostitution, driving them away from lifesaving services."). The president of

Global Aids Alliance states, "Some of the most effective peer-based prevention programs in

countries, like India, which are facing rapidly escalating epidemics, are threatened by these

[certification] requirements." Declaration of Paul Zeitz, (attached as Ex. 7) at ¶ 10. Finally, as

over 100 organizations and persons pointed out in a letter to President Bush condemning the

policy, " Any anti-prostitution declaration by organizations working in the sex sector has the

potential to judge and alienate the very people these organizations seek to assist, making it

difficult or impossible to provide services or assistance to those at risk." Ex. 3, Jenkins Dec. at

Ex. A.

As these statements of various NGO representatives make clear, a preliminary injunction

will also protect the HIV/AIDS patients and persons these organizations serve. If a preliminary

injunction is granted, those organizations need not act precipitously to terminate ongoing

programs that provide vital services to such persons, but which the organizations might believe

put them at risk of being insufficiently opposed to prostitution.

Further, a preliminary injunction will not harm USAID, which has functioned for years

without requiring its partner private voluntary organizations to adopt its policies on prostitution.

Nor would such an injunction limit in any way what the government directs to be done with

USAID funds. USAID cannot demonstrate that its mission or projects will be harmed in the

least by a preliminary (or a permanent) injunction. Such an injunction would simply preserve the

status quo as it existed before USAID applied the unconstitutional statute and regulations to U.S.

private organizations. Indeed, it is worth noting that although the statute has been in effect since

2003, USAID did not apply this provision to U.S. organizations until June 2005. Until

September 2004, the Department of Justice agreed with the NGO community that application to U.S. entities would violate the First Amendment.

Nor can a preliminary injunction cause any harm to any organizations who *agree* with the policy. Those organizations would remain free, as they have always been as U.S. organizations, to enact and live by the policies each organization deems best, including, of course, a policy opposing prostitution.

## IV.    THE INJUNCTION WILL NOT HARM THE PUBLIC INTEREST.

The premise of the First Amendment is that the public interest is best served by full and fair participation of willing speakers in the market-place of ideas. Indeed, the Supreme Court has held, "It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee." *Red Lion Broad. Co., v. FCC*, 395 U.S. 367, 390 (1969).

In this case, the government's policy threatens to force hundreds of United States private organizations to present in public only one side of a complex and difficult issue, thus depriving listeners (and policy makers) of crucial information, research, and conclusions that might suggest different approaches to prostitution. The organizations so coerced are those in the front lines in the HIV/AIDS battle. They are the ones who see and hear daily the causes and the results of prostitution. They are the ones best situated to gather factual, instead of intuitive, information, assess it in light of their public and private sector experience, and offer analysis and conclusions. If such organizations are forced to have a policy "opposing prostitution," they may still gather that information, but they may not be able to share it or any conclusions they draw from it if they run the risk of being seen as not "opposing prostitution." Thus, the public debate about the

- 19 -

social and health issues arising from prostitution will be robbed of this valuable contribution.
*See* Declaration of Ruth Messinger, President of American Jewish World Service (attached as
Ex. 8) at ¶ 8 ("We often study the efficacy of our work and the work of partner organizations in
the field in order to determine what approaches work best at preventing HIV, so that we and
others can replicate those models. With the newly-mandated USAID policy outlined in AAPD
05-04, we would be constrained in the conclusions that we can reach."); Declaration of Jill
Sheffield, President of Family Care International (attached as Ex. 9) ¶ 9 (noting the USAID
policy is "eliminating the voices or organizations and individuals with the most meaningful
information, research, and conclusions from the public debate on the best ways to address the
health and social issues resulting in and stemming from prostitution.").

This violates the rights not only of the organizations themselves, but of the public at
large. As the Supreme Court observed: "It is the right of the public to receive suitable access to
social, political, esthetic, moral, and other ideas and experiences which is crucial here." *Red Lion
Broad.*, 395 U.S. at 390.

Nor can the government suggest that because reasonable people must "oppose
prostitution," there is no debate to be protected. First, it is not for the U.S. government to decide
what is appropriate for public debate. Second, despite its facial appeal, the notion that all people
of good will "oppose prostitution" is both simplistic and wrong. Indeed, the citizens of Nevada
have agreed that legal prostitution may be the best way to protect the public health of citizens in
their state. Nev. Rev. Stat § 201.354 (2003) and Nev. Rev. Stat. § 244.345 (2003). Moreover,
regardless of the morality of prostitution, it has existed since recorded history, and probably
before that. For this reason, many argue that if it will occur anyway, as history suggests, the
most sensible public policy is to provide for the safety and health of those involved in it, and to

- 20 -

ensure that violence and coercion play no role. *See* West, Jackie, Prostitution: Collectives and the Politics of Regulation, *Gender, Work and Organization,* Vol 7, No. 2, April 2000 (comparing how the U.K., Australia, the Netherlands, and New Zealand have chosen different approaches of prohibition, legalization, and decriminalization). If that is the goal, then trying to "eradicate prostitution," as Congress would like to do, or even to "oppose prostitution," as it is trying to coerce private organizations to do, may be not only futile, but counterproductive.

Of course, for First Amendment purposes, this Court need not determine who has the better of the debate—it need only ensure that the public's constitutional interest in full and fair debate by anyone who wants to contribute is vigorously protected. Indeed, as the Supreme Court has clearly articulated under another set of circumstances, the criterion of unconstitutionality is whether the government action threatens "to drive certain ideas or viewpoints from the marketplace." *National Endowment for Arts v. Finley*, 524 U.S. 569, 587 (1998). That is clearly what the government intends to do here - to the detriment of the NGO community and the public at large.

The public interest is also best served by governmental efficiency. The regulations requiring organizations to adopt a policy will lead to significant time spent within private organizations discussing how and whether they should adopt such a policy, and in discussion with USAID over whether particular policies meet the requirements. And, because grantees are required to certify that all subgrantees have policies opposing prostitution as well, they will spend time monitoring their subgrantees instead of putting those additional labor hours into services preventing or treating HIV/AIDS. In short, if the requirement is invalided in this lawsuit, a preliminary injunction will ensure that USAID as well as the private organizations will not have wasted their time and efforts on a useless endeavor.

## CONCLUSION

The USAID statutory and regulatory policy requiring private organizations to adopt the U.S. government's policy of "explicitly opposing prostitution" as a condition of being eligible for USAID HIV/AIDS funds violates the First Amendment and causes irreparable injury. Because a preliminary injunction will substantially help, not harm, other parties and the public interest, the Court should  preliminarily enjoin USAID from enforcing the statute or the regulation.

Respectfully submitted,
DKT INTERNATIONAL, INC.

By
One of Plaintiff's Attorneys

Julie M. Carpenter
   D.C. Bar No. 418768
Martina E. Vandenberg
   D.C. Bar No. 476685
JENNER & BLOCK LLP
601 13th Street, N.W.
Washington, DC  20005
(202) 639-6000

OF COUNSEL
David S. Udell*
Rebekah Diller*
Laura K. Abel*
Brennan Center for Justice at NYU School of Law
161 Ave. of the Americas
12th Floor
New York, NY  10013

* Not admitted in the District of Columbia

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 11 day of August 2005, a true and correct copy of the foregoing document was delivered via hand delivery to:

Daniel Van Horn
Office of the United States Attorney, Civil Division
501 3rd Street, NW
Washington, DC 20001

and by certified mail to:

Andrew S. Natsios
Administrator
U.S. Agency for International Development
1300 Pennsylvania Ave, NW
Room 6.09
Washington, DC 20523

John S. Gardner
Office of General Counsel
U.S. Agency for International Development
1300 Pennsylvania Ave, NW
Room 6.06
Washington, DC 20523

The Hon. Alberto R. Gonzales
Attorney General of the United States
Department of Justice
Room 4400
950 Pennsylvania Ave, NW
Washington, DC 20530-0001

Julie M. Carpenter