IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DKT INTERNATIONAL, INC.   )
             )
      **Plaintiff,**   )
             )
 **v.**           ) **Civil Action Case No.**
             )
             )
UNITED STATES AGENCY FOR  )
INTERNATIONAL DEVELOPMENT, )
*et al.*            )
             )
             )
      **Defendants.**  )
             )
             )

## <u>DECLARATION OF MAURICE I. MIDDLEBERG</u>

    1.  I currently serve as the Acting President of EngenderHealth.

EngenderHealth is a private, non-governmental, non-profit, non-sectarian organization whose

mission is to ensure that reproductive health services – including family planning, maternal

health and HIV/AIDS – are safe, available and sustainable in developing nations.

EngenderHealth currently has programs in nineteen developing countries.  In fulfilling its

mission, EngenderHealth provides technical assistance, training, and information to improve

services where resources are scarce.  Approximately 75 percent of its $49 million budget consists

of funds from the U.S. Agency for International Development (USAID), with the remainder from

private and multilateral sources (such as United Nations agencies).  EngenderHealth is a

1

membership organization, with approximately 10,000 individual members.

2.    I have been actively involved in global health issues, with a specialization in reproductive health, for almost 23 years, promoting access to essential health services in developing countries as an executive, manager, advocate, analyst, teacher and writer. My previous positions include Executive Vice President of EngenderHealth, Director of Health and Population for CARE USA, Visiting Assistant Professor of International Health at Emory University, Director of the Options for Population Policy Project, Population Program Coordinator for USAID/Niger and Senior Research Associate with The Futures Group. I have had assignments in 30 countries and published extensively in the field of reproductive health.

3.    In my capacity as Acting President and Executive Vice President of EngenderHealth, I have over-all responsibility for EngenderHealth's programs, including our HIV/AIDS program. EngenderHealth's HIV/AIDS program focuses on a broad spectrum of HIV prevention, care, and treatment strategies. EngenderHealth works with its overseas partners to introduce and improve management of sexually transmitted infections, voluntary HIV counseling and testing, prevention of mother-to-child transmission, infection prevention, HIV care and support, counseling of pregnant and postpartum women, and HIV prevention counseling. We facilitate communication between health providers and the communities they serve to ensure services are responsive to the needs, concerns and perceptions of clients. EngenderHealth also works with providers to overcome fears and biases that can result in stigma and discrimination, which can limit access to and quality of care for those who need it most. Underlying all of EngenderHealth's approaches is an emphasis on the rights and needs of all

clients, particularly those living with HIV/AIDS.

4.      Some of the projects in our organizational HIV/AIDS portfolio are funded in whole or in part by USAID.  Others are funded by private donors, the Global Fund to Fight AIDS, Tuberculosis and Malaria and agencies of the United Nations.

5.      Under the terms of USAID Acquisition and Assistance Policy Directive (AAPD) 05-04, EngenderHealth is required to certify that the organization has a policy "explicitly opposing prostitution and sex-trafficking" as a condition to receiving USAID funds, including funding for on-going projects.  This mandated policy will necessarily apply to the entire organization, irrespective of whether the source of funds for a particular project is the U.S. Government, a private donor or a multilateral institution.

6.      AAPD 05-04 was issued by USAID subsequent to a re-interpretation of Section 301(f) of the U.S. Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003, Pub. L. No. 108-25, by the Department of Justice, asserting that the provision applied to U.S. non-governmental organizations. (Exh. A).  EngenderHealth believes the Department of Justice erred in asserting that the provision can legally apply to U.S. organizations.  Accordingly, EngenderHealth's position is that there is no lawful basis for USAID issuing or seeking to enforce AAPD 05-04 and that USAID should be barred from so doing.

7.      On July 14, 2005, EngenderHealth received a letter from USAID demanding that we sign a certification stipulating that we were in compliance with AAPD 05-04

and that this certification be returned by fax "<u>as soon as possible</u>" (underlining appears in the original). (Exh. B).  EngenderHealth's receipt of $1.6 million to support an HIV/AIDS program in Kenya that strengthens prevention of maternal-to-child transmission of HIV and voluntary counseling and testing services was made conditional on signing the certification.

8.    On July 27, 2005, subsequent to the adoption of an organizational policy on prostitution and trafficking, I signed the certification.  The certification was transmitted to USAID with a cover letter expressing our concerns about the legality and programmatic impact of the certification requirement. (Exh. C). As set forth in the letter, EngenderHealth signed the newly required certification with great reluctance.

9.    The demand for an "explicit policy" is intended to regulate *speech*.  It goes beyond the Government's legitimate right to regulate the use of federal funds by dictating speech and the use of non-federal funds.  It compels affected organizations to stipulate and articulate a specific position ordained by the U.S. Government on a matter of public policy.  The effort by USAID to compel EngenderHealth to utter a specific opinion on a matter of public policy intrinsically abridges our right to free speech under the First Amendment to the Constitution of the United States.

10.    In a letter dated February 25, 2005, I joined the leaders of thirteen major health and humanitarian organizations in a letter to Mr. Randall Tobias, Coordinator of the U.S. Global AIDS Program, a program of the State Department, protesting the proposed implementation of what was to become AAPD 05-04.  In that letter, we pointed to both the

4

potential harm of the pending policy to our individual and collective mission, as well as to the dubious legality and constitutionality of the effort to compel speech. (Exh. D).

11.    On April 29, 2005, I joined with the leaders of other health and humanitarian organizations in meeting with Dr. Kent Hill, USAID Acting Assistant Administrator for Global Health, to express our opposition to the proposed anti-prostitution "loyalty oath".

12.    Reproductive health is an inherently controversial arena, encompassing abortion, contraception, sexually transmitted disease, emergency contraception, needle exchange, sexual violence, sex education, services for youth, services for the unmarried, patient rights, parental rights, health provider rights, spousal rights, maternal health, cervical cancer and many other tendentious topics.

13.    Cognizant of the wide diversity of cultures, legal systems and beliefs in the many countries in which we work, EngenderHealth is extremely circumspect in adopting public policy positions that may impede our ability to carry out our mission effectively.  When and if the organization chooses to adopt an organizational position on a matter of health policy, it is only after intensive study and extensive consultation that can last months or years. EngenderHealth would never adopt a policy on a highly controversial issue with the extraordinary and unseemly haste demanded by USAID, were it not for the coercion and compulsion of having funding for our life-saving HIV/AIDS programs being withheld.

14. Prostitution is an example, *par excellence*, of the controversies in the reproductive health field. For many activists and public health professionals, the very term prostitution is offensive and alternative terms, such as "sex work", are preferred. The U.S. Government's policy on prostitution as applied to other nations is highly controversial. For example, the U.S. position on prostitution has been the subject of a bitter controversy between Brazil and the United States. The Government of Brazil has returned a $40 million grant to the United States rather than accommodate U.S. policy and the Brazilian Ministry of Health has condemned U.S. policy in very harsh terms. (*see* Exh. E).

15. In Brazil, EngenderHealth has a project aimed at preventing maternal-to-child transmission of HIV/AIDS that is funded by the United Nations Population Fund. Absent the compulsion of AAPD 05-04, EngenderHealth would not have taken a position on the legal status of prostitution or issued a statement "explicitly opposing prostitution", as doing so may risk alienating our Brazilian hosts, our United Nations donor, or USAID. Countries in which EngenderHealth works have widely varying laws, regulations and *de facto* regimes governing "prostitution", from highly tolerant to harshly punitive. EngenderHealth does not wish to condone or condemn any particular approach at this time. Because controversy on the legal and *de facto* status of prostitution may erupt between the United States and other countries, EngenderHealth wishes to have the option of not expressing a position on this issue at this time.

16. EngenderHealth is fully cognizant of the serious physical and psychological risks associated with sex work and deplores the exploitation of people in all its forms, including trafficking. Nonetheless, EngenderHealth believes that USAID's application of

6

Section 301(f) to U.S. based organizations will be detrimental to the mission of EngenderHealth for the following reasons:

a. Section 301(f) of Pub. L. No. 108-25 demands a "policy explicitly opposing prostitution." However, Section 301(f) does not address the root causes of vulnerability that force or lead men and women into sex work. EngenderHealth is morally opposed to condemning the outcome of vulnerability without addressing its root causes. *Inter alia*, these root causes include the failure of nation-states to ratify and fully implement the relevant human rights and protections for women and children articulated in international conventions and agreements, including the Convention on the Elimination of Discrimination Against Women, the Convention on the Rights of the Child, the Programme of Action adopted at the Fourth World Conference on Women and the Programme of Action adopted at the 1994 International Conference on Population and Development. EngenderHealth's view is that a morally legitimate stance opposing sex work would necessarily entail a full exploration of the root causes of vulnerability, which may lead to a critique of the behaviors of certain nation-states, including the United States. The USAID demand that EngenderHealth sign the certification immediately precludes the necessary exploration of the relevant issues, nor is EngenderHealth prepared to engage in a full exploration and exposition of this complex subject. As a result, USAID is compelling EngenderHealth to articulate a position that we view as intellectually limited and morally suspect.

b.    The policy statement demanded by USAID is necessarily a public document. EngenderHealth is concerned that by issuing a public statement it will contribute to further stigmatizing sex workers. Stigmatizing people perceived as engaging in high risk behavior has been a major contributor to the spread of HIV/AIDS. Stigma has suppressed education and driven people away from services. Sex workers are a very difficult population to reach, precisely because they have been so widely stigmatized. The impact of issuing a policy statement opposing prostitution may be to ally EngenderHealth with the stigmatization of sex workers and their clients. This is not an appropriate posture for a public health organization like EngenderHealth. As a public health organization, our duty is to prevent, mitigate and treat risks to health. This requires adopting a non-judgmental posture with regard to our clients. USAID should not compel EngenderHealth to issue a statement that we believe will contribute to exacerbating stigma.

c.    Notwithstanding provisions in the legislation that make USAID funded services available on a non-discriminatory basis, EngenderHealth is concerned that implementation of AAPD 05-04 will have a harmful affect on the scope of programs. EngenderHealth supports a basic package of essential health services, without discrimination against sex workers. Based on long experience, EngenderHealth is highly concerned that USAID Missions, host governments, local organizations and our own staff will avoid developing or supporting innovative programs for sex workers that may be construed as inadequately "anti-prostitution", rather than risk losing USAID funding.

8

d.    AAPD 05-04 serves to chill, if not virtually preclude, legitimate

debate on the legal and health regimens governing sex work that most advance

public health.  Countries have experimented with a wide range of legal and

health approaches to sex work.  EngenderHealth's staff, as public health

professionals, have the right to objectively examine these various approaches,

to assess the evidence on their outcomes and to present recommendations

based on the evidence.   Public health professionals have the right, indeed

obligation, to then advocate for the legal and health strategies they believe

most advance public health.  The effect of AAPD 05-04 is to forbid the

debate. EngenderHealth takes no position as to the legal regimen governing

sex work that will most advance public health.  However, we assert the right

to review the evidence at a time of our own choosing and to draw our own

conclusions accordingly, without having the U.S. Government pre-determine

our opinions.  Section 301(f) and AAPD 05-04 require that our staff censor

themselves when making public statements and monitor the issuance of

written reports to ensure that all of these representations are sufficiently

"opposed to prostitution".


17. Section 301(f) and AAPD 05-04 are so vague that they render

EngenderHealth subject to quixotic, capricious and arbitrary denial of funding:

a.   Neither definition as to what would constitute an acceptable "explicit

policy" nor stipulation of the criteria against which USAID will assess

organizational policies are provided.  There is no specific guidance

9

from USAID that would help us understand their minimum requirement. It is therefore difficult to know what language or key words must be in the policy to pass USAID's implicit test. This imposes an unreasonable burden on EngenderHealth to guess as to what would constitute an acceptable policy statement.

b.   AAPD 05-04 requires that EngenderHealth impose the certification requirement on sub-grantees and sub-contractors. It will, in our understanding, be the responsibility of EngenderHealth to monitor sub-grantee and sub-contractor compliance with the certification. However, it is very unclear as to how we are to assess compliance, just as it is unclear as to how USAID will monitor EngenderHealth's compliance. Of particular concern is the implication that we are to monitor the policy statements, writings and speech of partner organizations. This poses an unreasonable burden on EngenderHealth.

c.   EngenderHealth is expected to "explicitly oppose" prostitution. Unfortunately, there is no commonly accepted definition of prostitution. No international convention, treaty or law defines the term. Because of the extreme diversity of cultural contexts and circumstances in which transactional sex occurs, it has proven impossible for diplomats and legal scholars to arrive at an agreement. In most countries, prostitution is not outlawed; rather, it is the ancillary activities such as pimping and soliciting that are illegal. EngenderHealth is being asked to oppose an act that remains

10

undefined as a matter of international law and whose definition varies

very widely in the countries in which we work.  Therefore, its

application and enforcement are inherently vague and create an

unreasonable burden.

18.    EngenderHealth has never had a policy on prostitution in the past.

EngenderHealth does not wish to adopt a policy on prostitution, and believes that it will be

harmful to our organization to do so for the reasons given above.  EngenderHealth would not

adopt such a policy, but for the fact that the U.S. Government has compelled us to do so to

continue to obtain USAID funds for our existing HIV/AIDS programs, as well as for new

programs.

19.    As to the legal status of prostitution that would most advance public

health and social welfare, EngenderHealth wishes to remain silent at this time.  For the reasons

given above, EngenderHealth will suffer material harm to the realization of its mission as a result

of adopting the policy statement required by USAID.  We believe it is illegal and improper for

USAID to compel EngenderHealth to express an organizational position on the issue.

EngenderHealth believes it has a Constitutionally-protected right to say nothing.

20.    AAPD 05-04 harms EngenderHealth's First Amendment rights by

imposing limits on our *private*, non-federally-funded speech and activities.  Because USAID has

compelled EngenderHealth to adopt a policy statement, we must ensure that work funded from

private or multilateral sources conforms to the new organizational mandate.  A principal virtue of

11

receiving private funds is that it permits EngenderHealth to engage in innovative, experimental

and potentially controversial programs, as well as to articulate positions on controversial issues,

unfettered by the constraints of federal funding.  EngenderHealth views its private funds,

especially unrestricted gifts, as qualitatively different than federal grants.  Private funds allow

EngenderHealth to implement programs or express views that the U.S. Government would not

support or may oppose.  AAPD 05-04 robs EngenderHealth of the possibility of lawfully using

private funds to carry out activities or express views with which the Government disagrees.

      21.    The enforcement of AAPD 05-04 contributes to a pervasive climate of

threat, fear and intimidation affecting organizations receiving USAID funds.  EngenderHealth

must protect itself against both governmental and non-governmental actors who may monitor the

speech and writings of EngenderHealth staff for language that is not adequately opposed to

prostitution.   EngenderHealth is in the position of policing its own staff and that of its sub-

grantees to ensure that nothing is said or written that may cast doubt on the sincerity of our

opposition to legalizing or de-criminalizing prostitution.

      22.    Section 301(f), as interpreted by the Department of Justice, and AAPD

05-04, create a highly threatening precedent.  If the U.S. Government's position is upheld, it will

have the right to demand that recipient organizations adopt policy statements on virtually any

issue.  Given the highly controversial nature of reproductive health, as described above, this will

inevitably lead to a Government-dictated ideology of reproductive health to which private

organizations must swear fealty as a condition of carrying out life-saving and humanitarian

programs, irrespective of the source of funds. This would fundamentally undermine

12

EngenderHealth's status as an independent, non-governmental organization.

23.    For all the reasons given above, AAPD 05-04 and the Department of Justice's wrongful application of Section 301(f) have caused and will cause EngenderHealth, its staff and its members serious harm.  We therefore support plaintiff's motion for a preliminary injunction.

Pursuant to 28 U.S.C. § 1746, I swear or affirm, under penalty of perjury, that the foregoing is true and accurate to the best of my knowledge.

New York, New York

DATED this 9 day of August, 2005

Maurice I. Middleberg
Acting President
EngenderHealth

# EXHIBIT A

**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the Assistant Attorney General        *Washington, D.C. 20530*

September 20, 2004

Honorable Alex M. Azar, II
General Counsel
Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

Re:    Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA") and United
        States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("AIDS
        Act")

Dear Alex:

I understand that earlier this year the Department of Health and Human Services (HHS) asked the Department of Justice (DOJ) whether HHS could implement certain provisions of the TVPRA and of the AIDS Act. At that time, I understand that DOJ gave its tentative advice that the so-called "organization restrictions" set forth in 22 U.S.C.A. § 7110(g)(2) and 22 U.S.C.A. § 7631(f) could, under the Constitution, be applied only to foreign organizations acting overseas.

We have reviewed the matter further and we are withdrawing that tentative advice. The statutes are clear on their face that the organization restrictions were intended by Congress to apply without the limitations identified in our earlier advice. We have consulted with the Civil Division and, in these circumstances, given that the provisions do not raise separation of powers concerns and that there are reasonable arguments to support their constitutionality,[1] we believe that HHS may implement these provisions.[2] If the provisions are challenged in court, the

---

[1] Although the constitutionality of organization restrictions is a complex question, when, as here, they are closely tailored to the purpose of the grant program, there are reasonable arguments to support their constitutionality. *See South Dakota v. Dole*, 480 U.S. 203, 206-08 (1987) (holding that the government may condition funds on the recipient's relinquishment of a right where the condition is directly related to the purpose for which the funds are expended); *American Communications Ass'n v. Douds*, 339 U.S. 382, 390-91 (1950) (upholding a government benefit tied to a restriction on the recipients' speech where the restriction "bears reasonable relation to the evil which the statute was designed to reach").

[2] Nothing in this letter should be construed to question the authority of the President to decline to enforce a statute he views as unconstitutional. *See generally* Memorandum Opinion for the Counsel to the President from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Presidential Authority to Decline to Execute Unconstitutional Statutes,* 18 Op. O.L.C. 200 (1994).

Department stands ready to defend their constitutionality, in accordance with its longstanding practice of defending congressional enactments under such circumstances.[3]

Please do not hesitate to contact me if you have any further questions. I apologize for any confusion or inconvenience caused by our earlier tentative advice.

Sincerely,

/s/

Daniel Levin
Acting Assistant Attorney General

---

[3] Consistent with that practice, any decision as to whether to appeal an adverse decision would be made by the Solicitor General.

# EXHIBIT B



**USAID**
FROM THE AMERICAN PEOPLE

Amy E. Pollack, M.D., M.P.H.                                          **July 14, 2005**
President
EngenderHealth
440 Ninth Avenue
New York, NY 10001

Subject:                    Modification No.: 11 to CA No.: GPO-A-00-03-00006-00
                            Access, Quality and Use in Reproductive Health (ACQUIRE).

Dear Ms. Pollack,

Enclosed, please find the modification No.: 11 of the subject Agreement which adds (i) incremental funding in an amount of $1,600,000 and (ii) a Certification containing required language from Acquisition & Assistance Policy Directive (AAPD) 05-04.

Please sign both the modification and the certification and <u>send by fax as soon as possible</u>, a copy of the signed modification and a copy of the signed certification to the fax indicated below. After sending these documents by fax, please send by mail, the original of the certification and two originals of the modification to the address below.

Your prompt assistance on the request above will be most appreciated.

Regards,

Ousmane Faye
USAID Office of Acquisition & Assistance
M/OAA/GH/POP, RRB 7.09-92
1300 Pennsylvania Avenue
Washington, D.C. 20523-7100
Phone: (202) 712-0832
Fax: (202) 216-3396
Email: ofaye@usaid.gov

# EXHIBIT C

# ENGENDERHEALTH
*Improving Women's Health Worldwide*

**60 YEARS**
1943–2003

*United Nations Population Award Laureate*

July 27, 2005

Mr. Ousmane Faye
USAID Office of Acquisition & Assistance
M/OAA/GP/POP, RRB 7.09-92
1300 Pennsylvania Avenue
Washington, DC 20523-7100

Dear Mr. Faye:

In response to your letter of July 14, 2005, please find attached the signed Modification No. 11 to the ACQUIRE Cooperative Agreement (CA No. GPO-A-00-03-00006-00). We have also signed and attached the newly required certification. Accordingly, we await prompt return of the modification signed by the Agreement Officer, Mr. Elia.

EngenderHealth is fully cognizant of the serious physical and psychological risks associated with sex work and we vigorously deplore exploitation in all its forms. EngenderHealth does not advocate for the legalization of sex work. Nonetheless, it is only with great reluctance that we agreed to sign the newly required certification on "Condoms" and "Prohibition on the Promotion or Advocacy of the Legalization or Practice of Prostitution or Sex Trafficking".

Notwithstanding our agreement to the certification, EngenderHealth asserts that there is no statutory requirement for the certification on the "Prohibition on Advocacy on Prostitution". Such certifications are disfavored by law under federal procurement contracts when not expressly required by statute and we believe that they should be equally disfavored under federal assistance awards. We also wish to express our deep concern about the legality of applying the certification requirement to U.S. non-governmental organizations. The U.S. voluntary sector's proud tradition of independence is undermined by such mandates, which cover both domestic and overseas conduct and non-federal as well as federal funding. Even more importantly, freedom of speech is a basic and precious right of all Americans. Government coercion of expression violates the First Amendment to the Constitution. We also believe that, on the merits, the requirement is antithetical to good programming, serving to inflame stigma, discourage services to vulnerable populations and chill discourse among health professionals.

Respectfully, we ask that application of the requirement to U.S. organizations be reconsidered and withdrawn as soon as possible.

Sincerely,

Maurice I. Middleberg
Acting President

**EngenderHealth** certifies compliance as applicable with the standard provisions entitled "Condoms" and "Prohibition on the Promotion or Advocacy of the Legalization or Practice of Prostitution or Sex Trafficking" included in the referenced agreement."

Certified by: _Wavwa T. Middeeny_          Date: _July 27, 2005_

# EXHIBIT D

February 25, 2005

The Honorable Randall Tobias
Global AIDS Coordinator
U.S. Department of State
Washington, D.C. 20520


Re:    United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003
       ("AIDS Act")

Dear Ambassador Tobias:

As longstanding partners with the U.S. Government in our efforts to address the global
HIV/AIDS crisis, support effective reproductive health services and fight global poverty, we are
writing to express our concern about the possible application of restrictions contained within the
AIDS Act to U.S. organizations.   We would like to meet with you next week, if possible, to
discuss our concerns with you in person before the potential implementation of these restrictions.

It is our understanding that on September 20, 2004, the Department of Justice's Office of Legal
Counsel sent a letter to the Department of Health and Human Services withdrawing its previous
advice that the "organization restrictions" set forth in the AIDS Act could, under the
Constitution, be applied *only* to foreign organizations acting overseas.  It has now come to our
attention that the Department of State, the U.S. Agency for International Development and other
agencies are currently exploring the possible application of the restrictions to U.S. organizations.
We continue to believe that these restrictions, applied to any organizations, foreign or domestic,
raise serious public health concerns, and the potential application to U.S. organizations continues
to raise Constitutional questions.  In particular, such application would negatively impact the
ability of our organizations to effectively respond to the HIV/AIDS epidemic.

We agree that prostitution poses serious health, psychological and physical risks for women,
men, and children. And, we also condemn the trafficking of people for sex or any other purpose.
Through our programs, we work to address both the risks of prostitution and its consequences,
including helping to provide an expanded range of livelihood choices for individuals attempting
to find alternatives.  Specifically, we seek to work with the U.S. Government in achieving our
mutual goal of reducing the number of HIV infections in AIDS-affected countries.  In order to
effectively engage in programs with these men, women and children, we know that we must
remain non-judgmental about their situation.

Our research and experience tells us that contributing to the stigmatizing of populations that are
at risk, infected, or affected by HIV/AIDS greatly undermines the success of AIDS prevention,
testing, and care efforts.  Our ability to remain neutral on the issue of prostitution enables us to

inform individuals that they are at risk, reduces barriers to testing and increases the likelihood of prevention and treatment.

We are also deeply concerned that compelling US organizations to adopt a specific policy applicable to the use of both public and private funds infringes upon our First Amendment rights. Several U.S. Administrations have recognized these rights, and the alteration of such a fundamental position of the U.S. Government deserves public discussion and debate.

We would like to meet with you next week to discuss these concerns, since we understand that the Administration is already in the process of considering a new position. We will be contacting your office to arrange a mutually agreeable time to meet.

Thank you for your consideration.

Sincerely,


Peter D. Bell
President
CARE

Maurice I. Middleberg
Executive Vice President
EngenderHealth

George Rupp
President
International Rescue Committee

Lucille Atkin
Director
Margaret Sanger Center International

Christopher J. Elias, MD, MPH
President
PATH

Donald D. Cohen
Managing Director for International
Development
Plan USA

Charles F. MacCormack
President & CEO
Save the Children

Yolonda C. Richardson
President
Centre for Development & Population Activities

Geeta Rao Gupta
President
International Center for Research on Women

Pape Gaye
President
IntraHealth International, Inc.

Neal Keny-Guyer
Chief Executive Officer
Mercy Corps

Daniel E. Pellegrom
President
Pathfinder International

Peter Donaldson
President
Population Council

# EXHIBIT E

STREET JOURNAL.

# Brazil Refuses U.S. AIDS Funds, Rejects Conditions

Brazil refused $40 million in American AIDS grants to protest the U.S. requirement that recipients first sign a pledge condemning prostitution.

Brazil's decision escalates a global fight over the moral strings President

*By Michael M. Phillips in Washington and Matt Moffett in Rio de Janeiro*

Bush and his conservative allies in Congress attach to foreign assistance, especially when it comes to sex, drugs and AIDS prevention in developing nations.

Brazil is seen by some as a model in the battle against the spread of AIDS, and Brazilian officials say that is in part because they deal in an accepting, open way with prostitutes, homosexual men, intravenous-drug users and other high-risk groups. The Brazilians say it would hobble their work if they complied with U.S. demands and forced groups that implement AIDS programs—including prostitutes' associations—to condemn prostitution.

"We can't control [the disease] with principles that are Manichean, theological, fundamentalist and Shiite," said Pedro Chequer, director of Brazil's AIDS program and chairman of the national commission that made the decision to

*Please Turn to Page A12, Column 5*

Brazil
Article

800 526 0649 | TIFFANY.COM

# ovation drives everything we do.

resigned last week amid an accounting inquiry at the company, which is controlled by an arm of J.P. Morgan Chase & Co. See adjoining article).

Since insurers pay the same for a scan no matter who files the bill, it might seem that imaging firms giving big discounts to doctors would be leaving a lot of money on the table. Why charge a doctor $350 for a scan when an insurer would reimburse you $700 for it? But locking in usage with a doctor group provides something that imaging centers want: volume.

Insurers, meanwhile, "rarely know anything about" the arrangements, says Cherrill Farnsworth, CEO of HealthHelp Inc., a Houston firm that helps insurers manage radiology benefits.

Helping to keep the practice hidden is the disinclination of all parties to talk about reimbursement levels, for competitive reasons. Insurers, for instance, don't want doctor groups and imaging centers to know that the insurer may be giving a better deal to some than to others—depending on how badly it needs them in its network. The insurers bargain with providers over reimbursement levels.

### Details of the Deal

The specifics of one imaging center's referral deal with doctors were spelled out in a contract filed with Massachusetts regulators. The agreement was between Alliance Imaging Inc. of Anaheim, Calif., and a 45-doctor group in North Dartmouth, Mass., called Hawthorn Medical Associates. Alliance put one of its MRI machines in one of the doctors' buildings. Alliance pays rent to the doctors for the space, and the doctors agree to send most MRI patients to that machine.

The doctors pay $245 to Alliance Imaging for each MRI they order and then bill insurers for it themselves. Hawthorn pays it also has other costs, such as $75 to $100 for a radiologist to interpret each scan, plus scanner supplies, maintenance and the salary of a part-time and full-time technician. Still, it appears the doctors in the Hawthorn group collect at least a couple of hundred dollars above their costs for each scan they prescribe.

For instance, Harvard Pilgrim Health Care Inc., a health-maintenance organization in the area, reimburses about $610 to $712 for each lower-back MRI, and $1,343 for an MRI brain scan. Hawthorn doctors, who are providers within this HMO's network, are reimbursed in line with the HMO's average, says Hawthorn's medical director, William Caplan.

Dr. Caplan said the medical practice makes money from its deal with Alliance Imaging, but "only a little bit—no one is getting rich off this." He also said that the lawyers had cleared the arrangement and that it doesn't lead to overuse of scans. He rejected the idea that "doctors run up utilization to make money." Harvard Pilgrim declined to comment.

Alliance Imaging says its contracts with doctors represent a small slice of its business and are entered into cautiously. "Every single deal like this is reviewed" by outside and internal lawyers, said the company's chief executive, Paul Viviano. "They bless them before we begin dreaming of such a relationship. They view this as in compliance" with referral laws.

A company called Integrated Diagnostic Centers Inc. says it has signed more than 1,000 doctors to lease deals for its six scanning centers in Texas, Colorado and Nevada. This firm permits doctors to bill insurers directly only in the case of non-Medicare patients, to avoid running afoul of the federal law barring payment for referrals, said its CEO, John Allen.

In addition, instead of paying a price per scan, the doctors book a set number of hours on a scanner per week, which they must pay for even if they don't send enough patients. This arrangement adds an element of risk that helps make sure there is no violation of anti-kickback laws, Mr. Allen said.

He estimated that doctors who use all of the scanner time they book net about $150 to $200 per patient. He said he doesn't see physicians ordering extra scans after they sign a lease deal.

On IDC's Web site, Las Vegas orthopedist John Thalgott, whose practice has a contract with the imaging center, calls the financial arrangement a "win-win." Dr. Thalgott says in an interview that profits from imaging represent less than 5% of his income.

Matthew J. McMahon, a Las Vegas cardiologist, says his practice also has a contract with IDC. In an interview, Dr. McMahon says the "benefit to the business is plain and simple: it is an economic advantage. Medical imaging is profitable. This is another revenue stream."

# Brazil Refuses U.S. AIDS Funds

*Continued From Page A3*

*Continued From Page A3*

turn down further U.S. money as long as the antiprostitution pledge requirement remains in place. He said the commission members, including cabinet ministers, scientists, church representatives and outside activists, viewed U.S. demands as "interference that harms the Brazilian policy regarding diversity, ethical principles and human rights."

Brazil appears to be the first major recipient nation to take such a definitive stand against U.S. efforts to link billions of dollars in foreign aid to conservative responses to social ills. Some Republican lawmakers in Washington are pressing to cut off federal grants to those who don't support the president's views promoting sexual abstinence, condemning prostitution and opposing clean-needle exchanges for drug-users. Meanwhile, the White House has steered more federal money to groups that bring a religious orientation to overseas health programs.

"Obviously, Brazil has the right to act however it chooses in this regard," said Sen. Sam Brownback (R., Kan.), one of the leaders of the conservative cause on Capitol Hill. He said he hoped the money would be redirected to countries whose AIDS policies are more in line with those of the Bush administration and the Republican-controlled Congress. "We're talking about promotion of prostitution, which the majority of both the House and the Senate believe is harmful to women," he said.

Last week, Brazilian authorities wrote the U.S. Agency for International Development, one of the main distributors of official American aid, explaining the decision to reject the remainder of the grant, which began in 2003 and was to run through 2008 for a total of $48 million.

The American money was a small part of Brazil's overall anti-AIDS push. About 90% of Brazil's total funding for AIDS programs comes from its own revenue, with 7% or 8% coming from the World Bank and the rest from the U.S. and other governments. Dr. Chequer said the Brazilian government would increase its funding to make up for the lost U.S. funds.

USAID spokeswoman Roslyn Matthews said yesterday the agency is still reviewing the Brazilian decision. "This is an evolving situation," she said. "We are in the process of determining next steps."

Prostitution isn't a crime in Brazil, and prostitutes' associations are among the most active groups engaged in anti-AIDS work. The U.S. money was to have included $190,000 for eight prostitutes' groups around Brazil, according to Gabriela Leite, coordinator of the Brazilian Network of Sex Professionals and a former prostitute. Ms. Leite said she participated in lengthy discussions with USAID to ensure that American money went only to AIDS education and prevention, and not to other prostitutes' rights issues. The result was a 50-page agreement, she said, but it broke down because her group was unwilling to condemn prostitution.

Brazil's approach to the AIDS epidemic is considered a model by some scientists and public-health specialists. The government encourages abstinence and sexual fidelity, but its prevention efforts focus more on condom education and distribution. In addition, since 1996 the country has provided free, life-extending antiretroviral drug cocktails to anyone infected with HIV.

The result is a spread of HIV far less serious than had been feared. In 1992, experts forecast 1.2 million Brazilians would carry the AIDS virus by 2002. Instead, there were an estimated 660,000 cases. World-wide almost 40 million people are thought to be infected with HIV.

"Why should we adopt a different orientation if we have been successful for the more than 10 years?" asked Sonia Corrêa, a Brazilian AIDS activist and co-chair of the International Working Group on Sexuality and Social Policy, a global forum of researchers and activists.

The antiprostitution pledge requirement came out of two 2003 U.S. laws, one dealing with AIDS and the other with forced prostitution or sex trafficking.