# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DKT, INTERNATIONAL, INC.,      )
                                    )
      Plaintiff,            )
                                    )
        v.             )      Civil Action No. 05-01604
                                    )
UNITED STATES AGENCY FOR   )
INTERNATIONAL DEVELOPMENT  )
and ANDREW S. NATSIOS, in his   )
Official Capacity as ADMINISTRATOR, )
UNITED STATES AGENCY FOR   )
INTERNATIONAL DEVELOPMENT,  )
                                    )
      Defendants.         )
_____)

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION
## FOR PRELIMINARY INJUNCTION

## INTRODUCTION

The United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Leadership Act"), Pub. L. No. 108-25, 117 Stat. 711, codified at 22 U.S.C. § 7601-7682, creates a $15 billion program dedicated to the worldwide fight against HIV/AIDS, which has infected more than 65 million people since the pandemic began. The Leadership Act specifically notes that women and children in developing countries are at high risk of contracting HIV/AIDS, and identifies prostitution and sex trafficking as "factors in and causes of" the spread of HIV/AIDS. 22 U.S.C. § 7601(23). The Leadership Act establishes that it is a "priority" of Congress's comprehensive anti-HIV/AIDS program, 22 U.S.C. § 7611(a)(4), as well as the "policy of the United States," 22 U.S.C. § 7601(23), to "eradicate" prostitution and other forms of sexual victimization that contribute to the spread of HIV/AIDS, practices which Congress found to be "degrading to women and children," <u>id.</u>

In keeping with these policy and priority determinations by Congress, the Leadership Act imposes two relevant limitations on the distribution of $15 billion in U.S. funds for the purposes of preventing, treating, and monitoring HIV/AIDS worldwide. First, the Act provides that "[n]o funds made available to carry out this Act or any amendment made by this Act, may be used to promote or advocate the legalization or practice of prostitution or sex trafficking." 22 U.S.C. § 7631(e) (hereinafter, the "funding restriction"). Second, the Act provides that "[n]o funds made available to carry out this Act, or any amendment made by this Act, may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f) (hereinafter, the "organizational eligibility restriction"). These provisions have been implemented by the United States Agency for International Development ("USAID"), which is one of the Agencies responsible for carrying out the terms of the Leadership Act, in an implementing directive, USAID Acquisition and Assistance Policy Directive 05-04 ("AAPD 05-04"), issued June 9, 2005.

Plaintiff, DKT International, Inc., a private, non-governmental, U.S. organization which, in the past, has received USAID funding for HIV/AIDS prevention activities abroad, challenges the constitutionality of the Leadership Act and USAID's 2005 implementing directive. For purposes of its pending motion for preliminary injunctive relief, plaintiff argues that the Leadership Act's organizational eligibility restriction impermissibly infringes plaintiff's rights by compelling it to adopt the federal government's policy in order to be eligible for federal funding.[1] Thus, plaintiff argues, this restriction is unconstitutional because it infringes plaintiff's First Amendment right to adopt a different policy or "not to speak" at all on the basis of impermissible viewpoint-

---

[1] Although plaintiff's Complaint challenges both funding conditions imposed by the Leadership Act, its application for preliminary injunction is founded only upon its claim of unconstitutionally as to the second. See Pls' Mem. at 12 n.2.

discrimination and without being narrowly tailored to further a compelling government interest. Plaintiff also contends that the organizational eligibility restriction, as implemented by USAID, imposes an unconstitutional condition on plaintiff because requiring plaintiff to certify that it has a policy "opposing prostitution and sex trafficking" effectively precludes plaintiff from engaging in activities inconsistent with that policy with funds derived from sources other than the federal government. Finally, plaintiff contends that both limitations included in the Leadership Act exceed the scope of Congress's power, are unwise on policy grounds, and are impermissibly vague. On the basis of these claims, plaintiff seeks preliminary injunctive relief aimed at preventing USAID from enforcing the organizational eligibility restriction pending the resolution of plaintiff's claims.

   Plaintiff's arguments are insufficient to support its request for preliminary injunctive relief. First, plaintiff incorrectly asserts that the provisions of the Leadership Act are subject to strict scrutiny under the First Amendment. As case after case has held, conditions attached to subsidies granted by Congress do not directly restrain speech and, thus, do not directly implicate the First Amendment. Instead, it is well established that Congress has greater leeway to attach conditions to its spending than it has when it regulates directly, and that the Spending Clause provides the proper framework in which to evaluate such conditions. See, e.g., Regan v. Taxation with Representation, 461 U.S. 540 (1983); South Dakota v. Dole, 483 U.S. 203 (1987); Nat'l Endowment for the Arts v. Finley, 524 U.S. 569 (1998); Rust v. Sullivan, 500 U.S. 173 (1991); DKT Memorial Fund v. Agency for Int'l Development, 887 F.2d 275 (D.C. Cir. 1989). Under the Leadership Act, as in all enactments pursuant to Congress's spending power, any organization is free to make any statement or adopt any policy that the First Amendment contemplates, free from government interference. Organizations, however, have neither an entitlement nor a right to do so with government funds. They most certainly do not have the right to obtain government funds while maintaining a policy at

odds with the very purpose for which those funds were appropriated.

Second, plaintiff's argument that the organizational eligibility restriction imposes an unconstitutional condition also fails.  Plaintiff's argument relies entirely upon speculation relating to dicta in cases such as <u>Rust v. Sullivan</u>, <u>supra</u>, a case which <u>upheld</u> the only restriction before it. When creating a federal spending program, Congress has the power to ensure that its program is not undermined by the private entities with which it partners to carry out that program.  That is, Congress may insist that its private partners are qualified to carry out its mission, whether by naming the organizations it deems qualified or, as here, by describing them in more general terms.  The Leadership Act identifies the eradication of prostitution as not only a goal necessary to any successful international strategy aimed at fighting HIV/AIDS, but also as a priority of that effort. Thus, Congress may require that its private-sector partners share its goals and priorities.  It may impose conditions designed to guarantee that the overarching policy goals of the United States – and not the individual agendas of each federal grant recipient – are the ones advanced by the program. The Leadership Act does no more than take such legitimate and appropriate steps to protect the integrity of Congress's comprehensive anti-HIV/AIDS program and, thus, is constitutional.

Because plaintiff's constitutional claims are without merit, and because plaintiff fails to demonstrate either irreparable harm or that the public interest favors the entry of injunctive relief, plaintiff's request that this Court exercise its equitable power to take the extraordinary step of enjoining the operation of an Act of Congress must be denied.

## BACKGROUND

### A.    The 2003 Leadership Act.

In May 2003, Congress enacted the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003 ("Leadership Act"), Pub. L. No. 108-25, 117 Stat. 711

(attached as Ex. A), codified at 22 U.S.C. § 7601-7682, as part of the President's "emergency effort [to] provide $15 billion over the next 5 years to fight AIDS abroad."  Remarks on Signing the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003, 39 Weekly Comp. Pres. Docs. 663 (May 27, 2003) (attached as Ex. B).  The $15 billion commitment reflected in the Leadership Act constitutes "the largest, single upfront commitment in history for an international public health initiative involving a specific disease."  Id.  As the President explained, "[t]his Act of Congress addresses one of the most urgent needs of the modern world.  Because of the AIDS pandemic, a child born today in sub-Sahara Africa has a life expectancy of 47 years.  This disease falls most heavily on women and children.  Nearly 60 percent of those infected by HIV in sub-Sahara Africa are women.  Three million African children under 15 have the AIDS virus – 3 million.  And the disease has left 11 million orphans, more children than live in the entire state of California."  Id.

The Leadership Act is a "massive undertaking" that creates a "comprehensive program that has the potential in this decade to prevent 7 million new HIV infections, provide life-extending drugs to at least 2 million infected people, [and] give humane care to 10 million HIV sufferers and AIDS orphans."  Remarks on Signing, at 665.  Specifically, the Leadership Act authorizes the President "to furnish assistance, on such terms and conditions as the President may determine, for HIV/AIDS, including to prevent, treat, and monitor HIV/AIDS, and carry out related activities, in the countries in sub-Saharan Africa, the Caribbean, and other countries and areas."  § 22 U.S.C. § 7631 (amending the Foreign Assistance Act, 22 U.S.C. § 2151b-2); see also 22 U.S. § 2151b-2(d) (describing the activities supported).  The Leadership Act similarly authorizes the President to "furnish assistance, on such terms and conditions as the President may determine, for the prevention, treatment, control and elimination of" tuberculosis, see 22 U.S.C. § 2151b-3, and malaria, see 22 U.S.C. § 2151b-4.  For these purposes, the Leadership Act authorizes an appropriation of a total of $15 billion, $3

billion for each of the fiscal years 2004 through 2008.  22 U.S.C. § 7671.

In enacting the Leadership Act, Congress found that HIV/AIDS "has assumed pandemic proportions," and that more than 65 million people worldwide have been infected with HIV since the epidemic began.  22 U.S.C. § 7601(1) & (2).  Congress further found that "[w]omen are four times more vulnerable to infection than are men and are becoming infected at increasingly high rates, in part because many societies do not provide poor women and young girls with the social, legal, and cultural protections against high risk activities that expose them to HIV/AIDS."  22 U.S.C. § 7601(4).  Congress determined that "[s]uccessful strategies to stem the spread of the HIV/AIDS pandemic will require . . . measures to address the social and behavioral causes of the problem."  22 U.S.C. § 7601(15); see also id. § 7601(20)(D) ("behavior change . . . is a very successful way to prevent the spread of AIDS").  Specifically focusing on high-risk behaviors, Congress found that:

> Prostitution and other sexual victimization are degrading to women and children and it should be the policy of the United States to eradicate such practices.  The sex industry, the trafficking of individuals into such industry, and sexual violence are additional causes of and factors in the spread of the HIV/AIDS epidemic. . . . Victims of coercive sexual encounters do not get to make choices about their sexual activities.

22 U.S.C. § 7601(23); see also H.R. Rep. No. 108-60, at 33-34 (2003) ("prostitution, sex trafficking and sexual violence are additional causes and factors in the spread of HIV/AIDS").

It was Congress's considered view that "the magnitude and scope of the HIV/AIDS crisis demands a comprehensive, long-term, international response focused upon addressing the causes, reducing the spread, and ameliorating the consequences of the HIV/AIDS pandemic."  22 U.S.C. § 7601(21).  Congress determined that a critical element of this comprehensive plan was to "increase the participation of at-risk populations in programs designed to encourage behavioral and social change," id. § 7601(21)(C), and that a focus of United States international leadership on halting the spread of HIV/AIDS and eliminating the behaviors that contribute to its spread would be to

"promot[e] healthy lifestyles, including abstinence, delaying sexual debut, monogamy, marriage, faithfulness, use of condoms, and avoiding substance abuse." 22 U.S.C. § 7601(22)(E); accord H. Rep. 108-60 (noting that the bill "stresses the importance of behavior change . . . as the foundation of efforts to fight HIV/AIDS").

Thus, the Leadership Act "endorses a multisectoral approach to fighting AIDS," H. Rep. No. 108-60, at 23, and requires "establishing a comprehensive, integrated five-year, global strategy to fight HIV/AIDS . . . ." 22 U.S.C. § 7602(1). A key element of this comprehensive strategy is to "provide that the reduction of HIV/AIDS behavioral risks shall be a priority of all prevention efforts in terms of funding, educational messages, and activities by promoting abstinence from sexual activity and substance abuse, encouraging monogamy and faithfulness, promoting the effective use of condoms, and eradicating prostitution, the sex trade, rape, sexual assault and sexual exploitation of women and children." 22 U.S.C. § 7611(a)(4).

Congress's conclusion that prostitution and sex trafficking are "causes of and factors in the spread of the HIV/AIDS epidemic," 22 U.S.C. § 7601(23), and that eradication of these practices was a necessary element of any comprehensive plan to fight HIV/AIDS, was supported by the testimony Congress heard in the course of considering both the Leadership Act and the Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875 (December 2003), which amended the Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 (October 2000). Thus, for example, the Senate heard from the Honorable Frank E. Loy, then the Undersecretary of State for Global Affairs, who testified that "Individuals trafficked into the sex industry are coerced by their criminal captors to engage in activities that will expose them to deadly diseases, including HIV and AIDS. We understand that of the thousands of women and girls trafficked from Nepal annually – many of whom are in their early teens or younger – of the few

hundred who may escape – more than 65 percent are HIV positive." <u>International Trafficking in Women and Children</u>, Hearings before the Subcommittee on Near Eastern and South Asian Affairs of the Comm. on Foreign Relations, United States Senate, S. Hrg. 106-705 (February 22, 2000 & April 4, 2000); <u>see also id.</u> at 13 ("Thousands of women and children are trafficked annually from Nepal and Bangladesh to the brothels in India and Pakistan.  Many are now HIV positive").

Congress also heard from Dr. Donna M. Hughes, Professor and Carlson Endowed Chair in Women's Studies, University of Rhode Island, Kingston, RI, who testified that "[w]omen and children who are trafficked are at high risk for infection for HIV which is a death sentence for victims.  Brothels and other sites for women and children who are used in prostitution are markets for the distribution of the AIDS virus." <u>Trafficking in Women & Children in East Asia and Beyond: A Review of U.S. Policy</u>, Hearing before the Subcommittee on East Asian and Pacific Affairs of the Comm. on Foreign Relations, United States Senate, S. Hrg. 108-105 (April 9, 2003), at 18.

Gary Haugen, President and CEO, International Justice Mission, Washington, DC, agreed: "Federal funding of programs aimed at combating the international AIDS epidemic must include support of programs to combat sex trafficking and other forms of sexual violence against women and girls, or else our effort to fight AIDS will simply fail to address one of the most fundamental and certainly most brutal causes of the epidemic. . . . You could fill this hearing room with the children today who are passing away painfully because of the AIDS virus that was forcibly infected on them in brothels." <u>Id.</u> at 29; <u>see also id.</u> at 41 ("I don't think anybody doubts that there's a tremendous nexus between prostitution and the spread of AIDS").

In one hearing, Senator Sam Brownback of Kansas provided statistics regarding the connection between prostitution and the spread of sexually transmitted diseases, including HIV/AIDS:

> 50 to 70 percent of the Burmese prostitutes in Thailand are HIV-positive. The rate of HIV infection is 50 percent or higher among female prostitutes in Northern Thailand, 40 to 50 percent of the prostitutes in Cambodia are HIV positive, 60 percent of women prostitutes in Bombay's red light district are infected with STDs or AIDS. In 1991, Bombay's 100,000 prostitutes averaged 600,000 sexual contacts a day, and at that time 30 percent were HIV positive. . . .
>
> You can see that the spread of HIV associated with prostitution is just a clear, huge problem for us . . . ."

S. Hrg. 108-105, at 18. Senator Brownback also spoke eloquently of his own experience meeting with "young girls from Nepal that were trafficked to India, most of them 11, 12, 13 years old when they were tricked out of their Nepalese villages and moved into Bombay, into the brothel district. When I met them, they were returning to Nepal . . . at an aftercare facility. And . . . two-thirds were coming back with AIDS and/or tuberculosis at 17-18 years of age, coming home to die. It was just one of the most awful things I had seen anywhere in the world." S. Hrg. 106-705, at 93.

Congress's enactment of the Leadership Act was also guided by the National Security Presidential Directive relating to trafficking in persons. See Press Release, Trafficking in Persons National Security Presidential Directive, Feb. 25, 2003, attached as Ex. C.[2] The President's directive explains that "trafficking in persons refers to actions, often including the use of force, fraud, or coercion, to compel someone into a situation in which he or she will be exploited for sexual purposes, which could include prostitution or pornography, or for labor without compensation. . . ." Id. The President determined that "[p]rostitution and related activities, which are inherently harmful and dehumanizing, contribute to the phenomenon of trafficking in persons, as does sex tourism, which is an estimated $1 billion per year business worldwide." Id. Like Congress, the President deplored the "exposure of trafficked people to abuse, deprivation and disease, including HIV," and committed the United States to a policy of eradicating such practices. Id.

_____

[2] The text of the National Security Presidential Directive is classified.

In light of the clear evidence connecting prostitution, sex trafficking and the spread of HIV/AIDS, and given Congress's policy goal of prioritizing behavior change and, specifically, the eradication of prostitution and other sexual victimization, as part of its fight against the disease, see 22 U.S.C. §§ 7601(23), 7611(a)(4), the Leadership Act imposes two limitations on the $15 billion program it created to prevent, treat, and monitor HIV/AIDS. First, the Act provides that "[n]o funds made available to carry out this Act or any amendment made by this Act, may be used to promote or advocate the legalization or practice of prostitution or sex trafficking." 22 U.S.C. § 7631(e) (the "funding restriction"). Second, the Act provides that "[n]o funds made available to carry out this Act , or any amendment made by this Act, may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f) (the "organizational eligibility restriction").

**B.      Implementation of the Leadership Act.**

Under the Foreign Assistance Act, 22 U.S.C. § 2151 et seq., which is amended and supplemented by the Leadership Act, USAID is authorized to award grants, cooperative agreements, contracts, and other agreements. Contracts are awarded only when the principal purpose of the agreement is the "acquisition of property or services for the direct benefit or use of the Federal Government." 22 C.F.R. § 226.11. Otherwise, where the principal purpose of the transaction is to "accomplish a public purpose of support or stimulation authorized by Federal statute," USAID proceeds by way of grant or cooperative agreement as authorized by the Federal Grant and Cooperative Agreement Act, 31 U.S.C. § 6301-08. See 22 C.F.R. § 622.11. In particular, cooperative agreements are used where "substantial involvement is expected between the executive agency and the . . . recipient when carrying out the activity contemplated in the agreement." Id.

In order to implement the Leadership Act, on June 9, 2005, USAID issued Acquisition and

Assistance Policy Directive ("AAPD") 05-04, attached as Ex. D. AAPD 05-04 requires, among

other things, that HIV/AIDS grants and cooperative agreements include a standard provision, entitled

"Prohibition on the Promotion or Advocacy of the Legalization or Practice of Prostitution or Sex

Trafficking," which requires that recipients of anti-HIV/AIDS funds must have a policy explicitly

opposing prostitution and sex trafficking. Specifically, AAPD 05-04 requires that the following

language be "included as part of the Standard Provisions of any grant or cooperative agreement or

subagreement funded with FY04-FY08 HIV/AIDS funds with a U.S. nongovernmental organization,

non-U.S., non-governmental organization or public international organizations":

> "PROHIBITION ON THE PROMOTION OR ADVOCACY OF THE LEGALIZATION OR PRACTICE OF PROSTITUTION OR SEX TRAFFICKING (ASSISTANCE) (JUNE 2005)
>
> (a) The U.S. Government is opposed to prostitution and related activities, which are inherently harmful and dehumanizing, and contribute to the phenomenon of trafficking in persons. None of the funds made available under this agreement may be used to promote or advocate the legalization or practice of prostitution or sex trafficking. Nothing in the preceding sentence shall be construed to preclude the provision to individuals of palliative care, treatment, or post-exposure pharmaceutical prophylaxis, and necessary pharmaceuticals and commodities, including test kits, condoms, and, when proven effective, microbicides.
>
> (b) Except as noted in the second sentence of this paragraph, as a condition of entering into this agreement or any subagreement, a non-governmental organization or public international organization recipient/subrecipient must have a policy explicitly opposing prostitution and sex trafficking. The following organizations are exempt from this paragraph: the Global Fund to Fight AIDS, Tuberculosis and Malaria; the World Health Organization; the International AIDS Vaccine Initiative; and any United Nations agency.
>
> (c) The following definition applies for purposes of this provision:
>
> Sex trafficking means the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act. 22 U.S.C. 7102(9).
>
> (d) The recipient shall insert this provision, which is a standard provision, in all subagreements.
>
> (e) This provision includes express terms and conditions of the agreement and any

violation of it shall be grounds for unilateral termination of the agreement by USAID prior to the end of its term.

(End of Provision)

AAPD 05-04 at 5.  AAPD 05-04 further provides that all prime recipients of FY04-FY08 HIV/AIDS funds must "provide to the Agreement Officer a certification substantially as follows":

> [Recipient's name] certifies compliance as applicable with the Standard Provision[] entitled . . . "Prohibition on the Promotion or Advocacy of the Legalization or Practice of Prostitution or Sex Trafficking" included in the referenced agreement.

AAPD 05-04 at 6.

### C.    Plaintiff's Complaint and Application for Preliminary Injunction.

On August 11, 2005, plaintiff DKT International, Inc. ("DKT" or "plaintiff"), a not-for-profit U.S. corporation involved in family planning and HIV/AIDS prevention programming overseas and a past recipient of USAID funding, filed the instant complaint challenging the Leadership Act and USAID's implementing directive as facially unconstitutional.  Plaintiff alleges that it was negotiating funding for a condom lubricant marketing proposal in Vietnam with Family Health International ("FHI"), a USAID grantee that is not a party here but that is authorized to make subawards of USAID funds, albeit subject to USAID approval, under its cooperative agreement with USAID.[3] Compl. ¶¶ 13, 14.  Plaintiff further alleges that in the course of negotiations with FHI, it was informed that it would be required to certify that "DKT International . . . has a policy explicitly opposing prostitution and sex trafficking."  Id. ¶ 16.  Plaintiff refused to execute the certification. Id. ¶ 18.  Subsequently, plaintiff was informed by FHI "it will not be possible for FHI to fund DKT to carry out this work."  Id. ¶ 21.

---

[3]  USAID's cooperative agreement with FHI is attached as Ex. E.  It has been redacted to eliminate FHI's proprietary information (such as information regarding the program description, budget and costs); irrelevant agreement modifications and other attachments have also been omitted.

Plaintiff asserts that "it has no policy on prostitution and does not wish to adopt one." Compl. ¶ 23. It further claims that "as a result of" the Leadership Act and "the USAID requirement, DKT has been penalized for exercising its First Amendment right not to speak by losing the already-agreed-upon funding of $60,000 for the condom-lubricant proposal in Vietnam," Compl. ¶ 25, and that it "has also been penalized for exercising its First Amendment right not to speak by being excluded from eligibility for all future USAID grants."     Id. ¶ 26. Plaintiff also alleges that the funding conditions are vague, Compl. ¶¶ 27, 28, and that agreeing to the conditions "would restrict DKT International's ability to carry out programs funded entirely by non-U.S. government donors, including private, governmental and international organizations." Compl. ¶ 29.[4]

Based on these allegations, DKT seeks both preliminary and permanent injunctive relief. Plaintiff asks the Court for a preliminary order enjoining USAID from enforcing the provisions of the Leadership Act that "require private organizations to certify that they have a policy explicitly opposing prostitution to be eligible for USAID funding." Proposed Preliminary Injunction Order attached to Pls' App. for Preliminary Injunction. Plaintiff also seeks an order requiring USAID to instruct FHI that it is authorized to provide USAID funds to DKT "without requiring it to certify that it has a policy explicitly opposing prostitution." Id. Plaintiff also seeks permanent relief in the form of: (1) a declaration that the funding conditions of the Leadership Act are unconstitutional "to the

---

[4] For purposes of the specific funding proposal upon which plaintiff's Complaint is grounded, plaintiff is not a direct recipient of USAID funds but rather sought funding in the form of a subaward from a direct recipient, FHI, with whom USAID has a cooperative agreement. FHI is not a party to this case. The role of FHI raises questions concerning ripeness, standing, causation and traceability with respect to plaintiff's as applied claims and claims under the Administrative Procedure Act, 5 U.S.C. § 551 et seq. See, e.g. FHI Cooperative Agreement, Ex. E, at 53 (p. 9 of 19 of 2002 modification) (providing that "Subrecipients, subawardees, and contractors have no relationship with USAID under the terms of this agreement. All required USAID approvals must be directed through the recipient to USAID"). These questions are not addressed for purposes of responding to plaintiff's application for preliminary injunction, but USAID reserves the right to raise these issues in any subsequent proceedings.

extent they require U.S. organizations to have a policy explicitly opposing prostitution"; (2) a declaration that USAID's implementing directive is similarly unconstitutional; (3) a permanent injunction prohibiting USAID from enforcing these provisions; (4) an order requiring USAID to instruct FHI that it authorizes the disbursement of the $60,000 grant; and (5) other appropriate relief. Requests for Relief, Compl.

## ARGUMENT

Preliminary injunctive relief such as that demanded by plaintiff is "an extraordinary measure, and . . . the power to issue such exceptional relief 'should be sparingly exercised.'" Experience Works, Inc. v. Chao, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) (quoting Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969)) (internal quotes omitted); accord Boivin v. US Airways, Inc., 297 F. Supp. 2d 110 (D.D.C. 2003) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion" (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam)) (emphasis in original). "[I]n considering a plaintiff's request for a preliminary injunction a court must weigh four factors: (1) whether the plaintiff has a substantial likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury were an injunction not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest." Al-Fayed v. CIA, 254 F.3d 300, 303 (D.C. Cir. 2001); accord Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).

When contemplating a preliminary injunction enjoining the operation of a duly enacted Act of Congress, moreover, the Court is considering "in reality a suspension of an act, delaying the date selected by Congress to put its chosen policies into effect. Thus judicial power to stay an act of Congress, like judicial power to hold that act unconstitutional, is an awesome responsibility calling

for the utmost circumspection in its exercise." Turner Broadcasting System, Inc. v. F.C.C., 507 U.S. 1301, 1301 (1993) (Rehnquist, J., in chambers) (quoting Heart of Atlanta Motel, Inc. v. United States, 85 S. Ct. 1, 2 (1964) (Black, J., in chambers)); see also Rust v. Sullivan, 500 U.S. 173, 191 (1991) ("a decision to declare an Act of Congress unconstitutional 'is the gravest and most delicate duty that [a] Court is called upon to perform'") (quoting Blodgett v. Holden, 275 U.S. 142, 148 (1927). Acts of Congress are presumptively constitutional, Bowen v. Kendrick, 487 U.S. 589, 617 (1988), and facial invalidation of an Act of Congress "is, manifestly, strong medicine" that "has been employed by the Court sparingly and only as a last resort." Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973)).

As fully described herein, plaintiff fails to satisfy the prerequisites for preliminary relief.

## I.  PLAINTIFF FAILS TO DEMONSTRATE ANY LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.  The Leadership Act is a Spending Clause Enactment and is Not Subject to Strict Scrutiny Under the First Amendment.

The Leadership Act does not impose a direct restraint on speech.  Moreover, contrary to plaintiff's allegation, the Leadership Act does not compel the adoption of any particular policy. Plaintiff is free, at its pleasure, to adopt any policy it likes, or no policy at all, consistent with the First Amendment, on the subject of prostitution.  The Leadership Act merely specifies that, if plaintiff or any organization like it chooses to adopt a policy that is inimical to the federal goal of promoting behavior change and "eradicating prostitution" – which is a "factor in and cause of" the spread of HIV/AIDS – it is not eligible for government subsidies aimed at fighting the AIDS pandemic. Cf. DKT Memorial Fund, Ltd. v. Agency for Int'l Development, 887 F.2d 275, 287 (D.C. Cir. 1989) ("In attempting to assert an infringement of free speech rights, plaintiffs constantly mischaracterize the policy of [US]AID as a suppression of their viewpoint . . . .  What they actually

complain of is not suppression, but rather a refusal to fund"). As numerous courts, including the Supreme Court and the Court of Appeals for the D.C. Circuit, have held, there is nothing unconstitutional about such a condition attached to the grant of a subsidy under Congress's broad powers under the Constitution's Spending Clause. See U.S. Const., Art. I, § 8, cl.1 (empowering Congress to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general welfare of the United States").

Courts have repeatedly upheld Congress's use of the spending power "to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." South Dakota v. Dole, 483 U.S. 203, 206 (1987) (quoting Fullilove v. Klutznick, 448 U.S. 448, 474 (1980) (opinion of Burger, C.J.)). The reach of the spending power is broad, and it "is not limited by the direct grants of legislative power found in the Constitution." United States v. Butler, 297 U.S. 1, 66 (1936). Instead, the constitutional limitations on Congress when it exercises its spending power "are less exacting than those on its authority to regulate directly." Dole, 483 U.S. at 209.

For this reason, plaintiff's demand that strict scrutiny be applied to the Leadership Act, see Pls' Mem. at 8-11, is incorrect. As the Supreme Court explained in Finley, "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." 524 U.S. at 588; see Rust, supra; Finley, supra; FCC v. League of Women Voters, 468 U.S. 364 (1984); Regan v. Taxation with Representation, 461 U.S. 540 (1983); and Legal Services Corp. v. Velazquez, 531 U.S. 533 (2001) (all discussing various funding conditions that were argued or held to implicate First Amendment rights; none applying strict scrutiny to the enactment at issue).

Where Congress exercises its power to condition federal spending on the compliance of the

recipients of federal funding with conditions dictated by federal policy, the appropriate framework for assessing the constitutionality of such conditions are the standards that govern Congress's exercise of its Spending Power. See Am. Library Ass'n v. United States, 539 U.S. 194, 203 n. 2 (plurality opinion) (applying South Dakota v. Dole, supra, as "the appropriate framework for assessing [the Act's] constitutionality" where "Congress has exercised its Spending Power by specifying conditions on the receipt of federal funds," and where statute does not "directly regulate private conduct"); accord Regan, 461 U.S. at 549 ("a [government's] decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny"); DKT Memorial Fund, 887 F.2d at 289 (rejecting plaintiffs' contention that "the government's choice to fund some communicative and associational acts, while not funding all" was "invalid" because "the government has offered no compelling interest for its policy choice"; "this is not the law").

For similar reasons, plaintiff's contention that the funding conditions contained in the Leadership Act must be found unconstitutional because they "constitute viewpoint-based discrimination," Pls' Mem. at 7-8, is misguided. As the D.C. Circuit held in DKT Memorial Fund, "the fact that the government subsidizes one constitutionally protected or constitutionally permissible activity is no reason that it has to seek to subsidize another." 877 F.2d. at 288.

> The government must make policy choices and constantly makes policy choices as to which human activities it will subsidize and which it will not. These are by definition viewpoint-based. That is, it subsidizes the activities consistent with the viewpoints of the persons who engage in those activities, and inconsistent with those who do not, and vice versa.

Id.; accord id. at 290 ("If the United States cannot constitutionally fund international communications save on a viewpoint-neutral basis, then either the very population planning funding program in which plaintiffs seek to participate is constitutionally invalid, or, grants must be equally

available to domestic and foreign groups opposing population planning.").[5]  In upholding a funding restriction which prohibited federal funds granted to recipients under a family planning program from "being used in programs which advocate abortion as a method of family planning," 500 U.S. at 192, the Supreme Court in Rust v. Sullivan similarly cautioned that "[t]o hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals, would render numerous Government programs constitutionally suspect."  500 U.S. at 194.

As Regan, Rust and DKT Memorial Fund establish, it is simply an invalid mode of analysis to seek to analyze cases arising under the Spending Clause under the rubric of the First Amendment strict scrutiny.  Instead, as the D.C. Circuit has squarely held, "this sort of viewpoint-based subsidization decision is not 'predicated on a suspect classification,' and is subject only to a rational relationship test not the sort of strict scrutiny that may require the use of less restrictive means." DKT Memorial Fund, 887 F.2d at 291 (citing Harris v. McRae, 448 U.S. 297, 323 (1980)).[6]

---

[5] In so holding, the D.C. Circuit was specifically concerned with the federal government's need to "make viewpoint-based choices in foreign affairs" as the funding condition at issue in DKT Memorial Fund was applied only to foreign nongovernmental organizations and not to domestic organizations.  Although the First Amendment rights of domestic nongovernmental organizations may exceed any that might be held by foreign nongovernmental organizations, that fact has no bearing on the well-established principle that no organization, whether domestic or foreign, has a constitutional right to have its views subsidized by the federal taxpayer.  See Regan, 461 U.S. at 546 ("a [government's] decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny"); see also id. ("We reject again the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State") (quoting Cammarano v. United States, 358 U.S. 498, 515 (1959) (Douglas, J., concurring)); DKT Memorial Fund, 887 F.2d at 287 (citing cases).

[6] The Supreme Court's decision in Legal Services Corp. v. Velazquez, 531 U.S. 533 (2001), invalidating a federal funding condition, is not to the contrary; indeed, the program at issue in Velazquez differed in several critical respects from that at issue here.  The funding condition reviewed in Velazquez involved an attempt by Congress to restrict federally-funded legal services ("LSC") lawyers from arguing in favor of amending or otherwise challenging existing welfare laws

**B.    The Leadership Act Does Not Impose an "Unconstitutional Condition" on Recipients of Federal HIV/AIDS Grants.**

The crux of plaintiff's challenge to the Leadership Act and to USAID's implementing directive is that these provisions of law constitute an "unconstitutional condition" on federal funding because they condition the availability of a benefit – federal subsidies under the Leadership Act – upon an organization's relinquishment of its ability, protected by the First Amendment, to decide not to adopt a policy explicitly opposing prostitution and to pursue whatever policy it does choose to adopt with funds other than those granted by USAID.  This complaint is insufficient as a matter of law to warrant the facial invalidation of the Leadership Act or USAID's implementing directive.

1.    Federal Subsidies Are not a "Benefit" for Purposes of the Unconstitutional Conditions Doctrine.

The doctrine of "unconstitutional conditions" prohibits the government from "deny[ing] a benefit to a person on a basis that infringes his constitutionally protected interests – especially his interest in freedom of speech."  <u>Perry v. Sindermann</u>, 408 U.S. 593, 597 (1972); <u>see</u> <u>also</u> <u>Speiser v.</u>

_____

in the course of representation of their clients.  The Court focused, first, on the fact that "the LSC program was designed to facilitate private speech, not to promote a governmental message."  <u>Id.</u> at 542; <u>see</u> <u>id.</u> at 548 (distinguishing <u>Rust</u> because "in the context of this statute there is no programmatic message of the kind recognized in <u>Rust</u>").  Here, Congress seeks to append conditions to a program designed, not to "facilitate private speech," but rather to fulfill a government goal, the prevention, treatment and monitoring of HIV/AIDS and, moreover, to do so in a manner consistent with the government's policy of "eradicating prostitution, the sex trade, rape, sexual assault, and sexual exploitation of women and children."  22 U.S.C. § 7211(a)(4).

Second, the concluding paragraphs of the <u>Velazquez</u> opinion clarify that it was the impermissible <u>motive</u> that underlay the condition imposed upon the LSC attorneys which resulted in its invalidation.  According to the Supreme Court, the condition struck down in <u>Velazquez</u> was "designed to insulate the Government's interpretation of the Constitution from judicial challenge," and was "aimed at the suppression of ideas thought inimical to the Government's own interest."  531 U.S. at 548-49.  The conditions contained in the Leadership Act do not resemble in any respect the conditions at issue in <u>Velazquez</u>:  they are not designed to "insulate the Government from judicial challenge" or suppress speech "inimical to the Government's own interest."  Moreover, although the restrictions in <u>Velazquez</u> were found to be uniquely objectionable because they "threaten[ed] severe impairment of the judicial function," and were thus "inconsistent with accepted separation-of-power principles," <u>id.</u> at 546, the funding conditions contained in the Leadership Act do not affect the judicial power, or implicate the constitutional separation of powers, in any way.

Randall, 357 U.S. 513 (1958); Pls' Mem. at 9.  As the D.C. Circuit has squarely held, cases arising under the Spending Clause do not fall within the rubric of these cases; in the Court of Appeals' words, Spending Clause cases "do not fit that mold."  DKT Memorial Fund, 887 F.2d at 287.  In DKT Memorial Fund, the D.C. Circuit, like the Court here, was confronted with conditions attached to funding under the Foreign Assistance Act; in that case, the President had determined that federal funds for family planning activities abroad would not be distributed to "nongovernmental organizations which perform or actively promote abortion as a method of family planning in other nations."  See id. at 277 (quoting the Policy Statement of the United States of America at the United Nations International Conference on Population (Second Session), Mexico, D.F., August 6-13, 1984).  Plaintiffs there, as here, "attempted to couch their claims in terms of the imposition of an 'unconstitutional' condition on the receipt of a benefit."  Id. at 287.

The D.C. Circuit squarely rejected this attempt.  In a holding that binds this Court, the Court of Appeals found that "The Speiser case . . . speaks not at all to an act of government which does nothing other than refuse to subsidize the exercise of a First Amendment activity," because "[t]he question of subsidy simply was not before the Speiser Court, nor does the Speiser decision speak to anything which informs our decision in the present case."  DKT Memorial Fund, 887 F.2d at 288 (emphasis added); accord id. (where "government does not seek to punish the expression of a viewpoint, as in Speiser, but merely declines to subsidize one," settled law precludes a finding of unconstitutionality).  The Court similarly rejected the applicability of the second case upon which the DKT Memorial Fund plaintiffs, like plaintiff here, attempted to rely.  "Neither does Perry v. Sindermann support plaintiffs' argument," 887 F.2d at 288, because "in the present case, we have not a punishment for the exercise of a constitutional right, but at most a refusal to subsidize the exercise of free speech rights."  Id.; accord Harris, 448 U.S. at 317 n.19 ("A refusal to fund protected

activity, without more, cannot be equated with the imposition of a 'penalty' on that activity"); see also Regan, 461 U.S. at 545 (rejecting claim that a case where the government "refused to pay for lobbying out of public funds" fit the "Speiser-Perry model").

As the D.C. Circuit fully recognized in its opinion in DKT Memorial Fund, the Supreme Court has "held in several contexts that a [government's] decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." Regan, 461 U.S. at 546; see also id. (rejecting the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State.") (quoting Cammarano, 358 U.S. at 515 (Douglas, J., concurring)); see DKT Memorial Fund, 887 F.2d at 288-89 (citing cases). The mere refusal to subsidize a right "places no governmental obstacle in the path" of a plaintiff seeking to exercise it. Harris, 448 U.S. at 315; see also Regan, 461 U.S. at 549-50 ("the Constitution 'does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom'"). As the Rust Court noted, "subsidies are just that, subsidies . . . ; to avoid the force of the regulations, [a funding recipient] can simply decline the subsidy." 500 U.S. at 198 n.5. Because, "[a] refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity," Harris, 448 U.S. at 317 n.19, Congress's determination that it will not, for purposes of funding a program aimed at fighting HIV/AIDS, subsidize organizations that refuse to oppose practices that contribute to the spread of HIV/AIDS, is not unconstitutional. See Rust, 500 U.S. at 194 ("When Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, . . . it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism."). Plaintiff is free to adopt any policy it wishes with respect to prostitution; its First Amendment rights are not infringed, however, if the government declines to subsidize whatever policy it chooses to adopt.

2.     The Organizational Eligibility Requirement is Not Unconstitutional.

For purposes of the preliminary injunction proceedings, plaintiff focuses its constitutional challenge on the requirement contained in the Leadership Act that "[n]o funds made available to carry out this Act, or any amendment made by this Act, may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f).  Plaintiff argues that this requirement has the effect of imposing constraints upon activities that a USAID grantee might undertake with its own funds, or with funds provided from other, non-federal, sources, and that such a restriction imposed on an organization that receives federal funds (as opposed to only on the use of the funds provided by the federal government) is unconstitutional.  See Pls' Mem. at 12 (challenging organizational eligibility restriction because it "effectively precludes the organization from taking any other position on [the issue of prostitution] in any other context, even with wholly private funds").  (emphasis in original). The organizational eligibility restriction contained in the Leadership Act does, in fact, preclude organizations who choose to accept a federal HIV/AIDS subsidy from participating in activities at odds with that subsidy's core purpose, as defined by Congress, but there is nothing unconstitutional about such a requirement.

The Supreme Court has repeatedly recognized that "[w]hen the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." Velazquez, 531 U.S. at 541 (quoting Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 833 (1995)).  This "latitude" to take "legitimate and appropriate steps" to prevent garbling of messages flows from the understanding that "[w]hen the government speaks, for instance to promote its own policies or to advance a particular idea, it is in the end, accountable to the electorate and the political process for

its advocacy.  If the citizenry objects, newly elected officials later could espouse some different or contrary position."  Velazquez, 531 U.S. at 541-42 (quoting Bd. of Regents of Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 235 (2000)).

The organizational eligibility requirement contained in the Leadership Act is nothing more than a "legitimate and appropriate" step aimed at preventing not only distortion but also outright failure of the federal government's anti-HIV/AIDS program goals.  Congress has reasonably determined that providing Leadership Act subsidies to organizations with policies opposition prostitution and sex trafficking is necessary to the program it has established.  In creating the approach to fighting HIV/AIDS that is set out in the Leadership Act, Congress stressed that "eradicating prostitution" – identified as a factor in and cause of the spread of HIV/AIDS – is a "priority" of the plan, see 22 U.S.C. § 7611(a)(4), and that one of the critical elements of any successful strategy to combat AIDS was to encourage "behavior change" aimed at eliminating risky behaviors that increased the chance of infection and the spread of the disease.  See, e.g., 22 U.S.C. § 7601(21).  Congress further condemned prostitution and sex trafficking as "degrading to women and children," 22 U.S.C. § 7602(23), a condemnation which is also reflected in the President's national security directive.  See Ex. C.

In these circumstances, where the eradication of prostitution is declared to be both the policy of the United States and a specific priority of Congress's program to fight HIV/AIDS, it is both "legitimate and appropriate" for Congress to ensure that organizations to which program funds are granted operate in full support of those program goals.  See National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 747 (1st Cir. 1995) ("the more germane a condition to the benefit, the more deferential the review; nongermane conditions, in contrast, are suspect") (citation omitted).  Here, Congress has created a program that has very specific goals and then restricted the eligibility of

participants in order to ensure that those goals are met, and not undermined or ignored by participants who either oppose the goal or effect a stance of "neutrality" as to its accomplishment. As a necessary component of any successful strategy to combat HIV/AIDS, Congress has determined it critical to "eradicate prostitution." Plaintiff's preferred stance, i.e., neutrality with respect to prostitution, see Pls' Mem. at 4-5, is not an option where, as here, such neutrality would operate to the detriment of Congress's stated program goals. While plaintiff may disagree as to the wisdom of Congress's preferred strategy for combating HIV/AIDS, it cannot expect taxpayer funding to support goals inconsistent with those judged by Congress to be appropriate lest Congress's methods, goals and priorities be undermined and distorted.

Plaintiff fails to pay heed to the priorities established by Congress as necessary components of the anti-HIV/AIDS program created by the Leadership Act and, instead, seeks to support its unconstitutional conditions claim by citing dicta in Rust v. Sullivan, 500 U.S. 173 (1991), a case that upheld the only restriction before it. See Pls' Mem. at 12-14. In Rust, the Supreme Court considered a funding restriction which prohibited federal funds granted to recipients under Title X of the Public Health Act from "being used in programs which advocate abortion as a method of family planning," and held that "[t]here is no question but that the statutory prohibition. . . . is constitutional." 500 U.S. at 192. The only restriction before the Court in Rust was a condition that restricted the use of federal funds granted to subsidy recipients, and the Court based its conclusion that such a funding restriction was not unconstitutional, in part, on the fact that Congress had only restricted the use of the federal funds and had not restricted, outside the scope of the federal program, the activities of organizations who received those funds. See 500 U.S. at 196-98. The Rust Court did not hold, and indeed, had no reason to squarely decide, whether a restriction on the activities of a federal funding recipient outside the scope of the federal program could ever be constitutional.

Plaintiff's argument ignores the fundamental distinction between Congress's need to impose an organizational eligibility restriction in this case and the situation considered by the Court in Rust. The program at issue in Rust was created by Title X of the Public Health Services Act, 84 Stat. 1506, as amended, 42 U.S.C. § 300-300a-6, and authorized government "grants to . . . public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300a.  As the Supreme Court explained, the program created by Title X was "limited to preconceptional services." 500 U.S. at 179.  "Childbirth," "prenatal care," abortion, and, indeed, all postconception medical care and services, fell completely "outside the scope of the federal funded program."  See id. at 179, 193, 200.  Title X program's goals, accordingly, did not include any priorities concerning abortion and Congress articulated no policy choices fundamentally related to the Title X program concerning the provision of advice and counseling regarding abortion.  Having organizations participate in such activities outside the scope of the federal program – so long as a sufficient degree of separation was maintained in order to "ensure the integrity of the federally funded program" – therefore, was not inconsistent with any of Title X's goals.  All that was necessary in Rust was to ensure that federal funds "were spent for the purposes for which they were authorized," 500 U.S. at 196, and the Supreme Court sustained the constitutionality of regulations promulgated in furtherance of that goal.

Here, by contrast, Congress has plainly articulated that it is the policy of the United States to "eradicate prostitution" and that successful anti-HIV/AIDS strategies must include encouragement of behavioral change.  In a program that sets such goals, it is both "legitimate and appropriate" for Congress to determine that organizations that are unwilling or unable – due to their organizational policies – to further these goals will be ineligible to participate.  The certification requirement

contained in AAPD 05-04 merely serves to identify those organizations that are eligible for funding in pursuit of Congress's articulated goals.  Organizations not committed to those goals will not be funded, both because such organizations cannot be counted on to pursue the goals of the program for which the funds are distributed and because to fund such organizations would hopelessly confuse the government's objective that eradication of prostitution and behavioral change are critical benchmarks in the fight against HIV/AIDS.  Indeed, in both <u>Am. Library Ass'n</u>, 539 U.S. 194 (2004), and <u>Buckley v. Valeo</u>, 424 U.S. 1 (1976), the Supreme Court upheld restrictions that restricted the eligibility of those who would receive federal funds where Congress's policy goals were furthered by the restriction.[7]

Moreover, where Congress has enacted the Leadership Act specifically to advance certain policy goals, it "can hardly be faulted for assuming," <u>DKT Memorial Fund</u>, 887 F.2d at 291, that providing funds to organizations to further the goals of the Leadership Act, including that of "eradicating prostitution," would be undermined if its grantees expended those funds in furtherance of certain of the government's goals, while simultaneously endorsing – either explicitly or implicitly – the very practices that the same program seeks to eliminate.  This would, without question, "mix

_____

[7]  In <u>Am. Library Ass'n</u>, the statute at issue provided that funds would be awarded only to libraries that were enforcing "a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access."  47 U.S.C. § 254(h)(6)(C); <u>see also</u> 20 U.S.C. § 9134(f)(1)(A).  These restrictions were upheld because they did no more than mirror Congress's insistence that "public funds be spent for the purposes for which they were authorized," <u>i.e.</u>, "to help libraries fulfill their traditional role of obtaining materials of requisite and appropriate quality for educational and informational purposes."  539 U.S. at 211-12. Similarly, in <u>Buckley v. Valeo</u>, although the Court struck down as unconstitutional general expenditure limits on federal candidates because such limits infringed the First Amendment rights of those candidates to spend as they chose, it found no unconstitutionality in Congress's requirement that federal candidates who chose to accept public financing of their campaigns were also required to accept limitations on their private expenditures.  <u>See</u> 424 U.S. at 57 & n.65, 85-104.  Again, the Supreme Court noted that Congress's goals of reducing the "deleterious influence of large contributions on our political process . . . and to free candidates from the rigors of fundraising," <u>id.</u> at 91, were furthered by such a requirement.

the message" of the government's chosen policy, see DKT Memorial Fund, 887 F.2d at 291, if not undermine the government's policy goals altogether. It is Congress's prerogative to take legitimate and appropriate steps to further its goals by avoiding the communication of such mixed messages when creating a federal spending program, see Velazquez, 531 U.S. at 541 (citing Rosenberger, 515 U.S. at 833), and it has done nothing more or less here.

Congress, furthermore, can impose conditions intended to ensure that the substantial funds it has dedicated to the goals set forth in the Leadership Act do not serve to free up other funds a recipient might use to pursue contrary or inconsistent policies. As the Supreme Court acknowledged in Rust, Congress is entitled to "ensure the integrity of the federally funded program." 500 U.S. at 198. It would undermine Congress's stated goals and, indeed, undermine the leadership role of the United States that the Leadership Act was intended to foster, if organizations affiliated with Congress's anti-HIV/AIDS program used federal funds to implement programs consistent with Congress's goals, only to free up other funds from other sources to implement programs or take positions not consistent with those goals. Indeed, funding conditions which reflect the government's strong interests in preventing direct – or indirect – subsidies to activities that Congress has chosen not to fund have been repeatedly upheld. See DKT Memorial Fund, 887 F.2d at 290 ("We can hardly compel the government to subsidize indirectly that which it has chosen not to subsidize directly") (citing Grove City College v. Bell, 465 U.S. 555, 565 (1984)). Congress does not act unconstitutionally by taking steps to ensure that federal funding is granted to organizations that support Congress's goals and thereby preserve the integrity of its federally funded program.

Finally, more so than in other contexts, clear communication of the government's goals is particularly critical in a program intended to further the government's goals in the field of international relations. The Leadership Act creates an international aid program that adds $15 billion

in targeted aid as a supplement to the billions of dollars in federal spending already in place under the Nation's foreign assistance commitments. As the D.C. Circuit held in DKT Memorial Fund, "[w]hen the government speaks in international affairs, it speaks not only with its words and its funds, but with its associations." 887 F.2d at 290-91; see also id. (noting that, in the area of foreign affairs, "we must recognize the necessity for the nation to speak with a single voice").

It is entirely legitimate for Congress to have assumed that both its oversight capacity and that of the federal agencies charged with implementing the program created by the Leadership Act would be circumscribed by the need to provide aid on a global scale and to engage a multitude of partners in the effort to pursue the ambitious but critical goals articulated in the Leadership Act. See 22 U.S.C. §§ 7601(18) (recognizing that "nongovernmental organizations . . . have proven effective in fighting the HIV/AIDS pandemic); 7601(22)(F) (recognizing that the United States can be a leader in the fight against HIV/AIDS by "encouraging active involvement of the private sector, including . . . nongovernmental organizations, faith-based organizations, community-based organizations and other non-profit entities"). Because the program created by the Leadership Act is intended to operate worldwide, Congress has a legitimate need to ensure that it can monitor the diverse organizations around the world with which it will partner to further federal goals relating to stemming the spread of HIV/AIDS; the organizational eligibility restriction is framed to ensure such monitoring. Moreover, in the arena of foreign affairs, where the United States's policy is demonstrated by its actions, and where both Congress and the President have committed the United States to demonstrating its leadership in the fight against HIV/AIDS, Congress has more cause to be concerned that funding organizations that take positions inconsistent with the articulated policy goals of the Leadership Act will contribute to a mixed message that will undermine the United States's position as a world leader in a critical stage of the battle against this disease.

The organizational eligibility restriction contained in 22 U.S.C. § 7631(f) constitutes a legitimate and appropriate step by Congress to ensure that its program messages are not garbled or distorted by the grantees who are awarded federal funds to carry out parts of a comprehensive, international program.  Any organization that disagrees with Congress's message or that wishes to adopt a different strategy in the fight against HIV/AIDS is entitled to do so.  But it is not entitled to do so on the government's dime.  Congress does not act unconstitutionally when it attaches an organizational eligibility requirement to a federal funding program that is directly related to the very goals the program is attempting to achieve.  Because the Leadership Act does nothing more than impose a germane condition intended to further its goals, it is not unconstitutional.

### C.    The Leadership Act is a Valid Exercise of the Spending Power and is Not Impermissibly Vague.

Having failed to establish that the restrictions contained in the Leadership Act impose unconstitutional conditions, plaintiff falls back on the position that the Leadership Act exceeds Congress's powers because it reflects an unwise policy choice and is impermissibly vague.  It is well-established that under the spending power, Congress is granted greater leeway to encourage recipients to abide by its policy choices than it has when it seeks to regulate directly.  See Dole, 483 U.S. at 210 (limitations on the exercise of the spending power do not amount to "a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly").  Because the spending power is so broad, federal courts have been reluctant to interfere with Congress's choice of funding conditions.  See Kansas v. United States, 214 F.3d 1196, 1200-01 (10th Cir. 2000) (discussing cases); see also Rust, 500 U.S. at 194 ("[w]ithin far broader limits that petitioners are willing to concede, when the Government appropriates public funds to establish a program it is entitled to define the limits of that program").  The Supreme Court has made clear that putative funding recipients who do not agree with Congress's policy choices when it places

conditions on the availability of a federal subsidy may simply decline to accept the subsidy.  See Dole, 483 U.S. at 211 ("[t]he offer of benefits to a [grantee] by the United States dependent upon cooperation . . . with federal plans . . . is not unusual. . . . There is only a condition which the [grantee] is free at pleasure to disregard or to fulfill.") (internal quotes and citations omitted).

The Leadership Act, and the conditions at issue in this case are an unquestionably valid exercise of Congress's power to spend for the general welfare.  See Dole, 483 U.S. at 207 ("In considering whether a particular public expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress."); Helvering v. Davis, 301 U.S. 619, 645 ("the concept of general welfare or the opposite is shaped by Congress").[8]  As described above, the Leadership Act is an unprecedented and comprehensive federal initiative aimed at preventing, treating and monitoring HIV/AIDS and other related infectious diseases.  As also described above, both Congress and the President have determined that prostitution and sex trafficking contribute to the spread of HIV/AIDS and that it is the policy of the United States to "eradicate prostitution" and other forms of sexual victimization.  That such policies are undertaken in the furtherance of the general welfare can hardly be in dispute.

Similarly, both of the Leadership Act's funding conditions are directly related to the primary purpose of the Leadership Act.  See Dole, 483 U.S. at 207 (in order to satisfy requirements of the Spending Clause, conditions on federal grants must be related "to the federal interest in particular national projects or programs"); Kansas, 214 F.3d at 1199 ("The required degree of this relationship is one of reasonableness or minimum rationality"); see also National Amusements, Inc., 43 F.3d at 747 ("if a condition is germane – that is, if the condition is sufficiently related to the benefit – then

---

[8]  Indeed, the "level of deference to the congressional decision is such that the Supreme Court has . . . questioned whether "general welfare" is a judicially enforceable standard at all."  Dole, 483 U.S. at 207 (citing Buckley, 424 U.S. at 90-91).

it may be validly imposed"); cf. League of Women Voters, 468 U.S. at 396 (rejecting funding condition because, inter alia, the restriction "clearly 'provides only ineffective or remote support for the government's purpose'") (citation omitted).

As described above, the Leadership Act authorizes $15 billion over five years for programs directed at the prevention, treatment and monitoring of HIV/AIDS. Prostitution and sex trafficking are specifically identified by Congress as "factors in and causes of" the spread of HIV/AIDS. 22 U.S.C. § 7601(23). Congress further requires that, for purposes of the "comprehensive, integrated five-year global strategy to fight HIV/AIDS" created pursuant to the Leadership Act, see 22 U.S.C. § 7611, it shall be the policy of the United States and a priority of any successful strategy to fight HIV/AIDS to "eradicat[e] prostitution, the sex trade, rape, sexual assault, and sexual exploitation of women and children." 22 U.S.C. § 7611(a)(4). Requiring funding recipients to oppose prostitution and sex trafficking plainly operates in furtherance of those goals.

Although plaintiff takes issue with the wisdom of Congress's declared policy to "eradicate prostitution," see, e.g., Pls' Mem. at 17-18 (describing the testimony of its declarants), review of such policy decisions by the political branches of the federal government is beyond the purview of this Court. See, e.g., DKT Memorial Fund, 887 F.2d at 281 ("The [Administrative Procedure Act] has never been construed to grant this or any other court the power to review the wisdom of the policy decisions of the President"). As the Supreme Court has made clear, "federal judges – who have no constituency – have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: 'Our Constitution vests such responsibilities in the political branches.'" Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 866 (1984) (quoting Tenn. Valley Auth. v. Hill, 437 U.S. 153, 195

(1978)); see also Buckley, 424 U.S. at 91 ("whether the chosen means appear 'bad,' unwise,' or 'unworkable' is to us irrelevant. Congress has concluded that the means are 'necessary and proper' to promote the general welfare, and we thus decline to find this legislation without the grant of power in [the Spending Clause]").

Thus, although plaintiff is free to insist that it has devised a strategy to fight AIDS that is superior to Congress's preferred approach, plaintiff is not free to demand taxpayer dollars to implement any such strategy, and that is particularly so where, as here, its preferred strategy – neutrality with respect to prostitution – is at odds with Congress's judgment that prostitution must be eradicated as part of a successful effort to fight HIV/AIDS. Whether plaintiff believes that Congress's declared policy to eradicate prostitution is misguided, counterproductive, or just plain wrong, its opportunity for redress is in the political process, not in the federal courts.[9]

Nor is the requirement contained in the Leadership Act so vague as to require its invalidation under Spending Clause jurisprudence. Where Congress conditions the receipt of federal subsidies, it "must do so unambiguously . . . , enabl[ing] the [recipients] to exercise their choice knowingly, cognizant of the consequences of their participation." Dole, 483 U.S. at 207 (quoting Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981)). Exercises of the spending power are "much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." Pennhurst, 451 U.S. at 17. Thus, "if Congress intends to impose a

_____

[9] That plaintiff is, in fact, challenging the wisdom of Congress's policy choices is made clear by the fact that plaintiff appears to object to the funding conditions contained in the Leadership Act only to the extent that they require a funding recipient to certify that they have a policy "explicitly opposing prostitution." Plaintiff nowhere challenges the requirement that funding recipients also oppose "sex trafficking"; it does not allege that it has no policy related to sex trafficking; and notably, it does not seek relief – either preliminary or permanent – with respect to either the Leadership Act or USAID's implementing directive to the extent that those laws require funding recipients to have a policy "opposing . . . sex trafficking." See, e.g., Requests for Relief, Compl. (limiting declaratory relief request to provisions of Leadership Act "to the extent they require U.S. organizations to have a policy explicitly opposing prostitution") (emphasis added).

condition on the grant of federal moneys, it must do so unambiguously" by "speak[ing] with a clear voice." Id. This limitation on the spending power is satisfied so long as putative recipients are able to exercise their choice to accept subsidies knowingly and "cognizant of the consequences of . . . participation." Dole, 483 U.S. at 207. Although plaintiff complains that the conditions contained the Leadership Act are vague because "DKT cannot predict how USAID will interpret" their terms, Compl. ¶¶ 27, 28, this is not the test for assessing the validity of a federal funding condition. Instead, what is at issue is whether the language is sufficiently clear to allow a potential funding recipient to make knowing choices regarding its participation in the program.

Congress has spoken with a clear voice in the Leadership Act. The Act imposes two limitations, the funding restriction, 22 U.S.C. § 7631(e), and the organizational eligibility restriction, 22 U.S.C. § 7631(f). USAID has implemented these provisions by requiring that organizations receiving HIV/AIDS assistance must certify that they are in compliance with a USAID Standard Provision that reiterates the terms of the statute, and further specifies that this Standard Provision "contains express terms and conditions of the agreement and any violation of it shall be grounds for unilateral termination of the agreement by USAID prior to the end of its term." AAPD 05-04 at 5.

Thus, with respect to both conditions, the terms of participation and the penalties for non-compliance are unambiguously set forth in the statute and USAID's implementing directive. Organizations accept or decline the terms of their funding "contract" fully "cognizant of the consequences of their participation," Pennhurst, 451 U.S. at 17, and in such circumstances, their choice to certify compliance with the conditions set forth in the Leadership Act in order to continue receiving federal subsidies is a knowing and voluntary one. See Kansas, 214 F.3d at 1199 ("although contending that some of the requirements associated with the computerized database are vague, Kansas fails to assert that the alleged ambiguity resulted in its inability to exercise its choice to

accept the subsidies knowingly and cognizant of the consequences of participation") (internal quotes omitted).  Should an organization determine that the costs of compliance outweigh its benefits, or that it disagrees with the policy preferences expressed by Congress, it is free to decline the subsidy.  See Steward Mach. Co. v. Davis, 301 U.S. 548, 594-98 (1937) (recipients of federal funds remain free to unilaterally withdraw from "contract").  Indeed, plaintiff here alleges that it chose to do just that, demonstrating quite clearly that it had the "ability to exercise its choice to accept the subsidies knowingly and cognizant of the consequences of participation."  Kansas, 214 F.3d at 1199.

In any event, even apart from the test applicable to Spending Clause enactments, it is well established that, because "language is unavoidably inexact," statutes cannot, "in reason, define proscribed behavior exhaustively or with consummate precision."  United States v. Thomas, 864 F.2d 188, 195 (D.C. Cir. 1988).  "[C]ondemned to the use of words, we can never expect mathematical certainty from our language."  Palestine Info. Office v. Schultz, 853 F.2d 932, 943 (D.C. Cir. 1988) (quoting Grayned v. City of Rockford, 408 U.S. 104, 110 (1972)).  "These inherent limitations obtain in a speech-laden First Amendment setting as in any other."  Thomas, 864 F.2d at 195.  Accordingly, "courts do not require that an enactment touching on First Amendment interests set forth the precise line dividing proscribed from permitted behavior, or that a person contemplating a course of behavior know with certainty whether his or her act will be found to violate the proscription."  Id.  All that is required is that provisions be "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest."  Id. (quoting U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 579 (1973)).

Under these standards, the conditions contained in the Leadership Act cannot be found to be unconstitutionally vague.  As these decisions make plain, plaintiff's complaint that it cannot "know

with certainty whether his or her act will be found to violate the proscription," Thomas, 864 F.2d at 195; see Pls' Compl. ¶¶ 27, 28, poses no constitutional problem.[10]  Because the choice proposed by the Leadership Act and USAID's implementing directive is an unambiguous one, both the Act and USAID's implementing directive satisfy the Dole test.

Finally, although the Supreme Court has recognized that in "some circumstances, the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns to compulsion,'" this is not that case.  Dole, 483 U.S. at 211 (quoting Steward Mach. Co., 301 U.S. at 590).  As a preliminary matter, courts have expressed significant doubts about the continued viability of the coercion theory.  See Kansas, 214 F.3d at 1202 ("[T]he coercion theory is unclear, suspect, and has little precedent to support its application"); California v. United States, 104 F.3d 1086, 1092 (9th Cir. 1997) ("[T]o the extent that there is any viability left in the coercion theory, it is not reflected on the facts of this record"); Nevada v. Skinner, 884 F.2d 445, 448 (9th Cir.1989) ("The coercion theory has been much discussed but infrequently applied in federal case law, and never in favor of the challenging party."); see also Oklahoma v. Schweiker, 655 F.2d 401, 414 (D.C. Cir.1981) (declining to "enter the thicket" posed by the coercion theory)

In any event, plaintiff, which alleges that it obtains only 16% of its funding from USAID, see Pls' Mem. at 2; but see Holzman Decl. (attached to Pls' Mem. as Ex. 1) ¶ 6 (putting the figure at 13%), and identifies numerous other sources of funding, see Pls' Mem. at 2 n.1, does not allege that the effect of the funding restrictions at issue here even approaches the point of coercion.  See Doe v. Nebraska, 345 F.3d 593 (8th Cir. 2003) (rejecting coercion theory where funding "was no less

---

[10]  This is particularly so where the "degree of vagueness that the Constitution tolerates" is greater in the case of "enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."  Village of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 498-99 (1982); see Palestine Info. Office, 853 F.2d at 944 (similar). Although, as discussed infra, the refusal to subsidize a particular activity does not constitute a "penalty" of any kind, see Harris, 448 U.S. at 317 n.19, the same principle is applicable here.

than 60%" in a five-year period because "[A] difficult choice remains a choice, and a tempting offer is still but an offer.  If [the grantee] finds the requirements so disagreeable, it is ultimately free to reject both the conditions and the funding, no matter how hard the choice may be") (quoting <u>Kansas</u>, 214 F.3d at 1203).  As the Court held in <u>Dole</u>,"the Federal Government may establish and impose reasonable conditions relevant to the federal interest in the project and to the overall objectives thereof."  483 U.S. at 208.  Congress has done nothing less here, and thus, nothing in the funding conditions imposed by the Leadership Act and implemented by USAID exceeds Congress's power under the Spending Clause.  <u>Dole</u>, accordingly, establishes that the constitutionality of these conditions must be upheld.

## II.    PLAINTIFF FAILS TO DEMONSTRATE IRREPARABLE HARM.

Putting aside plaintiff's failure to demonstrate any likelihood of success on the merits, plaintiff has also failed to demonstrate that it suffers any irreparable harm from enforcement of the funding conditions contained in the Leadership Act as implemented by USAID.  It is axiomatic that the basis for injunctive relief in the federal courts has always "been irreparable harm and inadequacy of legal remedies."  <u>See</u> <u>Wisc. Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting <u>Sampson v. Murray</u>, 415 U.S. 61, 88 (1974)).  In other words, irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction."  <u>Bell & Howell: Mamiya Co. v. Masel Supply Co.</u>, 719 F.2d 42, 45 (2d Cir. 1983) (quoting 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2948, at 431 (1973)).  The absolute necessity of irreparable injury derives from the fact that "[p]reliminary injunctions are issued to forestall imminent and irreversible injury to the plaintiff's rights."  <u>Comic Strip, Inc. v. Fox Television Stations, Inc.</u>, 710 F. Supp. 976, 981 (S.D.N.Y. 1989).

For an alleged injury to constitute irreparable harm, it must be "both certain and great" and

"actual and not theoretical." Wisc. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). The plaintiff "must show that the injury complained of [is] of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." Id. (alteration in original and internal quotation marks omitted) (quoting Ashland Oil, Inc. v. FTC, 409 F. Supp. 297, 307 (D.D.C.), aff'd, 548 F.2d 977 (D.C. Cir. 1976)). This requirement is not relaxed when a violation of the First Amendment is alleged. See Nat'l Treas. Employees Union, et al. v. United States, 927 F.2d 1253, 1254-55 (D.C. Cir. 1991) (denying preliminary relief in the absence of irreparable injury); Christian Knights of the Ku Klux Klan Invisible Empire, Inc., et al. v. Dist. of Columbia, et al., 919 F.2d 148 (D.C. Cir. 1990) (same).

Plaintiff here bases its claim to injury on two grounds, one of which is entirely speculative and does not apply to it, and one of which has been squarely rejected by the Supreme Court. First, plaintiff contends that, if it had accepted the funding condition – which it did not – it would be harmed because it would be forced to articulate a policy with which it disagrees. Plaintiff, however, declined to accept funding conditioned upon certifying that it had a policy explicitly opposing prostitution, and, thus, is not currently engaged in any speech with which it disagrees. Plaintiff cannot claim harm when it has fully exercised its First Amendment right "not to speak." Nor can plaintiff claim that it has been penalized for the exercise of that right, because, as fully described above, "the Government has no constitutional duty to subsidize an activity merely because it is constitutionally protected," Rust, 500 U.S. at 201, and the decision not to subsidize an activity does not amount to a "penalty" on that activity, Harris, 448 U.S. at 317 n. 19; see also supra, at pp. 20-22.

Second, plaintiff claims that it is harmed by the funding conditions contained in the Leadership Act because it is required to choose between sacrificing its First Amendment rights to adopt a policy of its choosing and government funding. Pls' Mem. at 14. As the Court in Rust

squarely recognized, however, "[p]otential grant recipients can choose between accepting [Government] funds – subject to the Government's conditions . . . or declining the subsidy and financing their own unsubsidized program. We have never held that the Government violates the First Amendment simply by offering that choice." 500 U.S. at 199 n. 5. So too, here, plaintiff is not harmed by being confronted with a choice which it has full autonomy to accept or decline.

Absent any First Amendment harm, plaintiff's only claim to harm is that it has been denied $60,000 with which to fund a condom lubricant project in Vietnam. Courts, however, have consistently held that deprivation of money is not sufficient to constitute irreparable injury except under extreme circumstances. See, e.g., Wisc. Gas, 758 F.2d at 674 ("It is also well settled that economic loss does not, in and of itself, constitute irreparable harm."); accord Boivin v. U.S. Airways, 297 F. Supp. 2d 110, 118-19 (D.D.C. 2003). Recoverable monetary loss may constitute irreparable harm only where "the loss threatens the very existence of the movant's business." Wisc. Gas Co., 758 F.2d at 354.

Plaintiff makes no such allegation here; to the contrary, plaintiff alleges that only 16% of its budget is derived from USAID funding, Compl. at 26, but see Holzman Decl. ¶ 6 (putting the figure at 13%). Moreover, the specific $60,000 condom lubricant proposal that forms the basis for plaintiff's claim here constitutes only a minuscule proportion of its $3.6 million Vietnam budget and an even smaller proportion of its worldwide $44 million budget, see Holzman Decl. ¶ 5, and plaintiff identifies numerous other sources of funding. Pls' Mem. at 2 n.1. Plaintiff thus fails to demonstrate that it is irreparably harmed in the absence of a preliminary injunction.

## III.  THE PUBLIC INTEREST WEIGHS AGAINST ENTRY OF A PRELIMINARY INJUNCTION SUSPENDING THE OPERATION OF AN ACT OF CONGRESS.

In addition to all the reasons articulated above, plaintiff's request to enjoin USAID from enforcing the funding conditions contained in the Leadership Act should not be granted because by

enjoining an Act of Congress, the Court inflicts "irreparable harm" on the public as well as the government.  When it comes to federal statutes, "a temporary injunction against enforcement is in reality a suspension of an act, delaying the date selected by Congress to put its chosen policies into effect.  Thus judicial power to stay an act of Congress, like judicial power to hold that act unconstitutional, is an awesome responsibility calling for the utmost circumspection in its exercise." Turner Broadcasting System, Inc. v. F.C.C., 507 U.S. 1301, 1301 (1993) (Rehnquist, J., in chambers) (quoting Heart of Atlanta Motel, Inc. v. United States, 85 S. Ct. 1, 2 (1964) (Black, J., in chambers)). "[A]ny time [the government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  Valeria G. v. Wilson, 12 F. Supp. 2d 1007, 1027 (N.D. Cal. 1998) (quoting New Motor Vehicle Bd. of California v. Orrin W. Fox Co., 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)); see also Am. Fed'n of Gov't Employees v. OPM, 618 F. Supp. 1254, 1265 (D.D.C. 1985) (refusing to enjoin OPM regulations and recognizing "it would neither be equitable nor in the public interest to force a return to the old regulations" because an injunction would "cause yet another disruption in the orderly administration of the government" and because the new system "reflect[s] a conscious policy decision . . . ."), aff'd 782 F.2d 278 (D.C. Cir. 1986).

The Supreme Court has held that, in considering the public interest, courts must defer to Congress's considered judgment when that judgment is clearly reflected in enacted legislation.  See United States v. Oakland Cannabis Buyers' Co-Op, 532 U.S. 483, 496 (2001) (holding that "a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation . . . as [to] what behavior should be prohibited") (citation omitted); see also Virginian Ry. Co. v. System Fed. No. 40, 300 U.S. 515, 551-52 (1937) ("[i]n considering the propriety of the equitable relief granted here, we cannot ignore the judgment of Congress, deliberately expressed in legislation,"

- 39 -

because "[t]he fact that Congress has indicated its purpose [in a statute] is in itself a declaration of the public interest and policy which should be persuasive in inducing courts to give relief").

Congress here has determined that USAID may exercise its authority to make assistance awards only under certain conditions, and has further determined that it is in the interests of the public, as well as of the public fisc, to impose such conditions.  Moreover, the program into which Congress has inserted these requirements is of the utmost public importance; the global fight against HIV/AIDS is a critically important goal of U.S. policy and ensuring that the United States takes a leadership role in that fight is equally critical.  See, e.g., 22 U.S.C. § 7601(7)-(10) (describing why HIV/AIDS poses a "serious security issue for the international community").  Although plaintiff may disagree with the wisdom of Congress's policy choices and with the manner in which Congress has chosen to exercise the United States's leadership, it is the elected representatives of the people, and not individuals or individual organizations, who have the constitutional responsibility to determine the policies of the nation.  When such determinations are made by Congress, this Court may not lightly set them aside, and, for all the reasons explained herein, plaintiff has offered no argument sufficient to warrant such an extraordinary action by this Court in this case.

## CONCLUSION

For the reasons stated herein, plaintiff's application for preliminary injunction should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

KENNETH L. WAINSTEIN
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch


__/s/ Rupa Bhattacharyya_____
RUPA BHATTACHARYYA (VA 38877)
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel: (202) 514-3146
Fax: (202) 318-7593
rupa.bhattacharyya@usdoj.gov



Dated: August 26, 2005.