PUBLIC LAW 108–25—MAY 27, 2003          117 STAT. 711

Public Law 108–25
108th Congress

An Act

To provide assistance to foreign countries to combat HIV/AIDS, tuberculosis, and malaria, and for other purposes.

May 27, 2003
[H.R. 1298]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*,

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003".

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

United States
Leadership
Aganist HIV/
AIDS,
Tuberculosis, and
Malaria Act of
2003.
22 USC 7601
note.

Sec. 1.  Short title; table of contents.
Sec. 2.  Findings.
Sec. 3.  Definitions.
Sec. 4.  Purpose.
Sec. 5.  Authority to consolidate and combine reports.

TITLE I—POLICY PLANNING AND COORDINATION

Sec. 101.  Development of a comprehensive, five-year, global strategy.
Sec. 102.  HIV/AIDS Response Coordinator.

TITLE II—SUPPORT FOR MULTILATERAL FUNDS, PROGRAMS, AND PUBLIC-PRIVATE PARTNERSHIPS

Sec. 201.  Sense of Congress on public-private partnerships.
Sec. 202.  Participation in the Global Fund to Fight AIDS, Tuberculosis and Malaria.
Sec. 203.  Voluntary contributions to international vaccine funds.

TITLE III—BILATERAL EFFORTS

Subtitle A—General Assistance and Programs

Sec. 301.  Assistance to combat HIV/AIDS.
Sec. 302.  Assistance to combat tuberculosis.
Sec. 303.  Assistance to combat malaria.
Sec. 304.  Pilot program for the placement of health care professionals in overseas areas severely affected by HIV/AIDS, tuberculosis, and malaria.
Sec. 305.  Report on treatment activities by relevant executive branch agencies.
Sec. 306.  Strategies to improve injection safety.
Sec. 307.  Study on illegal diversions of prescription drugs.

Subtitle B—Assistance for Children and Families

Sec. 311.  Findings.
Sec. 312.  Policy and requirements.
Sec. 313.  Annual reports on prevention of mother-to-child transmission of the HIV infection.
Sec. 314.  Pilot program of assistance for children and families affected by HIV/AIDS.
Sec. 315.  Pilot program on family survival partnerships.

TITLE IV—AUTHORIZATION OF APPROPRIATIONS

Sec. 401.  Authorization of appropriations.

Sec. 402. Sense of Congress.
Sec. 403. Allocation of funds.
Sec. 404. Assistance from the United States private sector to prevent and reduce HIV/AIDS in sub-Saharan Africa.

TITLE V—INTERNATIONAL FINANCIAL INSTITUTIONS

Sec. 501. Modification of the Enhanced HIPC Initiative.
Sec. 502. Report on expansion of debt relief to non-HIPC countries.
Sec. 503. Authorization of appropriations.

26 USC 7601.

**SEC. 2. FINDINGS.**

Congress makes the following findings:

(1) During the last 20 years, HIV/AIDS has assumed pandemic proportions, spreading from the most severely affected regions, sub-Saharan Africa and the Caribbean, to all corners of the world, and leaving an unprecedented path of death and devastation.

(2) According to the Joint United Nations Programme on HIV/AIDS (UNAIDS), more than 65,000,000 individuals worldwide have been infected with HIV since the epidemic began, more than 25,000,000 of these individuals have lost their lives to the disease, and more than 14,000,000 children have been orphaned by the disease. HIV/AIDS is the fourth-highest cause of death in the world.

(3)(A) At the end of 2002, an estimated 42,000,000 individuals were infected with HIV or living with AIDS, of which more than 75 percent live in Africa or the Caribbean. Of these individuals, more than 3,200,000 were children under the age of 15 and more than 19,200,000 were women.

(B) Women are four times more vulnerable to infection than are men and are becoming infected at increasingly high rates, in part because many societies do not provide poor women and young girls with the social, legal, and cultural protections against high risk activities that expose them to HIV/AIDS.

(C) Women and children who are refugees or are internally displaced persons are especially vulnerable to sexual exploitation and violence, thereby increasing the possibility of HIV infection.

(4) As the leading cause of death in sub-Saharan Africa, AIDS has killed more than 19,400,000 individuals (more than 3 times the number of AIDS deaths in the rest of the world) and will claim the lives of one-quarter of the population, mostly adults, in the next decade.

(5) An estimated 2,000,000 individuals in Latin America and the Caribbean and another 7,100,000 individuals in Asia and the Pacific region are infected with HIV or living with AIDS. Infection rates are rising alarmingly in Eastern Europe (especially in the Russian Federation), Central Asia, and China.

(6) HIV/AIDS threatens personal security by affecting the health, lifespan, and productive capacity of the individual and the social cohesion and economic well-being of the family.

(7) HIV/AIDS undermines the economic security of a country and individual businesses in that country by weakening the productivity and longevity of the labor force across a broad array of economic sectors and by reducing the potential for economic growth over the long term.

(8) HIV/AIDS destabilizes communities by striking at the most mobile and educated members of society, many of whom are responsible for security at the local level and governance

at the national and subnational levels as well as many teachers, health care personnel, and other community workers vital to community development and the effort to combat HIV/AIDS. In some countries the overwhelming challenges of the HIV/AIDS epidemic are accelerating the outward migration of critically important health care professionals.

(9) HIV/AIDS weakens the defenses of countries severely affected by the HIV/AIDS crisis through high infection rates among members of their military forces and voluntary peacekeeping personnel. According to UNAIDS, in sub-Saharan Africa, many military forces have infection rates as much as five times that of the civilian population.

(10) HIV/AIDS poses a serious security issue for the international community by—

(A) increasing the potential for political instability and economic devastation, particularly in those countries and regions most severely affected by the disease;

(B) decreasing the capacity to resolve conflicts through the introduction of peacekeeping forces because the environments into which these forces are introduced pose a high risk for the spread of HIV/AIDS; and

(C) increasing the vulnerability of local populations to HIV/AIDS in conflict zones from peacekeeping troops with HIV infection rates significantly higher than civilian populations.

(11) The devastation wrought by the HIV/AIDS pandemic is compounded by the prevalence of tuberculosis and malaria, particularly in developing countries where the poorest and most vulnerable members of society, including women, children, and those individuals living with HIV/AIDS, become infected. According to the World Health Organization (WHO), HIV/AIDS, tuberculosis, and malaria accounted for more than 5,700,000 deaths in 2001 and caused debilitating illnesses in millions more.

(12) Together, HIV/AIDS, tuberculosis, malaria and related diseases are undermining agricultural production throughout Africa. According to the United Nations Food and Agricultural Organization, 7,000,000 agricultural workers throughout 25 African countries have died from AIDS since 1985. Countries with poorly developed agricultural systems, which already face chronic food shortages, are the hardest hit, particularly in sub-Saharan Africa, where high HIV prevalence rates are compounding the risk of starvation for an estimated 14,400,000 people.

(13) Tuberculosis is the cause of death for one out of every three people with AIDS worldwide and is a highly communicable disease. HIV infection is the leading threat to tuberculosis control. Because HIV infection so severely weakens the immune system, individuals with HIV and latent tuberculosis infection have a 100 times greater risk of developing active tuberculosis diseases thereby increasing the risk of spreading tuberculosis to others. Tuberculosis, in turn, accelerates the onset of AIDS in individuals infected with HIV.

(14) Malaria, the most deadly of all tropical parasitic diseases, has been undergoing a dramatic resurgence in recent years due to increasing resistance of the malaria parasite to inexpensive and effective drugs. At the same time, increasing

resistance of mosquitoes to standard insecticides makes control of transmission difficult to achieve. The World Health Organization estimates that between 300,000,000 and 500,000,000 new cases of malaria occur each year, and annual deaths from the disease number between 2,000,000 and 3,000,000. Persons infected with HIV are particularly vulnerable to the malaria parasite. The spread of HIV infection contributes to the difficulties of controlling resurgence of the drug resistant malaria parasite.

(15) HIV/AIDS is first and foremost a health problem. Successful strategies to stem the spread of the HIV/AIDS pandemic will require clinical medical interventions, the strengthening of health care delivery systems and infrastructure, and determined national leadership and increased budgetary allocations for the health sector in countries affected by the epidemic as well as measures to address the social and behavioral causes of the problem and its impact on families, communities, and societal sectors.

(16) Basic interventions to prevent new HIV infections and to bring care and treatment to people living with AIDS, such as voluntary counseling and testing and mother-to-child transmission programs, are achieving meaningful results and are cost-effective. The challenge is to expand these interventions from a pilot program basis to a national basis in a coherent and sustainable manner.

(17) Appropriate treatment of individuals with HIV/AIDS can prolong the lives of such individuals, preserve their families, prevent children from becoming orphans, and increase productivity of such individuals by allowing them to lead active lives and reduce the need for costly hospitalization for treatment of opportunistic infections caused by HIV.

(18) Nongovernmental organizations, including faith-based organizations, with experience in health care and HIV/AIDS counseling, have proven effective in combating the HIV/AIDS pandemic and can be a resource in assisting indigenous organizations in severely affected countries in their efforts to provide treatment and care for individuals infected with HIV/ AIDS.

(19) Faith-based organizations are making an important contribution to HIV prevention and AIDS treatment programs around the world. Successful HIV prevention programs in Uganda, Jamaica, and elsewhere have included local churches and faith-based groups in efforts to promote behavior changes to prevent HIV, to reduce stigma associated with HIV infection, to treat those afflicted with the disease, and to care for orphans. The Catholic Church alone currently cares for one in four people being treated for AIDS worldwide. Faith-based organizations possess infrastructure, experience, and knowledge that will be needed to carry out these programs in the future and should be an integral part of United States efforts.

(20)(A) Uganda has experienced the most significant decline in HIV rates of any country in Africa, including a decrease among pregnant women from 20.6 percent in 1991 to 7.9 percent in 2000.

(B) Uganda made this remarkable turnaround because President Yoweri Museveni spoke out early, breaking longstanding cultural taboos, and changed widespread perceptions

about the disease. His leadership stands as a model for ways political leaders in Africa and other developing countries can mobilize their nations, including civic organizations, professional associations, religious institutions, business and labor to combat HIV/AIDS.

(C) Uganda's successful AIDS treatment and prevention program is referred to as the ABC model: "Abstain, Be faithful, use Condoms", in order of priority. Jamaica, Zambia, Ethiopia and Senegal have also successfully used the ABC model. Beginning in 1986, Uganda brought about a fundamental change in sexual behavior by developing a low-cost program with the message: "Stop having multiple partners. Be faithful. Teenagers, wait until you are married before you begin sex.".

(D) By 1995, 95 percent of Ugandans were reporting either one or zero sexual partners in the past year, and the proportion of sexually active youth declined significantly from the late 1980s to the mid-1990s. The greatest percentage decline in HIV infections and the greatest degree of behavioral change occurred in those 15 to 19 years old. Uganda's success shows that behavior change, through the use of the ABC model, is a very successful way to prevent the spread of HIV.

(21) The magnitude and scope of the HIV/AIDS crisis demands a comprehensive, long-term, international response focused upon addressing the causes, reducing the spread, and ameliorating the consequences of the HIV/AIDS pandemic, including—

(A) prevention and education, care and treatment, basic and applied research, and training of health care workers, particularly at the community and provincial levels, and other community workers and leaders needed to cope with the range of consequences of the HIV/AIDS crisis;

(B) development of health care infrastructure and delivery systems through cooperative and coordinated public efforts and public and private partnerships;

(C) development and implementation of national and community-based multisector strategies that address the impact of HIV/AIDS on the individual, family, community, and nation and increase the participation of at-risk populations in programs designed to encourage behavioral and social change and reduce the stigma associated with HIV/AIDS; and

(D) coordination of efforts between international organizations such as the Global Fund to Fight AIDS, Tuberculosis and Malaria, the Joint United Nations Programme on HIV/AIDS (UNAIDS), the World Health Organization (WHO), national governments, and private sector organizations, including faith-based organizations.

(22) The United States has the capacity to lead and enhance the effectiveness of the international community's response by—

(A) providing substantial financial resources, technical expertise, and training, particularly of health care personnel and community workers and leaders;

(B) promoting vaccine and microbicide research and the development of new treatment protocols in the public and commercial pharmaceutical research sectors;

(C) making available pharmaceuticals and diagnostics for HIV/AIDS therapy;

(D) encouraging governments and faith-based and community-based organizations to adopt policies that treat HIV/AIDS as a multisectoral public health problem affecting not only health but other areas such as agriculture, education, the economy, the family and society, and assisting them to develop and implement programs corresponding to these needs;

(E) promoting healthy lifestyles, including abstinence, delaying sexual debut, monogamy, marriage, faithfulness, use of condoms, and avoiding substance abuse; and

(F) encouraging active involvement of the private sector, including businesses, pharmaceutical and biotechnology companies, the medical and scientific communities, charitable foundations, private and voluntary organizations and nongovernmental organizations, faith-based organizations, community-based organizations, and other nonprofit entities.

(23) Prostitution and other sexual victimization are degrading to women and children and it should be the policy of the United States to eradicate such practices. The sex industry, the trafficking of individuals into such industry, and sexual violence are additional causes of and factors in the spread of the HIV/AIDS epidemic. One in nine South Africans is living with AIDS, and sexual assault is rampant, at a victimization rate of one in three women. Meanwhile in Cambodia, as many as 40 percent of prostitutes are infected with HIV and the country has the highest rate of increase of HIV infection in all of Southeast Asia. Victims of coercive sexual encounters do not get to make choices about their sexual activities.

(24) Strong coordination must exist among the various agencies of the United States to ensure effective and efficient use of financial and technical resources within the United States Government with respect to the provision of international HIV/AIDS assistance.

(25) In his address to Congress on January 28, 2003, the President announced the Administration's intention to embark on a five-year emergency plan for AIDS relief, to confront HIV/AIDS with the goals of preventing 7,000,000 new HIV/AIDS infections, treating at least 2,000,000 people with life-extending drugs, and providing humane care for millions of people suffering from HIV/AIDS, and for children orphaned by HIV/AIDS.

(26) In this address to Congress, the President stated the following: "Today, on the continent of Africa, nearly 30,000,000 people have the AIDS virus—including 3,000,000 children under the age of 15. There are whole countries in Africa where more than one-third of the adult population carries the infection. More than 4,000,000 require immediate drug treatment. Yet across that continent, only 50,000 AIDS victims—only 50,000—are receiving the medicine they need.".

(27) Furthermore, the President focused on care and treatment of HIV/AIDS in his address to Congress, stating the following: "Because the AIDS diagnosis is considered a death sentence, many do not seek treatment. Almost all who do are turned away. A doctor in rural South Africa describes his frustration. He says, 'We have no medicines. Many hospitals tell people, you've got AIDS, we can't help you. Go home and

PUBLIC LAW 108–25—MAY 27, 2003          117 STAT. 717

die.' In an age of miraculous medicines, no person should have
to hear those words. AIDS can be prevented. Anti-retroviral
drugs can extend life for many years * * * Ladies and gentle-
men, seldom has history offered a greater opportunity to do
so much for so many.".

(28) Finally, the President stated that "[w]e have con-
fronted, and will continue to confront, HIV/AIDS in our own
country", proposing now that the United States should lead
the world in sparing innocent people from a plague of nature,
and asking Congress "to commit $15,000,000,000 over the next
five years, including nearly $10,000,000,000 in new money,
to turn the tide against AIDS in the most afflicted nations
of Africa and the Caribbean".

**SEC. 3. DEFINITIONS.**                                    22 USC 7602.

In this Act:
(1) AIDS.—The term "AIDS" means the acquired immune
deficiency syndrome.
(2) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term
"appropriate congressional committees" means the Committee
on Foreign Relations of the Senate and the Committee on
International Relations of the House of Representatives.
(3) GLOBAL FUND.—The term "Global Fund" means the
public-private partnership known as the Global Fund to Fight
AIDS, Tuberculosis and Malaria established pursuant to Article
80 of the Swiss Civil Code.
(4) HIV.—The term "HIV" means the human immuno-
deficiency virus, the pathogen that causes AIDS.
(5) HIV/AIDS.—The term "HIV/AIDS" means, with respect
to an individual, an individual who is infected with HIV or
living with AIDS.
(6) RELEVANT EXECUTIVE BRANCH AGENCIES.—The term
"relevant executive branch agencies" means the Department
of State, the United States Agency for International Develop-
ment, and any other department or agency of the United States
that participates in international HIV/AIDS activities pursuant
to the authorities of such department or agency or the Foreign
Assistance Act of 1961.

**SEC. 4. PURPOSE.**                                        22 USC 7603.

The purpose of this Act is to strengthen United States leader-
ship and the effectiveness of the United States response to certain
global infectious diseases by—
(1) establishing a comprehensive, integrated five-year,
global strategy to fight HIV/AIDS that encompasses a plan
for phased expansion of critical programs and improved
coordination among relevant executive branch agencies and
between the United States and foreign governments and inter-
national organizations;
(2) providing increased resources for multilateral efforts
to fight HIV/AIDS;
(3) providing increased resources for United States bilateral
efforts, particularly for technical assistance and training, to
combat HIV/AIDS, tuberculosis, and malaria;
(4) encouraging the expansion of private sector efforts and
expanding public-private sector partnerships to combat HIV/
AIDS; and

117 STAT. 718          PUBLIC LAW 108–25—MAY 27, 2003

(5) intensifying efforts to support the development of vaccines and treatment for HIV/AIDS, tuberculosis, and malaria.

Deadline.
22 USC 7604.

**SEC. 5. AUTHORITY TO CONSOLIDATE AND COMBINE REPORTS.**

With respect to the reports required by this Act to be submitted by the President, to ensure an efficient use of resources, the President may, in his discretion and notwithstanding any other provision of this Act, consolidate or combine any of these reports, except for the report required by section 101 of this Act, so long as the required elements of each report are addressed and reported within a 90-day period from the original deadline date for submission of the report specified in this Act. The President may also enter into contracts with organizations with relevant expertise to develop, originate, or contribute to any of the reports required by this Act to be submitted by the President.

# TITLE I—POLICY PLANNING AND COORDINATION

**SEC. 101. DEVELOPMENT OF A COMPREHENSIVE, FIVE-YEAR, GLOBAL STRATEGY.**

President.
22 USC 7611.

(a) STRATEGY.—The President shall establish a comprehensive, integrated, five-year strategy to combat global HIV/AIDS that strengthens the capacity of the United States to be an effective leader of the international campaign against HIV/AIDS. Such strategy shall maintain sufficient flexibility and remain responsive to the ever-changing nature of the HIV/AIDS pandemic and shall—

(1) include specific objectives, multisectoral approaches, and specific strategies to treat individuals infected with HIV/AIDS and to prevent the further spread of HIV infections, with a particular focus on the needs of families with children (including the prevention of mother-to-child transmission), women, young people, and children (such as unaccompanied minor children and orphans);

(2) as part of the strategy, implement a tiered approach to direct delivery of care and treatment through a system based on central facilities augmented by expanding circles of local delivery of care and treatment through local systems and capacity;

(3) assign priorities for relevant executive branch agencies;

(4) provide that the reduction of HIV/AIDS behavioral risks shall be a priority of all prevention efforts in terms of funding, educational messages, and activities by promoting abstinence from sexual activity and substance abuse, encouraging monogamy and faithfulness, promoting the effective use of condoms, and eradicating prostitution, the sex trade, rape, sexual assault and sexual exploitation of women and children;

(5) improve coordination and reduce duplication among relevant executive branch agencies, foreign governments, and international organizations;

(6) project general levels of resources needed to achieve the stated objectives;

(7) expand public-private partnerships and the leveraging of resources;

(8) maximize United States capabilities in the areas of technical assistance and training and research, including vaccine research;

(9) establish priorities for the distribution of resources based on factors such as the size and demographics of the population with HIV/AIDS, tuberculosis, and malaria and the needs of that population and the existing infrastructure or funding levels that may exist to cure, treat, and prevent HIV/AIDS, tuberculosis, and malaria; and

(10) include initiatives describing how the President will maximize the leverage of private sector dollars in reduction and treatment of HIV/AIDS, tuberculosis, and malaria.

(b) REPORT.—

(1) IN GENERAL.—Not later than 270 days after the date of enactment of this Act, the President shall submit to the appropriate congressional committees a report setting forth the strategy described in subsection (a). *Deadline. President.*

(2) REPORT CONTENTS.—The report required by paragraph (1) shall include a discussion of the elements described in paragraph (3) and may include a discussion of additional elements relevant to the strategy described in subsection (a). Such discussion may include an explanation as to why a particular element described in paragraph (3) is not relevant to such strategy.

(3) REPORT ELEMENTS.—The elements referred to in paragraph (2) are the following:

(A) The objectives, general and specific, of the strategy.

(B) A description of the criteria for determining success of the strategy.

(C) A description of the manner in which the strategy will address the fundamental elements of prevention and education, care, and treatment (including increasing access to pharmaceuticals and to vaccines), the promotion of abstinence, monogamy, avoidance of substance abuse, and use of condoms, research (including incentives for vaccine development and new protocols), training of health care workers, the development of health care infrastructure and delivery systems, and avoidance of substance abuse.

(D) A description of the manner in which the strategy will promote the development and implementation of national and community-based multisectoral strategies and programs, including those designed to enhance leadership capacity particularly at the community level.

(E) A description of the specific strategies developed to meet the unique needs of women, including the empowerment of women in interpersonal situations, young people and children, including those orphaned by HIV/AIDS and those who are victims of the sex trade, rape, sexual abuse, assault, and exploitation.

(F) A description of the specific strategies developed to encourage men to be responsible in their sexual behavior, child rearing and to respect women including the reduction of sexual violence and coercion.

(G) A description of the specific strategies developed to increase women's access to employment opportunities, income, productive resources, and microfinance programs.

(H) A description of the programs to be undertaken to maximize United States contributions in the areas of technical assistance, training (particularly of health care workers and community-based leaders in affected sectors), and research, including the promotion of research on vaccines and microbicides.

(I) An identification of the relevant executive branch agencies that will be involved and the assignment of priorities to those agencies.

(J) A description of the role of each relevant executive branch agency and the types of programs that the agency will be undertaking.

(K) A description of the mechanisms that will be utilized to coordinate the efforts of the relevant executive branch agencies, to avoid duplication of efforts, to enhance on-site coordination efforts, and to ensure that each agency undertakes programs primarily in those areas where the agency has the greatest expertise, technical capabilities, and potential for success.

(L) A description of the mechanisms that will be utilized to ensure greater coordination between the United States and foreign governments and international organizations including the Global Fund, UNAIDS, international financial institutions, and private sector organizations.

(M) The level of resources that will be needed on an annual basis and the manner in which those resources would generally be allocated among the relevant executive branch agencies.

(N) A description of the mechanisms to be established for monitoring and evaluating programs, promoting successful models, and for terminating unsuccessful programs.

(O) A description of the manner in which private, nongovernmental entities will factor into the United States Government-led effort and a description of the type of partnerships that will be created to maximize the capabilities of these private sector entities and to leverage resources.

(P) A description of the ways in which United States leadership will be used to enhance the overall international response to the HIV/AIDS pandemic and particularly to heighten the engagement of the member states of the G–8 and to strengthen key financial and coordination mechanisms such as the Global Fund and UNAIDS.

(Q) A description of the manner in which the United States strategy for combating HIV/AIDS relates to and supports other United States assistance strategies in developing countries.

(R) A description of the programs to be carried out under the strategy that are specifically targeted at women and girls to educate them about the spread of HIV/AIDS.

(S) A description of efforts being made to address the unique needs of families with children with respect to HIV/AIDS, including efforts to preserve the family unit.

(T) An analysis of the emigration of critically important medical and public health personnel, including physicians,

PUBLIC LAW 108–25—MAY 27, 2003        117 STAT. 721

nurses, and supervisors from sub-Saharan African countries that are acutely impacted by HIV/AIDS, including a description of the causes, effects, and the impact on the stability of health infrastructures, as well as a summary of incentives and programs that the United States could provide, in concert with other private and public sector partners and international organizations, to stabilize health institutions by encouraging critical personnel to remain in their home countries.

(U) A description of the specific strategies developed to promote sustainability of HIV/AIDS pharmaceuticals (including antiretrovirals) and the effects of drug resistance on HIV/AIDS patients.

(V) A description of the specific strategies to ensure that the extraordinary benefit of HIV/AIDS pharmaceuticals (especially antiretrovirals) are not diminished through the illegal counterfeiting of pharmaceuticals and black market sales of such pharmaceuticals.

(W) An analysis of the prevalence of Human Papilloma Virus (HPV) in sub-Saharan Africa and the impact that condom usage has upon the spread of HPV in sub-Saharan Africa.

(c) STUDY; DISTRIBUTION OF RESOURCES.—

(1) STUDY.—Not later than 3 years after the date of the enactment of this Act, the Institute of Medicine shall publish findings comparing the success rates of the various programs and methods used under the strategy described in subsection (a) to reduce, prevent, and treat HIV/AIDS, tuberculosis, and malaria. <span>Deadline. Publication.</span>

(2) DISTRIBUTION OF RESOURCES.—In prioritizing the distribution of resources under the strategy described in subsection (a), the President shall consider the findings published by the Institute of Medicine under this subsection. <span>President.</span>

**SEC. 102. HIV/AIDS RESPONSE COORDINATOR.**        22 USC 7612.

(a) ESTABLISHMENT OF POSITION.—Section 1 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 265(a)) is amended—        22 USC 2651a.

(1) by redesignating subsection (f) as subsection (g); and

(2) by inserting after subsection (e) the following:

"(f) HIV/AIDS RESPONSE COORDINATOR.—

"(1) IN GENERAL.—There shall be established within the Department of State in the immediate office of the Secretary of State a Coordinator of United States Government Activities to Combat HIV/AIDS Globally, who shall be appointed by the President, by and with the advice and consent of the Senate. The Coordinator shall report directly to the Secretary. <span>President.</span>

"(2) AUTHORITIES AND DUTIES; DEFINITIONS.—

"(A) AUTHORITIES.—The Coordinator, acting through such nongovernmental organizations (including faith-based and community-based organizations) and relevant executive branch agencies as may be necessary and appropriate to effect the purposes of this section, is authorized—

"(i) to operate internationally to carry out prevention, care, treatment, support, capacity development, and other activities for combatting HIV/AIDS;

117 STAT. 722          PUBLIC LAW 108–25—MAY 27, 2003

"(ii) to transfer and allocate funds to relevant executive branch agencies; and

"(iii) to provide grants to, and enter into contracts with, nongovernmental organizations (including faith-based and community-based organizations) to carry out the purposes of section.

"(B) DUTIES.—

"(i) IN GENERAL.—The Coordinator shall have primary responsibility for the oversight and coordination of all resources and international activities of the United States Government to combat the HIV/AIDS pandemic, including all programs, projects, and activities of the United States Government relating to the HIV/AIDS pandemic under the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 or any amendment made by that Act.

"(ii) SPECIFIC DUTIES.—The duties of the Coordinator shall specifically include the following:

"(I) Ensuring program and policy coordination among the relevant executive branch agencies and nongovernmental organizations, including auditing, monitoring, and evaluation of all such programs.

"(II) Ensuring that each relevant executive branch agency undertakes programs primarily in those areas where the agency has the greatest expertise, technical capabilities, and potential for success.

"(III) Avoiding duplication of effort.

"(IV) Ensuring coordination of relevant executive branch agency activities in the field.

"(V) Pursuing coordination with other countries and international organizations.

"(VI) Resolving policy, program, and funding disputes among the relevant executive branch agencies.

"(VII) Directly approving all activities of the United States (including funding) relating to combatting HIV/AIDS in each of Botswana, Cote d'Ivoire, Ethiopia, Guyana, Haiti, Kenya, Mozambique, Namibia, Nigeria, Rwanda, South Africa, Tanzania, Uganda, Zambia, and other countries designated by the President, which other designated countries may include those countries in which the United States is implementing HIV/AIDS programs as of the date of the enactment of the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003.

"(VIII) Establishing due diligence criteria for all recipients of funds section and all activities subject to the coordination and appropriate monitoring, evaluation, and audits carried out by the Coordinator necessary to assess the measurable outcomes of such activities.

"(C) DEFINITIONS.—In this paragraph:

"(i) AIDS.—The term 'AIDS' means acquired immune deficiency syndrome.

"(ii) HIV.—The term 'HIV' means the human immunodeficiency virus, the pathogen that causes AIDS.

"(iii) HIV/AIDS.—The term 'HIV/AIDS' means, with respect to an individual, an individual who is infected with HIV or living with AIDS.

"(iv) RELEVANT EXECUTIVE BRANCH AGENCIES.—The term 'relevant executive branch agencies' means the Department of State, the United States Agency for International Development, the Department of Health and Human Services (including the Public Health Service), and any other department or agency of the United States that participates in international HIV/AIDS activities pursuant to the authorities of such department or agency or this Act.".

(b) RESOURCES.—Not later than 90 days after the date of enactment of this Act, the President shall specify the necessary financial and personnel resources, from funds appropriated pursuant to the authorization of appropriations under section 401 for HIV/AIDS assistance, that shall be assigned to and under the direct control of the Coordinator of United States Government Activities to Combat HIV/AIDS Globally to establish and maintain the duties and supporting activities assigned to the Coordinator by this Act and the amendments made by this Act.

*Deadline.*
*President.*

(c) ESTABLISHMENT OF SEPARATE ACCOUNT.—There is established in the general fund of the Treasury a separate account which shall be known as the "Activities to Combat HIV/AIDS Globally Fund" and which shall be administered by the Coordinator of United States Government Activities to Combat HIV/AIDS Globally. There shall be deposited into the Fund all amounts appropriated pursuant to the authorization of appropriations under section 401 for HIV/AIDS assistance, except for amounts appropriated for United States contributions to the Global Fund.

# TITLE II—SUPPORT FOR MULTILATERAL FUNDS, PROGRAMS, AND PUBLIC-PRIVATE PARTNERSHIPS

**SEC. 201. SENSE OF CONGRESS ON PUBLIC-PRIVATE PARTNERSHIPS.**

22 USC 7621.

(a) FINDINGS.—Congress makes the following findings:

(1) Innovative partnerships between governments and organizations in the private sector (including foundations, universities, corporations, faith-based and community-based organizations, and other nongovernmental organizations) have proliferated in recent years, particularly in the area of health.

(2) Public-private sector partnerships multiply local and international capacities to strengthen the delivery of health services in developing countries and to accelerate research for vaccines and other pharmaceutical products that are essential to combat infectious diseases decimating the populations of these countries.

(3) These partnerships maximize the unique capabilities of each sector while combining financial and other resources, scientific knowledge, and expertise toward common goals which neither the public nor the private sector can achieve alone.

117 STAT. 724          PUBLIC LAW 108–25—MAY 27, 2003

(4) Sustaining existing public-private partnerships and building new ones are critical to the success of the international community's efforts to combat HIV/AIDS and other infectious diseases around the globe.

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the sustainment and promotion of public-private partnerships should be a priority element of the strategy pursued by the United States to combat the HIV/AIDS pandemic and other global health crises; and

(2) the United States should systematically track the evolution of these partnerships and work with others in the public and private sector to profile and build upon those models that are most effective.

22 USC 7622.

**SEC. 202. PARTICIPATION IN THE GLOBAL FUND TO FIGHT AIDS, TUBERCULOSIS AND MALARIA.**

(a) FINDINGS.—The Congress finds as follows:

(1) The establishment of the Global Fund in January 2002 is consistent with the general principles for an international AIDS trust fund first outlined by the Congress in the Global AIDS and Tuberculosis Relief Act of 2000 (Public Law 106–264).

(2) Section 2, Article 5 of the bylaws of the Global Fund provides for the International Bank for Reconstruction and Development to serve as the initial collection trustee for the Global Fund.

(3) The trustee agreement signed between the Global Fund and the International Bank for Reconstruction and Development narrows the range of duties to include receiving and investing funds from donors, disbursing the funds upon the instruction of the Global Fund, reporting on trust fund resources to donors and the Global Fund, and providing an annual external audit report to the Global Fund.

(b) AUTHORITY FOR UNITED STATES PARTICIPATION.—

(1) UNITED STATES PARTICIPATION.—The United States is hereby authorized to participate in the Global Fund.

(2) PRIVILEGES AND IMMUNITIES.—The Global Fund shall be considered a public international organization for purposes of section 1 of the International Organizations Immunities Act (22 U.S.C. 288).

Deadline.
President.

(c) REPORTS TO CONGRESS.—Not later than 1 year after the date of the enactment of this Act, and annually thereafter for the duration of the Global Fund, the President shall submit to the appropriate congressional committees a report on the Global Fund, including contributions pledged to, contributions (including donations from the private sector) received by, and projects funded by the Global Fund, and the mechanisms established for transparency and accountability in the grant-making process.

(d) UNITED STATES FINANCIAL PARTICIPATION.—

(1) AUTHORIZATION OF APPROPRIATIONS.—In addition to any other funds authorized to be appropriated for bilateral or multilateral HIV/AIDS, tuberculosis, or malaria programs, of the amounts authorized to be appropriated under section 401, there are authorized to be appropriated to the President up to $1,000,000,000 for the period of fiscal year 2004 beginning on January 1, 2004, and such sums as may be necessary for

the fiscal years 2005–2008, for contributions to the Global Fund.

(2) AVAILABILITY OF FUNDS.—Amounts appropriated under paragraph (1) are authorized to remain available until expended.

(3) REPROGRAMMING OF FISCAL YEAR 2001 FUNDS.—Funds made available for fiscal year 2001 under section 141 of the Global AIDS and Tuberculosis Relief Act of 2000—

(A) are authorized to remain available until expended; and

(B) shall be transferred to, merged with, and made available for the same purposes as, funds made available for fiscal years 2004 through 2008 under paragraph (1).

(4) LIMITATION.—

(A)(i) At any time during fiscal years 2004 through 2008, no United States contribution to the Global Fund may cause the total amount of United States Government contributions to the Global Fund to exceed 33 percent of the total amount of funds contributed to the Global Fund from all sources. Contributions to the Global Fund from the International Bank for Reconstruction and Development and the International Monetary Fund shall not be considered in determining compliance with this paragraph.

(ii) If, at any time during any of the fiscal years 2004 through 2008, the President determines that the Global Fund has provided assistance to a country, the government of which the Secretary of State has determined, for purposes of section 6(j)(1) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)(1)), has repeatedly provided support for acts of international terrorism, then the United States shall withhold from its contribution for the next fiscal year an amount equal to the amount expended by the Fund to the government of each such country.

(iii) If at any time the President determines that the expenses of the Governing, Administrative, and Advisory Bodies (including the Partnership Forum, the Foundation Board, the Secretariat, and the Technical Review Board) of the Global Fund exceed 10 percent of the total expenditures of the Fund for any 2-year period, the United States shall withhold from its contribution for the next fiscal year an amount equal the to the average annual amount expended by the Fund for such 2-year period for the expenses of the Governing, Administrative, and Advisory Bodies in excess of 10 percent of the total expenditures of the Fund.

(iv) The President may waive the application of clause (iii) if the President determines that extraordinary circumstances warrant such a waiver. No waiver under this clause may be for any period that exceeds 1 year.

(v) If, at any time during any of the fiscal years 2004 through 2008, the President determines that the salary of any individual employed by the Global Fund exceeds the salary of the Vice President of the United States (as determined under section 104 of title 3, United States Code) for that fiscal year, then the United States shall withhold from its contribution for the next fiscal year an

amount equal to the aggregate amount by which the salary of each such individual exceeds the salary of the Vice President of the United States.

(B)(i) Any amount made available under this subsection that is withheld by reason of subparagraph (A)(i) shall be contributed to the Global Fund as soon as practicable, subject to subparagraph (A)(i), after additional contributions to the Global Fund are made from other sources.

(ii) Any amount made available under this subsection that is withheld by reason of subparagraph (A)(iii) shall be transferred to the Activities to Combat HIV/AIDS Globally Fund and shall remain available under the same terms and conditions as funds appropriated pursuant to the authorization of appropriations under section 401 for HIV/AIDS assistance.

(iii) Any amount made available under this subsection that is withheld by reason of clause (ii) or (iii) of subparagraph (A) is authorized to be made available to carry out section 104A of the Foreign Assistance Act of 1961 (as added by section 301 of this Act). Amounts made available under the preceding sentence are in addition to amounts appropriated pursuant to the authorization of appropriations under section 401 of this Act for HIV/AIDS assistance.

(C)(i) The President may suspend the application of subparagraph (A) with respect to a fiscal year if the President determines that an international health emergency threatens the national security interests of the United States.

President.
Notification.
Deadline.

(ii) The President shall notify the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate not less than 5 days before making a determination under clause (i) with respect to the application of subparagraph (A)(i) and shall include in the notification—

(I) a justification as to why increased United States Government contributions to the Global Fund is preferable to increased United States assistance to combat HIV/AIDS, tuberculosis, and malaria on a bilateral basis; and

(II) an explanation as to why other government donors to the Global Fund are unable to provide adequate contributions to the Fund.

(e) INTERAGENCY TECHNICAL REVIEW PANEL.—

(1) ESTABLISHMENT.—The Coordinator of United States Government Activities to Combat HIV/AIDS Globally, established in section 1(f)(1) of the State Department Basic Authorities Act of 1956 (as added by section 102(a) of this Act), shall establish in the executive branch an interagency technical review panel.

(2) DUTIES.—The interagency technical review panel shall serve as a "shadow" panel to the Global Fund by—

(A) periodically reviewing all proposals received by the Global Fund; and

(B) providing guidance to the United States persons who are representatives on the panels, committees, and boards of the Global Fund, on the technical efficacy, suitability, and appropriateness of the proposals, and ensuring

that such persons are fully informed of technical inadequacies or other aspects of the proposals that are inconsistent with the purposes of this or any other Act relating to the provision of foreign assistance in the area of AIDS.

(3) MEMBERSHIP.—The interagency technical review panel shall consist of qualified medical and development experts who are officers or employees of the Department of Health and Human Services, the Department of State, and the United States Agency for International Development.

(4) CHAIR.—The Coordinator referred to in paragraph (1) shall chair the interagency technical review panel.

(f) MONITORING BY COMPTROLLER GENERAL.—

(1) MONITORING.—The Comptroller General shall monitor and evaluate projects funded by the Global Fund.

(2) REPORT.—The Comptroller General shall on a biennial basis shall prepare and submit to the appropriate congressional committees a report that contains the results of the monitoring and evaluation described in paragraph (1) for the preceding 2-year period.

(g) PROVISION OF INFORMATION TO CONGRESS.—The Coordinator of United States Government Activities to Combat HIV/AIDS Globally shall make available to the Congress the following documents within 30 days of a request by the Congress for such documents: *Deadline.*

(1) All financial and accounting statements for the Global Fund and the Activities to Combat HIV/AIDS Globally Fund, including administrative and grantee statements.

(2) Reports provided to the Global Fund and the Activities to Combat HIV/AIDS Globally Fund by organizations contracted to audit recipients of funds.

(3) Project proposals submitted by applicants for funding from the Global Fund and the Activities to Combat HIV/AIDS Globally Fund, but which were not funded.

(4) Progress reports submitted to the Global Fund and the Activities to Combat HIV/AIDS Globally Fund by grantees.

(h) SENSE OF THE CONGRESS REGARDING ENCOURAGEMENT OF PRIVATE CONTRIBUTIONS TO THE GLOBAL FUND.—It is the sense of the Congress that the President should—

(1) conduct an outreach campaign that is designed to—

(A) inform the public of the existence of—

(i) the Global Fund; and

(ii) any entity that will accept private contributions intended for use by the Global Fund; and

(B) encourage private contributions to the Global Fund; and

(2) encourage private contributions intended for use by the Global Fund by—

(A) establishing and operating an Internet website, and publishing information about the website; and

(B) making public service announcements on radio and television.

### SEC. 203. VOLUNTARY CONTRIBUTIONS TO INTERNATIONAL VACCINE FUNDS.

(a) VACCINE FUND.—Section 302(k) of the Foreign Assistance Act of 1961 (22 U.S.C. 2222(k)) is amended—

(1) by striking "$50,000,000 for each of the fiscal years 2001 and 2002" and inserting "such sums as may be necessary for each of the fiscal years 2004 through 2008"; and

(2) by striking "Global Alliance for Vaccines and Immunizations" and inserting "Vaccine Fund".

(b) INTERNATIONAL AIDS VACCINE INITIATIVE.—Section 302(l) of the Foreign Assistance Act of 1961 (22 U.S.C. 2222(l)) is amended by striking "$10,000,000 for each of the fiscal years 2001 and 2002" and inserting "such sums as may be necessary for each of the fiscal years 2004 through 2008".

(c) SUPPORT FOR THE DEVELOPMENT OF MALARIA VACCINE.— Section 302 of the Foreign Assistance Act of 1961 (22 U.S.C. 2222)) is amended by adding at the end the following new subsection:

"(m) In addition to amounts otherwise available under this section, there are authorized to be appropriated to the President such sums as may be necessary for each of the fiscal years 2004 through 2008 to be available for United States contributions to malaria vaccine development programs, including the Malaria Vaccine Initiative of the Program for Appropriate Technologies in Health (PATH).".

# TITLE III—BILATERAL EFFORTS

## Subtitle A—General Assistance and Programs

22 USC 7631.

**SEC. 301. ASSISTANCE TO COMBAT HIV/AIDS.**

(a) AMENDMENT OF THE FOREIGN ASSISTANCE ACT OF 1961.— Chapter 1 of part I of the Foreign Assistance Act of 1961 (22 U.S.C. 2151 et seq.) is amended—

(1) in section 104(c) (22 U.S.C. 2151b(c)), by striking paragraphs (4) through (7); and

(2) by inserting after section 104 the following new section:

22 USC 2151b–2.

**"SEC. 104A. ASSISTANCE TO COMBAT HIV/AIDS.**

"(a) FINDING.—Congress recognizes that the alarming spread of HIV/AIDS in countries in sub-Saharan Africa, the Caribbean, and other developing countries is a major global health, national security, development, and humanitarian crisis.

"(b) POLICY.—It is a major objective of the foreign assistance program of the United States to provide assistance for the prevention, treatment, and control of HIV/AIDS. The United States and other developed countries should provide assistance to countries in sub-Saharan Africa, the Caribbean, and other countries and areas to control this crisis through HIV/AIDS prevention, treatment, monitoring, and related activities, particularly activities focused on women and youth, including strategies to protect women and prevent mother-to-child transmission of the HIV infection.

"(c) AUTHORIZATION.—

"(1) IN GENERAL.—Consistent with section 104(c), the President is authorized to furnish assistance, on such terms and conditions as the President may determine, for HIV/AIDS, including to prevent, treat, and monitor HIV/AIDS, and carry out related activities, in countries in sub-Saharan Africa, the Caribbean, and other countries and areas.

PUBLIC LAW 108–25—MAY 27, 2003          117 STAT. 729

"(2) ROLE OF NGOS.—It is the sense of Congress that the President should provide an appropriate level of assistance under paragraph (1) through nongovernmental organizations (including faith-based and community-based organizations) in countries in sub-Saharan Africa, the Caribbean, and other countries and areas affected by the HIV/AIDS pandemic.

"(3) COORDINATION OF ASSISTANCE EFFORTS.—The President shall coordinate the provision of assistance under paragraph (1) with the provision of related assistance by the Joint United Nations Programme on HIV/AIDS (UNAIDS), the United Nations Children's Fund (UNICEF), the World Health Organization (WHO), the United Nations Development Programme (UNDP), the Global Fund to Fight AIDS, Tuberculosis and Malaria and other appropriate international organizations (such as the International Bank for Reconstruction and Development), relevant regional multilateral development institutions, national, state, and local governments of foreign countries, appropriate governmental and nongovernmental organizations, and relevant executive branch agencies.

President.

"(d) ACTIVITIES SUPPORTED.—Assistance provided under subsection (c) shall, to the maximum extent practicable, be used to carry out the following activities:

"(1) PREVENTION.—Prevention of HIV/AIDS through activities including—

"(A) programs and efforts that are designed or intended to impart knowledge with the exclusive purpose of helping individuals avoid behaviors that place them at risk of HIV infection, including integration of such programs into health programs and the inclusion in counseling programs of information on methods of avoiding infection of HIV, including delaying sexual debut, abstinence, fidelity and monogamy, reduction of casual sexual partnering, reducing sexual violence and coercion, including child marriage, widow inheritance, and polygamy, and where appropriate, use of condoms;

"(B) assistance to establish and implement culturally appropriate HIV/AIDS education and prevention programs that focus on helping individuals avoid infection of HIV/AIDS, implemented through nongovernmental organizations, including faith-based and community-based organizations, particularly those organizations that utilize both professionals and volunteers with appropriate skills, experience, and community presence;

"(C) assistance for the purpose of encouraging men to be responsible in their sexual behavior, child rearing, and to respect women;

"(D) assistance for the purpose of providing voluntary testing and counseling (including the incorporation of confidentiality protections with respect to such testing and counseling);

"(E) assistance for the purpose of preventing mother-to-child transmission of the HIV infection, including medications to prevent such transmission and access to infant formula and other alternatives for infant feeding;

"(F) assistance to ensure a safe blood supply and sterile medical equipment;

"(G) assistance to help avoid substance abuse and intravenous drug use that can lead to HIV infection; and

(H) assistance for the purpose of increasing women's access to employment opportunities, income, productive resources, and microfinance programs, where appropriate.

"(2) TREATMENT.—The treatment and care of individuals with HIV/AIDS, including—

"(A) assistance to establish and implement programs to strengthen and broaden indigenous health care delivery systems and the capacity of such systems to deliver HIV/AIDS pharmaceuticals and otherwise provide for the treatment of individuals with HIV/AIDS, including clinical training for indigenous organizations and health care providers;

"(B) assistance to strengthen and expand hospice and palliative care programs to assist patients debilitated by HIV/AIDS, their families, and the primary caregivers of such patients, including programs that utilize faith-based and community-based organizations; and

"(C) assistance for the purpose of the care and treatment of individuals with HIV/AIDS through the provision of pharmaceuticals, including antiretrovirals and other pharmaceuticals and therapies for the treatment of opportunistic infections, nutritional support, and other treatment modalities.

"(3) PREVENTATIVE INTERVENTION EDUCATION AND TECHNOLOGIES.—(A) With particular emphasis on specific populations that represent a particularly high risk of contracting or spreading HIV/AIDS, including those exploited through the sex trade, victims of rape and sexual assault, individuals already infected with HIV/AIDS, and in cases of occupational exposure of health care workers, assistance with efforts to reduce the risk of HIV/AIDS infection including post-exposure pharmaceutical prophylaxis, and necessary pharmaceuticals and commodities, including test kits, condoms, and, when proven effective, microbicides.

"(B) Bulk purchases of available test kits, condoms, and, when proven effective, microbicides that are intended to reduce the risk of HIV/AIDS transmission and for appropriate program support for the introduction and distribution of these commodities, as well as education and training on the use of the technologies.

"(4) MONITORING.—The monitoring of programs, projects, and activities carried out pursuant to paragraphs (1) through (3), including—

"(A) monitoring to ensure that adequate controls are established and implemented to provide HIV/AIDS pharmaceuticals and other appropriate medicines to poor individuals with HIV/AIDS;

"(B) appropriate evaluation and surveillance activities;

"(C) monitoring to ensure that appropriate measures are being taken to maintain the sustainability of HIV/AIDS pharmaceuticals (especially antiretrovirals) and ensure that drug resistance is not compromising the benefits of such pharmaceuticals; and

"(D) monitoring to ensure appropriate law enforcement officials are working to ensure that HIV/AIDS pharmaceuticals are not diminished through illegal counterfeiting or black market sales of such pharmaceuticals.

"(5) PHARMACEUTICALS.—

"(A) PROCUREMENT.—The procurement of HIV/AIDS pharmaceuticals, antiviral therapies, and other appropriate medicines, including medicines to treat opportunistic infections.

"(B) MECHANISMS FOR QUALITY CONTROL AND SUSTAINABLE SUPPLY.—Mechanisms to ensure that such HIV/AIDS pharmaceuticals, antiretroviral therapies, and other appropriate medicines are quality-controlled and sustainably supplied.

"(C) DISTRIBUTION.—The distribution of such HIV/AIDS pharmaceuticals, antiviral therapies, and other appropriate medicines (including medicines to treat opportunistic infections) to qualified national, regional, or local organizations for the treatment of individuals with HIV/AIDS in accordance with appropriate HIV/AIDS testing and monitoring requirements and treatment protocols and for the prevention of mother-to-child transmission of the HIV infection.

"(6) RELATED ACTIVITIES.—The conduct of related activities, including—

"(A) the care and support of children who are orphaned by the HIV/AIDS pandemic, including services designed to care for orphaned children in a family environment which rely on extended family members;

"(B) improved infrastructure and institutional capacity to develop and manage education, prevention, and treatment programs, including training and the resources to collect and maintain accurate HIV surveillance data to target programs and measure the effectiveness of interventions; and

"(C) vaccine research and development partnership programs with specific plans of action to develop a safe, effective, accessible, preventive HIV vaccine for use throughout the world.

"(7) COMPREHENSIVE HIV/AIDS PUBLIC-PRIVATE PARTNERSHIPS.—The establishment and operation of public-private partnership entities within countries in sub-Saharan Africa, the Caribbean, and other countries affected by the HIV/AIDS pandemic that are dedicated to supporting the national strategy of such countries regarding the prevention, treatment, and monitoring of HIV/AIDS. Each such public-private partnership should—

"(A) support the development, implementation, and management of comprehensive HIV/AIDS plans in support of the national HIV/AIDS strategy;

"(B) operate at all times in a manner that emphasizes efficiency, accountability, and results-driven programs;

"(C) engage both local and foreign development partners and donors, including businesses, government agencies, academic institutions, nongovernmental organizations, foundations, multilateral development agencies, and faith-based organizations, to assist the country in coordinating

and implementing HIV/AIDS prevention, treatment, and monitoring programs in accordance with its national HIV/AIDS strategy;

"(D) provide technical assistance, consultant services, financial planning, monitoring and evaluation, and research in support of the national HIV/AIDS strategy; and

"(E) establish local human resource capacities for the national HIV/AIDS strategy through the transfer of medical, managerial, leadership, and technical skills.

"(e) ANNUAL REPORT.—

Deadline.
President.

"(1) IN GENERAL.—Not later than January 31 of each year, the President shall submit to the Committee on Foreign Relations of the Senate and the Committee on International Relations of the House of Representatives a report on the implementation of this section for the prior fiscal year.

"(2) REPORT ELEMENTS.—Each report shall include—

"(A) a description of efforts made by each relevant executive branch agency to implement the policies set forth in this section, section 104B, and section 104C;

"(B) a description of the programs established pursuant to such sections; and

"(C) a detailed assessment of the impact of programs established pursuant to such sections, including—

"(i)(I) the effectiveness of such programs in reducing the spread of the HIV infection, particularly in women and girls, in reducing mother-to-child transmission of the HIV infection, and in reducing mortality rates from HIV/AIDS; and

"(II) the number of patients currently receiving treatment for AIDS in each country that receives assistance under this Act.

"(ii) the progress made toward improving health care delivery systems (including the training of adequate numbers of staff) and infrastructure to ensure increased access to care and treatment;

"(iii) with respect to tuberculosis, the increase in the number of people treated and the increase in number of tuberculosis patients cured through each program, project, or activity receiving United States foreign assistance for tuberculosis control purposes; and

"(iv) with respect to malaria, the increase in the number of people treated and the increase in number of malaria patients cured through each program, project, or activity receiving United States foreign assistance for malaria control purposes.

"(f) FUNDING LIMITATION.—Of the funds made available to carry out this section in any fiscal year, not more than 7 percent may be used for the administrative expenses of the United States Agency for International Development in support of activities described in section 104(c), this section, section 104B, and section 104C. Such amount shall be in addition to other amounts otherwise available for such purposes.

"(g) DEFINITIONS.—In this section:

"(1) AIDS.—The term 'AIDS' means acquired immune deficiency syndrome.

"(2) HIV.—The term 'HIV' means the human immuno-deficiency virus, the pathogen that causes AIDS.

"(3) HIV/AIDS.—The term 'HIV/AIDS' means, with respect to an individual, an individual who is infected with HIV or living with AIDS.

"(4) RELEVANT EXECUTIVE BRANCH AGENCIES.—The term 'relevant executive branch agencies' means the Department of State, the United States Agency for International Development, the Department of Health and Human Services (including its agencies and offices), and any other department or agency of the United States that participates in international HIV/AIDS activities pursuant to the authorities of such department or agency or this Act.".

(b) AUTHORIZATION OF APPROPRIATIONS.—

(1) IN GENERAL.—In addition to funds available under section 104(c) of the Foreign Assistance Act of 1961 (22 U.S.C. 2151b(c)) for such purpose or under any other provision of that Act, there are authorized to be appropriated to the President, from amounts authorized to be appropriated under section 401, such sums as may be necessary for each of the fiscal years 2004 through 2008 to carry out section 104A of the Foreign Assistance Act of 1961, as added by subsection (a).

(2) AVAILABILITY OF FUNDS.—Amounts appropriated pursuant to paragraph (1) are authorized to remain available until expended.

(3) ALLOCATION OF FUNDS.—Of the amount authorized to be appropriated by paragraph (1) for the fiscal years 2004 through 2008, such sums as may be necessary are authorized to be appropriated to carry out section 104A(d)(4) of the Foreign Assistance Act of 1961 (as added by subsection (a)), relating to the procurement and distribution of HIV/AIDS pharmaceuticals.

(c) RELATIONSHIP TO ASSISTANCE PROGRAMS TO ENHANCE NUTRITION.—In recognition of the fact that malnutrition may hasten the progression of HIV to AIDS and may exacerbate the decline among AIDS patients leading to a shorter life span, the Administrator of the United States Agency for International Development shall, as appropriate—

(1) integrate nutrition programs with HIV/AIDS activities, generally;

(2) provide, as a component of an anti-retroviral therapy program, support for food and nutrition to individuals infected with and affected by HIV/AIDS; and

(3) provide support for food and nutrition for children affected by HIV/AIDS and to communities and households caring for children affected by HIV/AIDS.

(d) ELIGIBILITY FOR ASSISTANCE.—An organization that is otherwise eligible to receive assistance under section 104A of the Foreign Assistance Act of 1961 (as added by subsection (a)) or under any other provision of this Act (or any amendment made by this Act) to prevent, treat, or monitor HIV/AIDS shall not be required, as a condition of receiving the assistance, to endorse or utilize a multisectoral approach to combatting HIV/AIDS, or to endorse, utilize, or participate in a prevention method or treatment program to which the organization has a religious or moral objection.

(e) LIMITATION.—No funds made available to carry out this Act, or any amendment made by this Act, may be used to promote

or advocate the legalization or practice of prostitution or sex trafficking. Nothing in the preceding sentence shall be construed to preclude the provision to individuals of palliative care, treatment, or post-exposure pharmaceutical prophylaxis, and necessary pharmaceuticals and commodities, including test kits, condoms, and, when proven effective, microbicides.

(f) LIMITATION.—No funds made available to carry out this Act, or any amendment made by this Act, may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking.

(g) SENSE OF CONGRESS RELATING TO FOOD ASSISTANCE FOR INDIVIDUALS LIVING WITH HIV/AIDS.—

(1) FINDINGS.—Congress finds the following:

(A) The United States provides more than 60 percent of all food assistance worldwide.

(B) According to the United Nations World Food Program and other United Nations agencies, food insecurity of individuals infected or living with HIV/AIDS is a major problem in countries with large populations of such individuals, particularly in African countries.

(C) Although the United States is willing to provide food assistance to these countries in need, a few of the countries object to part or all of the assistance because of fears of benign genetic modifications to the foods.

(D) Healthy and nutritious foods for individuals infected or living with HIV/AIDS are an important complement to HIV/AIDS medicines for such individuals.

(E) Individuals infected with HIV have higher nutritional requirements than individuals who are not infected with HIV, particularly with respect to the need for protein. Also, there is evidence to suggest that the full benefit of therapy to treat HIV/AIDS may not be achieved in individuals who are malnourished, particularly in pregnant and lactating women.

(2) SENSE OF CONGRESS.—It is therefore the sense of Congress that United States food assistance should be accepted by countries with large populations of individuals infected or living with HIV/AIDS, particularly African countries, in order to help feed such individuals.

**SEC. 302. ASSISTANCE TO COMBAT TUBERCULOSIS.**

(a) AMENDMENT OF THE FOREIGN ASSISTANCE ACT OF 1961.— Chapter 1 of part I of the Foreign Assistance Act of 1961 (22 U.S.C. 2151 et seq.), as amended by section 301 of this Act, is further amended by inserting after section 104A the following new section:

22 USC 2151b–3.

**"SEC. 104B. ASSISTANCE TO COMBAT TUBERCULOSIS.**

"(a) FINDINGS.—Congress makes the following findings:

"(1) Congress recognizes the growing international problem of tuberculosis and the impact its continued existence has on those countries that had previously largely controlled the disease.

"(2) Congress further recognizes that the means exist to control and treat tuberculosis through expanded use of the DOTS (Directly Observed Treatment Short-course) treatment strategy, including DOTS-Plus to address multi-drug resistant

tuberculosis, and adequate investment in newly created mechanisms to increase access to treatment, including the Global Tuberculosis Drug Facility established in 2001 pursuant to the Amsterdam Declaration to Stop TB and the Global Alliance for TB Drug Development.

"(b) POLICY.—It is a major objective of the foreign assistance program of the United States to control tuberculosis, including the detection of at least 70 percent of the cases of infectious tuberculosis, and the cure of at least 85 percent of the cases detected, not later than December 31, 2005, in those countries classified by the World Health Organization as among the highest tuberculosis burden, and not later than December 31, 2010, in all countries in which the United States Agency for International Development has established development programs.

"(c) AUTHORIZATION.—To carry out this section and consistent with section 104(c), the President is authorized to furnish assistance, on such terms and conditions as the President may determine, for the prevention, treatment, control, and elimination of tuberculosis.

"(d) COORDINATION.—In carrying out this section, the President shall coordinate with the World Health Organization, the Global Fund to Fight AIDS, Tuberculosis, and Malaria, and other organizations with respect to the development and implementation of a comprehensive tuberculosis control program.

President.

"(e) PRIORITY TO DOTS COVERAGE.—In furnishing assistance under subsection (c), the President shall give priority to activities that increase Directly Observed Treatment Short-course (DOTS) coverage and treatment of multi-drug resistant tuberculosis where needed using DOTS-Plus, including funding for the Global Tuberculosis Drug Facility, the Stop Tuberculosis Partnership, and the Global Alliance for TB Drug Development. In order to meet the requirement of the preceding sentence, the President should ensure that not less than 75 percent of the amount made available to carry out this section for a fiscal year should be expended for antituberculosis drugs, supplies, direct patient services, and training in diagnosis and treatment for Directly Observed Treatment Short-course (DOTS) coverage and treatment of multi-drug resistant tuberculosis using DOTS-Plus, including substantially increased funding for the Global Tuberculosis Drug Facility.

President.

"(f) DEFINITIONS.—In this section:

"(1) DOTS.—The term 'DOTS' or 'Directly Observed Treatment Short-course' means the World Health Organization-recommended strategy for treating tuberculosis.

"(2) DOTS-PLUS.—The term 'DOTS-Plus' means a comprehensive tuberculosis management strategy that is built upon and works as a supplement to the standard DOTS strategy, and which takes into account specific issues (such as use of second line anti-tuberculosis drugs) that need to be addressed in areas where there is high prevalence of multi-drug resistant tuberculosis.

"(3) GLOBAL ALLIANCE FOR TUBERCULOSIS DRUG DEVELOPMENT.—The term 'Global Alliance for Tuberculosis Drug Development' means the public-private partnership that brings together leaders in health, science, philanthropy, and private industry to devise new approaches to tuberculosis and to ensure that new medications are available and affordable in high tuberculosis burden countries and other affected countries.

"(4) GLOBAL TUBERCULOSIS DRUG FACILITY.—The term 'Global Tuberculosis Drug Facility (GDF)' means the new initiative of the Stop Tuberculosis Partnership to increase access to high-quality tuberculosis drugs to facilitate DOTS expansion.

"(5) STOP TUBERCULOSIS PARTNERSHIP.—The term 'Stop Tuberculosis Partnership' means the partnership of the World Health Organization, donors including the United States, high tuberculosis burden countries, multilateral agencies, and nongovernmental and technical agencies committed to short- and long-term measures required to control and eventually eliminate tuberculosis as a public health problem in the world.".

22 USC 7632.

(b) AUTHORIZATION OF APPROPRIATIONS.—

(1) IN GENERAL.—In addition to funds available under section 104(c) of the Foreign Assistance Act of 1961 (22 U.S.C. 2151b(c)) for such purpose or under any other provision of that Act, there are authorized to be appropriated to the President, from amounts authorized to be appropriated under section 401, such sums as may be necessary for each of the fiscal years 2004 through 2008 to carry out section 104B of the Foreign Assistance Act of 1961, as added by subsection (a).

(2) AVAILABILITY OF FUNDS.—Amounts appropriated pursuant to the authorization of appropriations under paragraph (1) are authorized to remain available until expended.

(3) TRANSFER OF PRIOR YEAR FUNDS.—Unobligated balances of funds made available for fiscal year 2001, 2002, or 2003 under section 104(c)(7) of the Foreign Assistance Act of 1961 (22 U.S.C. 2151b(c)(7) (as in effect immediately before the date of enactment of this Act) shall be transferred to, merged with, and made available for the same purposes as funds made available for fiscal years 2004 through 2008 under paragraph (1).

### SEC. 303. ASSISTANCE TO COMBAT MALARIA.

(a) AMENDMENT OF THE FOREIGN ASSISTANCE ACT OF 1961.—Chapter 1 of part I of the Foreign Assistance Act of 1961 (22 U.S.C. 2151 et seq.), as amended by sections 301 and 302 of this Act, is further amended by inserting after section 104B the following new section:

22 USC 2151b–4.

### "SEC. 104C. ASSISTANCE TO COMBAT MALARIA.

"(a) FINDING.—Congress finds that malaria kills more people annually than any other communicable disease except tuberculosis, that more than 90 percent of all malaria cases are in sub-Saharan Africa, and that children and women are particularly at risk. Congress recognizes that there are cost-effective tools to decrease the spread of malaria and that malaria is a curable disease if promptly diagnosed and adequately treated.

"(b) POLICY.—It is a major objective of the foreign assistance program of the United States to provide assistance for the prevention, control, and cure of malaria.

"(c) AUTHORIZATION.—To carry out this section and consistent with section 104(c), the President is authorized to furnish assistance, on such terms and conditions as the President may determine, for the prevention, treatment, control, and elimination of malaria.

President.

"(d) COORDINATION.—In carrying out this section, the President shall coordinate with the World Health Organization, the Global Fund to Fight AIDS, Tuberculosis, and Malaria, the Department of Health and Human Services (the Centers for Disease Control

PUBLIC LAW 108–25—MAY 27, 2003          117 STAT. 737

and Prevention and the National Institutes of Health), and other organizations with respect to the development and implementation of a comprehensive malaria control program.".

(b) AUTHORIZATION OF APPROPRIATIONS.—                                    22 USC 7633.

(1) IN GENERAL.—In addition to funds available under section 104(c) of the Foreign Assistance Act of 1961 (22 U.S.C. 2151b(c)) for such purpose or under any other provision of that Act, there are authorized to be appropriated to the President, from amounts authorized to be appropriated under section 401, such sums as may be necessary for fiscal years 2004 through 2008 to carry out section 104C of the Foreign Assistance Act of 1961, as added by subsection (a), including for the development of anti-malarial pharmaceuticals by the Medicines for Malaria Venture.

(2) AVAILABILITY OF FUNDS.—Amounts appropriated pursuant to paragraph (1) are authorized to remain available until expended.

(3) TRANSFER OF PRIOR YEAR FUNDS.—Unobligated balances of funds made available for fiscal year 2001, 2002, or 2003 under section 104(c) of the Foreign Assistance Act of 1961 (22 U.S.C. 2151b(c) (as in effect immediately before the date of enactment of this Act) and made available for the control of malaria shall be transferred to, merged with, and made available for the same purposes as funds made available for fiscal years 2004 through 2008 under paragraph (1).

(c) CONFORMING AMENDMENT.—Section 104(c) of the Foreign Assistance Act of 1961 (22 U.S.C. 2151b(c)), as amended by section 301 of this Act, is further amended by adding after paragraph (3) the following:

"(4) RELATIONSHIP TO OTHER LAWS.—Assistance made available under this subsection and sections 104A, 104B, and 104C, and assistance made available under chapter 4 of part II to carry out the purposes of this subsection and the provisions cited in this paragraph, may be made available notwithstanding any other provision of law that restricts assistance to foreign countries, except for the provisions of this subsection, the provisions of law cited in this paragraph, subsection (f), section 634A of this Act, and provisions of law that limit assistance to organizations that support or participate in a program of coercive abortion or involuntary sterilization included under the Child Survival and Health Programs Fund heading in the Consolidated Appropriations Resolution, 2003 (Public Law 108–7).".

**SEC. 304. PILOT PROGRAM FOR THE PLACEMENT OF HEALTH CARE          22 USC 7634.
PROFESSIONALS IN OVERSEAS AREAS SEVERELY
AFFECTED BY HIV/AIDS, TUBERCULOSIS, AND MALARIA.**

(a) IN GENERAL.—The President should establish a program          President.
to demonstrate the feasibility of facilitating the service of United States health care professionals in those areas of sub-Saharan Africa and other parts of the world severely affected by HIV/AIDS, tuberculosis, and malaria.

(b) REQUIREMENTS.—Participants in the program shall—

(1) provide basic health care services for those infected and affected by HIV/AIDS, tuberculosis, and malaria in the area in which they are serving;

(2) provide on-the-job training to medical and other personnel in the area in which they are serving to strengthen the basic health care system of the affected countries;

(3) provide health care educational training for residents of the area in which they are serving;

(4) serve for a period of up to 3 years; and

(5) meet the eligibility requirements in subsection (d).

(c) ELIGIBILITY REQUIREMENTS.—To be eligible to participate in the program, a candidate shall—

(1) be a national of the United States who is a trained health care professional and who meets the educational and licensure requirements necessary to be such a professional such as a physician, nurse, physician assistant, nurse practitioner, pharmacist, other type of health care professional, or other individual determined to be appropriate by the President; or

(2) be a retired commissioned officer of the Public Health Service Corps.

President.

(d) RECRUITMENT.—The President shall ensure that information on the program is widely distributed, including the distribution of information to schools for health professionals, hospitals, clinics, and nongovernmental organizations working in the areas of international health and aid.

(e) PLACEMENT OF PARTICIPANTS.—

(1) IN GENERAL.—To the maximum extent practicable, participants in the program shall serve in the poorest areas of the affected countries, where health care needs are likely to be the greatest. The decision on the placement of a participant should be made in consultation with relevant officials of the affected country at both the national and local level as well as with local community leaders and organizations.

(2) COORDINATION.—Placement of participants in the program shall be coordinated with the United States Agency for International Development in countries in which that Agency is conducting HIV/AIDS, tuberculosis, or malaria programs. Overall coordination of placement of participants in the program shall be made by the Coordinator of United States Government Activities to Combat HIV/AIDS Globally (as described in section 1(f) of the State Department Basic Authorities Act of 1956 (as added by section 102(a) of this Act)).

(f) INCENTIVES.—The President may offer such incentives as the President determines to be necessary to encourage individuals to participate in the program, such as partial payment of principal, interest, and related expenses on government and commercial loans for educational expenses relating to professional health training and, where possible, deferment of repayments on such loans, the provision of retirement benefits that would otherwise be jeopardized by participation in the program, and other incentives.

Deadline.
President.

(g) REPORT.—Not later than 18 months after the date of enactment of this Act, the President shall submit to the appropriate congressional committees a report on steps taken to establish the program, including—

(1) the process of recruitment, including the venues for recruitment, the number of candidates recruited, the incentives offered, if any, and the cost of those incentives;

(2) the process, including the criteria used, for the selection of participants;

PUBLIC LAW 108–25—MAY 27, 2003          117 STAT. 739

(3) the number of participants placed, the countries in which they were placed, and why those countries were selected; and

(4) the potential for expansion of the program.

(h) AUTHORIZATION OF APPROPRIATIONS.—

(1) IN GENERAL.—In addition to amounts otherwise available for such purpose, there are authorized to be appropriated to the President, from amounts authorized to be appropriated under section 401, such sums as may be necessary for each of the fiscal years 2004 through 2008 to carry out the program.

(2) AVAILABILITY OF FUNDS.—Amounts appropriated pursuant to the authorization of appropriations under paragraph (1) are authorized to remain available until expended.

**SEC. 305. REPORT ON TREATMENT ACTIVITIES BY RELEVANT EXECUTIVE BRANCH AGENCIES.**

22 USC 7635.

(a) IN GENERAL.—Not later than 15 months after the date of enactment of this Act, the President shall submit to appropriate congressional committees a report on the programs and activities of the relevant executive branch agencies that are directed to the treatment of individuals in foreign countries infected with HIV or living with AIDS.

President.
Deadline.

(b) REPORT ELEMENTS.—The report shall include—

(1) a description of the activities of relevant executive branch agencies with respect to—

(A) the treatment of opportunistic infections;

(B) the use of antiretrovirals;

(C) the status of research into successful treatment protocols for individuals in the developing world;

(D) technical assistance and training of local health care workers (in countries affected by the pandemic) to administer antiretrovirals, manage side effects, and monitor patients' viral loads and immune status;

(E) the status of strategies to promote sustainability of HIV/AIDS pharmaceuticals (including antiretrovirals) and the effects of drug resistance on HIV/AIDS patients; and

(F) the status of appropriate law enforcement officials working to ensure that HIV/AIDS pharmaceutical treatment is not diminished through illegal counterfeiting and black market sales of such pharmaceuticals;

(2) information on existing pilot projects, including a discussion of why a given population was selected, the number of people treated, the cost of treatment, the mechanisms established to ensure that treatment is being administered effectively and safely, and plans for scaling up pilot projects (including projected timelines and required resources); and

(3) an explanation of how those activities relate to efforts to prevent the transmission of the HIV infection.

**SEC. 306. STRATEGIES TO IMPROVE INJECTION SAFETY.**

Section 307 of the Public Health Service Act (42 U.S.C. 242l) is amended by adding at the end the following:

"(d) In carrying out immunization programs and other programs in developing countries for the prevention, treatment, and control of infectious diseases, including HIV/AIDS, tuberculosis, and

117 STAT. 740          PUBLIC LAW 108–25—MAY 27, 2003

malaria, the Director of the Centers for Disease Control and Prevention, in coordination with the Coordinator of United States Government Activities to Combat HIV/AIDS Globally, the National Institutes of Health, national and local government, and other organizations, such as the World Health Organization and the United Nations Children's Fund, shall develop and implement effective strategies to improve injection safety, including eliminating unnecessary injections, promoting sterile injection practices and technologies, strengthening the procedures for proper needle and syringe disposal, and improving the education and information provided to the public and to health professionals.".

22 USC 7636.

Deadline.
Reports.

**SEC. 307. STUDY ON ILLEGAL DIVERSIONS OF PRESCRIPTION DRUGS.**

Not later than 180 days after enactment of this Act, the Secretary of Health and Human Services, in coordination with other agencies, shall submit a report to the Congress that includes the following:

(1) A thorough accounting of evidence indicating illegal diversion into the United States of prescription drugs donated or sold for humanitarian efforts, and an estimate of the extent of such diversion.

(2) Recommendations to increase the administrative and enforcement powers of the United States to identify, monitor, and prevent the illegal diversion into the United States of prescription drugs donated or sold for humanitarian efforts.

(3) Recommendations and guidelines to advise and provide technical assistance to developing countries on how to implement a program that minimizes diversion into the United States of prescription drugs donated or sold for humanitarian efforts.

# Subtitle B—Assistance for Children and Families

22 USC 7651.

**SEC. 311. FINDINGS.**

Congress makes the following findings:

(1) Approximately 2,000 children around the world are infected each day with HIV through mother-to-child transmission. Transmission can occur during pregnancy, labor, and delivery or through breast feeding. Over 90 percent of these cases are in developing nations with little or no access to public health facilities.

(2) Mother-to-child transmission is largely preventable with the proper application of pharmaceuticals, therapies, and other public health interventions.

(3) Certain antiretroviral drugs reduce mother-to-child transmission by nearly 50 percent. Universal availability of this drug could prevent up to 400,000 infections per year and dramatically reduce the number of AIDS-related deaths.

(4) At the United Nations Special Session on HIV/AIDS in June 2001, the United States committed to the specific goals with respect to the prevention of mother-to-child transmission, including the goals of reducing the proportion of infants infected with HIV by 20 percent by the year 2005 and by 50 percent by the year 2010, as specified in the Declaration of Commitment on HIV/AIDS adopted by the United Nations General Assembly at the Special Session.

PUBLIC LAW 108–25—MAY 27, 2003          117 STAT. 741

(5) Several United States Government agencies including the United States Agency for International Development and the Centers for Disease Control are already supporting programs to prevent mother-to-child transmission in resource-poor nations and have the capacity to expand these programs rapidly by working closely with foreign governments and nongovernmental organizations.

(6) Efforts to prevent mother-to-child transmission can provide the basis for a broader response that includes care and treatment of mothers, fathers, and other family members who are infected with HIV or living with AIDS.

(7) HIV/AIDS has devastated the lives of countless children and families across the globe. Since the epidemic began, an estimated 13,200,000 children under the age of 15 have been orphaned by AIDS, that is they have lost their mother or both parents to the disease. The Joint United Nations Program on HIV/AIDS (UNAIDS) estimates that this number will double by the year 2010.

(8) HIV/AIDS also targets young people between the ages of 15 to 24, particularly young women, many of whom carry the burden of caring for family members living with HIV/AIDS. An estimated 10,300,000 young people are now living with HIV/AIDS. One-half of all new infections are occurring among this age group.

**SEC. 312. POLICY AND REQUIREMENTS.**

22 USC 7652.

(a) POLICY.—The United States Government's response to the global HIV/AIDS pandemic should place high priority on the prevention of mother-to-child transmission, the care and treatment of family members and caregivers, and the care of children orphaned by AIDS. To the maximum extent possible, the United States Government should seek to leverage its funds by seeking matching contributions from the private sector, other national governments, and international organizations.

(b) REQUIREMENTS.—The 5-year United States Government strategy required by section 101 of this Act shall—

(1) provide for meeting or exceeding the goal to reduce the rate of mother-to-child transmission of HIV by 20 percent by 2005 and by 50 percent by 2010;

(2) include programs to make available testing and treatment to HIV-positive women and their family members, including drug treatment and therapies to prevent mother-to-child transmission; and

(3) expand programs designed to care for children orphaned by AIDS.

**SEC. 313. ANNUAL REPORTS ON PREVENTION OF MOTHER-TO-CHILD TRANSMISSION OF THE HIV INFECTION.**

22 USC 7653.

(a) IN GENERAL.—Not later than 1 year after the date of the enactment of this Act, and annually thereafter for a period of 5 years, the President shall submit to appropriate congressional committees a report on the activities of relevant executive branch agencies during the reporting period to assist in the prevention of mother-to-child transmission of the HIV infection.

Deadline. President.

(b) REPORT ELEMENTS.—Each report shall include—

(1) a statement of whether or not all relevant executive branch agencies have met the goal described in section 312(b)(1); and

PUBLIC LAW 108–25—MAY 27, 2003

(2) a description of efforts made by the relevant executive branch agencies to expand those activities, including—

(A) information on the number of sites supported for the prevention of mother-to-child transmission of the HIV infection;

(B) the specific activities supported;

(C) the number of women tested and counseled; and

(D) the number of women receiving preventative drug therapies.

(c) REPORTING PERIOD DEFINED.—In this section, the term "reporting period" means, in the case of the initial report, the period since the date of enactment of this Act and, in the case of any subsequent report, the period since the date of submission of the most recent report.

22 USC 7654.

President.

**SEC. 314. PILOT PROGRAM OF ASSISTANCE FOR CHILDREN AND FAMI-LIES AFFECTED BY HIV/AIDS.**

(a) IN GENERAL.—The President, acting through the United States Agency for International Development, should establish a program of assistance that would demonstrate the feasibility of the provision of care and treatment to orphans and other children and young people affected by HIV/AIDS in foreign countries.

(b) PROGRAM REQUIREMENTS.—The program should—

(1) build upon and be integrated into programs administered as of the date of enactment of this Act by the relevant executive branch agencies for children affected by HIV/AIDS;

(2) work in conjunction with indigenous community-based programs and activities, particularly those that offer proven services for children;

(3) reduce the stigma of HIV/AIDS to encourage vulnerable children infected with HIV or living with AIDS and their family members and caregivers to avail themselves of voluntary counseling and testing, and related programs, including treatments;

(4) ensure the importance of inheritance rights of women, particularly women in African countries, due to the exponential growth in the number of young widows, orphaned girls, and grandmothers becoming heads of households as a result of the HIV/AIDS pandemic;

(5) provide, in conjunction with other relevant executive branch agencies, the range of services for the care and treatment, including the provision of antiretrovirals and other necessary pharmaceuticals, of children, parents, and caregivers infected with HIV or living with AIDS;

(6) provide nutritional support and food security, and the improvement of overall family health;

(7) work with parents, caregivers, and community-based organizations to provide children with educational opportunities; and

(8) provide appropriate counseling and legal assistance for the appointment of guardians and the handling of other issues relating to the protection of children.

Deadline.
President.

(c) REPORT.—Not later than 18 months after the date of enactment of this Act, the President should submit a report on the implementation of this section to the appropriate congressional committees. Such report should include a description of activities undertaken to carry out subsection (b)(4).

(d) AUTHORIZATION OF APPROPRIATIONS.—

PUBLIC LAW 108–25—MAY 27, 2003          117 STAT. 743

(1) IN GENERAL.—In addition to amounts otherwise available for such purpose, there are authorized to be appropriated to the President, from amounts authorized to be appropriated under section 401, such sums as may be necessary for each of the fiscal years 2004 through 2008 to carry out the program. A significant percentage of the amount appropriated pursuant to the authorization of appropriations under the preceding sentence for a fiscal year should be made available to carry out subsection (b)(4).

(2) AVAILABILITY OF FUNDS.—Amounts appropriated pursuant to paragraph (1) are authorized to remain available until expended.

**SEC. 315. PILOT PROGRAM ON FAMILY SURVIVAL PARTNERSHIPS.**

President.
22 USC 7655.

(a) PURPOSE.—The purpose of this section is to authorize the President to establish a program, through a public-private partnership, for the provision of medical care and support services to HIV positive parents and their children identified through existing programs to prevent mother-to-child transmission of HIV in countries with or at risk for severe HIV epidemic with particular attention to resource constrained countries.

(b) GRANTS.—

(1) IN GENERAL.—The President is authorized to establish a program for the award of grants to eligible administrative organizations to enable such organizations to award subgrants to eligible entities to expand activities to prevent the mother-to-child transmission of HIV by providing medical care and support services to HIV infected parents and their children.

(2) USE OF FUNDS.—Amounts provided under a grant awarded under paragraph (1) shall be used—

(A) to award subgrants to eligible entities to enable such entities to carry out activities described in subsection (c);

(B) for administrative support and subgrant management;

(C) for administrative data collection and reporting concerning grant activities;

(D) for the monitoring and evaluation of grant activities;

(E) for training and technical assistance for subgrantees; and

(F) to promote sustainability.

(c) SUBGRANTS.—

(1) IN GENERAL.—An organization awarded a grant under subsection (b) shall use amounts received under the grant to award subgrants to eligible entities.

(2) ELIGIBILITY.—To be eligible to receive a subgrant under paragraph (1), an entity shall—

(A) be a local health organization, an international organization, or a partnership of such organizations; and

(B) demonstrate to the awarding organization that such entity—

(i) is currently administering a proven intervention to prevent mother-to-child transmission of HIV in countries with or at risk for severe HIV epidemic with particular attention to resource constrained countries, as determined by the President;

PUBLIC LAW 108–25—MAY 27, 2003

(ii) has demonstrated support for the proposed program from relevant government entities; and

(iii) is able to provide HIV care, including antiretroviral treatment when medically indicated, to HIV positive women, men, and children with the support of the project funding.

(3) LOCAL HEALTH AND INTERNATIONAL ORGANIZATIONS.—For purposes of paragraph (2)(A)—

(A) the term "local health organization" means a public sector health system, nongovernmental organization, institution of higher education, community-based organization, or nonprofit health system that provides directly, or has a clear link with a provider for the indirect provision of, primary health care services; and

(B) the term "international organization" means—

(i) a nonprofit international entity;

(ii) an international charitable institution;

(iii) a private voluntary international entity; or

(iv) a multilateral institution.

(4) PRIORITY REQUIREMENT.—In awarding subgrants under this subsection, the organization shall give priority to eligible applicants that are currently administering a program of proven intervention to HIV positive individuals to prevent mother-to-child transmission in countries with or at risk for severe HIV epidemic with particular attention to resource constrained countries, and who are currently administering a program to HIV positive women, men, and children to provide life-long care in family-centered care programs using non-Federal funds.

(5) SELECTION OF SUBGRANT RECIPIENTS.—In awarding subgrants under this subsection, the organization should—

(A) consider applicants from a range of health care settings, program approaches, and geographic locations; and

(B) if appropriate, award not less than 1 grant to an applicant to fund a national system of health care delivery to HIV positive families.

(6) USE OF SUBGRANT FUNDS.—An eligible entity awarded a subgrant under this subsection shall use subgrant funds to expand activities to prevent mother-to-child transmission of HIV by providing medical treatment and care and support services to parents and their children, which may include—

(A) providing treatment and therapy, when medically indicated, to HIV-infected women, their children, and families;

(B) the hiring and training of local personnel, including physicians, nurses, other health care providers, counselors, social workers, outreach personnel, laboratory technicians, data managers, and administrative support personnel;

(C) paying laboratory costs, including costs related to necessary equipment and diagnostic testing and monitoring (including rapid testing), complete blood counts, standard chemistries, and liver function testing for infants, children, and parents, and costs related to the purchase of necessary laboratory equipment;

(D) purchasing pharmaceuticals for HIV-related conditions, including antiretroviral therapies;

(E) funding support services, including adherence and psychosocial support services;

(F) operational support activities; and

(G) conducting community outreach and capacity building activities, including activities to raise the awareness of individuals of the program carried out by the subgrantee, other communications activities in support of the program, local advisory board functions, and transportation necessary to ensure program participation.

(d) REPORTS.—The President shall require that each organization awarded a grant under subsection (b)(1) to submit an annual report that includes—

(1) the progress of programs funded under this section;

(2) the benchmarks of success of programs funded under this section; and

(3) recommendations of how best to proceed with the programs funded under this section upon the expiration of funding under subsection (e).

(e) FUNDING.—There are authorized to be appropriated to the President, from amounts authorized to be appropriated under section 401, such sums as may be necessary for each of the fiscal years 2004 through 2008 to carry out the program.

(f) LIMITATION ON ADMINISTRATIVE EXPENSES.—An organization shall ensure that not more than 7 percent of the amount of a grant received under this section by the organization is used for administrative expenses.

# TITLE IV—AUTHORIZATION OF APPROPRIATIONS

## SEC. 401. AUTHORIZATION OF APPROPRIATIONS.

22 USC 7671.

(a) IN GENERAL.—There are authorized to be appropriated to the President to carry out this Act and the amendments made by this Act $3,000,000,000 for each of the fiscal years 2004 through 2008.

(b) AVAILABILITY.—Amounts appropriated pursuant to the authorization of appropriations in subsection (a) are authorized to remain available until expended.

(c) AVAILABILITY OF AUTHORIZATIONS.—Authorizations of appropriations under subsection (a) shall remain available until the appropriations are made.

## SEC. 402. SENSE OF CONGRESS.

22 USC 7672.

(a) INCREASE IN HIV/AIDS ANTIRETROVIRAL TREATMENT.—It is a sense of the Congress that an urgent priority of United States assistance programs to fight HIV/AIDS should be the rapid increase in distribution of antiretroviral treatment so that—

(1) by the end of fiscal year 2004, at least 500,000 individuals with HIV/AIDS are receiving antiretroviral treatment through United States assistance programs;

(2) by the end of fiscal year 2005, at least 1,000,000 such individuals are receiving such treatment; and

(3) by the end of fiscal year 2006, at least 2,000,000 such individuals are receiving such treatment.

(b) EFFECTIVE DISTRIBUTION OF HIV/AIDS FUNDS.—It is the sense of Congress that, of the amounts appropriated pursuant to

117 STAT. 746          PUBLIC LAW 108–25—MAY 27, 2003

the authorization of appropriations under section 401 for HIV/AIDS assistance, an effective distribution of such amounts would be—

(1) 55 percent of such amounts for treatment of individuals with HIV/AIDS;

(2) 15 percent of such amounts for palliative care of individuals with HIV/AIDS;

(3) 20 percent of such amounts for HIV/AIDS prevention consistent with section 104A(d) of the Foreign Assistance Act of 1961 (as added by section 301 of this Act), of which such amount at least 33 percent should be expended for abstinence-until-marriage programs; and

(4) 10 percent of such amounts for orphans and vulnerable children.

22 USC 7673.    **SEC. 403. ALLOCATION OF FUNDS.**

(a) THERAPEUTIC MEDICAL CARE.—For fiscal years 2006 through 2008, not less than 55 percent of the amounts appropriated pursuant to the authorization of appropriations under section 401 for HIV/AIDS assistance for each such fiscal year shall be expended for therapeutic medical care of individuals infected with HIV, of which such amount at least 75 percent should be expended for the purchase and distribution of antiretroviral pharmaceuticals and at least 25 percent should be expended for related care. For fiscal years 2006 through 2008, not less than 33 percent of the amounts appropriated pursuant to the authorization of appropriations under section 401 for HIV/AIDS prevention consistent with section 104A(d) of the Foreign Assistance Act of 1961 (as added by section 301 of this Act) for each such fiscal year shall be expended for abstinence-until-marriage programs.

(b) ORPHANS AND VULNERABLE CHILDREN.—For fiscal years 2006 through 2008, not less than 10 percent of the amounts appropriated pursuant to the authorization of appropriations under section 401 for HIV/AIDS assistance for each such fiscal year shall be expended for assistance for orphans and vulnerable children affected by HIV/AIDS, of which such amount at least 50 percent shall be provided through non-profit, nongovernmental organizations, including faith-based organizations, that implement programs on the community level.

22 USC 7674.    **SEC. 404. ASSISTANCE FROM THE UNITED STATES PRIVATE SECTOR TO PREVENT AND REDUCE HIV/AIDS IN SUB-SAHARAN AFRICA.**

It is the sense of Congress that United States businesses should be encouraged to provide assistance to sub-Saharan African countries to prevent and reduce the incidence of HIV/AIDS in sub-Saharan Africa. In providing such assistance, United States businesses should be encouraged to consider the establishment of an HIV/AIDS Response Fund in order to provide for coordination among such businesses in the collection and distribution of the assistance to sub-Saharan African countries.

PUBLIC LAW 108–25—MAY 27, 2003        117 STAT. 747

# TITLE V—INTERNATIONAL FINANCIAL INSTITUTIONS

**SEC. 501. MODIFICATION OF THE ENHANCED HIPC INITIATIVE.**

Title XVI of the International Financial Institutions Act (22 U.S.C. 262p–262p–7) is amended by adding at the end the following new section:

**"SEC. 1625. MODIFICATION OF THE ENHANCED HIPC INITIATIVE.**

22 USC 262p–8.

"(a) AUTHORITY.—

"(1) IN GENERAL.—The Secretary of the Treasury should immediately commence efforts within the Paris Club of Official Creditors, the International Bank for Reconstruction and Development, the International Monetary Fund, and other appropriate multilateral development institutions to modify the Enhanced HIPC Initiative so that the amount of debt stock reduction approved for a country eligible for debt relief under the Enhanced HIPC Initiative shall be sufficient to reduce, for each of the first 3 years after the date of enactment of this section or the Decision Point, whichever is later—

"(A) the net present value of the outstanding public and publicly guaranteed debt of the country—

"(i) as of the decision point if the country has already reached its decision point; or

"(ii) as of the date of enactment of this Act, if the country has not reached its decision point,

to not more than 150 percent of the annual value of exports of the country for the year preceding the Decision Point; and

"(B) the annual payments due on such public and publicly guaranteed debt to not more than—

"(i) 10 percent or, in the case of a country suffering a public health crisis (as defined in subsection (e)), not more than 5 percent, of the amount of the annual current revenues received by the country from internal resources; or

"(ii) a percentage of the gross national product of the country, or another benchmark, that will yield a result substantially equivalent to that which would be achieved through application of subparagraph (A).

"(2) LIMITATION.—In financing the objectives of the Enhanced HIPC Initiative, an international financial institution shall give priority to using its own resources.

"(b) RELATION TO POVERTY AND THE ENVIRONMENT.—Debt cancellation under the modifications to the Enhanced HIPC Initiative described in subsection (a) should not be conditioned on any agreement by an impoverished country to implement or comply with policies that deepen poverty or degrade the environment, including any policy that—

"(1) implements or extends user fees on primary education or primary health care, including prevention and treatment efforts for HIV/AIDS, tuberculosis, malaria, and infant, child, and maternal well-being;

"(2) provides for increased cost recovery from poor people to finance basic public services such as education, health care, clean water, or sanitation;

"(3) reduces the country's minimum wage to a level of less than $2 per day or undermines workers' ability to exercise effectively their internationally recognized worker rights, as defined under section 526(e) of the Foreign Operations, Export Financing and Related Programs Appropriations Act, 1995 (22 U.S.C. 262p–4p); or

"(4) promotes unsustainable extraction of resources or results in reduced budget support for environmental programs.

"(c) CONDITIONS.—A country shall not be eligible for cancellation of debt under modifications to the Enhanced HIPC Initiative described in subsection (a) if the government of the country—

"(1) has an excessive level of military expenditures;

"(2) has repeatedly provided support for acts of international terrorism, as determined by the Secretary of State under section 6(j)(1) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)(1)) or section 620A(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2371(a));

"(3) is failing to cooperate on international narcotics control matters; or

"(4) engages in a consistent pattern of gross violations of internationally recognized human rights (including its military or other security forces).

"(d) PROGRAMS TO COMBAT HIV/AIDS AND POVERTY.—A country that is otherwise eligible to receive cancellation of debt under the modifications to the Enhanced HIPC Initiative described in subsection (a) may receive such cancellation only if the country has agreed—

"(1) to ensure that the financial benefits of debt cancellation are applied to programs to combat HIV/AIDS and poverty, in particular through concrete measures to improve basic services in health, education, nutrition, and other development priorities, and to redress environmental degradation;

"(2) to ensure that the financial benefits of debt cancellation are in addition to the government's total spending on poverty reduction for the previous year or the average total of such expenditures for the previous 3 years, whichever is greater;

"(3) to implement transparent and participatory policy-making and budget procedures, good governance, and effective anticorruption measures; and

"(4) to broaden public participation and popular understanding of the principles and goals of poverty reduction.

"(e) DEFINITIONS.—In this section:

"(1) COUNTRY SUFFERING A PUBLIC HEALTH CRISIS.—The term 'country suffering a public health crisis' means a country in which the HIV/AIDS infection rate, as reported in the most recent epidemiological data for that country compiled by the Joint United Nations Program on HIV/AIDS, is at least 5 percent among women attending prenatal clinics or more than 20 percent among individuals in groups with high-risk behavior.

"(2) DECISION POINT.—The term 'Decision Point' means the date on which the executive boards of the International Bank for Reconstruction and Development and the International Monetary Fund review the debt sustainability analysis for a country and determine that the country is eligible for debt relief under the Enhanced HIPC Initiative.

"(3) ENHANCED HIPC INITIATIVE.—The term 'Enhanced HIPC Initiative' means the multilateral debt initiative for

PUBLIC LAW 108–25—MAY 27, 2003        117 STAT. 749

heavily indebted poor countries presented in the Report of G–7 Finance Ministers on the Cologne Debt Initiative to the Cologne Economic Summit, Cologne, June 18–20, 1999.”.

**SEC. 502. REPORT ON EXPANSION OF DEBT RELIEF TO NON-HIPC COUNTRIES.**

22 USC 7681.

(a) IN GENERAL.—Not later than 90 days after the date of enactment of this Act, the Secretary of the Treasury shall submit to Congress a report on—

Deadline.

(1) the options and costs associated with the expansion of debt relief provided by the Enhanced HIPC Initiative to include poor countries that were not eligible for inclusion in the Enhanced HIPC Initiative;

(2) options for burden-sharing among donor countries and multilateral institutions of costs associated with the expansion of debt relief; and

(3) options, in addition to debt relief, to ensure debt sustainability in poor countries, particularly in cases when the poor country has suffered an external economic shock or a natural disaster.

(b) SPECIFIC OPTIONS TO BE CONSIDERED.—Among the options for the expansion of debt relief provided by the Enhanced HIPC Initiative, consideration should be given to making eligible for that relief poor countries for which outstanding public and publicly guaranteed debt requires annual payments in excess of 10 percent or, in the case of a country suffering a public health crisis (as defined in section 1625(e) of the Financial Institutions Act, as added by section 501 of this Act), not more than 5 percent, of the amount of the annual current revenues received by the country from internal resources.

(c) ENHANCED HIPC INITIATIVE DEFINED.—In this section, the term “Enhanced HIPC Initiative” means the multilateral debt initiative for heavily indebted poor countries presented in the Report of G–7 Finance Ministers on the Cologne Debt Initiative to the Cologne Economic Summit, Cologne, June 18–20, 1999.

**SEC. 503. AUTHORIZATION OF APPROPRIATIONS.**

22 USC 7682.

(a) IN GENERAL.—There are authorized to be appropriated to the President such sums as may be necessary for the fiscal year 2004 and each fiscal year thereafter to carry out section 1625 of the International Financial Institutions Act, as added by section 501 of this Act.

117 STAT. 750        PUBLIC LAW 108–25—MAY 27, 2003

(b) AVAILABILITY OF FUNDS.—Amounts appropriated pursuant to subsection (a) are authorized to remain available until expended.

Approved May 27, 2003.

LEGISLATIVE HISTORY—H.R. 1298 (S. 1009):

HOUSE REPORTS: No. 108–60 (Comm. on International Relations).
CONGRESSIONAL RECORD, Vol. 149 (2003):
    May 1, considered and passed House.
    May 15, considered and passed Senate, amended.
    May 21, House concurred in Senate amendments.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 39 (2003):
    May 27, Presidential remarks.

○