**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DKT INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-01604 (EGS) |
| | ) | |
| UNITED STATES AGENCY FOR | ) | |
| INTERNATIONAL DEVELOPMENT, | ) | |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION
TO PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION**

Although the government's lengthy brief is a fine defense of Congress' ability to choose to subsidize some activities to the exclusion of others, that point is irrelevant here because plaintiff does not challenge that principle. Nor does plaintiff challenge the principle that the First Amendment does not require Congress to subsidize speech, since plaintiff is not seeking a subsidy to allow it to pontificate about prostitution. Instead, plaintiff challenges the notion that Congress can choose to give grants only to those organizations that publicly adopt Congress' political viewpoint, so that their private work outside the scope of the government grants is restricted to speech and activities consistent with the government's political viewpoint. Understandably reluctant to engage that argument, the government has largely responded to a claim DKT did not make. And the government has offered no case or reason why this unprecedented action passes First Amendment muster.

## INTRODUCTION

As a preliminary matter, in light of the government's failure to address the issues that DKT has raised, it may be useful to state what this case does not challenge. It does not challenge restrictions on the use of government funding. Through 22 U.S.C. §7631(e), the government has ensured that federal funding will not be used to promote the legalization or practice of prostitution. Consequently, the only issue here is the government's attempt to restrict the uses that USAID grantees may make of their own private funding.[1]

Similarly, this case does not challenge the wisdom of Congress' chosen policies of combating HIV/AIDS, changing high-risk behaviors, eliminating human trafficking, and eradicating prostitution. To the contrary, DKT, as well as other NGOs, share many of those goals and have worked for years to combat the spread of HIV/AIDS. But when Congress relies on private organizations to carry out the specific projects it determines will further those goals, it is bound by the First Amendment. Thus, it cannot require that those organizations renounce their First Amendment rights with regard to speech and activity not funded by Congress as a condition of accepting grants to carry out those projects.[2]

---

[1] DKT uses the term "private" here to refer to funds from sources other than the U.S. government. But, as DKT pointed out in its opening brief, its "private funds" include funding from other organizations, foundations, and other national governments.

[2] The government has mentioned the issues of ripeness and standing, without actually raising them for purposes of the preliminary injunction. Gov't Br. at 13 n.4. As the government has not challenged standing, DKT will not respond at length here. However, it is worth noting that USAID regulation AAPD 05-04 required Family Health International (FHI) to enforce the prostitution policy certification requirement against all of its subgrantees, including DKT. AAPD 05-04 §3(A)(II)(b). FHI had no choice but to impose the policy. To have done otherwise would have permitted USAID to unilaterally terminate the FHI grant agreement. Thus, the fact that DKT obtained USAID funds as a subgrant through FHI, rather than a direct grant from USAID, has little bearing on these issues.

**ARGUMENT**

I.    DKT IS SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS BECAUSE
      THE STATUTE VIOLATES THE FIRST AMENDMENT.

      A.    <u>The Statute and Regulation Discriminate on the Basis of Protected Speech and
            Are Subject to First Amendment Strict Scrutiny.</u>

As DKT demonstrated in its opening brief, both the Supreme Court and lower courts

have struck down as unconstitutional speech restrictions attached to government funding.  <u>See</u>,

<u>e.g.</u>, <u>FCC v. League of Women Voters</u>, 468 U.S. 364 (1984); <u>ACLU v. Mineta</u> , 319 F. Supp. 2d

69 (D.D.C. 2004); <u>see also</u> <u>Legal Services Corp. v. Velazquez</u>, 531 U.S. 533 (2001).  Moreover,

the Supreme Court has repeatedly indicated that a funding condition like the one here, which

leaves no alternative avenue for the exercise of private speech, will likely be unconstitutional.

<u>See</u> <u>FCC v. League of Women Voters</u>, 468 U.S. 364 (striking down a condition on government

funding that restricted privately-funded speech as a violation of the First Amendment); <u>Rust v.

Sullivan</u>, 500 U.S. 173, 198 (1991) (noting Congress acted consistently with Supreme Court

precedent when it required a Title X grantee to engage in abortion-related activity separately

from federally-funded activity, but did "not den[y] [them] the right to engage in abortion-related

activities");  <u>Regan v. Taxation With Representation of Wash.</u>, 461 U.S. 541, 550 (1983) (noting

that charitable organization's right to lobby was not infringed when it had alternative means to

lobby that did not require it to give up all tax deductible contributions).

      The government relies solely on cases that considered whether Congress could choose to

fund some protected activities to the exclusion of others, which does not infringe on First

Amendment rights, rather than whether Congress can choose to direct funding for the activities it

has chosen to fund only to organizations that agree to adopt the government's political viewpoint

as their own, thereby binding their speech and activity <u>outside</u> the scope of the activity the

government is funding.  And the government then argues that whenever government funding is

3

involved, the First Amendment is essentially irrelevant.[3]  But this is not the law.  In virtually

every Spending Clause case, courts have carefully noted that "Congress has wide latitude to set

spending priorities" only "[s]o long as legislation does not infringe on other constitutionally

protected rights."  NEA v. Finley, 524 U.S. 569,  588 (1998); see also, South Dakota v. Dole,

483 U.S. 203, 208 (1987) (noting in context of federal funding of state highway programs that

"other constitutional provisions may provide an independent bar to the conditional grant of

federal funds"); Regan, 461 U.S. at 548 (holding strict scrutiny did not apply because declining

to subsidize speech is not a violation of First Amendment rights, but noting "[t]he case would be

different" if the subsidy were used to discriminate against "dangerous ideas").  Thus,  the

Supreme Court has repeatedly noted, "the First Amendment certainly has application in the

subsidy context," and "even in the provision of subsidies, the Government may not 'ai[m] at the

suppression of dangerous ideas.'"  NEA v. Finley, 524 U.S. at 587 (quoting Regan, 461 U.S. at

550).

        And courts have applied First Amendment scrutiny in funding cases.  Indeed, in the

funding case most similar to this one – because it involved government limitations on

organizations editorializing with private funds as a condition of receiving federal grants – the

Supreme Court declined to apply strict scrutiny only because the case involved broadcast radio,

---

[3] The government appears to rely on United States v. American Library Ass'n, 539 U.S. 194, 203 n.2 (2003) (Gov't Br. at 17) to support its claim that the spending clause trumps the First Amendment.  But even if that notion applied to this situation of compelling speech, which it does not, it is suggested only in the plurality opinion, and it is specifically disavowed by the concurrences of both Justice Kennedy and Justice Breyer.  Justice Kennedy's concurring opinion notes that the First Amendment interest at stake was "even compelling," and that the burden on users was not significant.  Justice Breyer's opinion concurring in the judgment would specifically have applied heightened scrutiny to the speech restriction attached to the government spending at issue there.  Because no single rationale enjoyed the assent of five justices, "the holding of the Court may be viewed as that position taken by those [m]embers who concurred in the judgments on the narrowest grounds."  Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976).  Thus, the case does not stand for the proposition the government suggests.

an area of law in which the government burden was somewhat reduced.  FCC v. League of Women Voters, 468 U.S. 364 (1984).  Likewise, in ACLU v. Mineta, 319 F. Supp. 2d 69 (D.D.C. 2004), the court applied heightened scrutiny in the context of a viewpoint-based funding statute denying funding to those mass transit agencies that accepted advertisements promoting the legalization or medical use of any controlled substance.  See also, Federal Election Comm'n v. Int'l Funding Inst., Inc., 969 F.2d 1110, 1115 (D.C. Cir. 1992) (noting that the "Supreme Court has consistently scrutinized more closely statutes that condition the receipt of a government benefit upon the recipient's altering its independently funded activities").

Finally, in Planned Parenthood of Central and Northern Arizona v. Arizona, 718 F.2d 938 (9th Cir. 1983) aff'd after remand, 789 F.2d 1348 (9th Cir. 1986), the court considered an Arizona statute very similar to the one here.  The statute provided that "no state money . . . may be given . . . by contract, grant, or otherwise, to agencies or entities which offer abortions, abortion procedures, counseling for abortion procedures or abortion referrals."  Id. at 941 n.1.  Responding to Planned Parenthood's First Amendment claim that this provision punished speech by withdrawing a government benefit, the court noted that the constitutional purpose of encouraging childbirth over abortion could not "invade the area of protected freedoms."  Id. at 944.  It therefore required that the statute be "drawn as narrowly as possible."  Id.  The court found that the state could accomplish its purpose by "simply forbid[ding] entities receiving state funds from using those funds for abortions and the related activities."  Id. at 945.  Because the state failed to show that more narrowly drawn means were infeasible or impossible, the court invalidated the statute as violating the First Amendment.   Id.

Thus, contrary to the government's argument, it is not whether the case "aris[es] under the Spending Clause" that determines the applicable level of review (Gov't Br. at 18), it is

whether the statute "operates to restrict expression." <u>League of Women Voters</u>, 468 U.S. at 375; <u>see also id</u>. at 399-401 ("[W]hen the government makes the availability of funding dependent upon restriction of activities paid for through private sources, the government requirements then become impermissible penalties on protected expression."). Here, the statute plainly operates to restrict expression by conditioning USAID grants on the private organization publicly adopting as its policy a particular government-dictated policy, and thereby precluding the organization from speaking, with its own funds, in any way inconsistent with that government-dictated policy. Unlike the subsidy cases in which the plaintiffs argued that the First Amendment requires the government to subsidize their speech, DKT raises no such argument here. It seeks no government subsidy of its speech about prostitution or any other matter. To the contrary, the organization has long abided by USAID requirements relating to speech and activities within USAID grants. DKT has not substantively objected to 22 U.S.C. § 7631(e), which ensures that no grantee can use government funding to advocate or promote the legalization or practice of prostitution. DKT is concerned here only with its ability to engage in protected speech and conduct <u>outside</u> the scope of the government project. Because the statute here stretches well beyond the scope of the government project, and "place[s] a condition on the <u>recipient</u> of the subsidy, rather than on a particular <u>program or service</u>, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program," <u>Rust</u>, 500 U.S. at 197 (emphasis added), it operates to restrict expression and is subject to First Amendment scrutiny.

In addition, as explained in DKT's opening brief, the restriction (not the subsidy) at issue here is indisputably viewpoint-specific. It quite clearly provides that those who agree to publicly adopt as their policy the government's viewpoint about prostitution are eligible for government

grants to carry out anti-HIV/AIDS work, such as distributing condoms, and that those who decline to publicly adopt the government's viewpoint as their policy are not.   Thus, it penalizes those organizations that decline to adopt the government's viewpoint by excluding them from eligibility to participate in the government program.  Indeed, by imposing this policy, the government has effectively required that DKT subsidize the government's speech with DKT's private funds.

It can hardly be disputed that in this provision, Congress has used its spending power to economically <u>favor</u> those who agree to adopt its political view as their own policy, and to <u>disfavor</u> those who either outright disagree, or who wish to remain silent on the issue in their activities outside the scope of the government-funded activities. "Our precedents [] apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content."  <u>Turner Broad. Sys., Inc. v. FCC</u>, 512 U.S. 622, 642 (1994). The Turner Court continued:  "Laws of this sort pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion.  These restrictions 'raise the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.'"  <u>Id</u>. at 641 (quoting <u>Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.</u>, 502 U.S. 105, 116 (1991)).  Given this clear and clearly intended affect, (<u>see</u> Gov't Brief at 22), the provision is clearly content-based and viewpoint-specific.  Accordingly, the provision must survive First Amendment scrutiny.  It does not.

B.     <u>The Statute Denies A Benefit To Those Who Will Not Forfeit Their First Amendment Rights.</u>

Relying largely on the same cases it cited earlier, and relying heavily on dicta from the D.C. Circuit Court of Appeals, the government simply repeats its argument that "cases arising under the Spending Clause" do not fall within the rubric of the unconstitutional condition cases, and that "federal subsidies" are not a "benefit" for purposes of the unconstitutional conditions doctrine.  Gov't Br. at 19-20.  However, the government has once again failed to distinguish between the claim that the government must subsidize protected activity (as in <u>Rust</u> and <u>Regan</u>), and the claim that the government cannot condition eligibility to participate in whatever activity the government has already chosen to subsidize on forfeiting First Amendment rights outside the scope of the government-funded activity.

On this point, the government relies almost exclusively on <u>DKT Memorial Fund Ltd. v. Agency for International Development</u>, 887 F.2d 275 (D.C. Cir. 1989), noting, warningly, that its holding "binds this Court."  Gov't Br. at  20.  But the government misrepresents the holding of that case – indeed, what the government says is the "holding" is what the court itself described as dicta.  The issue before the court was whether a foreign nongovernmental organization (NGO) had standing to raise a First Amendment claim.  The court held that it did not.  With regard to its somewhat lengthy discussion as to the merits of any First Amendment claim that a foreign NGO could potentially raise, however, the court said:

> We note that our discussion of the merits is not essential to our
> decision on standing. . . .  We therefore intend not a 'merits first'
> analysis as we conducted in [another case] but rather a 'merits
> also' discussion, in which we may be properly accused of
> <u>indulging in the inclusion of dicta</u>.

887 F.2d at 286 n.6 (emphasis added).  Thus, the government's heavy reliance is misplaced.

Indeed, unlike DKT Memorial Fund, this case is not one in which the government has done

"nothing other than refuse to subsidize the exercise of a First Amendment activity." Id. at 288.

Here, the government has done much more, demanding that U.S. NGOs become mouthpieces for

government policy even with their private funds.  Moreover, the issue in DKT Memorial Fund

was whether the restrictions could be imposed on foreign, not domestic organizations since the

statute did not so limit domestic ones.[4]  Nor did the regulations at issue in that case compel

anyone – either foreign or domestic NGOs – to adopt any particular policy as a condition of

funding.  Finally, that court emphasized that the regulation at issue did not restrict domestic

NGOs' use of their private funds.  Id. at 283 n.5.  For all these reasons, that case cannot carry the

weight the government assigns it.

        In addition, the government's proposition that "subsidies" cannot constitute "benefits" is

contrary to Supreme Court precedent.  In Regan v. Taxation With Representation, the Supreme

Court squarely held a tax exemption was, in essence, a subsidy, since it was the equivalent of the

government giving the taxpayer an amount of cash.  And in Speiser v. Randall, the Court held

that the taxpayer was unconstitutionally denied the benefit of a tax exemption (the functional

equivalent of a subsidy) when the government required him to sign a pledge declaring loyalty to

the United States to be eligible for that benefit.  357 U.S. 513 (1958). Thus, the relevant

distinction, for First Amendment purposes, is not between subsidies and benefits, but between

citizens demanding subsidies or benefits for the purpose of engaging in protected conduct (which

the First Amendment does not require) and citizens seeking eligibility for already-chosen

---

[4] In considering this point, courts have accorded substantial deference to the executive in the area
of foreign affairs.  DKT Mem'l Fund, 887 F.2d at 289-90.  However, the current policy applies
to organizations in the domestic sphere, compelling and restricting their speech in the United
States, as well as their speech abroad.  No such foreign policy deference is warranted here.

subsidies or benefits (which the First Amendment precludes being conditioned on forfeiting constitutional rights).

It is for this reason that this case fits squarely into the unconstitutional conditions cases plaintiff discussed in its opening brief.  Plaintiff is not asking USAID to subsidize speech or activities that the government has not already chosen to subsidize, as were the plaintiffs in <u>Rust</u>, <u>Regan</u>, <u>Cammarano</u>, and <u>Harris</u>.  The only benefit DKT seeks is to be eligible for the already-existing funding that USAID is directing to NGOs to distribute condoms and conduct other activities to fight HIV/AIDS.  Likewise, the only benefit Mr. Speiser sought was eligibility for the tax exemption California had already chosen to grant.  In that case and in this one, the benefit was denied solely because those applying for the benefit refused to say what the government required them to say.  Thus, what the Court said of the statute in <u>Speiser</u> can equally be said of the one in this case:  "It cannot be gainsaid that a discriminatory denial of [a grant to distribute condoms to fight HIV/AIDS] for engaging in speech is a limitation on free speech."  <u>Speiser</u>, 357 U.S. at 518 ; <u>see also</u> <u>Wooley v. Maynard</u>, 430 U.S. 705, 714 (1977) (state sought to deny benefit of driving a car when citizen refused to be a mouthpiece for the state's political view that one should "Live free or die"); <u>West Virginia State Board of Educ. v. Barnette</u>, 319 U.S. 624 (1943) (state tried to deny benefit of public school education when child would not repeat pledge); <u>Perry v. Sinderman</u>, 408 U.S. 593, 597 (1972) (holding that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests – especially, his interest in freedom of speech"); <u>O'Hare Truck Serv. Inc. v. City of Northlake</u>, 518 U.S. 712, 716-17 (1996) (city tried to deny benefit of being on tow truck rotation list when tow truck operator refused to support mayor's re-election).  In each of these cases, the plaintiff had a "choice": to surrender his or her constitutional rights and receive the benefit or to cling to those rights and

surrender the benefit. But that choice did not insulate the condition from review, and in each

case, the Supreme Court held that the government could not constitutionally compel these

individuals to make such a choice.

      C.     <u>Because the Government Has Not and Cannot Demonstrate That Requiring Private Organizations to Declare a Policy Opposing Prostitution Passes Either Strict or Intermediate Scrutiny, the Statute and Regulations Violate the First Amendment.</u>

It is settled law that although a duly enacted statute carries with it a presumption of

constitutionality, when a statute is alleged to infringe on the exercise of First Amendment rights,

the government bears the burden of establishing its constitutionality. <u>Forum for Academic and</u>

<u>Institutional Rights v. Rumsfeld</u>, 390 F.3d 219, 229 n.8 (3d Cir. 2004), <u>cert. granted</u>, 125 S. Ct.,

1977 (2005) (citing <u>ACORN v. City of Frontenac</u>, 714 F.2d 813, 817 (8th Cir. 1983)); <u>see also</u>

<u>Lebron v. Washington Metropolitan Area Transit Authority</u>, 749 F.2d 893, 896 (D.C. Cir. 1984)

(citing <u>Org. for a Better Austin v. Keefe</u>, 402 U.S. 415, 419 (1971)). Here, because the statute

and regulation both compel and restrict DKT's speech and activities outside the scope of any

USAID grant, and because they do so in a viewpoint-specific way, the restriction should be

subject to strict scrutiny. <u>See</u> Part I.A. <u>supra</u>. But even if this Court were to apply heightened

scrutiny, the government has still failed to carry its burden.

Under either level of scrutiny, the government must demonstrate that the interests it

asserts were actually interests of Congress. <u>League of Women Voters</u>, 468 U.S. at 387. But

here, to the extent the government has identified any interests, it has provided no evidence that

Congress enacted the policy-adopting requirement to avoid the harms the government

hypothesizes. Nor has the government shown that any of those harms occurred during the year

and a half during which, on the Department of Justice's advice, USAID did not apply the

requirement to U.S. NGOs. And the government has not even attempted to argue that there are

no less-restrictive alternatives to the statutory restriction.

> (1)     Interest in ensuring that grantees do not use their private funds to garble or
> distort the government's message, or to undermine the programs' goals.

As noted earlier, DKT does not challenge the government funds restriction found at 22

U.S.C. § 7631(e), which ensures that grantees will not use government funding to advocate or

promote the legalization or practice of prostitution. That provision certainly protects the

government from concerns about grantees sending "mixed messages" in the context of the

USAID program. And USAID has multiple non-speech-restrictive ways to sanction violations of

that or any other grant provision, including terminating the grant, requiring return of already

spent monies, debarment in some circumstances, and even the possibility of false claims charges

that carry both criminal and civil penalties.

To go further than that, however, as does the requirement that a grantee adopt an

organizational policy, the government must be suggesting that when it spends funds on a project

that may involve a governmental message, it has an interest in ensuring that its message is

neither garbled nor distorted by the grantee in its private activities outside the government

program. Gov't Br. at 22. The government also observes that it has a programmatic interest in

ensuring that the goals of its subsidies are not "undermined or ignored." And the government

posits that "neutrality" on the issue of prostitution by its grantees acting in their own right would

"operate to the detriment of Congress' stated program goals." Gov't Br. at 24. In the same vein,

it argues that the government should be able to exclude organizations that are "unwilling or

unable – due to their organizational policies – to further these goals," id. at 25, and that its goal

of "eradicating prostitution" would be undermined if, in activities and speech outside the

government program, grantees "simultaneously endorsed – either explicitly or implicitly – the very practices that the same program seeks to eliminate." Id. at 26.

Congress' reach here exceeds its grasp. If Congress can truly extend its interest in not "garbling" its programmatic messages to control privately-funded speech and activities outside the scope of the government grant, there is no logical end to its power. Indeed, this logic would support an absolute ban on all United States citizens attending public schools that receive civics funding from engaging in speech contrary to the government's message that all Americans should support a sitting president or a current war. This interest, untethered as it is to any government funds, is not compelling, substantial, or legitimate.

Even if it were a legitimate interest, the government offers no evidence that Congress thought that a lack of NGO unanimity "explicitly opposing prostitution" would undermine the purposes of the Act or lead to garbled messages. To the contrary, the statute strongly suggests that Congress was interested in ensuring that a diversity of voices and messages would be accommodated among grantees. To that end, Congress made clear that unanimity among grantees regarding important components of the Act is not necessary. For example, in 22 U.S.C. § 7601(22)(D), Congress directed a multisectoral approach to combating HIV/AIDS as an important part of its strategy, and that the United States should "encourag[e] . . . community-based organizations to adopt policies that treat HIV/AIDS as a multisectoral public health problem." It then defined the "priorities" of that multisectoral strategy to include, "promoting abstinence from sexual activity and substance abuse, encouraging monogamy and faithfulness, promoting the effective use of condoms, and eradicating prostitution, the sex trade, rape, sexual assault, and sexual exploitation of women and children." 22 U.S.C. § 7611(a)(4). But Congress then went on to provide that grantees "shall not be required … to endorse or utilize a

multisectoral approach to combating HIV/AIDS." 22 U.S.C. § 7631(d).  Thus, Congress has not

only allowed grantees to refrain from endorsing the multisectoral approach Congress has itself

declared to be its policy, but it has also allowed them to use a different approach or speak out

against the use of such an approach, thus specifically approving a diversity of "messages" in

connection with the HIV/AIDS grants.  Moreover, despite its decision to adopt a multisectoral

approach, Congress specifically provided in 22 U.S.C. § 7631(d) that grantees "shall not be

required to endorse a prevention method or treatment program to which they have a religious or

moral objection."  Thus, with regard to the very list of behavior-changing priorities the

government relies upon so heavily (such as "effective condom use"), Congress has not required

unanimity.

   Nor has the government pointed to any legislative history, even in their lengthy

discussion of the Act, expressing concern about garbled messages that would be alleviated by

compelling all USAID grantees to adopt U.S. policy on prostitution.  Indeed, to the extent this

provision was discussed at all, it appears intended to avoid "helping" groups who "believe that

prostitution ought to be legalized" because it is "outrageous that we would want to give money to

an organization that does that kind of things."  U.S. Leadership Against HIV/AIDS,

Tuberculosis, and Malaria Act of 2003 Mark-up Before the H. Comm. on Int'l. Relations, 108th

Congress, 96, 148-49, 151-52 (2003) (Comments of Rep. Smith).[5]  And while the government

cites legislative history from the Trafficking Victims Protection Act that includes statements

about the harms of prostitution resulting largely from sex trafficking, there are no findings and

---

[5] Of course the legislation applies equally to groups, like DKT, that have no policy on
prostitution.

no legislative history that relate to the need to have private entities adopt organizational policies on prostitution to avoid the harms the government has identified.[6]  Gov't Br. at 9.

Moreover, the government offers no basis for this court to conclude that requiring all HIV/AIDS-grant-accepting private organizations to publicly declare their opposition to prostitution will materially advance its goal of ensuring that whatever message it is sending in a particular grant is not garbled or that its goals are not undermined.  Forum for Academic & Institutional Rights v. Rumsfeld, 390 F.3d at 235 ("The Government has failed to proffer a shred of evidence that the [law] materially enhances its stated goal.").  Nor is it intuitive that unless DKT International has a policy "explicitly opposing prostitution," people in foreign countries receiving the condoms DKT distributes with USAID money will be "hopelessly confused" about the United States Congress' intent to "eradicate prostitution."   If that were so, the U.S. government's decision to exempt the Global Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, the International AIDS Vaccine Initiative, and any United Nations agency from the anti-prostitution policy requirement must leave foreign nationals utterly bewildered.[7]  Similarly, there is no evidence whatsoever (and it defies common sense to

---

[6] The government has muddied the legislative history by citing to not one, but three separate pieces of legislation.  The government's brief cites to legislative history relating to the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003, Pub. L. No. 108-25, 117 Stat. 711; the Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875; and the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464.  Such reliance on the legislative history of entirely separate acts of Congress is disfavored.  North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 530 n.21 (1982) (criticizing dissent for "us[ing] the legislative history – of a different statute").

[7] In FY 2004, the U.S. government provided $400,000,000 to the Global Fund to Fight AIDS, Tuberculosis and Malaria ("The Global Fund"); $26,000,000 to the International AIDS Vaccine Initiative; and an additional $26,000,000 to UNAIDS.  These sums dwarf the grants provided to individual U.S. NGOs, suggesting that the vast amount of work done under the Act is done by these organizations without the restrictions, despite the alleged fears of message-mixing and goal-undermining. Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, Div. D, Title II, 118 Stat. 3, 145.

conclude) that NGOs that have no policy at all regarding prostitution are somehow less <u>able</u> or less <u>willing</u> to carry out the specific requirements of whatever program they have agreed to carry out.  Nor is there a logical basis to assume that when an organization has no "policy" about prostitution, those in foreign countries will construe that lack of a policy as an "endorsement" of prostitution, or that refusing to adopt the government's political viewpoint about prostitution means that an NGO "endorses" prostitution.

Finally, even if the government had made any showing of a legitimate interest, and even if there were some evidence tending to show that the requirement materially advanced a government interest in ensuring that grantees did not mix the government's message when they used their private funds, the restriction is not narrowly tailored because there are alternative, less speech-restrictive means of accomplishing that goal.  For example, as the Supreme Court held in <u>League of Women Voters</u> and other cases, where the government is reasonably concerned that the public will be confused about which speech or activities are funded by federal grant, and which speech is private, disclaimers and signage are sufficient to avoid confusion.  468 U.S. at 395; <u>see</u>, <u>e.g.</u>, <u>Capitol Sq. Rev. & Advisory Bd. v. Pinette</u>, 515 U.S. 753, 769 (1995). Alternatively, permitting grantees to remain silent and adopt no position at all regarding prostitution would also further that interest and be significantly less restrictive.

(2)     Interest in ensuring that government grants do not "free up" private money for private uses inconsistent with government goals.

Finally, the government suggests that it has an interest in controlling what DKT says and does with its private funds if DKT accepts any HIV/AIDS prevention grants because Congress can condition its grants on organizations adopting the government's political viewpoint so as to avoid "freeing up" other private money that may be used for purposes with which Congress does

not agree. Gov't Br. at 27. To support this astonishing argument – which the government misrepresents as having been "repeatedly upheld" – the government points to two cases that do not relate at all to whether Congress can use its significant power of the purse to force organizations that take government money to limit all other activities to be consistent with Congress' political views. See DKT Mem'l Fund, 887 F.2d at 290 (addressing whether a statutory limitation precluding domestic NGOs from giving grants to some foreign NGOs violated a domestic NGO's association rights); Grove City College v. Bell, 465 U.S. 555, 565-66 (1984) (holding that "federal financial assistance" included both direct federal payments and indirect payments through federal student loans, thus subjecting the University to federal regulation). In point of fact, this "freeing-up" argument has been repeatedly rejected by courts across the country. See Planned Parenthood of Central and Northern Arizona, 718 F.2d at 945 (noting that "other courts have looked upon the freeing-up theory with disfavor" and holding "as a matter of law, the freeing-up theory cannot justify withdrawing all state funds from otherwise eligible entities merely because they engage in abortion-related activities disfavored by the state"); Planned Parenthood of Minn. v. Minnesota, 612 F.2d 359, 361 (8th Cir. 1980) (same), summarily aff'd, 448 U.S. 901 (1980); Mitchell v. Helms, 530 U.S. 793, 796 (2000) (the Supreme Court "has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends").

Moreover, in Rust v. Sullivan, the Court took some pains to point out that the restriction on speech there was constitutional because, "unlike the unconstitutional conditions cases," the "regulations govern the scope of the Title X project's activities, and leave the grantee unfettered in its other activities." 500 U.S. at 196; see also, Cammarano v. United States, 358 U.S. 498, 515 (1959) (denial of business-expense deduction for lobbying is constitutional, but an attempt to

17

deny all deductions for business expenses to a taxpayer who lobbies would penalize unconstitutionally the exercise of First Amendment rights); Harris v. McRae, 448 U.S. 297, 317 n.19 (1980) (denial of welfare benefits for abortion is constitutional, but an attempt to withhold all welfare benefits from one who exercises right to an abortion would likely be unconstitutional). Thus, these cases indicate that the "freeing-up" theory involves an unconstitutional purpose to the extent Congress aims at "tying up" funds that would be used for protected purposes. This alleged interest is surely not compelling, and cannot even be described as substantial or legitimate.

Again, the government provides no evidence that this was Congress' motive; such a motive is nowhere suggested in the statute or history. Further, private organizations, like DKT, exist and have their own goals separate and apart from USAID. When they receive grants from USAID, those grants are to carry out particular purposes that they would not carry out without that money. So USAID funding cannot logically be said to "free up" other private funding, nor is there any reason to assume that NGOs that devote themselves to preventing HIV/AIDS will pursue policies that will harm the United States' interest in preventing HIV/AIDS. There is simply no basis for allowing Congress to use its grant authority to control private organizations' speech and activities funded by private organization funds.[8]

Thus, the government has not articulated either compelling or substantial interests that justify both compelling DKT to adopt the government's political viewpoint and restricting DKT's speech outside the scope of the USAID grant program. Nor has the government

---

[8] Indeed, as DKT pointed out, it receives 16 percent of its total funding, and 13 percent of its funding in Vietnam from USAID. (Despite the several "but see" references in the government's brief, Gov't. Br. at 35, 38, and the implication that DKT was inconsistent in its facts, the brief and Holzman declaration plainly distinguished between the budget in Vietnam, and the total DKT budget.) If the statute were constitutional, it would allow Congress to direct how DKT spends the other 84 percent of its budget, the portion funded by non-U.S. government sources.

demonstrated that requiring DKT to adopt the anti-prostitution policy materially advances any interests it has identified.  And finally, it has not even argued that there are no less restrictive alternatives.  Accordingly, DKT has shown a high likelihood that it will succeed on its claim that the requirement violates the First Amendment.


II.     PLAINTIFF HAS DEMONSTRATED THAT IT HAS AND WILL CONTINUE TO
        SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.

        Having demonstrated that DKT has a strong likelihood of success on the merits, DKT now turns to the related issue of irreparable harm.  Beal v. Stern, 184 F.3d 117, 123 (2d Cir. 1999) ("[T]he irreparable injury issue and the likelihood of success issue overlap almost entirely" in the First Amendment context).

        The requirement that DKT adopt the government's policy "explicitly opposing prostitution" or lose its eligibility for all future USAID funding has caused and continues to threaten the organization with imminent, concrete, and irreparable harm.  The defendants make much of the fact that DKT has exercised its right not to speak.  Gov't Br. at 37.   But that does not resolve the issue – a plaintiff is not required to forfeit her First Amendment rights to protect them. Indeed, a "statute that threatens freedom of expression to a significant degree by its nature gives rise to irreparable injury."  Beal v. Stern, 184 F.3d at 123.  Because DKT has demonstrated that its "'First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought,'" an injunction is an appropriate remedy.  Wagner v. Taylor, 836 F.2d 566, 576 n.76 (D.C. Cir. 1987) (quoting  Elrod v. Burns, 427 U.S. at 373; alteration in original).

         Further, defendants' assertion that DKT has not been penalized for standing on its First Amendment rights is simply untrue.  DKT has lost one grant, and has lost its eligibility for other USAID grants in the foreseeable future unless it agrees to speak the words the government

requires.  The value of these losses cannot be quantified in dollar terms.  The grant opportunities

lost now cannot be recouped later.  Ambach v. Bell, 686 F.2d 974, 986 (D.C. Cir. 1982) (per

curiam).  Indeed, once the grants are awarded and disbursed to other recipients, the funds –

potentially totaling millions of dollars – will be permanently lost to DKT.  As in Population

Institute v. McPherson, 797 F.2d 1062, 1081 (D.C. Cir. 1986), absent an injunction, the plaintiff

"will suffer irreparable injury by the loss of the [government] funding because this court will be

unable to grant effective relief."  While recoverable economic loss normally does not constitute

irreparable harm, Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam),

unrecoverable loss is another story.   In sum, DKT lacks an "adequate and complete remedy at

law."  Triebwasser & Katz v. American Tel. & Tel. Co., 535 F.2d 1356, 1359 (2d Cir. 1976)

(internal quotation marks omitted).

　　　　As the organization exhausts its current USAID grants over the coming months, DKT

will again and again confront the same dilemma: sign the certification and sacrifice First

Amendment rights in order to apply for additional USAID funding, or refuse to sign and suffer

extensive program cuts.  Each day DKT faces a "choice between the rock and the whirlpool."

Frost v. Railroad Comm'n of Cal., 271 U.S. 583, 593-94 (1926) (holding that a state's power to

deny a privilege is not unlimited, "and one of the limitations is that it may not impose conditions

which require the relinquishment of constitutional rights").  These harms are neither speculative

or hypothetical.  Nor are they "mere economic loss."  Wisconsin Gas Co., 758 F.2d at 675 (citing

Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 259 F.2d 921, 925 (D.C. Cir.

1958)).

　　　　Finally, because DKT presents such a high likelihood of success on the merits, injury that

might be "held insufficient … in one case may well be sufficient to justify it in another."

Virginia Petroleum Jobbers Ass'n, 259 F.2d at 925.  Given the presumption that even threatened

or minimal First Amendment injuries constitute irreparable injury justifying a preliminary

injunction, Newsom ex rel. Newsom v. Albemarle County Sch. Bd., 354 F.3d 249, 261 (4th Cir.

2003) (granting a preliminary injunction to student sent home for refusing to turn his dress-

policy-violating t-shirt inside out), the comprehensive ban on DKT's participation in any

USAID-funded anti-HIV/AIDS programs occasioned by its refusal to adopt a U.S. government

policy as its own is more than sufficient to justify a preliminary injunction here.


III.     A PRELIMINARY INJUNCTION WILL NOT HARM OTHER PARTIES.

        The government has collapsed the two final prongs of the D.C. Circuit's test into one

superficial argument: the public interest is best served, and no one harmed, when courts refuse to

suspend acts of Congress.  Gov't Br. at 38-39.  In fact, defendants argue, to enjoin the

enforcement of the statute would inflict "irreparable harm" on the public and the government.

Id.  But this argument is nonsense.  If true, it would mean that no court could ever preliminarily

enjoin a statute despite the likelihood of success or irreparable injury.

        Defendants' conflation of the two tests ignores that in considering a motion for a

preliminary injunction, a court "must balance the competing claims of injury and must consider

the effect on each party of the granting or withholding of the requested relief."  National Wildlife

Fed'n v. Burford, 835 F.2d 305, 326 (D.C. Cir. 1987) (quotation marks omitted).   The

government cannot point to any harm whatsoever that the injunction might cause third parties.

Nor does it make any attempt to refute or counter the assertions made by affidavit from other

NGOs in support of DKT's Motion, such as that of EngenderHealth.

Indeed, the harm to EngenderHealth and other similarly situated NGOs that have signed the certification to protect their ongoing, and often life-saving programs, extends beyond the violation of their own First Amendment rights. With this policy, the U.S. government has essentially harnessed millions of dollars in private funds to amplify the U.S. government position on prostitution.[9] In so doing, the government has disrupted existing grant relationships between U.S. NGOs and their private funders, conscripting the funds of these private foundations to parrot U.S. government policy, even if the foundations actively oppose the policy. For USAID grantees that sign the certification, whether they receive 5 percent or 80 percent of their funding from the U.S. government, all speech, at least on the issue of prostitution, is government speech.[10] Such federal commandeering of private individuals' and organizations' non-U.S.-government funds is unprecedented. It is not the responsibility of individuals and individual organizations to carry out the "policies of the nation" with their own private funds. Gov't Br. at 40.

The harm to third parties who oppose the policy contrasts starkly with the complete lack of harm to those NGOs in total agreement with the U.S. government policy. As noted in plaintiff's application for a preliminary injunction, those who support the U.S. government's

[9] According to USAID's own report on U.S. voluntary agencies engaged in development abroad, "the private resources devoted to international development by the PVO [private voluntary organization] community exceed U.S. Government support. During fiscal year 2003, registered U.S. PVOs received $12.7 billion in annual private support. This was more than five times the amount they received in USAID support, which totaled $2.2 billion." 2005 VolAg Report of Voluntary Agencies at 5. Although it is unclear what proportion of these private funds went specifically to programs combating HIV/AIDS, NGOs' efforts to raise private funds to support their work should not permit the U.S. government to rely on these funds to promote government speech.

[10] Congress has mandated that no USAID funds for development assistance "may be made available to any United States private and voluntary organization…[that] obtains less than 20 percent of its total annual funding for international activities from sources other than the United States Government." Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, Div. D, Title V, § 502, 118 Stat. 3, 166-67. Private financing is required of U.S. NGOs.

policy on prostitution remain free to abide by the anti-prostitution pledge as before. Pl.'s Mem. at 19.

Nor has the government identified any harm to USAID – programmatic or otherwise – from a preliminary injunction. As for the U.S. government, it "is in no way harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation [and a statute], which,…[are] likely to be found unconstitutional." Newsom, 354 F.3d at 261.


IV.    A PRELIMINARY INJUNCTION WILL ENHANCE, NOT HARM, THE PUBLIC INTEREST.

The government fails to refute or counter DKT's arguments as to the public interest, relying instead on their notion that courts can never preliminarily enjoin statutes. However, the government does, rather ironically, cite Justice Rehnquist's reluctance to "delay [the date selected by] Congress to put its chosen policies into effect." Turner Broad. Sys., Inc. v. FCC, 507 U.S. 1301, 1301 (1993) (Rehnquist, J., in chambers).   As plaintiff notes, Congress passed the Global AIDS Act in 2003. Pl.'s Mem. at 5. The two-year delay in implementing the Act stems not from judicial interference, but from the Department of Justice's own assessment that the Act was unconstitutional as applied to U.S. private organizations. DOJ Letter, Ex. A to Maurice Middleberg Dec. (Ex. 4 to Pl.'s Mem.).

As noted in plaintiff's initial brief, the public has a pronounced interest in a vibrant marketplace of ideas. Pl.'s Mem. at 19. The public interest also weighs in favor of permitting private voluntary organizations to retain their independent character. In fact, Congress has declared "that it is in the interest of the United States that such organizations and cooperatives expand their overseas development efforts without compromising their private and independent

23

nature." 22 U.S.C. § 2151u(a).  In the same provision, Congress urged the USAID administrator to "draw on the resource of private and voluntary organizations and cooperatives to plan and carry out development activities…."  Id.  And as to the question of which agencies should carry out the programs, Congress stated that the activities should be carried out by "such private and voluntary organizations and cooperatives as have demonstrated a capacity to undertake effective development activities."  Id.

Based on this longstanding congressional guidance, the anti-prostitution policy harms the public interest in two concrete ways.  First, the coercive demand that private voluntary organizations surrender their independence and become handmaidens to U.S. government policy undermines the "private and independent nature" that Congress so values.  Id.  Second, the public interest is betrayed when organizations like DKT - an NGO that boasts excellent performance evaluations and long experience in the development field  - find themselves ineligible for U.S. grants due to a principled refusal to sacrifice constitutional rights.  The U.S. government's fight against HIV/AIDS is not helped by barring experienced NGOs from continuing the work they have long done simply because they do not wish to adopt a organizational policy "explicitly opposing prostitution."

Respectfully submitted,
DKT INTERNATIONAL, INC.

By /s/  *Julie M. Carpenter*
One of Plaintiff's Attorneys

Julie M. Carpenter
   D.C. Bar No. 418768
Martina E. Vandenberg
   D.C. Bar No. 476685
JENNER & BLOCK LLP
601 13th Street, N.W.
Washington, DC  20005
(202) 639-6000

OF COUNSEL
David S. Udell*
Rebekah Diller*
Laura K. Abel*
Brennan Center for Justice at NYU School of Law
161 Avenue of the Americas
12th Floor
New York, NY  10013
(212) 998-6730

*  Not admitted in the District of Columbia

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 2nd day of September 2005, a true and correct copy of the foregoing document, Plaintiff's Reply to Defendants' Opposition to Plaintiff's Application for a Preliminary Injunction, was delivered via U.S. mail to:

Rupa Bhattacharyya
Senior Trial Counsel
Federal Programs Branch, Civil Division
U.S. Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, DC 20001

Julie M. Carpenter