## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DKT, INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-01604 |
| | ) | |
| UNITED STATES AGENCY FOR | ) | |
| INTERNATIONAL DEVELOPMENT | ) | |
| and ANDREW S. NATSIOS, in his | ) | |
| Official Capacity as ADMINISTRATOR, | ) | |
| UNITED STATES AGENCY FOR | ) | |
| INTERNATIONAL DEVELOPMENT, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO DISMISS

### INTRODUCTION

The United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Leadership Act"), Pub. L. No. 108-25, 117 Stat. 711, codified at 22 U.S.C. § 7601-7682, creates a $15 billion program dedicated to the worldwide fight against HIV/AIDS, which has infected more than 65 million people since the pandemic began. The Leadership Act specifically notes that women and children in developing countries are at high risk of contracting HIV/AIDS, and identifies prostitution and sex trafficking as "factors in and causes of" the spread of HIV/AIDS. 22 U.S.C. § 7601(23). The Leadership Act establishes that it is a "priority" of Congress's comprehensive anti-HIV/AIDS program, 22 U.S.C. § 7611(a)(4), as well as the "policy of the United States," 22 U.S.C. § 7601(23), to "eradicate" prostitution and other forms of sexual victimization that contribute to the spread of HIV/AIDS, practices which Congress found to be "degrading to women and children." Id.

In keeping with these policy and priority determinations by Congress, the Leadership Act imposes two relevant limitations on the distribution of $15 billion in U.S. funds for the purposes of preventing, treating, and monitoring HIV/AIDS worldwide.  First, the Act provides that "[n]o funds made available to carry out this Act or any amendment made by this Act, may be used to promote or advocate the legalization or practice of prostitution or sex trafficking."  22 U.S.C. § 7631(e) (hereinafter, the "funding restriction").  Second, the Act provides that "[n]o funds made available to carry out this Act, or any amendment made by this Act, may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking."  22 U.S.C. § 7631(f) (hereinafter, the "organizational eligibility restriction").  These provisions have been implemented by the United States Agency for International Development ("USAID"), which is one of the Agencies responsible for carrying out the terms of the Leadership Act, in an implementing directive, USAID Acquisition and Assistance Policy Directive 05-04 ("AAPD 05-04"), issued June 9, 2005.

Plaintiff, DKT International, Inc., a private, non-governmental, U.S. organization which, in the past, has received USAID funding for HIV/AIDS prevention activities abroad, challenges the constitutionality of the Leadership Act and USAID's 2005 implementing directive.  Plaintiff argues that the Leadership Act's organizational eligibility restriction impermissibly infringes plaintiff's rights by compelling it to adopt the federal government's policy in order to be eligible for federal funding.  Thus, plaintiff argues, this restriction is unconstitutional because it infringes plaintiff's First Amendment right to adopt a different policy or "not to speak" at all on the basis of impermissible viewpoint-discrimination and without being narrowly tailored to further a compelling government interest.  Plaintiff also contends that the organizational eligibility restriction, as implemented by USAID, imposes an unconstitutional condition on plaintiff because requiring

plaintiff to certify that it has a policy "opposing prostitution and sex trafficking" effectively precludes plaintiff from engaging in activities inconsistent with that policy with funds derived from sources other than the federal government. Finally, plaintiff also contends that both limitations included in the Leadership Act – the funding restriction as well as the organizational eligibility restriction – exceed the scope of Congress's power, are unwise on policy grounds, and are impermissibly vague. On the basis of these claims, plaintiff seeks preliminary and permanent injunctive and declaratory relief aimed at preventing USAID from enforcing these statutorily-mandated restrictions.

Plaintiff's arguments are insufficient to state claims upon which relief might be granted. First, plaintiff incorrectly asserts that the provisions of the Leadership Act are subject to strict scrutiny under the First Amendment. As case after case has held, conditions attached to subsidies granted by Congress do not directly restrain speech and, thus, do not directly implicate the First Amendment. Instead, it is well established that Congress has greater leeway to attach conditions to its spending than it has when it regulates directly, and that the Spending Clause provides the proper framework in which to evaluate such conditions. See, e.g., Regan v. Taxation with Representation, 461 U.S. 540 (1983); South Dakota v. Dole, 483 U.S. 203 (1987); Nat'l Endowment for the Arts v. Finley, 524 U.S. 569 (1998); Rust v. Sullivan, 500 U.S. 173 (1991); DKT Memorial Fund v. Agency for Int'l Development, 887 F.2d 275 (D.C. Cir. 1989). Under the Leadership Act, as with all enactments pursuant to Congress's spending power, any organization is free to make any statement or adopt any policy that the First Amendment contemplates, free from government interference. Organizations, however, have neither an entitlement nor a right to do so with government funds. They most certainly do not have the right to obtain government funds while maintaining a policy at odds with the very purpose for which those funds were appropriated.

Second, plaintiff's argument that the organizational eligibility restriction imposes an unconstitutional condition on domestic organizations also fails. When creating a federal spending program which recruits private, nongovernmental organizations to partner with the federal government in implementing the federal government's goals, Congress has the power to take legitimate and appropriate steps to insure that it chooses partners that are qualified to advance the goals the program was created to serve, and that those partners do not garble or otherwise distort the underlying government message. The Leadership Act identifies the eradication of prostitution as not only a goal necessary to any successful international strategy aimed at fighting HIV/AIDS, but also as a priority of that effort. For purposes of preserving the integrity of that priority, Congress may specify that only those private-sector organizations that share its goals are eligible to partner with the federal government in the program created by the Leadership Act, and Congress may impose conditions designed to guarantee that the policy goals of the United States – and not the individual agendas of any federal grant recipient – are the ones advanced by the program. The Leadership Act does no more than take such legitimate and appropriate steps to protect the integrity of Congress's comprehensive anti-HIV/AIDS program and, thus, is constitutional.

Finally, plaintiff's challenge to both restrictions contained in the Leadership Act on grounds of vagueness must also fail. The Leadership Act meets all extant limitations on Congress's exercise of power under the Spending Clause and, moreover, the Act articulates its requirements in a manner that is more than sufficient to allow funding applicants to determine whether they will accept the conditions attached to the funds or choose to decline the government subsidy. The Spending Clause requires no more.

Because plaintiff's constitutional claims are without merit, plaintiff has failed to state claims upon which relief might be granted. Dismissal of this suit, accordingly, is warranted pursuant to

Federal Rule of Civil Procedure 12(b)(6).[1]

## BACKGROUND

### A.    The 2003 Leadership Act.

In May 2003, Congress enacted the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003 ("Leadership Act"), Pub. L. No. 108-25, 117 Stat. 711 (attached as Ex. A), codified at 22 U.S.C. § 7601-7682, as part of the President's "emergency effort [to] provide $15 billion over the next 5 years to fight AIDS abroad."  Remarks on Signing the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003, 39 Weekly Comp. Pres. Docs. 663 (May 27, 2003) (attached as Ex. B).  The $15 billion commitment reflected in the Leadership Act constitutes "the largest, single upfront commitment in history for an international public health initiative involving a specific disease."  Id.  As the President explained, "[t]his Act of Congress addresses one of the most urgent needs of the modern world.  Because of the AIDS pandemic, a child born today in sub-Sahara Africa has a life expectancy of 47 years.  This disease falls most heavily on women and children.  Nearly 60 percent of those infected by HIV in sub-Sahara Africa are women.  Three million African children under 15 have the AIDS virus – 3 million.  And the disease has left 11 million orphans, more children than live in the entire state of California."  Id.

The Leadership Act is a "massive undertaking" that creates a "comprehensive program that has the potential in this decade to prevent 7 million new HIV infections, provide life-extending drugs to at least 2 million infected people, [and] give humane care to 10 million HIV sufferers and AIDS orphans."  Remarks on Signing, at 665.  Specifically, the Leadership Act authorizes the President

---

[1]  As described in Part IV, plaintiff's request that the Court "order USAID to instruct Family Health International that USAID authorizes FHI to disburse the $60,000 grant for the Vietnam condom-lubricant proposal" is not ripe for review and thus claims related to this request for relief fall outside the Court's jurisdiction and are subject to dismissal under Federal Rule of Civil Procedure 12(b)(1).

"to furnish assistance, on such terms and conditions as the President may determine, for HIV/AIDS, including to prevent, treat, and monitor HIV/AIDS, and carry out related activities, in the countries in sub-Saharan Africa, the Caribbean, and other countries and areas." § 22 U.S.C. § 7631 (amending the Foreign Assistance Act, 22 U.S.C. § 2151b-2); see also 22 U.S. § 2151b-2(d) (describing the activities supported). The Leadership Act similarly authorizes the President to "furnish assistance, on such terms and conditions as the President may determine, for the prevention, treatment, control and elimination of" tuberculosis, see 22 U.S.C. § 2151b-3, and malaria, see 22 U.S.C. § 2151b-4. For these purposes, the Leadership Act authorizes an appropriation of a total of $15 billion, $3 billion for each of the fiscal years 2004 through 2008. 22 U.S.C. § 7671.

In enacting the Leadership Act, Congress found that HIV/AIDS "has assumed pandemic proportions," and that more than 65 million people worldwide have been infected with HIV since the epidemic began. 22 U.S.C. § 7601(1) & (2). Congress further found that "[w]omen are four times more vulnerable to infection than are men and are becoming infected at increasingly high rates, in part because many societies do not provide poor women and young girls with the social, legal, and cultural protections against high risk activities that expose them to HIV/AIDS." 22 U.S.C. § 7601(4). Congress determined that "[s]uccessful strategies to stem the spread of the HIV/AIDS pandemic will require . . . measures to address the social and behavioral causes of the problem." 22 U.S.C. § 7601(15); see also id. § 7601(20)(D) ("behavior change . . . is a very successful way to prevent the spread of AIDS"). Specifically focusing on high-risk behaviors, Congress found that:

> Prostitution and other sexual victimization are degrading to women and children and it should be the policy of the United States to eradicate such practices. The sex industry, the trafficking of individuals into such industry, and sexual violence are additional causes of and factors in the spread of the HIV/AIDS epidemic. . . . Victims of coercive sexual encounters do not get to make choices about their sexual activities.

22 U.S.C. § 7601(23); see also H.R. Rep. No. 108-60, at 33-34 (2003) ("prostitution, sex trafficking

and sexual violence are additional causes and factors in the spread of HIV/AIDS").

It was Congress's considered view that "the magnitude and scope of the HIV/AIDS crisis demands a comprehensive, long-term, international response focused upon addressing the causes, reducing the spread, and ameliorating the consequences of the HIV/AIDS pandemic." 22 U.S.C. § 7601(21). Congress determined that a critical element of this comprehensive plan was to "increase the participation of at-risk populations in programs designed to encourage behavioral and social change," id. § 7601(21)(C), and that a focus of United States international leadership on halting the spread of HIV/AIDS and eliminating the behaviors that contribute to its spread would be to "promot[e] healthy lifestyles, including abstinence, delaying sexual debut, monogamy, marriage, faithfulness, use of condoms, and avoiding substance abuse." 22 U.S.C. § 7601(22)(E); accord H. Rep. 108-60 (noting that the bill "stresses the importance of behavior change . . . as the foundation of efforts to fight HIV/AIDS").

Thus, the Leadership Act "endorses a multisectoral approach to fighting AIDS," H. Rep. No. 108-60, at 23, and requires "establishing a comprehensive, integrated five-year, global strategy to fight HIV/AIDS . . . ." 22 U.S.C. § 7602(1). A key element of this comprehensive strategy is to "provide that the reduction of HIV/AIDS behavioral risks shall be a priority of all prevention efforts in terms of funding, educational messages, and activities by promoting abstinence from sexual activity and substance abuse, encouraging monogamy and faithfulness, promoting the effective use of condoms, and eradicating prostitution, the sex trade, rape, sexual assault and sexual exploitation of women and children." 22 U.S.C. § 7611(a)(4).

Congress's conclusion that prostitution and sex trafficking are "causes of and factors in the spread of the HIV/AIDS epidemic," 22 U.S.C. § 7601(23), and that eradication of these practices was a necessary element of any comprehensive plan to fight HIV/AIDS, was supported by the

testimony Congress heard in the course of considering both the Leadership Act and the Trafficking

Victims Protection Reauthorization Act of 2003 ("TVPRA"), Pub. L. No. 108-193, 117 Stat. 2875

(December 2003), which amended the Trafficking Victims Protection Act of 2000 ("TVPA"), Pub.

L. No. 106-386, 114 Stat. 1464 (October 2000).[2]  Thus, for example, the Senate heard from the

Honorable Frank E. Loy, then the Undersecretary of State for Global Affairs, who testified that

"Individuals trafficked into the sex industry are coerced by their criminal captors to engage in

activities that will expose them to deadly diseases, including HIV and AIDS.  We understand that

of the thousands of women and girls trafficked from Nepal annually – many of whom are in their

early teens or younger  – of the few hundred who may escape – more than 65 percent are HIV

positive."  International Trafficking in Women and Children, Hearings before the Subcommittee on

Near Eastern and South Asian Affairs of the Comm. on Foreign Relations, United States Senate, S.

Hrg. 106-705 (February 22, 2000 & April 4, 2000); see also id. at 13 ("Thousands of women and

children are trafficked annually from Nepal and Bangladesh to the brothels in India and Pakistan.

Many are now HIV positive").

---

[2]  The purpose of the TVPA, enacted in October 2000, is to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."  22 U.S.C. § 7101(a).  The TVPA creates several grant programs, administered by various federal agencies, to provide protection and assistance to victims and potential victims of trafficking. See, e.g., 22 U.S.C. § 7104(b) (authorizing program to "increase public awareness, particularly among potential victims of trafficking, of the dangers of trafficking and the protections available to victims of trafficking"); id. § 7105(a)(1) (authorizing "programs and initiatives in foreign countries to assist in the safe integration, reintegration, or resettlement, as appropriate, of victims of trafficking"); id. § 7105(b)(1)(B) (authorizing agencies to "expand benefits and services to victims of severe forms of trafficking").  In December 2003, the TVPA was amended so that (like the Leadership Act which was enacted seven months earlier in May 2003), it restricts both the uses to which funds awarded under the TVPA may be put, see 22 U.S.C. § 7110(g)(1) ("no funds . . . may be used to promote, support, or advocate the legalization or practice of prostitution"), and the organizations that will be eligible for such funds.  See 22 U.S.C. § 7110(g)(2) ("No funds . . . may be used to implement any program that targets victims of severe forms of trafficking . . . through any organization that has not stated . . . that it does not promote, support or advocate the legalization or practice of prostitution").

Congress also heard from Dr. Donna M. Hughes, Professor and Carlson Endowed Chair in Women's Studies, University of Rhode Island, Kingston, RI, who testified that "[w]omen and children who are trafficked are at high risk for infection for HIV which is a death sentence for victims. Brothels and other sites for women and children who are used in prostitution are markets for the distribution of the AIDS virus." Trafficking in Women & Children in East Asia and Beyond: A Review of U.S. Policy, Hearing before the Subcommittee on East Asian and Pacific Affairs of the Comm. on Foreign Relations, United States Senate, S. Hrg. 108-105 (April 9, 2003), at 18.

Gary Haugen, President and CEO, International Justice Mission, Washington, DC, agreed: "Federal funding of programs aimed at combating the international AIDS epidemic must include support of programs to combat sex trafficking and other forms of sexual violence against women and girls, or else our effort to fight AIDS will simply fail to address one of the most fundamental and certainly most brutal causes of the epidemic. . . . You could fill this hearing room with the children today who are passing away painfully because of the AIDS virus that was forcibly infected on them in brothels." S. Hrg. 108-105, at 29; see also id. at 41 ("I don't think anybody doubts that there's a tremendous nexus between prostitution and the spread of AIDS").

In one hearing, Senator Sam Brownback of Kansas provided statistics regarding the connection between prostitution and the spread of sexually transmitted diseases, including HIV/AIDS:

> 50 to 70 percent of the Burmese prostitutes in Thailand are HIV-positive. The rate of HIV infection is 50 percent or higher among female prostitutes in Northern Thailand, 40 to 50 percent of the prostitutes in Cambodia are HIV positive, 60 percent of women prostitutes in Bombay's red light district are infected with STDs or AIDS. In 1991, Bombay's 100,000 prostitutes averaged 600,000 sexual contacts a day, and at that time 30 percent were HIV positive. . . .
>
> You can see that the spread of HIV associated with prostitution is just a clear, huge problem for us . . . ."

S. Hrg. 108-105, at 18. Senator Brownback also spoke eloquently of his own experience meeting

with "young girls from Nepal that were trafficked to India, most of them 11, 12, 13 years old when they were tricked out of their Nepalese villages and moved into Bombay, into the brothel district. When I met them, they were returning to Nepal . . . at an aftercare facility.  And . . . two-thirds were coming back with AIDS and/or tuberculosis at 17-18 years of age, coming home to die.  It was just one of the most awful things I had seen anywhere in the world."  S. Hrg. 106-705, at 93.

Congress's enactment of the Leadership Act was also guided by the National Security Presidential Directive relating to trafficking in persons.  See Press Release, Trafficking in Persons National Security Presidential Directive, Feb. 25, 2003, attached as Ex. C.[3]  The President's directive explains that "trafficking in persons refers to actions, often including the use of force, fraud, or coercion, to compel someone into a situation in which he or she will be exploited for sexual purposes, which could include prostitution or pornography, or for labor without compensation. . . ." Id.  The President determined that "[p]rostitution and related activities, which are inherently harmful and dehumanizing, contribute to the phenomenon of trafficking in persons, as does sex tourism, which is an estimated $1 billion per year business worldwide."  Id.  Like Congress, the President deplored the "exposure of trafficked people to abuse, deprivation and disease, including HIV," and committed the United States to a policy of eradicating such practices.  Id.

In light of the clear evidence connecting prostitution, sex trafficking and the spread of HIV/AIDS, and given Congress's policy goal of prioritizing behavior change and, specifically, the eradication of prostitution and other sexual victimization, as part of its fight against the disease, see 22 U.S.C. §§ 7601(23), 7611(a)(4), the Leadership Act imposes two limitations on the $15 billion program it created to prevent, treat, and monitor HIV/AIDS.  First, the Act provides that "[n]o funds made available to carry out this Act or any amendment made by this Act, may be used to

---

[3]  The text of the National Security Presidential Directive is classified.

promote or advocate the legalization or practice of prostitution or sex trafficking."  22 U.S.C. § 7631(e) (the "funding restriction").  Second, the Act provides that "[n]o funds made available to carry out this Act, or any amendment made by this Act, may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking."  22 U.S.C. § 7631(f) (the "organizational eligibility restriction").

**B.      Implementation of the Leadership Act.**

Under the Foreign Assistance Act, 22 U.S.C. § 2151 et seq., which is amended and supplemented by the Leadership Act, USAID is authorized to award grants, cooperative agreements, contracts, and other agreements.  Contracts are awarded only when the principal purpose of the agreement is the "acquisition of property or services for the direct benefit or use of the Federal Government."  22 C.F.R. § 226.11.  Otherwise, where the principal purpose of the transaction is to "accomplish a public purpose of support or stimulation authorized by Federal statute," USAID proceeds by way of grant or cooperative agreement as authorized by the Federal Grant and Cooperative Agreement Act, 31 U.S.C. § 6301-08.  See 22 C.F.R. § 622.11.  In particular, cooperative agreements are used where "substantial involvement is expected between the executive agency and the . . . recipient when carrying out the activity contemplated in the agreement."  Id.

In order to implement the Leadership Act, on June 9, 2005, USAID issued Acquisition and Assistance Policy Directive ("AAPD") 05-04, attached as Ex. D.  AAPD 05-04 requires, among other things, that HIV/AIDS grants and cooperative agreements include a standard provision, entitled "Prohibition on the Promotion or Advocacy of the Legalization or Practice of Prostitution or Sex Trafficking," which requires that recipients of anti-HIV/AIDS funds must have a policy explicitly opposing prostitution and sex trafficking.  Specifically, AAPD 05-04 requires that the following language be "included as part of the Standard Provisions of any grant or cooperative agreement or

subagreement funded with FY04-FY08 HIV/AIDS funds with a U.S. nongovernmental organization,

non-U.S., non-governmental organization or public international organizations":

> "PROHIBITION ON THE PROMOTION OR ADVOCACY OF THE LEGALIZATION OR PRACTICE OF PROSTITUTION OR SEX TRAFFICKING (ASSISTANCE) (JUNE 2005)
>
> (a)  The U.S. Government is opposed to prostitution and related activities, which are inherently harmful and dehumanizing, and contribute to the phenomenon of trafficking in persons.  None of the funds made available under this agreement may be used to promote or advocate the legalization or practice of prostitution or sex trafficking.  Nothing in the preceding sentence shall be construed to preclude the provision to individuals of palliative care, treatment, or post-exposure pharmaceutical prophylaxis, and necessary pharmaceuticals and commodities, including test kits, condoms, and, when proven effective, microbicides.
>
> (b)  Except as noted in the second sentence of this paragraph, as a condition of entering into this agreement or any subagreement, a non-governmental organization or public international organization recipient/subrecipient must have a policy explicitly opposing prostitution and sex trafficking.  The following organizations are exempt from this paragraph:  the Global Fund to Fight AIDS, Tuberculosis and Malaria; the World Health Organization; the International AIDS Vaccine Initiative; and any United Nations agency.
>
> (c)  The following definition applies for purposes of this provision:
>
> Sex trafficking means the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act.  22 U.S.C. 7102(9).
>
> (d)  The recipient shall insert this provision, which is a standard provision, in all subagreements.
>
> (e)  This provision includes express terms and conditions of the agreement and any violation of it shall be grounds for unilateral termination of the agreement by USAID prior to the end of its term.
>
> (End of Provision)

AAPD 05-04 at 5.  AAPD 05-04 further provides that all prime recipients of FY04-FY08 HIV/AIDS

funds must "provide to the Agreement Officer a certification substantially as follows":

> [Recipient's name] certifies compliance as applicable with the Standard Provision[] entitled . . . "Prohibition on the Promotion or Advocacy of the Legalization or Practice of Prostitution or Sex Trafficking" included in the referenced agreement.

AAPD 05-04 at 6.

     **C.    Plaintiff's Complaint and Application for Preliminary Injunction.**

On August 11, 2005, plaintiff DKT International, Inc. ("DKT" or "plaintiff"), a not-for-profit

U.S. corporation involved in family planning and HIV/AIDS prevention programming overseas and

a past recipient of USAID funding, filed the instant complaint challenging the Leadership Act and

USAID's implementing directive as facially unconstitutional.  Plaintiff alleges that it was negotiating

funding for a condom lubricant marketing proposal in Vietnam with Family Health International

("FHI"), a USAID grantee that is not a party here but that is authorized to make subawards of

USAID funds, albeit subject to USAID approval, under its cooperative agreement with USAID.

Compl. ¶¶ 13, 14.  Plaintiff further alleges that in the course of negotiations with FHI, it was

informed that it would be required to certify that "DKT International . . . has a policy explicitly

opposing prostitution and sex trafficking."  Id. ¶ 16.  Plaintiff refused to execute the certification.

Id. ¶ 18.  Subsequently, plaintiff was informed by FHI "it will not be possible for FHI to fund DKT

to carry out this work."  Id. ¶ 21.

Plaintiff asserts that "it has no policy on prostitution and does not wish to adopt one."

Compl. ¶ 23.  It further claims that "as a result of" the Leadership Act and "the USAID requirement,

DKT has been penalized for exercising its First Amendment right not to speak by losing the already-

agreed-upon funding of $60,000 for the condom-lubricant proposal in Vietnam," Compl. ¶ 25, and

that it "has also been penalized for exercising its First Amendment right not to speak by being

excluded from eligibility for all future USAID grants."  Id. ¶ 26.  Plaintiff also alleges that the

funding conditions are vague, Compl. ¶¶ 27, 28, and that agreeing to the conditions "would restrict

DKT International's ability to carry out programs funded entirely by non-U.S. government donors,

including private, governmental and international organizations." Compl. ¶ 29.[4]

Based on these allegations, DKT seeks both preliminary and permanent injunctive relief. Plaintiff asks the Court for a preliminary order enjoining USAID from enforcing the provisions of the Leadership Act that "require private organizations to certify that they have a policy explicitly opposing prostitution to be eligible for USAID funding." Proposed Preliminary Injunction Order attached to Pls' App. for Preliminary Injunction. Plaintiff also seeks an order requiring USAID to instruct FHI that it is authorized to provide USAID funds to DKT "without requiring it to certify that it has a policy explicitly opposing prostitution." Id.[5] Plaintiff seeks permanent relief in the form of: (1) a declaration that the funding conditions of the Leadership Act are unconstitutional "to the extent they require U.S. organizations to have a policy explicitly opposing prostitution"; (2) a declaration that USAID's implementing directive is similarly unconstitutional; (3) a permanent injunction prohibiting USAID from enforcing these provisions; (4) an order requiring USAID to instruct FHI that it authorizes the disbursement of the $60,000 grant; and (5) other relief. Requests for Relief, Compl.

## ARGUMENT

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the allegations of the complaint must be construed in favor of the pleader. See Gregg v. Barrett, 771 F.2d 539, 547 (D.C. Cir. 1985) (citations omitted). The Court need not, however, accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions. See Nat'l Treas. Employees Union v. United

---

[4] As required under prevailing standards, see discussion infra, defendants accept these allegations as true for purposes of this motion to dismiss, but do not concede their accuracy.

[5] Plaintiffs' Motion for Preliminary Injunction is fully briefed and is awaiting the decision of this Court.

<u>States</u>, 101 F.3d 1423, 1430 (D.C. Cir. 1996); <u>Kowal v. MCI Communications Corp.</u>, 16 F.3d 1271,

1276 (D.C. Cir. 1994). Thus, a complaint is properly dismissed if it fails to "set forth sufficient

information to suggest that there exists some recognized legal theory upon which relief can be

granted." <u>Gregg</u>, 771 F.2d at 547 (citing <u>Dist. of Columbia v. Air Florida, Inc.</u>, 750 F.2d 1077, 1081

(D.C. Cir. 1984)). Moreover, a "decision to declare an Act of Congress unconstitutional 'is the

gravest and most delicate duty that [a] Court is called upon to perform.'" <u>Rust v. Sullivan</u>, 500 U.S.

173, 191 (1991) (quoting <u>Blodgett v. Holden</u>, 275 U.S. 142, 148 (1927)). Acts of Congress are

presumptively constitutional, <u>Bowen v. Kendrick</u>, 487 U.S. 589, 617 (1988), and facial invalidation

of an Act of Congress "is, manifestly, strong medicine" that "has been employed by the Court

sparingly and only as a last resort." <u>Nat'l Endowment for the Arts v. Finley</u>, 524 U.S. 569, 580

(1998) (quoting <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 613 (1973). Under these well established

standards, dismissal of plaintiffs' complaint is warranted.

**I.     THE LEADERSHIP ACT IS A SPENDING CLAUSE ENACTMENT AND IS NOT
        SUBJECT TO STRICT SCRUTINY UNDER THE FIRST AMENDMENT.**

The Leadership Act does not impose a direct restraint on speech. Moreover, contrary to

plaintiff's allegation, the Leadership Act does not compel the adoption of any particular policy.

Plaintiff is free, at its pleasure, to adopt any policy it likes, or no policy at all, consistent with the

First Amendment, on the subject of prostitution. The Leadership Act merely specifies that, if

plaintiff or any organization like it chooses to adopt a policy that is inconsistent with the federal goal

of promoting behavior change and "eradicating prostitution" – which is a "factor in and cause of"

the spread of HIV/AIDS – it is not eligible for government subsidies aimed at fighting the AIDS

pandemic. <u>Cf. DKT Memorial Fund, Ltd. v. Agency for Int'l Development</u>, 887 F.2d 275, 287 (D.C.

Cir. 1989) ("In attempting to assert an infringement of free speech rights, plaintiffs constantly

mischaracterize the policy of [US]AID as a suppression of their viewpoint . . . . What they actually

complain of is not suppression, but rather a refusal to fund").  As numerous courts, including the

Supreme Court and the Court of Appeals for the D.C. Circuit, have held, there is nothing

unconstitutional about such a condition attached to the grant of a subsidy under Congress's broad

powers under the Constitution's Spending Clause.  See U.S. Const., Art. I, § 8, cl.1 (empowering

Congress to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for

the common Defence and general welfare of the United States").

Courts have repeatedly upheld Congress's use of the spending power "to further broad policy

objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal

statutory and administrative directives."  South Dakota v. Dole, 483 U.S. 203, 206 (1987) (quoting

Fullilove v. Klutznick, 448 U.S. 448, 474 (1980) (opinion of Burger, C.J.)).  The reach of the

spending power is broad, and it "is not limited by the direct grants of legislative power found in the

Constitution."  United States v. Butler, 297 U.S. 1, 66 (1936).  Instead, the constitutional limitations

on Congress when it exercises its spending power "are less exacting than those on its authority to

regulate directly."  Dole, 483 U.S. at 209.  Those "less exacting" constitutional limitations are set

forth by the Court in Dole:

> The spending power . . . is subject to several general restrictions articulated in our
> cases.  The first of these is derived from the language of the Constitution itself: the
> exercise of the spending power must be in pursuit of "the general welfare." . . .
> Second, we have required that if Congress desires to condition the . . . receipt of
> funds, it "must do so unambiguously . . ., enabl[ing] the [recipients] to exercise their
> choice knowingly cognizant of the consequences of their participation." . . . Third,
> our cases have suggested . . . that conditions on federal grants might be illegitimate
> if they are unrelated "to the federal interest in particular nationwide projects or
> programs." . . . . Finally, we have noted that other constitutional provisions may
> provide an independent bar to the conditional grant of federal funds.

483 U.S. at 207-08 (citations omitted).[6]

---

[6] It should be noted that the latter restriction "stands for the unexceptionable proposition that
the power may not be used to induce States to engage in activities that would themselves be
unconstitutional." 483 U.S. at 210.  This restriction, accordingly, has no significance in a case

In light of the holding in <u>Dole</u>, plaintiff's demand that strict scrutiny be applied to the Leadership Act, <u>see</u> Mem. of Law in Support of DKT International's Motion for a Preliminary Injunction ("Pls' PI Mem.") at 8-11, is incorrect. As the Supreme Court explained in <u>Finley</u>, "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." 524 U.S. at 588; <u>see</u> <u>Rust</u>, <u>supra</u>; <u>Finley</u>, <u>supra</u>; <u>FCC v. League of Women Voters</u>, 468 U.S. 364 (1984); <u>Regan v. Taxation with Representation</u>, 461 U.S. 540 (1983); and <u>Legal Services Corp. v. Velazquez</u>, 531 U.S. 533 (2001) (all discussing various funding conditions that were argued or held to implicate First Amendment rights; none applying strict scrutiny to the enactment at issue).

Where Congress exercises its power to condition federal spending on the compliance of the recipients of federal funding with conditions dictated by federal policy, the appropriate framework for assessing the constitutionality of such conditions are the standards that govern Congress's exercise of its Spending Power. <u>See</u> <u>Am. Library Ass'n v. United States</u>, 539 U.S. 194, 203 n. 2 (plurality opinion) (applying <u>South Dakota v. Dole</u>, <u>supra</u>, as "the appropriate framework for assessing [the Act's] constitutionality" where "Congress has exercised its Spending Power by specifying conditions on the receipt of federal funds," and where statute does not "directly regulate private conduct"); <u>accord</u> <u>Regan</u>, 461 U.S. at 549 ("a [government's] decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny"); <u>DKT Memorial Fund</u>, 887 F.2d at 289 (rejecting plaintiffs' contention that "the government's choice to fund some communicative and associational acts, while not funding all" was "invalid" because "the government has offered no compelling interest for its policy choice"; "this is not the law").

For similar reasons, plaintiff's contention that the funding conditions contained in the

---

involving federal grants to private, nongovernmental organizations.

Leadership Act must be found unconstitutional because they "constitute viewpoint-based discrimination," Pls' PI Mem. at 7-8, is misguided.  As the D.C. Circuit held in <u>DKT Memorial Fund</u>, "the fact that the government subsidizes one constitutionally protected or constitutionally permissible activity is no reason that it has to seek to subsidize another."  877 F.2d at 288.

> The government must make policy choices and constantly makes policy choices as to which human activities it will subsidize and which it will not.  These are by definition viewpoint-based.  That is, it subsidizes the activities consistent with the viewpoints of the persons who engage in those activities, and inconsistent with those who do not, and vice versa.

<u>Id.</u>; <u>accord</u> <u>id.</u> at 290 ("If the United States cannot constitutionally fund international communications save on a viewpoint-neutral basis, then either the very population planning funding program in which plaintiffs seek to participate is constitutionally invalid, or, grants must be equally available to domestic and foreign groups opposing population planning.").[7]  In upholding a funding restriction which prohibited federal funds granted to recipients under a family planning program from "being used in programs which advocate abortion as a method of family planning," 500 U.S. at 192, the Supreme Court in <u>Rust v. Sullivan</u> similarly cautioned that "[t]o hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a

---

[7]  In <u>DKT Memorial Fund</u>, the D.C. Circuit upheld the constitutionality of an eligibility restriction similar to that at issue in this case.  At issue in <u>DKT Memorial Fund</u>, was the so-called Mexico City Policy, which provided that the United States would not provide family planning funds to foreign nongovernmental organizations which "perform or actively promote abortion as a method of family planning in other nations."  887 F.2d at 277.  In holding that such funding decisions are not subject to claims of viewpoint discrimination, the D.C. Circuit was specifically concerned with the federal government's need to "make viewpoint-based choices in foreign affairs."  Although the First Amendment rights of domestic nongovernmental organizations may exceed any that might be held by the foreign nongovernmental organizations that were subject to the eligibility restriction at issue in <u>DKT Memorial Fund</u>, that fact has no bearing on the well-established principle that no organization, whether domestic or foreign, has a constitutional right to have its views subsidized by the federal taxpayer.  <u>See</u> <u>Regan</u>, 461 U.S. at 546 ("a [government's] decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny"); <u>see</u> <u>also</u> <u>id.</u> ("We reject again the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State") (quoting <u>Cammarano v. United States</u>, 358 U.S. 498, 515 (1959) (Douglas, J., concurring)); <u>DKT Memorial Fund</u>, 887 F.2d at 287 (citing cases).

program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals, would render numerous Government programs constitutionally suspect." 500 U.S. at 194.

As Regan, Rust and DKT Memorial Fund establish, it is simply an invalid mode of analysis to seek to analyze cases arising under the Spending Clause under the rubric of the First Amendment strict scrutiny. Instead, as the D.C. Circuit has squarely held, "this sort of viewpoint-based subsidization decision is not 'predicated on a suspect classification,' and is subject only to a rational relationship test not the sort of strict scrutiny that may require the use of less restrictive means." DKT Memorial Fund, 887 F.2d at 291 (citing Harris v. McRae, 448 U.S. 297, 323 (1980)).[8]

_____

[8] The Supreme Court's decision in Legal Services Corp. v. Velazquez, 531 U.S. 533 (2001), invalidating a federal funding condition, is not to the contrary; indeed, the program at issue in Velazquez differed in several critical respects from that at issue here. The funding condition reviewed in Velazquez involved an attempt by Congress to restrict federally-funded legal services ("LSC") lawyers from arguing in favor of amending or otherwise challenging existing welfare laws in the course of representation of their clients. The Court focused, first, on the fact that "the LSC program was designed to facilitate private speech, not to promote a governmental message." Id. at 542; see id. at 548 (distinguishing Rust because "in the context of this statute there is no programmatic message of the kind recognized in Rust"). Here, Congress seeks to append conditions to a program designed, not to "facilitate private speech," but rather to fulfill a government goal, the prevention, treatment and monitoring of HIV/AIDS and, moreover, to do so in a manner consistent with the government's policy of "eradicating prostitution, the sex trade, rape, sexual assault, and sexual exploitation of women and children." 22 U.S.C. § 7211(a)(4).

Second, the concluding paragraphs of the Velazquez opinion clarify that it was the impermissible motive that underlay the condition imposed upon the LSC attorneys which resulted in its invalidation. According to the Supreme Court, the condition struck down in Velazquez was "designed to insulate the Government's interpretation of the Constitution from judicial challenge," and was "aimed at the suppression of ideas thought inimical to the Government's own interest." 531 U.S. at 548-49. The conditions contained in the Leadership Act do not resemble in any respect the conditions at issue in Velazquez: they are not designed to "insulate the Government from judicial challenge" or suppress speech "inimical to the Government's own interest." Moreover, although the restrictions in Velazquez were found to be uniquely objectionable because they "threaten[ed] severe impairment of the judicial function," and were thus "inconsistent with accepted separation-of-power principles," id. at 546, the funding conditions contained in the Leadership Act do not affect the judicial power, or implicate the constitutional separation of powers, in any way.

II.    **THE ELIGIBILITY RESTRICTION CONTAINED IN THE LEADERSHIP ACT DOES NOT IMPOSE AN "UNCONSTITUTIONAL CONDITION" ON DOMESTIC RECIPIENTS OF FEDERAL HIV/AIDS GRANTS.**

The plaintiff's challenge to the Leadership Act and to USAID's implementing directive is largely focused on the organizational eligibility restriction found in 22 U.S.C. § 7631(f), which provides that"[n]o funds made available to carry out this Act, or any amendment made by this Act, may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f). Plaintiff argues that this provision constitutes an "unconstitutional condition" on federal funding because it conditions the availability of a benefit – federal subsidies under the Leadership Act – upon an organization's relinquishment of its ability, protected by the First Amendment, to decide not to adopt a policy explicitly opposing prostitution and to pursue whatever policy it does choose to adopt with funds other than those granted by USAID. Plaintiff also argues that this provision is unconstitutional because, by requiring eligible organizations to adopt the identified policy, it effectively prohibits such organization from acting in a manner inconsistent with that policy even with its own funds. These complaints mischaracterize the nature of the eligibility requirement and are insufficient as a matter of law to warrant the facial invalidation of the Leadership Act or USAID's implementing directive.

A.    **The Eligibility Requirement Does not Operate to Deny Plaintiff a "Benefit" for Purposes of the Unconstitutional Conditions Doctrine.**

The doctrine of "unconstitutional conditions" prohibits the government from "deny[ing] a benefit to a person on a basis that infringes his constitutionally protected interests – especially his interest in freedom of speech." Perry v. Sindermann, 408 U.S. 593, 597 (1972); see also Speiser v. Randall, 357 U.S. 513 (1958); Pls'PI Mem. at 9. As the D.C. Circuit has squarely held, cases arising under the Spending Clause do not fall within the rubric of this doctrine; in the Court of Appeals' words, Spending Clause cases "do not fit that mold." DKT Memorial Fund, 887 F.2d at 287. In

DKT Memorial Fund, the D.C. Circuit, like the Court here, was confronted with conditions attached to funding under the Foreign Assistance Act; in that case, the President had determined that federal funds for family planning activities abroad would not be distributed to "nongovernmental organizations which perform or actively promote abortion as a method of family planning in other nations." See id. at 277 (quoting the Policy Statement of the United States of America at the United Nations International Conference on Population (Second Session), Mexico, D.F., August 6-13, 1984). In other words, as here, the President had adopted a policy preference that limited the pool of organizations eligible to participate in the federal subsidy program. Plaintiffs there, as here, "attempted to couch their claims in terms of the imposition of an 'unconstitutional' condition on the receipt of a benefit." Id. at 287.

The D.C. Circuit squarely rejected this attempt. The Court of Appeals found that "The Speiser case . . . speaks not at all to an act of government which does nothing other than refuse to subsidize the exercise of a First Amendment activity," because "[t]he question of subsidy simply was not before the Speiser Court, nor does the Speiser decision speak to anything which informs our decision in the present case." DKT Memorial Fund, 887 F.2d at 288 (emphasis added); accord id. (where "government does not seek to punish the expression of a viewpoint, as in Speiser, but merely declines to subsidize one," settled law precludes a finding of unconstitutionality). The Court similarly rejected the applicability of the second case upon which the DKT Memorial Fund plaintiffs, like plaintiff here, attempted to rely. "Neither does Perry v. Sindermann support plaintiffs' argument," 887 F.2d at 288, because "in the present case, we have not a punishment for the exercise of a constitutional right, but at most a refusal to subsidize the exercise of free speech rights." Id.; accord Harris, 448 U.S. at 317 n.19 ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity"); see also Regan, 461 U.S. at 545

- 21 -

(rejecting claim that a case where the government "refused to pay for lobbying out of public funds" fit the <u>Speiser</u>-<u>Perry</u> model").

As the D.C. Circuit recognized in its opinion in <u>DKT Memorial Fund</u>, the Supreme Court has "held in several contexts that a [government's] decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." <u>Regan</u>, 461 U.S. at 546; <u>see</u> <u>also</u> <u>id.</u> (rejecting the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State.") (quoting <u>Cammarano</u>, 358 U.S. at 515 (Douglas, J., concurring)); <u>see</u> <u>DKT Memorial Fund</u>, 887 F.2d at 288-89 (citing cases). The mere refusal to subsidize a right "places no governmental obstacle in the path" of a plaintiff seeking to exercise it. <u>Harris</u>, 448 U.S. at 315; <u>see</u> <u>also</u> <u>Regan</u>, 461 U.S. at 549-50 ("the Constitution 'does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom'"). As the <u>Rust</u> Court noted, "subsidies are just that, subsidies . . . ; to avoid the force of the regulations, [a funding recipient] can simply decline the subsidy." 500 U.S. at 198 n.5. Because, "[a] refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity," <u>Harris</u>, 448 U.S. at 317 n.19, Congress's determination that it will not, for purposes of funding a program aimed at fighting HIV/AIDS, subsidize organizations that refuse to oppose practices that contribute to the spread of HIV/AIDS, is not unconstitutional. <u>See</u> <u>Rust</u>, 500 U.S. at 194 ("When Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, . . . it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism."). Plaintiff is free to adopt any policy contemplated by the First Amendment that it wishes with respect to prostitution; its First Amendment rights are not infringed, however, if the government declines to subsidize whatever policy it chooses to adopt, and if suffers no penalty from being excluded from

a program for which it is not eligible.

   B.    **The Organizational Eligibility Requirement is a Legitimate and Appropriate Means to Preserve the Integrity of the Spending Program Created by the Leadership Act.**

   Plaintiff's argument that the organizational eligibility requirement has the effect of imposing unconstitutional constraints upon activities that a USAID grantee might undertake with its own funds, or with funds provided from other, non-federal, sources, and that such a restriction imposed on an organization that receives federal funds (as opposed to only on the use of the funds provided by the federal government) is similarly flawed. See Pls' PI Mem. at 12 (challenging organizational eligibility restriction because it "effectively precludes the organization from taking any other position on [the issue of prostitution] in any other context, even with wholly private funds"). (emphasis in original). The organizational eligibility restriction contained in the Leadership Act does, in fact, preclude organizations who choose to accept a federal HIV/AIDS subsidy from participating in activities adverse to that subsidy's core purpose, as defined by Congress, but there is nothing unconstitutional about such a requirement.

   The Supreme Court has repeatedly recognized that "[w]hen the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." Velazquez, 531 U.S. at 541 (quoting Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 833 (1995)). This "latitude" to take "legitimate and appropriate steps" to prevent garbling of messages flows from the understanding that "[w]hen the government speaks, for instance to promote its own policies or to advance a particular idea, it is in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position." Velazquez, 531 U.S. at 541-42 (quoting Bd. of Regents of Univ. of Wis. Sys.

v. Southworth, 529 U.S. 217, 235 (2000)).

The organizational eligibility requirement contained in the Leadership Act is nothing more than a "legitimate and appropriate" step aimed at preventing not only distortion but also outright failure of the federal government's anti-HIV/AIDS program goals. Congress has reasonably determined that providing Leadership Act subsidies to organizations with policies opposing prostitution and sex trafficking is necessary to the program it has established. In creating the approach to fighting HIV/AIDS that is set out in the Leadership Act, Congress stressed that "eradicating prostitution" – identified as a factor in and cause of the spread of HIV/AIDS – is a "priority" of the plan, see 22 U.S.C. § 7611(a)(4), and that one of the critical elements of any successful strategy to combat AIDS was to encourage "behavior change" aimed at eliminating risky behaviors that increased the chance of infection and the spread of the disease. See, e.g., 22 U.S.C. § 7601(21). Congress further condemned prostitution and sex trafficking as "degrading to women and children," 22 U.S.C. § 7602(23), a condemnation which is also reflected in the President's national security directive. See Ex. C.

In these circumstances, where the eradication of prostitution is declared to be both the policy of the United States and a specific priority of Congress's program to fight HIV/AIDS, it is both "legitimate and appropriate" for Congress to ensure that organizations to which program funds are granted operate in full support of those program goals. See National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 747 (1st Cir. 1995) ("the more germane a condition to the benefit, the more deferential the review; nongermane conditions, in contrast, are suspect") (citation omitted). Here, Congress has created a program that has very specific goals and then restricted the eligibility of participants in order to ensure that those goals are met, and not undermined or ignored by participants who either oppose the goal or effect a stance of "neutrality" as to its accomplishment.

As a necessary component of any successful strategy to combat HIV/AIDS, Congress has determined it critical to "eradicate prostitution."   Plaintiff's preferred stance, i.e., neutrality with respect to prostitution, see Pls' PI Mem. at 4-5, is not an option where, as here, such neutrality would operate to the detriment of Congress's stated program goals.  While plaintiff may disagree as to the wisdom of Congress's preferred strategy for combating HIV/AIDS, it is that very disagreement which Congress believed would make such an organization ineligible for federal funding aimed at promoting Congress's – not plaintiff's – goals.  Plaintiff cannot expect taxpayer funding to support goals inconsistent with those judged by Congress to be appropriate lest Congress's methods, goals and priorities be undermined and distorted.[9]

Plaintiff fails to acknowledge the significance of the priorities established by Congress as necessary components of the anti-HIV/AIDS program created by the Leadership Act and, instead, seeks to support its unconstitutional conditions claim by citing cases that are inapposite.  For example, plaintiff places a great deal of reliance on dicta in Rust v. Sullivan, 500 U.S. 173 (1991), a case that upheld the only restriction before it.  See Pls' PI Mem. at 12-14.  In Rust, the Supreme Court considered a funding restriction which prohibited federal funds granted to recipients under Title X of the Public Health Act from "being used in programs which advocate abortion as a method of family planning," and held that "[t]here is no question but that the statutory prohibition. . . . is constitutional."  500 U.S. at 192.  The only restriction before the Court in Rust was a condition that restricted the use of federal funds granted to subsidy recipients, and the Court based its conclusion

_____

[9]  Statutory provisions that identify those organizations that are eligible for certain targeted funds by virtue of their organizational policies or missions are not unusual.  As described above in note 2, the TVPRA includes such a requirement in a program authorizing funds for anti-trafficking purposes.  See 22 U.S.C. § 7110(g)(2).  Another example is Congress's 1997 program aimed at the establishment of drug-free communities, which authorizes the Office of National Drug Control Policy to make grants to eligible community coalitions that "have as its principal mission the reduction of substance abuse, . . . in a comprehensive and long-term manner, with a primary focus on youth in the community."  21 U.S.C. § 1532(a)(4)(A).

that such a funding restriction was <u>not</u> unconstitutional, in part, on the fact that Congress had only

restricted the use of the federal funds and had not restricted, outside the scope of the federal program,

the activities of organizations who received those funds.  <u>See</u> 500 U.S. at 196-98.  The <u>Rust</u> Court

did not hold, and indeed, had no reason to squarely decide, that Congress could not exclude from

eligibility from federal funding those organizations which adopt policies that are inconsistent with

the goals of the very program being funded.

    Plaintiff's argument ignores the fundamental distinction between Congress's need to impose

an organizational eligibility restriction in this case and the situation considered by the Court in <u>Rust</u>.

The program at issue in <u>Rust</u> was created by Title X of the Public Health Services Act, 84 Stat. 1506,

as amended, 42 U.S.C. § 300-300a-6, and authorized government "grants to . . . public or nonprofit

private entities to assist in the establishment and operation of voluntary family planning projects

which shall offer a broad range of acceptable and effective family planning methods and services."

42 U.S.C. § 300a.  As the Supreme Court explained, the program created by Title X was "limited

to preconceptional services."  500 U.S. at 179.  "Childbirth," "prenatal care," abortion, and, indeed,

<u>all</u> postconception medical care and services, fell completely "outside the scope of the federal funded

program."  <u>See id.</u> at 179, 193, 200.  The Title X program's goals, accordingly, did not include any

priorities concerning abortion and Congress articulated no policy choices fundamentally related to

the Title X program concerning the provision of advice and counseling regarding abortion.  Having

organizations participate in such activities outside the scope of the federal program – so long as a

sufficient degree of separation was maintained in order to "ensure the integrity of the federally

funded program" – therefore, was not inconsistent with any of Title X's goals.  All that was

necessary in <u>Rust</u> was to ensure that federal funds "were spent for the purposes for which they were

authorized," 500 U.S. at 196, and the Supreme Court sustained the constitutionality of regulations

promulgated in furtherance of that goal.

Here, by contrast, Congress has plainly articulated that it is the policy of the United States to "eradicate prostitution" and that successful anti-HIV/AIDS strategies must include encouragement of behavioral change. In a program that sets such goals, it is both "legitimate and appropriate" for Congress to determine that organizations that are unwilling or unable – due to their organizational policies – to further these goals will be ineligible to participate. The certification requirement contained in AAPD 05-04 merely serves to identify those organizations that are eligible for funding in pursuit of Congress's articulated goals. Organizations not committed to those goals will not be funded, both because such organizations cannot be counted on to pursue the goals of the program for which the funds are distributed and because to fund such organizations would hopelessly confuse the government's objective that eradication of prostitution and behavioral change are critical benchmarks in the fight against HIV/AIDS.

Plaintiff's misguided effort to rely on Rust is repeated in its effort to rely on cases involving compelled speech, see Pls' Reply to Deft' Opp. to Pls' App. for Preliminary Injunction ("Pls' PI Reply"), at 10-11, which are also inapposite. Whether a person was willing to display the "Live Free or Die" message required on license plates by New Hampshire had no conceivable bearing on whether such person was qualified to drive a motor vehicle, see Wooley v. Maynard, 430 U.S. 705, 714 (1977); a child's willingness to repeat the pledge of allegiance to the United States had no rational relationship to his eligibility to attend a public school, see West Virginia State Board of Educ. v. Barnette, 319 U.S. 624 (1943); and a tow truck operator's willingness to support a local reelection campaign was no reflection on his ability to serve on a tow truck rotation list. See O'Hare Truck Servs. Inc. v. City of Northlake, 518 U.S. 712, 716-17 (1996). But, here, unlike in these cases cited by plaintiff, whether an organization maintains a policy consistent with that enunciated in the

Leadership Act so as to become eligible for funds allocated under that Act is an inquiry that directly bears on that organization's qualifications and ability to further the government's policy. In the same way that Congress would cross no constitutional lines if it decreed that fascist organizations would be ineligible for funds allocated to furthering the goals of the National Endowment for Democracy, Congress can legitimately limit the eligibility of participants in its anti-HIV/AIDS program to those who agree with the program's goals. See Freedom from Religion Foundation, Inc. v. McCallum, 179 F. Supp. 2d 950, 980  (W.D. Wisc.) ("The First Amendment does not require the government to purchase the services of every vendor that asserts it possesses a diverse point of view for fear of violating the vendor's right to free speech"), on reconsideration on other grounds, 214 F. Supp. 2d 905 (W.D. Wisc. 2002), aff'd, 324 F.3d 880 (7th Cir. 2003).

Moreover, where Congress has enacted the Leadership Act specifically to advance certain policy goals, it "can hardly be faulted for assuming," DKT Memorial Fund, 887 F.2d at 291, that providing funds to organizations to further the goals of the Leadership Act, including that of "eradicating prostitution," would be undermined if its grantees expended those funds in furtherance of certain of the government's goals, while simultaneously endorsing – either explicitly or implicitly – the very practices that the same program seeks to eliminate.[10] This would, without question, "mix the message" of the government's chosen policy, see DKT Memorial Fund, 887 F.2d at 291, if not

---

[10]  Plaintiff attempts to support its arguments by pointing to provisions of the Act where, according to plaintiff, "Congress made clear that unanimity among grantees regarding important components of the Act is not necessary." Pls' PI Reply at 13-14 (citing 22 U.S.C. § 7631(d) (grantees "shall not be required to . . . endorse or utilize a multisectoral approach to combating HIV/AIDS" and "shall not be required to endorse a prevention method or treatment program to which they have a religious or moral objection"). Plaintiff attempts to draw from these provisions the conclusion that "Congress was interested in ensuring that a diversity of voices and messages would be accommodated among grantees." Pls' PI Reply at 13. But the fact that Congress did not feel that the particular accommodations noted in these provisions affected the eligibility of organizations to participate in the program created by that Act has no bearing on whether the eligibility requirement that Congress did, in fact, specifically choose to include in the Act is constitutional.

undermine the government's policy goals altogether.  Indeed, the D.C. Circuit in <u>DKT Memorial Fund</u> articulated identical reasons in support of its decision to uphold the Mexico City Policy, which, like the organizational eligibility restrictions at issue here, identified those organizations eligible to receive federal funds.  <u>Id.</u> at 290-91.  While the policy at issue in <u>DKT Memorial Fund</u> extended only to foreign nongovernmental organizations – which have no First Amendment rights, <u>see id.</u> at 283-85.[11] – Congress does not violate the First Amendment when it imposes a similar eligibility requirement on domestic organizations because it is Congress's prerogative to take legitimate and appropriate steps to further its goals by avoiding the communication of mixed messages when creating a federal spending program.  <u>See</u> <u>Velazquez</u>, 531 U.S. at 541 (citing <u>Rosenberger</u>, 515 U.S. at 833).  Congress has done nothing more or less here.

Finally, more so than in other contexts, clear communication of the government's goals is particularly critical in a program intended to further the government's goals in the field of international relations.  The Leadership Act creates an international aid program that authorizes $15 billion in targeted aid as a supplement to the billions of dollars in federal spending already in place under the Nation's foreign assistance commitments.  As the D.C. Circuit held in <u>DKT Memorial Fund</u>, "[w]hen the government speaks in international affairs, it speaks not only with its words and its funds, but with its associations."  887 F.2d at 290-91; <u>see also id.</u> (noting that, in the area of foreign affairs, "we must recognize the necessity for the nation to speak with a single voice").

---

[11]    <u>DKT Memorial Fund</u> conclusively establishes that, at least with respect to foreign organizations who received funds under the Leadership Act, the eligibility restriction poses no constitutional problem.  Thus, there is no basis whatsoever for <u>facial</u> invalidation of the Leadership Act.  <u>See</u> <u>Rust</u>, 500 U.S. at 183 ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that <u>no set of circumstances exists</u> under which the Act would be valid.  The fact that [the statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [it] wholly invalid.") (emphasis added) (quoting <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987)).  At best, therefore, should plaintiff prevail, unconstitutionality would attach – if at all – to the eligibility requirement <u>as applied</u> to domestic organizations.

It is entirely legitimate for Congress to have assumed that both its oversight capacity and that of the federal agencies charged with implementing the program created by the Leadership Act would be circumscribed by the need to provide aid on a global scale and to engage a multitude of partners in the effort to pursue the ambitious but critical goals articulated in the Leadership Act. See 22 U.S.C. §§ 7601(18) (recognizing that "nongovernmental organizations . . . have proven effective in fighting the HIV/AIDS pandemic); 7601(22)(F) (recognizing that the United States can be a leader in the fight against HIV/AIDS by "encouraging active involvement of the private sector, including . . . nongovernmental organizations, faith-based organizations, community-based organizations and other non-profit entities"). Because the program created by the Leadership Act is intended to operate worldwide, Congress has a legitimate need to ensure that it can adequately monitor the diverse organizations around the world with which it will partner to further federal goals relating to stemming the spread of HIV/AIDS; the organizational eligibility restriction is framed to ensure such monitoring. Moreover, in the arena of foreign affairs, where the United States's policy is demonstrated by its actions, and where both Congress and the President have committed the United States to demonstrating its leadership in the fight against HIV/AIDS, Congress has more cause to be concerned that funding private organizations that take positions inconsistent with the articulated policy goals of the Leadership Act will contribute to a mixed message that will undermine the United States's position as a world leader in a critical stage of the battle against this disease.

The organizational eligibility restriction contained in 22 U.S.C. § 7631(f) constitutes a legitimate and appropriate step by Congress to ensure that its program messages are not garbled or distorted by the grantees who are awarded federal funds to carry out parts of a comprehensive, international program. Any organization that disagrees with Congress's message or that wishes to adopt a different strategy in the fight against HIV/AIDS is entitled to do so. But it is not entitled to

do so on the government's dime or with the government's support, and Congress can legitimately conclude that such organizations lack the qualifications necessary to be the federal government's partner given the specifically articulated goals and priorities of the program created by the Leadership Act. Because the Leadership Act does nothing more than impose a germane condition intended to further its goals, it is constitutional.

## III. THE LEADERSHIP ACT IS A VALID EXERCISE OF THE SPENDING POWER AND IS NOT IMPERMISSIBLY VAGUE.

Having failed to establish that the restrictions contained in the Leadership Act impose unconstitutional conditions, plaintiff falls back on the position that the two conditions contained in the Leadership Act – the funding restriction as well as the organizational eligibility restriction – exceed Congress's powers because they reflect unwise policy choices and are impermissibly vague. It is well-established that under the spending power, Congress is granted greater leeway to encourage recipients to abide by its policy choices than it has when it seeks to regulate directly. See Dole, 483 U.S. at 210 (limitations on the exercise of the spending power do not amount to "a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly"); see also Buckley v. Valeo, 424 U.S. 1, 57 & n.65, 85-104 (1976) (striking down as unconstitutional general expenditure limits on federal candidates because such limits infringed the First Amendment rights of those candidates to spend as they chose, while finding no unconstitutionality in Congress's requirement that federal candidates who chose to accept public financing of their campaigns were also required to accept limitations on their private expenditures). Because the spending power is so broad, federal courts have been reluctant to interfere with Congress's choice of funding conditions. See Kansas v. United States, 214 F.3d 1196, 1200-01 (10th Cir. 2000) (discussing cases); see also Rust, 500 U.S. at 194 ("[w]ithin far broader limits that petitioners are willing to concede, when the Government appropriates public funds to establish a program it is entitled to define the limits of that

program"). The Supreme Court has made clear that putative funding recipients who do not agree with Congress's policy choices when it places conditions on the availability of a federal subsidy may simply decline to accept the subsidy. See <u>Dole</u>, 483 U.S. at 211 ("[t]he offer of benefits to a [grantee] by the United States dependent upon cooperation . . . with federal plans . . . is not unusual. . . . There is only a condition which the [grantee] is free at pleasure to disregard or to fulfill.") (internal quotes and citations omitted).

The Leadership Act, and the conditions at issue in this case, are an unquestionably valid exercise of Congress's power to spend for the general welfare. See <u>Dole</u>, 483 U.S. at 207 ("In considering whether a particular public expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress."); <u>Helvering v. Davis</u>, 301 U.S. 619, 645 ("the concept of general welfare or the opposite is shaped by Congress").[12] As described above, the Leadership Act is an unprecedented and comprehensive federal initiative aimed at preventing, treating and monitoring HIV/AIDS and other related infectious diseases. As also described above, both Congress and the President have determined that prostitution and sex trafficking contribute to the spread of HIV/AIDS and that it is the policy of the United States to "eradicate prostitution" and other forms of sexual victimization. That such policies are undertaken in the furtherance of the general welfare can hardly be in dispute.

Similarly, both of the Leadership Act's funding conditions are <u>directly</u> related to the primary purpose of the Leadership Act. See <u>Dole</u>, 483 U.S. at 207 (in order to satisfy requirements of the Spending Clause, conditions on federal grants must be related "to the federal interest in particular national projects or programs"); <u>Kansas</u>, 214 F.3d at 1199 ("The required degree of this relationship

---

[12] Indeed, the "level of deference to the congressional decision is such that the Supreme Court has . . . questioned whether "general welfare" is a judicially enforceable standard at all." <u>Dole</u>, 483 U.S. at 207 (citing <u>Buckley</u>, 424 U.S. at 90-91).

is one of reasonableness or minimum rationality"); <u>see also</u> <u>National Amusements, Inc.</u>, 43 F.3d at

747 ("if a condition is germane – that is, if the condition is sufficiently related to the benefit – then

it may be validly imposed"); <u>cf.</u> <u>League of Women Voters</u>, 468 U.S. at 396 (rejecting funding

condition because, <u>inter alia</u>, the restriction "clearly 'provides only ineffective or remote support for

the government's purpose'") (citation omitted).

      As described above, the Leadership Act authorizes $15 billion over five years for programs

directed at the prevention, treatment and monitoring of HIV/AIDS.  Prostitution and sex trafficking

are specifically identified by Congress as "factors in and causes of" the spread of HIV/AIDS.  22

U.S.C. § 7601(23).  Congress further requires that, for purposes of the "comprehensive, integrated

five-year global strategy to fight HIV/AIDS" created pursuant to the Leadership Act, <u>see</u> 22 U.S.C.

§ 7611, it shall be the policy of the United States and a priority of any successful strategy to fight

HIV/AIDS to "eradicat[e] prostitution, the sex trade, rape, sexual assault, and sexual exploitation

of women and children."  22 U.S.C. § 7611(a)(4).  Restricting funding eligibility to those

organizations that have policies opposing prostitution and sex trafficking plainly operates in

furtherance of those goals.

      Although plaintiff takes issue with the wisdom of Congress's declared policy to "eradicate

prostitution," <u>see</u>, <u>e.g.</u>, Pls' PI Mem. at 17-18 (describing the testimony of its declarants), review of

such policy decisions by the political branches of the federal government is beyond the purview of

this Court.  <u>See</u>, <u>e.g.</u>, <u>DKT Memorial Fund</u>, 887 F.2d at 281 ("The [Administrative Procedure Act]

has never been construed to grant this or any other court the power to review the wisdom of the

policy decisions of the President").  As the Supreme Court has made clear, "federal judges – who

have no constituency – have a duty to respect legitimate policy choices made by those who do. The

responsibilities for assessing the wisdom of such policy choices and resolving the struggle between

competing views of the public interest are not judicial ones: 'Our Constitution vests such responsibilities in the political branches.'" <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 866 (1984) (quoting <u>Tenn. Valley Auth. v. Hill</u>, 437 U.S. 153, 195 (1978)); <u>see</u> <u>also</u> <u>Buckley</u>, 424 U.S. at 91 ("whether the chosen means appear 'bad,' unwise,' or 'unworkable' is to us irrelevant.  Congress has concluded that the means are 'necessary and proper' to promote the general welfare, and we thus decline to find this legislation without the grant of power in [the Spending Clause]").

Thus, although plaintiff is free to insist that it has devised a strategy to fight AIDS that is superior to Congress's preferred approach, plaintiff is not free to demand taxpayer dollars to implement any such strategy, and that is particularly so where, as here, its preferred strategy – neutrality with respect to prostitution – is at odds with Congress's judgment that prostitution must be eradicated as part of a successful effort to fight HIV/AIDS.  Whether plaintiff believes that Congress's declared policy to eradicate prostitution is misguided, counterproductive, or just plain wrong, its opportunity for redress is in the political process, not in the federal courts.[13]

Nor is the requirement contained in the Leadership Act so vague as to require its invalidation under Spending Clause jurisprudence.  Where Congress conditions the receipt of federal subsidies, it "must do so unambiguously . . . , enabl[ing] the [recipients] to exercise their choice knowingly, cognizant of the consequences of their participation."  <u>Dole</u>, 483 U.S. at 207 (quoting <u>Pennhurst</u>

---

[13]  That plaintiff is, in fact, challenging the wisdom of Congress's policy choices is made clear by the fact that plaintiff appears to object to the funding conditions contained in the Leadership Act <u>only</u> to the extent that they require a funding recipient to certify that they have a policy "explicitly opposing prostitution."  Plaintiff nowhere challenges the requirement that funding recipients also oppose "sex trafficking"; it does not allege that it has no policy related to sex trafficking; and notably, it does not seek relief – either preliminary or permanent – with respect to either the Leadership Act or USAID's implementing directive to the extent that those laws require funding recipients to have a policy "opposing . . . sex trafficking."  <u>See</u>, <u>e.g.</u>, Requests for Relief, Compl. (limiting declaratory relief request to provisions of Leadership Act "<u>to the extent</u> they require U.S. organizations to have a policy explicitly opposing prostitution") (emphasis added).

State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981)).  Exercises of the spending power are "much in the nature of a contract:  in return for federal funds, the [recipients] agree to comply with federally imposed conditions." Pennhurst, 451 U.S. at 17.  Thus, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously" by "speak[ing] with a clear voice." Id.  This limitation on the spending power is satisfied so long as putative recipients are able to exercise their choice to accept subsidies knowingly and "cognizant of the consequences of . . . participation." Dole, 483 U.S. at 207.  Although plaintiff complains that the conditions contained the Leadership Act are vague because "DKT cannot predict how USAID will interpret" their terms, Compl. ¶¶ 27, 28, this is not the test for assessing the validity of a federal funding condition. Instead, what is at issue is whether the language is sufficiently clear to allow a potential funding recipient to make knowing choices regarding its participation in the program.

Congress has spoken with a clear voice in the Leadership Act.  The Act imposes two limitations, the funding restriction, 22 U.S.C. § 7631(e), and the organizational eligibility restriction, 22 U.S.C. § 7631(f).  USAID has implemented these provisions by requiring that organizations receiving HIV/AIDS assistance must certify that they are in compliance with a USAID Standard Provision that reiterates the terms of the statute, and further specifies that this Standard Provision "contains express terms and conditions of the agreement and any violation of it shall be grounds for unilateral termination of the agreement by USAID prior to the end of its term."  AAPD 05-04 at 5.

Thus, with respect to both conditions, the terms of participation and the penalties for non-compliance are unambiguously set forth in the statute and USAID's implementing directive. Organizations accept or decline the terms of their funding "contract" fully "cognizant of the consequences of their participation," Pennhurst, 451 U.S. at 17, and in such circumstances, their choice to certify compliance with the conditions set forth in the Leadership Act in order to continue

receiving federal subsidies is a knowing and voluntary one. See Kansas, 214 F.3d at 1199 ("although contending that some of the requirements associated with the computerized database are vague, Kansas fails to assert that the alleged ambiguity resulted in its inability to exercise its choice to accept the subsidies knowingly and cognizant of the consequences of participation") (internal quotes omitted). Should an organization determine that the costs of compliance outweigh its benefits, or that it disagrees with the policy preferences expressed by Congress, it is free to decline the subsidy. See Steward Mach. Co. v. Davis, 301 U.S. 548, 594-98 (1937) (recipients of federal funds remain free to unilaterally withdraw from "contract"). Indeed, plaintiff here alleges that it chose to do just that, demonstrating quite clearly that it had the "ability to exercise its choice to accept the subsidies knowingly and cognizant of the consequences of participation." Kansas, 214 F.3d at 1199.

In any event, even apart from the test applicable to Spending Clause enactments, it is well established that, because "language is unavoidably inexact," statutes cannot, "in reason, define proscribed behavior exhaustively or with consummate precision." United States v. Thomas, 864 F.2d 188, 195 (D.C. Cir. 1988). "[C]ondemned to the use of words, we can never expect mathematical certainty from our language." Palestine Info. Office v. Schultz, 853 F.2d 932, 943 (D.C. Cir. 1988) (quoting Grayned v. City of Rockford, 408 U.S. 104, 110 (1972)). "These inherent limitations obtain in a speech-laden First Amendment setting as in any other." Thomas, 864 F.2d at 195. Accordingly, "courts do not require that an enactment touching on First Amendment interests set forth the precise line dividing proscribed from permitted behavior, or that a person contemplating a course of behavior know with certainty whether his or her act will be found to violate the proscription." Id. All that is required is that provisions be "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." Id. (quoting U.S. Civil Serv. Comm'n v. Nat'l Ass'n of

Letter Carriers, 413 U.S. 548, 579 (1973)).

Under these standards, the conditions contained in the Leadership Act cannot be found to be unconstitutionally vague.[14] As the cases cited herein make plain, plaintiff's complaint that it cannot "know with certainty whether his or her act will be found to violate the proscription," Thomas, 864 F.2d at 195; see Compl. ¶¶ 27, 28, poses no constitutional problem.[15] Because the choice proposed by the Leadership Act and USAID's implementing directive is an unambiguous one, both the Act and USAID's implementing directive satisfy the Dole test.

Finally, although the Supreme Court has recognized that in "some circumstances, the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns to compulsion,'" this is not that case. Dole, 483 U.S. at 211 (quoting Steward Mach. Co., 301 U.S. at 590). As a preliminary matter, courts have expressed significant doubts about the continued viability of the coercion theory. See Kansas, 214 F.3d at 1202 ("[T]he coercion theory is unclear, suspect, and has little precedent to support its application"); California v. United States, 104 F.3d 1086, 1092 (9th Cir. 1997) ("[T]o the extent that there is any viability left in the coercion theory, it is not reflected on the facts of this record"); Nevada v. Skinner, 884 F.2d 445, 448 (9th

---

[14] Indeed, many Spending Clause enactments are couched in broad terms, leaving a wide range of interpretation for funding recipients. See, e.g., Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 640-642 (1999) (upholding Title IX of the Education Amendments of 1972, which prohibits "discrimination" on the basis of sex in any education program or activity receiving Federal financial assistance); Jim C. v. United States, 235 F.3d 1079, 1081 (8th Cir. 2000) (en banc) (upholding § 504 of the Rehabilitation Act, which mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."), cert. denied, 533 U.S. 949 (2001).

[15] This is particularly so where the "degree of vagueness that the Constitution tolerates" is greater in the case of "enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." Village of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 498-99 (1982); see Palestine Info. Office, 853 F.2d at 944 (similar). Although, as discussed infra, the refusal to subsidize a particular activity does not constitute a "penalty" of any kind, see Harris, 448 U.S. at 317 n.19, the same principle is applicable here.

Cir.1989) ("The coercion theory has been much discussed but infrequently applied in federal case law, and never in favor of the challenging party."); see also Oklahoma v. Schweiker, 655 F.2d 401, 414 (D.C. Cir.1981) (declining to "enter the thicket" posed by the coercion theory)

In any event, plaintiff, which alleges that it obtains only a small percentage of its funding from USAID, see Pls' PI Mem. at 2 & n.1, and identifies numerous other sources of funding, id.; see also Pls' PI Reply at 2 n.1, does not allege that the effect of the funding restrictions at issue here even approaches the point of coercion.  See Doe v. Nebraska, 345 F.3d 593 (8th Cir. 2003) (rejecting coercion theory where funding "was no less than 60%" in a five-year period because "[A] difficult choice remains a choice, and a tempting offer is still but an offer.  If [the grantee] finds the requirements so disagreeable, it is ultimately free to reject both the conditions and the funding, no matter how hard the choice may be") (quoting Kansas, 214 F.3d at 1203).  As the Court held in Dole,"the Federal Government may establish and impose reasonable conditions relevant to the federal interest in the project and to the overall objectives thereof."  483 U.S. at 208.  Congress has done nothing less here, and thus, nothing in the funding conditions imposed by the Leadership Act and implemented by USAID exceeds Congress's power under the Spending Clause.  The constitutionality of these conditions must be upheld.

**IV.     THE COURT LACKS JURISDICTION TO CONSIDER PLAINTIFF'S REQUEST FOR RELIEF RELATING TO DISBURSEMENT OF FUNDS CONTROLLED BY A THIRD PARTY NOT BEFORE THIS COURT.**

In addition to its challenges to the terms of the Leadership Act and USAID's implementing directive, plaintiff also seeks injunctive relief aimed at compelling USAID to instruct a third party not before this Court that it is authorized to award plaintiff a $60,000 grant which plaintiff claims was denied due to its refusal to certify that it had a policy explicitly opposing prostitution.  Even assuming that plaintiff has any right to federal funds for which it refused to demonstrate its eligibility

– which as fully described above, it does not – this claim is not ripe for review because USAID was not in a position to make any decision with regard to plaintiff, including whether to approve or disapprove a subgrant.  This is because under the terms of USAID's cooperative agreement with Family Health International ("FHI"), with whom plaintiff was negotiating funding, USAID has no relationship with plaintiff and has taken no action with respect to plaintiff's funding proposal. Plaintiff's eligibility for USAID funding was determined by FHI, which is not a party here, and was a consequence of plaintiff's decision to refuse to sign a certification FHI presented for its signature. Under both the ripeness doctrine, and because of the jurisdictional limitations of the Administrative Procedure Act, 5 U.S.C. §§ 704, 706, USAID cannot be compelled, in the circumstances of this case, to instruct FHI to authorize the disbursement of the funds at issue.

In September 1997, USAID awarded a worldwide cooperative agreement to Family Health International ("FHI") to support a program of Regional and/or Country interventions in HIV/AIDS. Declaration of Eduardo Elia ("Elia Decl."), attached hereto a Ex. E, ¶ 4. The award was made on the condition that the funds would be administered on the terms and conditions set forth in USAID regulations, see 22 C.F.R. Part 226, the agreement Schedule, and Standard Provisions attached to the agreement. Elia Decl. ¶ 4 & Exs. A & C thereto.  As described above, the Standard Provision included in USAID grant agreements after the adoption of AAPD 05-04 states that "Except as noted in the second sentence of this paragraph, as a condition of entering into this agreement or any subagreement, a non-governmental organization or public international organization recipient/subrecipient must have a policy explicitly opposing prostitution and sex trafficking.  The following organizations are exempt from this paragraph:  the Global Fund to Fight AIDS, Tuberculosis and Malaria; the World Health Organization; the International AIDS Vaccine Initiative; and any United Nations agency." Ex. D, at 5.  This Standard Provision also requires that USAID

grant recipients "shall insert this provision, which is a standard provision, in all subagreements."[16] Id.  The cooperative agreement with FHI has been modified on several occasions and currently provides for over $400 million in funding for that organization through 2007.  Elia Decl., ¶ 9.

Under the cooperative agreement, FHI has authority to negotiate subawards of USAID funds. Elia Decl. ¶ 6 & Ex. B thereto; Declaration of Chris McDermott ("McDermott Decl."), attached hereto as Ex. F, ¶ 6.  Such subreceipients, subawardees, and subcontractors "have no relationship with USAID under the terms of" the cooperative agreement.   Elia Decl. ¶ 7 & Ex. C thereto. Instead, the prime recipient, in this case, FHI, is responsible for all interaction with the subawardee, and "all required USAID approvals must be directed through the recipient to USAID."  Id.  FHI is pre-approved to negotiate subawards up to $750,000, but clearance by a USAID official, the Cognizant Technical Officer ("CTO"), is required before any subawards may be made.  Id. ¶¶ 6, 8.

Plaintiff herein DKT International, Inc. ("DKT") is not a direct recipient of USAID funds for HIV/AIDS activities in Vietnam.  Instead, DKT alleges that it sought a subaward in the amount of $60,000 from USAID assistance recipient FHI for a project to market and distribute lubricant for use with condoms.  See Pls' PI Ex. 1, Declaration of Lawrence C. Holzman ("Holzman Decl."), ¶ 13. Although DKT asserts that it received a message from FHI that FHI had obtained permission from USAID to fund this proposal, Holzman Decl. ¶ 14, FHI represented to DKT only that it had "got a good sign from USAID that we can still work with DKT on the lubricant [proposal]," Holzman Decl., Ex. F.  DKT complains that FHI "cancelled" the grant for lubricant distribution when DKT's country representative refused to sign a certification, provided by FHI, stating that DKT had a policy explicitly opposing prostitution and sex trafficking.  Compl. ¶ 21.  DKT claims that "solely because

---

[16] USAID does not require subrecipients to sign the certification that its prime recipients are required to sign.  See AAPD 05-04, at 6 (describing the certification requirement and specifying that "[t]his certification requirement only applies to the prime recipient").

it has refused to adopt a government-dictated policy, DKT has been denied a USAID grant that []
USAID and FHI had previously agreed to fund and it has become ineligible for any future USAID
funding."  Pls' PI Mem. at 4.  As the email message attached to Mr. Holzman's message
demonstrates, the decision to deny funding for the condom lubricant project was FHI's and not
USAID's.  In fact, as described in the declarations of Christopher McDermott and Victor Barbiero,
the USAID CTOs for the relevant time period, one of whom was required to approve all subawards
made by FHI, were never notified of DKT's proposal, nor was any negotiated proposal ever
submitted to USAID for clearance.  McDermott Decl. ¶¶ 9-10; Declaration of Victor Barbiero
("Barbiero Decl."), attached as Ex. G hereto, ¶ 9-10.

     In these circumstances, any challenge that plaintiff might make with respect to its request for
a $60,000 subgrant from FHI is not ripe for review.  The ripeness doctrine is a component of the
requirement imposed by Article III of the Constitution that federal courts hear only actual "cases and
controversies"  When injunctive or declaratory relief is sought, the doctrine of ripeness serves "to
prevent the courts, through avoidance of premature adjudication, from entangling themselves in
abstract disagreements over administrative policies, and also to protect agencies from judicial
interference until an administrative decision has been formalized and its effects felt in a concrete way
by the challenging parties."  Aulenback, Inc. v. Federal Highway Admin., 103 F.3d 156, 166 (D.C.
Cir. 1997) (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49 (1967)).  The test for
determining whether a challenge to agency action is ripe is twofold, requiring the courts to consider
"the fitness of the issues for judicial decision and the hardship to the parties of withholding court
consideration."  Aulenback, Inc., 103 F.3d at 166.  A case is ripe if "the interests of the court and
agency in postponing review until the question arises in some more concrete and final form [are]
outweighed by the interest of those who seek relief from the challenged action's immediate and

practical impact upon them." Aulenback, Inc., 103 F.3d at 167 (quoting Continental Air Lines, Inc. v. Civil Aeronautics Bd., 522 F.2d 107, 125 (D.C. Cir. 1975) (en banc) (internal quotes omitted)).

Under these standards, plaintiff's request for specific relief requiring USAID to authorize disbursement of the $60,000 grant is plainly unfit for judicial review. USAID made no decision here at all with respect to plaintiff's receipt of USAID anti-HIV/AIDS funds and did not have the opportunity to consider whether plaintiff was eligible for such funding under any of its requirements. There is thus no agency action to review, and the Court has no jurisdiction to compel USAID to consider plaintiff's application for funds. Indeed, as specified in USAID's cooperative agreement with FHI, USAID has "no relationship" with any subgrantees of FHI. Elia Decl. ¶ 7. Instead, FHI is responsible for all interaction with the subawardee, and "all required USAID approvals must be directed through the recipient [i.e., FHI] to USAID." Id. The Court has no authority to interject itself into the relationship between FHI and USAID, as memorialized in the cooperative agreement. Nor can the Court require USAID to authorize an expenditure it was never asked to authorize, and most importantly, cannot do so absent any examination by USAID of whether plaintiff's proposal might meet the other requirements for USAID approval.

For the same reason, to the extent that plaintiff seeks judicial review of USAID's funding decision under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., see Compl. at ¶¶ 32, 34, 36 (all invoking the APA), this Court lacks jurisdiction to review any such claim. Section 704 of the APA limits federal court jurisdiction to review only of "final agency action." 5 U.S.C. § 704. As described in the attached declarations, no such final agency action has been undertaken by USAID here with respect to the particular denial of funding of which plaintiff complains. This Court, accordingly, lacks jurisdiction to consider plaintiff's request that it "order USAID to instruct Family Health International that USAID authorizes FHI to disburse the $60,000 grant for the

Vietnam condom-lubricant proposal."  Relief Requested, Compl.

## CONCLUSION

For the reasons stated herein, plaintiff has failed to state a claim upon which relief may be granted and plaintiff's action must be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

<div style="margin-left:40%">

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

KENNETH L. WAINSTEIN
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch


__/s/ Rupa Bhattacharyya_____
RUPA  BHATTACHARYYA  (VA  38877)
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C.  20001
Tel: (202) 514-3146
Fax: (202) 318-7593
rupa.bhattacharyya@usdoj.gov

</div>

Dated: October 11, 2005.