## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DKT, INTERNATIONAL, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 05-01604** |
| | ) | |
| UNITED STATES AGENCY FOR | ) | |
| INTERNATIONAL DEVELOPMENT | ) | |
| and ANDREW S. NATSIOS, in his | ) | |
| Official Capacity as ADMINISTRATOR, | ) | |
| UNITED STATES AGENCY FOR | ) | |
| INTERNATIONAL DEVELOPMENT, | ) | |
| | ) | |
| **Defendants.** | ) | |

## DECLARATION OF EDUARDO ELIA

I, Eduardo Elia, under penalty of perjury, hereby declare:

1.      I make this declaration of my own personal knowledge; if called as a witness, I would testify to the contents thereof.

2.      I make this declaration in support of Defendants' Motion in Opposition to a Preliminary Injunction in this action.

3.      I am a U.S. direct hire employee of the United States Agency for International Development (USAID), in which capacity I serve in the Bureau for Management, Office of Acquisition and Assistance.  I have been an employee of USAID since July 11, 2004.

4.      On September 26, 1997, USAID awarded a worldwide cooperative agreement, the IMPACT agreement, to Family Health International (FHI) to support a program of Regional and/or Country interventions in HIV/AIDS.  The award was made on the condition that the funds would be administered in accordance with the terms and conditions set forth in 22 CFR Part 226, as well as the agreement 'Schedule,' 'Program Description,' and 'Standard

Provisions,' all attached to the agreement. The award letter, schedule, and standard provisions are attached hereto as Ex. A.

        5.       I am a warranted Contracting/Agreement Officer with the authority to bind USAID and obligate funds. Since March 15, 2005, I have been the Agreement Officer (AO) for the FHI IMPACT agreement. In my role as AO, I bind the Agency and obligate funds. I administer the agreement, including approving activities, modifications and incremental funding. Additionally, I am authorized to approve subawards under the FHI agreement. In the normal management of this agreement, I would not review or approve subawards of less than $750,000.

        6.       On November 22, 2000, my predecessor Agreement Officer for the FHI IMPACT agreement, Emanuel Atsalinos, provided prior approval to FHI to negotiate and make sub-awards of USAID funds up to $750,000. The letter conditioned the approval on, among other things, clearance by the USAID Cognizant Technical Officer (CTO) of sub-awards. The letter is attached hereto as Ex. B.

        7.       Under the terms of the Standard Provisions incorporated into the FHI agreement by Modification 36, attached hereto as Ex. C, any subrecipients, subawardees, and contractors have no relationship with USAID. All required USAID approvals must be directed through the prime recipient to USAID. Accordingly, FHI is solely responsible for all interaction with its subawardees under the IMPACT agreement.

        8.       All subawards under the FHI cooperative agreement must be approved by the CTO. Any subaward in excess of $750,000 requires my approval as well. USAID Vietnam HIV/AIDS Program Manager Dan Levitt is not authorized to approve subawards under the FHI IMPACT agreement.

9.    The cooperative agreement with FHI has been modified more than 60 times and currently provides for $441,454,507 in total expected funding for that organization through September 29, 2007.

10.    USAID is planning to award FHI IMPACT $5,105,000 in fiscal year 2005 appropriations to conduct activities in Vietnam under the agreement.

11.    FHI has not communicated with me regarding a proposed subaward to DKT, International to conduct condom-lubricant activities in Vietnam. FHI never submitted a proposal to make such a subaward to me.

12.    In my capacity as the AO for the FHI IMPACT agreement, I never reviewed, cleared nor denied clearance for a proposed subaward to DKT to conduct activities in Vietnam.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this **25** day of August, 2005

Eduardo Elia

Signed and/or sworn to before me this 25th day of August, 2005.

Notary Public for the
District of Columbia

October 14, 2006
My Commission Expires

# EXHIBIT A



**USAID**

U.S. Agency for International Development, Washington, DC 20523-1427

SEP 26 1997

Family Health International
Attn: Mr. Robert W. Hughes, Controller
P.O. Box 13950
Research Triangle Park, NC  27709

Subject:  Award No.   HRN-A-00-97-00017-00

Dear Mr. Hughes::

Pursuant to the authority contained in the Foreign Assistance Act
of 1961, as amended, the U.S. Agency for International Development
(hereinafter referred to as "USAID" or "Grantor") hereby intends
to grant to the Family Health International (herein after referred
to as FHI or "Recipient"), the sum of $148,710,442.00 to provide
support for a program in Regional and/or Country Interventions in
HIV/AIDS, as described in the Schedule of this award and the
Attachment 2, entitled "Program Description." As this award is
incrementally funded, only the amount shown in Section 1.3.b. of the
Agreement schedule has been obligated for use hereunder.

This award is effective and obligation is made as of the date of
this letter and shall apply to commitments made by the Recipient
in furtherance of program objectives during the period beginning
with the effective date and ending 09/29/2002. USAID shall not be
liable for reimbursing the Recipient for any costs in excess of
the obligated amount.

This award is made to FHI, on condition that the funds will be
administered in accordance with the terms and conditions as set
forth in 22 CFR 226, entitled "Administration of Assistance Awards
to U.S. Non-Governmental Organizations"; Attachment 1, entitled
"Schedule"; Attachment 2, entitled "Program Description"; and
Attachment 3 entitled "Standard Provisions."

Please sign the original and each copy of this letter to
acknowledge your receipt of this award, and return the original
and all but one copy to the Grant Officer.

Sincerely,

Sharon L. Zawistoski
Grant Officer
M/OP/A/HPN

Attachments:
1. Schedule
2. Program Description
3. Standard Provisions
4. Standards for USAID Funded Communications Projects

ACKNOWLEDGED: Family Health International

BY: _____

Title: President

Date: September 27, 1997

ACCOUNTING AND APPROPRIATION DATA

REDACTED

Page 2 of 40

HRN-A-00-97-00017-00

TABLE OF CONTENTS                                    PAGE


ACCOUNTING AND APPROPRIATION DATA

ATTACHMENT 1 . . . . . . . . . . . . . . . . . . . . . . . .    4

SCHEDULE . . . . . . . . . . . . . . . . . . . . . . . . . .    4
    1.1    PURPOSE OF AGREEMENT . . . . . . . . . . . . . .     4
    1.2    PERIOD OF AGREEMENT . . . . . . . . . . . . . . .    4
    1.3    AMOUNT OF AWARD AND PAYMENT . . . . . . . . . . .    4
    1.4    BUDGET . . . . . . . . . . . . . . . . . . . . . .   4
    1.5    REPORTING AND EVALUATION . . . . . . . . . . . .     5
    1.5.1      Financial Reporting . . . . . . . . . . . . .    5
    1.5.2      Monitoring and reporting program performance . . . . 5
    1.6    SUBSTANTIAL INVOLVEMENT UNDERSTANDINGS . . . . . .   5
    1.7    KEY PERSONNEL . . . . . . . . . . . . . . . . . .    5
    1.8    TITLE TO AND CARE OF PROPERTY . . . . . . . . . .    5
    1.9    AUTHORIZED GEOGRAPHIC CODE . . . . . . . . . . . .   5
    1.10   INDIRECT COSTS . . . . . . . . . . . . . . . . . .   5
    1.11   RESOLUTION OF CONFLICTS . . . . . . . . . . . . .    6
    1.12   COST SHARING . . . . . . . . . . . . . . . . . . .   6
    1.13   COMMUNICATIONS PRODUCTS (OCT 1994) . . . . . . . .   6
    1.14   PAYMENT OFFICE . . . . . . . . . . . . . . . . . .   7

ATTACHMENT 2 . . . . . . . . . . . . . . . . . . . . . . . .    8

PROGRAM DESCRIPTION . . . . . . . . . . . . . . . . . . . . .    8

ATTACHMENT 3 . . . . . . . . . . . . . . . . . . . . . . . .    9

STANDARD PROVISIONS . . . . . . . . . . . . . . . . . . . . .    9
    3.1    INELIGIBLE COUNTRIES (MAY 1986) . . . . . . . . .    9
    3.2    NONDISCRIMINATION (MAY 1986) . . . . . . . . . . .   9
    3.3    U.S. OFFICIALS NOT TO BENEFIT (NOV 1985) . . . . .   9
    3.4    INVESTMENT PROMOTION (JAN 1994) . . . . . . . . .    9
    3.5    NONLIABILITY (NOV 1985) . . . . . . . . . . . . .   10
    3.6    AMENDMENT (NOV 1985) . . . . . . . . . . . . . . .  10
    3.7    NOTICES (NOV 1985) . . . . . . . . . . . . . . . .  10
    3.8    OMB APPROVAL UNDER THE PAPERWORK REDUCTION ACT . . . .  10
           (AUG 1992)
    3.9    INTERNATIONAL AIR TRAVEL AND TRANSPORTATION (DEC 1995)  11
    3.10   OCEAN SHIPMENT OF GOODS (AUG 1992) . . . . . . . .  16
    3.11   USAID ELIGIBILITY RULES FOR GOODS AND SERVICES (MAR 1997)  17
    3.12   SUBAGREEMENTS (FEB 1995) . . . . . . . . . . . . .  21
    3.13   LOCAL COST FINANCING (JUN 1993) . . . . . . . . .   22
    3.14   PUBLICATIONS (AUG 1992) . . . . . . . . . . . . .   24
    3.15   NEGOTIATED INDIRECT COST RATES - PREDETERMINED . . . .  25
           (AUG 1992)
    3.16   NEGOTIATED INDIRECT COST RATES - PROVISIONAL (AUG 1992)  26
    3.17   VOLUNTARY POPULATION PLANNING (JUN 1993) . . . . .  28
    3.18   PROTECTION OF THE INDIVIDUAL AS A RESEARCH SUBJECT . .  30
           (AUG 1995)

                        Page 3.1 of 40

HRN-A-00-97-00017-00

## TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| 3.19 | CARE OF LABORATORY ANIMALS (NOV 1985) | 31 |
| 3.20 | USE OF POUCH FACILITIES (AUG 1992) | 31 |
| 3.21 | CONVERSION OF UNITED STATES DOLLARS TO LOCAL CURRENCY (NOV 1985) | 33 |
| 3.22 | RIGHTS IN DATA (AUG 1992) | 33 |
| ATTACHMENT 4 | | 37 |
| STANDARDS FOR USAID-FUNDED PUBLICATIONS | | 37 |
| STANDARDS FOR USAID-FUNDED VIDEO PRODUCTIONS | | 39 |

ATTACHMENT 1

SCHEDULE

1.1    PURPOSE OF AGREEMENT

The purpose of this Agreement is to provide support for the program described in Attachment 2 of this Agreement entitled "Program Description."

1.2    PERIOD OF AGREEMENT

The effective date of this Agreement is the date of the Cover Letter and the estimated completion date is 09/29/2002.

Funds obligated hereunder are available for program expenditures for the estimated period beginning the effective date of this Agreement through March 31, 1998.

1.3    AMOUNT OF AWARD AND PAYMENT

(a) The total estimated amount of this Award is [ REDACTED ]

(b) USAID hereby obligates the amount of [ REDACTED ] for program expenditures during the period set forth in 1.2 above and as shown in the Budget below.

(c) Payment shall be made to the Recipient by Payment - Letter of Credit in accordance with procedures set forth in 22 CFR 226.22.

(d) Additional funds up to the total estimated amount may be obligated by USAID subject to the availability of funds, and 22 CFR 226.25.

1.4    BUDGET

The following is the Agreement Budget, including local cost financing items, if authorized. Revisions to this budget shall be made in accordance with 22 CFR 226.25.

Five Year Budget to Sept. 29, 2002

REDACTED

Page 4 of 40


1.5      REPORTING AND EVALUATION

1.5.1       Financial Reporting

In keeping with the requirements established in 22 CFR 226.52, the Recipient is required to:

(a) Prepare a "Financial Status Report", SF 269a, on an accrual basis and submitted quarterly in an original and two copies to USAID/M/FM/CMP.

1.5.2       Monitoring and reporting program performance

(a) Requirements. The Recipient shall submit an original and one copy of a brief semi-annual program report to the address listed in the Cover Letter. In addition, one copy shall be submitted to USAID/CDIE/DI, Washington, DC 20523-1802.  A final performance report is also required.

(b) Contents. The Program report shall briefly present the information contained in 22 CFR 226.51(d).

1.6      SUBSTANTIAL INVOLVEMENT UNDERSTANDINGS

USAID, through the Cognizant Technical Officer, shall be substantially involved during the implementation of the Agreement in the following ways;

1.    Approval of annual work plans, and all modifications, which describe the specific activities to be carried out under the Agreement and progress reports;

2.    Designation of key positions and approval of key personnel and any changes;

3.    Approval of monitoring and evaluation plans; USAID involvement in monitoring progress toward achievement of the Strategic Objective and Intermediate Results during the course of the Agreement;

4.    As appropriate, other monitoring as described in 22 CFR 226.

1.7      KEY PERSONNEL

The following positions and individuals have been designated as key to the successful completion of the objective of this award. In accordance with the Substantial Involvement clause of this Award, these personnel are subject to the Approval of the USAID Technical Officer.

REDACTED

1.8      TITLE TO AND CARE OF PROPERTY

Title to all property financed under this award shall vest in the Recipient subject to the requirements of 22 CFR 226.30 through 37.


1.9    AUTHORIZED GEOGRAPHIC CODE

    The authorized geographic code for procurement of goods and services under this award is 000.

1.10    INDIRECT COSTS

    Pursuant to the Standard Provisions of this Award entitled "Negotiated Indirect Cost Rates - Predetermined" and "Negotiated Indirect Cost Rates - Provisional (Nonprofits)," a predetermined indirect cost rate or rates shall be established for each of the Recipient's accounting periods which apply to this Award.  Pending establishment of predetermined indirect cost rates for the initial period , provisional payments on account of allowable costs shall be made on the basis of the following negotiated provisional rate(s) applied to the base(s) which is (are) set forth below:

| Type | Rate | Base | Period |
|------|------|------|--------|
|      | REDACTED |  |  |

1/    Base of Application: Total Salary Expense

2/    Base of Application: Total cost incurred excluding equipment, equip. rental and repair and maintenance, transfers, occupancy, utilities, depreciation, building lease, donated goods, seconded personnel greater than $25,000 and subawards greater than $25,000.

    Rates for subsequent periods shall be established in accordance with the Standard Provision entitled "Negotiated Indirect Cost Rates - Predetermined."

1.11    RESOLUTION OF CONFLICTS

    Conflicts between any of the Attachments of this Agreement shall be resolved by applying the following descending order of precedence:

        Attachment 1 - Schedule
        22 CFR 226
        Attachment 3 - Standard Provisions
        Attachment 2 - Program Description

1.12    COST SHARING

    The Recipient agrees not to expend an amount, as required in the RFA, for Cost Sharing.  Any cost sharing contributions will meet the criteria as set out in 22 CFR 226.23.

1.13    COMMUNICATIONS PRODUCTS (OCT 1994)

    (a) Definition - Communications products are any printed materials (other than non-color photocopy material), photographic services or video production services.

    (b) Standards - USAID has established standards for communications products.  These standards must be followed unless otherwise specifically provided in the agreement or approved in writing by the agreement officer. A copy of the

1.13    (Continued)

         standards for USAID financed publications and video
         productions is attached.

    (c) Communications products which meet any of the following
        criteria are not eligible for USAID financing under this
        agreement unless specifically authorized in the agreement
        schedule or in writing by the agreement officer:

        (1) Any communication product costing over $25,000, including
            the costs of both preparation and execution.  For
            example, in the case of a publication, the costs will
            include research, writing and other editorial services
            (including any associated overhead), design, layout and
            production costs.

        (2) Any communication products that will be sent directly to,
            or likely to be seen by, a Member of Congress or
            Congressional staffer; and

        (3) Any publication that will have more than 50 percent of
            its copies distributed in the United States (excluding
            copies provided to CDIE and other USAID/W offices for
            internal use.

1.14    PAYMENT OFFICE

            U.S. Agency for International Development
            Office of Finanacial Management
            M/FM/CMP/DC, Room 700, SA-2
            Washington, DC  20523

ATTACHMENT 2

PROGRAM DESCRIPTION

The Recipient's proposal entitled "Regional and/or Country
Interventions in HIV/AIDS" and dated May 14, 1997 with addendum of
August 23, 1997 is incorporated hereto by reference as the Program
Description and is made a part of this Award.

Page 8 of 40

REDACTED, Attachment 2, Program Description (26 pages)

ATTACHMENT 3

STANDARD PROVISIONS

3.1    INELIGIBLE COUNTRIES (MAY 1986)

Unless otherwise approved by the USAID Agreement Officer, funds will only be expended for assistance to countries eligible for assistance under the Foreign Assistance Act of 1961, as amended, or under acts appropriating funds for foreign assistance.

3.2    NONDISCRIMINATION (MAY 1986)

(This provision is applicable when work under the grant is performed in the U.S. or when employees are recruited in the U.S.)

No U.S. citizen or legal resident shall be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity funded by this grant on the basis of race, color, national origin, age, handicap, or sex.

3.3    U.S. OFFICIALS NOT TO BENEFIT (NOV 1985)

No member of or delegate to the U.S. Congress or resident U.S. Commissioner shall be admitted to any share or part of this agreement or to any benefit that may arise therefrom; but this provision shall not be construed to extend to this award if made with a corporation for its general benefit.

3.4    INVESTMENT PROMOTION (JAN 1994)

No funds or other support provided hereunder may be used in a project or activity reasonably likely to involve the relocation or expansion outside of the United States of an enterprise located in the United States if non-U.S. production in such relocation or expansion replaces some or all of the production of, and reduces the number of employees at, said enterprise in the United States.

No funds or other support provided hereunder may be used in a project or activity the purpose of which is the establishment or development in a foreign country of any export processing zone or designated area where the labor, environmental, tax, tariff, and safety laws of the country would not apply, without the prior written approval of USAID.

No funds or other support provided hereunder may be used in a project or activity which contributes to the violation of internationally recognized rights of workers in the recipient country, including those in any designated zone or area in that country.

Page 9 of 40

3.4    (Continued)

       This provision must be included in all subagreements.

3.5    NONLIABILITY (NOV 1985)

       USAID does not assume liability for any third party claims for
       damages arising out of this Agreement.

3.6    AMENDMENT (NOV 1985)

       The Agreement may be amended by formal modifications to the
       basic agreement document or by means of an exchange of letters
       between the Agreement Officer and an appropriate official of the
       Recipient.

3.7    NOTICES (NOV 1985)

       Any notice given by USAID or the recipient shall be sufficient
       only if in writing and delivered in person, mailed, or cabled as
       follows:

       To the USAID Agreement Officer, at the address specified in the
       agreement.

       To recipient, at recipient's address shown in the agreement or
       to such other address designated within the agreement.

       Notices shall be effective when delivered in accordance with
       this provision, or on the effective date of the notice, whichever
       is later.

3.8    OMB APPROVAL UNDER THE PAPERWORK REDUCTION ACT
       (AUG 1992)

       (This provision is applicable whenever any of the seven
       provisions below containing an information collection requirement
       is included in the grant.)

       Information collection requirements imposed by this grant are
       covered by OMB approval number 0412-0510; the current expiration
       date is 8/31/97.  Identification of the Standard Provision
       containing the requirement and an estimate of the public reporting
       burden (including time for reviewing instructions, searching
       existing data sources, gathering and maintaining the data needed,
       and completing and reviewing the collection of information) are
       set forth below.

       Standard Provision              Burden Estimate

       International Air Travel and         1 (hour)
       Transportation

                      Page 10 of 40

3.8    (Continued)

| | |
|---|---|
| Ocean Shipment of Goods | .5 |
| Patent Rights | .5 |
| Publications | .5 |
| Negotiated Indirect Cost Rates – Predetermined and Provisional | 1 |
| Voluntary Population Planning | .5 |
| Protection of the Individual as a Research Subject | 1 |

   Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Procurement Policy and Evaluation Staff (M/OP/E), Agency for International Development, Washington, DC 20523-1435 and to the Office of Management and Budget, Paperwork Reduction Project (0412-0510), Washington, DC 20503.

3.9    INTERNATIONAL AIR TRAVEL AND TRANSPORTATION (DEC 1995)

   (a) PRIOR BUDGET APPROVAL

      In accordance with OMB Cost Principles, direct charges for foreign travel costs are allowable only when each foreign trip has received prior budget approval.  Such approval will be deemed to have been met when:

      (1) The trip is identified.  Identification is accomplished by providing the following information:  the number of trips, the number of individuals per trip, and the destination country(s);

      (2) The information noted at (a)(1) above is incorporated in: the proposal, the program description or schedule of the award, the annual workplan (initial or revisions), or amendments to the award; and

      (3) The costs related to the travel are incorporated in the approved budget of the award.

      The Agreement Officer may approve travel which has not been incorporated in writing as required by paragraph (a)(2).  In such case, a copy of the Agreement Officer's approval must be included in the agreement file.

   (b) NOTIFICATION

3.9    (Continued)

    (1) As long as prior budget approval has been met in
        accordance with paragraph (a) above, a separate
        Notification will not be necessary unless:

        (i)    The primary purpose of the trip is to work with
               USAID Mission personnel, or

        (ii)   The recipient expects significant administrative
               or substantive programmatic support from the
               Mission.

    Neither the USAID Mission nor the Embassy will require
    Country Clearance of employees or contractors of USAID
    Recipients.

    (2) Where notification is required in accordance with
        paragraph (1) (i) or (ii) above, the recipient will
        observe the following standards:

        (i)    Send a written notice to the cognizant USAID
               Technical Office in the Mission. If the
               recipient's primary point of contact is a
               Technical Officer in USAID/W, the recipient may
               send the notice to that person. It will be the
               responsibility of the USAID/W Technical Officer to
               forward the notice to the field.

        (ii)   The notice should be sent as far in advance as
               possible, but at least 14 calendar days in advance
               of the proposed travel. This notice may be sent
               by fax or e-mail. The recipient should retain
               proof that notification was made.

        (iii)  The notification shall contain the following
               information: the award number, the cognizant
               Technical Officer, the traveler's name (if known),
               date or arrival, and the purpose of the trip.

        (iv)   The USAID Mission will respond only if travel has
               been denied. It will be the responsibility of the
               Technical Officer in the Mission to contact the
               recipient within 5 working days of having received
               the notice if the travel is denied. If the
               recipient has not received a response within the
               time frame, the recipient will be considered to
               have met these standards for notification, and may
               travel.

        (v)    If a subrecipient is required to issue a
               Notification, as per this section, the

3.9    (Continued)

subrecipient may contact the USAID Technical
Officer directly, or the prime may contact USAID
on the subrecipient's behalf.

(c)  SECURITY ISSUES

Recipients are encouraged to obtain the latest Department of
State Travel Advisory Notices before traveling.  These Notices
are available to the general public and may be obtained
directly from the State Department, or via Internet.

Where security is a concern in a specific region, recipients
may choose to notify the US Embassy of their presence when
they have entered the country.  This may be especially
important for longterm posting.

(d)  USE OF U.S. - OWNED LOCAL CURRENCY

Travel to certain countries shall, at USAID's option, be
funded from U.S. - owned local currency.  When USAID intends
to exercise this option, USAID will either issue a U.S.
Government S.F. 1169, Transportation Request (GTR) which the
grantee may exchange for tickets, or issue the tickets
directly.  Use of such U.S.-owned currencies will constitute a
dollar charge to this grant.

(e)  THE FLY AMERICA ACT

(1)  The Fly America Act requires that all air travel and
shipments under this award must be made on U.S. flag air
carriers to the extent service by such carriers is
available.  The Comptroller General of the United States,
by Decision B-138942 of June 17, 1975, as amended March
31, 1981, provided guidelines for implementation of
Section 5 of the International Air Transportation Fair
Competitive Practices Act (Fly America Act) of 1974 (49
U.S.C. 1517, as amended by Section 21 of Public Law 96-
192).

(2)  U.S. flag air carrier service is considered available
even though:

(i)   Comparable or a different kind of service can be
provided at less cost by a foreign air carrier;

(ii)  Foreign air carrier service is preferred by or is
more convenient for the agency or traveler; or

(iii) Service by a foreign air carrier can be paid for
in excess foreign currency, unless U.S. flag air
carriers decline to accept excess or near excess

Page 13 of 40

Attachment 3

3.9    (Continued)

foreign currencies for transportation payable only out of such monies.

(3)   In determining availability of a U.S. flag air carrier, the following scheduling principles should be followed unless their application results in the last or first leg of travel to or from the United States being performed by foreign air carrier:

(i)   U.S. flag air carrier service available at point of origin shall be used to destination or in the absence of direct or through service to the farthest interchange point on a usually traveled route;

(ii)  Where an origin or interchange point is not served by U.S. flag air carrier, a foreign air carrier shall be used only to the nearest interchange point on a usually traveled route to connect with U.S. flag air carrier service; or

(iii) Where a U.S. flag air carrier involuntarily reroutes the traveler via a foreign air carrier, the foreign air carrier may be used notwithstanding the availability of alternative U.S. flag air carrier service.

(4)  Travel to and from the United States:  For travel between a gateway airport in the United States (the last U.S. airport from which the traveler's flight departs or the first U.S. airport at which the traveler's flight arrives) and a gateway airport abroad (that airport from which the traveler last embarks enroute to the U.S. or at which the traveler first debarks incident to travel from the U.S.), passenger service by U.S. flag air carrier will not be considered available if:

(i)   The gateway airport abroad is the traveler's origin or destination airport, and the use of U.S. flag air carrier service would extend the time in a travel status including delay at origin and accelerated arrival at destination, by at least 24 hours more than travel by foreign air carrier; or

(ii)  The gateway airport abroad is an interchange point, and the use of U.S. flag air carrier service would require the traveler to wait six hours or more to make connections at that point or, delayed departure from or accelerated arrival at the gateway airport in the U.S. would extend the time in a travel status by at least six hours

Page 14 of 40

3.9    (Continued)

more than travel by foreign air carrier.

(5) Travel Between Points Outside the United States:  Use of
a foreign-flag air carrier is permissible if:

(i)    Travel by foreign air carrier would eliminate two
or more aircraft changes enroute;

(ii)   Where one of the two points abroad is the gateway
airport enroute to or from the United States and
the use of a U.S. flag air carrier would extend
the time in a travel status by at least six hours
more than travel by foreign air carrier; including
accelerated arrival at the overseas destination or
delayed departure from the overseas origin as well
as delay at the gateway airport or other
interchange point abroad; or

(iii)  The travel is not part of a trip to or from the
United States and the use of a U.S. flag air
carrier would extend the time in a travel status
by at least six hours more than travel by foreign
air carrier including delay at origin, delay
enroute and accelerated arrival at destination.

(6) Short Distance Travel:  Use of a foreign-flag air carrier
is permissible, regardless of origin and destination, if
the elapsed travel time on a scheduled flight from origin
to destination airport by a foreign flag air carrier is
three hours or less and service by a US flag air carrier
would double the travel time.

(7) Use of foreign air carrier service may be deemed
necessary if a U.S. flag air carrier otherwise available
cannot provide the foreign air transportation needed, or
if use of such service will not accomplish the agency's
mission.  Travel and transportation on non-free world air
carriers are not reimbursable under this award.

(8) Where U.S. Government funds are used for reimbursement on
other than U.S. flag air carriers for international
transportation, the recipient shall include a
certification in their own files involving such
transportation which is essentially as follows:

"CERTIFICATION OF UNAVAILABILITY OF U.S. FLAG AIR
CARRIERS.  I hereby certify that the transportation
service for personnel (and their personal effects)  or
property by certificated air carrier was unavailable for
the following reason(s)."  (State appropriate reason(s)
as set forth above).

3.9    (Continued)

    (f)    COST PRINCIPLES

       The recipient will be reimbursed for travel and the
reasonable cost of subsistence, post differentials and
other allowances paid to employees in international
travel status in accordance with the recipient's
applicable cost principles and established policies and
practices which are uniformly applied to federally
financed and other activities of the grantee.

       If the recipient does not have written established
policies regarding travel costs, the standard for
determining the reasonableness or reimbursement for
overseas allowance will be the Standardized Regulations
(Government Civilians, Foreign Areas), published by the
U.S. Department of State, as from time to time amended.
The most current subsistence, post differentials, and
other allowances may be obtained from the Agreement
Officer.

  (g)    SUBAWARDS

     This provision will be included in all subawards and contracts
which require air travel and transportation under this award.

3.10    OCEAN SHIPMENT OF GOODS (AUG 1992)

  (This provision is applicable when goods purchased with funds
provided under this grant are transported to cooperating countries
on ocean vessels whether or not grant funds are used for the
transportation.)

(a)    At least 50% of the gross tonnage of all goods purchased under
this grant and transported to the cooperating countries shall
be made on privately owned U.S. flag commercial ocean vessels,
to the extent such vessels are available at fair and
reasonable rates for such vessels.

(b)    At least 50% of the gross freight revenue generated by
shipments of goods purchased under this grant and transported
to the cooperating countries on dry cargo liners shall be paid
to or for the benefit of privately owned U.S. flag commercial
ocean vessels to the extent such vessels are available at fair
and reasonable rates for such vessels.

(c)    When U.S. flag vessels are not available, or their use would
result in a significant delay, the grantee may request a
determination of non-availability from the AID Transportation
Division, Office of Procurement, Washington, D.C. 20523,
giving the basis for the request which will relieve the

3.10    (Continued)

grantee of the requirement to use U.S. flag vessels for the amount of tonnage included in the determination. Shipments made on non-free world ocean vessels are not reimburseable under this grant.

(d) Vouchers submitted for reimbursement which include ocean shipment costs shall contain a certification essentially as follows:

"I hereby certify that a copy of each ocean bill of lading concerned has been submitted to the U.S. Department of Transportation, Maritime Administration, Division of National Cargo, 400 7th Street, S.W., Washington, D.C. 20590, and that such bills of lading state all of the carrier's charges including the basis for calculation such as weight or cubic measurement."

(e) Shipments by voluntary nonprofit relief agencies (i.e., PVOs) shall be governed by this standard provision and by AID Regulation 2, "Overseas Shipments of Supplies by Voluntary Nonprofit Relief Agencies" (22 CFR Part 202).

(f) Shipments financed under this grant must meet applicable eligibility requirements set out in Handbook 1, Supplement B, Chapter 7.

(g) This provision will be included in all subagreements which will finance goods to be shipped on ocean vessels.

3.11    USAID ELIGIBILITY RULES FOR GOODS AND SERVICES (MAR 1997)

(This provision is applicable when the costs for goods or services will be paid for with USAID funds. This provision is not applicable if the recipient is providing for the goods or services with private funds as part of a cost-sharing requirement, or with Program Income generated under the award.)

(a) Ineligible and Restricted Goods and Services: If USAID determines that the recipient has procured any of the restricted or ineligible goods and services specified below, or has procured goods and services from unauthorized sources, and has received reimbursement for such purpose without the prior written authorization of the Agreement Officer, the recipient agrees to refund to USAID the entire amount of the reimbursement. USAID's policy on ineligible and restricted goods and services is contained in ADS Chapter 312.

(1) Ineligible Goods and Services. Under no circumstances shall the recipient procure any of the following under this award:

3.11    (Continued)

        (i)    Military equipment,

        (ii)   Surveillance equipment,

        (iii) Commodities and services for support of police or other law enforcement activities,

        (iv)  Abortion equipment and services,

        (v)   Luxury goods and gambling equipment, or

        (vi)  Weather modification equipment.

(2) Ineligible Suppliers.  Funds provided under this award shall not be used to procure any goods or services furnished by any firms or individuals whose name appears on the "Lists of Parties Excluded from Federal Procurement and Nonprocurement Programs."  USAID will provide the grantee with a copy of these lists upon request.

(3) Restricted Goods.  The recipient shall not procure any of the following goods and services without the prior budget approval of the Agreement Officer:

        (i)   Agricultural commodities,

        (ii)  Motor vehicles,

        (iii) Pharmaceuticals,

        (iv)  Pesticides,

        (v)   Rubber compounding chemicals and plasticizers,

        (vi)  Used equipment,

        (vii) U.S. Government-owned excess property, or

        (viii) Fertilizer.

Prior budget approval will be deemed to have been met when:

(i)  the item has been identified and incorporated in the program description or schedule of the award (initial or revisions), or amendments to the award; and

(ii) the costs related to the item are incorporated in the approved budget of the award.

3.11    (Continued)

Where the item has not been incoporated into the award as
described above, a separate written authorization from the
Agreement Officer must be provided before the item is
procured.

(b) Source and Nationality:  The eligibility rules for goods
and services based on source and nationality are divided into
two categories.  One applies when the total procurement
element during the life of the award is over $250,000 and the
other applies when the total procurement element during the
life of the award is not over $250,000 or the award is funded
under the Development Fund for Africa (DFA) regardless of the
amount.  The total procurement element includes procurement of
all goods (e.g., equipment, materials, supplies) and services.
Guidance on the eligibility of specific goods or services may
be obtained from the Agreement Officer.  USAID policies and
definitions on source, origin and nationality are contained in
22 CFR Part 228, Rules on Source, Origin and Nationality for
Commodities and Services Financed by the Agency for
International Development, which is incorporated into this
Award in its entirety.

(1)  For DFA funded awards or when the total procurement
element during the life of this award is valued at
$250,000 or less, the following rules apply:

(i)  The authorized source for procurement of all goods
and services to be reimbursed under the award is
USAID Geographic Code 935, "Special Free World,"
and such goods and services must meet the source,
origin and nationality requirements set forth in 22
CFR Part 228 in accordance with the following order
of preference:

(A)  The United States (USAID Geographic Code 000),

(B)  The Cooperating Country,

(C)  "Selected Free World" countries (USAID
Geographic Code 941), and

(D)  "Special Free World" countries (USAID
Geographic Code 935).

(ii) Application of order of preference:  When the
recipient procures goods and services from other
than U.S. sources, under the order of preference in
paragraph (b)(1)(i) above, the recipient shall
document its files to justify each such instance.
The documentation shall set forth the circumstances

Page 19 of 40

3.11    (Continued)

surrounding the procurement and shall be based on one or more of the following reasons, which will be set forth in the grantee's documentation:

(A) The procurement was of an emergency nature, which would not allow for the delay attendant to soliciting U.S. sources,

(B) The price differential for procurement from U.S. sources exceeded by 50% or more the delivered price from the non-U.S. source,

(C) Compelling local political considerations precluded consideration of U.S. sources,

(D) The goods or services were not available from U.S. sources, or

(E) Procurement of locally available goods and services, as opposed to procurement of U.S. goods and services, would best promote the objectives of the Foreign Assistance program under the award.

(2) When the total procurement element exceeds $250,000 (unless funded by DFA), the following applies: Except as may be specifically approved or directed in advance by the Agreement Officer, all goods and services financed with U.S. dollars, which will be reimbursed under this award must meet the source, origin and nationality requirements set forth in 22 CFR Part 228 for the authorized geographic code specified in the schedule of this award. If none is specified, the authorized source is Code 000, the United States.

(c) Marine Insurance: The eligibility of marine insurance is determined by the country in which it is placed. Insurance is placed in a country if payment of the insurance premium is made to, and the insurance policy is issued by an insurance company located in that country. Eligible countries for placement are governed by the authorized geographic code, except that if Code 941 is authorized, the Cooperating Country is also eligible. Section 604(d) of the Foreign Assistance Act requires that if a recipient country discriminates by statute, decree, rule, or practice with respect to USAID-financed procurement against any marine insurance company authorized to do business in the U.S., then any USAID-financed commodity shipped to that country shall be insured against marine risk and the insurance shall be placed in the U.S. with a company or companies authorized to do marine insurance business in the U.S.

3.11    (Continued)

    (d) Ocean and air transportation shall be in accordance with the
    applicable provisions contained within this award and the
    provisions of 22 CFR Part 228, Subpart C.

    (e) Printed or Audio-Visual Teaching Materials:  If the
    effective use of printed or audio-visual teaching materials
    depends upon their being in the local language and if such
    materials are intended for technical assistance projects or
    activities financed by USAID in whole or in part and if other
    funds including U.S.-owned or U.S.-controlled local currencies
    are not readily available to finance the procurement of such
    materials, local language versions may be procured from the
    following sources, in order of preference:

        (1) The United States (USAID Geographic Code 000),

        (2) The Cooperating Country,

        (3) "Selected Free World" countries (USAID Geographic Code
        941), and

        (4) "Special Free World" countries (USAID Geographic Code
        899).

    (f) This provision will be included in all subagreements which
    include procurement of goods or services over $5,000.

3.12    SUBAGREEMENTS (FEB 1995)

    (This provision is applicable when subgrants or cooperative
agreements are financed under the grant.)

    (a) All provisions of 22 CFR 226 and all Standard Provisions
    attached to this agreement shall be applied to subrecipients
    which meet the definition of "Recipient" in that part, unless
    a section specifically excludes a subrecipient from coverage.

    (b) Any subawards made with entities which fall outside of the
    definition of "Recipient" (such as Non-US organizations) will
    be made in accordance with USAID Handbook 13, Appendix 4D
    "Standard Provisions for Non-US Nongovernmental Grantees"
    except for the "Accounting, Audit and Records" Standard
    Provision.  Recipients must apply the following guidelines
    when subawarding to entities which do not meet the definition
    of "Recipient".

    (c) A recipient that receives a USAID award and provides $25,000
    or more of it during its fiscal year to a sub-recipient
    (whether meeting the definition of "Recipient" or not) shall
    follow the guidelines of OMB Circular A-133.  The recipient

3.12    (Continued)

    shall ensure that:

      (1) The nonprofit institution sub-recipients that receive
$25,000 or more have met the audit requirements of OMB
Circular A-133, and that sub-recipients subject to OMB
Circular A-128 have met the audit requirements of that
Circular;

      (2) Appropriate corrective action is taken within six months
after receipt of the sub-recipient audit report in
instances of noncompliance with Federal laws and
regulations;

      (3) They consider whether sub-recipients audits necessitate
adjustment of the grantee's own records; and

      (4) Each sub-recipient is required to permit independent
auditors to have access to the records and financial
statements as necessary for the grantee to comply with
OMB Circular A-133.

3.13    LOCAL COST FINANCING (JUN 1993)

    This provision is applicable when the total estimated
procurement element for the life of the grant is valued over
$250,000 and the grant is not funded under DFA.

(a) Financing local procurement involves the use of appropriated
funds to finance the procurement of goods and services
supplied by local businesses, dealers or producers, with
payment normally being in the currency of the cooperating
country.

(b) All locally financed procurements must be covered by source
and nationality waivers as set forth in AID Handbook 1,
Supplement B, Chapter 5 with the following exceptions:

      (1) Locally available commodities of U.S. origin, which are
otherwise eligible for financing, if the value of the
transaction is estimated not to exceed $100,000 exclusive
of transportation costs.

      (2) Commodities of geographic code 935 origin if the value of
the transaction does not exceed the local currency
equivalent of $5,000.

      (3) Professional Services Contracts estimated not to exceed
$250,000.

      (4) Construction Services Contracts estimated not to exceed
$5,000,000.

3.13   (Continued)

        (5) Commodities and services available only in the local
economy (no specific per transaction value applies to
this category).  This category includes the following
items:

           (i)   Utilities including fuel for heating and cooking,
waste disposal and trash collection;

           (ii)  Communications - telephone, telex, fax, postal and
courier services;

           (iii) Rental costs for housing and office space;

           (iv)  Petroleum, oils and lubricants for operating
vehicles and equipment;

           (v)   Newspapers, periodicals and books published in the
cooperating country;

           (vi)  Other commodities and services and related
expenses that, by their nature or as a practical
matter, can only be acquired, performed, or
incurred in the cooperating country, e.g., vehicle
maintenance, hotel accommodations, etc.

(c) All procurements under grants financed with DFA funds and
grants with procurement elements of $250,000 or less are
subject to the guidance provided under standard provision "AID
Eligibility Rules for Goods and Services."

(d) Ineligible Goods and Services:  Under no circumstances shall
the grantee procure any of the following under this grant:

    (1) Military equipment,

    (2) Surveillance equipment,

    (3) Commodities and services for support of police or other
law enforcement activities,

    (4) Abortion equipment and services,

    (5) Luxury goods and gambling equipment, or

    (6) Weather modification equipment.

(e) Ineligible Suppliers:  Funds provided under this grant shall
not be used to procure any goods or services furnished by any
firm or individual whose name appears on the "Lists of Parties
Excluded from Federal Procurement and Nonprocurement

3.13    (Continued)

      Programs." AID will provide the grantee with these lists upon request.

    (f) Restricted Goods:  The grantee shall not procure any of the following goods and services without the prior written authorization of the grant officer:

        (1) Agricultural commodities,

        (2) Motor vehicles,

        (3) Pharmaceuticals,

        (4) Pesticides,

        (5) Rubber compounding chemicals and plasticizers,

        (6) Used equipment,

        (7) U.S. Government-owned excess property, or

        (8) Fertilizer.

    (g) If AID determines that the grantee has procured any of the restricted or ineligible goods and services specified in subparagraphs c. through e. above, or has received reimbursement for such purpose without the prior written authorization of the grant officer, the grantee agrees to refund to AID the entire amount of the reimbursement.

    (h) This provision will be included in all subagreements where local procurement of goods or services will be required.

3.14    PUBLICATIONS (AUG 1992)

    (This provision is applicable when publications are financed under the grant.)

    (a) AID shall be prominently acknowledged in all publications, videos or other information/media products funded or partially funded through this grant, and the product shall state that the views expressed by the author(s) do not necessarily reflect those of AID.  Acknowledgements should identify the sponsoring AID Office and Bureau or Mission as well as the U.S. Agency for International Development substantially as follows:

    "This [publication, video or other information/media product (specify)] was made possible through support provided by the Office of Health and Nutrition, Global, U.S. Agency for International Development, under the terms of Grant No.

3.14    (Continued)

HRN-A-00-97-00017-00.  The opinions expressed herein are those of the author(s) and do not necessarily reflect the views of the U.S. Agency for International Development."

(b) Unless the grantee is instructed otherwise by the cognizant technical office, publications, videos or other information/media products funded under this grant and intended for general readership or other general use will be marked with the AID logo and/or U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT appearing either at the top or at the bottom of the front cover or, if more suitable, on the first inside title page for printed products, and in equivalent appropriate location in videos or other information/media products.  Logos and markings of co-sponsors or authorizing institutions should be similarly located and of similar size and appearance.

(c) The grantee shall provide the AID technical officer and POL/CDIE, Room 215, SA-18, Washington, DC 20523-1802, with one copy each of all published works developed under the grant and with lists of other written work produced under the grant.

(d) In the event grant funds are used to underwrite the cost of publishing, in lieu of the publisher assuming this cost as is the normal practice, any profits or royalties up to the amount of such cost shall be credited to the grant unless the schedule of the grant has identified the profits or royalties as program income.

(e) Except as otherwise provided in the terms and conditions of the grant, the author or the recipient is free to copyright any books, publications, or other copyrightable materials developed in the course of or under this grant, but AID reserves a royalty-free nonexclusive and irrevocable right to reproduce, publish, or otherwise use, and to authorize others to use the work for Government purposes.

3.15    NEGOTIATED INDIRECT COST RATES - PREDETERMINED
        (AUG 1992)

(This provision is applicable to educational or nonprofit institutions whose indirect cost rate(s) under this grant are on a predetermined basis.)

(a) The allowable indirect costs under this grant shall be obtained by applying predetermined indirect cost rate(s) to the base(s) agreed upon by the parties, as specified in the schedule of this grant.

(b) Not later than 13 months after the close of the grantee's fiscal year, the grantee shall submit to the cognizant Government Audit Activity the required OMB Circular A-133

3.15    (Continued)

audit, a proposed predetermined indirect cost rate(s), and supporting cost data. In the event AID is the cognizant agency or no cognizant agency has been designated, the grantee shall submit a copy of the proposed predetermined indirect cost rate(s) and supporting cost data to the AID Inspector General, Washington, DC 20523, and to the Overhead and Special Costs - Contract Closeout Branch, Office of Procurement, Washington, DC 20523. The proposed rate(s) shall be based on the grantee's actual cost experience during that fiscal year. Negotiations of predetermined indirect cost rate(s) shall begin as soon as practical after receipt of the grantee's proposal.

(c) Allowability of costs and acceptability of cost allocation methods shall be determined in accordance with the provisions of the applicable cost principles in effect on the date of this grant.

(d) Rates for subsequent periods shall be negotiated and the results of each negotiation shall be set forth in a written indirect cost rate agreement executed by both parties. Such agreement shall be automatically incorporated into this grant upon execution and shall specify (1) the agreed upon predetermined rate(s), (2) the base(s) to which the rate(s) apply, (3) the fiscal year (unless the parties agree to a different period) for which the rate(s) apply, and (4) the specific items treated as direct costs or any changes in the items previously agreed to be direct costs. The indirect cost rate agreement shall not change any monetary ceiling, grant obligation, or specific cost allowance or disallowance provided for in this grant.

(e) Pending establishment of predetermined indirect costs rate(s) for any fiscal year or different period agreed to by the parties, the grantee shall be reimbursed either at the rate(s) fixed for the previous fiscal year or other period or at billing rate(s) acceptable to the AID grant officer subject to appropriate adjustment when the final rate(s) for the fiscal year or other period are established.

3.16    NEGOTIATED INDIRECT COST RATES - PROVISIONAL (AUG 1992)

(This provision is applicable to any EDUCATIONAL OR NONPROFIT INSTITUTION which does not have predetermined indirect cost rate(s); however, it shall also be included when the NEGOTIATED INDIRECT COST RATES - PREDETERMINED standard provision is used.)

(a) A provisional indirect cost rate(s) shall be established for each of the grantee's accounting periods during the term of this grant. Pending establishment of a final rate(s), the parties have agreed that provisional payments on account of

3.16    (Continued)

allowable indirect costs shall be at the rate(s), on the base(s), and for the periods shown in the schedule of this grant.

(b) Not later than 13 months after the close of the grantee's fiscal year, the grantee shall submit to the cognizant Government Audit Activity, in accordance with the requirements of OMB Circular A-133, an audit report along with proposed final indirect cost rate(s) and supporting cost data.  In the event AID is the cognizant agency or no cognizant agency has been designated, the grantee shall submit seven copies of the OMB Circular A-133 audit along with the proposed final indirect cost rate(s) and supporting cost data to the AID Inspector General, Washington, DC 20523, and a copy to the Overhead and Special Costs - Contract Closet Branch, Office of Procurement, Washington, DC 20523.  The proposed rate(s) shall be based on the grantee's actual cost experience during that fiscal year. Negotiations of final indirect cost rate(s) shall begin as soon as practical after receipt of the grantee's proposal.

(c) Allowability of costs and acceptability of cost allocation methods shall be determined in accordance with the applicable cost principles in effect on the date of this grant.

(d) The results of each negotiation shall be set forth in a written indirect cost rate agreement executed by both parties.  Such agreement shall specify (1) the agreed upon final rate(s), (2) the base(s) to which the rate(s) apply, and (3) the period for which the rate(s) apply. The indirect cost rate agreement shall not change any monetary ceiling, grant obligation, or specific cost allowance or disallowance provided for in this grant.

(e) Pending establishment of final indirect cost rate(s) for any period, the grantee shall be reimbursed either at negotiated provisional rate(s) as provided above or at billing rate(s) acceptable to the grant officer, subject to appropriate adjustment when the final rate(s) for that period are established.  To prevent substantial over or under payment, the provisional or billing rate(s) may, at the request of either party, be revised by mutual agreement, either retroactively or prospectively.  Any such revision of negotiated provisional rate(s) provided in this standard provision shall be set forth in a modification to this grant.

(f) Any failure by the parties to agree on final rate(s) under this standard provision shall be considered a dispute within the meaning of the standard provision of this grant entitled

"Dispute" and shall be disposed of in accordance therewith.

3.17     VOLUNTARY POPULATION PLANNING (JUN 1993)

         (This provision is applicable to all grants involving any aspect
of voluntary population planning activities.)

    (a) Voluntary Participation:

        (1) The grantee agrees to take any steps necessary to ensure
            that funds made available under this grant will not be
            used to coerce any individual to practice methods of
            family planning inconsistent with such individual's
            moral, philosophical, or religious beliefs. Further, the
            grantee agrees to conduct its activities in a manner
            which safeguards the rights, health and welfare of all
            individuals who take part in the program.

        (2) Activities which provide family planning services or
            information to individuals, financed in whole or in part
            under this agreement, shall provide a broad range of
            family planning methods and services available in the
            country in which the activity is conducted or shall
            provide information to such individuals regarding where
            such methods and services may be obtained.

    (b) Voluntary Participation Requirements For Sterilization
        Programs:

        (1) None of the funds made available under this grant shall
            be used to pay for the performance of involuntary
            sterilization as a method of family planning or to coerce
            or provide any financial incentive to any person to
            practice sterilization.

        (2) The grantee shall ensure that any surgical sterilization
            procedures supported in whole or in part by funds from
            this grant are performed only after the individual has
            voluntarily gone to the treatment facility and has given
            informed consent to the sterilization procedure.
            Informed consent means the voluntary, knowing assent from
            the individual after being advised of the surgical
            procedures to be followed, the attendant discomforts and
            risks, the benefits to be expected, the availability of
            alternative methods of family planning, the purpose of
            the operation and its irreversibility, and the option to
            withdraw consent anytime prior to the operation. An
            individual's consent is considered voluntary if it is
            based upon the exercise of free choice and is not
            obtained by any special inducement or any element of
            force, fraud, deceit, duress, or other forms of coercion
            or misrepresentation.

        (3) Further, the grantee shall document the patient's
            informed consent by (i) a written consent document in a

                              Page 28 of 40

3.17    (Continued)

language the patient understands and speaks, which
explains the basic elements of informed consent, as set
out above, and which is signed by the individual and by
the attending physician or by the authorized assistant of
the attending physician; or (ii) when a patient is unable
to read adequately a written certification by the
attending physician or by the authorized assistant of the
attending physician that the basic elements of informed
consent above were orally presented to the patient, and
that the patient thereafter consented to the performance
of the operation. The receipt of the oral explanation
shall be acknowledged by the patient's mark on the
certification and by the signature or mark of a witness
who shall be of the same sex and speak the same language
as the patient.

(4) Copies of informed consent forms and certification
documents for each voluntary sterilization procedure must
be retained by the grantee for a period of three years
after performance of the sterilization procedure.

(c) Prohibition on Abortion-Related Activities:

(1) No funds made available under this grant will be used to
finance, support, or be attributed to the following
activities: (i) procurement or distribution of equipment
intended to be used for the purpose of inducing abortions
as a method of family planning; (ii) special fees or
incentives to women to coerce or motivate them to have
abortions; (iii) payments to persons to perform abortions
or to solicit persons to undergo abortions; (iv)
information, education, training, or communication
programs that seek to promote abortion as a method of
family planning; and (v) lobbying for abortion.

(2) No funds made available under this grant will be used to
pay for any biomedical research which relates, in whole
or in part, to methods of, or the performance of,
abortions or involuntary sterilizations as a means of
family planning. Epidemiologic or descriptive research
to assess the incidence, extent or consequences of
abortions is not precluded.

(d) The grantee shall insert this provision in all subsequent
subagreements and contracts involving family planning or
population activities which will be supported in whole or part
from funds under this grant.

3.18    PROTECTION OF THE INDIVIDUAL AS A RESEARCH SUBJECT
        (AUG 1995)

        (This provision is applicable when research funded by this grant
        is conducted on human subjects.)

        (a) Safeguarding the rights and welfare of human subjects in
            research supported by USAID is the responsibility of the
            organization to which support is awarded.  USAID has adopted
            the Common Federal Policy for the Protection of Human
            Subjects, Part 225 of Title 22 of the Code of Federal
            Regulations (the "Policy").  Additional interpretation,
            procedures, and implementation guidance of the Policy are
            found in USAID General Notice entitled "Procedures for the
            Protection of Human Subjects in Research Supported by USAID",
            issued April 19, 1995, as from time to time amended (a copy of
            which is attached to this grant). USAID's Cognizant Human
            Subjects Officer (CHSO) in AID/W has oversight, guidance, and
            interpretation responsibility for the Policy.

        (b) Recipient organizations must comply with USAID policy when
            humans are the subject of research, as defined in 22 CFR
            section 225.102(d), funded by the grant and recipients must
            provide "assurance", as required by 22 CFR section 225.103,
            that they follow and abide by the procedures in the Policy.
            See also Section 5 of the April 19, 1995, USAID General Notice
            which sets forth activities to which the Policy is applicable.
            The existence of a bona fide, applicable assurance approved
            by the Department of Health and Human Services (HHS) such as
            the "multiple project assurance" (MPA) will satisfy this
            requirement. Alternatively, organizations can provide an
            acceptable written assurance to USAID as described in 22 CFR
            section 225.103.  Such assurances must be determined by the
            CHSO to be acceptable prior to any applicable research being
            initiated or conducted under the grant.  In some limited
            instances outside the U.S., alternative systems for the
            protection of human subjects may be used provided they are
            deemed "at least equivalent" to those outlined in Part 225
            (see 22 CFR 225.101[h]).  Criteria and procedures for making
            this determination are described in the General Notice cited
            in the preceding paragraph.

        (c) Since the welfare of the research subject is a matter of
            concern to USAID as well as to the organization, USAID staff,
            consultants and advisory groups may independently review and
            inspect research and research processes and procedures
            involving human subjects, and based on such findings, the CHSO
            may prohibit research which presents unacceptable hazards or
            otherwise fails to comply with USAID procedures.  Informed
            consent documents must include the stipulation that the
            subject's records may be subject to such review.

3.19    CARE OF LABORATORY ANIMALS (NOV 1985)

(This provision is applicable when laboratory animals are involved in research performed in the U.S. and financed by the grant.)

(a) Before undertaking performance of any grant involving the use of laboratory animals, the grantee shall register with the Secretary of Agriculture of the United States in accordance with Section 6, Public Law 89-544, Laboratory Animal Welfare Act, August 24, 1966, as amended by Public Law 91-579, Animal Welfare Act of 1970, December 24, 1970. The grantee shall furnish evidence of such registration to the grant officer.

(b) The grantee shall acquire animals used in research under this grant only from dealers licensed by the Secretary of Agriculture, or from exempted sources in accordance with the Public Laws enumerated in (a) above.

(c) In the care of any live animals used or intended for use in the performance of this grant, the grantee shall adhere to the principles enunciated in the Guide for Care and Use of Laboratory Animals prepared by the Institute of Laboratory Animals Resources, National Academy of Sciences - National Research Council, and in the United States Department of Agriculture's (USDA) regulations and standards issued under the Public Laws enumerated in a. above.  In case of conflict between standards, the higher standard shall be used.  The grantee's reports on portions of the grant in which animals were used shall contain a certificate stating that the animals were cared for in accordance with the principles enunciated in the Guide for Care and Use of Laboratory Animals prepared by the Institute of Laboratory Animal Resources, NAS-NRC, and/or in the regulations and standards as promulgated by the Agricultural Research Service, USDA, pursuant to the Laboratory Animal Welfare Act of 24 August 1966, as amended (P.L. 89-544 and P.L. 91-579).  NOTE: The grantee may request registration of the grantee's facility and a current listing of licensed dealers from the Regional Office of the Animal and Plant Health Inspection Service (APHIS), USDA, for the region in which the grantee's research facility is located.  The location of the appropriate APHIS Regional Office as well as information concerning this program may be obtained by contacting the Senior Staff Office, Animal Care Staff, USDA/APHIS, Federal Center Building, Hyattsville, Maryland 20782.

3.20    USE OF POUCH FACILITIES (AUG 1992)

(This provision is applicable when activities under the grant will take place outside of the United States.)

(a) Use of diplomatic pouch is controlled by the Department of

3.20    (Continued)

State. The Department of State has authorized the use of pouch facilities for AID grantees and their employees as a general policy, as detailed in items (1) through (6) below. However, the final decision regarding use of pouch facilities rest with the Embassy or AID Mission.  In consideration of the use of pouch facilities, the grantee and its employees agree to indemnify and hold harmless, the Department of State and AID for loss or damage occurring in pouch transmission:

(1) Grantees and their employees are authorized use of the pouch for transmission and receipt of up to a maximum of .9 kgs per shipment of correspondence and documents needed in the administration of assistance programs.

(2) U.S. citizen employees are authorized use of the pouch for personal mail up to a maximum of .45 kgs per shipment (but see (a)(3) below).

(3) Merchandise, parcels, magazines, or newspapers are not considered to be personal mail for purposes of this standard provision and are not authorized to be sent or received by pouch.

(4) Official and personal mail pursuant to a.1. and 2. above sent by pouch should be addressed as follows:

Name of individual or organization (followed by letter symbol "G")
City Name of post (USAID/_____)
Agency for International Development
Washington, D.C.  20523-0001

(5) Mail sent via the diplomatic pouch may not be in violation of U.S. Postal laws and may not contain material ineligible for pouch transmission.

(6) AID grantee personnel are not authorized use of military postal facilities (APO/FPO).  This is an Adjutant General's decision based on existing laws and regulations governing military postal facilities and is being enforced worldwide.

(b) The grantee shall be responsible for advising its employees of this authorization, these guidelines, and limitations on use of pouch facilities.

(c) Specific additional guidance on grantee use of pouch facilities in accordance with this standard provision is available from the Post Communication Center at the Embassy or AID Mission.

3.21    CONVERSION OF UNITED STATES DOLLARS TO LOCAL CURRENCY
        (NOV 1985)

        (This provision is applicable when activities under the grant
        will take place outside of the United States.)

        Upon arrival in the Cooperating Country, and from time to time
        as appropriate, the grantee's chief of party shall consult with
        the Mission Director who shall provide, in writing, the procedure
        the grantee and its employees shall follow in the conversion of
        United States dollars to local currency.  This may include, but is
        not limited to, the conversion of currency through the cognizant
        United States Disbursing Officer or Mission Controller, as
        appropriate.

3.22    RIGHTS IN DATA (AUG 1992)

        (This provision is applicable whenever data will be produced
        under the grant.)

        (a) Definitions

        "Data" means recorded information (including information
        relating to the research, testing, or development of any drug
        or device requiring approval for use in the United States),
        regardless of form or the media on which it may be recorded.
        In the aggregate these data may be in the form of reports,
        articles, manuals, or publications.  The term includes
        technical data and computer software.  The term does not
        include financial reports or other information incidental to
        grant administration.

        "Form, fit and function data" means data relating to items,
        components, or processes that are sufficient to enable
        physical and functional interchangeability, as well as data
        identifying source, size, configuration, mating, and
        attachment characteristics, functional characteristics, and
        performance requirements but specifically excludes the source
        code, algorithm, process, formulae, and flow charts of the
        software.

        "Limited rights" means the rights of the Government in limited
        rights data as set forth in the following Limited Rights
        Notice:

            -- "These data are submitted with limited rights.  These
               data may be reproduced and used by the Government
               with the limitation that they will not, without
               written permission of the Grantee, be used for
               purposes of manufacture nor disclosed outside the
               Government.

            -- "This Notice shall be marked on any reproduction of

                            Page 33 of 40

3.22    (Continued)

these data, in whole or in part."

"Limited rights data" means data (other than computer
software) that embody trade secrets, or are commercial or
financial and confidential or privileged, to the extent that
such data pertain to items, components, or processes developed
at private expense, including minor modifications thereof.

"Restricted computer software" means computer software
developed at private expense and that is a trade secret; is
commercial or financial and is confidential or privileged; or
is published copyrighted computer software, including minor
modifications of such computer software.

"Technical data" means data (other than computer software)
which are of a scientific or technical nature.

"Unlimited rights" means the right of the Government to use,
disclose, reproduce, prepare derivative works, distribute
copies to the public, and perform publicly, in any manner and
for any purpose, and to permit others to do so.

(b)  Allocation of Rights

(1)  Except as provided in paragraph (c) of this provision
regarding copyright, the Federal Government shall have
unlimited rights in --

(i)    Data first produced in performance of this Grant;

(ii)   Form, fit and function data delivered under this
Grant;

(iii)  Data delivered under this Grant (except for
restricted computer software) that constitutes
manuals or instructional and training material for
installation, operation or routine maintenance and
repair of items, components, or processes
delivered or furnished for use under this Grant;
and

(iv)   All other data delivered under this Grant unless
provided otherwise for limited rights data or
restricted computer software in accordance with
paragraph (d) of this provision.

(2)  The Grantee shall have the right to --

(i)    Use, release to others, reproduce, distribute, or
publish any data first produced or specifically
used by the Grantee in the performance of this

Page 34 of 40

3.22    (Continued)

Grant;

(ii)    Protect from unauthorized disclosure and use those
data which are limited rights data or restricted
computer software to the extent provided in
paragraph (d) of this provision;

(iii)   Substantiate use of, add or correct limited
rights, restricted rights, or copyright notices;

(iv)    Establish claim to copyright subsisting in data
first produced in the performance of this Grant to
the extent provided in subparagraph (c) of this
provision.

(c) Copyright

(1) Data first produced in the performance of this Grant. The
Grantee may establish, without prior approval of AID,
claim to copyright subsisting in scientific and technical
articles based on or containing data first produced in
the performance of this Grant and published in academic,
technical or professional journals, symposia proceedings
or similar works. The prior express written permission
of AID is required to establish claim to copyright
subsisting in all other data first produced in
performance of this Grant. For computer software and
other data the Grantee grants to the Government, and
others acting on its behalf, a paid-up nonexclusive,
irrevocable worldwide license in such copyrighted data to
reproduce, prepare derivative works and display publicly
by or on behalf of the Government.

(2) Data not first produced in the performance of this Grant.
The Grantee shall not, without prior written permission
of AID incorporate in data delivered under this Grant any
data not first produced in the performance under this
Grant and which contains the copyright notice of 17
U.S.C. 401 or 402, unless the grantee identifies such
data and grants to the Government, or acquires on its
behalf, a license of the same scope as set forth above in
paragraph (c).

(3) Removal of copyright notices. The Government agrees not
to remove any copyright notices placed on data delivered
under this Grant and to include such notice on all
reproductions of such data.

(d) Protection of limited rights data and restricted computer
software

Page 35 of 40

3.22    (Continued)

When data other than that listed in subparagraph (b)(1)(i),
(ii) and (iii) of this provision are specified to be delivered
under this Grant and qualify as either limited rights data or
restricted computer software, if the Grantee desires to
continue protection of such data, the Grantee shall withhold
such data and not furnish them to the Government under this
Grant.  As a condition to this withholding, the Grantee shall
identify the data being withheld and furnish form, fit, and
function data in lieu thereof.

(e) Subagreements

The Grantee has the responsibility to obtain from subgrantees
and those who work in collaboration with the Grantee in
performance of this Grant all data and rights necessary to
fulfill the Grantee's obligations under this Grant.  If a
subgrantee or collaborator refuses to accept terms affording
the Government such rights, the Grantee shall promptly bring
such refusal to the attention of AID and not proceed without
authorization from AID.

(f) Relationship to patents

Nothing contained in this provision shall imply a license to
the Government under any patent or be construed as affecting
the scope of any license or other right granted to the
Government.

Page 36 of 40

ATTACHMENT 4

STANDARDS FOR USAID-FUNDED PUBLICATIONS

The following standards are intended as general guidelines for the
production of USAID-funded publications that fall within the scope of
those requiring USAID (LPA) approval.

The purpose of establishing basic standards is to enable LPA to work in
a cooperative effort with agency bureaus and field missions to produce
informative, professional and cost-effective products that meet the
needs of a designated audience.  The audience and distribution plans
must be clearly defined and justification given that a real need exists
for the proposed publication.

We are fully aware that there will be situations that warrant
exceptions to these standards.  Exceptions will be made by LPA on a
case-by-case basis.

I.   Publications Intended for a U.S. Audience, Including Congress:

     A.   Use of color: Two-color maximum for both cover and text
          (black or blue ink, generally used for text, counts as one
          color).  In the case of publications such as conference
          proceedings, one color is the standard.

     B.   Paper:  For both cover and text, use the most cost-effective
          stock that suits the publication's purpose.  Make every effort
          to use recycled paper.  Do not use heavy stock.

     C.   Photos:  Black-and-white.

     D.   Content:  Emphasize results achieved toward sustainable
          development through USAID programs.  NOTE:  In most cases, LPA
          will ask for a separate textual (ASCII) version of the final
          document for possible posting on USAID's Internet, which at
          present can support text only.

     E.   Design:  Avoid expensive folds/paper cuts, inserts/foldouts,
          die cuts, embossing, foil stamps and other design elements
          that add additional expense.

II.  Reports Required by Congress

     Most reports should be in typewritten, xeroxed format and respond
     specifically to what is required by statute.

III. Use of Metric Units of Measurement

     Unless a waiver is granted, metric units are to be used in
     accordance with Executive Order 12770.  Traditional units may be
     shown in parentheses after metric.

Page 37 of 40

IV.  Use of Agency Logo

The USAID logo (or the name of the agency written out) should be displayed prominently, e.g., on the cover or title page.

V.  Approval Form

LPA is developing a "request-for-approval" form that will be put on the agency-wide computer network as a macro to simplify and streamline the approval process.  Information that will be required is as follows:  type and design/format of publication; justification for its need; clearly defined audience and distribution plans; print run; budget breakdown including costs for photographic services (if a contract photographer is used), writing, editing, design, layout and printing; whether OE or program funds are being used; and plans to evaluate the effectiveness of the product.

STANDARDS FOR USAID-FUNDED VIDEO PRODUCTIONS

The following standards are intended as general guidelines for
USAID-funded video productions that require USAID (LPA) approval.

The purpose of establishing these basic standards is to enable LPA to
work in cooperation with agency bureaus and field missions to produce
informative, professional and cost-effective programs that meet the
needs of the designated audience.  The audience and distribution plans
must be clearly defined. The purpose and production plans must be
justified and must support a real need.

We are aware that USAID video productions generally fall into two
categories--those produced for information/education of U.S. audiences,
and those produced with program funds for largely foreign audiences.
These guidelines will help missions decide which programs warrant video
productions and how these should be produced.

We are also aware that certain situations will justify exceptions to
these standards.  Exceptions will be made by LPA on a case-by-case
basis.

I.   Basic Guidelines

     A.   Content:  Videos intended for U.S. audiences, including
          Congress, should portray concrete results or chronicle a USAID
          success story.  The video should not be a "promo" for a
          contractor or a specialized technical report aimed at a narrow
          audience of experts.  Videos produced with program funds for
          foreign audiences would usually be training tapes or other
          instructional material.  Also, LPA will not approve video
          recordings of conference proceedings that can more
          appropriately be shared as written transcripts or
          audiocassette recordings.

     B.   Format:  The program should be shot in a professional
          television format: BETA, BETA-SP, or 3/4".  Only viewing
          copies should be made in VHS.  Programs may be shot in
          American TV standard (NTSC) or in PAL or SECAM TV standard.

     C.   Producers:  Direct contracts must comply with OFPP Letter No.
          79-4 which establish a "Government-Wide Contracting System for
          Motion Picture and Videotape Productions" (as required by OFPP
          by OFPP letter 79-4.)  The designated production team must
          have a track record producing information/education programs
          or other professional broadcast products.  A brief list of
          previously produced programs should be included.

     D.   Length:  The video should be no more than 15 minutes, unless
          there is a strong justification.

     E.   Copies:  The number should be determined by the bureau/mission
          and reflected in the production budget.  Viewing copies for

Page 39 of 40

HRN-A-00-97-00017                                                      Attachment 4

NGOs, PVOs and local officials should be in VHS. Copies for local TV placement must be in 3/4" or BETA. A copy of the master of the finished program must be sent to the LPA video archive.

II.  Approval Form

To simplify the approval process, LPA is developing a macro for the "request-for-approval" form that will be put on the agency wide computer network. The following information will be required.

A.  A general description of the subject of the video.

B.  The intended audience and a detailed distribution plan.

C.  Whether OE or program funds will be used.

D.  Budget breakdown to include costs for the following items:

- Pre-production: research, script, shooting schedule (where the video will be shot);

- Production: how many shooting days (include travel days), how much per day for the crew plus equipment. Please note: where possible, a local crew should be used; and Editing: how many hours, how much per hour, how much for graphics and titles.

E.  Discussion of plans to evaluate the script and the "rough cut" for the effectiveness of the product.

Note:  All videos produced with USAID funds must be deposited in the LPA video archive. This includes all "source" tapes, plus a copy of the completed master program.

Page 40 of 40

# EXHIBIT B

08/09/2002  13:23    4051406                FAMILY HEALTH INTL                PAGE  02



RECEIVED - FHI

GRANTS

U.S. AGENCY FOR
INTERNATIONAL
DEVELOPMENT

NOV 2 2 2000

Family Health International
Attn: Mr. Robert W. Hughes, Controller
P.O. Box 13950
Research Triangle Park, NC  27713

Subject:        Cooperative Agreement HRN-A-00-97-00017-00
                Prior Approval of Sub-Awards for HIV/AIDS

Dear Mr. Hughes:

This letter is in response to your letter of November 7, 2000, requesting an increase
in the amount in which sub-awards are prior approved.  Your request is to increase
the threshold from $50,000 to $750,000.

Due to the need to provide rapid implementation under the HIV/AIDS initiative, this
letter is providing Agreement Officer prior approval to enter into sub-awards up to
$750,000.  Sub-awards over that amount shall continue to follow the procedures
documented in my letter of December 8, 1997.  This prior approval does not apply to
sub-contracts with Foreign Governmental Organizations.

In keeping with your own policies and procedures, the sub-award file(s) shall, at a
minimum, contain the supporting documentation indicated below.  Retention and
access requirements for records shall be in accordance with 22 CFR 226.53.  These
standards meet the "prior approval" requirement in 22 CFR 226.25(c)(8).

    1.    Name of Sub-awardee
    2.    Sub-award total estimated amount;
    3.    Type of sub-award: Contract, Grant or Cooperative Agreement;
    4.    Period of Performance;
    5.    Country of Performance;
    6.    Document how the sub-award was competed;
    7.    Document how the sub-award was negotiated based on the applicable
          cost principle standard of "reasonable, allowable, and allocable";
    8.    Document the sub-awardee responsibility, as defined in ADS
          E303.5.9a
    9.    Summary of the award.

1300 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C.  20523

PAGE 2

As a further condition of prior approval:

a.   The proposed sub-awardee shall not have direct involvement with USAID or the Agreement Officer.

b.   The proposed sub-awards are to be written in accordance with the standard established in the Standard Provision entitled "Applicability of 22 CFR 226".

c.   The Agreement Officer reserves the right to periodically review the sub-award files.

d.   USAID CTO clearance of sub-awards is required in accordance with the applicable provisions of the Cooperative Agreement;

This prior approval authorization may by rescinded if Family Health International is found to be in non-compliance with the stated conditions.

If you have any further questions regarding this consent, please contact me on 202/712-1039 or by email at matsalinos@usaid.gov.

Sincerely,

Emmanuel E. Atsalinos
Agreement Officer
M/OP/A/HRN
Office of Procurement


cc:  A. Getson, G/PHN/HN/HIV-AIDS

doc: a7017subawardpriorapproval

# EXHIBIT C

## MODIFICATION OF ASSISTANCE

| | | | Page 1 of 19 |
|---|---|---|---|

| 1. MODIFICATION NUMBER | 2. EFFECTIVE DATE OF MODIFICATION | 3. AWARD NUMBER: | 4. EFFECTIVE DATE OF AWARD: |
|---|---|---|---|
| 38 | See block 15 | HRN-A-00-97-00017-00 | 09-26-1997 |

**5. GRANTEE:**
FAMILY HEALTH INTERNATIONAL
P.O. BOX 13950
RESEARCH TRIANGLE PARK, NC  27709

DUNS NO.:  06819088D
TIN NO. :  237143005

**6. ADMINISTERED BY:**
USAID
M/OP/G/PHN
1300 PENNSYLVANIA AVE.,  NW, RM 7.09.141
WASHINGTON,  DC  20523-7900

**7. FISCAL DATA:**    Amount Obligated: $ .00

Budget Fiscal Year:       0
Operating Unit:
Strategic Objective:
Team/Division:
Benefiting Geo Area:
Object Class:

**8. TECHNICAL OFFICE:**
G/PHN/HN/HIV

**9. PAYMENT OFFICE:**
USAID
OFFICE OF FINANCIAL MANAGEMENT
1300 PENNSYLVANIA AVE., NW
WASHINGTON,  DC  20523-7900

**10. FUNDING SUMMARY:**

| | Obligated Amount | Total Est. Amt. |
|---|---|---|
| Amount Prior to this Modification: | | |
| Change Made by this Modification: | [ REDACTED ] | |
| New/Current Total: | [ REDACTED ] | REDACTED ] |

**11. DESCRIPTION OF MODIFICATION:**

The purpose of this modification is for the following:  (1) revise the total estimated
costs and program amount; (2) extend the period of performance from 9/29/2002 to 9/29/2007;
(3) revise the budget; (4) add Geographic Code 935; (5) revise the indirect cost rates;
(6) update the Standard Provisions; and (7) revise the program description.  The TIN
number is also revised as shown above.  The Agreement is modified as follows:

(Continued on the next page)

[ORG ID: 10302/NMS NO.: 2866]

**12. THIS MODIFICATION IS ENTERED INTO PURSUANT TO THE AUTHORITY OF** PAA OF 1961, AS AMMENDED
AS AMENDED. EXCEPT AS SPECIFICALLY HEREIN AMENDED, ALL TERMS AND CONDITIONS OF THE GRANT
REFERENCED IN BLOCK #3 ABOVE, AS IT MAY HAVE HERETOFORE BEEN AMENDED, REMAIN UNCHANGED AND IN FULL
FORCE AND EFFECT.

**13. GRANTEE:** [X] **IS** [ ] **IS NOT REQUIRED TO SIGN THIS DOCUMENT TO RECONFIRM ITS AGREEMENT WITH THE CHANGES EFFECTED HEREIN**

**14. GRANTEE:**

BY: _[signature]_

Robert W. Hughes
(Name Typed or Printed)

TITLE:  Chief Financial Officer

DATE:  January 30, 2002

**15.  THE UNITED STATES OF AMERICA**
U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT

BY: _[signature]_

Emmanuel E. Atsalinos
(Name Typed or Printed)

TITLE:  AGREEMENT OFFICER

DATE:  FEB 1 4 2002

| MODIFICATION FOR ASSISTANCE CONTINUATION PAGES | |
|---|---|
| ASSISTANCE NO.: HRN-A-00-97-00017-00 | MOD NO: 38 |

ACCOUNTING AND APPROPRIATION DATA

A. GENERAL

Delete the amounts shown for items one and two in this section and replace with the following:

1. Total Estimated Amount [ . REDACTED ]
2. Total Program Amount: [ REDACTED ]

ATTACHMENT 1 - SCHEDULE

1.2  PERIOD OF AGREEMENT

Change the completion date from 09/29/2002 to 09/29/2007.

1.3  AMOUNT OF AWARD AND PAYMENT

(a)  Delete the total estimated cost of [ REDACTED ] and replace with [ REDACTED ]

1.4  BUDGET

Delete the budget and replace with the budget provided in Attachment 1 of this modification. Note: This modification does not constitute approval of vehicles. Vehicle purchases shall have prior approval by the Agreement Officer in accordance with 22 CFR 226 and CIB 01-04.

1.9 AUTHORIZED GEOGRAPHIC CODE

Add authorization for code "935". The agreementor must comply with CIB 01-04, Expedited Acquisition and Assistance Procedures for HIV/AIDS and Infectious Disease Initiatives found at http://www.usaid.gov/procurement_bus_opp/procurement/cib to use this authorization code.



## 1.10  INDIRECT COSTS

Delete the rates in this section and replace with the following indirect cost rate table below:

REDACTED

UPDATED STANDARD PROVISIONS

**Delete 3.8 OMB APPROVAL UNDER THE PAPERWORK REDUCTION ACT (April 1992) and replace with the following:**

OMB APPROVAL UNDER THE PAPERWORK REDUCTION ACT (April 1998)

Information collection requirements imposed by this grant are covered by OMB approval number 0412-0510; the current expiration date is 11/30/2000. Identification of the Standard Provision containing the requirement and an estimate of the public reporting burden (including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information) are set forth below.

| Standard Provision | Burden Estimate |
|---|---|
| Air Travel and Transportation | 1 (hour) |
| Ocean Shipment of Goods | .5 |

| | | |
|---|---|---|
| Patent Rights | | .5 |
| Publications | | .5 |
| Negotiated Indirect Cost Rates - | | 1 |
| (Predetermined and Provisional) | | |
| Voluntary Population Planning | | .5 |
| Protection of the Individual as a | | 1 |
| Research Subject | | |

| | | |
|---|---|---|
| 22 CFR 226 | | Burden Estimate |
| 22 CFR 226.40-.49 | 1 | |
| Procurement of Goods and Services | | |
| 22 CFR 226.30 - .36 | | 1.5 |
| Property Standards | | |

Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Procurement, Policy Division (M/OP/P) U.S. Agency for International Development, Washington, DC 20523-7801 and to the Office of Management and Budget, Paperwork Reduction Project (0412-0510), Washington, DC 20503.

### 3.9 Delete the INTERNATIONAL AIR TRAVEL AND TRANSPORTATION (DEC 1995) and replace with the following:

INTERNATIONAL AIR TRAVEL AND TRANSPORTATION (JUNE 1999)

(This provision is applicable when costs for international travel or transportation will be paid for with USAID funds. This provision is not applicable if the recipient is providing for travel with private funds as part of a cost-sharing requirement, or with Program Income generated under the award.)

(a) PRIOR BUDGET APPROVAL

In accordance with OMB Cost Principles, direct charges for foreign travel costs are allowable only when each foreign trip has received prior budget approval. Such approval will be deemed to have been met when:

(1) the trip is identified. Identification is accomplished by providing the following information: the number of trips, the number of individuals per trip, and the destination country(s).

(2) the information noted at (a)(1) above is incorporated in: the proposal, the program description or schedule of the award, the implementation plan (initial or revisions), or amendments to the award; and

(3) the costs related to the travel are incorporated in the approved budget of the award.

The Agreement Officer may approve travel which has not been incorporated in writing as required by paragraph (a)(2). In such case, a copy of the Agreement Officer's approval must be included in the agreement file.

(b) NOTIFICATION

(1) As long as prior budget approval has been met in accordance with paragraph (a) above, a separate Notification will not be necessary unless:

(i) the primary purpose of the trip is to work with USAID Mission personnel, or

(ii) the recipient expects significant administrative or substantive programmatic support from the Mission.

Neither the USAID Mission nor the Embassy will require Country Clearance of employees or contractors of USAID Recipients.

(2) Where notification is required in accordance with paragraph (1)(i) or (ii) above, the recipient will observe the following standards:

(i) Send a written notice to the cognizant USAID Technical Office in the Mission. If the recipient's primary point of contact is a Technical Officer in USAID/W, the recipient may send the notice to that person. It will be the responsibility of the USAID/W Technical Officer to forward the notice to the field.

(ii) The notice should be sent as far in advance as possible, but at least 14 calendar days in advance of the proposed travel. This notice may be sent by fax or e-mail. The recipient should retain proof that notification was made.

(iii) The notification shall contain the following information: the award number, the cognizant Technical Officer, the traveler's name (if known), date of arrival, and the purpose of the trip.

(iv) The USAID Mission will respond only if travel has been denied. It will be the responsibility of the Technical Officer in the Mission to contact the recipient within 5 working days of having received the notice if the travel is denied. If the recipient has not received a response within the time frame, the recipient will be considered to have met these standards for notification, and may travel.

(v) If a subrecipient is required to issue a Notification, as per this section, the subrecipient may contact the USAID Technical Officer directly, or the prime may contact USAID on the subrecipient's behalf.

(c) SECURITY ISSUES

Recipients are encouraged to obtain the latest Department of State Travel Advisory Notices before travelling. These Notices are available to the general public and may be obtained directly from the State Department, or via Internet.

Where security is a concern in a specific region, recipients may choose to notify the US Embassy of their presence when they have entered the country. This may be especially important for long-term posting.

(d) USE OF U.S.-OWNED LOCAL CURRENCY

Travel to certain countries shall, at USAID's option, be funded from U.S.-owned local currency. When USAID intends to exercise this option, USAID will either issue a U.S. Government S.F. 1169, Transportation Request (GTR) which the grantee may exchange for tickets, or issue the tickets directly. Use of such U.S.-owned currencies will constitute a dollar charge to this grant.

(e) THE FLY AMERICA ACT

The Fly America Act (49 U.S.C. 40118) requires that all air travel and shipments under this award must be made on U.S. flag air carriers to the extent service by such carriers is available. The Administrator of General Services Administration (GSA) is authorized to issue regulations for purposes of implementation. Those regulations may be found at 41 CFR part 301, and are hereby incorporated by reference into this award.

(f)    COST PRINCIPLES

The recipient will be reimbursed for travel and the reasonable cost of subsistence, post differentials and other allowances [1] paid to employees in international travel status in accordance with the recipient's applicable cost principles and established policies and practices which are uniformly applied to federally financed and other activities of the grantee.

If the recipient does not have written established policies regarding travel costs, the standard for determining the reasonableness of reimbursement for overseas allowance will be the Standardized Regulations (Government Civilians, Foreign Areas), published by the U.S. Department of State, as from time to time amended. The most current subsistence, post differentials, and other allowances may be obtained from the Agreement Officer.

(g) SUBAWARDS
This provision will be included in all subawards and contracts which require international air travel and transportation under this award.

**3.10 Delete the OCEAN SHIPMENT OF GOODS (Aug 1992) and replace with the following:**

OCEAN SHIPMENT OF GOODS (JUNE 1999)

(This provision is applicable for awards and subawards for $100,000 or more and when goods purchased with funds provided under this award are transported to cooperating countries on ocean vessels whether or not award funds are used for the transportation.)

(a) At least 50% of the gross tonnage of all goods purchased under this agreement and transported to the cooperating countries shall be made on privately owned U.S. flag commercial ocean vessels, to the extent such vessels are available at fair and reasonable rates for such vessels.

(b) At least 50% of the gross freight revenue generated by shipments of goods purchased under this agreement and transported to the cooperating countries on dry cargo liners shall be paid to or for the benefit of privately owned U.S. flag commercial ocean vessels to the extent such vessels are available at fair and reasonable rates for such vessels.

(c) When U.S. flag vessels are not available, or their use would result in a significant delay, the grantee may request a determination of non-availability from the USAID Transportation Division, Office of Procurement, Washington, D.C. 20523, giving the basis for the request which will relieve the grantee of the requirement to use U.S. flag vessels for the amount of tonnage included in the determination. Shipments made on non-free world ocean vessels are not reimbursable under this grant.

(d)    The recipient shall send a copy of each ocean bill of lading, stating all of the carrier's charges including the basis for calculation such as weight or cubic measurement, covering a shipment under this agreement to:

    U.S. Department of Transportation, Maritime Administration, Division of National Cargo, 400 7th Street, S.W., Washington, DC 20590, and

    U.S. Agency for International Development,
    Office of Procurement, Transportation Division
    1300 Pennsylvania Avenue, N.W.
    Washington, DC 20523-7900

---

(a)   Shipments by voluntary nonprofit relief agencies (i.e., PVOs) shall be governed by this standard provision and by USAID Regulation 2, "Overseas Shipments of Supplies by Voluntary Nonprofit Relief Agencies" (22 CFR Part 202).

(f)        Shipments financed under this grant must meet applicable eligibility requirements set out in 22 CFR 228.21.


**Delete 3.11 USAID ELIGIBILITY RULES FOR GOODS AND SERVICES (March 1997) and replace with the following:**

USAID ELIGIBILITY RULES FOR GOODS AND SERVICES (April 1998)

(This provision is not applicable to goods or services which the recipient provides with private funds as part of a cost-sharing requirement, or with Program Income generated under the award.)

(a)      Ineligible and Restricted Goods and Services: USAID's policy on ineligible and restricted goods and services is contained in ADS Chapter 312.

   (1)      Ineligible Goods and Services. Under no circumstances shall the recipient procure any of the following under this award:

   (i)      Military equipment,
   (ii)     Surveillance equipment,
   (iii)    Commodities and services for support of police or other law enforcement activities,
   (iv)     Abortion equipment and services,
   (v)      Luxury goods and gambling equipment, or
   (vi)     Weather modification equipment.

   (2)      Ineligible Suppliers. Funds provided under this award shall not be used to procure any goods or services furnished by any firms or individuals whose name appears on the "Lists of Parties Excluded from Federal Procurement and Nonprocurement Programs." USAID will provide the recipient with a copy of these lists upon request.

   (3)      Restricted Goods. The recipient shall not procure any of the following goods and services without the prior approval of the Agreement Officer:

   (i)      Agricultural commodities,
   (ii)     Motor vehicles,
   (iii)    Pharmaceuticals,
   (iv)     Pesticides,
   (v)      Used equipment,
   (vi)     U.S. Government-owned excess property, or
   (vii)    Fertilizer.

Prior approval will be deemed to have been met when:

   (i) the item is of US source/origin;

   (ii) the item has been identified and incorporated in the program description or schedule of the award (initial or revisions), or amendments to the award; and

   (iii) the costs related to the item are incorporated in the approved budget of the award.

Where the item has not been incorporated into the award as described above, a separate written authorization from the Agreement Officer must be provided before the item is procured.

(b)    Source and Nationality: The eligibility rules for goods and services based on source and nationality are divided into two categories. One applies when the total procurement element during the life of the award is over $250,000, and the other applies when the total procurement element during the life of the award is not over $250,000, or the award is funded under the Development Fund for Africa (DFA) regardless of the amount. The total procurement element includes procurement of all goods (e.g., equipment, materials, supplies) and services. Guidance on the eligibility of specific goods or services may be obtained from the Agreement Officer. USAID policies and definitions on source, origin and nationality are contained in 22 CFR Part 228, Rules on Source, Origin and Nationality for Commodities and Services Financed by the Agency for International Development, which is incorporated into this Award in its entirety.

(1)    For DFA funded awards or when the total procurement element during the life of this award is valued at $250,000 or less, the following rules apply:

(i)    The authorized source for procurement of all goods and services to be reimbursed under the award is USAID Geographic Code 935, "Special Free World," and such goods and services must meet the source, origin and nationality requirements set forth in 22 CFR Part 228 in accordance with the following order of preference:

(A)    The United States (USAID Geographic Code 000),
(B)    The Cooperating Country,
(C)    USAID Geographic Code 941, and
(D)    USAID Geographic Code 935.

(ii)    Application of order of preference: When the recipient procures goods and services from other than U.S. sources, under the order of preference in paragraph (b)(1)(i) above, the recipient shall document its files to justify each such instance. The documentation shall set forth the circumstances surrounding the procurement and shall be based on one or more of the following reasons, which will be set forth in the grantee's documentation:

(A)    The procurement was of an emergency nature, which would not allow for the delay attendant to soliciting U.S. sources,

(B)    The price differential for procurement from U.S. sources exceeded by 50% or more the delivered price from the non-U.S. source,

(C)    Compelling local political considerations precluded consideration of U.S. sources,

(D)    The goods or services were not available from U.S. sources, or

(E)    Procurement of locally available goods and services, as opposed to procurement of U.S. goods and services, would best promote the objectives of the Foreign Assistance program under the award.

(2)    When the total procurement element exceeds $250,000 (unless funded by DFA), the following applies: Except as may be specifically approved or directed in advance by the Agreement Officer, all goods and services financed with U.S. dollars, which will be reimbursed under this award must meet the source, origin and nationality requirements set forth in 22 CFR Part 228 for the authorized geographic code specified in the schedule of this award. If none is specified, the authorized source is Code 000, the United States.

(c)    Printed or Audio-Visual Teaching Materials: If the effective use of printed or audio-visual teaching materials depends upon their being in the local language and if such materials are intended for technical assistance projects or activities financed by USAID in whole or in part and if other funds including U.S.-owned or U.S.-controlled local

currencies are not readily available to finance the procurement of such materials, local language versions may be procured from the following sources, in order of preference:

       (1)    The United States (USAID Geographic Code 000),
       (2)    The Cooperating Country,
       (3)    "Selected Free World" countries (USAID Geographic Code 941), and
       (4)    "Special Free World" countries (USAID Geographic Code 899).

(d) If USAID determines that the recipient has procured any of these goods or services under this award contrary to the requirements of this provision, and has received payment for such purposes, the Agreement Officer may require the recipient to refund the entire amount of the purchase.

This provision must be included in all subagreements which include procurement of goods or services which total over $5,000.

**Delete 3.12 SUBAGREEMENTS (Feb 1995) and replace with the following:**

SUBAGREEMENTS (June 1999)

Subrecipients, subawardees, and contractors have no relationship with USAID under the terms of this agreement. All required USAID approvals must be directed through the recipient to USAID.

### 3.14 Delete the PUBLICATIONS (AUGUST 1992) provision and replace with the following:

PUBLICATIONS AND MEDIA RELEASES (JUNE 1999)

   (a) USAID shall be prominently acknowledged in all publications, videos or other information/media products funded or partially funded through this award, and the product shall state that the views expressed by the author(s) do not necessarily reflect those of USAID. Acknowledgements should identify the sponsoring USAID Office and Bureau or Mission as well as the U.S. Agency for International Development substantially as follows:

   "This [publication, video or other information/media product (specify)] was made possible through support provided by the Global Bureau of Health/HIV-AIDS, U.S. Agency for International Development, under the terms of Award No. HRN-A-00-97-00017-00. The opinions expressed herein are those of the author(s) and do not necessarily reflect the views of the U.S. Agency for International Development."

   (b) Unless the recipient is instructed otherwise by the Cognizant Technical Officer, publications, videos or other information/media products funded under this award and intended for general readership or other general use will be marked with the USAID logo and/or U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT appearing either at the top or at the bottom of the front cover or, if more suitable, on the first inside title page for printed products, and in equivalent appropriate location in videos or other information/media products. Logos and markings of co-sponsors or authorizing institutions should be similarly located and of similar size and appearance.

   (c) The recipient shall provide the USAID Cognizant Technical Officer one copy of all published works developed under the award with lists of other written work produced under the award. In addition, the recipient shall submit one electronic or one hard copy of final documents (electronic copies are preferred) to PPC/CDIE/DIO at the following address:

USAID Development Experience Clearinghouse (DEC)



ATTN: Document Acquisitions
1611 Kent Street, Suite 200
Arlington, VA 22209-2111
Internet e-mail address: docsubmit@dec.cdie.org
Homepage: http://www.dec.org

Attachments should consist of only one electronic file that comprises the complete and final equivalent of the paper copy; otherwise, a hard copy should be sent. Acceptable software formats for electronic documents include Microsoft Word, WordPerfect, Microsoft Excel and Portable Document Format (PDF). Each document submitted to PPC/CDIE/DIO should include the following information: 1) descriptive title; 2) author(s) name; 3) award number; 4) sponsoring USAID office; 5) date of publication; 6) software name and version (if electronic document is sent).

(d) In the event award funds are used to underwrite the cost of publishing, in lieu of the publisher assuming this cost as is the normal practice, any profits or royalties up to the amount of such cost shall be credited to the award unless the schedule of the award has identified the profits or royalties as program income.

(e) Except as otherwise provided in the terms and conditions of the award, the author or the recipient is free to copyright any books, publications, or other copyrightable materials developed in the course of or under this award, but USAID reserves a royalty-free nonexclusive and irrevocable right to reproduce, publish, or otherwise use, and to authorize others to use the work for Government purposes.

Supplement:

- In each annual workplan, the recipient must list all publications and videos, and their expected publication date, planned with USAID's HIV/AIDS funding during the workplan year;
- Upon request, the recipient must provide a draft document for review of GBH/HIV prior to publication;
- Every publication produced with USAID's HIV/AIDS funds must submit a hard copy and .pdf file to The Synergy Project for inclusion in their resource center.

### Delete 3.15 NEGOTIATED INDIRECT COST RATES – PROVISIONAL (AUG 1992) and 3.16 NEGOTIATED INDIRECT COST RATES - PROVISIONAL (Aug 1992)

NEGOTIATED INDIRECT COST RATES - PROVISIONAL (Nonprofit) (April 1998)

(This provision is applicable to any nonprofit organizations whose indirect cost rates under this award are on a provisional basis.)

(a)      Provisional indirect cost rates shall be established for each of the recipient's accounting periods during the term of this award. Pending establishment of revised provisional or final rates, allowable indirect costs shall be reimbursed at the rates, on the bases, and for the periods shown in the schedule of the award.

(b)      Within the earlier of 30 days after receipt of the A-133 audit report or nine months after the end of the audit period, the recipient shall submit to the cognizant agency for audit the required OMB Circular A-133 audit report, proposed final indirect cost rates, and supporting cost data. If USAID is the cognizant agency or no cognizant agency has been designated, the recipient shall submit four copies of the audit report, along with the proposed final indirect cost rates and supporting cost data, to the Overhead, Special Costs, and Closeout Branch, Office or Procurement, USAID, Washington, DC 20523-7802. The proposed rates shall be based on the recipient's actual cost experience during that fiscal year. Negotiations of final indirect cost rates shall begin soon after receipt of the recipient's proposal.

(c)    Allowability of costs and acceptability of cost allocation methods shall be determined in accordance with the applicable cost principles.

(d)    The results of each negotiation shall be set forth in a written indirect cost rate agreement signed by both parties. Such agreement is automatically incorporated into this award and shall specify (1) the agreed upon final rates, (2) the bases to which the rates apply, (3) the fiscal year for which the rates apply, and (4) the items treated as direct costs. The agreement shall not change any monetary ceiling, award obligation, or specific cost allowance or disallowance provided for in this award.

(e)    Pending establishment of final indirect cost rate(s) for any fiscal year, the recipient shall be reimbursed either at negotiated provisional rates or at billing rates acceptable to the Agreement Officer, subject to appropriate adjustment when the final rates for the fiscal year are established. To prevent substantial overpayment or underpayment, the provisional or billing rates may be prospectively or retroactively revised by mutual agreement.

(f)    Failure by the parties to agree on final rates is a 22 CFR 226.90 dispute.

## 3.17 Delete VOLUNTARY POPULATION ACTIVITIES CLAUSE and replace with the following:

VOLUNTARY POPULATION PLANNING (JUNE 1999)

(a)  Voluntary Participation and Family Planning Methods:

    (1) The recipient agrees to take any steps necessary to ensure that funds made available under this award will not be used to coerce any individual to practice methods of family planning inconsistent with such individual's moral, philosophical, or religious beliefs. Further, the recipient agrees to conduct its activities in a manner which safeguards the rights, health and welfare of all individuals who take part in the program.

    (2) Activities which provide family planning services or information to individuals, financed in whole or in part under this agreement, shall provide a broad range of family planning methods and services available in the country in which the activity is conducted or shall provide information to such individuals regarding where such methods and services may be obtained.

(b) Requirements for Voluntary Family Planning Projects A Family planning project must comply with the requirements of this paragraph.

    (1) A project is a discrete activity through which a governmental or nongovernmental organization provides family planning services to people and for which Development Assistance funds, or goods or services financed with such funds, are provided under this award, except funds solely for the participation of personnel in short-term, widely attended training conferences or programs.

    (2) Service providers and referral agents in the project shall not implement or be subject to quotas or other numerical targets of total number of births, number of family planning acceptors, or acceptors of a particular method of family planning. Quantitative estimates or indicators of the number of births, acceptors, and acceptors of a particular method that are used for the purpose of budgeting, planning, or reporting with respect to the project are not quotas or targets under this paragraph, unless service providers or referral agents in the project are required to achieve the estimates or indicators.
    (3) The project shall not include the payment of incentives, bribes, gratuities or financial rewards to (i) any individual in exchange for becoming a family planning acceptor or (ii) any personnel performing functions under the project for achieving a numerical quota or target of total number of births, number of family planning acceptors, or acceptors of a particular method of contraception. This restriction applies to salaries or payments paid or made to personnel performing functions under the project if the amount of the salary or payment increases or decreases based

on a predetermined number of births, number of family planning acceptors, or number of acceptors of a particular method of contraception that the personnel affect or achieve.

(4) No person shall be denied any right or benefit, including the right of access to participate in any program of general welfare or health care, based on the person's decision not to accept family planning services offered by the project.

(5) The project shall provide family planning acceptors comprehensible information about the health benefits and risks of the methods chosen, including those conditions that might render the use of the method inadvisable and those adverse side effects known to be consequent to the use of the method. This requirement may be satisfied by providing information in accordance with the medical practices and standards and health conditions in the country where the project is conducted through counseling, brochures, posters, or package inserts.

(6) The project shall ensure that experimental contraceptive drugs and devices and medical procedures are provided only in the context of a scientific study in which participants are advised of potential risks and benefits.

(7) With respect to projects for which USAID provides, or finances the contribution of, contraceptive commodities or technical services and for which there is no subaward or contract under paragraph (e) of this clause, the organization implementing a project for which such assistance is provided shall agree that the project will comply with the requirements of this paragraph while using such commodities or receiving such services.

(i) The recipient shall notify USAID when it learns about an alleged violation in a project of the requirements of subparagraphs (3), (4), (5) or (7) of this paragraph;

(ii) the recipient shall investigate and take appropriate corrective action, if necessary, when it learns about an alleged violation in a project of subparagraph (6) of this paragraph and shall notify USAID about violations in a project affecting a number of people over a period of time that indicate there is a systemic problem in the project.

(iii) The recipient shall provide USAID such additional information about violations as USAID may request.

(c) Additional Requirements for Voluntary Sterilization Programs

(1) None of the funds made available under this award shall be used to pay for the performance of involuntary sterilization as a method of family planning or to coerce or provide any financial incentive to any individual to practice sterilization.

(2) The recipient shall ensure that any surgical sterilization procedures supported in whole or in part by funds from this award are performed only after the individual has voluntarily appeared at the treatment facility and has given informed consent to the sterilization procedure. Informed consent means the voluntary, knowing assent from the individual after being advised of the surgical procedures to be followed, the attendant discomforts and risks, the benefits to be expected, the availability of alternative methods of family planning, the purpose of the operation and its irreversibility, and the option to withdraw consent anytime prior to the operation. An individual's consent is considered voluntary if it is based upon the exercise of free choice and is not obtained by any special inducement or any element of force, fraud, deceit, duress, or other forms of coercion or misrepresentation.

(3) Further, the recipient shall document the patient's informed consent by (i) a written consent document in a language the patient understands and speaks, which explains the basic elements of informed consent, as set out above, and which is signed by the individual and by the attending physician or by the authorized assistant of the attending physician; or (ii) when a patient is unable to read adequately a written certification by the attending physician or by the authorized assistant of the attending physician that the basic elements of informed consent above were orally presented to the patient, and that the patient thereafter consented to the performance of the operation. The receipt of this oral explanation shall be acknowledged by the patient's mark on the certification and by the signature or mark of a witness who shall speak the same language as the patient.

(4) The recipient must retain copies of informed consent forms and certification documents for each voluntary sterilization procedure must be retained by the recipient for a period of three years after performance of the sterilization procedure.

(d) Prohibition on Abortion-Related Activities:

(1) No funds made available under this award will be used to finance, support, or be attributed to the following activities:

(i) procurement or distribution of equipment intended to be used for the purpose of inducing abortions as a method of family planning;
(ii) special fees or incentives to women to coerce or motivate them to have abortions;
(iii) payments to persons to perform abortions or to solicit persons to undergo abortions;
(iv) information, education, training, or communication programs that seek to promote abortion as a method of family planning; and
(v) lobbying for abortion.

(2) No funds made available under this award will be used to pay for any biomedical research which relates, in whole or in part, to methods of, or the performance of, abortions or involuntary sterilizations as a means of family planning. Epidemiologic or descriptive research to assess the incidence, extent or consequences of abortions is not precluded.

(e) Ineligibility of Foreign Nongovernmental Organizations that Perform or Actively Promote Abortion As a Method of Family Planning

(1) The recipient agrees that it will not furnish assistance for family planning under this award to any foreign nongovernmental organization which performs or actively promotes abortion as a method of family planning in USAID-recipient countries or which provides financial support to any other foreign nongovernmental organization that conducts such activities. For purposes of this paragraph (e), a foreign nongovernmental organization is a nongovernmental organization that is not organized under the laws of any State of the United States, the District of Columbia or the Commonwealth of Puerto Rico.

(2) Prior to furnishing funds provided under this award to another nongovernmental organization organized under the laws of any State of the United States, the District of Columbia, or the Commonwealth of Puerto Rico, the recipient shall obtain the written agreement of such organization that the organization shall not furnish assistance for family planning under this award to any foreign nongovernmental organization except under the conditions and requirements that are applicable to the recipient as set forth in this paragraph (e).

(3) The recipient may not furnish assistance for family planning under this award to a foreign nongovernmental organization (the subrecipient) unless: (i) the subrecipient certifies in writing that it does not perform or actively promote abortion as a method of family planning in USAID-recipient countries and does not provide financial support to any other foreign nongovernmental organization that conducts such activities; and (ii) the recipient obtains the written agreement of the subrecipient containing the undertakings described in subparagraph (4) below.
(4) Prior to furnishing assistance for family planning under this award to a subrecipient, the subrecipient must agree in writing that: (i) The subrecipient will not, while receiving assistance under this award, perform or actively promote abortion as a method of family planning in USAID-recipient countries or provide financial support to other foreign nongovernmental organizations that conduct such activities. (ii) The recipient and authorized representatives of USAID may, at any reasonable time, (A) inspect the documents and materials maintained or prepared by the subrecipient in the usual course of its operations that describe the family planning activities of the subrecipient, including reports, brochures and service statistics; (B) observe the family planning activity conducted by the subrecipient; (C) consult with family planning personnel of the subrecipient; and (D) obtain a copy of the audited financial statement or report of the subrecipient, if there is one. (iii) In the event that the recipient or USAID has

reasonable cause to believe that a subrecipient may have violated its undertaking not to perform or actively promote abortion as a method of family planning, the recipient shall review the family planning program of the subrecipient to determine whether a violation of the undertaking has occurred. The subrecipient shall make available to the recipient such books and records and other information as may be reasonably requested in order to conduct the review. USAID may also review the family planning program of the subrecipient under these circumstances, and USAID shall have access to such books and records and information for inspection upon request. (iv) The subrecipient shall refund to the recipient the entire amount of assistance for family planning furnished to the subrecipient under this award in the event it is determined that the certification provided by the subrecipient under subparagraph (3), above, is false. (v) Assistance for family planning provided to the subrecipient under this award shall be terminated if the subrecipient violates any undertaking in the agreement required by subparagraphs (3) and (4), and the subrecipient shall refund to the recipient the value of any assistance furnished under this award that is used to perform or actively promote abortion as a method of family planning. (vi) The subrecipient may furnish assistance for family planning under this award to another foreign nongovernmental organization (the sub-subrecipient) only if (A) the sub-subrecipient certifies in writing that it does not perform or actively promote abortion as a method of family planning in USAID-recipient countries and does not provide financial support to any other foreign nongovernmental organization that conducts such activities and (B) the subrecipient obtains the written agreement of the sub-subrecipient that contains the same undertakings and obligations to the subrecipient as those provided by the subrecipient to the recipient as described in subparagraphs (4)(i) – (v)above.

(5) Agreements with subrecipients and sub-subrecipients required under subparagraphs (3) and (4) shall contain the definitions set forth in subparagraph (10) of this paragraph (e).

(6) The recipient shall be liable to USAID for are fund for a violation of any requirement of this paragraph (e) only if (i) the recipient knowingly furnishes assistance for family planning to a subrecipient who performs or actively promotes abortion as a method of family planning, or (ii) the certification provided by a subrecipient is false and the recipient failed to make reasonable efforts to verify the validity of the certification prior to furnishing assistance to the subrecipient, or (iii) the recipient knows or has reason to know, by virtue of the monitoring which the recipient is required to perform under the terms of this award, that a subrecipient has violated any ofthe undertakings required under subparagraph (4) and the recipient fails to terminate assistance for family planning to the subrecipient, or fails to require the subrecipient to terminate assistance to a sub-subrecipient which violates any undertaking of the agreement required under subparagraph 4(vi), above.   If the recipient finds, in exercising its monitoring responsibility under this award, that a subrecipient or sub-subrecipient receives frequent requests for the information described in subparagraph (10)(iii)(A)(II), below, the recipient shall verify that this information is being provided properly in accordance with subparagraph 10(iii)(A)(II) and shall describe to USAID the reasons for reaching its conclusion.

(7) In submitting a request to USAID for approval of a recipient's decision to furnish assistance for family planning to a subrecipient, the recipient shall include a description of the efforts made by the recipient to verify the validity of the certification provided by the subrecipient. USAID may request the recipient to make additional efforts to verify the validity of the certification. USAID will inform the recipient in writing when USAID is satisfied that reasonable efforts have been made. If USAID concludes that these efforts are reasonable within the meaning of subparagraph (6) above, the recipient shall not be liable to USAID for a refund in the event the subrecipient's certification is false unless the recipient knew the certification to be false or misrepresented to USAID the efforts made by the recipient to verify the validity of the certification.

(8) It is understood that USAID may make independent inquiries, in the community served by a subrecipient or sub-subrecipient, regarding whether it performs or actively promotes abortion as a method of family planning.

(9) A subrecipient must provide the certification required under subparagraph (3) and a sub-subrecipient must provide the certification required under subparagraph (4)(vi) each time a new agreement is executed with the subrecipient or sub-subrecipient in furnishing assistance for family planning under the award.


(10)The following definitions apply for purposes of this paragraph (e): (i) Abortion is a method of family planning when it is for the purpose of spacing births. This includes, but is not limited to, abortions performed for the physical or mental health of the mother but does not include abortions performed if the life of the mother would be endangered if the fetus were carried to term or abortions performed following rape or incest (since abortion under these circumstances is not a family planning act). (ii) To perform abortions means to operate a facility where abortions are performed as a method of family planning. Excluded from this definition are clinics or hospitals that do not include abortion in their family planning programs. Also excluded from this definition is the treatment of injuries or illnesses caused by legal or illegal abortions, for example, post-abortion care. (iii) To actively promote abortion means for an organization to commit resources, financial or other, in a substantial or continuing effort to increase the availability or use of abortion as a method of family planning. (A) This includes, but is not limited to, the following; (I) Operating a family planning counseling service that includes, as part of the regular program, providing advice and information regarding the benefits and availability of abortion as a method of family planning; (II) Providing advice that abortion is an available option in the event other methods of family planning are not used or are not successful or encouraging women to consider abortion (passively responding to a question regarding where a safe, legal abortion may be obtained is not considered active promotion if the question is specifically asked by a woman who is already pregnant, the woman clearly states that she has already decided to have a legal abortion, and the family planning counselor reasonably believes that the ethics of the medical profession in the country requires a response regarding where it may be obtained safely); (III) Lobbying a foreign government to legalize or make available abortion as a method of family planning or lobbying such a government to continue the legality of abortion as a method of family planning; and (IV) Conducting a public information campaign in USAID-recipient countries regarding the benefits and/or availability of abortion as a method of family planning. (B) Excluded from the definition of active promotion of abortion as a method of family planning are referrals for abortion as a result of rape, incest or if the life of the mother would be endangered if the fetus were carried to term. Also excluded from this definition is the treatment of injuries or illnesses caused by legal or illegal abortions, for example, post-abortion care. (C) Action by an individual acting in the individual's capacity shall not be attributed to an organization with which the individual is associated, provided that the organization neither endorses nor provides financial support for the action and takes reasonable steps to ensure that the individual does not improperly represent that the individual is acting on behalf of the organization. (iv) To furnish assistance for family planning to a foreign nongovernmental organization means to provide financial support under this award to the family planning program of the organization, and includes the transfer of funds made available under this award or goods or services financed with such funds, but does not include the purchase of goods or services from an organization or the participation of an individual in the general training programs of the recipient, subrecipient or sub- subrecipient. (v) To control an organization means the possession of the power to direct or cause the direction of the management and policies of an organization.

(11)In determining whether a foreign nongovernmental organization is eligible to be a subrecipient or sub-subrecipient of assistance for family planning under this award, the action of separate nongovernmental organizations shall not be imputed to the subrecipient or sub-subrecipient, unless, in the judgment of USAID, a separate nongovernmental organization is being used as a sham to avoid the restrictions of this paragraph (e). Separate nongovernmental organizations are those that have distinct legal existence in accordance with the laws of the countries in which they are organized. Foreign organizations that are separately organized shall not be considered separate, however, if one is controlled by the other. The recipient may request USAID's approval to treat as separate the family planning activities of two or more organizations, which would not be considered separate under the preceding sentence, if the recipient believes, and provides a written justification to USAID therefor, that the family planning activities of the organizations are sufficiently distinct as to warrant not imputing the activity of one to the other.

(12) Assistance for family planning may be furnished under this award by a recipient, subrecipient or sub-subrecipient to a foreign government even though the government includes abortion in its family planning program, provided that no assistance may be furnished insupport of the abortion activity of the government and any funds transferred to the government shall be placed in a segregated account to ensure that such funds may not be used to support the abortion activity of the government.

(13) The requirements of this paragraph are not applicable to child spacing assistance furnished to a foreign nongovernmental organization which is engaged primarily in providing health services if the objective of the assistance is to finance integrated health care services to mothers and children and child spacing is one of several health care services being provided by the organization as part of a larger child survival effort with the objective of reducing infant and child mortality.

(f) The recipient shall insert paragraphs (a), (b), (c),(d) and (f) of this provision in all subsequent subagreements and contracts involving family planning or population activities which will be supported in whole or in part from funds under this award. Paragraph (e) shall be inserted in subagreements and sub-subagreements in accordance with the terms of paragraph (e). The term subagreement means subgrants and subcooperative agreements.

(g) Exceptions

The paragraphs set forth in section (e) above may be omitted from the Standard Provision in the situations described below:

(1) While the paragraphs are to be used in grants and cooperative agreements (and assistance subagreements) that provide financing for family planning activity or activities, if family planning is a component of an activity involving assistance or other purposes, such as food and nutrition, health for education, paragraph (e), "Ineligibility of Foreign Nongovernmental Organizations that Perform or Actively Promote Abortion as a Method of Family Planning," applies only to the family planning component.

(2) When health or child survival funds are used to provide assistance for child spacing as well as health purposes, these paragraphs are applicable to such assistance unless: (a) the foreign nongovernmental organization is one that primarily provides health services; (b) the objective of the assistance is to finance integrated health care services to mothers and children; and (c) child spacing is one of several health care services being provided as part of a larger child survival effort with the objective of reducing infant and child mortality. These paragraphs need not be included in the assistance agreement if it indicates that assistance for child spacing will be provided only in this way. USAID support under these circumstances is considered a contribution to a health service delivery program and not to a family planning program. In such a case, these paragraphs need not be included in an assistance agreement.

(3) These paragraphs need not be included in assistance agreements with United States nongovernmental organizations for family planning purposes if implementation of the activity does not involve assistance to foreign nongovernmental organizations.

ADDITIONAL STANDARD PROVISIONS

Add the following standard provisions:

3.23  APPLICABILITY OF 22 CFR PART 226  (April 1998)

(a)  All provisions of 22 CFR Part 226 and all Standard Provisions attached to this agreement are applicable to the recipient and to subrecipients which meet the definition of "Recipient" in Part 226, unless a section specifically excludes a subrecipient from coverage. The recipient shall assure that subrecipients have copies of all the attached standard provisions.

(b)  For any subawards made with entities which fall outside of the definition of "Recipient" (such as Non-US organizations) the Recipient shall include the applicable "Standard Provisions for Non-US Nongovernmental Grantees" except for the "Accounting, Audit and Records" Standard Provision. Recipients are required to ensure compliance with subrecipient monitoring procedures in accordance with OMB Circular A-133 and shall insert an appropriate provision on accounting, audit and records.

**3.24  LOCAL PROCUREMENT  (April 1998)**

(a)      Financing local procurement involves the use of appropriated funds to finance the procurement of goods and services supplied by local businesses, dealers or producers, with payment normally being in the currency of the cooperating country.

(b)      Locally financed procurements must be covered by source and nationality waivers as set forth in 22 CFR 228, Subpart F, except as provided for in mandatory standard provision, "USAID Eligibility Rules for Goods and Services," or when one of the following exceptions applies:

(1)      Locally available commodities of U.S. origin, which are otherwise eligible for financing, if the value of the transaction is estimated not to exceed $100,000 exclusive of transportation costs.

(2)      Commodities of geographic code 935 origin if the value of the transaction does not exceed the local currency equivalent of $5,000.

(3)      Professional Services Contracts estimated not to exceed $250,000.

(4)      Construction Services Contracts estimated not to exceed $5,000,000.

(5)      Commodities and services available only in the local economy (no specific per transaction value applies to this category).  This category includes the following items:

(i)      Utilities including fuel for heating and cooking, waste disposal and trash collection;

(ii)      Communications - telephone, telex, fax, postal and courier services;

(iii) Rental costs for housing and office space;

(iv)      Petroleum, oils and lubricants for operating vehicles and equipment;

(v)      Newspapers, periodicals and books published in the cooperating country;

(vi)      Other commodities and services and related expenses that, by their nature or as a practical matter, can only be acquired, performed, or incurred in the cooperating country, e.g., vehicle maintenance, hotel accommodations, etc.

(c)      The coverage on ineligible and restricted goods and services in the mandatory standard provision entitled, "USAID Eligibility Rules for Goods and Services," also apply to local procurement.

(d)      This provision will be included in all subagreements where local procurement of goods or services is a supported element.


**3.25  COST SHARING (MATCHING) (April 1998)**

(a) If at the end of any year (or funding period) hereunder, the recipient has expended an amount of non-Federal funds less than the agreed upon amount or percentage of total expenditures, the difference may be applied to reduce the

amount of USAID incremental funding the following year (or funding period), or, if the award has expired or has been terminated, the difference shall be refunded to USAID.

(b) The source, origin and nationality requirements and the restricted goods provision established in the Standard Provision entitled "USAID Eligibility Rules for Goods and Services" do not apply to cost sharing (matching) expenditures.

## 3.26  PROHIBITION OF ASSISTANCE TO DRUG TRAFFICKERS (JUNE 1999)

(This provision is applicable where performance of the award will take place in "Covered" Countries, as described in ADS 206 (see 206.5.3))

a) USAID reserves the right to terminate assistance to, or take other appropriate measures with respect to, any participant approved by USAID who is found to have been convicted of a narcotics offense or to have been engaged in drug trafficking as defined in 22 CFR Part 140.

b) (1) For any loan over $1000 made under this agreement, the recipient shall insert a clause in the loan agreement stating that the loan is subject to immediate cancellation, acceleration, recall or refund by the recipient if the borrower or a key individual of a borrower is found to have been convicted of a narcotics offense or to have been engaged in drug trafficking as defined in 22 CFR Part 140.

(2) Upon notice by USAID of a determination under section (1) and at USAID's option, the recipient agrees to immediately cancel, accelerate or recall the loan, including refund in full of the outstanding balance. USAID reserves the right to have the loan refund returned to USAID.

c) (1) The recipient agrees not to disburse, or sign documents committing the recipient to disburse, funds to a subrecipient designated by USAID ("Designated Subrecipient") until advised by USAID that: (i) any United States Government review of the Designated Subrecipient and its key individuals has been completed; (ii) any related certifications have been obtained; and (iii) the assistance to the Designated Subrecipient has been approved. Designation means that the subrecipient has been unilaterally selected by USAID as the subrecipient. USAID approval of a subrecipient, selected by another party, or joint selection by USAID and another party is not designation.

2) The recipient shall insert the following clause, or its substance, in its agreement with the Designated Subrecipient:

"The recipient reserves the right to terminate this [Agreement/Contract] or take other appropriate measures if the [Subrecipient] or a key individual of the [Subrecipient] is found to have been convicted of a narcotic offense or to have been engaged in drug trafficking as defined in 22 CFR Part 140."

## 3.27  PARTICIPANT TRAINING (April 1998)

(This provision is applicable when any participant training is financed under the award.)

(a)    Definition:  A participant is any non-U.S. individual being trained under this award outside of that individual's home country.

(b)    Application of ADS Chapter 253:  Participant training under this award shall comply with the policies established in ADS Chapter 253, Participant Training, except to the extent that specific exceptions to ADS 253 have been provided in this award with the concurrence of the Office of International Training.

(c)    Orientation:  In addition to the mandatory requirements in ADS 253, recipients are strongly encouraged to provide, in collaboration with the Mission training officer, predeparture orientation and orientation in Washington at

the Washington International Center.   The latter orientation program also provides the opportunity to arrange for home hospitality in Washington and elsewhere in the United States through liaison with the National Council for International Visitors (NCIV).  If the Washington orientation is determined not to be feasible, home hospitality can be arranged in most U.S. cities if a request for such is directed to the Agreement Officer, who will transmit the request to NCIV through R&D/OIT.

SPECIAL PROVISION

Add the following special provision:

Consultant rates shall be based upon the equivalent historical rate experienced for at least one year or 260 days.  If the highest rate has not been experienced for the above period then the highest rate shall be weighted and factored with the other historical rates.

ATTACHMENT 2 - FHI's Implementation and Management Plan dated 5/25/01 is hereby incorporated by reference coordination with USAID's CTO and USAID missions.

[END]