**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DKT INTERNATIONAL, INC.,                )
                                         )
      Plaintiff,                        )
                                         )
        v.                              )     Civil Action No. 05-01604 (EGS)
                                         )
UNITED STATES AGENCY FOR                 )
INTERNATIONAL DEVELOPMENT,               )
*et al.*                                 )
                                         )
      Defendants.                       )
_____ )

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... iii

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS.............................1

INTRODUCTION ...........................................................................................................1

ARGUMENT...................................................................................................................2

I.   THE USAID PLEDGE REQUIREMENT VIOLATES THE FIRST AMENDMENT ...........3

    A. The USAID Pledge Requirement Discriminates On The Basis Of Protected
       Speech and Is Subject To Strict or Heightened First Amendment Scrutiny.......................3

       1.   The Supreme Court and Other Courts Have Repeatedly Applied Heightened
          First Amendment Scrutiny to Funding Restrictions. .......................................................4

       2.   *Dole* Does Not Supersede First Amendment Analysis When a Funding
          Provision Restricts Free Expression. ...........................................................................7

       3.   The Pledge Requirement Cannot Pass First Amendment Scrutiny. ...........................10

    B. The USAID Pledge Requirement Violates the First Amendment Under the
       Unconstitutional Conditions Doctrine. ...........................................................................10

       1.   The Pledge Requirement Plainly Denies A Benefit....................................................12

       2.   The Pledge Requirement Is An Unconstitutional Condition. ......................................14

       3.   Any Government Interest In Ensuring That A Government Message Is Not
          Garbled Does Not Make the Condition Immune From Scrutiny................................16

II.  THE COMPLAINT SUFFICIENTLY STATES A CLAIM THAT THE GLOBAL AIDS
    ACT PROVISIONS ARE UNCONSTITUTIONALLY VAGUE. ........................................21

    A. The Complaint Adequately States A Claim That the Anti-Prostitution Statutory
       Provisions Fail Under the Supreme Court's Constitutional Test for Vagueness..............22

    B. The Spending Clause Does Not Trump Constitutional Review for Vagueness. ..............26

III. THIS COURT HAS JURISDICTION TO CONSIDER PLAINTIFF'S REQUESTS FOR
    RELIEF........................................................................................................................27

    A. The Complaint's Request For Relief That USAID Be Required To Instruct a
       Third Party About Events In the Case Does Not Interfere With Jurisdiction...................27

    B. DKT's Challenge to the Denial of the $60,000 Grant Is Ripe For Review. .....................29

CONCLUSION..............................................................................................................................34

# TABLE OF AUTHORITIES

## CASES

*ACLU v. Mineta*, 319 F. Supp. 2d 69 (D.D.C. 2004)..........................................................................4

*Aerosource, Inc. v. Slater*, 142 F.3d 572 (3d Cir. 1998)...............................................................30

*Ambach v. Bell*, 686 F.2d 974 (D.C. Cir. 1982)..............................................................................33

*Atascadero State Hospital v. Scanlon*, 473 U.S. 234 (1985) ..........................................................8

*Atlantic States Legal Foundation v. EPA*, 325 F.3d 281 (D.C. Cir. 2003)....................................29

*Baggett v. Bullitt*, 377 U.S. 360 (1964)..........................................................................................24

*Bennett v. Spear*, 520 U.S. 154 (1997) ...........................................................................................28

*Better Government Ass'n v. Department of State*, 780 F.2d 86 (D.C.Cir.1986).......................30, 33

*Buckley v. Valeo*, 424 U.S. 1 (1976) .................................................................................................7

*Cammarano v. United States*, 358 U.S. 498 (1959)........................................................................12

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) ...................................................................22, 24

*Community for Creative Non-Violence v. Turner*, 893 F.2d 1387 (D.C. Cir. 1990) .....................24

*Cramp v. Board of Public Instruction of Orange County*, 368 U.S. 278 (1961)...........................21

*DKT Memorial Fund Ltd. v. Agency for International Development*, 887 F.2d 275 (D.C.
     Cir. 1989) ...........................................................................................................................13, 14

*Electric Power Supply Ass'n v. FERC*, 391 F.3d 1255 (D.C. Cir. 2004) .......................................32

*FCC v. League of Women Voters*, 468 U.S. 364 (1984)........................................3, 4-5, 8-9, 10, 13

*Federal Election Commission v. International Funding Institute, Inc.*, 969 F.2d 1110
     (D.C. Cir. 1992) .........................................................................................................................9

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) ....................................................22

*Forum for Academic and Institutional Rights v. Rumsfeld*, 390 F.3d 219 (3d Cir. 2004),
     *cert. granted*, 125 S. Ct. 1977 (2005) ......................................................................................2

*Grayned v. City of Rockford*, 408 U.S. 104 (1972).................................................................22, 26

*Harris v. McRae*, 448 U.S. 297 (1980) .................................................................12

*Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610 (1976) ...................................22

*King v. Smith*, 392 U.S. 309 (1968) ......................................................................7

*Lebron v. Washington Metropolitan Area Transit Authority*, 749 F.2d 893 (D.C. Cir. 1984) .................................................................................3

*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001) ................................5, 8, 17, 20

*Maher v. Roe*, 432 U.S. 464 (1977) ....................................................................12

*Mountain States Legal Foundation v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002) ................................2

*National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998).........................................5-6, 8, 9

*National Mining Ass'n v. Fowler*, 324 F.3d 752 (D.C. Cir. 2003) .......................................30

*National Association of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272 (D.C. Cir. 2005) ...............................................................29

*O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712 (1996).........................................11

*Perry v. Sinderman*, 408 U.S. 593 (1972)................................................................11

*Planned Parenthood of Central and Northern Arizona v. Arizona*, 718 F.2d 938 (9th Cir. 1983), aff'd after remand, 789 F.2d 1348 (9th Cir.), aff'd mem. sub nom Babbitt v. Planned Parenthood Federation, 479 U.S. 925 (1986).........................................5, 10

*Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983) ....................5, 9, 10

*Rust v. Sullivan*, 500 U.S. 173 (1991)............................................................5, 8, 9, 12, 20

*Smith v. Goguen*, 415 U.S. 566 (1974) ..........................................................21-22, 23

*South Dakota v. Dole*, 483 U.S. 203 (1987) .........................................................7, 27

*Speiser v. Randall*, 357 U.S. 513 (1958)............................................................11, 15

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251 (D.C. Cir. 2004) .................................................................................2

*United States v. American Library Ass'n*, 539 U.S. 194 (2003).........................................6

*Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379 (4th Cir. 2001) ................................................................................................................31

*West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943)............................11, 15

*Wooley v. Maynard*, 430 U.S. 705 (1977) ........................................................................11, 15

## STATUTES

5 U.S.C. § 704 ......................................................................................................................30

18 U.S.C. § 287......................................................................................................................25

18 U.S.C. § 1001....................................................................................................................24

22 U.S.C. § 7611(a)(4)...........................................................................................................20

22 U.S.C. § 7631(e) ....................................................................................................16, 21, 26

22 U.S.C. § 7631(f)......................................................................................................3, 21, 26

31 U.S.C. § 3729....................................................................................................................24

Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, Div. D, Title II, 118 Stat. 3, 145....................................................................................................................................19

## LEGISLATIVE MATERIAL

*U.S. Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 Mark-up Before the H. Comm. on Int'l. Relations*, 108th Cong. (2003) ................................................18

## MISCELLANEOUS

*Prostitution v. Constitution*, Economist, Aug. 20, 2005 ................................................................27

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DKT INTERNATIONAL, INC.,     )
     )
    Plaintiff,     )
     )
    v.     )    Civil Action No. 05-01604 (EGS)
     )
UNITED STATES AGENCY FOR     )
INTERNATIONAL DEVELOPMENT,     )
*et al.*     )
     )
    Defendants.     )
_____)

## <u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

The government's Motion to Dismiss is nearly a verbatim copy of its Opposition to Plaintiff's Motion for a Preliminary Injunction, with a few minor additions and deletions. It includes only one new argument relating to whether this court has jurisdiction over one element of plaintiff's requested relief. For the record to be clear with regard to the Motion to Dismiss, plaintiff must, regretfully, repeat many of the arguments it has previously made. To reduce redundancy as much as possible, however, plaintiff incorporates by reference the entirety of its Memorandum In Support of Application for Preliminary Injunction ("PI Memo"), and its Reply to Defendants' Opposition to Motion for Preliminary Injunction ("PI Reply").

## INTRODUCTION

Once again, the government insists that the issues here are simply whether the government can choose to subsidize some activities to the exclusion of other activities, and whether DKT can insist that the government subsidize its speech. Neither of these points is at issue in this case. DKT does not argue that the government must subsidize pro-prostitution activities, nor does it seek to use government funds to further its own views about prostitution.

To the contrary, DKT recognizes the government's power to preclude private organizations from using government funds to promote the practice or legalization of prostitution (so long as that limitation is not unconstitutionally vague).

What is at issue here is the government's unprecedented attempt to commandeer the privately-funded speech of any organization accepting government money. The USAID pledge requirement permits Congress to choose to give grants only to those organizations that publicly adopt Congress' political viewpoint, so that the organizations' privately-funded work outside the scope of the government project is restricted to speech and activities consistent with the government's viewpoint. The USAID pledge requirement violates the First Amendment.

## ARGUMENT

Defendants have moved to dismiss the complaint on the theory that plaintiffs have failed to state a claim for which relief can be granted. But such a motion may not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1134 (D.C. Cir. 2002) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Indeed, the complaint should be "construed liberally in the plaintiffs' favor" and the plaintiff should be granted "the benefit of all inferences that can be derived from the facts alleged." *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1260 (D.C. Cir. 2004) (internal quotation marks omitted). Further, it is settled law that although a duly enacted statute carries with it a presumption of constitutionality, when a statute is alleged to infringe on the exercise of First Amendment rights, the government bears the burden of establishing its constitutionality. *Forum for Academic and Institutional Rights v. Rumsfeld*, 390 F.3d 219, 229 n.8 (3d Cir. 2004), *cert. granted*, 125 S. Ct. 1977 (2005) (citing *ACORN v. City of Frontenac*, 714 F.2d 813, 817 (8th Cir. 1983)); *see also*

*Lebron v. Washington Metro. Area Transit Auth.*, 749 F.2d 893, 896 (D.C. Cir. 1984) (citing

*Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)).

## I.    THE USAID PLEDGE REQUIREMENT VIOLATES THE FIRST AMENDMENT

The government argues that plaintiff has failed to state a claim because this case "arises

under" the Spending Clause and is therefore immune from any First Amendment challenge. This

position fails.

### A.    The USAID Pledge Requirement Discriminates On The Basis Of Protected Speech and Is Subject To Strict or Heightened First Amendment Scrutiny.

The pledge requirement compels any private organization engaged in the fight against

HIV/AIDS overseas to "have a policy explicitly opposing prostitution" to be eligible for any

USAID grants. 22 U.S.C. § 7631(f); USAID AAPD 05-04. DKT has no policy either favoring

or opposing prostitution. But, to be eligible to continue to receive the funding it has received for

years to do this work, DKT must adopt the government-dictated policy and conform its

privately-funded activities and speech to that policy.

As DKT has demonstrated in its earlier briefing,[1] ample precedent establishes that when

any statute, including a funding statute, "operates to restrict expression," it is subject to scrutiny

under the First Amendment. *FCC v. League of Women Voters,* 468 U.S. 364, 375 (1984). The

Supreme Court has long held that when the government makes the availability of funding

dependent upon restriction of activities paid for through private sources, the government

requirements then become impermissible penalties on protected expression. *Id*. at 399-401.

Whether the statute is subject to strict scrutiny, or some other level of review, depends on the

nature of the restriction. Here, because the pledge is viewpoint-specific – requiring private

---

[1] PI Memo at 6-13; PI Reply at 3-7.

agencies to adopt a particular government policy – it should be subject to strict scrutiny.  In the alternative, it should be subject to heightened scrutiny.[2]  It can pass neither.

The government's only response to this clear and substantial precedent is to argue that the Spending Clause trumps the First Amendment, so the First Amendment is simply an "invalid mode of analysis."  Gov't Br. at 15-19.  But this response fails for two separate reasons.  First, the Spending Clause cases the government cites do not support its proposition, particularly when viewed in the context of the many cases in which the courts *have* applied First Amendment analysis to a case involving government funding.  Second, the government's assertion that Congress has no independent constitutional constraints when it pays private organizations to carry out government programs (though it does when it deals with states) is simply wrong.

      1.      The Supreme Court and Other Courts Have Repeatedly Applied Heightened First Amendment Scrutiny to Funding Restrictions.

Courts have repeatedly recognized that when the government restricts the First Amendment rights of funding recipients, even through Spending Clause enactments, those restrictions are subject to heightened scrutiny.  *See, e.g., FCC v. League of Women Voters*, 468 U.S. 364 (1984) (striking down under heightened scrutiny a condition on government funding that restricted privately-funded speech, because it violated the First Amendment); *ACLU v. Mineta*, 319 F. Supp. 2d 69 (D.D.C. 2004) (applying heightened scrutiny in the context of a

---

[2] The government argues that "strict scrutiny" does not apply, and then concludes that the First Amendment has no relevance, simply ignoring any lesser scrutiny available under the First Amendment.  Gov't Br. at 17.  But plaintiffs have plainly argued, first, that strict scrutiny should apply because the restriction is viewpoint-based, and second, in the alternative, that heightened scrutiny should apply.

It is telling that the government has not offered any argument that the statute and regulation at issue could pass any level of scrutiny under the First Amendment.  Instead, the government relies wholly on its argument that the Spending Clause alone provides the constitutionality test for the statute.  Accordingly, in light of settled law that when a statute is alleged to have violated the First Amendment the government bears the burden of showing it to be constitutional, the government's failure to offer any First Amendment defense must be taken as a concession that it cannot pass First Amendment scrutiny.

viewpoint-based funding statute denying funding to those mass transit agencies that accepted

advertisements promoting the legalization or medical use of any controlled substance); *Planned*

*Parenthood of Cent. & N. Arizona v. Arizona*, 718 F.2d 938 (9th Cir. 1983), *aff'd after remand*,

789 F.2d 1348 (9th Cir.), *aff'd mem. sub nom. Babbitt v. Planned Parenthood Fed'n*, 479 U.S.

925 (1986) (invalidating under First Amendment scrutiny a funding statute precluding

organizations that offered abortions or abortion counseling from eligibility for state funds

because it was not narrowly tailored); *see also Legal Services Corp. v. Velazquez*, 531 U.S. 533

(2001) (concluding that viewpoint discrimination in the funding statute was *per se*

unconstitutional under the First Amendment, and invalidating restriction in funding enactment).

Indeed, the only exception to this rule is when the speech restrictions serve only to define

the limits of the government subsidy and do not restrict private speech, such as the limits

approved in *Rust v. Sullivan*, 500 U.S. 173, 194 (1991). But that exception essentially proves the

rule since in those cases, the Court carefully evaluated whether the funding statute restricted

private speech. Thus, where Congress chose to fund some activities, such as family-planning

services, to the exclusion of others, such as prenatal care and abortion counseling, the Court

found there was no restriction of private speech because the abortion-related speech restrictions

applied only in the family-planning program. Key to the analysis was the fact that the

restrictions did not limit the grantees' private speech outside that program. *Rust v. Sullivan*, 500

U.S. at 194 (examining whether the funding restrictions infringed on First Amendment rights,

and "finding" that the restrictions were "narrowly drawn" to further the government's interest);

*see also Regan v. Taxation Without Representation of Wash.*, 461 U.S. 540 (1983) (concluding

that where decision not to subsidize the exercise of a constitutional right did not bar other

channels to exercise that right, the First Amendment was not violated). In *National Endowment*

*for the Arts v. Finley*, 524 U.S. 569 (1998), the Court specifically noted that the First

Amendment could well invalidate funding decisions made under the challenged statute, although

it did not in the facial challenge before the Court:

> If the NEA were to leverage its power to award subsidies on the
> basis of subjective criteria into a penalty on disfavored viewpoints,
> then we would confront a different case. We have stated that, *even
> in the provision of subsidies*, the Government may not 'ai[m] at the
> suppression of dangerous ideas.'"

*Id.* at 587 (emphasis added). And even the plurality in *United States v. American Library Ass'n*,

539 U.S. 194 (2003), did not, as the government suggests, disregard the First Amendment

altogether. To the contrary, the plurality specifically considered whether the funding condition

was unconstitutional because it would induce libraries to act in violation of the First

Amendment. Importantly, the two concurrences and the three dissenters make clear that five

members of the Court continue to apply a traditional First Amendment analysis to funding

conditions that restrict private expression. Thus, none of the government's cases support its

position that the First Amendment has no effect when the challenged statute and regulation arise

under the Spending Clause.

Finally, it is worth noting that despite the government's frequent assertions that DKT is

not entitled to federal subsidies to exercise its First Amendment rights, that is *not* what this case

is about. *See* Gov't Br. at 3, 22. As we have repeatedly noted, DKT does not seek government

grants to pay for its own speech. Nor does it argue that the government cannot choose to

subsidize some activities to the exclusion of others. Instead, the complaint alleges that a statute

and regulation requiring a private organization to explicitly adopt a particular government policy

as a condition of being eligible for government grants, thus effectively restricting what that

organization can do or say with its own private funds, is a substantial restriction on expression. The complaint certainly states a claim, and it is necessarily subject to First Amendment scrutiny.

> 2. *Dole* Does Not Supersede First Amendment Analysis When a Funding Provision Restricts Free Expression.

The government proposes a sweeping application of *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) that would erase the careful consideration of First Amendment limits on Congressional spending enactments in all cases. In *Dole*, a case in which the First Amendment was never raised, the Supreme Court noted that the Spending Clause allows Congress to move beyond the powers enumerated in Article I of the Constitution. "[T]he power of Congress to authorize expenditure of public moneys for public purposes is not limited by *the direct grants of legislative power* found in the Constitution." 483 U.S. at 207 (quoting *United States v. Butler*, 297 U.S. 1, 66 (1936) (emphasis added)); *accord Buckley v. Valeo*, 424 U.S. 1, 90-91 (1976) (per curiam). However, *Dole* itself recognized that restrictions elsewhere in the Constitution constrain Congress' exercise of the spending power: "Finally we have noted that other constitutional provisions may provide an independent bar to the conditional grant of federal funds." *Dole,* 483 U.S. at 208. The *Buckley* Court also explained that constitutional limitations outside Article I continue to apply to Congressional action: "Any limitations upon the exercise of that granted power must be found elsewhere in the Constitution." 424 U.S. at 91; *see also King v. Smith*, 392 U.S. 309, 333 n.34 (1968) ("There is of course no question that the Federal Government *unless barred by some controlling constitutional prohibition*, may impose the terms and conditions upon which its money allotments to the States shall be disbursed." (emphasis added)).

In its continuing effort to avoid any First Amendment analysis whatsoever, the government argues that the "independent constitutional bar" language of *Dole* applies only to

funding conditions to states, so it "has no significance in a case involving federal grants to private, nongovernmental organizations" and therefore, no First Amendment analysis is appropriate. Gov't Br. at 16 n.6. This argument is only partly correct. *Dole* involved a funding condition that applied to a state. Thus, the Court appropriately decided the question before it as it related to a state.[3] Had the Court intended *Dole* to preclude the First Amendment from applying to individuals or private organizations, who are situated quite differently from states, it would likely have said so. More importantly, in cases since then relating to funding for private organizations or individuals, *the Court has not applied the four-part Dole analysis.* Instead, as it did before *Dole*, it continues to look to whether the statute "operates to restrict [] expression." *League of Women Voters*, 468 U.S. at 375. *See Rust*, 500 U.S. at 191-95 & n.4 (although Court mentions *Dole*, it does not apply *Dole* when the case involves conditional subsidies to a private organization, instead examining the effect of the statute on expression and "find[ing] . . . the regulations are narrowly tailored"); *Velazquez*, 531 U.S. at 544 (Court never mentions *Dole* and examines the "substantial restriction is placed upon that [private] speech"); *Finley*, 524 U.S. at 583 (Court does not mention *Dole*, and considers whether NEA artistic grant award criteria "threaten censorship of ideas").

Indeed, in virtually every Spending Clause case the government cites involving conditional grants to private organizations or individuals, courts have carefully noted that "Congress has wide latitude to set spending priorities" only "[s]o long as legislation does not

---

[3] There are obviously significant differences between Congress' relationship with the sovereign states, and Congress' relationship with individual citizens or private organizations that would justify differences in how Congress may condition its largesse. For one thing, states have no First Amendment protection. And as the Supreme Court has held, "given their constitutional role, the States are not like any other class of recipients of federal aid." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985). In short, the *Dole* test reflects an effort to ensure that a deal between equals is not dishonored; it does not suggest that Congress can exercise its spending power in ways that violate individual rights.

infringe on other constitutionally protected rights." *Finley*, 524 U.S. at 588; *Regan,* 461 U.S. at

548 (holding strict scrutiny did not apply because declining to subsidize speech is not a violation

of First Amendment rights, but noting "[t]he case would be different" if the subsidy were used to

discriminate against "dangerous ideas"). Thus, as the Supreme Court has repeatedly noted, "the

First Amendment certainly has application in the subsidy context." *Finley*, 524 U.S. at 587

(quoting *Regan*, 461 U.S. at 550).

For these reasons, it is not whether the case "aris[es] under the Spending Clause" that

determines the applicable level of review (Gov't Br. at 18), it is whether the statute "operates to

restrict[]expression." *League of Women Voters*, 468 U.S. at 375. Here, the statute plainly

operates to restrict expression by making any otherwise eligible NGO *ineligible* for USAID grant

funds unless it declares it "explicitly opposes prostitution," and then alters its activities outside

any government project to comply with that declaration. This intentional effect on speech

outside the government project, in which the government seeks to transmute private speech into

government speech is the critical issue here. Because the USAID pledge requirement stretches

well beyond the scope of the government project, and "place[s] a condition on the *recipient* of

the subsidy, rather than on a particular *program or service*, thus effectively prohibiting the

recipient from engaging in the protected conduct outside the scope of the federally funded

program," *Rust*, 500 U.S. at 197 (emphasis added), it operates to restrict expression in a

viewpoint-specific way, and is subject to First Amendment scrutiny. *See also Federal Election

Comm'n v. Int'l Funding Inst.*, 969 F.2d 1110, 1115 (D.C. Cir. 1992) (noting that Supreme Court

has consistently scrutinized more closely statutes that condition the receipt of a government

benefit upon the recipient's altering its independently funded activities).

9

3.    The Pledge Requirement Cannot Pass First Amendment Scrutiny.

The government does not argue that the pledge requirement passes First Amendment

scrutiny of any kind.  Thus, for purposes of this Motion, if the Court determines that First

Amendment scrutiny does apply, the Court must deny this Motion.  Plaintiffs have addressed the

reasons why the regulation and statute fail under the First Amendment.  PI Memo at 7-11; PI

Reply at 11-19.  As noted, cases such as *FCC v. League of Women Voters*, 468 U.S. 364, and

*Planned Parenthood of Central and Northern Arizona v. Arizona*, 718 F.2d 938 (9th Cir. 1983),

*aff'd after remand*, 789 F.2d 1348 (9th Cir.), *aff'd mem. sub nom. Babbitt v. Planned Parenthood*

*Fed'n*, 479 U.S. 925 (1986), are directly on point.

**B.    The USAID Pledge Requirement Violates the First Amendment Under the
Unconstitutional Conditions Doctrine.**

As noted in our earlier briefs,[4] the pledge requirement also violates the First Amendment

because it requires an organization for forfeit First Amendment rights as a condition of eligibility

for USAID funding.  Specifically, the pledge requirement requires private organizations to adopt

a policy "explicitly opposing prostitution" as a condition of being eligible for any HIV/AIDS

grant.  Whatever the precise level of heightened scrutiny applied, it is clear that a flat ban on

privately funded activities cannot survive.  In *League of Women Voters*, the Supreme Court case

most directly on point, the Court was confronted with a Congressional ban on the broadcast of

editorial opinions by television stations receiving federal subsidies.  The Supreme Court struck

down the ban on the use of private funds by grantees to fund editorial opinion.  468 U.S. 364.

*Regan* further supports this proposition.  There, the Court upheld Congress' denial of tax-exempt

status to nonprofits engaged in lobbying, but only because those organizations could set up non-

tax-exempt affiliates to engage in the constitutionally-protected activity of lobbying.  461 U.S.

---

[4] PI Memo at 11-13; PI Reply at 5-11.

540.  The pledge requirement offers funding recipients no alternative channel through which to

exercise their right to engage in privately funded speech, and therefore violates the First

Amendment.  Similarly, the Supreme Court has repeatedly held that government may not compel

individuals or organizations to speak as a condition of participating in a government program.

*Perry v. Sinderman,* 408 U.S. 593, 597 (1972) (holding that the government "may not deny a

benefit to a person on a basis that infringes his constitutionally protected interests – especially,

his interest in freedom of speech").  Nor can there be any question that the right of free speech

"includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v.*

*Maynard,* 430 U.S. 705, 714 (1977) (state violated First Amendment when it conditioned the

benefit of driving on requiring display of state motto on license plate); *see also West Virginia*

*State Board of Education v. Barnette,* 319 U.S. 624 (1943) (pledge of allegiance requirement as a

condition of attending public school violated First Amendment); *Speiser v. Randall*, 357 U.S.

513 (1958) (requirement that veterans to sign a loyalty pledge to be eligible for a tax exemption

violated First Amendment); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 716-17

(1996) (requiring tow truck operator to support mayor's re-election as a condition of being put

on the city's tow truck rotation list violated First Amendment).

    And even when the Court has upheld conditions on funding programs that, unlike the one

challenged here, simply subsidized some activities in government programs to the exclusion of

others, the Court has carefully distinguished cases like this one.  Thus, in *Rust*, the plaintiff

argued that the regulations prohibiting doctors from speaking with patients about abortion within

the confines of the federal program imposed an unconstitutional condition on accepting the grant.

Responding directly to that argument, the Court noted that the Title X regulations at issue

> govern the scope of the Title X activities, and leave the grantee
> unfettered in its other activities.  The Title X grantee can continue

11

to perform abortions, provide abortion-related services, and engage
in abortion advocacy [separate from the federal program].

In contrast, our 'unconstitutional conditions' cases involve
situations in which the Government has placed a condition on the
recipient of the subsidy rather than on a particular program or
service, *thus effectively prohibiting the recipient from engaging in
the protected conduct outside the scope of the federally funded
program.*

*Rust*, 500 U.S. at 196-97 (emphasis added).  Likewise, in *Harris v. McRae*, 448 U.S. 297, 317

n.19 (1980), while the Court recognized that Congress could exclude some medical services

from Medicaid coverage, the Court took care to point out that "a substantial constitutional

question would arise if Congress had attempted to withhold all Medicaid benefits from an

otherwise eligible candidate simply because that candidate had exercised [with resources other

than Medicaid] her constitutionally protected freedom to terminate her pregnancy by abortion."

And in *Maher v. Roe*, 432 U.S. 464, 474 n.8 (1977) the Court said:  "If Connecticut denied

general welfare benefits to all women who had obtained abortions and who were otherwise

entitled to the benefits, we would have a close analogy to the facts in *Shapiro*, and strict scrutiny

might be appropriate."  *See also Cammarano v. United States*, 358 U.S. 498, 515 (1959) (denial

of business-expense deduction for lobbying does not offend First Amendment, but an attempt to

deny all deductions for business expenses to taxpayers who lobby would penalize

unconstitutionally the exercise of First Amendment rights).

1.      The Pledge Requirement Plainly Denies A Benefit.

This case is exactly the one the Supreme Court distinguished in the four cases just

discussed above.  The USAID pledge requirement is a condition on the *recipient* of the subsidy,

not a condition on the particular USAID *program*.  As we have pointed out repeatedly, DKT is

not claiming that it is entitled to receive subsidies for its First Amendment activities.  Nor is it

claiming that the government is required to subsidize speech or activities it chooses not to

12

subsidize. Instead, plaintiff challenges the notion that Congress can choose to give grants only to those organizations that explicitly adopt Congress' political viewpoint, so that their private work *outside the scope of the government grants* is restricted to speech and activities consistent with the government's political viewpoint. Thus, it is not the grant itself that is the benefit denied here, it is being eligible for the USAID grants Congress has already decided to provide. In this case, DKT has both been denied funding for a particular $60,000 grant, and, it has been explicitly informed by USAID officials that it will be ineligible for any USAID funding – including the same funding it has received for years – unless and until it agrees to adopt the government's policy "opposing prostitution." And, as plaintiff explained in its PI Reply at 9-10, there can be no question that withdrawing eligibility for a subsidy or a grant is denying a benefit.

The government's sole response to these arguments is that "cases arising under the Spending Clause do not fall within the rubric of this [unconstitutional conditions] doctrine." Gov't Br. at 20. This simplistic and blanket assertion is wholly belied by *Rust*, in which the Court considered whether the spending regulations were unconstitutional conditions, and by *League of Women Voters*, in which the Court rejected the spending argument because the statute banned the grantees from engaging in certain private speech. Nor can the government muster case law to overcome this Supreme Court precedent. It appears to rely almost exclusively, once again, on what even the D.C. Circuit explicitly conceded was *dicta* in *DKT Memorial Fund v. Agency for International Development*, 887 F.2d 275, 286 n.6 (D.C. Cir. 1989) (acknowledging court indulged in *dicta* in merits discussion of a foreign NGO's theoretical First Amendment claim). As we pointed out in our PI Reply at 8-9, even *dicta* from that case does not support the government's claim here, especially in light of Supreme Court precedent since that case was decided. Moreover, unlike *DKT Memorial Fund*, this case is *not* one in which the government

13

has done "nothing other than refuse to subsidize the exercise of a First Amendment activity." 887 F.2d at 288. Here, the government has done much more, demanding that U.S. NGOs become mouthpieces for government policy even with their private funds. Moreover, the issue in *DKT Memorial Fund* was whether the restrictions could be imposed on foreign, not domestic organizations since the statute did *not* so limit domestic ones.[5] Nor did the regulations at issue in that case compel anyone – either foreign or domestic NGOs – to adopt an explicit policy as a condition of funding. Finally, that court emphasized that the regulation at issue did not restrict domestic NGOs' use of their private funds. *Id*. at 283 n.5.

In light of *Speiser*, *Rust*, *League of Women Voters,* and the other cases plaintiff has set out at length, the government's argument that the pledge requirement denies no benefit is untenable.

    2.    The Pledge Requirement Is An Unconstitutional Condition.

Plaintiffs have fully explained why this case fits squarely into the unconstitutional conditions cases. PI Memo at 11-13; PI Reply at 8-10. As we have pointed out repeatedly, plaintiff does not argue that USAID must subsidize speech or activities that the government has already chosen not to subsidize, as did the plaintiffs in *Rust, Regan, Cammarano*, and *Harris*. The benefit DKT seeks is to be eligible for the already-existing funding that USAID is directing to NGOs to distribute condoms and to conduct other activities to fight HIV/AIDS. Likewise, the benefit Mr. Speiser sought was eligibility for the tax exemptions California had already chosen

---

[5] The government argues that it is entitled to substantial deference in the area of foreign affairs. However, the current policy applies to organizations in the domestic sphere, compelling and restricting their speech in the United States, as well as their speech abroad. And the *DKT Memorial Fund* court highlighted the distinction between how Congress may treat domestic NGO versus foreign NGOs: "A recognition of a right, whether or not constitutionally based, for American entities to pursue certain goals with their own funds while receiving largesse from the government for other pursuits does not in any way mandate that the same treatment be afforded to foreign entities." *DKT Mem'l Fund*, 887 F.2d at 291. Thus, the sort of deference at issue in *DKT Memorial Fund* is not called for here.

to grant. In that case and in this one, the benefit was denied solely because those applying for the benefit refused to parrot what the government required them to say. Thus, what the Court said of the statute in *Speiser* can equally be said of the one in this case: "It cannot be gainsaid that a discriminatory denial of [a grant to distribute condoms to fight HIV/AIDS] for engaging in speech is a limitation on free speech." *Speiser,* 357 U.S. at 518; *see also Wooley,* 430 U.S. at 714 (1977).

The government suggests that since DKT has a "choice" about whether to accept the funding with the conditions, it has not been harmed. Gov't Br. at 22. But a choice is inherent in all the unconstitutional condition cases. In each of those cases, like this one, the plaintiff had a choice: to surrender his or her constitutional rights and receive the benefit or to exercise those rights and forego the benefit. The existence of a choice did not make any of those statutes constitutional. To the contrary, requiring the choice *created* the constitutional difficulty. The Supreme Court has held time and again that governments cannot make benefits dependent on such "choices."[6]

_____

[6] The government tries to distinguish some (though not all) of the unconstitutional conditions cases on the ground that the conditions there were unrelated to "qualifications" to participate in the government program. Since those cases did not involve government grants, it is not surprising that the conditions there do not relate to qualifications. But the conditions in those cases were certainly designed to further a particular government policy, just as the government claims the conditions here do. *See Barnette*, 319 U.S. 624 (requiring children to say Pledge of Allegiance as condition of receiving public education furthered state's interest in raising good citizens); *Wooley*, 430 U.S. 705 (requirement that drivers display state motto of "Live Free or Die" related to furthering state interest in promoting appreciation of history, individualism, and state pride), *Speiser*, 357 U.S. 513 (requiring signing of loyalty oath as a condition of tax exemption eligibility was related to interest in national security and safety). And in each case, the Court determined that the First Amendment precluded the government restriction, even though it plainly was related to the government's purpose in enacting the restriction.

3.    Any Government Interest In Ensuring That A Government Message Is Not Garbled Does Not Make the Condition Immune From Scrutiny.

Essentially conceding, as it must, that the pledge requirement *does* restrict private organizations' speech and conduct outside the scope of the government-funded project, the government argues that the restriction is not troubling because it is a "legitimate and appropriate" means to "preserve the integrity of the spending program." Gov't Br. at 23.[7] The government further argues it can require private organizations to adopt government policies so as to ensure that its "message is neither garbled nor distorted by the grantee." *Id.*

As noted earlier, DKT does not challenge the substantive authority of the government funds restriction found at 22 U.S.C. § 7631(e),[8] which ensures that grantees will not use government funding to advocate or promote the legalization or practice of prostitution. That legitimate provision certainly protects the government from concerns about grantees sending "mixed messages" in the context of specific USAID programs. And USAID has multiple non-speech-restrictive ways to sanction violations of that or any other grant provision, including terminating the grant, requiring return of already spent moneys, debarment in some circumstances, and even the possibility of false claims charges that carry both criminal and civil penalties.

The government seeks to go much further than that, however, and asserts that when it appropriates funds for projects to further a Congressional goal, it can reach well beyond the projects it funds by requiring that its grantees explicitly adopt its goals in their *private activities*

---

[7] The government never explains what "legitimate and appropriate" mean. But it is unlikely that these terms can really refer to conditions that require relinquishment of First Amendment freedoms.

[8] Plaintiff notes that it has challenged this provision on vagueness grounds, but not on whether the government has the authority to limit speech within the government program.

*outside the government program.* This extraordinary argument has no support in case law or in logic.

First, the Supreme Court has certainly held that the government can take steps to ensure non-garbling of government speech, even when the government uses "private speakers." But the Court has narrowly defined when private speakers are engaged in government speech: it is only when the government pays private speakers "to transmit specific information pertaining to its own program." *Velazquez*, 531 U.S. at 541 (1995) (internal citation omitted). Here, the government seeks to exponentially expand that definition of "government speech." It argues that in the name of protecting its goals from being "undermined," it can shoehorn into "government speech" any grantee's private speech outside the government project that might relate to the government's goals. Under this logic, of course, federal funding for schools could be conditioned upon teachers in those schools declaring that they "explicitly approve" of annual testing to ensure that Congress' goals in the "No Child Left Behind Act" are not undermined. Or, libraries could be required to "explicitly oppose vulgar language" as a condition of federal funding to help further the government's goal of making libraries safe and comfortable for children. Medicaid funds could be conditioned on doctors and hospitals "explicitly opposing" any state provisions allowing physician-assisted suicide to avoid undermining Congress' goals of proper use of controlled substances.

Neither the Supreme Court, nor any other court to plaintiff's knowledge, has sanctioned the extraordinary leap the government so casually asserts here—that when Congress uses private parties to carry out its programs, it also acquires the power to control what those parties say with their own funds. Such a doctrine would convert the private speech of anyone accepting government money into government speech, and would essentially allow the government to

control any private organization accepting government funds. It would also allow the government to use its significant power of the purse to economically favor those who agree with it, and to silence those who disagree with it on virtually any number of issues. Indeed, there is significant evidence that those interests underlie the pledge requirement. *See U.S. Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 Mark-up Before the H. Comm. on Int'l. Relations*, 108th Cong. 96, 148-49, 151-52 (2003) (Comments of Rep. Smith) (pledge requirement appears to have been intended to avoid "helping" groups who "believe that prostitution ought to be legalized" because it is "outrageous that we would want to give money to an organization that does that kind of things."); *see also* Gov't Br. at 25 (suggesting that a private organization's "disagreement" with a broad government position makes them "unqualified" to carry out specific government projects). Of course, that doctrine is not the law, and Congress cannot use its subsidies to mute the voices of those who may not share the government's views on particular aspects of difficult, often intractable problems. Defendants have not and cannot point to a single case suggesting that this vast expansion of the government speech doctrine would pass constitutional muster.

Second, the government repeatedly suggests that Congress can protect its "message" from being garbled by excluding from eligibility organizations whose policies are "inconsistent with," or "at odds with the goals of the program being funded." Gov't Br. at 3, 26. Whether this is the case is debatable. But even if it were, it has no relevance here, because DKT has been excluded from eligibility though it has no policies on prostitution that are "inconsistent with" or "at odds" with the AIDS/HIV program being funded. Taking no policy position on "prostitution" whatsoever cannot reasonably be said to be "inconsistent" with the government's view that it should be eradicated. Silence cannot be considered to be "at odds" with the

government's goals. Thus, the government's argument depends on facts that do not exist here. Nor does logic support the government's attempt to stretch its rationale to cover silence. It is certainly not intuitive that unless DKT International has a policy "explicitly opposing prostitution," people in foreign countries receiving the condoms DKT distributes with USAID money will be confused about the U.S. government's policy.

And the government's claims that organizations without the required policy "cannot be counted on" to carry out the government project and will "hopelessly confuse" the government's objective are simply untenable in light of the government's decision to exempt the Global Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, the International AIDS Vaccine Initiative, and any United Nations agency from the anti-prostitution policy requirement.[9] Similarly, there is no evidence whatsoever (and it defies common sense to conclude) that NGOs that have no policy at all regarding prostitution are somehow less able, willing, or qualified to carry out the specific requirements of whatever program they have agreed to carry out. Nor is there a logical basis to assume that when an organization has no "policy" about prostitution, those in foreign countries will construe that lack of a policy as an "endorsement" of prostitution, or that refusing to adopt the government's political viewpoint about prostitution means that an NGO "endorses" prostitution.

Third, the government insists that eradication of prostitution is a "core purpose" of the funding program, and that the pledge is "necessary" to keep grantees from "garbling" Congress'

---

[9] In FY 2004, the U.S. government provided $400,000,000 to the Global Fund to Fight AIDS, Tuberculosis and Malaria ("The Global Fund"); $26,000,000 to the International AIDS Vaccine Initiative; and an additional $26,000,000 to UNAIDS. These sums dwarf the grants provided to individual U.S. NGOs, suggesting that the vast amount of work done under the Act is done by these organizations without the restrictions, despite the alleged fears of message-mixing and goal-undermining. Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, Div. D, Title II, 118 Stat. 3, 145.

"message."[10]  Since it recognizes the difficulty *Rust* poses to its position, the government tries to

distinguish *Rust* by suggesting that control of the Title X recipients was not "necessary" there

because having those recipients engage in non-government-funded, abortion-related conduct was

"not inconsistent" with Congress' goals there, the government argues that such control is

necessary here because allowing organizations with no policy on prostitution would be

inconsistent with Congress' goal of eradicating prostitution. Gov't Br. at 26. But the *Rust* Court

specifically noted that Congress was exercising its authority to encourage its goals of conception

and childbirth, and to "decline to promote abortion." *Rust*, 500 U.S. at 193. And the

government itself argued specifically in that case that the regulations were "necessary" to "avoid

creating the appearance that the Government is supporting abortion-related activities." *Id.* at

188.  Thus in *Rust*, the government asserted that the speech restrictions were necessary to insure

that Congress' goals – promoting its policy and not mixing the message – were not undermined.

   Finally, the government improperly conflates general goals and priorities with

"transmitt[ing] specific information pertaining to its own program." *Velazquez*, 531 U.S. at 541.

Here, DKT has used USAID funding to distribute condoms.  That program has not in the past,

and does not now, require distributors to express anti-prostitution messages.  Given these facts,

---

[10] The government relies heavily on its claim that the "eradication of prostitution" is a "priority" in the Act.  But it is no more or less a priority than the other asserted goals.  22 U.S.C. § 7611(a)(4) provides that the five-year strategy should "provide that the reduction of HIV/AIDS behavioral risks shall be a priority of all prevention efforts in terms of funding, educational messages, and activities by promoting abstinence from sexual activity and substance abuse, encouraging monogamy and faithfulness, promoting the effective use of condoms, and eradicating prostitution, the sex trade, rape, sexual assault and sexual exploitation of women and children."  Thus, promoting the effective use of condoms is an equal "priority" with "eradicating prostitution," and it is that priority that DKT is trying to further.  DKT's policies (or the lack thereof) on prostitution simply cannot have any legitimate bearing on whether it is *qualified* to distribute condoms.  Indeed, as the largest distributor of condoms in Vietnam, and as a recipient of USAID funds for years for this very purpose, DKT would seem well-qualified to conduct the government's program of distributing condoms.

the government can make no showing that requiring grantees to adopt the government-dictated policy is "necessary" to protect the clarity of any specific information pertaining to the particular program in which DKT would be involved.

II.    **THE COMPLAINT SUFFICIENTLY STATES A CLAIM THAT THE GLOBAL AIDS ACT PROVISIONS ARE UNCONSTITUTIONALLY VAGUE.**

"The vices inherent in an unconstitutionally vague statute —the risk of unfair prosecution and the potential deterrence of constitutionally protected conduct—have been repeatedly pointed out" by the Supreme Court. *Cramp v. Board of Public Instruction of Orange County*, 368 U.S. 278, 283 (1961).  The two Global AIDS Act provisions relating to prostitution suffer from both of these vices, and are impermissibly vague.[11] Pl. Com. ¶¶ 27-28.  The first restriction, 22 U.S.C. § 7631(e), prohibits the use of U.S. government funds authorized under the Act from being spent on activities that "promote or advocate the legalization or practice of prostitution or sex trafficking" (hereinafter the "restriction on government funds").  The second restriction, found at 22 U.S.C. § 7631(f), mandates "no funds made available to carry out this Act . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking" (hereinafter the "organizational eligibility provision" or "restriction on private funds").[12]  Both provisions are unconstitutionally vague. *Smith v.*

---

[11] Because DKT did not raise the vagueness challenge in its preliminary injunction motion, (now converted into a summary judgment motion), DKT respectfully notes that this issue is not similarly situated to the other claims in the case.  Indeed, although plaintiffs have introduced some evidence, by declaration, about the vagueness of the statute, there will likely be a need to develop additional evidence on this point, including depositions, to determine whether and how USAID officials have interpreted and enforced the statutory provisions since applying them to U.S. organizations.

[12] It is important to note, however, that DKT has not challenged the first restriction on any other grounds beyond vagueness.  DKT agrees that it is within the government's spending power to mandate how U.S. government funds may be spent.  DKT's challenge to the second restriction is based on the fact that § 7631(f) regulates DKT's private speech funded by non-U.S. government sources, as well as the fact that the statute is vague.

*Goguen*, 415 U.S. 566 (1974) (finding the Massachusetts flag misuse statute void for vagueness);

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) (striking down a city ordinance as vague).

**A.    The Complaint Adequately States A Claim That the Anti-Prostitution Statutory Provisions Fail Under the Supreme Court's Constitutional Test for Vagueness.**

The Supreme Court has provided clear guidance on the standard to be applied in cases where an enactment regulates speech or threatens potential criminal and civil penalties.  The law must  "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Secondly, a law or regulation must "provide explicit standards for those who apply them."  *Id.*; *see also Forsyth County. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (striking down a permit requirement that delegated "overly broad licensing discretion to a government official").

The challenged provisions of the Global AIDS Act fail under this standard.  Neither provision makes clear what is prohibited.  Nor does the statute delineate any guidelines to be followed by the USAID employees now charged with enforcement of the anti-prostitution pledge scheme.  This enactment, like so many vague laws struck down on constitutional grounds, "may trap the innocent by not providing fair warning."  *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 621-22 (1976) (striking down a city ordinance that required prior notification to police prior to neighborhood canvassing).

For those groups that accepted funds, the vagueness of the statutory and regulatory requirements will effectively chill their speech.  Non-governmental organizations that adopted policies and provided certifications now face arbitrary and unpredictable enforcement.  Nowhere does the statute define the term "prostitution."  USAID has refused to provide any official guidance whatsoever on how the government will interpret or enforce the statutory provisions.

And what constitutes "prostitution," if anything, varies from country to country in the regions in which DKT and other NGOs operate. *See*, Middleberg Dec. at 10-11 (Ex. 4 to PI Memo.) ("Unfortunately, there is no commonly accepted definition of prostitution. No international conventions, treaty or law defines the term. Because of the extreme diversity of cultural contexts, it has proven impossible for diplomats and legal scholars to arrive at an agreement. In most countries, prostitution is not outlawed; rather it is the ancillary activities such as pimping and soliciting that are illegal.") Thus, "no standard of conduct is specified at all." *Coates v. City of Cincinnati*, 402 U.S. at 614. What does it mean to "promote...the practice of prostitution"? Is teaching English to sex workers an activity that will be found to promote the practice of prostitution? What about organizing credit unions for sex workers seeking to protect their earnings? Or teaching sex workers to encourage condom use among their clients and peers? Similarly, what sort of organization-wide policy proclamation "opposing prostitution" will USAID find acceptable? How will USAID determine whether an organization has violated its own policy? Non-governmental organizations have accepted the USAID funding at their own peril.[13]

These questions simply underscore Justice Black's concern, repeated in *Smith v. Goguen*, "against entrusting lawmaking to the moment-to-moment judgment of the policeman on his

---

[13] The government would have this Court believe that DKT has challenged these provisions because they reflect "unwise policy choices." Gov. Br. at 31. This grossly mischaracterizes DKT's argument, and ignores the clearly-pled constitutional challenge. Nor is plaintiff required to object to portions of the statute and regulation that do not cause it harm, such as being opposed to sex-trafficking.

It is also more than ironic that the government suggests that DKT avail itself of the political process. Gov. Br. at 34. Any organization accepting government funds would be barred from that political process, muzzled by the government-mandated policy that the organization "oppose prostitution." The anti-prostitution pledge required by the Act would arguably prohibit organizations from advocating to change those very policies. DKT has brought this suit in part to preserve its First Amendment right — and the rights of its sister NGOs — to use private funding to press for policy change *in the United States*.

beat." 415 U.S. at 575 (internal quotation marks omitted). Determination of whether an

organization has not behaved in a manner sufficiently "opposing prostitution" or has somehow

"promoted …the practice of prostitution" through its activities should not be left to USAID

officials guided by only their own interpretation of these terms and the law. The statute's very

lack of precision gives "those enforcing this prohibition an impermissibly wide discretionary

range in which to determine who is in violation." *Community for Creative Non-Violence v.*

*Turner*, 893 F.2d 1387, 1395 (D.C. Cir. 1990). Thus, "the uncertain meanings" of the statutory

provisions require non-governmental organizations receiving funding to "'steer far wider of the

unlawful zone' than if the boundaries of the forbidden areas were clearly marked." *Baggett v.*

*Bullitt*, 377 U.S. 360, 372 (1964) (*quoting Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

　　　The government erroneously argues that only the non-penalty of a "refusal to subsidize"

flows from the statute, so any inherent vagueness is within the degree tolerated by the

Constitution. In fact, significant criminal penalties accompany both the pledge requirement, and

the limitation on how funds may be spent. Compl. ¶¶ 27-28. Absent any clarification from

USAID on what it means to "oppos[e] prostitution" or "promote…[the] practice of prostitution,"

men and women of "'common intelligence must necessarily guess at [the] meaning.'" *Coates,*

402 U.S. at 614 (*quoting Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926)).

This guessing game carries the threat of heavy civil and criminal penalties. Under the federal

criminal fraud and false statements statute, 18 U.S.C. § 1001, the knowing and willful utterance

of a materially false statement in a matter within the jurisdiction of a federal agency is

punishable by up to five years imprisonment and fines. The federal False Claims Act also

provides civil and criminal penalties for misrepresentations made to the government in claiming

payment. 31 U.S.C. § 3729 (imposing civil liability on any person who "knowingly presents. . .

a false or fraudulent claim for payment or approval" or who uses a false statement "to get a false or fraudulent claim paid"); 18 U.S.C. § 287 (imposing criminal liability on any person who presents a claim "knowing such claim to be false, fictitious, or fraudulent"). Signing a certification that an organization has a policy "explicitly opposing prostitution" could subject the organization to the civil and criminal penalties outlined above if USAID later decides either that the policy is insufficient or that the organization has not adequately complied with it, thus raising the question of whether the original certification was false. Similarly, submitting a payment voucher for U.S.-funded activities determined after the fact by USAID to "promote...the legalization or practice of prostitution" could give rise to civil or criminal charges under the False Claims Act.

Should DKT prevail in its claim that the pledge requirement is unconstitutional, it will certainly seek USAID funding again. But an organization choosing to accept funding under this scheme faces tremendous uncertainty and potentially draconian penalties. Indeed, DKT will then face the same quandary now confronted by organizations such as the Open Society Institute and the Alliance for Open Society International. Those two organizations, plaintiffs in a parallel suit against USAID filed in the Southern District of New York, recently sought a temporary restraining order to prevent the U.S. government from taking civil or criminal action against the organizations for sponsorship of a conference held in New York City titled *Sex Work, Sexual Rights and Countering the Conservative Sexual Agenda*. *See Alliance for Open Society International v. USAID*, Civ. Action No. 05-8209, Plaintiffs' Motion for a Temporary Restraining Order (S.D.N.Y. filed Oct. 12, 2005).

Moreover, the fact that DKT has been forced to choose to forego the funding so it can maintain its First Amendment rights does not change the analysis. DKT's coerced retreat from

all federal anti-HIV/AIDS funding under the Act is a mere reflection of the profound fear in the NGO community that once an organization has received funding, the determination of whether the organization has violated the policy will rest on the arbitrary determinations of individual USAID officers.  That unfettered discretion, untethered to any legal guidance, renders the statutory provisions unconstitutionally vague.  The statute and USAID policy directive fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that [s/]he may act accordingly." *Grayned v. City of Rockford,* 408 U.S. at 108.  As such, the anti-prostitution pledge requirements do not allow an organization the freedom "to steer between lawful and unlawful conduct." *Id.*

**B.    The Spending Clause Does Not Trump Constitutional Review for Vagueness.**

Unable to muster a response to Plaintiff's First Amendment claim, the government has responded with its now-familiar refrain that the Spending Clause trumps all.  The government introduces an alternative vagueness standard, the so-called *Dole* test, that is "whether the language is sufficiently clear to allow a potential funding recipient to make knowing choices regarding its participation in the program." Gov. Br. 35.  But, for reasons discussed in Part I.A.2, above, *Dole* does not apply here.  No case law suggests that the *Dole* standard should apply to cases like this one because the statute restricts speech funded by private, not government, sources.

Indeed, the organizational eligibility requirement, 22 U.S.C. § 7631(f), seeks to muzzle the *private* speech of private organizations, speech in no way "subsidized" by government funding.  And even if the government funding restriction, 22 U.S.C. § 7631(e), could be legitimately be judged under *Dole*, it does not meet even this milquetoast standard for vagueness.  As we noted above, USAID has not defined "prostitution" nor has it articulated what policies "explicitly opposing prostitution" should say or envision.  Organizations that have accepted

26

funds and have no intention of "promot[ing] or advocat[ing] the legalization or practice of

prostitution...." with those government funds still have no idea what USAID will consider a

violation. As *The Economist* queried recently, does prostitution "include, for example, so-called

'transactional sex,' when women exchange favours for food or clothing and which is a fact of

life in many developing countries?" *Prostitution v. Constitution*, The *Economist*, Aug. 20, 2005,

at 62.

In light of the vagueness of the provisions, and the inability of private organizations to

know what they mean, or how USAID will apply them, those organizations, including DKT,

cannot be "cognizant of the consequences of participation." *Dole*, 483 U.S. at 207. This is

particularly so when serious criminal penalties loom for the organization that guesses wrong.

Thus, the Complaint clearly states a claim that the challenged statutory provisions should

be declared unconstitutional, and the government's motion to dismiss should be denied.

## III.    THIS COURT HAS JURISDICTION TO CONSIDER PLAINTIFF'S REQUESTS FOR RELIEF.

### A.    The Complaint's Request For Relief That USAID Be Required To Instruct a Third Party About Events In the Case Does Not Interfere With Jurisdiction.

The government has also moved to dismiss for lack of jurisdiction over, not a *claim* in the

lawsuit, but one of the *requests for relief*. In yet another mischaracterization of plaintiff's case,

the government says that plaintiff seeks specific relief "aimed at compelling USAID to instruct a

third party not before this Court that it is authorized to award plaintiff a $60,000 grant." Gov't

Br. at 38. But DKT has not requested such relief. Instead, it asks the Court to "[o]rder USAID

to instruct Family Health International that USAID authorizes FHI to disburse the $60,000 grant

for the Vietnam condom-lubrication proposal." Complaint, Relief Requested, D.

As DKT showed in its Complaint, FHI has long been a grantee of USAID funds, and it

has often made sub-grants to DKT to carry out USAID programs. Complaint, ¶ 13. FHI

27

informed DKT that it could not fund the condom-lubricant proposal because DKT would not sign the pledge, Complaint, ¶¶ 13-22. And because this was FHI's stated reason for refusing to fund the program, DKT simply asks the Court to ensure that, if the pledge requirement is invalidated, USAID will inform FHI that the pledge requirement will not stand in the way of authorizing the grant. This in no way asks the Court to force FHI to take any action. To the contrary, it simply asks the court to ensure that USAID notifies FHI that the obstacle — the pledge requirement — that previously blocked the grant will no longer block the grant. Of course, FHI may apply other criteria to its decision as to whether to award the grant to DKT or not, and the Court's order to USAID would not require FHI to award the grant to DKT. For these reasons, the fact that FHI is not before the Court is simply not an issue at all, and certainly not one that goes to this Court's jurisdiction. *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997) ("While, as we have said, it does not suffice if th[e] injury complained [of] is the result of the independent action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else.") (internal quotation marks omitted; alteration in original).

In their concerted effort to avoid responsibility for the decision to reject the lubricant proposal, defendants have focused on FHI's purportedly independent initiative to force its own subgrantees to certify that they oppose prostitution. Gov't Br. at 40 n. 16. But the certification itself — whether mandated by FHI or by USAID — is only a proxy for the compelled speech demanded by the statute as applied by the USAID policy. The very terms of the grant agreement presented to DKT International by FHI required that the organization adopt a policy "explicitly opposing prostitution." The underlying compelled speech requirement renders the certification

28

alone mere window-dressing. The certification was simply FHI's preferred method of policing subgrantees, a guarantee that FHI would not run afoul of the USAID policy.

FHI's refusal to fund any DKT programs with USAID funds, including the lubricant grant, has created a case or controversy ripe for adjudication. That FHI's sole basis for refusing to fund DKT is the U.S. government's anti-prostitution policy outlined in AAPD 05-04 is unrebutted. An instruction from USAID to FHI that AAPD 05-04 does not apply to any DKT subgrant would be sufficient authorization, responsive to the requested relief outlined in the Complaint.[14] DKT understands that this would not necessarily result in immediate funding of the lubricant proposal; it would simply remove the sole obstacle that scuttled the grant originally. DKT does not ask for more.

**B.     DKT's Challenge to the Denial of the $60,000 Grant Is Ripe For Review.**

DKT has brought a compelling case and controversy before this Court, not a nonjusticiable hypothetical challenge, as the government implies. The ripeness doctrine has two components, requiring a court to consider "the fitness of the issues for judicial review and the hardship to the parties of withholding court consideration." *National Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1281 (D.C. Cir. 2005) (quotation marks omitted). In the instant case, both factors weigh heavily in favor of ripeness.

DKT easily satisfies the first prong of the ripeness test, as the case is fit for judicial review. The D.C. Circuit has noted that agency regulations are ripe for review when the factual components of the scope of controversy have been fleshed out "by some concrete action applying the regulations to the claimant's situation in a fashion that that harms or threatens to harm him." *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003). That is

---

[14] The Court is certainly not required to merely repeat the language of the Requested Relief when issuing an order, but can refine the language as necessary in light of the Court's decision.

exactly the situation presented in this case. The requested relief flows directly from DKT's

contention that the challenged provisions of the Global AIDS Act and AAPD 05-04 are

unconstitutional. This purely legal claim is "presumptively reviewable." *Nat'l Mining Ass'n v.*

*Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003). Nor is there any necessity to wait for a "more

concrete setting." *Id.* The denial of the $60,000 lubricant grant and DKT's blanket ineligibility

for all USAID anti-HIV/AIDS grants, despite the fact that the organization has long received

them, removes this case from the realm of abstraction and contingencies. DKT does not

speculate that some future harm may result from the enforcement of AAPD 05-04. The

application of the policy has already had an immediate and concrete impact on DKT's programs.

A more "ripe" controversy is unlikely to present itself.

The government also tries to argue that one element of the requested relief is not ripe

because USAID did not take "final agency action." In short, the government asserts that the

agency made no "decision" to cancel the $60,000 lubricant proposal. Gov't Br. at 42. In light of

the strictures of AAPD 05-04, this claim is simply astonishing. Indeed, for purposes of the

analysis here, USAID took final agency action when it issued AAPD 05-04 on June 9, 2005.

Under the Administrative Procedure Act ("APA"), final agency action for which there is no other

adequate remedy in a court is subject to judicial review. 5 U.S.C. § 704. The Supreme Court, in

interpreting "finality" element pragmatically, has held that indicia of the finality of an agency's

actions include "a definitive statement of the agency's position which has a direct and immediate

effect on the petitioner's day-to-day operations, which has the status of law, and of which

immediate compliance is expected." *Aerosource, Inc. v. Slater*, 142 F.3d 572 (3d Cir. 1998)

(citing *FTC v. Standard Oil Co. of Ca.*, 449 U.S. 232, 239 (1980)); *see also Better Government*

*Assoc. v. Department of State*, 780 F.2d 86, 93 (D.C. Cir. 1986) ("Courts have taken a flexible

30

and pragmatic view of the finality of agency action."). The USAID decision to apply the

AAPD's anti-prostitution clauses to U.S. organizations, based on guidance from the Department

of Justice, required DKT to "adjust its conduct immediately": adopt a policy, or face

ineligibility for any grants. *Virginia Society for Human Life, Inc. v. Federal Election Comm'n*,

263 F.3d 379, 390 (4th Cir. 2001). Whether USAID had any role in canceling the condom-

lubricant grant is of little significance. The USAID regulations *prohibited* any and all sub-grants

to DKT under the circumstances. Indeed, a decision by FHI to fund the DKT proposal would

have placed FHI's own grant at risk of termination under the terms of the FHI agreement with

USAID. As the defendants admit, the current version of the FHI grant agreement includes the

Standard Provision required by AAPD 05-04. Gov't Br. at 39. That provision states:

> Except as noted in the second sentence of this paragraph, as a condition of entering into
> this agreement or any subagreement, a non-governmental organization or public
> international organization recipient/*subrecipient* must have a policy explicitly opposing
> prostitution and sex trafficking.

Gov't Br., Ex. D at 5 (emphasis added). The Standard Provision mandates that USAID grant

recipients "insert this provision, which is a standard provision, in all subagreements" and further

states:

> This provision includes express terms and conditions of the agreement and any violation
> of it shall be grounds for unilateral termination of the agreement by USAID prior to the
> end of the term.

*Id.*

FHI certainly considered the insertion of the AAPD 05-04 standard clause into their grant

agreement as "final agency action." In a message to DKT International, FHI pointed to their

own USAID agreement as the basis for the refusal to fund DKT International for the lubricant

program and in the future. Steve Mills, a FHI representative stated, "The FHI policy and

certification requirement is in compliance with FHI's Agreement with USAID, including USAID

31

Acquisition and Assistance Policy Directive 05-04 issued June 9, 2005. Thus, FHI is unable to provide additional funding to DKT." Email from Steve Mills, FHI, attached as Ex. G to Declaration of Lawrence C. Holzman, PI Motion. FHI was compelled by its own grant agreement terms to ensure that DKT had adopted a policy explicitly opposing prostitution.

The second test for ripeness requires the court to consider hardship to the parties of withholding the court's consideration. The AAPD policy has worked a "direct and immediate impact on [the plaintiff] that rises to the level of hardship." *Elec. Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1263 (D.C. Cir. 2004) (quotation marks omitted). The loss of the $60,000 lubricant grant, combined with the blanket ineligibility for all USAID anti-HIV/AIDS funding, has penalized DKT harshly for its refusal to utter compelled speech. Since refusing to adopt a policy opposing prostitution, DKT has not only lost the $60,000 lubricant grant. The organization has been unable to secure any USAID grants in Vietnam whatsoever. The U.S. government allocated $34 million to USAID Vietnam in support of HIV/AIDS programming for FY 2006. In 2005, DKT International submitted two proposals to FHI *and* to USAID for funding under the USAID HIV/AIDS program for FY 2005/2006. In addition to the lubricant proposal, DKT submitted a draft proposal for an outreach project to take the HIV/AIDS prevention message to rural areas via mobile units. DKT has received no communication from FHI or from USAID on the second proposal and assumes that the outreach project has been denied.

FHI also effectively denied the renewal of DKT's longstanding "100% Condom Access" project, funded since 1998 with USAID funds. The project, originally funded at approximately $250,000 per year, has now expired, forcing DKT to lay off a staff member and to significantly curtail its HIV/AIDS prevention activities. Like the Department of Justice guidelines at issue in

32

*Better Government Ass'n v. Department of State*, USAID's policy has had a "direct and immediate impact on [DKT's]" "primary conduct [that has been] . . . felt immediately." 780 F.2d at 93 (internal quotation marks omitted).  And as discussed in DKT's preliminary injunction application, the grant opportunities lost now cannot be recouped later.  *Ambach v. Bell*, 686 F.2d 974, 986 (D.C. Cir. 1982) (per curiam).  The denial of funding is not abstract.  And consideration by this Court is both timely and necessary.

CONCLUSION

For the reasons stated herein, the defendants' Motion to Dismiss should be denied.

Respectfully submitted,
DKT INTERNATIONAL, INC.

By _____
One of Plaintiff's Attorneys

Julie M. Carpenter
    D.C. Bar No. 418768
Martina E. Vandenberg
    D.C. Bar No. 476685
JENNER & BLOCK LLP
601 13th Street, N.W.
Washington, DC 20005
(202) 639-6000

OF COUNSEL
David S. Udell*
Rebekah Diller*
Laura K. Abel*
Brennan Center for Justice at NYU School of Law
161 Avenue of the Americas
12th Floor
New York, NY 10013
(212) 998-6730

* Not admitted in the District of Columbia

34

## CERTIFICATE OF SERVICE

I hereby certify that this 24th day of October, 2005, a copy of the foregoing Opposition to

Motion to Dismiss was served by first class mail, postage prepaid, on the following:

> Rupa Bhattacharyya
> Senior Trial Counsel
> Federal Programs Branch, Civil Division
> U.S. Department of Justice
> P.O. Box 883
> 20 Massachusetts Avenue, NW
> Washington, DC  20001

Martina E. Vandenberg