**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DKT, INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-01604 |
| | ) | |
| UNITED STATES AGENCY FOR | ) | |
| INTERNATIONAL DEVELOPMENT | ) | |
| and ANDREW S. NATSIOS, in his | ) | |
| Official Capacity as ADMINISTRATOR, | ) | |
| UNITED STATES AGENCY FOR | ) | |
| INTERNATIONAL DEVELOPMENT, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

The Leadership Act creates a multi-billion dollar federal spending program intended to cement the United States's leadership role in the worldwide fight against the spread of HIV/AIDS. In furtherance of that program, Congress identified a number of specific priorities, including the eradication of prostitution and sex trafficking, which Congress specifically found to be factors in and causes of the spread of HIV/AIDS. To ensure that federal money was not spent to subsidize activities that the United States does not support, Congress included a provision in the Leadership Act that limits the uses to which federal money may be put. See 22 U.S.C. § 7631(e) (the "funding restriction"). Plaintiff concedes, as it must in light of the decisional law, that Congress has the power to make decisions regarding the activities that it chooses to support with federal funds, and plaintiff's only challenge to the funding restriction is that it is unconstitutionally vague. As fully explained in Part III of this reply brief, and in defendants' earlier filings, it is not.

In addition to the funding restriction, and in order to ensure that federal subsidies are not awarded to organizations that have policies inconsistent with the goals of the program created by the Leadership Act, Congress also enacted a provision restricting the eligibility to participate in Congress's program to organizations that have a "policy explicitly opposing prostitution and sex trafficking."  See 22 U.S.C. § 7631(f) (the "organizational eligibility restriction").  This restriction does not constitute a direct regulation of any entity or activity but rather serves as a tool by which Congress can ensure that federal funds are awarded to organizations qualified to participate in the federal program for which those funds are appropriated.

The focus of this lawsuit is on plaintiff's challenge to the organizational eligibility restriction as unconstitutional and plaintiff's attempt to rely on Supreme Court precedent to support that challenge.  The fundamental flaw in each of plaintiff's arguments in opposition to defendants' motion to dismiss, however, is that, although those arguments cite liberally from cases that plaintiff claims are dispositive here, plaintiff offers no valid analysis of the facts of those cases that demonstrates why the reasoning of those decisions has the effect of rendering the eligibility requirement contained in the Leadership Act unconstitutional.  This is because none of the cases plaintiff cites in fact requires such a result.  To the contrary, a careful analysis of the Supreme Court's decisional law involving the interaction of the Spending Clause and the First Amendment demonstrates that Congress's decision as to who it will choose to subsidize, i.e., the organizational eligibility restriction, falls as clearly within Congress's constitutional powers as Congress's decision as to what it will choose to subsidize, i.e., the funding restriction.

## I.     NEITHER STRICT NOR HEIGHTENED SCRUTINY APPLIES.

Plaintiff continues to insist that simply because it has invoked the First Amendment, it can demand that heightened scrutiny apply to its challenge.  As defendants have repeatedly

explained, Dfts' Opp. to Pl's App. for Prelim. Injunction ("Dfts' PI Opp.") at 15-19; Dfts' Mem.

of Points and Authorities in Support of Motion to Dismiss ("Dfts' Dismiss Mem.") at 15-19, this

is not the law.  Since at least 1936, the Supreme Court has held that measures enacted by

Congress pursuant to its broad authority under the Spending Clause need only be rationally

related to a legitimate public purpose.  See Butler v. United States, 297 U.S. 1, 66 (1936).  The

Court of Appeals for the District of Columbia Circuit, after analyzing the Supreme Court's

decisions in cases like Rust v. Sullivan, 500 U.S. 173 (1991), and Regan v. Taxation with

Representation of Wash., 461 U.S. 540 (1983), has similarly recognized that "so long as the

purpose of a statute is not to 'suppress [] . . . dangerous ideas,' . . . it is constitutional if it has a

rational basis."  Federal Election Comm'n v. Int'l Funding Institute, 969 F.2d 1110, 1116 (D.C.

Cir. 1992) (en banc); accord DKT Memorial Fund v. U.S. Agency for Int'l Development, 887

F.2d 275, 291 (D.C. Cir. 1989) (a "subsidization decision is not 'predicated on a suspect

classification' and is subject to only a rational relationship test not the sort of strict scrutiny that

may require use of the least restrictive means") (citations omitted).

The adoption of plaintiff's contrary view would require a radical shift in the doctrinal

framework for judicial review of Spending Clause enactments, and indeed, a significant

departure from well-established principles of law that generally govern Congress's power to

condition the availability of federal subsidies on actions that further national policy goals.

Despite plaintiff's failure to distinguish between funding conditions, on the one hand, and direct

legislative mandates, on the other, as the Supreme Court explained in National Endowment for

the Arts v. Finley, 524 U.S. 569 (1998), "[t]here is a basic difference between direct state

interference with a protected activity and state encouragement of an alternative activity consonant

with legislative policy."  Id. at 588; accord Rust, 500 U.S. at 193 (quoting Maher v. Roe, 432

U.S. 464, 475 (1977)).

The "basic difference" referenced by the Supreme Court is the distinction between a legal obligation that is <u>imposed</u> through the coercive power of government and a course of action that is <u>voluntarily assumed</u> by persons or entities seeking to avail themselves of a government-conferred subsidy. This distinction plays a critical role in the evaluation of government action, whether viewed through the lens of the Spending Clause or not. Thus, in <u>Rust</u>, the Court rejected, without invoking strict scrutiny, a First Amendment claim by a private grantee who complained that limitations on the use of federal funds were "impermissible because they condition the receipt of a benefit . . . on the relinquishment of a constitutional right, the right to engage in abortion advocacy and counseling." 500 U.S. at 196; <u>see</u> <u>id.</u> at 198-99 ("The employees' freedom of expression is limited during the time that they actually work for the project; <u>but this limitation is a consequence of their decision to accept employment in the project</u>, the scope of which is permissibly restricted by the funding authority") (emphasis added). Similarly, in <u>Cornelius v. NAACP Legal Defense and Educ. Fund</u>, 473 788, 806-11 (1985), the Court held that the government may constitutionally restrict the availability of a "non-financial benefit" (eligibility to participate in the federally sponsored Combined Federal Campaign) to charitable organizations that solicit funds solely for traditional health and welfare activities and do not attempt to influence the outcome of political elections or the determination of public policy.[1]

As the above decisions and others cited in defendants' briefs, <u>see</u> Dfts' PI Opp. at 15-18;

---

[1] <u>See also</u> Regan, <u>supra</u> (upholding the denial of tax exempt status to nonprofit organizations engaged in substantial lobbying activities); <u>Waters v. Churchill</u>, 511 U.S. 661, 672 (1994); <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983) (both upholding restrictions on federal employee speech when imposed as a consequence of their acceptance of federal employment).

Dfts' Dismiss Mem. at 15-18, make clear, the constraints imposed by the First Amendment are substantially less demanding in circumstances where the activity that is alleged to violate the First Amendment arises not from governmentally imposed regulation, but instead from a voluntary undertaking by the recipient of a governmental subsidy.  That is precisely the situation that exists here.  However hard it might try, plaintiff cannot merely shunt to one side the inescapable fact that the eligibility restriction contained in the Leadership Act is no more and no less than a funding condition that imposes requirements only on those entities that choose to accept federal subsidies.  Congress's power to "further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives," Fullilove v. Klutznick, 448 U.S. 448, 474 (1980) (opinion of Burger, C.J.), is unquestioned and Congress's exercise of that power is routinely upheld.  The same goes for the well-accepted proposition that Congress's power to spend is "not limited by the direct grants of legislative power found in the Constitution."  Butler, 297 U.S. at 66.

To apply strict scrutiny to the eligibility restriction, as plaintiff demands, would ignore this "basic difference" repeatedly recognized by the Supreme Court, and may well run counter to the consistently-cited proposition that the constitutional limitations on Congress when it exercises its spending power "are less exacting that those on its authority to regulate directly." Dole, 483 U.S. at 209; see also Finley, 524 U.S. at 587-88 ("the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake").[2]  Congress's spending conditions are viewed with greater

---

[2]    Contrary to plaintiff's overblown claim that defendants assert "that Congress has no independent constitutional constraints when it pays private organizations to carry out government programs," Pl's Opp. to Dfts' Mot. to Dismiss, at 4, defendants have made no such argument.  What defendants argue is the principle accepted by both the Supreme Court and the D.C. Circuit, i.e., that in circumstances analogous to those present here, the constitutional constraints on Congress's

deference by the courts than direct regulations for one obvious reason:  any funding recipient

retains the power to decline the subsidy.  See New York v. United States, 505 U.S. 144, 168

(1992) (where Congress exercises the spending power to encourage States to make particular

policy choices, "the residents of the States retain the ultimate decision as to whether or not the

State will comply.  If a State's citizens view federal policy as sufficiently contrary to local

interests, they may elect to decline a federal grant."); see also id. at 174 ("The choice remains at

all times with the residents of the State, not with Congress.  The State need not expend any

funds, nor participate in any federal program, if local residents do not view such expenditures or

participation worthwhile"); Rust, 500 U.S. at 199 n. 5 ("subsidies are just that, subsidies.  The

recipient is in no way compelled to operate the [government-funded] program; to avoid the force

of the [funding condition], it can simply decline the subsidy").  The Leadership Act does nothing

more than pose a choice to federal funding recipients.  The Court "has never held that the

Government violates the First Amendment simply by offering that choice."  Rust, 500 U.S. at

199 n. 5.

        Plaintiff ignores these fundamental principles and instead cites cases that are easily

distinguishable in its misguided effort to seek strict scrutiny.  Thus, plaintiff begins by urging

that, under FCC v. League of Women Voters, 468 U.S. 364, 375 (1984), where a funding statute

"operates to restrict expression," it is subject to "scrutiny under the First Amendment."  Pl's Opp.

to Dfts' Mot. to Dismiss ("Pl's Dismiss Opp.") at 3.  This assertion mischaracterizes the

prevailing law in several respects and ignores the decisions of the Supreme Court in later cases,

such as Finley, where the Court has specifically identified the characteristics of a Spending

---

exercise of its power to control the federal purse are far less than plaintiff claims.  See Rust, 500 U.S.
at 194 ("Within far broader limits than petitioner is willing to concede, when the Government
appropriates public funds to establish a program, it is entitled to define the limits of that program").

Clause enactment that might raise a proverbial constitutional eyebrow.

Plaintiff's single-minded emphasis on whether a funding statute "operates to restrict expression" is an effort to create a overarching heightened standard of review that nowhere appears in the cases on which they rely.[3]  To the contrary, as the Court has recognized subsequent to its decision in League of Women Voters, three factors are critical to the question of whether a subsidy provision raises the level of scrutiny beyond the rational basis review mandated by the cases cited above.  First, as the Court recognized in Finley, and reaffirmed in Legal Servs. Corp. v. Velazquez, 531 U.S. 533 (2001), cases where the government is providing subsidies in order to "encourage a diversity of views from private speakers" are fundamentally distinguishable from those cases where the government is acting, not as a regulator, but rather as a facilitator of its own message.  See Finley, 524 U.S. at 587-88 ("Although the First Amendment certainly has application in the subsidy context, we note that the government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake"); Velazquez, 531 U.S. at 541 ("viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker . . . or instances, like Rust, in which the government 'used private speakers to transmit specific information pertaining to its own programs'") (citing Rosenberger v. Rector and Visitors of the Univ. of Virginia, 515 U.S. 819, 833 (1995)); see also United States v. American Library Ass'n, 539 U.S. 194, 213 n. 7 (2003) (plurality op.) (discussing the distinction between cases where the government facilitates private speech and cases where the issue is "the government's right . . . to use its own funds to

---

[3]  In any event, as described in defendants' prior papers, see, e.g., Dfts' Dismiss Mem. at 3, 22-23, the eligibility restrictions in the Leadership Act do not "operate to restrict speech"; to the contrary, the conditions do not directly regulate speech at all, but rather serve as a tool by which the Government might identify those organizations eligible to participate in this particular funding program.

advance a particular message").  Thus, when the government broadly facilitates private speech it

is entitled to less deference than where, as here, it seeks to promote its own messages.  Compare

Rosenberger, 515 U.S. at 834 (applying heightened First Amendment scrutiny to viewpoint-

based restrictions on the use of a limited public forum where the government "does not itself

speak or subsidize transmittal of a message it favors but instead expends funds to encourage a

diversity of views from private speakers"), with Finley, 524 U.S. at 586, 118 S.Ct. 2168 ("In the

context of arts funding, in contrast to many other subsidies, the Government does not

indiscriminately encourage a diversity of views from private speakers.") (internal quotation

marks and citation omitted).

Second, again as the Court recognized in Finley, a key factor in determining whether the

government has overstepped the bounds of the First Amendment when it acts to facilitate its own

message by providing government subsidies is whether the subsidy is "manipulated" to have a

"coercive effect" such that it "result[s] in the imposition of a disproportionate burden calculated

to drive 'certain ideas or viewpoints from the marketplace.'"  Finley, 524 U.S. at 587 (citations

omitted); see also Federal Election Comm'n v. Int'l Funding Institute, 969 F.2d at 1116

(concluding, after analyzing Supreme Court precedent, that in the arena of government funding,

"so long as the purpose of a statute is not to 'suppress [] . . . dangerous ideas,' . . . it is

constitutional if it has a rational basis").

Third, always of import to the analysis is the relationship of the funding criterion to the

program that is being funded.  See National Amusements, Inc. v. Town of Dedham, 43 F.3d 731,

747 (1st Cir. 1995) ("Not all conditions are prohibited . . . if a condition is germane – that is, if

the condition is sufficiently related to the benefit – then it may validly be imposed. . . . The more

germane a condition to a benefit, the more deferential the review; nongermane conditions, in

contrast, are suspect."). Thus, where a funding restriction applies to a program intended to disseminate the government's message, does not have a coercive effect intended to drive certain ideas or viewpoints from the marketplace, and is germane to the spending program at issue, no "pressing constitutional concern" arises. See Finley, 524 U.S. at 587.

In each of the cases plaintiff cites, see Pl's Dismiss Opp. at 4-5, one or more of these factors was absent. Thus, in FCC v. League of Women Voters, the Court was confronted with a circumstance where the regulatory agency sought to restrict editorializing in a funding program aimed at "supplement[ing] existing state, local and private financing so that educational broadcasting could realize its full potential as a true alternative to commercial broadcasting," 468 U.S. at 368, a program clearly intended to "facilitate private speech" and to "encourag[e] a diversity of views from private speakers." Velazquez, 533 U.S. at 542. Moreover, the context in which the Court approached its decision in League of Women Voters involved the Government acting in its power as regulator, not as a purveyor of its own message; thus, the Court specifically noted that the analysis applicable to broadcast regulation cases was applicable to the decision in that case. See 468 U.S. at 375-76. League of Women Voters – which notably, rejected the application of strict scrutiny, see id. at 376 – hardly establishes that strict or heightened scrutiny is appropriate where the government, as here, acts not as a regulator in a program created to facilitate private speech, but rather in a program that recruits partners from the private sector to act in furtherance of the government's own programmatic message.

Plaintiff's reliance on the decision in ACLU v. Mineta, 319 F. Supp. 2d 69 (D.D.C. 2004) (Friedman, J.), is equally misplaced. First, the Court squarely recognized in that case the very proposition that plaintiff here would cavalierly dismiss, i.e., that where the case involves a "condition placed by Congress on a federal appropriation," a plaintiff's First Amendment

challenge "cannot be addressed independently from the doctrine surrounding the exercise of the congressional spending power." 319 F. Supp. 2d at 78. Second, the Court also noted that viewpoint-based restrictions are unconstitutional when the government "expends funds to encourage a diversity of views from private speakers," id. at 84 (quoting Rosenberger, 515 U.S. at 834), or "whenever funding 'is designed to facilitate private speech, not to promote a governmental message.'" 319 F. Supp. 2d at 84 (quoting Velazquez, 531 U.S. at 542). The Court found, however, that the funding program containing the restriction at issue in ACLU v. Mineta – a condition that restricted recipients of federal transportation funds from accepting advertising promoting the medical use or legalization of any controlled substance – fell within neither of these two categories: "This case is not about government funding speech, private or otherwise." 319 F. Supp. 2d. at 84. Instead, the Court found, the "government has articulated no legitimate state interest in the suppression of this particular speech other than the fact that it disapproves of the message, an illegitimate and constitutionally impermissible motive." Id. at 85. ACLU v. Mineta, accordingly, offers little guidance in a case, like this one, where the government is funding a program aimed at distributing its own message, and does so in a manner that is calculated, not to suppress any "dangerous message," but, rather, to ensure that the government's priority of eradicating prostitution – found to be a factor in and cause of the spread of HIV/AIDS – is fulfilled.

Plaintiff has little to say about those cases upon which defendants rely in support their argument that rational basis review is the appropriate framework. In Rust, Regan, and Finley, the Court found it necessary only that government demonstrate that its condition was rationally related to the spending program to which it was attached. See also Federal Election Comm'n v. Int'l Funding Institute, 969 F.2d at 1116; accord DKT Memorial Fund, 887 F.2d at 287-88, 291.

The Leadership Act establishes criteria which the implementing agencies use to identify those organizations that are eligible for funding and those that are not.  Nothing in that Act directly regulates speech, and none of the decisions upon which plaintiff attempts to rely establishes that when Congress makes a policy determination to pursue certain specified goals with government funds, it cannot, at the same time, identify those organizations that will be eligible to participate in a program as adequate partners in the effort to disseminate a government message.  Moreover, the Leadership Act, like the program at issue in Rust, creates a program that is intended to recruit private actors to assist in the dissemination of the government's message and does no more than is necessary to ensure that those private partners who are recruited are adequately committed to the government's cause – and not their own private agendas.  The condition evidences no intention on Congress's part to drive competing philosophies from the marketplace; indeed, it has no coercive effect at all.  All the provision is intended to do is to ensure that government funding for a particular goal – the prevention of HIV/AIDS – is awarded to those private actors who share the government's goal of eradicating the causes of that disease, including prostitution and sex trafficking.  It is intended to implement Congress's choice as to who to subsidize, just as the funding restrictions repeatedly sustained by the Court are intended to implement Congress's choices as to what to subsidize.  As the D.C. Circuit has repeatedly recognized, when evaluating subsidization decisions, "so long as the purpose of a statute is not to 'suppress [] . . . dangerous ideas,' . . . it is constitutional if it has a rational basis."  Federal Election Comm'n v. Int'l Funding Institute, 969 F.2d at 1116; accord DKT Memorial Fund, 887 F.2d at 288-89, 291; see also Finley, 524 U.S. at 587.  Because the relationship between the eradication of prostitution and the goal of preventing the spread of HIV/AIDS is certainly rational, the eligibility restriction contained in the Leadership Act plainly survives such scrutiny.

**II.    THE LEADERSHIP ACT'S ELIGIBILITY RESTRICTION DOES NOT CONSTITUTE AN UNCONSTITUTIONAL CONDITION.**

Plaintiff contends that the eligibility condition at issue here should be deemed unconstitutional because it operates to restrict speech that plaintiff might undertake with its private funds.  See Pl's Dismiss Opp. at 10-21.  This distinction, however, does not render the condition contained in that Act unconstitutional.

First, despite plaintiff's glib dismissal of the meat of the D.C. Circuit's decision in DKT Memorial Fund, supra, as "dicta," nowhere does plaintiff make any serious attempt to grapple with the reasoning employed by the Court of Appeals.  As described in defendants' prior filings, see Dfts' Dismiss Mem. at 20-23, the issue addressed by the D.C. Circuit in DKT Memorial Fund was whether USAID, following a policy determination made the President, could apply an organizational eligibility restriction to foreign organizations that sought family planning funds.  See 887 F.2d at 277 ("the United States Government will no longer contribute to separate nongovernmental organizations which perform or actively promote abortion as a method of family planning in other nations").  Like here, the policy at issue in DKT Memorial Fund made certain organizations ineligible for federal funds if they undertook certain activities with their private funds.  In other words, like here, the DKT Memorial Fund Court confronted the question of whether the government can decide who to subsidize on the same terms as it may decide – by virtue of well-established law – what to subsidize.  Despite plaintiff's failure to acknowledge the similarities, the reasoning employed by the D.C. Circuit in DKT Memorial Fund is wholly relevant here.

Although plaintiff adamantly claims that this Court should pay no attention to the decision of the D. C. Circuit in DKT Memorial Fund, plaintiff does not seriously contest the reasoning applied by the Court in arriving at its conclusions.  Whatever may be the

authoritativeness of the opinion of the Court of Appeals in <u>DKT Memorial Fund</u>, plaintiff cannot

avoid the consequences of the reasoning applied by the D.C. Circuit simply by dismissing its

opinion as dicta.  Quite simply, plaintiff offers no coherent argument, dicta or not, why the D.C.

Circuit got it wrong.  Thus, plaintiff does not contend that the Court of Appeals erred when it

determined that strict scrutiny was not to be applied to review of an eligibility restriction in a

federal funding program, <u>see</u> <u>DKT Memorial Fund</u>, 887 F.2d at 287-88 (citing <u>Regan</u>, 461 U.S.

at 549; <u>Buckley v. Valeo</u>, 424 U.S. 1 (1976); and <u>Cammarano v. United States</u>, 358 U.S. 498

(1959)); <u>id.</u>, at 289 (citing <u>Maher v. Roe</u>, 432 U.S. at  477); plaintiff does not contend that the

Court of Appeals reasoned incorrectly when it determined that the unconstitutional conditions

cases cited by plaintiff such as <u>Speiser v. Randall</u>, 357 U.S. 513 (1958), and <u>Perry v.

Sindermann</u>, 408 U.S. 593 (1972), did not apply to a case involving an eligibility condition in a

federal funding program, <u>see</u> 887 F.2d at 287-288; plaintiff does not contest the Court of

Appeals' conclusion that viewpoint-based funding decisions are acceptable when the government

makes selective subsidy decisions, <u>see</u> 877 F.2d at 289; and plaintiff does not challenge the Court

of Appeals' conclusion that where the federal government establishes a program that operates

overseas, it has a strong interest in ensuring that its private partners share its program goals so as

to avoid confusion of the government's message in matters relating to foreign aid.  <u>See</u> <u>id</u>. at 289-

291 (citing <u>Baker v. Carr</u>, 369 U.S. 186 (1962)).

        Indeed, plaintiff makes little response at all to the D.C. Circuit's decision in <u>DKT

Memorial Fund</u> other than to repeatedly point out that "the court emphasized that the regulation

did not restrict domestic NGOs' use of their private funds."  <u>See</u> Pl's App. for Prelim. Injunction

("Pl's PI Mem") at 8-9; Pl's Dismiss Opp. at 13-14.  Since the policy at issue in <u>DKT Memorial

Fund</u> only applied to foreign organizations, a point which defendants have repeatedly noted,

see Dfts' PI Opp. at 18 n.5; Dfts' Dismiss Mem. at 29 & n.11, it is hardly surprising that the policy had no effect whatsoever on anything done by domestic organizations.  But nothing in DKT Memorial Fund suggests that domestic organizations faced with a similar policy decision by the federal government would have any better chance of success on their First Amendment claims than did the foreign organizations that were the subject of the D.C. Circuit's opinion in DKT Memorial Fund.

Second,  none of the cases upon which plaintiff does seek to rely establishes that Congress lacks the power to limit the eligibility of persons who participate in a federal spending program aimed at purposes like those contained in the Leadership Act.  Indeed, to the contrary, other such programs exist.  See Dfts' Dismiss Mem. at 25 n.9.[4]  Moreover, the Court has previously upheld the extension of restrictions on government funds to private funds used by the recipient of a government subsidy.  Thus, in Rust v. Sullivan, for example, the Court specifically considered and rejected the plaintiffs' argument that "the regulations violate the First Amendment by penalizing speech funded with non-Title X moneys" because "since Title X requires that grant recipients contribute to the financing of Title X projects through the use of matching funds and grant-related income, the regulation's restrictions . . . penalize privately-funded speech."  500 U.S. at 199 n.5.  The Court found this argument "flawed for several reasons," one of which is controlling here.  The Court rejected the plaintiffs' complaint about restrictions on the use of private funds because "Title X subsidies are just that, subsidies.  The recipient is in no way compelled to operate a Title X project; to avoid the force of the regulations

_____

[4]  See also Dfts' Dismiss Mem. at 14 (describing the requirement that federal funding recipients of various stripes implement nondiscrimination policies).  That funding recipient under these programs must expend non-federal funds to implement the required nondiscrimination policies does not render these requirements constitutionally defective.

it can simply decline the subsidy. . . . By accepting Title X funds, a recipient voluntarily consents

to any restrictions on any matching funds or grant-related income." Id.[5]  Similarly, in Buckley v.

Valeo, although the Court found that limitations on the expenditure of private funds for political

campaigns violated the First Amendment when unrelated to a federal subsidy, once a candidate

chose to accept federal subsidies in the form of federal matching funds, expenditure limits on the

use of private funds were considered part of the bargain.  424 U.S. at 57 & n.65, 85-104.

Other statutory schemes examined by the Supreme Court contain similar limits on the use

of private funds.  For example, the statutory scheme sustained in American Library Ass'n v.

Ashcroft, 539 U.S. 194 (2002), requires each library or school that accepts federal funding to

adopt "a policy of Internet safety that includes the operation of a technology protection

measure . . .  that protects against access" by all persons to "visual depictions" that constitute

"obscen[ity]" or "child pornography," and that protects against access by minors to "visual

depictions" that are "harmful to minors,"on all of its computers connected to the Internet,

regardless of the other sources of funding which might have supported the provision of those

computers.  See 20 U.S.C. §§ 9134(f)(1)(A)(i) & (B)(i); 47 U.S.C. §§ 254(h)(6)(B)(i) & (C)(i).

Similarly, in Velazquez – while the Supreme Court struck one restriction on activities

that could be undertaken with government funds for reasons that are wholly distinguishable here,

---

[5]     Although the Court offered a second reason for its rejection of this argument – that the "regulation is limited to Title X funds; [and] the recipient remains free to use private, non-Title X funds to finance abortion-related activity," 500 U.S. at 199 n.5 – it nowhere suggested that both reasons were required to sustain the constitutionality of the requirement.  And, of course, as previously noted by defendants, the Rust Court did not hold, and, indeed, had no reason to squarely decide, that Congress could not exclude from eligibility for federal funding those organizations which adopt policies that are inconsistent with the very goals of the program being funded.  See Dfts' Dismiss Mem. at 25-27.

see Dfts' Dismiss Mem. at 19 n.8[6] – the statutory scheme at issue in that case contains numerous

other restrictions, including prohibitions on using funds.   Thus, for example, funds made

available under this statutory scheme may not be used to (1) "support or conduct training

programs for the purpose of advocating particular public policies or encouraging political

activities, labor or antilabor activities, boycotts, picketing, strikes, and demonstrations, as

distinguished from the dissemination of information about such policies or activities" with

certain exceptions; (2) "provide legal assistance with respect to any proceeding or litigation

which seeks to procure a nontherapeutic abortion or to compel any individual or institution to

perform an abortion, or assist in the performance of an abortion, or provide facilities for the

performance of an abortion, contrary to the religious beliefs or moral convictions of such

individual or institution"; (3) "provide legal assistance with respect to any proceeding or

litigation relating to the desegregation of any elementary or secondary school or school system,"

with certain exceptions; (4) "provide legal assistance with respect to any proceeding or litigation

arising out of a violation of the Military Selective Service Act [50 App. U.S.C.A. § 451 et seq.]

or of desertion from the Armed Forces of the United States," with certain exceptions; or (5)

"provide legal assistance in a manner inconsistent with the Assisted Suicide Funding Restriction

Act of 1997[, 42 U.S.C.A. § 14401 et seq.]."  See generally 42 U.S.C. § 2996f(b).  These

---

[6] As described above, the Velazquez decision focused on the three factors which the courts have long found critical to the decision of cases where the First Amendment interacts with Congress's spending prerogatives.  Unlike, the statutory scheme at issue here, that at issue in Velazquez involved an effort to facilitate private speech for reasons unrelated to the transmission of a government message, see 531 U.S. at 542, and the particular condition at issue sought to restrict expression in an effort to insulate the Government's own actions from challenge, 531 U.S. at 548, and was not germane to the program created by the statute.  See 531 U.S. at 543 (condition was designed to "distort the usual functioning" of the system created by the government program). Nothing in the Leadership Act resembles these factors critical to the Supreme Court's finding of unconstitutionality in Velazquez, and it is important to note that plaintiff makes no answer to these distinctions.

restrictions on uses of funds, moreover, extend to private funds received by the federal grantees as well.  See 42 U.S.C. § 2996i(c) ("Non-federal funds received by the Corporation, and funds received by any recipient from a source other than the corporation, shall be accounted for and reported as receipts and disbursements separate and distinct from Federal funds; but any funds so received for the provision of legal assistance shall not be expended by recipients for any purposes prohibited by this subchapter" with certain exceptions) (emphasis added).

Plaintiff makes no answer to these examples.  It is plain, however, that far from being the "extraordinary leap" that plaintiff condemns, see Pl's Dismiss Opp. at 17, the organizational eligibility restriction contained in the Leadership Act is no more than a tool by which Congress can separate those private organization that support the programmatic message intended to be disseminated by the funding program created by the Leadership Act from those that do not.  Those that do are qualified to be federal government's partner for the purposes of the very specific and specifically defined goals set forth in the Leadership Act; those that do not are not.[7]

To this, plaintiff's only answer is that "taking no policy position on 'prostitution'

_____

[7]  It is entirely incorrect for plaintiff to assert that what the government seeks to do here "would convert private speech of anyone accepting government money into government speech." Pl's Dismiss Opp. at 17-18, and have the effect of "silencing" those who disagree with the government.  As defendants have repeatedly explained – but as plaintiff repeatedly ignores – the key factors that distinguish this case from other cases where funding restrictions of the type at issue here might be unsustainable is that here, the government has created a program aimed at a very specific goal, the prevention of HIV/AIDS; has identified a leadership role for the United States to play in the pursuit of that goal on an international scale; has designated specific priorities in the pursuit of that goal, including the promotion of behavior change and the eradication of prostitution and sex trafficking; and has sought to recruit private partners to assist in the furtherance of the specific goals and priorities outlined in the Act.  Nothing in this very detailed and specific scheme suggests that the government is attempting to "silence" anyone, see Pl's Dismiss Opp. at 18, nor has plaintiff made any showing that the subsidies at issue here would operate in any coercive way.   See Finley, 524 U.S. at 587.  As courts have recognized, "a difficult choice remains a choice, and a tempting offer is still but an offer.  If [the grantee] finds the requirements so disagreeable, it is ultimately free to reject both the conditions and the funding, no matter how hard the choice may be." Doe v. Nebraska, 345 F.3d 593 (8th Cir. 2003).

whatsoever cannot reasonably be said to be 'inconsistent' with the government's view that it should be eradicated." Pl's Dismiss Opp. at 18. This is akin to seeking government funds to pursue the promotion of democratic principles but remaining neutral on the vitality of the right to vote. Congress and the President have identified the eradication of prostitution as a priority of the program created by the Leadership Act and they have done so in response to compelling testimony heard by Congress detailing the link and specific congressional findings that demonstrate that prostitution and sex trafficking are causes of and factors in the spread of HIV/AIDS and that such practices must be eliminated if there is to be a successful effort to fight this disease. Neutrality in the face of such findings in simply incompatible with the goals of the program, and Congress cannot be faulted for seeking to exclude organizations who can do no more than profess neutrality for this critical goal from participation in this particular funding program.

## III.    THE PROVISIONS OF THE LEADERSHIP ACT ARE NOT UNCONSTITUTIONALLY VAGUE.

Plaintiff's concerns about vagueness of the conditions contained in the Leadership Act are answered by the very cases upon which they seek to rely. In light of the clear evidence connecting prostitution, sex trafficking and the spread of HIV/AIDS, and given Congress's policy goal of prioritizing behavior change and, specifically, the eradication of prostitution and other sexual victimization, as part of its fight against the disease, see 22 U.S.C. §§ 7601(23), 7611(a)(4), the Leadership Act imposes two limitations on the $15 billion program it created to prevent, treat, and monitor HIV/AIDS. First, the Act provides that "[n]o funds made available to carry out this Act or any amendment made by this Act, may be used to promote or advocate the legalization or practice of prostitution or sex trafficking." 22 U.S.C. § 7631(e) (the "funding restriction"). Second, the Act provides that "[n]o funds made available to carry out this Act, or

any amendment made by this Act, may be used to provide assistance to any group or organization

that does not have a policy explicitly opposing prostitution and sex trafficking."  22 U.S.C.

§ 7631(f) (the "organizational eligibility restriction").  There is nothing unconstitutionally vague

about these provisions.

Under the First Amendment, "speakers are protected from arbitrary and discriminatory

enforcement of vague standards."  Finley, 524 U.S. 569, 588 (1998).  The courts are concerned

with vague statutes in "criminal and regulatory contexts where speakers – because they do not

understand what the statute proscribes – will feel compelled to steer too far clear of any

'forbidden area.'"  ACLU v. Mineta, 319 F. Supp. 2d at 76.  As the Supreme Court recognized in

Finley, however, "it is unlikely that speakers will be compelled to steer too far clear of any

'forbidden area' in the context of grants of this nature."  524 U.S. at 588 (contrasting Grayned v.

City of Rockford, 408 U.S. 104, 108 (1972)).  Moreover, as the Supreme Court further

recognized, "when the government is acting as patron rather than as sovereign, the consequences

of imprecision are not unconstitutionally severe."  Finley, 524 U.S. at 588.  Plaintiff thus again

fails to grasp the basic difference between statutes that coerce compliance and statutes that offer

voluntary choices.

As the Finley Court acknowledged, "[i]n the context of selective subsidies, it is not

always feasible for Congress to legislate with clarity."  Id. at 589; see also United States v.

Thomas, 864 F.2d 188, 195 (D.C. Cir. 1988) ("language is unavoidably inexact" and statutes

cannot "in reason, define proscribed behavior exhaustively or with consummate precision").  As

defendants have previously noted, see Dfts' Dismiss Mem. at 36-38, even in the context of the

First Amendment, courts do not require "that a person contemplating a course of action know

with certainty whether his or her act will be found to violate the proscription."  Thomas, 864 F.2d

at 195.  All that is required is that the provisions be "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with. . . . " <u>Id.</u>

There is nothing so unclear about the provisions of the Leadership Act as to render them facially invalid under these well-established standards.  Despite plaintiff's objections, a "common person exercising ordinary common sense" can understand the significance of the term "prostitution," and, indeed, plaintiff, which refused to accept the funding condition, does not allege that it did so because it failed to understand that condition, but rather because it disagreed with Congress's policy choice.  <u>See</u> Holzman Decl. ¶ 18 ("DKT International has no policy either opposing or supporting prostitution.  DKT objects to and will not adopt a policy 'opposing prostitution.'").  As the Court found in <u>ACLU v. Mineta</u>, when evaluating a statutory provision that denied federal mass transit funding to "any Federal transit grantee . . . involved directly or indirectly in any activity that promotes the legalization or medical use of any substance listed in Schedule I of the Controlled Substances Act," despite some vagueness in its terms, "the essence of the provision is quite clear."  319 F. Supp. 2d at 76; <u>see</u> <u>also</u> <u>Finley</u>, 524 U.S. at 590 (upholding against a vagueness challenge the requirement that the National Endowment for the Arts evaluate grant applications by "tak[ing] into consideration general standards of decency and respect for the diverse beliefs and values of the American public"; and cautioning that "to accept [plaintiff's] vagueness argument would be to call into question the constitutionality of . . . valuable Government programs and countless others like them").  The provisions of law at issue here are no less clear.

"Although 'the fertile legal imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question,'" <u>ACLU v. Mineta</u>, 319 F. Supp. 2d at 76 (citing <u>Terry v. Reno</u>, 101 F.3d 1412, 1421 (D.C. Cir. 1996)), such hypothetical questions, like

those raised by plaintiff, see Pl's Dismiss Opp. at 23, are insufficient to render a statute otherwise

written in clear and understandable language unconstitutionally vague.  Should plaintiff accept

funds under the program and accept the conditions attached to those funds, it will have every

opportunity to discuss its hypothetical fears of USAID enforcement action in an appropriate as-

applied context.[8]  See Finley, 524 U.S. at 587 ("We will not now pass upon the constitutionality

of these regulations by envisioning the most extreme applications conceivable, but will deal with

those problems if and when they arise.").[9]  In face of the substantial authority cited by

defendants, see Dfts' PI Opp. at 32-35; Dfts' Dismiss Mem. at 31-38, plaintiff has failed to

demonstrate that their unspecified fears of arbitrary USAID enforcement are sufficient to render

the provisions of the Leadership Act facially invalid.

**IV.    THIS COURT LACKS JURISDICTION TO ORDER USAID TO ADVISE FHI THAT IT IS AUTHORIZED TO DISBURSE THE $60,000 GRANT TO PLAINTIFF.**

Plaintiff concedes that its request that this Court order USAID to authorize the

disbursement of the contested $60,000 grant without any regard for other USAID conditions or

---

[8]  Plaintiff complains that "USAID has refused to provide any official guidance whatsoever on how the government will interpret or enforce the statutory provisions." Pl's Dismiss Opp. at 21. Plaintiff's complaint is curious since plaintiff does not anywhere allege that it sought such guidance from USAID.  In fact, with respect to the organizations currently proceeding in the separate litigation in the United States District Court for the Southern District of New York that is referenced by plaintiff, see Pl's Dismiss Opp. at 25, USAID provided guidance as to its views on activities that would run afoul of the restriction.  See Ex. A hereto (reiterating that Dr. Kent Hill, Acting Assistant Administrator of the USAID Bureau for Global Health notified the plaintiff in the New York case in April of 2005 that "advocating for the legalization of prostitution" or "organizing or unionizing prostitutes for the purposes of advocating for the legalization of prostitution, as distinct from organizing for the purposes of deterring human rights abuses" would be clear indicators that "an organization does not explicitly oppose prostitution").

[9]  Final agency actions taken by USAID related to grant decisions under its foreign aid programs are subject to review under the terms of the Administrative Procedure Act, 5 U.S.C. § 701, et seq.

requirements, and without giving USAID an opportunity to review the grant proposal as required by USAID's cooperative agreement with FHI, exceeds the scope of this Court's authority.  Thus, plaintiff now seeks different relief than that which is requested in its Complaint.  <u>See</u> Pl's Dismiss Opp. at 29 & n. 14.  It is "axiomatic," however, that the complaint "may not be amended by the briefs in opposition to a motion to dismiss."  <u>Car Carriers, Inc. v. Ford Motor Co.</u>, 745 F.2d 1101, 1107 (7th Cir. 1984); <u>see also</u> <u>Thomason v. Nachtrieb</u>, 888 F.2d 1202, 1205 (7th Cir. 1989) ("It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss . . . .").  In any event, plaintiff's new request for relief with respect to the $60,000 grant is nothing more than a reiteration of the relief it requests in response to its challenge to the funding conditions on their face, as to which defendants make no jurisdictional objection.  In other words, plaintiff seeks an order that USAID cannot enforce the eligibility restriction to exclude domestic organizations who do not have a policy explicitly opposing prostitution from government funding under the Leadership Act.  As fully described herein and in defendants' prior papers, plaintiff has failed to state a claim that could result in the grant of such relief.

## CONCLUSION

For the reasons stated herein, in Defendants' Opposition to Plaintiff's Application for Preliminary Injunction and in the Memorandum filed in Support of Defendants' Motion to Dismiss, plaintiff's challenge to the funding conditions contained in the Leadership Act should be dismissed.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

KENNETH L. WAINSTEIN
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch


__/s/ Rupa Bhattacharyya_____
RUPA BHATTACHARYYA (VA 38877)
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C.  20001
Tel: (202) 514-3146
Fax: (202) 318-7593
rupa.bhattacharyya@usdoj.gov

Dated: October 31, 2005