# EXHIBIT A

No. 04-1152

# In the Supreme Court of the United States

DONALD H. RUMSFELD, SECRETARY OF DEFENSE,
ET AL., PETITIONERS

*v.*

FORUM FOR ACADEMIC AND INSTITUTIONAL RIGHTS,
INC., ET AL.

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT*

## REPLY BRIEF FOR THE PETITIONERS

PAUL D. CLEMENT
*Solicitor General
Counsel of Record
Department of Justice
Washington, D.C. 20530-0001
(202) 514-2217*

TABLE OF CONTENTS

                                                                Page

A.  The Solomon Amendment does not result in a
    compelled speech violation .....................................................    1
B.  The Solomon Amendment does not impermissibly
    interfere with an institution's right to protest
    government action or to educate its students .................    8
C.  The Solomon Amendment does not violate the
    First Amendment right to associate ...................................    10
D.  The Solomon Amendment does not involve imper-
    missible viewpoint discrimination .......................................    13
E.  The Solomon Amendment is not subject to, but in
    any event satisfies, the *O'Brien* standard .......................    14
F.  The Spending Clause provides an independent justifi-
    cation for the Solomon Amendment ...................................    17

TABLE OF AUTHORITIES

Cases:

*Abood* v. *Detroit Bd. of Educ.*, 431 U.S. 209
    (1977) ..............................................................................................    11
*Boy Scouts of Am.* v. *Dale*, 530 U.S. 640 (2000) ...............    10
*Brown* v. *Socialist Workers '74 Campaign Comm.*,
    459 U.S. 87 (1982) .....................................................................    11
*Clark* v. *CCNV*, 468 U.S. 288 (1984) ......................................    8
*Elrod* v. *Burns*, 427 U.S. 347 (1976) ...................................    11
*First Nat'l Bank* v. *Bellotti*, 435 U.S. 765 (1978) ..............    11
*Giboney* v. *Empire Storage Co.*, 336 U.S. 490
    (1949) ..............................................................................................    4, 14
*Grove City Coll.* v. *Bell*, 465 U.S. 555 (1984) ..........    13, 17, 18
*Hishon* v. *King & Spalding*, 467 U.S. 69 (1984) ...............    12
*Hurley* v. *Irish-American Gay, Lesbian & Bi-*
    *sexual Group of Boston, Inc.*, 515 U.S. 557 (1995) .........    4, 5
*Johanns* v. *Livestock Mktg. Ass'n*, 125 S. Ct.
    2055 (2005) ..................................................................................    7, 9

(I)

II

Cases—Continued:                                                    Page

*Meyer* v. *Grant,* 486 U.S. 414 (1988) .....................................    11
*Miami Herald Publ'g Co.* v. *Tornillo,* 418 U.S.
    241 (1974) ................................................................................    6
*NAACP* v. *Alabama ex rel. Patterson,* 357 U.S.
    449 (1958) ................................................................................    11
*NAACP* v. *Button,* 371 U.S. 415 (1963) ............................    11
*NAACP* v. *Claiborne Hardware Co.,* 458 U.S.
    886 (1982) ................................................................................    9
*National Endowment for the Arts* v. *Finley,*
    524 U.S. 569 (1998) .............................................................    17, 18
*O'Hare Truck Serv., Inc.* v. *City of Northlake,*
    518 U.S. 712 (1996) .............................................................    11
*Pacific Gas & Elec. Co.* v. *Public Utils. Comm'n,*
    475 U.S. 1 (1986) ..................................................................    6, 7
*Pruneyard Shopping Ctr.* v. *Robbins,* 447 U.S.
    74 (1980) ................................................................................    3
*R.A.V.* v. *City of St. Paul,* 505 U.S. 377 (1992) ..............    3, 14
*Rosenberger* v. *Rector & Visitors of Univ. of
    Va.,* 515 U.S. 819 (1995) ....................................................    6, 13
*Rust* v. *Sullivan,* 500 U.S. 173 (1991) ................................    13
*Sabri* v. *United States,* 541 U.S. 600 (2004) ......................    19
*Shelton* v. *Tucker,* 364 U.S. 479 (1960) ..............................    11
*South Dakota* v. *Dole,* 483 U.S. 203 (1987) ........................    18
*Turner Broad. Sys., Inc.* v. *FCC,* 512 U.S. 622
    (1994) ................................................................................    2
*United States* v. *Albertini,* 472 U.S. 675 (1985) ...............    16
*United States* v. *O'Brien,* 391 U.S. 367 (1968) ..............    14, 15
*West Va. State Bd. of Educ.* v. *Barnette,* 319 U.S. 624
    (1943) ................................................................................    7
*Westside Cmty. Bd. of Educ.* v. *Mergens,*
    496 U.S. 226 (1990) ...................................................    3, 5, 13, 18
*Wooley* v. *Maynard,* 430 U.S. 705 (1977) ..........................    7
*Zauderer* v. *Office of Disciplinary Counsel of the
    Supreme Court,* 471 U.S. 626 (1985) ..................................    4

III

Constitution, statutes and regulation:                                    Page

  U.S. Const.:
    Art. I, § 8, Cl. 1 (Spending Clause) ................................    17
    Amend. I ..........................................................................    *passim*
      Free Press Clause ....................................................    6
  10 U.S.C. 983(c)(2) ...............................................................    13
  20 U.S.C. 1687(2)(A) .............................................................    19
  29 U.S.C. 794(b)(2)(A) ...........................................................    19
  42 U.S.C. 2000d-4a(2)(A) .......................................................    19
  42 U.S.C. 6107(4)(B)(1) ..........................................................    19
  50 U.S.C. App. 456(j) .............................................................    13
  32 C.F.R. 216.4(c)(3) .............................................................    13

Miscellaneous:

  140 Cong. Rec. 11,438 (1994) ................................................    15
  H.R. Rep. No. 443, 108th Cong., 2d Sess. Pt. 1
    (2004) ...............................................................................    20

## REPLY BRIEF FOR THE PETITIONERS

Respondents argue that the Solomon Amendment violates their rights to be free from compelled speech, to protest government policy, and to associate for expressive purposes. Those arguments are without merit. More fundamentally, respondents' arguments lose sight of the fact that the Solomon Amendment is not a free-standing requirement, but rather a common-sense condition on funds upon which any donor would insist. The United States makes available substantial federal funding that assists in the education of students, and in return seeks only the same opportunity to recruit those students that is extended to other employers.

### A. The Solomon Amendment Does Not Result In A Compelled Speech Violation

1. Respondents argue (Br. 21-22) that the Solomon Amendment violates the First Amendment because it compels educational institutions to speak. In particular, respondents assert that the Solomon Amendment compels educational institutions to put the military's recruitment literature in student mailboxes, post the military's job announcements on bulletin boards, email students about the military's arrival on campus, arrange appointments for students, supply meeting rooms, and reserve spots at job fairs. But any speech under the Solomon Amendment is doubly uncompelled. Institutions can avoid the equal access requirement entirely by declining federal funds. The Solomon Amendment, moreover, does not require institutions to provide military recruiters with any particular type of access. Institutions covered by the Solomon Amendment are free to define the services they provide to recruiters in any way they choose. The Amendment merely requires that they provide

(1)

2

military recruiters the same services that they deem appropriate for other recruiters.[1]

2. a. Even putting aside the first aspect of voluntariness —an institution's option to decline federal funding and its conditions—requiring institutions to provide equal access does not result in a compelled speech violation. Institutions operate widely inclusive recruitment programs, and participating employers have views that span the ideological spectrum. In that context, an equal access requirement—including a requirement that institutions host and carry the recruiting messages of military employers to the same extent as the institutions deem appropriate for other employers—merely ensures that military recruiters are not competitively disadvantaged in their search for qualified applicants; it does not result in institutions' adopting the messages of military recruiters (or any other recruiters) as their own. Absent circumstances not present here (see pp. 4-7, *infra*), when entities merely host and carry the messages of others, and are not required to adopt the messages as their own, no compelled speech violation occurs. See *Turner*

---

[1] Because the Solomon Amendment conditions federal assistance on recipients' providing military recruiters with the same level of access as provided to "any" other employer, respondents refer (Br. 7) to it as a "most-favored-recruiter" condition. Respondents do not suggest, however, that institutions provide participating employers varying levels of access. Thus, most-favored-recruiter access and equal access amount to the same thing. Respondents suggest (Br. 2, 5) that the Solomon Amendment establishes a preference for military recruiters because it relieves them from the institutions' requirement to provide equal treatment to homosexuals. The military, however, is not similarly situated with other employers that have policies on the employment of homosexuals. The military's policy is embodied in an Act of Congress, that law has been repeatedly upheld based in part on considerations unique to the military, and respondents have not challenged it here. See U.S. Br. 6-7 & n.1. Moreover, just as respondents do not challenge the military's employment policy, it is not an integral aspect of their legal theory. Respondents' theory would equally entitle them to express their disapproval of the global war on terrorism by excluding military (or Justice Department) recruiters.

3

*Broad. Sys., Inc.* v. *FCC*, 512 U.S. 622, 655 (1994); *Pruneyard Shopping Ctr.* v. *Robbins*, 447 U.S. 74, 87 (1980).

Thus, while there is no evidence that any military recruiter has ever said "Son, you have no place in the JAG Corps" (compare Resp. Br. 24, with J.A. 39-40), if such a remark were made, it would be the recruiter's speech, not the school's. Just as educational institutions do not purport to adopt the statements made to students by other recruiters for outside employers, they do not purport to adopt the statements of military recruiters as their own.

The same is true of messages delivered to students through the recruitment office. While respondents complain about activities such as posting the military's job announcements and emailing students about the arrival of military recruiters, the administrative personnel performing those functions act as conduits and facilitators of exchanges between military recruiters and the students, just as they do for other outside employers. They do not purport to act as spokespersons for the military any more than they do for Cravath, the Justice Department, the ACLU, or any other employer. The distinction between the school's own speech and messages it conveys to facilitate its equal access obligations is obvious enough for high school students to grasp, *Westside Cmty. Bd. of Educ.* v. *Mergens*, 496 U.S. 226, 250 (1990); *id.* at 268 (Marshall, J., concurring in the judgment), and should not be lost on law students. Indeed, the distinction is more obvious in the context of outside employers than for on-campus student groups.

b. Furthermore, a compelled speech problem does not arise simply because a general obligation to provide equal access may, on occasion, require an institution to engage in speech to fulfill that obligation. When the government has authority to regulate conduct, and that conduct is carried out in part through speech, the First Amendment does not prevent inclusion of the speech component of the conduct within the scope of the regulation. See *R.A.V.* v. *City of St. Paul*,

4

505 U.S. 377, 389 (1992); *Giboney* v. *Empire Storage Co.*, 336 U.S. 490, 502 (1949). Thus, while an employer that informs a white applicant that there is a job opening is compelled by Title VII to tell a minority applicant the same thing, that does not mean that Title VII is subject to strict scrutiny under the compelled speech doctrine. Instead, because the obligation to speak is simply an ancillary feature of a more general obligation to provide equal employment opportunities without respect to race, no compelled speech issue arises at all. The situation is the same here. Any obligation that an institution's recruiting office has to perform such routine tasks as scheduling interviews for military recruiters or sending emails announcing the arrival of employers simply reflects the fact that the office has already undertaken to perform those functions as part of the bundle of recruiting services it provides to outside employers, and that the institution, by accepting federal funds, has undertaken to provide military recruiters with equal access to those services.

Moreover, recruitment offices are engaged in an inherently commercial function that is analogous to that of any job placement agency: they are seeking to help place individuals with employers. The compelled speech doctrine has far less force in that inherently commercial context. In particular, it does not apply to the furnishing of basic information in that context. *Zauderer* v. *Office of Disciplinary Counsel of the Supreme Court*, 471 U.S. 626, 651 (1985). For that reason as well, when a recruitment office relays basic information about the availability of jobs for a wide group of employers, a requirement that it do the same for the military does not result in a compelled speech violation.

c. Respondents contend (Br. 22) that a requirement of equal access to a recruitment program is analogous to a requirement that a parade organizer include an unwanted message in its parade. See *Hurley* v. *Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995). That comparison is inapt.

5

As is true of all parades, the parade in *Hurley* was intended to express the collective views of its participants, 515 U.S. at 568, the parade organizer accordingly selected for inclusion in the parade messages it deemed worthy of presentation, *id.* at 574-575, the public therefore understood the messages to reflect the views of the organizer, *id.* at 575-577, and it was impractical for a moving parade to disclaim an unwanted message, *id.* at 576-577. In those circumstances, the message of any speaker in the parade became the speech of the parade organizer. That is why the Court invalidated as compelled speech a requirement that the parade organizer include an unwanted message in the parade.

An examination of the same factors leads to the opposite conclusion here. Educational institutions do not create recruitment programs as forums for the expression of their own ideological views; they create such programs to facilitate economic opportunities for their students with outside employers. Educational institutions do not approve the recruitment messages of employers that participate in their recruitment programs; they allow their students to judge the merit of the various employers' recruitment messages. And students and the public at large do not attribute to the educational institutions the recruitment messages of the participating outside employers. Cf. *Westside Cmty.*, 496 U.S. at 250; *id.* at 268 (Marshall, J., concurring in the judgment). Nor is it impractical for educational institutions to disavow the military's recruitment messages to the extent they disagree with them. Educational institutions voice their criticisms of government policies all the time (including the policies of government agencies, like the Justice Department, to which they extend full access), and there is no reason why they cannot also effectively differentiate their own views from those of military recruiters.

Respondents argue (Br. 27-28) that recruitment programs are like parades because institutions exclude some speakers based on *conduct* to which the institutions object. But that

6

does not make the messages of participating recruiters those of the institution. In *Rosenberger*, the university excluded student organizations from an expressive forum based on discriminatory conduct it found objectionable, but that practice did not transform the views of the participating student organizations into those of the university. See *Rosenberger* v. *Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 823, 834-835, 841-842 (1995). So too here, an institution that excludes some recruiters from its recruitment program based on conduct it finds objectionable does not transform the participating recruiters' speech into its own.

d. The other cases on which respondents rely take them further afield from the context of recruiting by outside employers and do not support their compelled speech claim. In *Miami Herald Publishing Co.* v. *Tornillo*, 418 U.S. 241 (1974), the Court invalidated a requirement that a newspaper publish a reply to its attacks on political candidates. The Court reasoned that newspapers make highly selective editorial judgments about what viewpoints most merit the public's consideration, and protection for those highly selective judgments lies at the core of the Free Press Clause. *Id.* at 258. The Court also emphasized that if States could force newspapers to publish views opposing their own, newspapers would be deterred from voicing controversial views. *Id.* at 257. Those considerations have no application here, which is far removed from the core of the Free Press Clause.

In *Pacific Gas & Electric Co.* v. *Public Utilities Commission*, 475 U.S. 1 (1986), the Court invalidated a requirement that an electric company include in its billing envelope messages that opposed the utility's views. The plurality reasoned that the expression in the utility's newsletter went beyond proposing a commercial transaction to include a discussion of issues of public concern, *id.* at 8-9, that an award of access based on the speaker's opposition to the utility's position would discriminate on the basis of viewpoint and deter the utility from speaking, *id.* at 13-14, and that the govern-

7

ment may not force a speaker to choose between appearing to agree with an opposing message or responding, *id.* at 15. Because the Solomon Amendment's equal access condition applies in the commercial context of recruiting for future employment, requires equal access rather than guaranteed placement of a message, and does not have any of the other features in *Pacific Gas*, that decision is inapposite here.

Finally, in *Wooley* v. *Maynard*, 430 U.S. 705 (1977), the Court invalidated a requirement that a motorist carry on his car an objectionable ideological message. Because of the close personal connection that a motorist has to his car, the Court viewed that requirement as the functional equivalent of a requirement that the individual act as a personal mobile billboard for the State's ideological message. *Id.* at 715; see *Johanns* v. *Livestock Mktg. Ass'n*, 125 S. Ct. 2055, 2060 (2005) (characterizing *Wooley* as a case in which "an individual [was] obliged personally to express a message he disagree[d] with"); cf. *West Virginia State Bd. of Educ.* v. *Barnette*, 319 U.S. 624 (1943). Educational institutions have no such intimate connection to facilities they have opened to outside recruiters, and they cannot sensibly be viewed as personal mobile billboards promoting the messages of military recruiters or other outside recruiters, many of whom offer contradictory messages. Moreover, the State in *Wooley* commandeered a private individual to carry a single ideological message. Educational institutions, by contrast, already carry the commercial messages of numerous employers, and are simply being asked to carry another.

e.  Contrary to respondents' contention (Br. 26-28), the government does not argue that attribution is an essential element of every compelled speech claim, or that the practical ability to disclaim a message always negates a compelled speech claim, or that the creation of a broadly inclusive forum for outside speakers who are not selected based on the merit of their messages is inherently incompatible with a compelled speech claim. Rather, the government's position

8

is that a compelled speech claim depends on all the relevant circumstances, including those three significant factors, and that in this case the relevant circumstances show that there is no compelled speech violation. What is crucial here is that recruiting offices are involved in an inherently commercial activity, that *none* of the factors that the Court has identified as causing a compelled speech problem is present here, that institutions control the nature of access they extend to outside employers, and that the equal access requirement is not triggered to begin with unless the institution has agreed to accept federal funding.

### B. The Solomon Amendment Does Not Impermissibly Interfere With An Institution's Right To Protest Government Action Or To Educate Its Students

Respondents argue (Br. 28-30) that the Solomon Amendment violates the First Amendment right of institutions to protest government policy and educate their students. The Solomon Amendment, however, leaves educational institutions entirely free to criticize the government's policies and teach their students whatever lessons they wish. They simply may not do so by interfering with the government's legitimate interest in recruiting students for service in the military.

Respondents claim (Br. 29) that denying equal access is the most effective method for criticizing the government's policy and teaching their students a lesson about discrimination. But the First Amendment does not give a speaker a right to engage in conduct that interferes with the government's legitimate interests simply because the speaker deems that conduct the most effective way to deliver his message. The most effective way to call attention to the plight of the homeless may be to sleep in a public park. But there is no First Amendment right to do so. *Clark* v. *CCNV*, 468 U.S. 288 (1984). The most effective way to protest a tax may be to refuse to pay it. But there is no First Amendment

9

right to do so. *Livestock Mktg.*, 125 S. Ct. at 2062. As those examples illustrate, the First Amendment does not give a person the right to deliver his message through the means he deems most effective when, as here, its conduct interferes with legitimate government interests. Nor does the Solomon Amendment violate the First Amendment to whatever extent it may lead an institution to explain to its students and supporters why it does not wish to disassociate entirely from the government and military.

Respondents rely on *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886 (1982), as support for their argument that they have a right to criticize the government and teach their students by denying the military equal access to their students. In that case, the Court held that a State could award damages to merchants who were victims of a boycott to the extent that their losses were caused by violent protest. *Id.* at 916. At the same time, the Court held that the State could not hold individuals and organizations liable for the violence of others simply because they associated with them, *id.* at 916-920, or subject individuals to liability based on their activities in peacefully persuading others to join the boycott, *id.* at 926.

The concerns that animated the decision in *Claiborne* are not present here. The Solomon Amendment does not seek to hold institutions accountable for the activities of others; nor does it seek to hold them accountable for their efforts to persuade others to join their cause. Rather, it addresses their own conduct in denying equal access to military recruiters and attaches consequences to it.

Nor is the conduct of educational institutions in denying equal access to military recruiters analogous to the boycott at issue in *Claiborne* in any other respect. The individuals involved in the boycott in *Claiborne* engaged in a complete refusal to deal. Educational institutions, by contrast, have not sought to sever their relationship with the federal government. That option, with its presumably greater and sim-

10

pler communicative force, remains available. Instead, respondents wish to deny the military equal access, even as they insist on continuing to receive the government's money. That is equivalent to the individuals in *Claiborne* refusing to spend money at the stores of the merchants, but insisting on a First Amendment right to continued access to the merchandise.

## C.  The Solomon Amendment Does Not Violate The First Amendment Right To Associate

Respondents argue (Br. 30) that the Solomon Amendment violates an educational institution's right to associate for expressive purposes because it parallels the law invalidated in *Boy Scouts of America* v. *Dale*, 530 U.S. 640 (2000).  There are no relevant parallels, however, between this case and *Dale*.

*Dale* invalidated a state law that required the Boy Scouts to accept gay men as leaders because it intruded on the Boy Scouts' interest in determining its membership, 530 U.S. at 648, and because it forced that organization to send a message to the public on a controversial subject that was contrary to its beliefs.  *Id.* at 653-654.  The Solomon Amendment, however, is not concerned with an institution's membership criteria or leadership structure; by definition, recruiters are outsiders, and their brief, periodic visits to campus as representatives of their employers does not turn them into members of the institution.  *Dale* protects an organization's internal structure, not its dealings with the outside world.  And that is particularly true when those dealings relate to employment outside the school.  Nor does the Solomon Amendment force an institution to send a message to the public on a controversial issue that is contrary to its beliefs. Just as the views of numerous other recruiters who come to campus are not attributed to the institutions, neither are the views of the military recruiters.

Respondents dispute none of this.  Instead, they argue (Br. 31-32) that *other* decisions of this Court show that a

11

violation of the right to associate can occur even when the
*Dale* conditions are not satisfied. That is true. And the
United States has never suggested that an intrusion on in-
ternal membership rules and a forced endorsement of a mes-
sage contrary to belief are necessary preconditions for *all*
right-to-associate violations. Rather, faced with a court of
appeals decision that relied entirely on *Dale* for its right-to-
associate holding, it has argued that they are the necessary
preconditions for the specific kind of right-to-associate viola-
tion identified in *Dale*. That argument is supported by a
straightforward reading of *Dale*, and respondents do not
contend otherwise.

Nor do the other cases cited by respondents suggest that
a "non-*Dale*" right to associate is violated here. The Solomon
Amendment does not prohibit associations from referring
individuals to lawyers or from paying persons to advocate
their cause. *NAACP* v. *Button*, 371 U.S. 415, 433-436 (1963).
*Meyer* v. *Grant*, 486 U.S. 414, 416-417 (1988). It does not re-
quire individuals to join a particular political party or sup-
port a political candidate as the price of a government con-
tract or job. *O'Hare Truck Serv., Inc.* v. *City of Northlake*,
518 U.S. 712, 715-716 (1996); *Elrod* v. *Burns*, 427 U.S. 347,
355-356 (1976) (plurality opinion). It does not prohibit a cor-
poration from spending money to express its position on a
public issue. *First Nat'l Bank* v. *Bellotti*, 435 U.S. 765, 767-
768 (1978). It does not require individuals to lend financial
support to private ideological causes. *Abood* v. *Detroit Bd. of
Educ.*, 431 U.S. 209, 212-213, 222-223, 233-235 (1977). And it
does not require disclosure of an organization's members or
contributors when the risk of reprisals might deter persons
from joining or contributing to the organization. *NAACP* v.
*Alabama ex rel. Patterson*, 357 U.S. 449, 453-454, 462-463
(1958); *Brown* v. *Socialist Workers '74 Campaign Comm.*,
459 U.S. 87, 89-90, 96-98 (1982); *Shelton* v. *Tucker*, 364 U.S.
479, 480-481, 486-487 (1960).

12

Respondents in fact do not claim that the holding of any of those decisions applies here. Instead, they seek to extrapolate from those decisions the more general rule that every time "an organization claims an expressive purpose in declining to associate with some individual," the freedom not to associate must be balanced against the government's interest in requiring the association. Resp. Br. 33. But that view is not grounded in the decisions cited by respondents and has no logical stopping point.

The Court's cases, moreover, affirmatively reject that notion. For example, in *Hishon* v. *King & Spalding*, 467 U.S. 69 (1984), the Court did not hold, as respondents suggest, that a private employer has a presumptive First Amendment right not to hire persons of a particular gender, and that the government may prohibit such conduct only when its interest is sufficiently compelling to overcome the employer's First Amendment right. Instead, the Court held that the Constitution does not affirmatively protect the employer's conduct in the first place. *Id.* at 78. *Hishon*, moreover, involved an employer's decision to select its own employees. Because the Solomon Amendment does not affect internal composition, but only an institution's temporary and episodic relationship with outside employers, there is even less basis for a claim that it impairs the right to associate.

That would be true even if the equal access rule were imposed as a direct mandate. In fact, however, the equal access rule applies only to institutions that voluntarily accept it as a condition of federal funding. In that context, respondents' right-to-associate claim loses all force. An institution may not voluntarily associate itself with the government's money and then credibly claim that it has a right not to associate with the government—especially in the modest manner contemplated by the equal access condition.

13

### D. The Solomon Amendment Does Not Involve Impermissible Viewpoint Discrimination

Respondents argue (Br. 42-43) that the Solomon Amendment is subject to strict scrutiny because it involves a preference for the viewpoint of military recruiters. The Solomon Amendment, however, does not create a viewpoint-based preference. Rather, by its terms, it seeks to ensure only that students have the same access to the views of military recruiters they have to the views of other recruiters. Equal access requirements can always be reconceptualized as a preference for the views that would otherwise be excluded, but that recharacterization is not enough to condemn such requirements. See, e.g., *Westside Cmty.*, *supra*; *Grove City Coll.* v. *Bell*, 465 U.S. 555, 575 (1984). In any event, under the government speech doctrine, the government may seek to further its own viewpoint without simultaneously seeking to further different ones. *Rosenberger*, 515 U.S. at 833; *Rust* v. *Sullivan*, 500 U.S. 173, 194 (1991).

Respondents also contend (Br. 43 n.6) that the Solomon Amendment involves viewpoint discrimination because it distinguishes between institutions that deny equal access for protest reasons and institutions that deny equal access for any other reason. The Solomon Amendment, however, focuses on an institution's conduct in denying equal access; it is indifferent to the reasons for the denial.[2]

---

[2] Respondents similarly err in contending (Br. 43 n.6) that the statutory exception for institutions with longstanding policies of pacifism based on historical religious affiliation (10 U.S.C. 983(c)(2)) creates an impermissible distinction based on viewpoint. That exemption comports with the established policy of excusing military service by persons with religious scruples against war (50 U.S.C. App. 456(j)), as well as a recognition that recruitment is unlikely to be effective at such institutions. The two regulatory provisions cited by respondents are applications of the equal access rule, not exceptions to it. See 32 C.F.R. 216.4(c)(3) (institution does not violate Solomon Amendment when it does not allow access to any other employer); *ibid.* (institution that excludes all employers except in response to student interest does not violate the Solomon Amendment).

14

### E. The Solomon Amendment Is Not Subject To, But In Any Event Satisfies, The *O'Brien* Standard

1. Respondents take issue with the government's position that the Solomon Amendment should not be subjected to scrutiny under *United States* v. *O'Brien*, 391 U.S. 367 (1968), because the Solomon Amendment is directed primarily to conduct. According to respondents (Br. 42), the Solomon Amendment is instead directed to activity that is "communicative to the core." But while the military's recruitment activities are themselves communicative, an institution's action in either preventing or facilitating such communication is conduct at its core. For example, when institutions deny military recruiters access to a building, prevent military recruiters from participating in a job fair, or fail to place a military job announcement on a bulletin board set aside for such announcements, they are engaged primarily in conduct that prevents the military from speaking, not speech of their own. Institutions can also deny equal access through differential treatment that involves speech, such as by failing to send an email alerting students to the military's arrival if they send such an email for other employers. But that is simply an example of speech that is swept up in a statute that is directed to conduct, and the regulation of such speech raises no First Amendment issue  See *Giboney*, 336 U.S. at 502; see also *R.A.V.*, 505 U.S. at 389-390.

2. Even if the activities undertaken by institutions were sufficiently communicative to trigger an analysis under *O'Brien*, the Solomon Amendment would readily satisfy that analysis. Relying on a statement made by one of the Solomon Amendment's sponsors, respondents suggest (Br. 44) that the Solomon Amendment is aimed at the suppression of ideas. When taken as a whole, however, the sponsors' statements make clear that they viewed the Solomon Amendment as necessary to further the military's interest in enlisting the

15

most qualified men and women in the armed services. See U.S. Br. 3-4.

In any event, in conducting the inquiry into whether the purpose of a statute is to suppress ideas, the Court looks not to the statements of individual Members of Congress, but to the face of the statute. *O'Brien*, 391 U.S. at 384. In this case, the statute is addressed to an institution's conduct in denying equal access, conduct that interferes with the Nation's interest in recruiting the most qualified men and women to serve in the armed forces. The terms of the statute leave institutions free to criticize the military on whatever ground they choose without risking the loss of federal funds. Taking advantage of that opportunity, institutions have repeatedly criticized Congress's policy on military service by homosexuals (and other military policies as well), and the Department of Defense has never withdrawn federal funding on that basis. Pet. App. 97a-98a.

3. Respondents contend (Br. 45) that the Solomon Amendment is not addressed to a serious problem. But when the Solomon Amendment was enacted, Congress understood that in recent years the military had been "unable to find enough recruits to fill the current number of slots, especially with high caliber students." 140 Cong. Rec. 11,438 (1994). In a Nation that depends on a volunteer army for its defense, that is a serious problem. Respondents note (Br. 45) that, at the time of enactment, only some schools were denying access. But on a matter as important as the Nation's defense, Congress was not required to wait until the number of schools resisting military recruiters reached crisis proportions. In fact, after the Association of American Law Schools prohibited member schools from giving placement assistance or access to facilities to employers that discriminate on the basis of sexual orientation, J.A. 252, all member schools began to resist the military's recruitment efforts, causing Congress to amend the statute to strengthen the incentives for allowing such recruitment.

16

Respondents cite (Br. 11, 45) a 1998 letter from a military recruiter informing a law school that non-selection of applicants should not reflect negatively on them because some very qualified applicants would not be selected. See J.A. 156, 169. That recruiter's tactful letter hardly reflects a Defense Department judgment that the Solomon Amendment was unnecessary. Moreover, Congress surely knew that, even if there might be a sufficient number of highly qualified applicants in one year, there was a looming danger that interest in military service might decline, making recruitment on campuses all the more important. Finally, Congress is entitled to conclude that, even in a year with a sufficient number of highly qualified candidates, the military deserves an equal opportunity to recruit the very best.

Respondents argue (Br. 48) that there was no evidence that recruitment on campuses would be more effective than other alternatives. But under *O'Brien*, the question is whether the method chosen by Congress is an effective one, not whether another alternative might work better. *United States* v. *Albertini*, 472 U.S. 675, 689 (1985). Here, Congress reasonably concluded that recruiting on campuses is an effective recruiting method. If it were not, institutions and their departments would not invite employers to campus and employers would not take advantage of the offer.

Respondents argue (Br. 45-46) that whatever justification there is for a bare access condition, there is no justification for an equal access condition. An equal access condition, however, is doubly justified. First, it relies on the institutions' expertise (or alternatively the prevailing market conditions as determined by the institutions in conjunction with competing employers) in deciding how much access is needed for effective recruiting. Respondents assert (Br. 47) that institutions have not made a judgment of what is required for any particular employer to be effective. They have made a judgment, however, on what is *generally* needed for effec-

17

tive recruitment, and Congress was entitled to rely on that judgment.

Second, the equal access standard ensures that military recruiters will not be competitively disadvantaged in the search for the most highly qualified applicants. Respondents assert (Br. 46) that it should make no difference whether college personnel or law school personnel provide recruiting assistance or whether the military's literature is placed in the library or the recruitment office. But Congress is not required to accept an institution's view that separate and unequal access is good enough, any more than it would have to accept it if the institutions were providing such differential treatment to minority recruiters. A rule of equal treatment ensures a level playing field and avoids difficult case-by-case inquiries into how unequal access affected the bottom-line hiring results.

## F.  The Spending Clause Provides An Independent Justification For The Solomon Amendment

1. Respondents argue (Br. 35-41) that Congress may not mandate the equal access condition directly, and that it therefore may not impose it as a condition of federal funding either.  For reasons already discussed, a direct mandate would not violate the First Amendment.  Even if Congress lacked the authority to impose the equal access rule directly, however, it would still be constitutional as a condition of federal assistance.  Respondents' contrary view is inconsistent with the Court's holding that Congress has authority under the Spending Clause to establish criteria for the receipt of federal funding "that would be impermissible were direct regulation of speech or a criminal penalty at stake." *National Endowment for the Arts (NEA)* v. *Finley*, 524 U.S. 569, 588 (1998).  Whatever the outer limits of Congress's authority to establish "reasonable and unambiguous conditions to federal financial assistance," see *Grove City*, 465 U.S. at 575, they are not exceeded here by a common-sense condi-

18

tion upon which any donor would insist—that the donor have
an equal opportunity to recruit students whose education it
helped to fund.

Three factors highlight the condition's reasonableness.
First, the Solomon Amendment does not prescribe any fixed
level of access. It instead asks educational institutions to
give the military the same level of access that the institu-
tions deem appropriate for other employers. Second, the
Solomon Amendment's equal access condition relates di-
rectly to the nature of the funding that is extended. That
funding either directly or indirectly supports the education
of students, and the Solomon Amendment asks only that in-
stitutions give the federal government an equal opportunity
to recruit the students whose education it has supported.
Third, the Solomon Amendment is addressed solely to an
institution's conduct in denying equal access. It is not aimed
at unrelated conduct, let alone "at the suppression of dan-
gerous ideas." *NEA*, 524 U.S. at 587 (citations omitted). Far
from reflecting any effort to ensure loyalty or orthodoxy,
institutions remain free to voice their criticism of the United
States and its military on whatever ground they wish. In
similar circumstances, the Court has rejected First Amend-
ment challenges to equal access funding conditions. *Grove
City, supra; Westside Cmty., supra.*

2. Respondents contend (Br. 37) that the Solomon
Amendment is indistinguishable from a mandate because all
educational institutions have agreed to the equal access con-
dition in order to obtain federal funding. But an offer of fed-
eral money cannot be deemed coercive "simply by reason of
its success in achieving the congressional objective." *South
Dakota* v. *Dole*, 483 U.S. 203, 211 (1987). An attractive offer
is still an offer, not a mandate.

3. Relying on *Rust*, respondents argue (Br. 37-38) that
Congress's Spending Clause authority is limited to condi-
tions that are placed on a "program" and does not extend to

19

conditions that are placed on the "recipient." For several reasons, respondents' reliance on *Rust* is misplaced.

First, the line between a condition on a program and a condition on the recipient was important in *Rust* because the condition at issue prohibited participants in the program from expressing a particular viewpoint. Had Congress imposed that condition on the entity rather than the program, it would have violated the rule that Congress may not in a funding condition aim at the suppression of ideas. The Solomon Amendment, by contrast, aims only at the institutions' conduct in denying equal access; it does not aim at the suppression of any ideas or address the institutions' activities outside of recruiting.

Second, Congress has substantial leeway to define the relevant program. In the statutes that prohibit discrimination in federally assisted programs on the basis of race, sex, disability, and age, Congress has taken an institution-wide approach by defining the relevant federally assisted program as all the operations of a college or university. See 42 U.S.C. 2000d-4a (2)(A), 20 U.S.C. 1687(2)(A), 29 U.S.C. 794(b)(2)(A), and 42 U.S.C. 6107(4)(B)(1). That approach reflects a reasonable judgment that all federal aid to institutions supports the education of students to some degree, and that money that supports one activity can free up money for others. See *Sabri* v. *United States*, 541 U.S. 600, 606 (2004). Congress could reasonably make that same judgment here. Even so, under the Solomon Amendment the only "programs" actually affected are the offices responsible for assisting in recruiting, not all aspects of the institution's operations.[3]

---

[3] Respondents argue (Br. 34-35, 40 n.5) that the nondiscrimination statutes are distinguishable because they are supported by a compelling governmental interest in eliminating discrimination. But some funding recipients might argue that there is not a compelling interest in eliminating forms of discrimination that are not subject to heightened scrutiny. In any event, as respondents concede (Br. 44), there is also a compelling governmental interest in meeting the military's recruitment needs. Moreover, under respondents' theory (Br. 34), even a compelling governmental interest would not override a First Amendment claim where institutions have

20

Finally, the condition at issue in *Rust* sought to affect the recipient's relationship with third parties. By contrast, the Solomon Amendment seeks only to affect a recipient's bilateral relationship with the United States. Congress asks only that, in return for federal funding that assists the education of students, the United States should receive an equal opportunity to recruit those students.[4]

\* \* \* \* \*

For the foregoing reasons, as well as those in the opening brief, the judgment of the court of appeals should be reversed.

Respectfully submitted.

PAUL D. CLEMENT
*Solicitor General*

OCTOBER 2005

---

views on discrimination that are integral to their identity. Thus, under their theory, such institutions would have carte blanche to discriminate against female and minority recruiters and female and minority students, and still receive funds for medical research, as long as they did not discriminate in the administration of the research funds.

[4] Some of respondents' amici (see Amici Brief of 56 Columbia Law School Faculty Members; Amici Brief of William Alford, *et al.*) have argued that institutions do not violate the Solomon Amendment's equal access rule when they treat military recruiters the same way they treat other employers that fail to observe the institutions' nondiscrimination policies. That argument is not within the question presented, and respondents have waived that statutory argument here. Indeed, amici's argument that Congress accomplished almost nothing in the Solomon Amendment provides no basis to enjoin the Amendment as unconstitutional and no basis for affirming the judgment below (which is the burden of a bottom-side brief). In any event, the text of the statute prohibits recipients from denying to military recruiters the level of access "provided to any other employer" (Pet. App. 186a), not the access provided to any other employer with a similar hiring policy. And the background of the 2004 amendments shows that they were intended to provide a firmer statutory foundation for the Department of Defense's interpretation of the predecessor statute, under which it had asked for access without regard to how institutions treated other employers that have policies that limit employment by homosexuals. See H.R. Rep. No. 443, 108th Cong., 2d Sess. Pt. 1, at 6 (2004).