# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DKT INTERNATIONAL, INC.

    Plaintiff,

       v.

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT, et al.

    Defendants.

Civil Action No. 05-01604 (EGS)

**MEMORANDUM OF LAW OF AIDS ACTION AND TWENTY-ONE OTHER ORGANIZATIONS[*] AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT**

---

[*] A complete list of *amici curiae* appears on the following page.

## LIST OF ALL AMICI CURIAE

AIDS Action

American Foundation for AIDS Research

American Humanist Association

The Center for Health and Gender Equity

Center for Reproductive Rights

The Center for Women Policy Studies

Community HIV/AIDS Mobilization Project

The Feminist Majority Foundation

Gay Men's Health Crisis

The Global AIDS Alliance

The Guttmacher Institute

The Human Rights Center, University of California, Berkeley

Human Rights Watch

The Institute of Human Rights at Emory University

The International Planned Parenthood Federation, Western Hemisphere Region

The International Women's Health Coalition

Physicians for Human Rights

Planned Parenthood Federation of America, Inc.

Population Action International

The Population Council

Religious Consultation on Population, Reproductive Health and Ethics

Sexuality Information and Education Counsel of the U.S.

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................................... ii

INTEREST OF THE *AMICI CURIAE* ....................................................................................... 1

BACKGROUND ........................................................................................................................... 2

SUMMARY OF ARGUMENT ................................................................................................... 4

ARGUMENT ................................................................................................................................ 6

I.  The U.S. Government May Not Condition Funding So As To Restrict A
    Recipient's Private Speech Unless It Demonstrates That Such Restrictions Are
    Narrowly Tailored To Serve A Substantial Government Interest. ...................................... 6

II.  Compelling Organizations To Adopt The Anti-Prostitution Pledge Conflicts With
     The U.S. Government's Long-Standing Opposition To Stigmatization Related To
     HIV/AIDS. ......................................................................................................................... 7

III. Compelling Organizations To Adopt A Pledge That Stigmatizes Sex Workers
     And That Limits Privately Funded Speech and Activities Runs Contrary To
     Public Health Policy And Best Practices In The Field. .................................................. 12

IV.  USAID's Pledge Requirement And Restriction Of Privately Funded Speech Does
     Not Advance The Public Health Objectives Enshrined In The AIDS Leadership
     Act. ................................................................................................................................. 22

CONCLUSION .......................................................................................................................... 25

APPENDIX A ............................................................................................................................. a

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*FCC v. League of Women Voters of Cal.*, 468 U.S. 364 (1984) ........................................6

## FEDERAL STATUTES

22 U.S.C. § 2151b-2 ...............................................................................................3, 4, 23
*22 U.S.C. § 7601 ...................................................................................................... *passim*
22 U.S.C. § 7603 ..............................................................................................................3
22 U.S.C. § 7631(e) .......................................................................................................23
*22 U.S.C. § 7631(f) ..............................................................................................1, 4, 23
H.R. Rep. No. 108-60 (Apr. 7, 2003), *reprinted in* 2003 U.S.C.C.A.N. 712 ...............23

## INTERNATIONAL AGREEMENTS

International Covenant on Civil and Political Rights (ICCPR), Dec. 19, 1966,
999 U.N.T.S. 171 ......................................................................................................15

## MISCELLANEOUS

Centers for Disease Control and Prevention, Divisions of HIV/AIDS Prevention, *HIV
Prevention Strategic Plan Through 2005* (Jan. 2001).............................................9

Centers for Disease Control and Prevention, *Stigma and Discrimination: World AIDS
Day 2002* (Press Release Dec. 1, 2002) ................................................................8

Centers for Disease Control and Prevention, *Testimony of Dr. Eugene McCray, Director,
CDC's Global AIDS Program Before the Senate Committee on Foreign Relations,
Subcommittee on African Affairs* (Feb. 14, 2002)..................................................8

Centers for Disease Control and Prevention, *Training Module 5 for Reducing Mother-
To-Child-Transmission of HIV/AIDS* (undated)......................................................9

Central and Eastern European Harm Reduction Network (CEEHRN), *Sex work,
HIV/AIDS and Human Rights in Central Europe* (July 2005) ..............................17

EngenderHealth, *Reducing Stigma and Discrimination Related to HIV and AIDS –
Training for Health Care Workers* (2004) ...........................................................11

Human Rights Watch, *Epidemic of Abuse: Police Harassment of HIV/AIDS Outreach
Workers in India* (July 2002) ...............................................................................16

Human Rights Watch, *Fanning the Flames: How Human Rights Abuses Are Fueling the
AIDS Epidemic in Kazakhstan* (June 2003) ........................................................17

Human Rights Watch, *Ravaging the Vulnerable:  Abuses Against Persons at High Risk of HIV in Bangladesh* (Aug. 2003) ........................................................................16, 17

Human Rights Watch, *Unprotected: Sex, Condoms, and the Human Right to Health in the Philippines* (May 2004) ............................................................................................16

Joint United Nations Programme on HIV/AIDS, *AIDS Epidemic Update 2004* (Dec. 2004) ..............................................................................................................................2

NGO Letter to George Bush (May 18, 2005) ..............................................................21

Pres. George W. Bush, *State of the Union Address* (Jan. 28, 2003) ..............................3

Saunders, Penelope, *Prohibiting Sex Work Projects, Restricting Women's Rights: The International Impact of the 2003 U.S. Global AIDS Act*, 7 HEALTH AND HUMAN RIGHTS: AN INTERNATIONAL JOURNAL 179 (2004) ....................7, 20

UNAIDS Best Practice Collection Key Material, *Innovative Approaches to HIV Prevention: Selected Case Studies* (Oct. 2000) .................................................................14

*UNAIDS Case Study, *Female Sex Worker HIV Prevention Projects: Lessons Learnt from Papua New Guinea, India and Bangladesh* 9 (Nov. 2000) .............................14, 19, 20

*UNAIDS Technical Update, *Sex Work and HIV/AIDS* (June 2002) .............................14, 15, 19

U.S. Agency for International Development, *Cambodia HIV/AIDS Strategic Plan: 2002-2005* (Mar. 2004) ..................................................................................................................9

U.S. Agency for International Development, *Expanded Response Guide to Core Indicators for Monitoring and Reporting on HIV/AIDS Programs* (Jan. 2003) ...................10

U.S. Agency for International Development, *Leading the Way:  USAID Responds to HIV/AIDS – 1997-2000* (Sept. 2001) .............................................................................9, 10

U.S. Agency for International Development, *Remarks by Andrew S. Natsios, Administrator, HIV Prevention Symposium, Academy for Educational Development* (Jan. 14, 2004) ......................................................................................................................10

U.S. Agency for International Development, *USAID's Expanded Response to HIV/AIDS* (June 2002) ..........................................................................................................................10

U.S. Agency for International Development, *Working Report Measuring HIV Stigma: Results of a Field Test in Tanzania* (June 2005) ..............................................................10

U.S. Department of State, Office of the Global AIDS Coordinator, *Engendering Bold Leadership - The President's Emergency Plan for AIDS Relief: First Annual Report to Congress* (Mar. 4, 2005) ................................................................................................12

U.S. Department of State, *Global Fight Against HIV/AIDS: What Do We Need To Do Differently? Remarks to IMPACT Arena, Bangkok, Thailand* (July 14, 2004) ....................11

U.S. Department of State, *Working Together as Partners in the Global HIV/AIDS Fight*, Remarks at the Nat'l Ass'n of People With AIDS Staying Alive 2005: Positive Living Summit, Los Angeles, CA (Aug. 21, 2005) ...............................................................11

World Health Organization, *The World Health Report: Changing History* (2004) ...............15, 18

**INTEREST OF THE *AMICI CURIAE***

*Amici* are nongovernmental organizations ("NGOs") that provide services or conduct programs, research, or advocacy in the global effort to combat HIV/AIDS and to stop needless deaths through prevention and access to treatment for all affected persons. The individual statements of interest for each *amicus* are listed in Appendix A. *Amici* are united in striving to provide and/or promote the most effective interventions to prevent the spread of HIV/AIDS and provide access to treatment based on accepted best principles and practices of public health. As such, *amici* follow basic principles of public health that accept that both structural and individual behavioral change are core components of sustainable, effective health interventions, and that all public health interventions can be judged according to ethical principles of respect, beneficence, the obligation to do no harm and the principle of justice.

A number of the *amici* currently administer programs or provide health care services to people with HIV/AIDS or at high risk of transmission of the virus, or intend to administer such programs in the future. Some of these programs expressly target sex workers or include sex workers within their general scope. A number of these programs have a proven track record in reducing HIV infection and providing treatment to those with the virus and have led to significant advances in understanding the physical, cultural, and socioeconomic underpinnings of the AIDS epidemic.

*Amici's* mission in combating HIV/AIDS is seriously threatened by the condition attached to funding provided by the U.S. Agency for International Development ("USAID") for international AIDS programs that NGOs must adopt a "policy explicitly opposing prostitution." *See* 22 U.S.C. § 7631(f). That condition compels public health service providers in the global

fight against AIDS to choose between forgoing U.S. funding or adopting a policy that alienates and marginalizes the high-risk communities with which they work and restricts speech and activities supported by non-USAID funds. For those *amici* who do not accept or receive U.S. funding, their ability to research and advocate on HIV/AIDS in these high-risk communities is also harmed as fewer partnering public health providers are willing to take the risk that their activities will be misconstrued as "support" for "prostitution."

Like the plaintiff, *amici* believe that the compelled adoption of the USAID policy statement, applied to U.S. organizations, is a violation of the First Amendment. They submit this brief not to repeat the constitutional arguments, but to provide the Court with the public health context in which this restriction on speech occurs and to emphasize its potentially devastating effects on public health.

## BACKGROUND

The crisis posed by the HIV/AIDS global epidemic is large, immediate and growing. In 2000, there were an estimated 34 million people living with HIV. In 2002, their ranks increased to 36 million. In 2004, the total had grown to an estimated 39.4 million. The number of people living with HIV in Eastern Europe and Central Asia increased by 40 percent in just two years; in East Asia the increase was almost 50 percent between 2002 and 2004. Last year, an estimated 3.1 million people died of AIDS. At the same time, some 4.9 million people became newly infected with the virus: an average of over 13,000 people a day.[1] The rapid increase in HIV infection worldwide and the tragedy of its human toll demands the

---

[1] All statistics from Joint United Nations Programme on HIV/AIDS, *AIDS Epidemic Update 2004*, at 2 (Dec. 2004), *available at* http://www.unaids.org/wad2004/report.html.

2

comprehensive attention of governments and nongovernmental public health service providers around the world.

In his State of the Union address in January 2003, President Bush recognized the "severe and urgent crisis abroad" posed by the HIV/AIDS pandemic, and proposed the President's Emergency Plan for AIDS Relief (commonly known as "PEPFAR"), asking the Congress to commit $15 billion over five years to "turn the tide against AIDS."[2] Congress responded with the enactment of the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("AIDS Leadership Act"), to authorize the appropriations requested by the President. Pub. L. No. 108-25, 117 Stat. 711, codified at 22 U.S.C. § 7601 et seq. The stated purpose of the AIDS Leadership Act is to strengthen U.S. leadership and the effectiveness of its response to HIV/AIDS by establishing a comprehensive five-year global strategy, providing increased resources for multilateral and bilateral efforts to fight the disease, and "encouraging the expansion of private sector efforts and expanding public-private sector partnerships to combat HIV/AIDS." 22 U.S.C. § 7603. The central objective of the AIDS Leadership Act is the amelioration of the HIV/AIDS pandemic, which is reflected by the legislative conviction that "HIV/AIDS is *first and foremost* a health problem." 22 U.S.C. § 7601(15) (emphasis added).

The AIDS Leadership Act authorizes the U.S. government to provide financial support for a number of education and prevention activities, including "programs and efforts that are designed or intended to impart knowledge with the exclusive purpose of helping individuals avoid behaviors that place them at risk of HIV infection, including . . . where appropriate, use of condoms." 22 U.S.C. § 2151b-2(d)(1)(A). Congress further agreed to provide "assistance to

---

[2] Pres. George W. Bush, *State of the Union Address* (Jan. 28, 2003), *available at* http://www.whitehouse.gov/news/releases/ 2003/01/20030129-1.html.

3

establish and implement culturally appropriate HIV/AIDS education and prevention programs

that focus on helping individuals avoid infection of HIV/AIDS." 22 U.S.C. § 2151b-2(d)(1)(B).

Such programs are to be "implemented through nongovernmental organizations, including faith-

based and community-based organizations, particularly those organizations that utilize both

professionals and volunteers with appropriate skills, experience, and community presence." 22

U.S.C. § 2151b-2(d)(1)(B). The legislation also authorizes "[b]ulk purchases of available test

kits, condoms, and, when proven effective, microbicides that are intended to reduce the risk of

HIV/AIDS transmission and for appropriate program support for the introduction and

distribution of these commodities, as well as education and training on the use of the

technologies." 22 U.S.C. § 2151b-2(d)(3)(B).

## SUMMARY OF ARGUMENT

The imperatives of PEPFAR and the AIDS Leadership Act are placed in jeopardy

by USAID's requirement that public health organizations and other groups that receive funding

under the AIDS Leadership Act *must* adopt a written policy "explicitly opposing prostitution and

sex trafficking."[3] 22 U.S.C. § 7631(f) ("the pledge requirement"). The pledge requirement runs

counter to U.S. and internationally recognized public health practice, and human rights standards

protecting the right to health, by forcing organizations to adopt a policy opposing sex work[4] and in

doing so stigmatize the very individuals they are trying to help. As such, the pledge requirement

is at odds with the federal government's longstanding recognition that such stigmatization harms

people most at risk of HIV/AIDS, and undermines efforts to prevent the spread of HIV/AIDS and

---

[3] Because plaintiff does not challenge the requirement that organizations oppose sex trafficking, *amici* do not address herein that aspect of 22 U.S.C. § 7631(f).

[4] Consistent with the internationally recognized conventions of the public health sector, this brief uses the terms "sex work" and "sex workers" to refer to prostitution and those individuals engaged in prostitution.

to treat its victims. More importantly, the pledge requirement is at odds with public health policy and best practices in the field recognized internationally because it alienates the sex worker communities whose participation and cooperation in the fight against HIV/AIDS is crucial to the success of such efforts. Requiring NGOs that deal primarily with health and social services to take a political stance opposing sex work will negate their ability to approach sex workers with the non-judgmental and non-moralistic attitude that their years of experience have shown to be effective with these communities.

In addition, USAID has also made clear that not only must recipient organizations adopt an organization-wide policy, but that if they accept government funding, they must also refrain from using their own private funding to engage in speech and activities that USAID perceives as being insufficiently opposed to sex work. *See* Letter from Christopher D. Crowley, Mission Director, USAID, to Galina Karmanova, AOSI, (Oct. 7, 2005), Ex. A, Declaration of Rebekah Diller, Plaintiffs' Motion for a Temporary Restraining Order, *Alliance for Open Society Int'l, Inc., et al. v. U.S. Agency for Int'l Dev.*, 1:05-cv-08209-VM (S.D.N.Y. Oct. 12, 2005) (Ex. 1). As implemented by USAID, the pledge requirement restricts the ability of service providers to engage in proven public health interventions even with their private funds. As a result, the pledge requirement undermines, rather than supports, the public health objectives of the AIDS Leadership Act because service providers must either adopt an anti-prostitution policy — thereby restricting their ability to engage in proven public health interventions even with their private funds — or they must forego government funding, which threatens to greatly reduce the reach and effectiveness of their public health efforts.

## ARGUMENT

I.   **The U.S. Government May Not Condition Funding So As To Restrict A Recipient's Private Speech Unless It Demonstrates That Such Restrictions Are Narrowly Tailored To Serve A Substantial Government Interest.**

It is axiomatic that government restrictions based on viewpoint are subject to strict scrutiny. "A regulation of speech that is motivated by nothing more than a desire to curtail expression on a particular point of view on controversial issues of general interest is the purest example of a 'law . . . abridging the freedom of speech . . . .'" *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383-84 (1984) (citation omitted). In imposing viewpoint-based restrictions as a condition of funding, the government's actions are subject to heightened scrutiny and it must demonstrate that such restrictions are narrowly tailored to further a substantial government interest. *See id.* at 380.

The funding condition is particularly problematic here because it extends to the plaintiff's use of private funds. Restrictions on how federal funds recipients use private funding to engage in constitutionally protected speech are unconstitutional when, as here, they leave no alternative avenue for a recipient to engage in privately funded speech. *See generally League of Women Voters*, 468 U.S. 364 (1984). At the very least, such restrictions are subject to heightened scrutiny, which a flat ban will almost always fail. *See id.*

As demonstrated below, and in addition to the reasons set forth in plaintiff's pleadings, the pledge requirement and its resulting restraint on private speech fail heightened scrutiny. The pledge requirement undermines rather than reinforces the government's goal — expressed in the AIDS Leadership Act and elsewhere — of reducing the stigmatization of those affected by HIV/AIDS. Likewise, the pledge requirement and its restraints on the use of private funds to engage in speech are at odds with well-established "best practices" for the prevention and treatment of HIV/AIDS, as well as international human rights standards on the rights to

6

health and free expression. As such, the pledge requirement is not narrowly tailored to advance the public health objectives that the AIDS Leadership Act was designed to promote.

**II.     Compelling Organizations To Adopt The Anti-Prostitution Pledge Conflicts With The U.S. Government's Long-Standing Opposition To Stigmatization Related To HIV/AIDS.**

USAID's current policy of compelling domestic NGOs to take a position opposing prostitution and to refrain from using private funding to engage in constitutionally protected activities as a condition of their receiving federal funds marks a radical and unjustified shift in U.S. policy towards AIDS prevention. "U.S. funded HIV/AIDS initiatives . . . have employed sex workers to promote adoption of safer-sex behavior among their peers and have engaged in policy discussion and law reform as part of efforts to create 'enabling environments' to protect health among communities of sex workers." Penelope Saunders, *Prohibiting Sex Work Projects, Restricting Women's Rights: The International Impact of the 2003 U.S. Global AIDS Act*, 7 HEALTH AND HUMAN RIGHTS: AN INTERNATIONAL JOURNAL 179, 184 (2004). Indeed, the pledge requirement is at odds with the U.S. government's long-standing acknowledgment that stigmatizing groups vulnerable to HIV/AIDS undermines treatment and prevention efforts.

As a result of its experience with the outbreak of HIV/AIDS in the United States in the 1980s, the U.S. Government has long-recognized that stigmatizing individuals living with HIV/AIDS and the members of vulnerable groups most at risk for HIV/AIDS actively harms efforts to prevent and treat the disease. For those already infected by HIV/AIDS, such stigmatization discourages them from acknowledging their condition and seeking treatment out of fear of being shunned by their community and in some cases verbally or physically abused. Likewise, members of vulnerable groups who fear stigmatization will shun HIV/AIDS information — and even medical treatment — or fail to take precautions to prevent the spread of

the disease because they fear the additional stigma of being associated with those already infected by HIV/AIDS.

The premier federal agencies leading the U.S. efforts at home and abroad to prevent the spread of HIV/AIDS and to treat those infected with the disease have repeatedly recognized that isolating groups most vulnerable to HIV/AIDS, such as sex workers, undermines prevention and treatment efforts for these very reasons. The U.S. Government's Centers for Disease Control and Prevention ("CDC"), which has a long history working to combat HIV/AIDS in the United States and overseas, has warned that stigmatization of vulnerable groups "profoundly affect[s] prevention effort[s]" worldwide because of its "pernicious effects" through which stigmatized people are threatened with shunning and physical harm, and therefore avoid seeking HIV/AIDS testing, information and other related services. Centers for Disease Control and Prevention, *Stigma and Discrimination: World AIDS Day 2002* (Press Release Dec. 1, 2002).[5] The CDC has explained that the stigma associated with HIV/AIDS goes beyond the fears people have about the disease itself: "AIDS stigma reflects societal biases about race/ethnicity, socioeconomic status, sexual orientation, age, gender, and drug use. HIV infection evokes and magnifies these biases." Centers for Disease Control and Prevention, *Testimony of Dr. Eugene McCray, Director, CDC's Global AIDS Program Before the Senate Committee on Foreign Relations, Subcommittee on African Affairs* (Feb. 14, 2002).[6]

The CDC recognizes that "[at] home and abroad, HIV continues to stalk our most *vulnerable populations*, people who are marginalized because of race or ethnicity, socioeconomic status, sexual orientation, age or gender. For HIV/AIDS prevention to succeed,

---

[5] *Available at* http://www.cdc.gov/hiv/wad.htm.

[6] *Available at* http://www.cdc.gov/washington/testimony/ha021402.htm.

the *special needs* and life contexts of those populations must be sensitively addressed, by

*culturally competent* programs and staff." Centers for Disease Control and Prevention, Divisions

of HIV/AIDS Prevention, *HIV Prevention Strategic Plan Through 2005* 24 (January 2001)

(emphasis in original).[7] Consistent with this position, the CDC's manuals to train health care

providers who work with those living with HIV/AIDS include sections on ways to address and

reduce stigmatization of vulnerable groups. For example, the CDC's materials for training

health care workers overseas to reduce the transmission of HIV/AIDS from mothers to their

children emphasize the reasons that stigma associated with HIV/AIDS needs to be confronted:

> Stigma is disruptive and harmful at every stage of the HIV/AIDS
> continuum, from prevention and testing to treatment and support.
> For example, people who fear discrimination and stigmatization
> are less likely to seek HIV testing while persons who have been
> diagnosed may be afraid to seek necessary care.

Centers for Disease Control and Prevention, *Training Module 5 for Reducing Mother-To-Child-*

*Transmission of HIV/AIDS* (undated).[8]

USAID, which provides substantial funding for HIV/AIDS prevention and

treatment overseas, likewise has consistently recognized that "[s]tigma and discrimination push

people in high-risk groups (*e.g.,* sex workers, injecting drug users) underground, making them

[more] difficult to reach through prevention programs and thus creating more opportunities for

HIV/AIDS to spread to the general population." U.S. Agency for International Development,

*Leading the Way:  USAID Responds to HIV/AIDS – 1997-2000* 11 (Sept. 2001).[9] For at least the

---

[7] *Available at* http://www.cdc.gov/hiv/pubs/prev-strat-plan.pdf.

[8] *Available at* http://www.cdc.gov/nchstp/od/gap/pmtct/Trainer%20Manual/Adobe/
Module_5TM.pft.

[9] *Available at* http://www.synergyaids.com/documents/3013_USAID_HIV_AIDSreport2.pdf.
*See also* U.S. Agency for International Development, *Cambodia HIV/AIDS Strategic Plan:*
(continued…)

9

past several years, USAID has recognized that "[o]vercoming the stigma attached to HIV/AIDS

and the resulting discrimination" is "essential to combating the epidemic."  U.S. Agency for

International Development, *USAID's Expanded Response to HIV/AIDS* 16 (June 2002).[10]

Defendant USAID Administrator, Andrew Natsios, recently listed "stigma reduction" as one of

the key elements of a successful strategy to fight HIV/AIDS.  U.S. Agency for International

Development, *Remarks by Andrew S. Natsios, Administrator, HIV Prevention Symposium,*

*Academy for Educational Development* (Jan. 14, 2004).[11]  To further these objectives, USAID

funds a variety of studies researching ways to reduce and eliminate stigmatization of and

discrimination against groups associated with the spread of HIV/AIDS.[12]  The Agency monitors

the impact that stigma has on prevention and treatment, including "association of the disease

with marginal groups, such as homosexuals, drug injectors, and sex workers . . . ."[13]  USAID also

funds private groups to prepare training manuals for health care workers focused exclusively on

the elimination of stigma resulting from the "negative attitudes toward the behavior of a group,

---

*2002-2005,* at 51 (Mar. 2004), *available at* http://www.usaid.gov/kh/health/documents/
USAID_Cambodia_HIV_strategy_2002_2005.pdf ("[S]tigma forces those most vulnerable to
HIV infection underground, thereby strengthening the chain of transmission between those
individuals and groups and the rest of the community.").

[10] *Available at* http://www.usaid.gov/our_work/global_health/aids/Publications/docs/
expandedresponse.pdf.

[11] *Available at* http://www.usaid.gov/press/speeches/2004/sp040114.html.

[12] *See, e.g.,* U.S. Agency for International Development, *Leading the Way:  USAID Responds to
HIV/AIDS – 1997-2000,* at 35 (Sept. 2001), *available at* http://www.synergyaids.com/
documents/3013_USAID_HIV_AIDSreport2.pdf; U.S. Agency for International Development,
*Working Report Measuring HIV Stigma:  Results of a Field Test in Tanzania* (June 2005),
*available at* http://www.synergyaids.com/resources.asp?id=5976.

[13] *See, e.g.,* U.S. Agency for International Development, *Expanded Response Guide to Core
Indicators for Monitoring and Reporting on HIV/AIDS Programs* 69 (Jan. 2003), *available at*
http://www.usaid.gov/our_work/global_health/aids/TechAreas/monitoreval/expandresponse.pdf.

such as homosexuals or prostitutes."[14]  EngenderHealth, *Reducing Stigma and Discrimination Related to HIV and AIDS – Training for Health Care Workers* 28 (2004).

More recently, the federal government's spokesperson for its policies to combat the spread of HIV/AIDS globally, Ambassador Randall Tobias, Coordinator for the newly established Office of the Global AIDS Coordinator ("OGAC") has repeatedly emphasized the importance of combating the stigmatization of vulnerable groups and the need to eliminate it. For example, Ambassador Tobias recently recognized that "[t]he need for public leadership in fighting stigma is tremendous." U.S. Department of State, *Working Together as Partners in the Global HIV/AIDS Fight*, Remarks at the Nat'l Ass'n of People With AIDS Staying Alive 2005: Positive Living Summit, Los Angeles, CA (Aug. 21, 2005).[15]  He has also stated that groups fighting HIV/AIDS must focus on the goal of reducing stigma associated with AIDS and not argue about how best to achieve that task:

> [The] denial, stigma, and complacency that fuel HIV/AIDS – these too are real enemies. It is morally imperative that we direct our energies at these enemies, not at one another. We may not agree on every tactic employed by every donor and we may have passionate opinions about how things can be done better, but we must work with each other to find the best solutions, while knowing that every person in this fight simply wants to save lives. That is a noble calling, and should be appreciated and respected.

U.S. Department of State, *Global Fight Against HIV/AIDS:  What Do We Need To Do Differently? Remarks to IMPACT Arena, Bangkok, Thailand* (July 14, 2004).[16]  Indeed, in its first report to Congress, OGAC expressly acknowledges the harm caused by stigmatization of vulnerable groups and has said reducing stigma is one of the major components of reducing the

---

[14] *Available at* http://engenderhealth.org/res/offc/hiv/stigma/pdf/stigma_trainer.pdf.

[15] *Available at* http://www.state.gov/s/gac/rl/rm/51304.htm.

[16] *Available at* http://www.state.gov/s/gac/rl/rm/2004/34366.htm.

global spread of HIV/AIDS.  U.S. Department of State, Office of the Global AIDS Coordinator,

*Engendering Bold Leadership – The President's Emergency Plan for AIDS Relief:  First Annual*

*Report to Congress* 33 (Mar. 4, 2005).[17]

　　　　　As these statements demonstrate, the U.S. Government has recognized that

stigmatization of vulnerable groups, including sex workers, must be avoided if efforts to treat

them and prevent the spread of HIV/AIDS are to be successful.  In contrast, the pledge

requirement as administered by USAID ignores this important policy lesson and contradicts

current U.S. efforts aimed at fighting stigma when it thwarts public health objectives.  By

compelling NGOs that work with sex workers to take a position opposing prostitution, the pledge

requirement will force these groups to stigmatize the very individuals that they intend to help.

The AIDS Leadership Act offers no evidence or explanation as to why, given the U.S.

Government's long-standing recognition that stigma hinders efforts to stem the spread of

HIV/AIDS and its efforts to stop stigmatization of vulnerable groups, forcing organizations to

adopt this stigmatizing policy will have a different result now.  In fact, the AIDS Leadership Act

recognizes that efforts to "reduce the stigma associated with HIV/AIDS" are essential to

combating the HIV/AIDS pandemic.  22 U.S.C. § 7601(21)(C).  As such, the pledge requirement

does not advance the public health objectives of the AIDS Leadership Act, but instead

undermines those very aims.

**III.　Compelling Organizations To Adopt A Pledge That Stigmatizes Sex Workers And That Limits Privately Funded Speech and Activities Runs Contrary To Public Health Policy And Best Practices In The Field.**

　　　　　The AIDS Leadership Act's pledge requirement and the resulting restraints on the

use of private funding to engage in constitutionally protected speech — speech that recipients

---

[17] *Available at* http://www.state.gov/documents/organization/43885.pdf.

12

believe is the best way to fight HIV/AIDS — runs contrary to public health policy and best practices in the field by threatening to alienate the sex worker communities whose participation and cooperation in the fight against HIV/AIDS is crucial to the success of such efforts. Compelling NGOs to adopt a policy statement opposing prostitution impedes their ability to reach out to sex workers, to teach them skills that would make it possible for them to leave prostitution, to promote safer sex practices among sex workers and their clients, to provide medical treatment and care for HIV-positive sex workers and their families, and to engage in further research into effective practices for preventing the spread of HIV. Gaining the trust and cooperation of sex workers in order to enter into an active collaboration is a crucial component of the anti-HIV/AIDS programs that are implemented around the world by *amici*. Forcing NGOs, which deal primarily with health and social issues, to take a political stance opposing prostitution will negate their ability to approach sex workers with the non-judgmental and non-moralistic attitude that their years of experience have shown to be effective with these communities. As many case studies and "best practices" guidelines[18] demonstrate, the active and voluntary participation of sex workers themselves is crucial to the success of HIV-prevention and treatment programs.

Sex workers tend to be a marginalized segment of the population — often poor, disenfranchised, and subject to abuse. "In nearly all settings, female sex workers are a stigmatized group of people. . . . [M]ost mainstream societies have relegated them to the

---

[18] "Best practices" are published by health organizations such as the World Health Organization and UNAIDS and heavily relied on by public health professionals. Best practices can range from specific training techniques to entire programs. The basis for best practices ranges from very strong evidence in the form of randomized controlled trials to less rigorous evidence-based studies, when these are the only measure available. *See* Declaration of Chris Beyrer, dated Sept. 21, 2005, ¶¶ 21-22, Plaintiffs' Motion for Preliminary Injunction, *Alliance for Open Society Int'l, Inc., et al. v. U.S. Agency for Int'l Dev.*, 1:05-cv-08209-VM (S.D.N.Y. Sept. 28, 2005) (Ex. 2).

margins, abused them, exploited them[,] and restricted their rights as citizens." UNAIDS Case

Study, *Female Sex Worker HIV Prevention Projects: Lessons Learnt from Papua New Guinea,*

*India and Bangladesh* 9 (Nov. 2000).[19] The stigma and illegality frequently associated with

prostitution make sex workers a particularly difficult population to reach in HIV/AIDS

intervention efforts.

   Despite the difficulty of establishing contact and collaboration with sex workers,

organizations have persevered, because sex workers are crucial actors in efforts to prevent the

spread of HIV. "Early in the [AIDS] epidemic, sex workers were recognized as a key group to

involve in HIV-prevention work. . . . However, sex workers have been difficult to fully involve

in HIV prevention, since the illegality of prostitution in many countries means that women and

men who exchange sex for money may not always be visible or accessible. Sex work is also

highly stigmatized in many societies and, in early reports about AIDS, the mass media often

presented sex workers unhelpfully as 'conduits of infection' rather than as individuals who might

be especially vulnerable and/or who have a key role to play in HIV prevention." UNAIDS Best

Practice Collection Key Material, *Innovative Approaches to HIV Prevention: Selected Case*

*Studies* 38 (Oct. 2000) (citations omitted). UNAIDS further advises that in developing,

implementing, monitoring and evaluating HIV/AIDS prevention and care programs, "it is

important to consider . . . the active involvement of sex workers themselves in all phases of

project development, implementation and evaluation." UNAIDS Technical Update, *Sex Work*

*and HIV/AIDS* 3 (June 2002).

---

[19]  All UNAIDS documents cited are *available at* http://www.unaids.org.

That approach is consistent with international human rights standards, which recognize the fundamental right of all individuals, including sex workers, to "seek, receive, and impart information" about HIV/AIDS without discrimination.[20] Protecting the fundamental speech rights of organizations working with sex workers also is essential to ensuring sex workers' access to health information.

Recognizing and promoting the human rights of sex workers is also viewed as a public health "best practice" in the fight against HIV/AIDS. This "human rights approach recognizes that rights are universal and reinforces the value of full participation of all members of society." World Health Organization, *The World Health Report: Changing History* 47 (2004).[21] Promoting the human rights of these stigmatized and marginalized individuals makes them more effective participants in the prevention and treatment of HIV and AIDS. "In addition to reducing HIV and STI infections and providing care services, sex work programmes need to address the issue of decreasing sex workers' vulnerability. To do so, programmes must address the conditions surrounding sex work and function as agents of social change. This requires a broad and long-term perspective, which is why sex work programmes should incorporate a community-development approach to HIV into their basic framework. 'Empowering' sex workers at the individual, community and societal level is a vital component of addressing their vulnerability." UNAIDS Technical Update, *Sex Work and HIV/AIDS* at 14. Specifically, the stigma faced by sex workers is seen by U.S. policymakers, among others, as an important

---

[20] The International Covenant on Civil and Political Rights (ICCPR), art. 19, Dec. 19, 1966, 999 U.N.T.S. 171, (recognizing that "[e]veryone shall have the right to freedom of expression," including the right to "seek, receive and impart information of all kinds) *available at* http://www.ohchr.org/english/law/ccpr.htm. The United States ratified the ICCPR in 1992.

[21] *Available at* http://www.who.int/whr/2004/en/.

impediment to reaching sex workers with information, condoms and other HIV/AIDS-related services.

Human rights organizations have documented how stigma and discrimination expose marginalized persons and those who work with them to violence and other forms of abuse. These human rights violations facilitate the spread of the virus by interfering with education and outreach, and driving those most vulnerable to infection away from HIV prevention and treatment efforts. In many countries, sex workers are routinely subjected to violations of their fundamental rights by the police, both at the time of their arrest and while in detention.[22] Peer educators providing HIV/AIDS outreach to these women frequently suffer many of the same abuses. Police have beaten peer educators, claimed without basis that outreach work promotes prostitution, and brought trumped-up criminal charges against outreach workers.[23] The mere possession of condoms — a key tool in the work of HIV/AIDS peer educators — is often enough to trigger police harassment, and thus to deter outreach that could help prevent the spread of HIV/AIDS.[24] In Kazakhstan and Bangladesh, for example, sex workers have reported verbal and physical abuse by police, including gang rape, and beating with fists, feet and batons. When sex workers face abuse from governmental authorities, they

---

[22] *See, e.g.*, Human Rights Watch, *Epidemic of Abuse: Police Harassment of HIV/AIDS Outreach Workers in India*, (July 2002), *available at* http://www.hrw.org/reports/2002/india2/; Human Rights Watch, *Ravaging the Vulnerable: Abuses Against Persons at High Risk of HIV in Bangladesh*, (Aug. 2003), *available at* http://www.hrw.org/reports/2003/bangladesh0803/; Human Rights Watch, *Unprotected: Sex, Condoms, and the Human Right to Health in the Philippines* 32-34 (May 2004), *available at* http://hrw.org/reports/2004/philippines0504/.

[23] *Id.*

[24] *Id.*

have no one to defend them and when they face abuse from private actors, sex workers report being told that as sex workers they have no right to lodge complaints.[25]

Moreover, as a result of adopting a position opposing prostitution, the relationship of cooperation and trust many NGOs have worked hard to cultivate with sex workers will be damaged. This relationship has made NGOs much more likely to assist in discovering and preventing sexual exploitation and violence directed at sex workers. For example, in Bishkek, Kyrgyzstan, since 2003 the NGO "Tais Plus" has had a project responding to violence for people in sex work. Tais Plus, and similar HIV/AIDS projects in the region, have described their work as an essential first point of contact for marginalized sex workers experiencing violence from police and private actors, as neither traditional rights organizations or the governments in Central Asia have responded to the violence against sex workers. *See* Central and Eastern European Harm Reduction Network (CEEHRN), *Sex work, HIV/AIDS and Human Rights in Central Europe* 66 (Vilnius: Lithuania: July 2005).

Countries have increasingly recognized the importance of a human rights approach in contributing to the success of HIV/AIDS programs. At the 1994 World AIDS Summit in Paris, forty-two governments including the United States declared "the enhanced involvement of people living with or affected by HIV/AIDS was critical to ethical and effective national responses to the epidemic. This principle of greater involvement is fundamental to the fairness of any policies and programmes concerning HIV/AIDS." World Health Organization,

---

[25] *See, e.g.*, Human Rights Watch, *Fanning the Flames: How Human Rights Abuses Are Fueling the AIDS Epidemic in Kazakhstan* (June 2003), *available at* http://hrw.org/reports/2003/kazak0603/; Human Rights Watch, *Ravaging the Vulnerable: Abuses Against Persons at High Risk of HIV in Bangladesh* (Aug. 2003) *available at* http://www.hrw.org/reports/2003/bangladesh0803/.

*The World Health Report: Changing History* at 47.[26]  In 1998, the Office of the United Nations

High Commissioner for Human Rights and UNAIDS "jointly developed international guidelines

on HIV/AIDS and human rights, a tool that applies to human rights law and norms to the specific

context of HIV/AIDS and identifies what states can and should do in the light of their human

rights obligations.  Commitment to these principles was reinforced in the Declaration of

Commitment on HIV/AIDS, adopted at the United Nations General Assembly Special Session

on HIV/AIDS in 2001."  *Id.*

    Brazil has explicitly recognized the key role that sex workers play in that

country's successful anti-AIDS initiative.  According to Brazil's national AIDS commissioner,

physician Pedro Chequer:  "We view sex workers as essential partners in our HIV prevention

efforts.  We partner with  . . . NGOs composed of and led by sex workers to formulate and

implement our HIV prevention program.  These NGOs have been tremendously effective in

getting Brazilians to give up dangerous sexual behavior, such as having sex with strangers

without condoms."  Declaration of Pedro Chequer, dated Aug. 24, 2005, ¶ 6, Plaintiffs' Motion

for Preliminary Injunction, *Alliance for Open Society Int'l, Inc., et al. v. U.S. Agency for Int'l

Dev.*, 1:05-cv-08209-VM (S.D.N.Y. Sept. 28, 2005) (Ex. 3).  In explaining why the country

decided to turn down $40 million in U.S. assistance against AIDS rather than sign a statement

condemning prostitution, "we believed we could not conduct effective outreach to and programs

with sex workers if our NGO partners were forced to state their explicit opposition to

prostitution, as USAID was requiring."  *Id.* at ¶ 8.

---

[26] *Available at* http://www.who.int/whr/2004/en/report04_en.pdf.

Even when HIV/AIDS education and care are made available to sex workers, they may not take advantage of them, often citing as a deterrent the "unwelcoming or judgmental attitudes on the part of staff." UNAIDS Technical Update, *Sex Work and HIV/AIDS* at 8. One of the projects lauded by UNAIDS as a successful model of Asia's best efforts at preventing HIV infection among female sex workers is instructive. *See* UNAIDS Case Study, *Female Sex Worker HIV Prevention Projects: Lessons Learnt from Papua New Guinea, India and Bangladesh* (Nov. 2000). Named the Transex Project (because it initially focused on transport and sex workers in Papua New Guinea), this three-year initiative was globally funded by the Australian government, and specific activities were additionally funded by USAID, the World Health Organization, the United Nations Populations Fund, and UNAIDS. The observations and lessons that emerged from this project were telling. The difficulty of engaging sex workers in the initiative was noted: "Rapport building with sex workers proved to be a long and delicate process. . . . " *Id.* at 26. One of the challenges was to train the project's staff to bring a non-judgmental attitude to their interactions with sex workers. "Staff training was intensified to try to overcome all expression of the moralistic stance and poor gender-related attitudes sometimes exhibited by the male staff." *Id.* Sex workers whom the initiative was designed to educate and help were alienated from the project by their initial belief that the project's mission was to condemn or abolish prostitution. "Project personnel repeatedly reassured concerned groups that they were not going to moralize about prostitution or rehabilitate sex workers, but that they would work with other NGOs to provide skills training for sex workers who wished to give up their trade or simply supplement their income. Such non-moralistic attitudes are not widespread in [Papua New Guinea], but the project's success has demonstrated their value." *Id.* at 29. Adopting the pledge requirement would send precisely the type of antagonizing message that the

Transex Project worked so hard to neutralize.  Given the barriers encountered in reaching sex

workers due to informal, unofficial attitudes, those barriers would become insurmountable in the

face of a written, publicized policy statement condemning those the programs are intending to

help.

Among the key lessons learned from the Transex Project is the necessity of a non-

moralistic, non-judgmental stance.  UNAIDS concluded that: "*Training to diminish moralistic

and judgmental attitudes among staff* proved to be successful and a valuable lesson to all

observers.  The project showed that the *development of meaningful relationships with target

groups* is a key issue, requiring time and empathy." *Id.* at 52.  As in other successful projects

deemed to exemplify "best practices" for preventing the spread of HIV in sex workers, the

Transex Project effectively gained the trust and cooperation of the target population.

For NGOs dedicated to reducing the spread of HIV, the freedom to refuse to

adopt a political position explicitly condemning a group so vulnerable to infection is necessary in

order to provide effective medical and social services.  "Programs that successfully prevent HIV

transmission among [sex worker] populations, and provide health care and treatment support, are

those that build trust while ameliorating stigma and discrimination.  Frequently this means

supporting sex workers' demands for their rights as workers and citizens, including fair treatment

by the police and ethical regulation of health and safety in the sex industry.  *It is folly to suggest

that successful programs could possibly maintain their relationship with sex workers if they

advocated for their continued criminalization, arrest and prosecution.*"  Saunders, 7 HEALTH

AND HUMAN RIGHTS: AN INTERNATIONAL JOURNAL at 187 (emphasis added).

Practitioners who have spent years in the field working with sex workers in the

context of HIV/AIDS confirm that the pledge requirement alienates the very people whose trust

20

is so crucial for their work.  In Cambodia, for example, NGOs discontinued plans to provide

English language training classes for women in brothels for fear such programs would be

interpreted as insufficiently opposed to prostitution, or indeed "promoting prostitution."[27]

Plaintiff argues that the pledge requirement is unconstitutionally vague.  *See* Plaintiff's Opp. to

Defendants' Mot. to Dismiss, 21-26, *DKT Int'l, Inc. v. USAID, et al.*, Civil Action No. 05-01604

(EGS) (D.D.C. Oct. 24, 2005).  Indeed, the ambiguity of the term "opposing prostitution" is

particularly evident here, where NGOs feared that even providing training to enable sex workers

to find alternative employment might be misconstrued as promoting prostitution.  The lack of

access to such programs, scoupled with their criminal status, contributes to the continued social

exclusion of women in prostitution in Cambodia and may even keep women in prostitution.[28]

Likewise, NGOs that provide health services and conduct operations research on factors

contributing to vulnerability to HIV/AIDS will be unable to engage in research or scientific

debate about the impact of different policies and practices on the health and safety of the sex

workers on whose behalf they claim to work.

      Close working relationships between NGOs and sex workers are widely

recognized as a crucial component of any intervention that seeks to diminish the spread of HIV

in the sex worker population.  Marginalized and stigmatized, sex workers are often suspicious of

outside aid groups.  The most successful interventions have consciously adopted a neutral, non-

moralistic stance toward prostitution.  Such a stance has won them the trust of the population

whom they are trying to serve.  Based on this trust, NGOs in the field can provide information

---

[27] NGO Letter to George Bush (May 18, 2005), *available at* http://hrw.org/campaigns/hivaids/
hiv-aids-letter/.

[28] *Id.*

and influence the behavior of sex workers in ways that stem the spread of HIV, a result that achieves the public health goals of the AIDS Leadership Act and benefits the entire society. Requiring NGOs to declare their opposition to prostitution will erode these working relationships, undermine the mutual exchange of life-saving information, and eventually unravel the positive results that years of dedicated work have brought.

**IV.    USAID's Pledge Requirement And Restriction Of Privately Funded Speech Does Not Advance The Public Health Objectives Enshrined In The AIDS Leadership Act.**

USAID's requirement that NGOs seeking U.S. funding adopt a policy condemning prostitution and restricting activities believed to be at odds with the pledge not only fails to promote the objectives of the AIDS Leadership Act, but undermines them. The central objective of the AIDS Leadership Act is the amelioration of the HIV/AIDS pandemic, which is reflected by the legislative conviction that "HIV/AIDS is *first and foremost* a health problem." 22 U.S.C. § 7601(15) (emphasis added). Congress found that a multisector approach was required to address the pandemic:

> Successful strategies to stem the spread of the HIV/AIDS pandemic will require clinical medical interventions, the strengthening of health care delivery systems and infrastructure, and determined national leadership and increased budgetary allocations for the health sector in countries affected by the epidemic as well as measures to address the social and behavioral causes of the problem and its impact on families, communities, and societal sectors.

*Id.* Congress also recognized that "[t]he magnitude and scope of the HIV/AIDS crisis" demanded a "comprehensive, long-term, [and] international response focused upon addressing the causes, reducing the spread, and ameliorating the consequences of the HIV/AIDS pandemic." 22 U.S.C. § 7601(21). To be effective, Congress concluded that such a response would have to include "development and implementation of national and community-based multisector

strategies" that would "increase the participation of at-risk populations in programs designed to encourage behavioral and social change and reduce the stigma associated with HIV/AIDS." *Id.*

The pledge requirement, however, does not advance these objectives. The legislation does not exclude sex workers from the Act's prevention efforts. To the contrary, the Act specifically contemplates that "particular emphasis" on education and prevention is necessary for "specific populations that represent a particularly high risk of contracting or spreading HIV/AIDS, including those exploited through the sex trade[.]" 22 U.S.C. § 2151b-2(d)(3)(A). Moreover, it specifically authorizes grantees to provide health services to sex workers. 22 U.S.C. § 7631(e).

While the AIDS Leadership Act does provide that "[n]o funds made available to carry out this chapter . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution," 22 U.S.C. § 7631(f), that restriction has heretofore not been applied to U.S. public health groups, and Congress made no findings that the adoption of such a policy would further the Act's public health goals. The Act's requirement for a policy "explicitly opposing prostitution" was added by a voice vote amendment in the House Committee on International Relations and is not explained or justified in the legislative history. H.R. Rep. No. 108-60 at 28-31, *reprinted in* 2003 U.S.C.C.A.N. 712, 718. While there is a congressional finding that "[p]rostitution and other sexual victimization is degrading to women and children and it should be the policy of the United States to eradicate such practices," *see* 22 U.S.C. § 7601(23), there is no congressional finding that compelling domestic NGOs, in violation of their First Amendment rights, to adopt an explicit policy opposing prostitution and to restrict their privately funded speech will further that goal. Nor is there any finding that the

23

asserted government policy cannot be achieved through other means that impair neither grantees'
constitutional rights nor the public health focus and objectives of the Act.

Moreover, the pledge requirement threatens the public-private partnerships that
are one of the backbones of the AIDS Leadership Act by forcing domestic NGOs to make an
unconstitutional choice — forgo government funding or restrict their public health effectiveness
through adoption of the anti-prostitution policy and restrictions on even privately funded speech.
The statute acknowledges that in order to be most effective the United States would need to
"encourage active involvement of the private sector, including businesses, pharmaceutical and
biotechnology companies, the medical and scientific communities, charitable foundations,
private and voluntary organizations and nongovernmental organizations, faith-based
organizations, community-based organizations, and other nonprofit entities." 22 U.S.C.
§ 7601(22). Congress sought partnerships with nongovernmental organizations with experience
in health care and HIV/AIDS counseling precisely because they "have proven effective in
combating the HIV/AIDS pandemic and can be a resource in assisting indigenous organizations
in severely affected countries." 22 U.S.C. § 7601(18). The requirement that these organizations
have no other option but to adopt a policy explicitly condemning prostitution, and must refrain
from using their nongovernment funding to engage in activities that public health experts agree
are most effective in fighting HIV/AIDS, make these "partnerships" far less likely.

The AIDS Leadership Act correctly recognizes that "HIV/AIDS is *first and
foremost* a health problem," 22 U.S.C. § 7601(15) (emphasis added). The USAID requirement
that U.S.-based organizations adopt a policy opposing prostitution and refrain from privately
funded activities that might be viewed as not opposing it, however, only exacerbates the global
health threat posed by HIV/AIDS. Because public health service providers and the U.S.

Government itself have long recognized that overcoming stigma and alienation are part of the challenge in combating AIDS, there can be no governmental interest in furthering that alienation through the required policy statement and restriction of privately funded activity. As such, the pledge requirement is not adequately tailored to further any legitimate government interest and therefore should be enjoined.

## CONCLUSION

For the reasons set forth above and in plaintiff's brief, the relief sought in the Complaint should be granted.

Respectfully submitted

Lenora M. Lapidus*
Emily J. Martin*
Claudia Flores*
Women's Rights Project
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, N.Y. 10004
Telephone:  (212) 519-7816
Facsimile:  (212) 549-2580

Caroline M. Brown  (D.C. Bar #438342)
Karin L. Kizer (D.C. Bar #469057)
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291

Christine I. Magdo*
COVINGTON & BURLING
1330 Avenue of the Americas
New York, N.Y. 10019
Telephone:  (212) 841-1000
Facsimile:  (646) 441-9252

*Counsel for Amici*

Date:  November 15, 2005

_____

* Not admitted to the District of Columbia Bar.  Pro hac vice motion to be submitted.

# APPENDIX A

# STATEMENTS OF INTEREST OF *AMICI CURIAE*

## 1. AIDS ACTION

AIDS Action is a national organization based in Washington, DC, dedicated to the development, analysis, cultivation, and encouragement of sound policies and programs in response to the HIV epidemic through the dissemination of information and the building and use of advocacy on behalf of all those living with and affected by HIV. AIDS Action collaborates with the greater public health community to enhance HIV prevention programs and care and treatment services, and to secure comprehensive resources on a federal level to address community needs until the epidemic is over.

AIDS Action fundamentally opposes the stigmatization of all people living with HIV and of people at risk for HIV. Stigmatization of people living with HIV is counter to currently accepted "best practices" which require a non-judgmental and culturally competent approach to reaching out to people at risk for, or living with, HIV. AIDS Action is therefore concerned that requiring nongovernmental organizations ("NGOs") to sign a pledge specifically stating that the NGOs are "opposed to prostitution" as a condition of receiving funding under the AIDS Leadership Act is counterproductive to the goal of reaching out to sex workers in promoting effective health interventions that reduce or eliminate the spread of HIV. By requiring NGOs to voice opposition to prostitution, the U.S. government is necessarily requiring NGOs to stigmatize sex workers, the very people that they are trying to help. In fact, this pledge conflicts with the U.S. government's own "anti-stigmatization" policies as set forth in the AIDS Leadership Act. AIDS Action is concerned that NGOs will be forced to choose between making

the pledge to "oppose prostitution" and limiting their ability to contact, educate and help sex workers or failing to make the pledge and losing funding.

## 2. AMERICAN HUMANIST ASSOCIATION

The American Humanist Association ("AHA") is a nationwide, nonprofit humanist organization, dedicated to raising public awareness and acceptance of humanism, and advancing humanist values. The AHA focuses on defending religious liberty and protecting the fundamental rights of every individual. The AHA views access to healthcare and freedom of expression as fundamental rights. Through its Feminist Caucus, founded in 1977, the AHA specifically works to protect and expand gender equality, reproductive freedom, and access to reproductive healthcare.

## 3. THE AMERICAN FOUNDATION FOR AIDS RESEARCH

The American Foundation for AIDS Research ("amfAR") is one of the world's leading nonprofit organizations dedicated to the support of ADIS research, HIV prevention, treatment education, and the advocacy of sound AIDS-related public policy. Since 1985, amfAR has invested more than $233 million in its programs and has awarded grants to more than 2,000 research teams worldwide. AmfAR's mission is to prevent HIV infection and the disease and death associated with it, and to protect the human rights of all people threatened by the epidemic of HIV/AIDS. Over the years, amfAR has supported research, education, and policy activities addressing HIV prevention among vulnerable populations, including sex workers, in the U.S. and globally. AmfAR is a signatory on a May 2005 letter to President Bush opposing the application of the anti-prostitution requirement in PEPFAR to U.S.-based organizations, and has been quoted in the press on this subject. Therefore, amfAR has a substantial interest in the proper resolution of this case.

- b -

4. **THE CENTER FOR HEALTH AND GENDER EQUITY**

The Center for Health and Gender Equity ("CHANGE") is a U.S.-based non-governmental organization that seeks to ensure that U.S. international assistance promotes evidence-based approaches to reproductive and sexual health. CHANGE researches the effects of U.S. policies on the health and rights of women, girls, and other populations in poor countries and engages in legislative advocacy based on our research. Additionally, although CHANGE does not accept federal funds, it advocates for increased funding for U.S. Government-supported international programs in HIV/AIDS and reproductive health.

5. **CENTER FOR REPRODUCTIVE RIGHTS**

The Center for Reproductive Rights ("the Center") is a national public interest law firm based in New York City dedicated to preserving and expanding reproductive rights in the United States and throughout the world. The Center's domestic and international programs engage in litigation, policy analysis, legal research, and public education seeking to achieve women's equality in society and ensure that all women have access to appropriate and freely chosen reproductive health services, including contraceptives. The Domestic Legal Program of the Center specializes in litigating reproductive rights cases throughout the United States and is currently lead or co-counsel in a majority of the reproductive rights litigation in the nation.

6. **THE CENTER FOR WOMEN POLICY STUDIES**

The Center for Women Policy Studies was founded in 1972 with a mission to shape public policy to improve women's lives. A hallmark of the Center's work is the multiethnic feminist lens through which all issues affecting women and girls are viewed. In all of its work, the Center looks at the combined impact of gender, race, ethnicity, class, age, disability, and sexual orientation. The Center represents the interests of women around the world whose access to information, health services and social services is impeded by U.S. funding

restrictions on NGOs that do not adopt a "policy explicitly opposing prostitution." It also represents the interests of women-centered programs and organizations that – because of the policy – face detrimental speech and activity restrictions.

**7.   COMMUNITY HIV/AIDS MOBILIZATION PROJECT**

The mission of the Community HIV/AIDS Mobilization Project ("CHAMP") is to ensure access to comprehensive HIV/AIDS prevention education and tools, with a particular focus on those most at risk of acquiring HIV. It believes that the current U.S. government standard that requires a repudiation of sex work in order to receive U.S. funding has jeopardized vital HIV prevention efforts.

**8.   FEMINIST MAJORITY FOUNDATION**

Founded in 1987, the Feminist Majority Foundation ("FMF") is a nationwide, nonprofit, nongovernmental feminist research and action organization in the United States dedicated to advancing women's equality, reproductive rights and health, and non-violence. As part of our well-established and internationally recognized Global Women's Empowerment Program, the FMF works to secure U.S. and international policies that promote women's rights and ensure access to reproductive health care and HIV/AIDS services as a matter of fundamental human rights.

**9.   GAY MEN'S HEALTH CRISIS**

Gay Men's Health Crisis ("GMHC") is a not-for-profit, volunteer-supported and community-based organization committed to national leadership in the fight against HIV/AIDS. Our mission is to reduce the spread of HIV disease; help people with HIV maintain and improve their health and independence; and keep the prevention, treatment and cure of HIV an urgent national and local priority. Founded in 1981, and based in New York City, GMHC provides HIV prevention and care services to thousands of people living with or at risk for HIV/AIDS and

advocates for evidence-based, effective prevention and care interventions globally.  Inevitably, this work requires us to engage with individuals at high risk of transmission of the HIV virus, including sex workers.  Because this case implicates the ability of organizations such as GMHC to employ "best practices" in the fight against the spread of HIV/AIDS, its resolution is a matter of significant concern to GMHC and to the people it serves.

## 10. THE GLOBAL AIDS ALLIANCE

The Global AIDS Alliance ("GAA") is a nonprofit organization based in Washington, DC, whose mission is to galvanize the political will and financial resources needed to address the global AIDS crisis and reduce its impacts on poor countries that have been hardest hit by the pandemic. GAA has carved out a leadership role in shaping AIDS policy discussions and mobilizing campaigns to break through entrenched bureaucratic inaction and speed the pace of the global response to HIV/AIDS. GAA recognizes the need for a holistic perspective of the structural roots of and responses to the HIV/AIDS crisis.  Sex workers are among the populations most vulnerable to HIV and play an important role in transmission or prevention thereof.  The US policy at issue in this amicus brief only furthers the marginalization and stigma that frequently drives women to enter sex work in the first place, alienating them from prevention and treatment efforts and enabling increased violations of their human rights.  The U.S. policy undermines sound public health by exacerbating the stigma attached to sex workers and causing them to lose trust in those working to address the HIV pandemic.  This policy stymies and potentially reverses the efforts of many organizations who are providing direct services on the ground to vulnerable populations in affected countries.

## 11. THE GUTTMACHER INSTITUTE

The Guttmacher Institute is an independent, nonprofit corporation that advances sexual and reproductive health in the United States and around the world through an interrelated

program of research, policy analysis and public education. The Institute works to protect,

expand and equalize access to information, services and rights that will enable women and men

to avoid unplanned pregnancies and prevent and treat sexually transmitted infections including

HIV. The Institute is acutely aware of the pressing need to improve the quality of policy and

programs concerning sexual and reproductive health in the United States, and regards achieving

this goal as its primary responsibility. Understanding that the political, cultural and economic

power of the United States can have considerable impact on sexual and reproductive health

throughout the world, the Institute places a similarly high priority on monitoring and analyzing

the effects of U.S. policy on women and men in other countries.

## 12. THE HUMAN RIGHTS CENTER, UNIVERSITY OF CALIFORNIA, BERKELEY

Founded in 1994 with the assistance of the Sandler Family Supporting

Foundation, U.C. Berkeley's Human Rights Center is a unique interdisciplinary research and

teaching enterprise that reaches across academic disciplines to conduct research in emerging

issues in international human rights and humanitarian law. The Center complements and

supports the work of nongovernmental human rights organizations by drawing upon the

creativity and expertise of scholars from several diverse university programs and departments

such as anthropology, demography, education, ethnic studies, geography, journalism, law,

political science and public health.

## 13. HUMAN RIGHTS WATCH

Human Rights Watch ("HRW"), the largest U.S.-based international human rights

organization, was established in 1978 to report on violations of human rights worldwide. HRW's

work includes documenting human rights violations that fuel the HIV/AIDS epidemic, and

impede access to HIV/AIDS prevention and care services, as well as conducting advocacy to

address such abuses. The proper resolution of this case is therefore a matter of substantial interest to HRW.

## 14. THE INSTITUTE OF HUMAN RIGHTS AT EMORY UNIVERSITY

The Institute of Human Rights at Emory University seeks to advance the cause of human rights through educational, research and community awareness programs in parallel with the mission of the university. It seeks to engage representatives of governmental and non-governmental institutions as well as scholars and practitioners in dialogue about the use of rights-based approaches. The Institute's teaching programs include an interdisciplinary graduate certificate in human rights open to graduate students across the university, and it supports faculty from the University in pursuing human rights related research particularly in the areas of health and religion.

## 15. THE INTERNATIONAL PLANNED PARENTHOOD FEDERATION, WESTERN HEMISPHERE REGION

The International Planned Parenthood Federation, Western Hemisphere Region ("IPPF/WHR") and its 46 member associations are committed to promoting the rights of women and men to decide freely the number and spacing of their children and to the highest possible level of sexual and reproductive health. IPPF/WHR provides more than 18 million services — from contraceptive counseling and supplies to HIV prevention, testing and treatment — to the neediest people in the region. Imposition of a requirement on USAID grantees to denounce prostitution will impede the effectiveness of the work of all organizations receiving U.S. assistance for HIV/AIDS prevention and treatment, potentially including member associations of IPPF/WHR.

## 16. THE INTERNATIONAL WOMEN'S HEALTH COALITION

The International Women's Health Coalition ("IWHC") is a nonprofit organization that works to generate health and population policies, programs, and funding that promote and protect the rights and health of girls and women worldwide. For the past 20 years, IWHC has been working with partner organizations in Africa, Asia and Latin America. Central to our efforts is the belief that global well-being and social and economic justice can only be achieved by ensuring women's human rights, health, and equality. IWHC supports programs and policies to enable women to equally and effectively engage in decisions about their sexual and reproductive rights and health; experience a healthy and satisfying sexual life free from discrimination, coercion, and violence; make free and informed choices about childbearing; and have access to the information and services they need to enhance and protect their health.

## 17. PHYSICIANS FOR HUMAN RIGHTS

Physicians for Human Rights ("PHR") mobilizes health professionals to advance the health and dignity of all people through action that promotes respect for, protection of, and fulfillment of human rights. PHR has conducted a number of investigations relating to HIV/AIDS, and maintains an ongoing Health Action AIDS Campaign through which PHR works with health professionals in AIDS-torn Uganda. Based upon its experience, PHR believes that it is critical to engage sex workers as well as women involved in occasional transactional sex in HIV prevention and treatment efforts. Forcing grantees to oppose prostitution will make such engagement difficult, if not impossible and will only further stigmatize and marginalize these devalued individuals and groups, making their access to health and other services all the more challenging. Furthermore, the "pledge requirement" violates the First Amendment by requiring private organizations to adopt the government's point of view and by restricting what they can say and do with their private funding.

- h -

## 18. PLANNED PARENTHOOD FEDERATION OF AMERICA, INC. ("PPFA"),

Planned Parenthood Federation of America, Inc. ("PPFA"), a New York not-for-profit corporation, is America's oldest and most trusted sexual and reproductive health care advocate and provider.  PPFA provides leadership to 120 affiliates that manage approximately 800 medical centers around the country and provide medical services and sexuality education to nearly five million women, men, and teens each year.  PPFA and its network of affiliates work with organizations around the world to protect and promote global sexual and reproductive health and rights.  This includes efforts to ensure that all women and men have the means to meet their sexual and reproductive health care needs, including the means to prevent the spread of HIV/AIDS.

## 19. POPULATION ACTION INTERNATIONAL

Population Action International ("PAI"), an independent policy advocacy group working to strengthen political and financial support worldwide for population programs grounded in individual rights.  Through research and advocacy, PAI seeks to make clear the linkages among population, reproductive health, the environment, and development.  At the heart of PAI's mission is its commitment to universal access to family planning and related health services, and to educational and economic opportunities, especially for girls and women. Although PAI receives no U.S. government funding, and hence is not itself required to adopt an organizational policy opposing prostitution, it nevertheless believes that the requirement is an unconstitutional infringement on the rights and independence of other organizations with which it cooperates and on whose behalf PAI advocates, limiting those partners' ability to implement programs to prevent the spread of HIV/AIDS based on sound public health practice.

- i -

## 20. **THE POPULATION COUNCIL**

The Population Council ("the Council") is a nonprofit research organization that seeks to improve the well-being and reproductive health of current and future generations around the world and to help achieve a humane, equitable, and sustainable balance between people and resources.  The Council's activities include conducting fundamental biomedical research in human reproduction; developing contraceptives and products such as microbicides to prevent the sexual transmission of HIV; doing studies to improve the quality and cost-effectiveness of services related to family planning and HIV/AIDS; conducting research on health and behavior, family dynamics and gender, and causes and consequences of population change; and strengthening professional resources in developing countries through collaborative research, fellowships, and training.  Council staff members conduct research and programs in 70 countries.

The HIV/AIDS pandemic has had and will continue to have a devastating impact on the poor and disadvantaged including the victims of sex trafficking, forced labor, and those engaged in prostitution.  With respect to this pandemic, the Council believes that the paramount public health objective is to provide health-related assistance to people in order to lessen human suffering and to prevent or reduce the spread of HIV/AIDS.  The proper resolution of this case is therefore a matter of interest to the Council.

## 21. **RELIGIOUS CONSULTATION ON POPULATION, REPRODUCTIVE HEALTH AND ETHICS**

The Religious Consultation on Population, Reproductive Health and Ethics ("The Consultation") is a 501C 3 nongovernmental organization consisting of some 100 international scholars of world religions.  All the participating scholars of The Consultation are committed to women's health and reproductive freedom and to the maintenance of reasonable demographic goals.  All our scholars are feminists (half being women) and committed to countering the

- j -

excessive influence of right wing, fundamentalist religion by giving voice to alternative religiously grounded moral visions and values. The Consultation is concerned with the abuses and forms of discrimination that attend sexual expression in society.

## 22. <u>THE SEXUALITY INFORMATION AND EDUCATION COUNCIL OF THE U.S.</u>

The Sexuality Information and Education Council of the U.S. ("SIECUS") has served as a leading national voice for sexuality education, sexual health, and sexual rights for over 40 years. SIECUS affirms that sexuality is a fundamental part of being human, one that is worthy of dignity and respect. SIECUS advocates for the right of all people to accurate information, comprehensive education about sexuality, and sexual health services. SIECUS works to create a world that ensures social justice and sexual rights.

People engaged in sex work have a right to the information, services, and supplies they need to stay healthy. SIECUS also understands that outreach to sex workers is critical to stemming the HIV/AIDS pandemic. SIECUS believes that the current U.S. government policy that requires a repudiation of sex work in order to receive U.S. funding undermines the ability of organizations to work with sex workers and conduct vital harm reduction programs.