# EXHIBIT A

*Decision and Order*
*Alliance for Open Society International, Inc., et al.*
*v.*
*United States Agency for International Development, et al.*
*SDNY 05 Civ. 8209*

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------- X
ALLIANCE FOR OPEN SOCIETY          :
INTERNATIONAL, INC. et al.,        :
                                   :
                    Plaintiffs,    :    05 Civ. 8209
                                   :
        - against -                :    DECISION AND ORDER
                                   :
UNITED STATES AGENCY FOR           :
INTERNATIONAL DEVELOPMENT et al.,  :
                                   :
                    Defendants.    :
--------------------------------X
```

**VICTOR MARRERO, United States District Judge.**

## TABLE OF CONTENTS

I.   **INTRODUCTION** ........................................ **1**

II.  **BACKGROUND** ......................................... **2**

    A.   FACTS ........................................ 3

        1.   The Parties ............................... 3

            a.   Plaintiffs ......................... 3

            b.   Defendants ......................... 5

                i.  In General .................... 5
                ii. In Relation to the Act ........ 6

        2.   HIV/AIDS ............................... 6

            a.   Internationally .................... 7

            b.   In Central Asia .................... 7

            c.   Among High-Risk Populations ......... 8

        3.   The Act ................................ 9

            a.   In General ......................... 9

        b.  Role of Private Partners in
            Combating HIV/AIDS .................  10

        c.  Findings and Policies Regarding
            the Social and Behavioral Cause
            of HIV/AIDS, Particularly
            Prostitution ......................  11

        d.  The Government Funds Restriction ....  12

        e.  The Policy Requirement ..............  12

    4.  Defendants' Implementation of the Act ...  13

        a.  USAID ..............................  13

            i.  Acquisition and Assistance
               Policy Directives .............  13

            ii.  Plaintiffs Seek Clarification
               of Requirements ..............  15

        b.  HHS and the CDC ....................  19

    5.  Plaintiffs' Complaint and Motions for a
        Preliminary Injunction ..................  21

III.  **APPLICABLE STANDARD FOR PRELIMINARY INJUNCTION** ....  **24**

IV.  **DISCUSSION** .......................................  26

    A.  Likelihood of Success on the Merits ..........  26

        1.  Statutory Interpretation .................  26

            a.  Plain Meaning of the Statutory Text .  27

            b.  Purpose of the Statute ..............  32

            c.  Legislative History .................  36

            d.  Draining Other Provisions of Meaning.  40

               i.  Superfluous Provisions .........  40

              ii.  Other Provisions ..............  45

(a) "Moral Objection" ......... 45

(b) Palliative and Prophylactic
    Care .................... 46

(c) Specific Restriction in
    § 7631(e) ............... 47

e.  Doctrine of Constitutional
    Avoidance and Deference to
    Agency Interpretation ......... 48

2.  First Amendment Claims ................. 52

a.  Applicable Standard Review .......... 52

i.  Congress's Power Pursuant
    to the Spending Clause ........ 55

ii.  Overview of Unconstitutional
     Conditions Doctrine ........... 56

iii.  Determination of the
      Applicable Standard ........... 58

(a) The Government Cannot
    Adequately Distinguish
    Regan, League of Women
    Voters, and Rust ......... 77

    i. Alternate Channels for
       First Amendment
       Activities .......... 77

    ii. The Role of NGOs ...... 78

(b) American Library
    Association Is Not
    Controlling .............. 81

(c) The Act's Effect on Inter-
    national Affairs Is Not
    Cause for the Automatic
    Application of a Rational
    Basis Standard of Review.. 85

iv.   Statement of Standard of
      Review ........................ 89

b. Application of Standard and
   Additional First Amendment
   Analysis ......................... 91

   i. As Construed by Defendants, the
      Provision Is Not Narrowly
      Tailored to Achieve Congress's
      Goals ........................ 92

   ii. The Policy Requirement, As
       Construed by Defendants,
       Is Unconstitutional Because
       it Improperly Applies
       Its Viewpoint Discriminatory
       Restriction to Plaintiffs'
       Private Funds................. 98

   iii. The Act Unconstitutionally
        Compels Speech ............... 105

3.   AOSI and Pathfinder Have Demonstrated
     a Likelihood of Success on Their
     Constitutional Claims ................... 109

4.   OSI Has Not Demonstrated a Likelihood
     of Success With Regard to Its Claim
     for Relief ............................. 110

B.   IRREPARABLE HARM ............................ 113

V.   ORDER ......................................... 115

## I. INTRODUCTION

Plaintiffs, Alliance for Open Society International ("AOSI"), Open Society Institute ("OSI") and Pathfinder International ("Pathfinder") (collectively "Plaintiffs") brought suit against defendants, the United States Agency for International Development and Andrew S. Natsios in his official capacity as its administrator (collectively "USAID"), the United States Department of Health and Human Services and Michael O. Leavitt in his official capacity as its Secretary (collectively "HHS"), and the United States Centers for Disease Control and Prevention and Julie Louise Gerbeding in her official capacity as its Director (collectively "CDC") (and USAID, HHS and CDC collectively "Defendants," or the "Agencies," or the "Government"). Plaintiffs seek clarification of a provision of the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 (the "Act"), 22 U.S.C. §§ 7601 et seq. Under the Act, AOSI receives funding from USAID and Pathfinder receives funding from USAID, HHS, and CDC to administer programs authorized by the Act. OSI does not receive government funding pursuant to the Act but fears that AOSI's funding under the Act my be jeopardized by OSI's activities.

The Act forbids the Agencies from awarding funds authorized for its purposes to "any group or organization that does not have a policy explicitly opposing prostitution[.]" 22 U.S.C. §

7631(f).   Plaintiffs challenge Defendants' interpretation of this provision, which Plaintiffs contend places limits on Plaintiffs' activities carried out with their private, non-government funds, and leaves Plaintiffs with no alternative avenue to express certain points of view.   Plaintiffs argue that this restriction violates the First Amendment.   Thus, they seek a preliminary injunction enjoining Defendants from penalizing Plaintiffs, through the withholding of Act-authorized funds or other methods, on the grounds that Plaintiffs have used their private funding to engage in activities that Defendants view as insufficiently opposed to prostitution.

## II. BACKGROUND[1]

---

[1]  The factual recitation below derives from the following documents.  Except as specifically quoted or otherwise cited, no further reference to these documents will be made.

    For Plaintiffs: Complaint, <u>Alliance for Open Society International, Inc. et al. v. United States Agency for International Development et al.</u>, No. 05 CV 8209, filed September 23, 2005 (the "Complaint"); Memorandum of Law in Support of Plaintiffs Alliance for Open Society International and Open Society Institute for a Preliminary Injunction, dated September 28, 2005 ("Pl. Mem."); Memorandum of Law in Support of Motion of Plaintiff Pathfinder International for a Preliminary Injunction, dated December 7, 2005 ("Path. Mem."); Reply Memorandum of Law in Further Support of Motion of Plaintiffs Alliance for Open Society International and Open Society Institute, and Pathfinder International for a Preliminary Injunction ("Pl. Reply"); Declaration of Burt Neuborne, dated September 22, 2005 ("Neuborne Decl."); Declaration of Rosanna Barbero, dated September 19, 2005 ("Barbero Decl."); Declaration of Chris Beyrer, MD, MPH, dated September 21, 2005 ("Beyrer Decl."); Declaration of Pedro Chequer, MD, MPH, dated August 24, 2005 ("Chequer Decl."); Declaration of Rebekah Diller, dated September 22, 2005 ("Diller Decl."); Declaration of Robert Kushen, dated September 16, 2005 ("Kushen Decl."); Declaration of Ruth W. Messinger, dated August 16, 2005 ("Messinger Decl."); Declaration of Maurice I. Middleberg, dated July 27, 2005 ("Middleberg Decl."); Declaration of Aryeh Neier, dated September 13, 2005 ("Neier Decl."); Declaration of Daniel E. Pellegrom, dated December 7, 2005 ("Pellegrom Decl."); Supplemental Declaration of Rebekah Diller, dated January 24, 2006 ("Suppl. Diller Decl."); Supplemental Declaration of Robert Kushen, dated January 24, 2006 ("Suppl. Kushen Decl."); Supplemental Declaration of Daniel E. Pellegrom, dated January 24, 2006 ("Suppl. Pellegrom

A.    FACTS

1.    The Parties[2]

a.    Plaintiffs

Plaintiffs are United States-based non-profit organizations actively participating in the worldwide effort to limit the spread of HIV/AIDS. As part of this effort, they work closely with populations that have a high risk of contracting HIV/AIDS, including persons engaged in prostitution.[3]

OSI is the principal United States-based foundation established and financed by George Soros, organized under New

---

Decl.").

For Defendants: Defendants' Memorandum of Law in Opposition to Plaintiffs' Motions for a Preliminary Injunction and for a Temporary Restraining Order, dated January 4, 2006 ("Def. Mem."); Declaration of Richard E. Rosberger, dated January 4, 2006 ("Rosberger Decl.").

[2]  The Court has also benefitted from the advocacy of several amici curiae: Untitled Memorandum of Law of Amici Curiae AIDS Action and Twenty-One Other Organizations, dated November 7, 2005 ("AIDS Action Mem."); Memorandum of Law of Apne Aap and Eighteen Other Organizations as Amici Curiae, dated December 9, 2005 ("Apne Aap Mem."); and Memorandum of Law of Proposed Amicus Curiae InterAction in Support of Plaintiffs' Motion for a Preliminary Injunction, dated January 30, 2006 ("InterAction Mem.").

[3]  The Court notes that the terminology to be applied to the issues discussed in this opinion is a point of contention between the parties. First, while Defendants use the term "prostitute" throughout their brief, Plaintiffs have used the term "sex worker" instead. The Court will use the term "prostitute" in this opinion, as the term "sex worker" does not appear in the statute at issue. In fact, in numerous provisions, including the section here at issue, the Act explicitly uses the term "prostitution" to describe the conduct the legislation addresses. Though Plaintiffs assert that the term "sex worker" is widely used in the public health and international relief fields, some of the amici dispute this contention and take offense at the notion of a "sex" worker. Second, Defendants refer to 22 U.S.C. § 7631(f)'s requirement that fund recipients have a policy opposing prostitution as the "organizational eligibility restriction," while Plaintiffs use the term "pledge requirement" to refer to this provision. The Court will refer to § 7631(f) as the "Policy Requirement" in this opinion.

York law, supporting a network of more than thirty "Soros Foundations" that operate worldwide (the "Open Society Network"). Each of these Soros foundations is independently established under local laws and governed by a local board of directors. OSI does not currently receive funding from Defendants under the Act.

AOSI, although closely affiliated to OSI as a member of the Open Society Network, is a legally independent non-profit organization incorporated in Delaware with offices in New York, New York and Almaty, Kazakhstan. AOSI was created in 2003 with a mission to "promote democratic governance, human rights, public health and economic, legal and social reform" in Central Asia. (Kushen Decl. at 2.) AOSI administers a program, known as the Drug Demand Reduction Program ("DDRP"), aimed at limiting the spread of injection drug use in Uzbekistan, Tajikistan, and Kyrgyzstan. It has done so with the financial support of USAID, but also with a substantial private grant of nearly $2.2 million from OSI. The DDRP is directed towards three populations: drug users, high-risk groups (e.g., young people, prisoners, prostitutes, and rural-urban migrants), and the general public.

Pathfinder provides family planning and reproductive health services in twenty countries. It administers a number of programs that benefit from the financial assistance of

USAID, HHS, and the CDC, including a health services project in Peru, a program to prevent mother-to-child HIV transmission in Kenya, and other global reproductive health services programs. Pathfinder also uses funding from private sources to engage in the following activities: organizing of prostitutes in India to collectively agree to engage in HIV prevention methods, like using condoms; as well as additional outreach to promote safer sex practices, including cooperation with brothel owners and pimps.

   b. <u>Defendants</u>

    i. <u>In General</u>

Created by executive order in 1961, USAID is an independent agency that provides economic, development, and humanitarian assistance around the world in support of the foreign policy goals of the United States. HHS is charged with protecting the health of all Americans and providing essential human services, to those ends managing programs encompassing health and social science research, food and drug safety, Medicare and Medicaid, faith-based and community initiatives, and financial assistance for low-income families. CDC, one of the operating components of HHS, works to prevent and control infectious and chronic diseases, injuries, workplace hazards, disabilities, and environmental health threats.

ii.  <u>In Relation to the Act</u>

Pursuant to Congress's policy initiative, <u>see</u> 22 U.S.C. 7603(1), the President in his State of the Union Address on January 28, 2003, announced a comprehensive, five-year global strategy to fight HIV/AIDS.[4]   USAID and HHS are two of the seven primary implementing agencies of the President's Emergency Plan for AIDS Relief ("Emergency Plan").[5]

Under the Emergency Plan, both USAID and HHS implement prevention, care, and treatment programs for HIV/AIDS.   USAID supports implementation through direct in-country presence and seven regional programs.  HHS operates in developing countries and conducts HIV/AIDS research.   As an operating component of HHS, CDC coordinates its Global AIDS Program, which assists with surveillance, training, monitoring, evaluation, and implementation of HIV/AIDS prevention, treatment, and care programs, by partnering with governments, non-governmental organizations ("NGOs"), international organizations, U.S.-based universities and the private sector.  <u>See</u> Emergency Plan at 149-50.

2.  <u>HIV/AIDS</u>

---

[4]   <u>See</u> President George W. Bush, State of the Union Address (January 28, 2003), <u>available at</u> http://www.whitehouse.gov/news/releases/2003/01/20030128-19.html.

[5] <u>See</u> Office of the United States Global AIDS Coordinator, <u>Action Today, A Foundation for Tomorrow: Second Annual Report to Congress on the President's Emergency Plan for AIDS Relief</u>, at 145-54 (2006), <u>available at</u> http://www.state.gov/documents/organization/60813.pdf.

a.   <u>Internationally</u>

In passing the Act, Congress made a number of findings as to the global status of HIV/AIDS.  The Court pauses to take note of some of these findings in order to establish the larger context in which the present dispute takes place.  To begin, Congress found that "HIV/AIDS has assumed pandemic proportions, spreading . . . to all corners of the world, and leaving an unprecedented path of death and devastation."  22 U.S.C. § 7601(1).  At the time of enactment, approximately 65 million people worldwide had been infected with the disease, of which more than 25 million had died.  <u>See</u> <u>id.</u> § 7601(2).  The effects of HIV/AIDS have permeated every conceivable level of social, cultural, political, economic and geographic organization, affecting individuals, families, communities, countries, economies and continents.  <u>See</u> <u>id.</u> §§ 7601(3)-(12).  Although these statistics have undoubtedly changed since the legislation's enactment, they establish the grievous situation that Congress sought to address through the provisions of the Act.

b.   <u>In Central Asia</u>

Plaintiff AOSI contends that, as a result of spillover from the drug trafficking routes that run from Afghanistan through Tajikistan, Uzbekistan, and Kyrgyzstan, Central Asia has experienced dramatic increases in HIV/AIDS rates, with

-7-

public health experts fearing "the outbreak of a full-scale
HIV/AIDS epidemic fueled by the exploding use of injection
drugs." (Kushen Decl. ¶ 8.) Already, Central Asia "is
experiencing one of the world's fastest growing rates of HIV."
(Beyrer Decl. ¶ 55.)

     c.  <u>Among High-Risk Populations</u>

HIV/AIDS often begins its assault on a community in
small, high-risk populations, such as prostitutes and
injection drug users. (<u>See</u> Beyrer Decl. ¶ 2.) In enacting
the statute, Congress made clear its finding that prostitution
and sex trafficking are "causes and factors in the spread of
the HIV/AIDS epidemic." 22 U.S.C. § 7601(23). Indeed, in one
congressional hearing Senator Sam Brownback set forth
statistics from various countries demonstrating this
connection, including that "50 to 70 percent of the Burmese
prostitutes in Thailand are HIV positive . . . 40 to 50
percent of the prostitutes in Cambodia are HIV positive, [and]
60 percent of women prostitutes in Bombay's red light district
are infected with STDs or AIDS."[6] Considerable debate
persists as to how to appropriately and effectively engage
members of these groups. It has been argued that preventing
the spread of infection among such high-risk individuals is an

---

[6] <u>Trafficking Women and Children in East Asia and Beyond: A Review of US Policy, Hearing Before the Subcomm. on East Asian and Pacific Affairs of the Comm. On Foreign Relations</u>, 108th Cong. 18 (2003) (statement of Senator Sam Brownback).

important way to combat the spread of HIV/AIDS in the general population. (<u>See</u>, <u>e.g.</u>, Beyrer Decl. ¶ 19) ("Stigma and discrimination push people in high risk groups . . . underground, making them difficult to reach through prevention programs and thus creating more opportunities for HIV/AIDS to spread to the general population."); <u>see also</u> USAID, <u>Leading the Way: USAID Responds to HIV/AIDS 1997-2000</u> (2001), attached to Diller Decl. as Exhibit 18 ("[I]nvolving individuals from the particular target community - sex workers, for example - in delivering the message gives credibility, reduces fear and stigma, and makes it more likely that people hearing the message will follow through with specific behaviors.").) Advocates for these populations and programs believe that the imposition of harsh criminal penalties for prostitution runs contrary to accepted best principles and practices of public health. (<u>See</u>, <u>e.g.</u>, AIDS Action Mem. at 13-21.) One country, Brazil, as one part of its comprehensive HIV/AIDS program, has adopted an approach treating prostitutes as "essential partners" in the fight against HIV/AIDS. (Chequer Decl. ¶ 6.)

    3. <u>The Act</u>

        a. <u>In General</u>

In response to this dire situation, Congress promulgated the Act with the single overriding purpose of "strengthen[ing] United States leadership and the effectiveness of the United

States response to" HIV/AIDS, tuberculosis, and malaria. 22 U.S.C. § 7603. Congress designated several avenues through which this international campaign was to run: a comprehensive, five-year strategy designed by the President; bilateral and multilateral efforts; private sector efforts; public-private partnerships; and vaccine and treatment development. See id. § 7603(1)-(5).

To effectuate these ends, the Act, among other strategies, establishes an HIV/AIDS Response Coordinator, see id. § 7612; authorizes an HIV/AIDS Working Capital Fund, see id. § 7612a; authorizes U.S. participation in the Global Fund to Fight AIDS, Tuberculosis, and Malaria, see id. § 7622; authorizes the use of funds to assist organizations in fighting HIV/AIDS, see id. § 7631, tuberculosis, see id. § 7632, and malaria, see id. § 7633; provides assistance for children and families, see id. §§ 7651-7655; and provides for consideration of expanding debt relief, see id. § 7681.

b. Role of Private Partners in Combating HIV/AIDS

Recognizing that "[n]on-governmental organizations . . . have proven effective in combating the HIV/AIDS pandemic," id. § 7601(18), Congress voiced its sense that "the sustainment and promotion of public-private partnerships should be a priority element of the strategy pursued by the United States

to combat the HIV/AIDS pandemic and other global health
crises," id. § 7621(b)(1).

    c.    <u>Findings and Policies Regarding the Social and
Behavioral Causes of HIV/AIDS, Particularly
Prostitution</u>

In the Act, Congress expressed its concern with the
social, cultural, and behavioral antecedents of the HIV/AIDS
pandemic, determining that "[s]uccessful strategies to stem
the HIV/AIDS pandemic will require . . . measures to address
the social and behavioral causes of the problem." § 7601(15);
<u>see</u> <u>also</u> § 7601(21)(C).

Congress considered prostitution to be among the
behavioral causes of HIV/AIDS. <u>See</u> § 7611(a)(4) ("[T]he
reduction of HIV/AIDS behavioral risks shall be a priority of
all prevention efforts in terms of funding, educational
messages, and activities by . . . [among other things,]
eradicating prostitution, the sex trade, rape, sexual assault
and sexual exploitation of women and children.").

In addition, Congress expressly found that the
eradication of prostitution should be a policy of the United
States:

    Prostitution and other sexual victimization are degrading
    to women and children and it should be the policy of the
    United States to eradicate such practices. The sex
    industry, the trafficking of individuals into such
    industry, and sexual violence are additional causes of
    and factors in the spread of the HIV/AIDS epidemic.

§ 7601(23).

  d. <u>The Government Funds Restriction</u>

  The provision of the Act referred to by Plaintiffs as the "the restriction on government funds" and by Defendants as the "government funding restriction" states:

> No funds made available to carry out this Act, or any amendment made by this Act, may be used to promote or advocate the legalization or practice of prostitution or sex trafficking. Nothing in the preceding sentence shall be construed to preclude the provision to individuals of palliative care, treatment, or post-exposure pharmaceutical prophylaxis, and necessary pharmaceuticals and commodities, including test kits, condoms, and, when proven effective, microbicides.

§ 7631(e) ("§ 7631(e)").

  Plaintiffs do not challenge the restriction placed on government funds.

  e. <u>The Policy Requirement</u>

  In addition to the government funds restriction, the Act provides:

> No funds made available to carry out this Act, or any amendment made by this Act, may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking, except that this subsection shall not apply to the Global Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, the International AIDS Vaccine Initiative or to any United Nations agency.

§ 7631(f) ("§ 7631(f)" or the "Policy Requirement").

It is the interpretation and implementation of this provision that is the point of contention in this case.

The final clause of this provision exempts certain recipients from the Policy Requirement. <u>See</u> § 7631(f). Some of these exempted recipients have recognized that advocacy for the reduction or removal of criminal penalties for prostitution is among the best practices in HIV prevention. (<u>See</u> Beyrer Decl. ¶ 25.)

4.   <u>Defendants' Implementation of the Act</u>

a.   <u>USAID</u>

i.   <u>Acquisition and Assistance Policy Directives</u>

USAID initially refrained from applying the Policy Requirement to U.S.-based organizations because the Department of Justice ("DOJ") warned that such an application would be unconstitutional.[7] Specifically, USAID issued guidance stating that the government funds restriction applied to both U.S. and foreign recipients, but that the Policy Requirement required only "non-U.S. non-governmental organizations and certain Public International Organizations . . . to agree that they have a policy explicitly opposing . . . prostitution and sex trafficking." <u>Id.</u> USAID followed the DOJ's advice, issuing a

---

[7]   <u>See</u> USAID, <u>Guidance on the Definition and Use of the Child Survival and Health Programs Fund and the Global HIV/AIDS Initiative Account, FY 2004 Update</u>, dated July 22, 2004, attached to Diller Decl. as Exhibit 4.

-13-

policy directive omitting any requirement that U.S.-based organizations receiving funds under the Act have a policy explicitly opposing prostitution.[8]

Subsequently, the DOJ withdrew what it characterized as its prior "tentative advice."[9]  The DOJ asserted that there are "reasonable arguments to support" the constitutionality of applying the restrictions to U.S.-based recipients.  Id.

Following suit with the revised DOJ position, USAID changed course in June 2005, issuing a directive applying the Policy Requirement to U.S.-based recipients.[10]  Under AAPD 05-04, USAID required, as a prerequisite for private organizations to receive funding under the Act, (1) a policy explicitly opposing prostitution and sex trafficking (see id. at 5), and (2) certification of compliance with the

---

[8]  See USAID, Acquisition & Assistance Policy Directive 04-04 (Revised) - Eligibility Limitation on the Use of Funds and Opposition to Prostitution and Sex Trafficking ("AAPD 04-04"), issued February 26, 2004, attached to Diller Decl. as Exhibit 2.  "AAPDs . . . provide information of significance to contracting personnel including (but not limited to): advance notification of changes in acquisition or assistance regulations; reminders; procedures; and general information. Also, they have been used to implement new requirements on short-notice, pending formal amendment of acquisition or assistance regulations."  Acquisition & Assistance Policy Directives (AAPDs)/Contract Information Bulletins (CIBs) Index, USAID, at http://www.usaid.gov/business/business_opportunities/cib/(last modified March 24, 2006).

[9]  Letter from Daniel Levin, U.S. Department of Justice, to Alex Azar, II, U.S. Department of Health and Human Services, dated September 20, 2004, attached to Diller Decl. as Exhibit 7.

[10]  See USAID, Acquisition & Assistance Policy Directive 05-04, Implementation of the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003 - Eligibility Limitation on the Use of Funds and Opposition to Prostitution and Sex Trafficking ("AAPD 05-04"), issued June 9, 2005, attached to Rosberger Decl. as Exhibit C and to Diller Decl. as Exhibit 3.

"Prohibition on the Promotion and Advocacy of the Legalization or Practice of Prostitution or Sex Trafficking" (id. at 7). This shift in position coincided with pressure exerted upon USAID and the President by members of Congress concerning the allocation of funds under the Act.[11]

       ii.  Plaintiffs Seek Clarification of
            Requirements

Under USAID's initial interpretation of the Act, as reflected in AAPD 04-04, AOSI was not itself subject to the Policy Requirement. See supra Section I.A.4.a.i. However, because AOSI partnered with non-U.S.-based organizations in administering the DDRP, it adopted the following policy:

> AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan believe that trafficking and sex work do harm both to the individuals directly involved and to others in various ways. AOSI and the Soros Foundations in Tajikistan and Kyrgyzstan do not promote or advocate such activities. Rather, our approach is to try to reduce the harms caused by disseminating credible information on questions such as the prevention of disease, and by providing direct public health assistance to vulnerable populations. . .

(Kushen Decl. ¶ 23).

---

[11] See Letter from U.S. Representative Mark E. Souder, Chairman of the House Committee on Government Reform's Subcommittee on Criminal Justice, Drug Policy, and Human Resources, to James Kunder, Assistant Administrator, Asia and Near East Bureau, USAID, dated October 6, 2005, attached to Suppl. Diller Decl. as Exhibit 1; Letter from U.S. Representative Mark E. Souder to Andrew Natsios, Administrator, USAID, dated December 7, 2005, attached to Suppl. Diller Decl. as Exhibit 2; Letter from Tom A. Coburn, M.D., Chairman of the Subcommittee on Federal Financial Management, Government Information, and International Security, to President George W. Bush, dated May 19, 2005, attached to Diller Decl. as Exhibit 9; Letter from U.S. Representative Mark Souder et. al., to Andrew Natsios, Administrator of USAID, dated July 15, 2005, attached to Diller Decl. as Exhibit 10.

In a memorandum dated May 26, 2004, AOSI asked Kerry Pelzman, Regional HIV/AIDS Adviser for USAID/Central Asia, for guidance concerning its compliance with AAPD 04-04.[12] The memo stated that AOSI believed itself to be exempt from the Policy Requirement as a U.S-based organization, but sought clarification regarding funds given to non-U.S.-based sub-grantees. (<u>Id.</u>) It further explained that internal principles of governance prevented AOSI from accepting funding that would restrict its speech "in a manner contrary to the values of an open society." (<u>Id.</u>) The memo recited AOSI's policy statement and requested, in writing, confirmation that it complied with AAPD 04-04.

On June 13, 2004, AOSI received a response from Pelzman via e-mail. (<u>See</u> Kushen Decl., Exhibit B, at 2-3.) The June 13 e-mail neither certified AOSI's compliance nor provided any substantive advice. (<u>See</u> <u>id.</u>) Accordingly, AOSI again solicited guidance from USAID. By a second e-mail to Pelzman on June 15, 2004, AOSI clarified that it was seeking advice specifically relating to the question of whether AOSI's policy satisfied the requirements of AAPD 04-04. (<u>See</u> Kushen Decl., Exhibit B, at 2 ("Our goal in sending you our policy was for AID to provide an interpretation of the AAPD and related

---

[12]    <u>See</u> Memo from Robert Kushen, Chairperson of AOSI, et. al, to Kerry Pelzman, Regional HIV/AIDS Adviser for USAID/Central Asia, dated May 26, 2004, attached to Kushen Decl. as Exhibit A.

provisions and determine if our policy complied with the law and AID's policies.").)

In response, Belinda K. Barrington, in her capacity as Acting Regional Legal Advisor, USAID/Central Asia sent AOSI an e-mail on June 18, 2004. (See Kushen Decl., Exhibit B, at 1.) Barrington apparently interpreted the past correspondence between AOSI and the agency as raising a question of AOSI's ability to certify its compliance consistently with its internal governance principles. (See id. ("The issue was not, as your June 15th e-mail seems to suggest, whether your policy complies with the law or USAID policies, but whether AOSI is able to sign or is comfortable with signing the certification required.").) As to whether its policy was in compliance, AOSI was told that "[o]nly future actions can determine whether recipients have complied with the certification." (Id.)

Still uncertain as to whether AOSI's policy was in compliance, Robert Kushen, Chairperson of AOSI, arranged a meeting with USAID officials. Present at a meeting held on April 11, 2005 were Kent Hill, Acting Assistant Administrator for Global Health at USAID; Susan Pascocello, Acting Assistant General Counsel to Global Health; and various other USAID officials and AOSI staff. Plaintiffs allege that, in the course of this meeting, Hill cautioned that he could not

-17-

proffer official guidance, but divulged his belief that (1) organizations that promoted the legalization of prostitution would violate the requirement and (2) organizations that limited their activities to providing health services to prostitutes would be in compliance. Plaintiffs allege that questions about the status of the universe of activities between these two poles were unanswered.

On June 9, 2005, USAID issued AAPD 05-04, shifting its prior stance and applying the Policy Requirement to both U.S.-based and non-U.S.-based organizations receiving funding under the Act. See supra Section II.A.4.a.i. AOSI then contacted USAID on June 13, 2005 again to reaffirm its belief that its policy complied with the requirement, emphasizing the distinction between OSI and AOSI, and highlighting the problems with an overly broad interpretation of the Act.[13]

While waiting for USAID's response, a question arose over the allocation of interim funds for the DDRP. On August 2, 2005, AOSI received a response via facsimile. (See Neier Decl., attached as Exhibit D.) USAID reiterated its position that "prospective determinations for private organizations about whether or not their policy statements comply with the statutory requirement reflected in AAPD 05-04" were

---

[13] See Letter from Aryeh Neier, President of OSI and Member of AOSI Board of Directors, to Andrew Natsios, Administrator of USAID, dated June 13, 2005, attached to Neier Decl. as Exhibit C.

inappropriate. (See id. at 1.)  It outlined the contours of what a future inquiry of compliance might look like, including verification that (1) the certification had been signed, (2) certification clauses were incorporated into sub-awards, and (3) policies explicitly opposing prostitution were in place.

On August 3, 2005, AOSI received a Modification of Assistance from USAID to restart funding.  (See Kushen Decl., attached as Exhibit C.)  The Acting Executive Director of AOSI, Oksana Korneo, decided to sign the modification agreement to ensure the survival of the DDRP. (See id.)  Once funding had been allocated, according to the complaint in this action, AOSI felt comfortable proceeding with the present litigation.  (Compl. ¶ 67.)

Subsequent to filing suit for a preliminary injunction, AOSI received a letter from USAID in October 2005 indicating that "advocating for the legalization of prostitution" or "organizing or unionizing prostitutes for the purpose of advocating for the legalization of prostitution" will result in a finding of noncompliance.[14]

b.  HHS and the CDC

The factual record concerning the implementation of the Act by the HHS and the CDC is considerably less complete.

---

[14]  Letter from Christopher D. Crowley, USAID Mission Director, to Galina Karmanova, AOSI, dated October 7, 2005, attached to Rosberger Decl. as Exhibit D.

-19-

Plaintiff Pathfinder alleges that "in all relevant respects Defendant CDC is implementing the pledge requirement in the same manner as Defendant USAID." (Path. Mem. at 3.) Following the DOJ's change of course, see supra Section II.A.4.a.i, the CDC allegedly began applying the Policy Requirement to U.S.-based recipients "on or about" May 2005. (Id.) This shift is reflected in the cooperative agreements between Pathfinder and HHS and the CDC. Whereas earlier agreements lack the new standard provisions, which include the Policy Requirement (see Suppl. Pellegrom Decl., attached as Exhibits 3-5); later agreements do in fact subject Pathfinder to the Policy Requirement (see Pellegrom Decl., attached as Exhibits 6-9).[15]

In July 2005, Pathfinder adopted the following policy to comply with the requirement:

> In order to be eligible for federal funding for HIV/AIDS, Pathfinder opposes prostitution and sex trafficking because of the harm they cause primarily to women. Pathfinder's HIV/AIDS programs seek to promote effective ways to prevent the transmission of HIV/AIDS and to reduce the suffering caused by HIV/AIDS. In order to achieve these goals, Pathfinder works with, and provides assistance and support to and for, many vulnerable groups, including women who are commercial sex workers, who, if not effectively reached by HIV/AIDS programs, will suffer and can become drivers of the HIV/AIDS epidemic.

---

[15] See also Expanding and Support of HIV/AIDS/STI/TB Information, Education, and Communication and Behavior Change Communication Activities in Ethiopia – Amendment, Centers for Disease Control and Prevention, 70 Fed. Reg. 29759 (May 24, 2005), attached to Rosberger Decl. as Exhibit E (providing that "any recipient must have a policy explicitly opposing prostitution and sex trafficking").

(Pellegrom Decl. ¶ 17.)

> 5.  <u>Plaintiffs' Complaint and Motions for a Preliminary Injunction</u>

On September 23, 2005, OSI and AOSI filed the complaint commencing this action against USAID, and moved for a preliminary injunction on September 28, 2005.  The Court held a conference on October 7, 2005 at which the parties resolved to undertake to agree upon a briefing schedule and enter into a temporary "standstill" agreement, with the Government to agree that AOSI and OSI[16] could continue their activities pending the outcome of the preliminary injunction motion. Because the parties were initially unable to come to an agreement, AOSI and OSI moved for a Temporary Restraining Order on October 12, 2005.  Following a phone conference, the parties continued to negotiate, and entered into a stipulated agreement on October 14, 2005.  The agreement provided that pending the decision on the motions for a preliminary injunction and temporary retraining order, AOSI would continue to comply with its understanding of the Policy Requirement in good faith, and USAID agreed to provide at least two weeks notice prior to taking any action to redress any perceived violation of the Act.  On December 5, an amended complaint was filed adding Pathfinder as a plaintiff and HHS, Leavitt, the

---

[16] Pathfinder had not yet been added to the case as a plaintiff, and HHS and CDC had not yet been added as defendants.

CDC, and Gerberding as defendants.  Pathfinder thereafter filed a motion for a preliminary injunction.  Its supporting brief set forth the relevant facts with regard to Pathfinder and incorporated all of the legal arguments from AOSI's and OSI's memorandum of law in support of a preliminary injunction.[17]

Plaintiffs seek a declaratory judgment that the Policy Requirement requires only that U.S-based recipients state that prostitution causes harm to women, but does not in any way restrict the activities that recipients may engage in with their private funds.  In the alternative, they seek a declaratory judgment that Defendants' application of the Policy Requirement is unconstitutional.

Plaintiffs also seek a preliminary injunction barring Defendants from (1) discontinuing funding until a ruling on the merits of this litigation, (2) unilaterally terminating the cooperative agreements, and (3) otherwise taking action solely on the ground that Plaintiffs engaged in privately-funded speech.  To this end, they allege that there is a likelihood they will succeed on the merits and that they will suffer irreparable harm if the injunction is denied.

OSI claims that it will be irreparably harmed due to the

---

[17]  On January 12, 2006, the Court So Ordered a stipulation entered between USAID and Pathfinder, memorializing their standstill agreement following Pathfinder's entry into the case.  On the same date, the Court also So Ordered a stipulation between Pathfinder and HHS and CDC, memorializing their standstill agreement.

uncertainty as to whether the Policy Requirement will be applied to its activities by its association with AOSI, even though it is not technically a partner in the DDRP or a recipient of federal funds pursuant to the Act. OSI emphasizes that it has already been subjected to scrutiny by some members of Congress. Accordingly, OSI claims that, absent assurances that its speech will not be imputed to AOSI, it must monitor its own speech for fear of endangering AOSI.

Section 6(e) of the cooperative agreement between AOSI and USAID provides that "any violation . . . shall be grounds for unilateral termination of the agreement by USAID prior to the end of its term." (Suppl. Kushen Decl., attached as Exhibit 1.) AOSI claims that USAID's implementation of the Policy Requirement (1) compels the organization to engage in speech against its own will, (2) forces it to monitor its own speech and refrain from engaging in certain activities, even with its private funds, for fear of unilateral termination of government funding, and (3) violates AOSI's internal rules of governance. As an example, AOSI claims it will be chilled from fully participating in a conference in June 2006 entitled "Sexual Rights, Sexual Health: Countering the Conservative Sexual Agenda," which will include a discussion of the legal status of prostitution. (Suppl. Kushen Decl. ¶ 3.)

Pathfinder alleges that it must refrain from using its

private funding in such a manner as to run afoul of a broad interpretation of the Policy Requirement. For example, Pathfinder wishes to continue using its private funds to "organize sex workers in India," to collaborate "with community organizations in Brazil that . . . have sought to change the legal regime surrounding sex work," and, more generally, to engage in a thoughtful policy debate on the appropriate legal regime for prostitution. (Path. Mem. at 5-6.) Pathfinder fears that Defendants may penalize it for such activities. See 45 C.F.R. §§ 74.13, 74.6, 74.62 (2006) (permitting the HHS to unilaterally terminate the award and disqualify the grantee from receiving future funding as a penalty for violating the Policy Requirement); Expanding and Support of HIV/AIDS/STI/TB Information, Education, and Communication and Behavior Change Communication Activities in Ethiopia – Amendment, Centers for Disease Control and Prevention, 70 Fed. Reg. 29760, (May 24, 2005), attached to Rosberger Decl. as Exhibit E ("Any violation of the provisions shall be grounds for unilateral termination of the agreement prior to the end of its term.").

### III. APPLICABLE STANDARD FOR PRELIMINARY INJUNCTION

The Court notes at the outset that it will address only Plaintiffs' as applied challenges to Defendants' construction of the Policy Requirement. Plaintiffs state that they are

bringing an as applied challenge to Defendants' statutory construction of the statute, as well as challenging the constitutionality of the agency's interpretation both facially and as applied. The Court is not persuaded of the necessity to address a facial challenge to Defendants' interpretation of the statute at this early stage in the litigation and before the Agencies have undergone a review process or issued any formal guidance or regulations on the implementation of the Act and the meaning of the phrase "policy opposing prostitution." At this juncture, the Court views it as premature to look beyond the facts presented by these parties, particularly, as noted, prior to any formal statutory construction or regulatory action on the part of the Agencies. Thus the Court confines its analysis to the question of whether a preliminary injunction preventing Defendant's from penalizing Plaintiffs for engaging in protected speech with their private funds a should be issued pending the final outcome of this litigation.

For the Court to issue a preliminary injunction against the government, Plaintiffs must demonstrate both a likelihood of success on the merits and a threat of irreparable harm. See, e.g., Velazquez v. Legal Servs. Corp., 164 F.3d 757, 763 (2d Cir. 1999) ("Velazquez I"). The Court will first address the requirement that Plaintiffs demonstrate a likelihood of

-25-

success on the merits.    In considering this question, the Court must first analyze the parties' statutory construction arguments, to determine whether or not Plaintiffs can prevail on their claims that Defendants' reading of § 7631(f), to the limited extent an interpretation or application has been articulated, is incorrect, and should be supplanted by Plaintiffs' construction pursuant to the canon of constitutional avoidance.    Because the Court concludes that Plaintiffs have not demonstrated that Defendants' statutory construction regarding certain issues central to this action is erroneous, it then turns to the question of whether Plaintiffs are likely to show that the Policy Requirement, as construed by Defendants, violates the First Amendment by restricting Plaintiffs' privately funded speech, leaving Plaintiffs with no alternative means of communicating countering viewpoints, and compelling Plaintiffs to adopt an organization-wide policy consistent with the Government's position.

## IV. DISCUSSION

A. <u>Likelihood of Success on the Merits</u>

1. <u>Statutory Interpretation</u>

According to Plaintiffs, § 7631(f)'s Policy Requirement demands only a declaration that the applicant for funding under the Act generally opposes the harms caused by

prostitution and that if it has complied with this condition, the organization should not lose its contract for engaging in specific activities, such as advocating for changes in the legal status of prostitution, or providing funding or technical assistance to entities that so advocate, as long as no Act funds are used for these purposes. Plaintiffs make several arguments in support of this proposition. First, they assert that the plain text compels that interpretation of the statute. Second, they argue that their construction is also supported by the purpose of the Act, as well as by legislative history. Third, they maintain that Defendants' interpretation saps other statutory provisions of meaning, including rendering § 7631(e) – the government funds restriction – superfluous. Finally, they argue that Defendants' interpretation necessarily implicates constitutional issues and thus acceptance of that reading would violate the doctrine of constitutional avoidance, under which courts are to narrowly construe statutes so as to avoid conflicts with constitutional provisions. The Court will address each of these arguments in turn.

     a. <u>Plain Meaning of the Statutory Text</u>

As discussed above, § 7631(f) requires organizations receiving funds under the Act to have a "policy explicitly

opposing prostitution."[18]    According to Plaintiffs, the word "policy," by its plain meaning, indicates that the statute requires nothing more than a general statement – a declaration of "general orientation only," regardless of the specific program activities the organization actually undertakes. (Pl. Br. at 16.)    In support of this argument they proffer definitions from <u>Black's Law Dictionary</u>, the <u>American Heritage Dictionary of the English Language</u>, and Congress's use of the word "policy" elsewhere in the Act.

This argument fails, even under the definitions set forth in the dictionaries that Plaintiffs cite.    As Plaintiffs themselves point out, <u>Black's Law Dictionary</u> defines "policies" as "general principles by which a government is guided." (Pl. Br. at 16 (<u>citing</u> <u>Black's Law Dictionary</u> 1157 (6th ed. 1990).)[19]    Although Plaintiffs emphasize the words "general principles" in this definition, the second half of the definition – "by which a government is guided" – indicates that the words "general principles" are used in context:  that a policy could encompass a statement of principle, but that such statement indicates and is intended to guide an organization's <u>actions</u>.    Otherwise, any policy an entity

---

[18] The statute also requires such organizations to have a "policy explicitly opposing . . . sex trafficking," <u>see</u> § 7631(f), but Plaintiffs are not contesting that portion of the statute.

[19] The Eighth Edition of Black's Law Dictionary contains the same definition: "the general principles by which a government is guided in its management of public affairs."  <u>Black's Law Dictionary</u> 1196 (8th ed. 2004).)

adopts -- whether voluntarily or compelled, whether informally or pursuant to stated procedure -- and then in practice ignores, would amount to nothing more than lofty ornamentation, an empty ceremony of words.  Similarly, the definition in the <u>American Heritage</u> dictionary – a "plan <u>or course of action</u>" or "<u>guiding</u> principle" - by its terms suggests more than the lip service of a written statement.  <u>American Heritage Dictionary of the English Language</u> 1401 (3d ed. 1996) (emphasis added).  Conduct inconsistent with the principle would mean that the policy no longer served as a <u>guiding</u> principle.[20]  The more reasonable conclusion to draw from these definitions is that a policy is not just a set of abstract disembodied words that have no bearing on or connection to an organization's conduct.  Rather, the term constitutes an expression of principle that sets forth, mirrors and guides an organization's conduct along the paths of its mission and purposes.  If anything, the plain text of the statute demonstrates that conforming conduct is not only necessarily interwoven with words but expected when issued as an organization's "policy."

---

[20] Moreover, even assuming that a policy were just a statement of principle, those same dictionary sources reveal that a "principle" is not necessarily merely a statement, but can encompass conduct, action or activity in conformity with what is stated.  A "principle" is "a basic rule, law or doctrine."  <u>Black's Law Dictionary</u> 1231.  A "rule" is "an established and authoritative standard or principle; a general norm <u>mandating</u> <u>or</u> <u>guiding</u> <u>conduct</u> <u>or</u> <u>action</u> in a given type of situation," <u>id.</u> 1357 (emphasis added); a "doctrine" is "a principle, esp[ecially] a legal principle, <u>that is</u> <u>widely</u> <u>adhered to</u>."  <u>Id.</u> 518 (emphasis added).

Plaintiffs' argument that Congress's use of the word "policy" elsewhere in the Act reinforces their reading of the statute is unpersuasive.  According to Plaintiffs, throughout the Act the term "policy" refers consistently to generalized goals, not to means used to achieve those goals, while other words, such as "project" or "program" refer to activities. Yet § 7652, to which Plaintiffs point, is not properly read this way.  That section of the statute, entitled "Policy and Requirements," states, under the subsection entitled "Policy":

> The United States Government's response to the global HIV/AIDS pandemic should place high priority on the prevention of mother-to-child transmission, the care and treatment of family members and caregivers, and the care of children orphaned by AIDS. To the maximum extent possible, the United States Government should seek to leverage its funds by seeking matching contributions from the private sector, other national governments, and international organizations.

22 U.S.C. § 7652(a).  The "policy" itself contains suggested conduct to which some follow-up commitment is made – such as "seek[ing] to leverage" funds and "seeking matching contributions."  Section 7652(b), entitled and containing the "Requirements," simply enumerates certain mandated activities (such as "expand[ing] programs designed to care for children orphaned by AIDS") and benchmarks ("provid[ing] for meeting or exceeding the goal to reduce the rate of mother-to-child transmission of HIV by 20 percent by 2005 and by 50 percent by 2010") in conformity with the policy, but does not mean that the policy does not encompass those or other activities.

-30-

At oral argument, Plaintiffs argued that it was not their contention that they should be permitted to adopt a policy and then flout it by engaging in conduct contrary to that policy. Rather, Plaintiffs asserted that different courses of conduct (i.e., different approaches to the problem) could be consistent with having a "policy opposing prostitution," and as such they vigorously contest Defendants' position that only a narrow set of actions is consistent with having a policy opposing prostitution. Thus, Plaintiffs argue, they are not seeking an interpretation of the term "policy" that is disembodied from conduct or action; instead they seek recognition that a wide array of conduct, including possibly advocating for a reduction in criminal penalties for prostitution, is consistent with having a "policy opposing prostitution."[21]  The Court is not persuaded by this argument. Problematically, it leaves no room for agency interpretation of the term "policy opposing prostitution," as it would allow Plaintiffs to unilaterally designate which among various courses of conduct they view as fulfilling the provision's meaning.  While Plaintiffs are correct that different courses

---

[21] The term "conduct" is used throughout this section in discussing the notion that with a policy must come some course of action (or "conduct") that is related to that policy, i.e., that a policy cannot stand on its own divorced from any particular course of action.  Thus, conduct is not being used here to refer to, or distinguish, non-expressive activity, or activities in which speech is incidental to the conduct.  On the contrary, it is clear that the activities, or conduct, at issue here (e.g., advocacy for or discussion of change of the legal treatment of prostitution, outreach and education regarding sexual health and activity, organization of prostitutes) are speech-related, expressive activities.

of action can be consistent with a stated policy, and that in § 7631(f) Congress did not specify which courses of action it would view as manifesting a policy opposing prostitution, this does not mean that Congress meant that _any_ conduct Plaintiffs pronounce to be consistent with such a policy is necessarily so.   Again, if this were the case, the provision would be barren of meaning.

      b. <u>Purpose of the Statute</u>

Plaintiffs argue that their interpretation of § 7631(f) supports the purpose of the statute.   According to Plaintiffs, the overarching purpose of the Act is "to fight the spread of HIV/AIDS and other diseases."   (Pl. Reply Br. at 27.) Moreover, under that view, because organizations, after issuing a statement opposing the harms caused by prostitution, remain free to choose the strategies that they deem most effective in responding to the HIV/AIDS epidemic, such a reading furthers the purpose of the Act. Plaintiffs' theory further suggests that "eradicating prostitution" is a "secondary" objective whereas the primary goal of the Act is to address HIV/AIDS.   Since Plaintiffs' work seeks to combat the spread of HIV/AIDS, impeding that mission is inconsistent with the primary purpose of the Act.   (<u>See</u> <u>also</u> AIDS Action Mem. at 5 ("[T]he pledge requirement undermines, rather than supports, the public health objectives of the AIDS Leadership Act....")).

In contrast, Defendants argue that Plaintiffs' interpretation would in fact "frustrate the Act's strategies and goals, and create an environment for risky behavior that the Act aims to prevent as part of its comprehensive approach to fighting the spread of HIV/AIDS." (Def. Mem. at 22.)

It is clear that combating the spread of HIV/AIDS and other diseases – and making the United States a leader in this effort - is the primary goal of the Act.  Indeed, as noted above, the Act expressly declares so in stating that its purpose is "to strengthen United States leadership and the effectiveness of the United States response to certain global infectious diseases [HIV/AIDS, tuberculosis and malaria]," and designating several means through which to achieve this end. 22 U.S.C. § 7603.  The focus of this statement of purpose is clearly on eradicating disease; the language does not mention eradicating prostitution.  Rather, the statement that it should be the policy of the United States to "eradicate" prostitution is embedded in the "Findings" section of the statute.  See id. § 7601(23).  However, Congress made several policy and strategic choices as to how it would meet its primary goal of eradicating HIV/AIDS.  One of those choices, based on the finding that prostitution is a cause of HIV/AIDS, was to eradicate prostitution.  Indeed, Congress specifically found that the sex industry was one of the causes of and factors in the spread of HIV/AIDS.  See id. § 7601(23).

-33-

At minimum in light of this finding, the statute indicates that eradicating prostitution is an integral <u>part of</u> the comprehensive strategy Congress envisioned in the fight against HIV/AIDS. In the section setting forth the "Comprehensive Strategy" – which itself is described as part of the purpose of the statute, <u>see</u> <u>id.</u> § 7603(1) - Congress stated:

> The President shall establish a comprehensive, integrated, five-year <u>strategy</u> <u>to</u> <u>combat</u> <u>HIV/AIDS</u> . . . Such <u>strategy</u> . . . <u>shall</u> . . . <u>provide</u> <u>that</u> <u>the</u> <u>reduction</u> <u>of</u> <u>HIV/AIDS</u> <u>behavioral</u> <u>risks</u> <u>shall</u> <u>be</u> <u>a</u> <u>priority</u> of all prevention efforts in terms of funding, educational messages, and activities <u>by</u> . . . <u>eradicating</u> <u>prostitution</u> . . .

<u>Id.</u> § 7611(a)(4) (emphasis added).

Congress thus explicitly chose to include eradicating prostitution in its strategy to fight HIV/AIDS under the statute. Whether or not other approaches – such as legalizing prostitution, or reforming the sex industry through unionizing prostitutes, or other approaches advocated by Plaintiffs and other organizations – are more effective programmatic responses to HIV/AIDS, that choice among strategies was already made by Congress and unequivocally adopted in the Act. In legislating ways and means, Congress is free to choose which strategies best serve the goal to fight HIV/AIDS. In this case, Congress manifestly chose to prescribe a strategy with which at least some of Plaintiffs' program strategies are at odds.

-34-

Although, as Plaintiffs point out, Congress's finding that prostitution is "degrading to women and children and it should be the policy of the United States to eradicate such practices" is embedded among twenty-seven other congressional findings regarding a large-scale effort to prevent, treat, and eradicate HIV/AIDS, those other findings do not suggest that eradicating prostitution was not meant to be part of this large-scale effort, or that Congress was thereby making a deliberate normative choice to regard the eradication of prostitution as a "secondary" purpose. Apropos of this issue, the Court notes the observation proffered by the AIDS Action amici that reducing the stigma associated with HIV/AIDS is part of how Congress described an appropriate response to the HIV/AIDS pandemic, and that forcing organizations to adopt a stance opposing prostitution could lead to more stigmatization of the very individuals these organizations are trying to help. See 22 U.S.C. § 7601(21)(C) ("The magnitude and scope of the HIV/AIDS crisis demands a comprehensive, long-term, international response focused upon addressing the causes, reducing the spread, and ameliorating the consequences of the HIV/AIDS pandemic, including . . . development and implementation of national and community-based multisector strategies that . . . increase the participation of at-risk populations in programs designed to . . . reduce the stigma associated with HIV/AIDS") (emphasis added). Other amici,

-35-

however, who also provide HIV/AIDS prevention services to prostitutes, argue that requiring organizations to oppose prostitution, including requiring them to oppose the legalization of prostitution, does not stigmatize prostitutes and in fact that such opposition is necessary to work effectively against the harms inflicted by prostitution, including HIV/AIDS. (See Apne Aap Mem. at 12-13.) Regardless of who has the better of these policy arguments, it is clear that the question as to whether opposition to prostitution does or does not necessarily involve stigmatization is at least arguable, and that Congress, by including findings addressing the problems of both HIV/AIDS and prostitution in the same statute did not view the opposition of prostitution as necessarily stigmatizing of this population.

       c.  Legislative History

Plaintiffs' key, indeed entire, piece of evidence in the legislative history arsenal is an exchange on the Senate floor between Senate Majority Leader Bill Frist and Senator Patrick Leahy. In it Senator Leahy expressed concern about the potential counterproductive consequence of the Policy Requirement insofar as it could impair the relationship of trust necessary between the organizations that help women involved in the sex industry and the victims they seek to serve, and thereby impede the effectiveness of these programs. In response, Senator Frist assured Senator Leahy that he was

in agreement that the organizations who work with and on behalf of these women need to be supported in their efforts, while at the same time noting that the legislation should be careful to not condone prostitution or sex trafficking.  See 149 Cong. Rec. S6451-01, S6457 (daily ed. May 15, 2003). Senator Frist then stated that the answer to this issue would be "to include a statement in the contract or grant agreement between the U.S. Government and such organization that the organization is opposed to the practices of prostitution and sex trafficking because of the psychological and physical risks they pose for women."  Id.   He further noted that "[s]uch a statement . . . would satisfy the intent of this provision."  Id.[22]

---

[22] The full text of the colloquy is set forth below:

> Mr. LEAHY:  Mr. President, I see the distinguished majority leader, Senator Frist, and wonder if I could ask him to address a concern I and other Senators have about a provision entitled "Limitation" which is located on page 62, line 13 of the bill.
>
> Mr. FRIST:  I would be happy to.
>
> Mr. LEAHY:  This provision says that no funds made available to carry out this act may be used to provide assistance to any group or organization that does not have a policy "explicitly opposing" prostitution and sex trafficking. On its face, this provision appears harmless. No one here supports prostitution or sex trafficking. In fact, we abhor these practices, which are demeaning and degrading towards women, and also extremely dangerous. The rate of HIV infection among prostitutes in Cambodia is estimated to be 40 percent. India is facing a similar catastrophe. It is no secret that commercial sex workers and sex trafficking are a major cause of HIV transmission in Asia and in parts of Africa. We all want to see these practices end.
>
> But the reality is that they exist. Prostitution and sex trafficking are rampant, not only in parts of Africa and Asia, but in Eastern Europe and the former Soviet republics, the Caribbean, and parts of Latin America. Any effective strategy to combat HIV/AIDS must include programs to reduce its spread through prostitution and sex trafficking. As difficult as it is, this reality cannot be ignored.

According to Plaintiffs, this exchange demonstrates that Congress intended § 7631(f) to be satisfied by a simple statement from an organization that it opposes prostitution, without otherwise imposing any impediments upon that organization's activities. Under this interpretation, § 7631(f) "was simply a means for Congress to express its opposition to prostitution generally, while funding organizations that work closely with sex workers to prevent

---

There are organizations who work directly with commercial sex workers and women who have been the victims of trafficking, to educate them about HIV/AIDS, to counsel them to get tested, to help them escape if they are being held against their will, and to provide them with condoms to protect themselves from infection. This work is not easy. It can also be dangerous. It requires a relationship of trust between the organizations and the women who need protection.

I am concerned that this provision, which requires such organizations to explicitly oppose prostitution and sex trafficking, could impede their effectiveness. In fact, some or many of these organizations may refuse to condemn the behavior of the women whose trust they need in order to convince them to protect themselves against HIV. I would ask the Majority Leader how we can avoid that result, because we need to be able to support these organizations.

Mr. FRIST:  I thank the Senator from Vermont for his question. I agree that these organizations who work with prostitutes and women who are the victims of trafficking play an important role in preventing the spread of HIV/AIDS. We need to support these organizations, because HIV transmission through this type of behavior is widespread in many parts of the world. At the same time, we do not want to condone, either directly or indirectly, prostitution or sex trafficking. Both are abhorrent.

I believe the answer is to include a statement in the contract or grant agreement between the U.S. Government and such organization that the organization is opposed to the practices of prostitution and sex trafficking because of the psychological and physical risks they pose for women. Such a statement, as part of the contract or grant agreement, would satisfy the intent of this provision.

Mr. LEAHY:  I thank the majority leader. I think that is important, because we do not want to impose requirements which have the unintended result of impeding the ability of these organizations to do their work, or interfering with our ability to support them.

149 Cong. Rec. S6451-01, S6457 (daily ed. May 15, 2003).

the spread of HIV/AIDS."  (Pl. Reply at 30.)

There are aspects of Plaintiffs' interpretation of this exchange that appear compelling.  Indeed, Senator Frist's words do seem to indicate an intent to have organizations funded under the Act retain the ability to engage in the work that they normally do, and such work could include activities that the Government is now construing as inconsistent with a policy against prostitution.  Yet a closer look reveals that Senator Frist's words are not inconsistent with the Government's position.

First, neither senator discusses the effect of the provision on organizations whose work includes advocating legalization or promotion of prostitution.  Instead, Senator Leahy mentions other types of work organizations perform on behalf of women involved in prostitution – "educat[ing]" and "counsel[ing]," "help[ing] them escape," and "provid[ing] them with condoms" – and Senator Frist agrees that "these organizations" play an important role in preventing the spread of HIV/AIDS and should be supported.  The passage does not address whether these organizations could advocate for the legalization of prostitution or, for example, unionization of prostitutes and remain consistent with a policy explicitly opposing prostitution.  Second, the exchange simply does not speak to the issue of public versus private funding, and whether such organizations could retain the freedom to engage

-39-

in certain activities with their own funds that they could not with federal funds.[23]

### d. Draining Other Provisions of Meaning

Plaintiffs point to several other provisions of the statute and argue that their reading is necessary to prevent those other provisions from being drained of meaning or becoming superfluous. The Court finds none of these arguments persuasive.

### i. Superfluous Provisions

Plaintiffs argue that interpreting § 7631(f)'s Policy

---

[23] Moreover, other legislative history suggests an intent to deny funding to groups advocating for legalization of prostitution. The Policy Requirement was first added to the legislation by way of amendment during the bill's markup session in the House Committee on International Relations. Representative Christopher Smith, introducing the amendment, described his concerns regarding individuals working on HIV/AIDS prevention issues in both the government and the private sector who "feel that legalizing prostitution and focusing primarily on safe sex . . . is a solution." United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003: Markup Before the Committee on International Relations, House of Representatives, 108th Cong. 148-49 (Apr. 2, 2003) (hereinafter "Markup Report"). Representative Smith summarized the choice to adopt his amendment as "whether or not we will provide money to organizations that seek the legalization of prostitution." Id. He further noted that the amendment did "not state that prostitutes and trafficked women should not be treated for AIDS." Id. Before the committee voted on the amendment, Representative Smith answered questions from another committee member, Representative Berman, about the purpose of the restriction and whether it was designed to limit the ability of an organization to provide AIDS treatment to individuals engaged in prostitution. Representative Smith responded that the purpose of the amendment was to ensure that "organizations that seek to provide that kind of assistance make it clear that they are not trying to legalize prostitution or legalize sex trafficking, which is obviously a heinous practice." Id.

The Court is mindful that, while markup sessions are part of the legislative history, see Regan v. Wald, 468 U.S. 222, 238 (1984), their weight may not be decisive, see Becton, Dickinson & Co. v. F.D.A., 589 F.2d 1175, 1182 n.6 (2d Cir. 1978) (rejecting FDA's attempt to rely on markup session excerpts, because "the gap between such committee room interchanges and the intent of the legislature is generally too wide"). Nonetheless, the markup session merits mention to the extent that, at least as reflected in the recorded expressions of other members of Congress, it contradicts Plaintiffs' proposed interpretation of the Policy Requirement based only on Senator Frist's statement on the floor, and further suggests that the meaning of the Policy Requirement is not as straightforward as Plaintiffs claim.

-40-

Requirement to encompass an organization's program activities would render § 7631(e) superfluous. According to this reasoning, if § 7631(f) barred specific activities deemed to be inconsistent with a general policy stance opposing prostitution, this prohibition would necessarily encompass advocating for the legalization and practice of prostitution – including using government funds to so advocate. Thus, § 7631(e)'s ban on using government funds to promote the legalization and practice of prostitution would be rendered unnecessary, as such a ban already would be encompassed by § 7631(f). The Court rejects this reading of the statute.

Certain canons of construction counsel courts to interpret statutes in a way that avoids rendering any language superfluous, and "to give effect, if possible, to every clause and word of a statute." Duncan v. Walker, 533 U.S. 167, 174 (2001) (quoting United States v. Menasche, 348 U.S. 528, 538-39 (1955) (quoting Montclair v. Ramsdell, 107 U.S. 147, 152 (1883))) (internal quotation marks omitted); Collazos v. United States, 368 F.3d 190, 199 (2d Cir. 2004). At the same time, the Court is mindful that canons of construction "are not mandatory rules" that trump other evidence, reasoning and common sense. See Chickasaw Nation v. United States, 534 U.S. 84, 94 (2001). Particular canons of statutory construction "'should not take precedence over more convincing reasons.'" Krause v. Titleserv, Inc., 402 F.3d 119, 128 (2d Cir. 2005)

-41-

(quoting Hakala v. Deutsche Bank AG, 343 F.3d 111, 116 (2d Cir. 2003)). Even the preference for avoiding surplusage construction "'is not absolute.'" Id. (quoting Lamie v. U.S. Tr., 540 U.S. 526, 536 (2004)). For example, adopting the plain meaning of statutory language with the result that some language is superfluous is preferable to adopting an ambiguous meaning where there is no surplusage. See Lamie, 540 U.S. at 536. Similarly, other evidence of congressional intent can overcome the force of an interpretive canon. See Chickasaw Nation, 534 U.S. at 94.

Most relevant to this analysis, the Court notes that when construing a statute, the general preference against surplusage is constrained by the requirement that a construction avoiding surplusage must be a reasonable one. See Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307-08 (1961) ("The statute admits a reasonable construction which gives effect to all of its provisions. In these circumstances we will not adopt a strained reading which renders one part a mere redundancy.") (emphasis added). Thus, even if the Court's reading resulted in some redundancy in the statute, such redundancy – which may simply reinforce Congress's message - would not be a reason to choose a reading that simply was not plausible. The Court has already determined, for the reasons discussed above grounded on statutory text and legislative intent, that Plaintiffs' construction of the

-42-

meaning of "policy," while ostensibly designed to avoid rendering § 7631(e) superfluous, is simply not plausible.

Here, however, the Court need not worry about choosing between an interpretation that strains logic but avoids surplusage, and one that is more logical but may ostensibly contain surplusage. Instead, the Court offers two plausible readings of the statute, each of which gives effect to every clause. See Duncan, 533 U.S. at 174.

First, Congress could, as a matter of policy, choose to identify one form of activity that it determines is more offensive and harmful than others, and therefore more worthy of an expression of its disapproval highlighted in a separate provision of the statute, without needing to enumerate every other activity that may be inconsistent with the legislative purpose, or foreclosing subsequent determinations of other such activities pursuant to a more general delegation of authority to the statute's administering agency. Such drafting technique is not uncommon, and is ordinarily employed in legislation that lays out either broad terms or particular priorities and leaves to the implementing agencies the task of filling in further details and proscriptions by appropriate regulations. Thus, in § 7631(e) Congress could have chosen to specify one form of activity (spending government funds for the legalization of prostitution) it deemed merited special proscription as an articulation of the significance Congress

attached to barring that activity, without precluding limitations on other activities (e.g., advocating for the legalization of prostitution as an organization that is acting in some capacity as a government partner in the global fight against HIV/AIDS) imposed by the more general administrative means provided in § 7631(f).

Second, § 7631(e) and § 7631(f) could be interpreted as addressing two different points in time in the grant of funds to organizations under the Act. Section 7631(f) may be viewed as providing an eligibility criterion defining which organizations qualify to apply for and receive funds, while § 7631(e) restricts specific activities for which Act funds could not be used after the grant is made, a violation of which presumably could warrant termination of a contract. Thus, viewed temporally, § 7631(f) stands as a first cut-off in the grant-seeking process: only those organizations with a policy expressly opposing prostitution are eligible to receive contracts. The prohibition of § 7631(e) would come into play, if called for, after the organizations have been selected to receive federal funds. In other words, the provision imposes a condition on the use of those funds: that they not be expended to promote or advocate the legalization or practice of prostitution. This reading of the statute – an eligibility restriction and a funding restriction – does not render § 7631(e) superfluous and is better supported by legislative and

-44-

administrative   reasons   than   the   more   strained   reading
Plaintiffs advance.

Read   in   either   way   suggested,   each   provision   of   the
statute   would   be   given   effect,   although   this   course   raises
other   problems.    As   will   be   discussed   below,   if   the   Policy
Requirement   of   § 7631(f)   is   read   as   an   eligibility   restriction
demanding   that   organizations   adopt   a   policy   that   encompasses
speech   activities   carried   out   with   their   private   funds   to
qualify   for   receipt   of   federal   funds,   such   a   condition   could
infringe   on   the   organizations'   First   Amendment   rights.    This
issue   is   addressed   in   Section   IV.A.2 of   this   opinion.

ii.  <u>Other Provisions</u>

(a)  <u>"Moral Objection"</u>

Plaintiffs   also   contend   that   the   Government's   reading   of
the   Policy   Requirement   would   undermine   § 7631(d),   under   which
organizations   that   are   "otherwise   eligible   to   receive
assistance   .   .   .   shall   not   be   required,   as   a   condition   of
receiving   the   assistance,   .   .   .   to   participate   in   a   prevention
method   or   treatment   program   to   which   the   organization   has   a
religious   or   moral   objection."  22 U.S.C. § 7631(d).    According
to   Plaintiffs,   since   they   have   adopted   governing   principles
that   require   them   to   "treat   socially   marginalized   groups   in   a
manner   that   does   not   marginalize   them   further,"   requiring
Plaintiffs   to   explicitly   oppose   prostitution   would   force   them
to   treat   prostitutes   in   a   way   contrary   to   Plaintiffs'   moral

-45-

values.  (See Pl. Mem. at 18.)

The Court is not persuaded by this argument.  First, Plaintiffs do not specify how the restriction forces them to participate in a "prevention or treatment" method or how this conflicts with a "moral" value.  Second, Plaintiffs' argument suggests that this provision is subject to open interpretation by all potential grantees, and that the phrase "moral value" may be given any content that Plaintiffs propose.  Such a framework, however, has the potential to render the entire restriction meaningless, and thus cannot be adopted by this Court.

(b) Palliative and Prophylactic Care

Plaintiffs also point to an exclusion for palliative and prophylactic care in the government funding restriction: after imposing its restrictions on the use of government funds, § 7631(e) states:

> Nothing in the preceding sentence shall be construed to preclude the provision to individuals of palliative care, treatment, or post-exposure pharmaceutical prophylaxis, and necessary pharmaceuticals and commodities, including test kits, condoms, and, when proven effective, microbicides.

22 U.S.C. § 7631(e).  According to Plaintiffs, interpreting § 7631(f)'s Policy Requirement to cover specific activities of the organization could render this portion of § 7631(e) meaningless, apparently on the theory that activities within the scope of the exclusion could "evince an insufficient

-46-

opposition to prostitution" and thus be barred by § 7631(f). There is nothing on the record before the Court to support such a reading of the § 7631(e) exclusion. Plaintiffs point to no statement by Defendants indicating that providing the specific types of care in question would be construed as not sufficiently opposing prostitution. Indeed, insofar as legislative history and intent with regard to this issue is not ambiguous or contradicted, the sponsor of the amendment in the markup session observed that "[i]t does not state that prostitutes and trafficked women should not be treated for AIDS" and that language elsewhere in the bill "points out that nothing in this act shall be construed to preclude the provision to individuals of palliative treatment or postexposure pharmaceuticals, including the distribution of condoms, and it goes on, in brothels and places of that sort." Markup Report at 149 (comments of Rep. Smith, member, House Committee on International Relations).

(c) Specific Restriction in § 7631(e)

Finally, Plaintiffs argue that when Congress wanted to bar particular activities in the Act, it did so explicitly. Plaintiffs point to the language in § 7631(e) expressly forbidding grant recipients from using federal money "to promote or advocate the legalization or practice of prostitution." The absence of a similarly specified set of activities in § 7631(f) indicates, according to Plaintiffs,

-47-

that Congress did not intend the Policy Requirement to encompass such activities.

The Court disagrees. As discussed above in the Court's reconciliation of § 7631(e) and § 7631(f), that Congress, in § 7631(e), specifically delineated activities prohibited with government funds, does not necessarily mean that it intended, through the absence of a similarly delineated list of activities in § 7631(f), to condone or allow for such activities. The phrase "policy expressly opposing prostitution" is broad and general. Why this phrase was left undefined is unclear: perhaps it was a legislative compromise; perhaps Congress felt the details of what this term should encompass were best left to the administering agencies to elaborate in regulations; perhaps the more general language was designed to avoid the very constitutional issues now before this Court. It is difficult to divine the congressional intent behind the absence of a more precisely contoured definition of a statutory term. However, the absence of a specifically listed activity in one section of the statute does not mean that the broad phrase "policy explicitly opposing prostitution" does not, or cannot, encompass that activity.

    e. <u>Doctrine of Constitutional Avoidance and Deference to Agency Interpretation</u>

Finally, Plaintiffs argue that, pursuant to the canon of

-48-

constitutional avoidance, the Court should adopt their reading of the Policy Requirement and not needlessly reach the constitutional questions potentially implicated in the case. Specifically, Plaintiffs argue that Defendants' construction of the Policy Requirement, by allowing the Government to regulate and restrict privately funded speech and associational activities on a viewpoint discriminatory basis, impinges upon organizations' First Amendment free speech rights. Moreover, requiring organizations to adopt a policy, according to Plaintiffs, impermissibly compels speech in violation of the First Amendment. Plaintiffs urge that their construction, by allowing organizations to conduct activities as they see fit, avoids this constitutional quagmire. The Court rejects Plaintiffs' argument. To save a statute from unconstitutionality, "every <u>reasonable</u> construction must be resorted to." <u>Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council</u>, 485 U.S. 568, 575 (1988) (<u>quoting</u> <u>Hooper v. California</u>, 155 U.S. 648 (1895)); but, as already discussed, Plaintiffs' interpretation simply is not viable or reasonable.[24]

For their part, Defendants argue that their construction

---

[24] The Court also notes that even requiring just a "statement" potentially raises constitutional issues regarding compelled speech, and thus that Plaintiffs' interpretation, strained though it may be, does not avoid constitutional issues.

of the provision should be granted deference,[25] as they are the agencies entrusted to administer the statutory scheme.  With regard to Defendants' argument, the Court finds that while their construction of the meaning of the term "policy" is not an unreasonable reading of the Act, the Court still cannot defer to the Government's interpretation of the Policy Requirement because of the significant constitutional problems, discussed at length in Section IV.A.2 of this opinion, to which such a construction gives rise.  Where an agency's interpretation of a statute raises significant constitutional issues, a court need not defer to that reading absent a clear indication from Congress that such interpretation was intended.  See Solid Waste Agency v. U.S. Army Corps of Engineers, 531 U.S. 159, 173-74 (2001) (finding that deference was inappropriate because the agency's interpretation "invoke[d] the outer limits of Congress' power" under the Commerce Clause by "permitting federal encroachment upon a traditional state power," thus "rais[ing] significant constitutional questions" without a "clear statement from

---

[25] The Agencies' interpretation in this case would not be entitled to full deference pursuant to Chevron U.S.A., Inc. v. Natural Resource Defense Council, Inc. 467 U.S. 837 (1984), but only "some deference," since the reading and application of the statute were not subject to formal notice-and-comment procedures pursuant to the Administrative Procedure Act, but rather, set forth in ad-hoc determinations and correspondence from agency staff who may or may not even have the authority to make policy or offer administrative interpretations of the Act on behalf of any of the Agencies.  See Reno v. Koray, 515 U.S. 50, 61 (1995) (agency's interpretation appearing only in an internal agency guideline, rather than in published regulations subject to public notice and comment was entitled to "some deference" because it was a "'permissible construction of the statute'" (quoting Chevron, 476 U.S. at 843)).

Congress" that it intended this result);  see also Miller v. Johnson, 515 U.S. 900, 923 (1995) ("[W]e think it inappropriate for a court engaged in constitutional scrutiny to accord deference to the Justice Department's interpretation of the Act.  Although we have deferred to the Department's interpretation in certain statutory cases . . . we have rejected agency interpretations to which we would otherwise defer where they raise serious constitutional questions."); DeBartolo, 485 U.S. at 574-75.

Since Defendants' construction of the statute as it relates to the Policy Requirement raises significant constitutional questions – indeed, as discussed below, it goes beyond the outer limits of what the Supreme Court has found acceptable in its line of "unconstitutional conditions" cases -- the Court can not defer to this interpretation.  There is no clear evidence that Congress intended to restrict entirely a recipient organization's ability to express certain viewpoints, even through its privately funded activities, nor is there clear evidence of what is meant by a "policy expressly opposing prostitution."  Without a clear indication of Congressional intent in this regard in the statutory text or in compelling legislative history, the Court will not conclude that Congress intended an unconstitutional result. See Velazquez I, 164 F.3d at 764 ("While the legislative history may give some support to the view that Congress

-51-

intended to prevent grantees from creating affiliates to undertake restricted activity, the statutory text is silent on the point. We conclude that the LSC regulations are not inconsistent with or unauthorized by the terms of the Act."). The Government's interpretation of the Policy Requirement as applied to the private speech of recipients of funds under the Act, is not a constitutionally permissible construction of the statute, and the Court cannot defer to it.

Thus, in order to determine whether Plaintiffs are entitled to an injunction restraining the Defendants' interpretation of the statute, the Court turns to Plaintiffs' constitutional arguments.

2. <u>First Amendment Claims</u>

a. <u>Applicable Standard of Review</u>

Not surprisingly, since much of the resolution of this proceeding turns on which standard of review the Court should apply in reviewing the constitutionality of the statute, the parties have devoted considerable energy to their arguments concerning this question. Plaintiffs contend that the statute unduly burdens their First Amendment rights by constraining use of their private funds as a condition of receiving or maintaining federal program benefits, and thus implicates the unconstitutional conditions doctrine. Because the statute requires them to refrain from engaging in certain privately

funded speech and further compels them to adopt a policy espousing a specific government formulated or endorsed viewpoint on prostitution, Plaintiffs argue that review of the statute must be subject to heightened scrutiny.

In contrast, the Government argues that the Act is an enactment pursuant to Congress's authority deriving from the Spending Clause of the Constitution, Art. I, § 8, cl. 1.1, under the jurisprudence of which the Policy Requirement does not impose any unconstitutional conditions because the Government has no obligation to subsidize the activities in question, and Plaintiffs are under no compunction to receive funds under the Act. Plaintiffs may apply for such financing, but remain at liberty to turn down any contract awarded at any time they cannot comply with the Policy Requirement. In that event, if they wish, Plaintiffs can still speak freely on approaches to prostitution or any other matter. The Government thus claims that because the statute was enacted pursuant to Congress's spending power, it is subject to only rational basis review.

In addressing these arguments, the Court is mindful of the historical context and policy considerations that surround analysis of First Amendment issues. As the Supreme Court has observed, "[i]t is fundamental that the First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the

-53-

people." Legal Services Corp. v. Velazquez, 531 U.S. 533, 548 (2001) ("Velazquez II") (internal quotations omitted); c.f. United States v. Associated Press, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (noting that the interest protected by the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection").

Bearing these points in mind, the Court concludes that when the government carries out its powers, including those emanating from the Spending Clause, in a manner whose substantial purpose or effect is to guide or burden choice by recipients of government benefits in the exercise of First Amendment freedoms so as to endorse the viewpoint the government favors or prescribes, such action distinguishes the case from other invocations of the Spending Clause power (e.g., strictly for economic regulation) and indeed demands a heightened level of scrutiny. For the reasons set forth below, the Court is persuaded that this case falls within the unconstitutional conditions framework, and that, while the Act is undoubtedly a Spending Clause enactment, that consideration alone does not spare from heightened scrutiny the statute's imposition on Plaintiffs' First Amendment freedoms. Before turning to its reasons for this determination, the Court will provide a brief overview of both the Spending Clause power and the unconstitutional conditions doctrine. It will then

-54-

discuss the application of these doctrines to the instant case.

> i. Congress's Power Pursuant to the Spending Clause

Under the Constitution, Congress is empowered to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general welfare of the United States." U.S. Const., Art. I, § 8, cl. 1.1. The Supreme Court has recognized that this provision, known as the Spending Clause, allows Congress to "attach conditions on the receipt of federal funds, and [Congress] has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." South Dakota v. Dole, 483 U.S. 203, 206 (1987) (quoting Fullilove v. Klutznick, 448 U.S. 448, 474 (1980)). Congress's power pursuant to the Spending Clause is broad, and "the constitutional limitations on Congress when exercising its spending power are less exacting than those on its authority to regulate directly." Id. at 209. Because recipients of government funds allocated pursuant to Congress's spending power retain the ability to reject the funds offered to them, and thus not assume any restrictions attached to the funds that they deem unduly burdensome, such conditions are generally subject to less scrutiny than legislation imposing direct regulation. See, e.g., id. at

207.

    ii. <u>Overview of Unconstitutional Conditions Doctrine</u>

Despite the well established broad authority Congress possesses under the Spending Clause, the Supreme Court has recognized that while the government may attach conditions to financial and other benefits, there are limitations as to what these conditions may require. Succinctly framed, the doctrine holds that the government can not place conditions on its granting of public benefits or subsidies that cause the recipient to surrender vital constitutional rights, even if the government has no obligation to provide the benefit and thus could withhold it altogether. As the Court recently reiterated in <u>Rumsfeld v. Forum for Academic and Institutional Rights</u>, "the government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." 547 U.S. __, 126 S.Ct. 1297, 1307 (Mar. 6, 2006) ("<u>FAIR</u>") (quoting <u>United States v. American Library Ass'n</u>, 539 U.S. 194, 210 (2003)).

The Supreme Court's decision in the seminal unconstitutional conditions case, <u>Speiser v. Randall</u>, 357 U.S. 513 (1958), embodies this principle. There, the Court held unconstitutional California's decision to deny a property tax exemption to veterans who refused to declare that they would

-56-

not advocate for the overthrow of the government. Id. The Court found unacceptable the deterrent effect on speech that the tax provision would cause, noting that "to deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech." Id. at 518.

Numerous subsequent Supreme Court decisions reflect this doctrine, reiterating Speiser's rejection of the contention that government may condition the acceptance of a public benefit on the curtailment of a constitutional right. In Perry v. Sindermann, the Court, in considering the claim of a state university professor that the university's failure to renew his contract was motivated by retaliation for his criticism of the university's governing board, noted that "even though the government may deny [a] . . . benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech." 408 U.S. 593, 597 (1972); see also Federal Communications Comm'n v. League of Women Voters, 468 U.S. 364 (1984) (FCC not permitted to condition receipt of federal funds for public radio and television stations on the banning of editorial content in the broadcasts of those stations); cf. Rust v. Sullivan, 500 U.S. 173, 196 (1991) (upholding federal government funded family planning program's restriction on

-57-

abortion related speech because the regulations did not "force the [government program] grantee to give up abortion related speech [but rather] merely require that the grantee keep such activities separate and distinct from the [government program activities]").

This doctrine, while seemingly straightforward when stated in the abstract, in practice has proven difficult to apply. The Supreme Court's line of unconstitutional conditions cases has been recognized as a "troubled area of [Supreme Court] jurisprudence in which a court ought not entangle itself unnecessarily." Rust, 500 U.S. at 205 (Blackmun, J. dissenting) (citing Richard Epstein, Unconstitutional Conditions, State Power, and the Limits of Consent, 102 Harv. L. Rev. 4, 6 (1988) (describing this problem as "the basic structural issue that for over a hundred years has bedeviled courts and commentators alike")). The demarcation between an acceptable exercise of state power, or implementation of a selective fiscal provision pursuant to Congress's authority under the Spending Clause, and an unconstitutional condition, has proven to be a blurred and shifting line.

iii.  Determination of the Applicable Standard

Because of the lack of clarity as to the contours of the unconstitutional conditions doctrine, both Plaintiffs and

-58-

Defendants are able to summon germane authority to bolster their respective contentions with regard to the applicable standard of review.  Plaintiffs, in support of their argument that the court should apply a heightened standard, point to League of Women Voters.  There, the Supreme Court, in striking down a federal funding restriction, noted that while the government had a "substantial interest" in the legislation's purpose, the interest could be "fully satisfied by less restrictive means that are readily available."  468 U.S. at 395.  Plaintiffs also point to the Second Circuit decision in Velazquez I, which suggested, in dictum,[26] that even when funding restrictions affecting private funds afford alternative avenues for expression, the restriction still must not be "unduly burdensome."[27]  164 F.3d at 767.

For their part, Defendants point to Regan v. Taxation with Representation, in support of their argument that a rational basis test is all that is required when analyzing restrictions on government funding benefits.  See 461 U.S. 540, 550 (1983) ("It is not irrational for Congress to decide

---

[26]  In Velazquez v. Legal Servs. Corp., 349 F. Supp. 2d 566, 600 (E.D.N.Y. 2004) ("Velazquez III"), the court suggested that the Circuit Court's adoption of the undue burden standard in Velazquez I, while dictum, merits close attention.  Characterizing it as "judicial dictum" rather than mere "obiter dictum," id. at 600, the court concluded that the Circuit Court's dictum was intended to guide the lower courts and "'must be given considerable weight and can not be ignored in the resolution of [a] close question,'" id. at 582 (quoting United States v. Bell, 524 F.2d 202, 206 (2d Cir. 1975)).

[27]  The Second Circuit's pronouncement, though dictum, derives support from the Supreme Court's decision in Regan v. Taxation with Representation, 461 U.S. 540 (1983), as discussed in Section IV.A.2.a of this opinion, infra.

-59-

that tax-exempt charities such as TWR should not further benefit at the expense of taxpayers at large by obtaining a further subsidy for lobbying."). Defendants further contend that because funding conditions are voluntarily assumed, and could be avoided entirely by simply not requesting or turning down conditioned government funds, the constraints imposed on First Amendment freedoms are considerably less demanding due to their consensual basis. Following this point, the Government argues that where Congress exercises its spending power to require that grant recipients comply with conditions imposed by federal policy, Dole, and its rational relationship test, provide the appropriate framework for analysis. As further support for this proposition the Government points to American Library Association, which applied Dole as the appropriate analytical framework, while noting that the challenged act did not directly regulate private activity, but rather reflected the exercise of Congress's spending power "by specifying conditions on the receipt of federal funds." 539 U.S. at 203 n.2.

Drawing from these cases, the Government invokes several basic principles that generally guide the determination of the appropriate standard of review in cases involving the unconstitutional conditions doctrine. Specifically, the Government asserts that deferential review is applicable here because: (1) Congress has no obligation to provide a subsidy,

-60-

and if it elects to do so it may require conditions consistent with the statutory purpose -- an expression of the concept that the larger power to withhold a public benefit or subsidy that is a matter of grace encompasses the lesser power to impose conditions on its acceptance; (2) the recipients of funds under the Act are entirely free to accept or reject the grants, thus compliance with the Policy Requirement does not involve any form of coercion or penalty on the exercise of the beneficiaries' First Amendment rights, nor does it entail an attempt by the Government to suppress dangerous ideas; (3) the Policy Requirement is germane to the purposes of the Act and Congress's reasons for the imposition of the condition, and consequently the Government does not thereby seek to exact a price for the surrender of protected speech.

It is the Court's task to determine where in the murky borderlands between Congress's Spending Clause power and the unconstitutional conditions doctrine the instant case lies. Confirming the muddle this Court has already noted in this area of law, another court has similarly observed that "determining the constitutionality of government subsidization of expression is one of the most frustrating tasks of the First Amendment." Legal Aid Society of Hawaii v. Legal Servs. Corp., 961 F.Supp. 1402, 1412 (D. Haw. 1997) (quoting Martin H. Redish and Daryl Kessler, Government Subsidies and Free Expression, 80 Minn L. Rev. 543, 544 (1996)). That said, in

-61-

the instant case the Court is persuaded that Defendants' interpretation of the statute as applied to Plaintiffs' privately funded speech activities falls squarely beyond what the Supreme Court has permitted to date as conditions of government financing.

To be sure, the multiple dimensions and articulations of the unconstitutional conditions doctrine reflect the particular principles the Government cites. But the jurisprudence also embodies other rules and guidance that weaken the force of the Government's legal theories in this regard, or render them inapt. The Court finds these considerations more compelling in determining whether a minimal or heightened standard of review applies here.

First, with regard to the point that governmental power to deny a subsidy implies the power to condition its acceptance, while undoubtedly a truism, the principle by itself falls short of the broader conception of the unconstitutional conditions doctrine that has emerged from the most recent Supreme Court jurisprudence, which is summarized below. In response to this principle, these cases implicitly embody a countervailing view central to the modern doctrine: that the government should not be permitted to do indirectly what it may not properly do directly. See, e.g., Speiser, 357 U.S. at 527 (noting that the government cannot manipulate the denial of benefits in order to "produce a result which it

-62-

could not command directly").[28]

Concerning the coercion/penalty principle, certain conditions imposed on the acceptance of government grants may not appear as coercion or penalty in a strict sense of the words, in part because the concepts embody a subjective value judgment dimension that cannot readily be expressed in objective terms; nor can the quality be empirically demonstrated by the extreme intentional wrongful conduct ordinarily associated with coercion or penalties when all that is involved in the governmental action is a decision not to provide a discretionary subsidy. Absent recognized norms, distinctions between what is and is not coercive to particular individuals or in particular circumstances are often difficult to draw.[29] More significant and compelling to the standard of

---

[28] Of course this point is nuanced in the context of a challenge to a Spending Clause enactment, as Dole explicitly provides that Congress can attempt to achieve certain ends through spending enactments that it would not be able to directly. Nonetheless, while the spending power may be broad, it is certainly not unlimited, and its constraints include the First Amendment. See National Endowment for the Arts v. Finley, 524 U.S. 569, 587-90 (1998) (stating that "the First Amendment certainly has application in the subsidy context," while noting that, pursuant to the spending power, "the Government may allocate competitive funding accordingly to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake.") The continued applicability of the First Amendment, and its limitations on the Government's ability to impose restrictions on the rights it protects, was implicitly affirmed by the Supreme Court in Velazquez II, which struck down, without discussion of the Spending Clause or Dole, a restriction on federally funded speech. See 531 U.S. 533.

[29] In Dole, the Supreme Court acknowledged that in "some circumstances, the financial inducement offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion," while also recognizing that "to hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties." 483 U.S. at 211 (citing Steward Machine Co. v. Davis, 301 U.S. 548, 590-91 (1937)). As is discussed above, it is the drawing of lines between coercion and temptation that is so perplexing and subjective. Speiser, for example, refers to 'coercion' in describing the effect of the tax benefit provision at issue in that case. See 357 U.S. at

review, however, is that, as the Supreme Court has noted, government conditions on public benefits need not be inherently coercive to constitute an impermissible burden on the exercise of constitutional liberties. See, e.g., United States v. Jackson, 390 U.S. 570, 583 (1968).

Turning to the Government's germaneness argument, the principle holds that, to pass muster, attaching a government condition that burdens constitutional rights to a public benefit must bear a sufficient relationship to the interests the government would serve by denying the subsidy. See Dole, 483 U.S. at 207, 209 (noting that conditions on federal funds "might be illegitimate if they are unrelated to the federal interest in particular national projects or programs" but, finding the challenged provision before it directly related to one of the main purposes of the expenditure, declining to determine "whether conditions less directly related to the particular purpose of the expenditure might be outside the bounds of the spending power") (internal citation omitted); National Amusements v. Town of Dedham, 43 F.3d 731, 747 (1st Cir. 1995) (citing Kathleen M. Sullivan, Unconstitutional Conditions, 102 Harv. L. Rev. 1415, 1465 (1989)). On this

519 (noting that "the denial of a tax exemption for engaging in certain speech necessarily will have the effect of coercing the claimants to refrain from the proscribed speech") (emphasis added). In Dole, the Court found that the spending enactment in question was not so coercive as to require invalidation because, under the enactment, a state that refused to comply with Congress's condition would lose only five percent of the funds otherwise obtainable, a condition which the Court considered to be "relatively mild encouragement." 483 U.S. at 211.

-64-

basis, the lesser the degree of relatedness the greater the level of scrutiny accorded to the enactment, even if the grantee were free to accept or reject the government funds. The rationale largely grounding the germaneness theory is that a condition that promotes a governmental interest unrelated to any reason that would justify denial of the public benefit is tantamount to an impermissible penalty on the exercise of a constitutional right. C.f. Regan, 461 U.S. at 544-45 (upholding restriction on use of non-profit organization's tax deductible contributions for lobbying, in part because the tax code did not create situation in which charitable organizations were prevented from receiving tax deductible funds for all activities because they engaged in lobbying).

This rule as reason to guide a proper standard of review determination in this case, though a useful consideration, falls short as well. For, in essence the relatedness inquiry focuses more on the legitimacy of the governmental process that produces the challenged condition than on the systemic effect of an impermissible enactment on two larger values: the recipient's free speech rights, as well as the overarching constitutional scheme by which our society is governed. In other words, it primarily addresses the propriety of the legislative warrant for the law rather than the asserted burden on protected speech and the larger implications of an unconstitutional enactment. In emphasizing the validity of

-65-

legislative reasons supporting an enactment -- sometimes articulated, at other times not -- this principle necessarily relaxes the starting point for constitutional inquiry, thus potentially skewing the outcome.

This analytic shortcoming is especially evident in the case of a dual-edged condition on a government benefit such as the one in contention in the case at hand. Here, it is true that the government has authorized funds for programs it is not obligated to subsidize, and that the recipients are free to take or leave this public privilege. To that extent, therefore, the issue before the Court is not the validity of a Policy Requirement as enacted and applied in general to the expenditure of public funds. More to the point is that the government seeks to extend an otherwise permissible condition to restrict activities carried out entirely with the recipient's private funds. From this perspective, the limitation would place a larger burden on some grantees, while effectively favoring others. In particular, the restriction would place at a disadvantage organizations that would not only be required to pledge to a viewpoint and to program strategies with which they may fundamentally disagree, but also potentially thereby to violate other commitments governing their private funds, and to place those resources at risk.

Accordingly, while on its face part of the hybrid

condition may pass the relatedness test and thus not properly be deemed a penalty as imposed on a recipient's use of government funds, it falters and raises more far-reaching implications regarding congressional purpose when applied to inhibit activities privately financed. In the latter case the condition/benefit relationship attenuates and the restriction shades into the suspect domain of what Supreme Court doctrine deems an impermissible penalty.

The deficiencies of the various theories the parties advance as rules of decision controlling the choice of an appropriate standard of review in this case prompts the Court to suggest another analytical approach. This construct incorporates, as appropriate, the traditional unconstitutional conditions principles described above, but places them in a larger framework of free speech rights and the role of the First Amendment in our governmental scheme. Central to this broader inquiry are several tenets. As a point of departure, freedom to enjoy preferred liberties presupposes the right to make choices about their exercise uninhibited by government duress, penalty, discrimination or other forms of undue encumbrances. At the core of this principle, standing as a fulcrum of our democracy, is the power relationship between the state and the people in American society. The government is entrusted with vast resources, with which it could exercise power to harm or to lift any member of society. In turn, the

individual possesses certain constitutional rights to safeguard against abuse of the government's delegated authority and to enable enjoyment of the personal liberties constitutionally conferred on the people. Thus, in recognition of the disproportionate means bestowed on the state in our governmental plan, the First Amendment stands as a source of constitutional protections which serves to establish and maintain that power alignment between the state and its citizenry finely balanced at all times. It safeguards the individual's right to speak, by free choice, either in accordance with the government's position or in a dissonant voice.

For the so-called "marketplace of ideas" that is vital for a free society to function properly and to flourish, sustaining the people-to-government power equilibrium as constitutionally calibrated demands a number of checks long recognized in First Amendment jurisprudence. In its dealings with the individual, and in response to the legitimate private viewpoints competing in the public debate about major issues, the government should be evenhanded. It should assume a stance of neutrality as regards what people believe, and not discriminate among privately held viewpoints, nor compel its own message in a manner that unduly enhances one person and burdens another. In sum, the government should not throw its immense delegated weight into the public arena through

strategies and means that improperly arrogate or shift public power, in particular when the net consequence may be to promote the government's own view at the expense of other perspectives, to distort political ties as between the state and each individual, or to upset the societal standings of particular individuals or groups relative to one another.

In this context, conditions on receipt of government funds, even if recipients remain free to accept or reject the grants, become constitutionally suspect, and demand enhanced scrutiny, if the purpose or effect of the allocation of the public resources and benefits would substantially alter choice of private speech and materially disrupt the power equilibrium of which the First Amendment functions as centerpoint. Such imbalances could occur, for example, through (1) encumbrance of the individual's ability to exercise private and independent choice in expressing private points of view, see, e.g., League of Women Voters, 468 U.S. at 400-01; (2) elevation of the majority view and, conversely, suppression of minority "dangerous" ideas, see e.g., Speiser, 357 U.S. at 519; (3) selections among recipients of public subsidies that favor and strengthen those friendly to the government's message while placing at a disadvantage and thus weakening the opponents and skeptics. Through these means the government would give legitimacy to some while invalidating other beneficiaries. It would also enhance the value of some

-69-

perspectives at the expense of others, deterring some and encouraging others by inducing compliance, effectively thereby putting a bounty on the exercise of constitutional rights. In each of these instances, the government's intervention would carry the substantial likelihood to redirect the choice of speech that a recipient might otherwise feel entirely uninhibited to make, and by the use of such inducements derived from its vast resources, to tilt the public power equilibrium to the choice of view the government elects to favor. The constitutional risks associated with any such material disruptions of the people-to-government relationship, and substantial power shifts in First Amendment values they could engender, would warrant closer scrutiny of the government action at issue.

The Supreme Court has spoken most pointedly to the unconstitutional conditions issue before this Court in terms that support the approach described above in three cases: Regan, League of Women Voters, and Rust. Analysis of these cases supports the conclusion that an uninhibited Spending Clause rational basis standard, as here urged by the Government, is inapt. The Government's arguments ultimately fail to adequately consider the substantial impediment the Policy Requirement imposes on Plaintiffs' speech with regard to their use of non-federal funds, in effect foreclosing for Plaintiffs any alternative channel through which to express a

-70-

differing viewpoint.  As underscored below, to that extent the condition would unduly disrupt the public power relationship the First Amendment seeks to maintain appropriately balanced. A careful reading of Regan, League of Women Voters, and Rust compels the result that, despite the broad powers Congress is granted by the Spending Clause, when a spending enactment substantially impairs First Amendment protected activity conducted by private entities with private funds as a condition of receiving a government benefit, heightened scrutiny is warranted.

In Regan, the Supreme Court upheld a challenge to section 501(c)(3) ("§ 501(c)(3)") of the Internal Revenue Code ("IRC"), which provided that charitable organizations engaged in lobbying could not receive tax-deductible contributions. The Court upheld the provision, applying minimal scrutiny in doing so because the provision did not reflect an attempt by Congress to invidiously discriminate in allocating its subsidies in a way designed to suppress ideas the government deems dangerous, as was the case in Speiser.  As noted above, the Court observed that the IRC allowed § 501(c)(3) organizations to lobby the government through financially independent but affiliated organizations under § 501(c)(4), as long as records were kept to ensure that no tax deductible contributions were used for lobbying purposes.  See Regan, 461 U.S. at 544.  In his concurring opinion, Justice Blackmun

-71-

relied on the organization's ability to continue to lobby through a § 501(c)(4) affiliate in upholding the IRC provision, and noted that without this constitutional safety valve § 501(c)(3) alone would be "constitutional[ly] defect[ive]." Id. at 552.

In League of Women Voters, the case that Plaintiffs argue is controlling here, the Supreme Court found unconstitutional a provision denying federal funds to public broadcasting stations that engaged in editorializing. The Court found it problematic that "in contrast to the appellee in Taxation With Representation . . . a station [that receives only one percent of its annual income from the federal government] is not able to segregate its activities according to the source of its funding. The station has no way of limiting the use of its federal funds to all noneditorializing activities, and, more importantly, it is barred from using even wholly private funds to finance its editorial activity." 468 U.S. at 400. Most apt to the circumstances of the case at hand, the Court further stated that if Congress were to adopt a revised version of the statute that permitted noncommercial stations to establish affiliate stations which could editorialize with non-federal funds, this mechanism "would plainly be valid." Id.

In Rust, recipients of family planning funds under Title X of the Public Health Services Act brought suit challenging

the HHS's regulations implementing the statute. The regulations prohibited those receiving Title X funds from engaging in abortion counseling, referral, and activities advocating abortion as a method of family planning. Also particularly germane to the instant controversy, the agency's detailed regulations, fully developed after extensive public proceedings, required that funding recipients maintain "program integrity" between facilities, personnel, and records for Title X providers and any medical providers of abortion related information or services. Rust, 500 U.S. at 180-81. The Supreme Court upheld the regulations, doing so while explicitly citing as a consideration the ability of grant recipients to communicate abortion related messages through non-Title X programs. On this point, the Court stated:

> Title X expressly distinguishes between a Title X grantee and a Title X project. The grantee, which normally is a health-care organization, may receive funds from a variety of sources for a variety of purposes . . . The grantee receives Title X funds, however, for the specific and limited purpose of establishing and operating a Title X project . . . The regulations govern the scope of the Title X project's activities, and leave the grantee unfettered in its other activities.

Id. at 196 (emphasis in original). Because the grant recipients remained able to engage in "the protected conduct outside the scope of the federally funded program," the Rust Court found that the case was unlike League of Women Voters, which had foreclosed all avenues for the protected expression,

and upheld the regulations.  Id. at 197.[30]

Taken together, these decisions suggest that when Congress burdens the First Amendment rights of recipients of government benefits by placing restrictions on the eligibility for or use of such benefits, it must leave the recipients with adequate freedom to engage in protected expression through unregulated means.  See Velazquez I, 164 F.3d at 766 (concluding that the inference these three cases yield is "that, in appropriate circumstances, Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alternative channels of protected expression").  Further, in each of these three rulings, there is some support for the application of heightened scrutiny when speech activities carried out with

---

[30] In Rust, the Court offered further elaboration on its reasoning in Regan, stating:

> [I]n Regan we held that Congress could, in the exercise of its spending power, reasonably refuse to subsidize the lobbying activities of tax-exempt charitable organizations by prohibiting such organizations from using tax-deductible contributions to support their lobbying efforts. In so holding, we explained that such organizations remained free "to receive deductible contributions to support . . . nonlobbying activit[ies]." 461 U.S. at 545. Thus, a charitable organization could create, under § 501(c)(3) of the Internal Revenue Code of 1954, 26 U.S.C. § 501(c)(3), an affiliate to conduct its nonlobbying activities using tax-deductible contributions, and at the same time establish, under § 501(c)(4), a separate affiliate to pursue its lobbying efforts without such contributions. 461 U.S. at 544. Given that alternative, the Court concluded that "Congress has not infringed any First Amendment rights or regulated any First Amendment activity[; it] has simply chosen not to pay for [appellee's] lobbying." Id. at 546 (emphasis added).

Rust, 500 U.S. at 197-198.  This explanation of Regan further underscores the importance of according to recipients of a conditioned government benefit sufficient ability to engage in protected speech supported with their private funds.

non-federal funds are restricted as a qualification for the receipt of federal funding.  In Rust, the Court found that the challenged regulations, restricting the use of federal funds only, were "narrowly tailored to fit Congress's intent [that the funds] not be used to promote or advocate for abortion." Rust, 500 U.S. at 195 n.4.[31]  League of Women Voters also applied heightened scrutiny in rejecting the Government's argument that the restriction on all editorial expression was justifiable as an exercise of Congress's power pursuant to the Spending Clause.  See 468 U.S. at 399-400.  The League of Women Voters Court distinguished Regan precisely because Regan allowed for an adequate alternate channel of communication. Indeed, it is significant that while Regan upheld the challenged tax code provision under a rational relationship standard, the restriction (no lobbying) applied only to activities paid for with government subsidized funds (those collected as tax deductible contributions).  The Regan court found that a requirement that lobbying activities be conducted with unsubsidized contributions, through an affiliate § 501(c)(4) organization, was not "unduly burdensome."  Regan,

---

[31]  It is notable that in Rust the Court articulated a narrow tailoring test even where Congress's restrictions on speech applied only to the use of federal, and not private, funds.  In addition, in the same footnote, the Court goes on to cite Dole for the proposition that "Congress's power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use." Id.  This statement suggests that heightened scrutiny is appropriate even where funding is allocated by Congress pursuant to its spending powers as discussed in Dole, contrary to the Government's arguments.

461 U.S. at 544 n.6.

Finally, the rulings in these cases provide support to the approach of the analysis suggested above that looks to the effect of the government funding restriction on the power relationship between the state and the people that the First Amendment serves to preserve appropriately balanced. Applying the Policy Requirement to the recipients' privately funded speech activities unduly burdens organizations that may have qualms over endorsing the government's viewpoint or encounter other risks to their private use of such funds. At the same time, the condition would favor organizations that conceptually supported the government's position, have no private funds to put in jeopardy or otherwise do not have the financial or programmatic strength to resist the government's inducement.

The Government, in its bid for the Court to apply a rational relationship test pursuant to a Spending Clause analysis, endeavors to distinguish these cases, asserting as well that the Supreme Court's ruling in <u>American Library Association</u> supports Defendants' claim for the application of a rational basis standard. In addition, the Government argues that because the Act involves the arena of international relations, Congress's choices are entitled to the more deferential standard of review. For the reasons stated below, the Court finds these arguments unpersuasive.

-76-

(a) <u>The Government Cannot Adequately Distinguish Regan, League of Women Voters, and Rust</u>

i. <u>Alternate Channels for First Amendment Activities</u>

There is no doubt that Congress has broad powers to determine how federal funding should be utilized. However, as <u>League of Women Voters</u> demonstrates, and <u>Rust</u> further underscores, any attempt by Congress to foreclose a grant recipient's ability to engage in certain protected conduct with its private funds should be greeted warily. <u>See</u> <u>League of Women Voters</u>, 468 U.S. at 400-01; <u>Rust</u>, 500 U.S. at 196. While the Government correctly argues that the Supreme Court did not face the question of restrictions on private spending in either <u>Rust</u> or <u>Regan</u>, and thus these decisions are not binding as to the issue at hand, this contention does little to diffuse the support for Plaintiffs' arguments that emerges from the compelling rationale and language of these two decisions. Given that <u>League of Women Voters</u> is the only Supreme Court decision to directly address a statute in which a private organization's private spending was entirely restricted as a condition of obtaining government funding (and that the Court found such a restriction unconstitutional), the Supreme Court's reliance in both <u>Rust</u> and <u>Regan</u> on the availability of alternate channels for grant recipients' First Amendment activity as a basis for upholding the challenged provisions in each of those cases is strongly persuasive here.

-77-

ii.  The Role of NGOs

The Government's effort to distinguish League of Women Voters as a unique case because the core First Amendment activity of expression of editorial opinion was implicated is also unavailing.  To be sure, League of Women Voters did note that the expression of editorial opinion "lies at the heart" of First Amendment protection.  468 U.S. at 381; see also id. at 376 (editorial opinion entitled to "most exacting" degree of First Amendment protection).  However, the instant case presents an infringement on Plaintiffs' First Amendment rights to communicate openly about matters of public concern, a right that has historically been recognized, no less so than editorial opinion, as "rest[ing] on the highest rung of the hierarchy of First Amendment values." NAACP v. Claiborne Hardware Co., 458 U.S. 886, 993 (1982).  While the Court recognizes the immense degree of protection that journalistic expression is granted under the First Amendment, it is unpersuaded that the expression at stake here is of such a materially different character as to render the analysis in League of Women Voters, and that decision's application of heightened scrutiny, inapplicable in this case.

Indeed, the far-reaching role of NGOs in presenting issues of concern to governmental officials, as well as contributing to public debate on contested social issues, in influencing the course of public policy as well as in

-78-

enhancing core public values and safeguarding them from government abuse, has always been critical to our democracy. From the beginning of the Republic to this day, as Congress itself recognized in the Act,[32] NGOs have played a significant role as partners of government in administering vital public services. They promote fuller participation and a diversity of views in civil society. They have served as advocates of public causes, as voices for the marginalized, disenfranchised and impoverished, and as counterweight to the more powerful interests in our society, both as friends and as adversaries of the government. They engage in conducting public forums to disseminate information, opinions and advice on issues before the government, a function that is critical to an informed citizenry. Quite simply, public interest groups have resources and capabilities that individuals, acting alone, do not: "by collective effort individuals can make their views known, when, individually, their voices would be faint or lost." Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley, 454 U.S. 290, 294 (1981)).

By means of these and many other functions NGOs perform, they help fundamentally in shaping the nation's public agenda. For that reason their ability to engage an "uninhibited,

---

[32] See 22 U.S.C. § 7601(18) (acknowledging that "[n]on-governmental organizations . . . have proven effective in combating the HIV/AIDS pandemic"); § 7621(b)(1) (declaring that "the sustainment and promotion of public-private partnerships should be a priority element of the strategy pursued by the United States to combat the HIV/AIDS pandemic and other global health crises").

robust, and wide-open" public discourse serves as an essential
weight in preserving the balanced power relationship between
the government and the people that the First Amendment
safeguards.  New York Times Co. v. Sullivan, 376 U.S. 254, 270
(1964).  The diversity and breadth of the traditional public
functions NGOs contribute to our society should rank the
quality of First Amendment rights and protection they merit to
no lesser degree than that accorded to editorial opinion or to
universities.  See, e.g., Rust, 500 U.S. at 200 (noting that
"the university is a traditional sphere of free expression so
fundamental to the functioning of our society that the
Government's ability to control speech within that sphere by
means of conditions attached to the expenditure of Government
funds is restricted by the vagueness and overbreadth doctrines
of the First Amendment") (citing Keyishian v. Board of
Regents, 385 U.S. 589, 603, 605-06 (1967)); Claiborne
Hardware Co., 458 U.S. at 907 ("the practice of persons
sharing common views banding together to achieve a common end
is deeply embedded in the American political process.")
(quoting Citizens Against Rent Control, 454 U.S. at 294.

The organizations implicated in the present case serve
precisely these values.  OSI, AOSI, Pathfinder, and several
amici seek to cooperate with the Government in furtherance of
a shared purpose: combating the devastating consequences of
the HIV/AIDS pandemic.  They seek to do so, however, without

-80-

forfeiting the critical role they play in stimulating public discourse on controversial issues, including eminently debatable questions such as what may be the most appropriate or effective policy to engage high-risk groups in such efforts. The Policy Requirement, to the extent it prevents NGOs from speaking openly on such questions with their private funds, contravenes our national commitment open debate and our First Amendment values. See New York Times Co., 376 U.S. at 270.

(b) American Library Association Is Not Controlling

The Government argues that the Supreme Court's ruling in American Library Association supports a finding that statutes enacted pursuant to the Spending Clause may impose conditions limiting grant recipients' exercise of their First Amendment rights even with private funds. In that case, the Supreme Court upheld a provision of the Children's Internet Protection Act ("CIPA") requiring libraries receiving federal funding for their internet service costs to enforce a "policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access." 47 U.S.C. § 254(h)(6)(c). See also 539 U.S. at 201. The Government points to the case as an instance in which the Supreme Court applied a rational relationship test to restrictions that had application beyond the government funds

-81-

themselves, and upheld the restrictions because they were sufficiently related to the objectives of the statute.

The Government's reliance on American Library Association is misplaced. Significantly, in the various opinions upholding the challenged act, the Supreme Court carefully took note that CIPA's requirement that Internet filtering software be applied to all funding recipients' computers imposed a comparatively minimal burden on the First Amendment rights implicated in that case. The plurality opinion first observed that libraries possess the "traditional role in identifying suitable and worthwhile material [and they] are no less entitled to play that role when [they] collect materials from the Internet than when [they] collect material from any other source." Id. at 208. The Court noted that most libraries exclude pornography from their print collection, and that libraries have the same ability to block access to pornographic websites. In answer to the dissent's concerns about constitutional rights that would be impinged by the unintended "over blocking" of access to speech, the plurality found that any constitutional concerns "are dispelled by the ease with which patrons may have the filtering software disabled," noting that libraries had the ability to permanently unblock erroneously blocked sites and to remove the filter to a specific site at the request of a patron. Id.

at 209.   In his concurring opinion,[33] Justice Kennedy agreed
with the upholding of the statute because there had not been
any showing that adult library users' First Amendment right to
access  protected  material  would  be  burdened  "in  any
significant degree," as sites could be unblocked upon request.
Id. at 214; see also id. at 220 (Breyer, J. concurring)
("Given  the  comparatively  small  burden  that  the  Act  imposes
upon the library patron seeking legitimate Internet materials,
I cannot say that any speech-related harm that the Act may
cause is disproportionate when considered in relation to the
Act's legitimate objectives.")[34]

Viewing American Library Association as evaluating a
restriction that imposed a minimal burden on First Amendment
rights,  as  it  could  be  undone  upon  request,  the
inapplicability of the decision to the circumstances presented

_____

[33] Justice Kennedy's opinion, as the narrowest majority view, is considered
the controlling opinion.  See Velazquez III, 349 F. Supp. 2d at 593-594
(citing standard set out in Marks v. United States, 430 U.S. 188, 193
(1977)).

[34] In addition, the Court notes that public libraries, as government entities,
hold a somewhat different position vis-a-vis the First Amendment than do
NGOs.  Indeed, there is a significant question as to whether a government
entity may invoke the protections of the First Amendment at all.   See
American Library Ass'n, 539 U.S. at 210-11. In American Library Association,
the Supreme Court, while not relying on this distinction between private
citizens and public entities, recognized the issue and questioned, without
deciding, whether a public library could even advance a claim under the
unconstitutional conditions doctrine. See id. at 210-12 (finding that the
filtering requirement did not impose an unconstitutional condition, "assuming
. . . that public libraries have First Amendment rights"); see also id.
(acknowledging the argument that public entities do not have First Amendment
rights) (citing Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.,
412 U.S. 94, 139 n.7 (1973) (Stewart, J. concurring) ("The First Amendment
protects the press from governmental interference; it confers no analogous
protection on the government.").

by the instant case becomes clear. Here, Defendants'
application of the Policy Requirement to Plaintiffs is
substantially more burdensome, as it requires Plaintiffs to
agree to not engage, even with their private funds, in
undefined forms of speech that at any moment and on any
indeterminate subject the Government could interpret as being
inconsistent with a "policy opposing prostitution," a
limitation that Plaintiffs have demonstrated directly impinges
on their First Amendment rights and substantially impairs
their ability to express these ideas. This broad restriction,
encumbering Plaintiffs' ability to engage in public debate on
particular topics, is not comparable to the minimal burden
associated with the easily lifted filter applied to library
computers at issue in American Library Association. Indeed,
the ability of library patrons to request that the filter be
lifted as needed is somewhat analogous to the ability of the
organizations in Regan and Rust to continue their privately
financed activities with non-government funds or subsidies.
Despite the need for a library patron to request on occasion
that a site be unblocked, the American Library Association
Court found that this imposition did not impose an unduly
burdensome restriction on their First Amendment interests.
Thus, the American Library Association decision, which applied
the rational basis test as the appropriate standard of review,
may be best explained not by the breadth of Congress's

-84-

Spending Clause power but by the insubstantial degree to which the challenged provision burdened the complainants' First Amendment rights.[35]

        (c)  <u>The Act's Effect on International Affairs Is Not Cause for the Automatic Application of a Rational Basis Standard of Review</u>

The Court is also unpersuaded that the government's

---

[35] While the Court finds that this rationale provides the most consistent analysis of these cases, it pauses to take note of a potential ambiguity arising in the <u>American Library Association</u> decision. In his dissenting opinion, Justice Stevens argues that the CIPA provision in question is an unconstitutional condition. In support of this contention, Justice Stevens points out that the provision requires that once a library has received any benefit through the specified federal programs, it must implement the filtering device on all of its computers, whether or not the computers were purchased with federal funds or were connected to the Internet through the federally funded discount Internet access programs. Thus, if a "library attempts to provide Internet service for even <u>one</u> computer through an E-rate discount, that library must put filtering software on <u>all</u> of its computers with Internet access, not just the one computer with E-rate discount." <u>Id.</u> at 230 (Stevens, J. dissenting) (emphasis in original). In response to this point, the plurality opinion states that "CIPA does not 'penalize' libraries that choose not to install such software . . . rather, CIPA simply reflects Congress's decision not to subsidize their doing so." <u>Id.</u> at 212. The plurality goes on to state: "To the extent that libraries wish to offer unfiltered access, they are free to do so without federal assistance." <u>Id.</u> Upon review, the meaning of this sentence is somewhat ambiguous, as the text itself can be read to suggest either that libraries may impose the filtering device only on those computers receiving the federally discounted Internet service, while continuing to act freely with its own funds, <u>or</u> that libraries are not mandated to adhere to the filtering requirement, as they remain free to turn down federal assistance and thus continue to offer unrestricted Internet access to their patrons should they so choose. While the context of the overall opinion suggests that the sentence should be read in the latter manner, some confusion remains. If Justice Stevens is correct that the Act requires filters on computers that are connected to the Internet through means other than the federal discount programs, then the plurality's statement that "CIPA simply reflects Congress's decision not to subsidize [unfiltered Internet access]" would seem to be incorrect. That is, a provision requiring that all library computers be installed with filtering software, regardless of whether or not the computer is connected to the Internet through a means subsidized by the federal government, would extend the restriction beyond the access subsidized by Congress. In any case, even assuming that the sentence should be read to state that the Act permissibly imposes restriction on computers accessing the Internet thorough non-federally funded means, the Court would not find such language decisive. As discussed above, <u>American Library Association</u> is a plurality decision, and it is Justice Kennedy's concurring opinion, relying on the minimal burden imposed by the filtering device, that is controlling.

interest in clearly communicating its goals in the field of international relations provides a basis for applying rational basis review in the instant case.   The Court recognizes that "when the government speaks in international affairs, it speaks not only with its words and its funds but also with its associations."   DKT Memorial Fund, Ltd. v. Agency for Int'l Dev., 887 F.2d 275, 290-91 (D.C. Cir. 1989).    At oral argument, the Government suggested that the Act's impact on international relations provided a basis for distinguishing this case from Rust, League of Women Voters and Regan, all of which indicate that Congress must leave open adequate alterative channels for communication of ideas when imposing speech related conditions on Government benefits.   The Government suggested that because here, unlike in the preceding cases, the Act has ramifications for United States foreign policy efforts abroad, the Act's limitations on speech, even if such restrictions substantially impair the recipients' ability to express certain viewpoints, should be subject to only rational basis review.   The Court cannot agree.

While mindful of the government's strong interest in managing the country's international relations, the Court cannot find that this interest, in this case, is sufficient to warrant the rational basis deference that the Government

requests.[36]    First, the Act itself does not suggest that the
nation's foreign policy interests are the primary governmental
ends driving this legislation, or that these interests require
uniform policies on the part of all entities receiving funds
through the Act.    As is discussed at length in Section
IV.A.2.b.i, below, the Act exempts from the Policy Requirement
certain organizations which have in the past recognized that
advocacy for the reduction of criminal penalties for
prostitution are among the best practices in HIV prevention,
suggesting that the Government's foreign policy interests are
not undermined by association with organizations that hold
such views.    Finally, the Government's reliance on DKT, for
its deference to the executive branch in the arena of foreign
policy, is misplaced insofar as that case involved a challenge
to a restriction on the First Amendment activities of foreign
NGOs accepting United States government funds.    See DKT
Memorial Fund, 887 F.2d 275.

   The policy challenged in that case required foreign NGOs
accepting United States government grants to forego all

---

[36] At the outset, the Court notes that there is a distinction between a non-
justiciable foreign policy objective, and the justiciable implementation of
such an objective by an agency.    In this case, at this stage in the
litigation, it is the agency implementation of the Act's provision that is at
issue, and the enjoinment of such an interpretation pending an outcome on the
merits is scope of the relief that the Court considers in this opinion.    See
Planned Parenthood Fed'n of America, Inc. v. Agency for Int'l Dev., 915 F.2d
59, 62 (1990) (discussing procedural history in case involving agency
implementation of executive branch policy, stating: "In [our previous
decision] we agreed that the policy itself was not justiciable, but we
reversed and directed the district court to consider on remand the legality
of [the agency's] implementation of the [policy].").

abortion related activities, even with their private funds, but allowed domestic NGOs receiving government grants to continue to spend their private funds as they chose.  To the extent that the <u>DKT</u> court did not focus on the policy's distinction between foreign and domestic NGOs in upholding the restriction, as the Government contends they did not, any suggestion in <u>DKT</u> that such a restriction would be valid if applied to domestic NGOs is dictum.[37]  In addition, the Second Circuit, in addressing a parallel challenge to the policy in question in <u>DKT,</u> upheld the restriction on foreign NGOs while explicitly noting that the policy did not "prohibit plaintiffs [domestic NGOs] from exercising their First Amendment rights . . . [The domestic NGOs] may use their own funds to pursue whatever abortion related activities they wish in foreign countries."  <u>Planned Parenthood Fed'n</u>, 915 F.2d at 64.  In the instant case, as Plaintiffs have pointed out, the restrictions at issue apply to NGOs based in the United States,

---

[37]  Notably, in the section of the <u>DKT</u> opinion discussing the government's interest in selectively spending funds abroad, the arguments are limited to activities carried out with government funds.  For example, the Circuit Court notes that "to hold that the government cannot make viewpoint based choices in foreign aid and foreign affairs . . . would work much mischief."  887 F.2d at 290.  The Circuit Court's examples of such mischief, however, speak to burdens that could improperly be placed on <u>government</u> funds - including the argument that such a rule would expose the government's funding of an anti-apartheid initiative to unconstitutionality if the government refused to provide funding to encourage the continuance of apartheid.  The opinion's relevance is also considerably narrowed because the case deals with restrictions on funding of <u>foreign</u> NGOs and speaks to the United States government's choice of foreign partners, an issue more closely related to foreign affairs than the funding of domestic organizations for their work abroad which is at issue here.  <u>See</u> <u>id.</u> at 53 ("We observe again, that a nation speaks in foreign affairs not only by the express messages that it sends, but by its choice of <u>foreign</u> <u>entities</u> with whom it will associate.") (emphasis added).

restrictions which extend to these NGOs' speech within United
States (for example, a conference on sexual rights and sexual
health that AOSI will co-sponsor in this country in June of
2006). Defendants simply have not made an adequate showing as
to why such domestic, private speech activity should be
necessarily classified as a matter of American foreign policy.
Taking all of these factors into consideration, the Court
concludes that while the Government's increased interest in
preventing its message from being distorted in the domain of
international relations abundantly demonstrates the validity
of the Act's speech restriction on activities conducted with
government funds, it is not sufficient to negate Plaintiffs'
First Amendment rights when they act with private funds.

iv. <u>Statement of Standard of Review</u>

In light of the preceding Supreme Court precedents, which
this Court finds sufficiently compelling, the Court rejects
the Government's argument that rational relationship review is
applicable to this case and concludes that a heightened
standard of review is appropriate.[38]  In applying this
heightened scrutiny, the Court asks whether the restriction,
as interpreted and applied by Defendants, is "narrowly
tailored to fit Congress's intent." <u>Rust</u>, 500 U.S. at 195

---

[38] The Court views strict scrutiny as inapplicable to the instant case as the
Policy Requirement is not a direct regulation on speech, but rather affects
First Amendment freedoms indirectly.

n.4; see also League of Women Voters, 468 U.S. at 395 (noting that while the government had a "substantial interest" in the legislation's purpose, the interest could be "fully satisfied by less restrictive means that are readily available" and striking down the provision); c.f. Velazquez I, 164 F.3d at 766-67 (noting that while the record before the court was insufficient for facial invalidation of regulations, the rules may be subject to an as applied challenge if they "prove [to be] unduly burdensome and inadequately justified, with the result that [the Act and regulations] will suppress impermissibly the speech of certain funded organizations and their lawyers"); Planned Parenthood of Cent. & N. Ariz. v. Arizona, 718 F.2d 938, 945 (9th Cir. 1983) (finding that ban restricting organizations receiving state funds from engaging in abortion related activities was not narrowly tailored).

As the variance between the standards applied by the Supreme Court in League of Women Voters and Rust indicates, there is no settled articulation of the heightened standard of review in this area of law. Thus, this Court adopts Rust's phrasing of the heightened standard, applying a traditional First Amendment narrow tailoring test to the challenged provision. The Court concludes that, of the relevant precedents considered, Rust speaks most directly to the issues of the instant case, largely because both cases involve speech regulated by Spending Clause enactments through which the

-90-

government conveys a message and endeavors to compel compliance with that message by placing conditions on eligibility for government benefits.[39]  Furthermore, the narrow tailoring test has been applied in analogous situations in which a regulation or statute touches on competing constitutional interests, or where there is some government justification for speech-related harm -- for example, in both the commercial speech context and also in the analysis of time, place, and manner restrictions.  See, e.g., Board of Trustees. v. Fox, 492 U.S. 469, 480 (1989) (in a case involving commercial speech, requiring "a fit between the legislature's ends and the means chosen to accomplish those ends . . . a means narrowly tailored to achieve the desired objective"); Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984) (upholding a National Park Service regulation challenged by protest planners as an appropriate time, place, manner regulation where it was content neutral, narrowly tailored to serve a significant government interest, and left open ample alternative channels for communication of the information).

b. Application of Standard and Additional First Amendment Analysis

---

[39]  This aspect of both Rust and the instant case, insofar as they concern government spending designed to carry out a government initiative rather than to foster a variety of speech, is discussed at length in Section IV.A.2.b.ii, infra.  For now, the Court merely notes that in League of Women Voters, the government was fostering speech by providing funds to broadcasters, and perhaps for this reason the slightly higher level of scrutiny articulated in that case, suggesting a least restrictive means analysis, was warranted.

i.   As Construed by Defendants, the Provision Is
     Not Narrowly Tailored to Achieve Congress's
     Goals

Defendants assert that the Policy Requirement is needed
to further Congress's intended aims, all deriving from the
Government's goal of fighting HIV/AIDS and Congress's chosen
policy of eradicating prostitution as part of its methodology
to achieve this goal. In particular, the Government argues
that it has an interest in not having its message (that the
eradication of prostitution is part of its strategy to combat
HIV/AIDS) distorted by the activities of its private partners
in this fight.[40]   Plaintiffs take issue with this asserted
concern and the degree of the Government's interest in
furthering this goal.   They argue that the Government's
purported interest has not been sufficiently supported with a
factual record.[41]   Plaintiffs also contend that the primary

---

[40] The Government's asserted interest in avoiding the perceptions of a mixed
message on the part of the United States government is analyzed in detail in
Section IV.A.2.b.ii, infra.

[41] Plaintiffs cite United States v. Playboy Entertainment Group, Inc., 529
U.S. 803 (2000), and League of Women Voters, 468 U.S. 364, in support of two
related arguments.  They allege that (1) "Congress made no findings and heard
no testimony regarding the undermining of its anti-prostitution message by
funding recipients" and (2) Defendants have not shown "that the government's
anti-prostitution message lost currency during the year and a half during
which they refrained from applying the pledge requirement to U.S.
organizations."  (Pl. Reply at 14.)  Each argument may be seen as a
derivation of the more general proposition that the Government must present
"more than anecdote and supposition" about the supposed harms regulated
speech will cause when imposing a content-based restriction on speech.
Playboy Entm't Group, 529 U.S. at 822.  The Court is not convinced that this
point bears the same force here, as neither case involved speech regulated by
Spending Clause enactments through which the government conveys a message.
Since the Court finds that the exclusion provision of the Act belies the
Government's assertion that the means it has chosen is narrowly tailored to
achieve its interest, the Court need not further address this issue at this
point.

purpose of the Act is to combat the spread of HIV/AIDS and other diseases, while the goal of the "eradication of prostitution" as a means of stemming the harms associated with prostitution is just one of twenty-eight congressional findings in the Act which together call for the prevention and treatment of HIV/AIDS. See 22 U.S.C. § 7601, (1)-(22), (24)-(28). Plaintiffs argue that to the extent the asserted overall goal, the fight against HIV/AIDS, is at cross purposes with the secondary goal of the eradication of prostitution, the Government has a limited interest in that secondary goal.[42]

The Court declines to dwell on this debate, however, as the Government's claim that its goals will be jeopardized if the Policy Requirement is not enforced as the Government interprets it is undercut by the Act's exclusion provisions exempting certain recipients of funds under the Act from complying with § 7631(f). The text of that provision states that "this subsection shall not apply to the Global Fund to Fight Aids, Tuberculosis and Malaria, the World Health

---

[42] As was discussed in Section IV.A.1.b, Plaintiffs' argument that the eradication of prostitution is really only a secondary goal of the Act, is in part an attempt to do an end-run around the Act's finding that the eradication of prostitution should be the policy of the United States as it pursues the aims of the Act. In Plaintiffs' view, the goal of eradicating prostitution can undermine efforts to fight HIV/AIDS because prostitutes must be empowered and enlisted in this fight, which may require actions that are at odds with a goal of immediate eradication of prostitution. Plaintiffs' argument is at base a restatement of the policy differences between Plaintiffs, who wish to preserve the right to engage in outreach to prostitutes, which can include providing supportive services to prostitutes, and the Government, which views the eradication of prostitution as one of the priorities in the fight against HIV/AIDS. As stated above, it is not the Court's role in adjudicating the instant dispute to resolve which of the parties has the better of this policy debate.

Organization ["WHO"], the International AIDS Vaccine Initiative or to any United Nations agency." 22 U.S.C. § 7631(f). As Plaintiffs point out, both the WHO and the Joint United Nations Programme on HIV/AIDS ("UNAIDS") and possibly other United Nations agencies have recognized advocacy for the reduction or removal of penalties imposed on prostitution, so that such penalties do not interfere with outreach efforts by driving this population underground, as among the best practices in HIV prevention. (Beyrer Decl. ¶ 25.) Each of these organizations receives funds pursuant to the Act. The Government has not advanced any explanation as to why a restriction on Plaintiffs' speech is necessary to protect Congress's goals in promoting uniformity of message while these high profile organizations can engage in clearly dissenting speech. The Government's purported fear of its message being garbled by organizations that accept the Agencies' funds while simultaneously using their own funds to "[endorse], either implicitly or explicitly, the very practices that the program aims to eliminate" (see Def. Mem. at 37), is not sufficient to warrant the blanket ban on Plaintiffs' privately funded speech when the exempted organizations are free under the Act to make just such endorsements should they see fit. The exemption thus reinforces Plaintiffs' argument that the ban, as construed by Defendants, is more than is needed to protect the Government's

-94-

asserted interest, and thus is not narrowly tailored.

Further, even assuming that the Government had presented significant interests in enforcing the Policy Requirement as currently construed, the Court still could not find that this construction is "narrowly tailored to fit Congress's intent." Rust, 500 U.S. at 195 n.4. The current construction of the provision, requiring the Government's private partners to abstain from all speech that could be understood by the Government as supporting the decriminalization of prostitution, at this point, even absent formally adopted administrative agency definitions and regulations, amounts to a blanket ban on certain constitutionally protected speech. As such, Defendants' application of the provision is not "narrowly tailored." See Loper v. New York City Police Dep't, 999 F.2d 699, 705 (2d Cir. 1993) (holding that "a statute that totally prohibits begging in all public places cannot be considered 'narrowly tailored' to" achieve the prevention of the effects associated with begging); Sable Communications of California, Inc. v. FCC, 492 U.S. 115, 126-27 (1989) (concluding that a "total ban" on indecent interstate commercial telephone messages was not narrowly tailored to protect children from exposure to indecent dial-a-porn messages); Playboy Entm't, 529 U.S. at 814 ("[T]he objective of shielding children [from sexually-oriented material] does not suffice to support a blanket ban [on the transmission of

-95-

such material] if the protection can be accomplished by a less restrictive alternative.").

The Court also notes the existence of other less restrictive methods of protecting the Government interests, which undermine the argument that the Act is narrowly tailored. Specifically, the Government could ensure clarity about the policies of the United States government in this area by requiring, as was the case of the regulatory scheme that the Supreme Court acknowledged as a saving grace in Rust and Regan, that government fund recipients sufficiently segregate and account for their government financed activities from those privately conducted. See also, Velazquez I, 164 F.3d at 766-67. Plaintiffs could also be required to issue disclaimers clarifying that particular projects and activities are privately funded and are not supported by any funds from the United States Government, a method far less restrictive than preventing Plaintiffs from engaging in any speech conveying a different viewpoint than the one advanced by the Act.[43]  See League of Women Voters, 468 U.S. at 395 (recognizing the Government's interest in ensuring that audiences of noncommercial stations would not be led to think that the station's editorials reflected the view of the government, but noting that this interest could be "fully

---

[43]  Such disclaimers, stating in USAID agency funded publications that the views in the publication are not necessarily those of USAID, are currently required for USAID publications. See, e.g., 22 C.F.R. § 226.91(c)(1).

satisfied by less restrictive means that are readily available," including "simply requir[ing] public broadcasting stations to broadcast a disclaimer every time they editorialize"). These disclaimers could also be included on Plaintiffs' websites, delineating which projects are supported with the help of the Government, as well as in any written materials related to privately funded projects. The burden of providing disclaimers would be inordinately less restrictive than an indefinite ban on certain types of speech.

Even short of requiring disclaimers, the Court agrees with Plaintiffs that the Government has failed to demonstrate why the restriction on government funds is not itself adequate to prevent public confusion over its message, or why permitting grantees to refrain entirely from taking a position on prostitution would undermine the Government's message. Cf. Reno v. American Civil Liberties Union, 521 U.S. 844, 879 (1997) (stating that the breadth of the challenged restriction imposed a burden on the government to explain "why a less restrictive provision would not be as effective" and finding the challenged statute not narrowly tailored "[p]articularly in the light of the absence of any detailed findings by the Congress, or even hearings addressing the special problems of [the challenged act]").

ii.  The Policy Requirement, as Construed by
     Defendants, Is Unconstitutional Because it
     Improperly Applies Its Viewpoint Discriminatory
     Restriction to Plaintiffs' Private Funds

Plaintiffs additionally argue that the Policy Requirement is unconstitutional because it compels fund recipients to adopt the Government's viewpoint, and refrain from espousing any competing viewpoint even with their private funds, as a condition of receiving government funds. Defendants contend that when government legislation is aimed at the transmission of a government message, as opposed to creating a forum for increased speech from private speakers with varied viewpoints, the government may endorse one viewpoint over another, and choose to subsidize the transmittal of that particular message.

The Supreme Court has recognized that "even in the provision of subsidies, the government may not 'ai[m] at the suppression of dangerous ideas.'" National Endowment for the Arts v. Finley, 524 U.S. 569, 587 (1998) (quoting Regan, 461 U.S. at 550) (internal quotation marks omitted). In Finley, the Supreme Court upheld a statute requiring the National Endowment for the Arts ("NEA") to consider, as part of the criteria for evaluating grant applications, general standards of "decency and respect" for the diverse beliefs and values of the American public. Id. In doing so, the Court observed

-98-

that the NEA's mandate was to make "aesthetic judgments" and thus it must implement an inherently content based "excellence" threshold. Id. at 586. The Court noted that the case presented less of a constitutional dilemma because no facts were presented suggesting that the NEA had denied a grant as a result of "invidious viewpoint discrimination." Id. at 587. The Court went on to state that the case would be different "if the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints." Id. Plaintiffs argue that the Policy Requirement is precisely the sort of viewpoint based mandate that Finley distinguished from the provision upheld in that decision.

The Government rightly points to Rust and Velazquez II as supporting its argument that because here Congress is dispersing funds pursuant to a selective spending provision in which the government itself seeks to convey a message, it may choose to endorse one viewpoint over another. See Velazquez II, 531 U.S. at 541 ("We have said that viewpoint based funding decisions can be sustained . . . in . . . instances, like Rust, in which the government used private speakers to transmit information pertaining to its own program."); Rust, 500 U.S. at 193.[44] But in Rust, Congress's choice to fund one

[44] While the Supreme Court has thus upheld provisions that embody viewpoint based funding decisions, it bears noting that the invalidated tax provision in question in Speiser can arguably be viewed as a this type of restriction. See Speiser, 357 U.S. 513. There, veterans were required to adopt an oath

viewpoint over another extended only to the use of <u>federal</u> funds. And although <u>Velazquez II</u> expounds upon the government's ability to selectively fund certain viewpoints and not others, the Court there struck down a funding restriction which prevented <u>federal</u> funds from being used to bring suits questioning the validity of existing welfare laws. The Court in <u>Velazquez II</u> distinguished <u>Rust</u> in order to strike down a restrictive funding provision. Thus, even accepting the Government's reading of <u>Velazquez II</u> and <u>Rust</u> and the proposition that the subsidies in this case are aimed at conveying a government message as opposed to fostering speech, the fact remains that neither <u>Rust</u> nor <u>Velazquez II</u> speaks to the issue before this Court: whether the government may condition the grant of its funds on a requirement that recipients adopt its message and refrain from engaging in any activities that might be deemed supportive of any competing viewpoint even with its <u>private</u> funds.

Indeed, the <u>Rust</u> Court stated that Congress can "selectively fund a program . . . it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in

that they would not advocate for the overthrow of the Government by force or violence or other unlawful means, or advocate for support of a foreign government in the event of hostilities, in order to participate in California's property tax exemption program for veterans. <u>Id.</u> at 515. Despite that the provision was designed to ensure that the veterans endorsed the government's message, and thus reflected a "viewpoint based funding decision[]," <u>Rust</u>, 500 U.S. at 193, aimed at using private speakers to convey a government message, the Court struck down the oath requirement. <u>Id.</u> at 513.

another way." <u>Rust</u>, 500 U.S. at 193. Here, however, Plaintiffs do not seek funding for the dissemination of viewpoints contrary to the Government's own program. They do not contest, as the plaintiffs did in <u>Rust</u>, the viewpoint-based restrictions imposed on activities conducted with government funds. Rather, they seek only to use their private funds to consider and pursue "alternative program[s] which [seek] to deal with the problem in another way." <u>Id.</u> This distinction is of paramount importance.

Defendants claim that the unprecedented degree of government restriction on competing viewpoints imposed by the Policy Requirement is warranted because of the broad scope of the government message that the Act conveys. The Government argues that because the Act sets forth a congressional policy of "eradicating prostitution, the sex trade, rape, sexual assault, and sexual exploitation of women and children," 22 U.S.C. § 7611(a)(4), the Policy Requirement is necessary to ensure that the government aim, and its message, are not undermined by the privately funded activities of Plaintiffs. The Government points out that "when the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." <u>Velazquez II</u>, 531 U.S. at 541 (internal quotation omitted).

-101-

The Government's argument would, upon first review, appear to be answered by Rust, the very precedent which it advances in support of its position, as there the Court upheld a viewpoint discriminatory funding requirement in part because the regulations implementing the funding restriction allowed for adequate alternative channels of communication, which the Policy Requirement, as currently construed, does not. But the Government argues that the instant case is distinguishable from Rust in that here the government's asserted policy aim -- the eradication of prostitution -- is broader than the goal advanced by the funding program in Rust.

In Rust, the Title X family planning program at issue was limited to pre-conception care, with abortion falling outside the scope of the federally funded program, and thus allowing Title X grant recipients to continue to offer abortion related services with their private funds was not inconsistent with the government program's goals. The Government contends that this is in stark contrast to the program at issue here, where the government has articulated the eradication of prostitution as one of its strategies to fight HIV/AIDS. See 22 U.S.C. § 7611(a)(4). Thus, the Government's argument goes, to allow grant recipients to advocate, even with their private funds, for decriminalization, unionization or tolerance of prostitution is inconsistent with the program goals of the Act

-102-

to a greater extent than was the case in Rust.[45]

While the Government's argument is commendably creative, the Court cannot credit it as justifying the Policy Requirement's restriction on private funds.  The plain fact is that in Rust, the regulations the Supreme Court upheld were designed to address precisely the same kind of mixed message concern that the Government complains of here.  In Rust, the Secretary of Health and Human Services defended the "program integrity" regulations, which provided for the separation of the government funded Title X project from privately funded projects engaged in by the same organization involving abortion related services, as necessary to assure that "grantees avoid creating the appearance that the Government is

---

[45]  The Court finds it noteworthy that the Government's asserted interest in eradicating prostitution may not be entirely inconsistent, or at least not as inconsistent as Defendants suggests, with Plaintiffs' aims of reaching out to and empowering prostitutes in the fight against HIV/AIDS.  In the supporting documents and exhibits submitted to the Court, there is mention of at least one program that, though involving the engagement of the prostitution community, ultimately had the effect of reducing prostitution overall in the region in which the program operated.  The Sonagachi Project in Calcutta, India not only helped produce low rates of HIV infection among prostitutes, but also contributed to a decrease in prostitution as economic and social barriers to exiting the sex industry were eased.  (See Beyrer Decl. ¶ 42.) While the Sonagachi Project did not, at least insofar as this Court is aware, go as far as to advocate for the legalization of prostitution, it did provide prostitutes with a number of supportive services (e.g., adult literacy programs, loan assistance, group training sessions, and informal daily meetings in the "red light" districts), activities sufficiently supportive of prostitution to engender the criticism of Representative Mark Souder and twenty-eight other Members of Congress in a letter to USAID, characterizing the project as "pro-prostitution."  (Letter from U.S. Representative Mark Souder et. al., to Andrew Natsios, Administrator of USAID, dated July 15, 2005, attached to Diller Decl. as Exhibit 10.)  The Court highlights this example to point out that, to the extent the Government advances its interest in the eradication of prostitution as a justification for its interpretation of the Policy Requirement, it is arguable, as Plaintiffs note, that activities supportive of prostitutes themselves, and conceivably facilitating prostitution in the short term, may indeed in the long run serve Congress's goal of eradication of prostitution.

supporting abortion related activities." See Rust, 500 U.S. at 188 (noting that "the program integrity regulations were promulgated in direct response to the observations in the GAO and OIG reports that because the distinction between the recipients' Title X and other activities may not be easily recognized, the public can get the impression that Federal funds are being improperly used for abortion activities") (internal quotation and citation omitted). The regulation was thus specifically promulgated to address the potential for the same mixed message concern that is proffered by the Government here. While the Supreme Court found this concern sufficient to restrict the grant recipients' speech with regard to their federal funds, it explicitly relied on the existence of adequate channels of alternate communication for the grant recipients in doing so. See id. at 196-97. The Government's effort to extend Rust to allow for viewpoint based speech restrictions on grant recipients' private funds on the basis of concerns about a mixed message goes beyond what has been permitted in any of the Supreme Court unconstitutional conditions cases addressing this issue.[46]    See id. at 173;

---

[46] The rationale proposed by the Government is problematic because it has no inherent limits and presumably could be manipulated to allow for almost any viewpoint based restriction - simply through the crafting of a sufficiently broad "government message." As was recognized in Velazquez II, "Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." 531 U.S. at 547. Furthermore, the Court does not agree with the notion that government contractors running potentially competing government and non-government programs necessarily detracts from the government's interests or messages. Indeed, this is not uncommon among those who work for and with the government. For example, pursuant to the President's

League of Women Voters, 468 U.S. 364; Regan, 461 U.S. 540.

Even if the Court found this argument persuasive, it would still decline to allow the government to impose the viewpoint based restriction at issue in this case, as the Government's arguments are deeply undercut by the Act's provisions excepting certain organizations from the Policy Requirement.  As these carve out provisions, and the way in which they undermine the government's asserted interests, have already been discussed in Section IV.A.2.b.i, the Court will not detail again this point here.  It is sufficient to say that the government's purported interest in the sanctity of its message cannot bear the weight of banning Plaintiffs' privately    funded    speech    when    specifically    exempted organizations, without any justification offered, are free to maintain and express any policy they wish, or no policy at all, while accepting funds under the Act.

iii. The Act Unconstitutionally Compels Speech

Furthermore, the Government's viewpoint based restriction is even more offensive to the First Amendment as it improperly compels speech by affirmatively requiring Plaintiffs to adopt

---

charitable initiative for faith-based organizations, such organizations may use federal funds to provide services and assistance to those in need, but "organizations that engage in inherently religious activities, such as worship, religious instruction, and proselytization, must offer those services separately in time or location from any programs or services supported with direct Federal financial assistance," though the organizations remain free to engage in these activities and types of speech when acting without federal assistance.  See Presidential Executive Order No. 13279, 67 Fed. Reg. 77141 (Dec. 12, 2002).  A second example arises with defense contractors, who routinely provide services to the United States Armed Services while at the same time working for potentially competing nations.

a policy espousing the government's preferred message. The Government defends this component of the requirement by again pointing to Congress's power pursuant to the Spending Clause, arguing that Plaintiffs cannot claim to be compelled as they are free to turn down the funds. The Government's response is another variation on its contention, relied on throughout its papers, that because the Act's restrictions on First Amendment freedoms reach Plaintiffs only if they choose to accept federal funds, such restrictions may be as broad and far-reaching as the government desires. This somewhat cavalier take-it-or-leave-it answer to an infringement of speech -- which can more or less be characterized as "if you don't like it, lump it" -- is simply not in keeping with the expectations our society derives from First Amendment freedoms and how government would respond to their invocation. The Supreme Court has repeatedly found that speech, or an agreement not to speak, cannot be compelled or coerced as a condition of participation in a government program. Whether the government is acting as an employer, a contractor, a patron, or in offering tax exemptions or public services, the principle remains the same: the government's ability to condition participation in its programs by the beneficiaries' relinquishment of constitutional protections is far from limitless. See, e.g., Perry, 408 U.S. at 597 (state, acting as employer, cannot condition teaching position upon

-106-

refraining from public or private criticism of college administration's policies); <u>O'Hare Truck Serv., Inc. v. City of Northlake</u>, 518 U.S. 712, 725-26 (1996) (while the government, as contractor, may terminate at-will relationships without cause, "it does not follow that this discretion can be exercised to impose conditions on expressing, or not expressing, specific political views"); <u>Speiser</u>, 357 U.S. at 518 (rejecting the argument that because tax exemptions may be characterized as "privileges," they cannot constitute infringements of free speech); <u>see also</u> <u>Wooley v. Maynard</u>, 430 U.S. 705 (1977) (finding unconstitutional a requirement that drivers use license plate bearing state motto in order to use roadways); <u>West Virginia State Bd. of Educ. v. Barnette</u>, 319 U.S. 624 (1943) (state could not compel schoolchildren to participate in flag salute and pledge as a condition of receiving access to public education).

The Government argues that these cases are inapposite as none of them involve a selective spending program in which Congress "simply designed a limited program to expend government funds for a particular purpose." (<u>See</u> Def. Mem. at 35.) Admittedly, the compelled speech cases discussed do not concern Spending Clause enactments. Nonetheless, that the Policy Requirement at issue here arises out of a Spending Clause enactment, and thus is not a direct regulation of speech, is not enough to distinguish it from the overriding

-107-

principle that emerges from these cases: that the government cannot compel speech in exchange for participation in a government program, even a program to which there is no direct entitlement. Cf. FAIR, 126 S.Ct. at 1308 (in upholding the Solomon Amendment's requirement that universities provide military recruiters equal access to campus as a condition of receiving government funding, the Court found that the funding provision compelled conduct as opposed to speech, while noting that "there is nothing in this case approaching a Government-mandated pledge or motto that the school must endorse"). While it is also true that Plaintiffs can turn down the funds and avoid the compelled speech, this option is not sufficient to cure the heavy burden imposed by the Policy Requirement, especially because the provision extends to Plaintiffs' entire organizations.[47]  The requirement essentially enlists the government's private partners to convey the government's message and renders these organizations, on this particular issue, de facto mouthpieces for its view. Cf. Wooley, 430 U.S. at 715-17 (striking down a state provision that effectively forces an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable" and noting that "where the state's

---

[47]  In addition, Plaintiffs have asserted that they face strict penalties if they are found to violate the Policy Requirement, as the Defendant agencies retain the ability to unilaterally terminate their contracts, permanently disqualify them from receiving future funding, or even seek a refund of money already disbursed. (See Pl. Mem. at 22 n.21; Pl. Reply at 19 n.12.)

interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message"). The outcome for which the Government advocates would result in a potentially troublesome government funding arena, one in which the government would have the unmitigated ability to wield its spending power to play favorites, as described above, by supporting and thereby strengthening only those NGOs, entities, and individuals that convey messages supportive of the government's viewpoint, while placing at a disadvantage, and potentially weakening, those that decline to endorse the government's message. Insofar as the government engages in this form of viewpoint favoritism among significant players in the public debate of vital issues, whether by coercion or by inducements available only to those who would agree with the government's line, the practice would tend to offset the delicate balance of the power relationship between the government and the public that the First Amendment works to calibrate.

　　　3.　　AOSI and Pathfinder Have Demonstrated a Likelihood of Success on Their Constitutional Claims

Because the provision as construed by Defendants cannot survive heightened scrutiny, and also impermissibly discriminates based on viewpoint and compels speech, it violates the First Amendment. Though Plaintiffs have also

-109-

asserted, as an additional basis for enjoining Defendants from enforcing the Policy Requirement, that the provision is unconstitutionally vague,[48] the Court will not reach this argument at it has already determined that an injunction is warranted for the reasons already discussed.

### 4. <u>OSI Has Not Demonstrated a Likelihood of Success With Regard to Its Claim for Relief</u>

In seeking a declaratory judgment that the Policy Requirement cannot be applied to include OSI's activities, Plaintiffs express two related, but distinct, concerns. First, Plaintiffs have expressed a fear that USAID may attempt to impose the Policy Requirement directly upon OSI. This concern is easily dispensed with, as Defendants concede that OSI is not subject to the Policy Requirement because it is not a recipient of funding under the Act, either as a grantee or sub-grantee. (<u>See</u> Def. Mem. at 26 & 44 n.29.) In no

---

[48] Plaintiffs claim that the policy requirement is impermissibly vague in three ways: it is unclear as to (1) the required content of a policy statement; (2) which privately funded activities will be construed as inconsistent with an opposition to prostitution; and (3) whether OSI's activities will be imputed to AOSI for purposes of ascertaining compliance.

The principal point of contention between the parties is the appropriate standard for assessing vagueness challenges in circumstances such as these. Plaintiffs argue that the relevant inquiry is whether the policy requirement fails to provide (1) a "person of ordinary intelligence a reasonable opportunity to know what is prohibited" and (2) "explicit standards for those who apply [it]." (Pl. Reply at 18 (<u>citing</u> <u>Grayned v.</u> <u>City of Rockford</u>, 408 U.S. 104, 108 (1972)).) Plaintiffs contend that this rigorous standard is applicable to cases in which a government benefit is conditioned upon a restriction on speech. Defendants disagree, maintaining that when Congress enacts pursuant to its Spending Clause power, the Constitution tolerates a greater degree of vagueness. In addition, Defendants suggest that, even if the Plaintiffs' heightened standard is used, Defendants have provided sufficient guidance in the form of AAPDs, grant provisions, and informal correspondence and meetings.

uncertain terms, Defendants state that "the Act plainly provides that only funding recipients are subject to the conditions of the" Policy Requirement. (<u>Id.</u> at 44 n.29.) Moreover, this concession is consistent with USAID's current interpretation of the Act. (<u>See</u> USAID, AAPD 05-04, issued June 9, 2005, attached to Rosberger Decl. as Exhibit C and to Diller Decl. as Exhibit 3 (limiting certification of compliance to grantees and sub-grantees).)

Second, Plaintiffs have alleged a concern that OSI's speech will be imputed to AOSI. Accordingly, OSI claims that, absent assurances, it must monitor its own speech for fear that AOSI will be penalized on the basis of OSI's expressive activities. In this regard, Plaintiffs suggest that Defendants' aforementioned concession takes care "to leave open the possibility that Defendants will penalize AOSI for OSI's actions." (Pl. Reply at 23.) Setting aside the sense that Plaintiffs read too much into Defendants' statement, the Court is convinced that rendering a declaratory judgment on this point would be premature, skating too close to Article III's prohibition on the issuance of advisory opinions.

The legal doctrines of standing and ripeness arise out of Article III and the requirement that federal courts adjudicate only actual cases or controversies. See, e.g., <u>Allen v. Wright</u>, 468 U.S. 737, 750 (1984); <u>Abbott Labs. v. Gardner</u>,

387 U.S. 136, 148-49 (1967) ("The basic rationale [of the ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies[.]"); Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation, 79 F.3d 1298, 1305 (2d Cir. 1996) ("A dispute is ripe for adjudication when there is a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.") (citations and internal quotation marks omitted). Central to the ripeness requirement is that courts should not endeavor to resolve contingencies that may or may not occur as expected or may not happen at all. See Thomas v. Union Carbide Agric. Prod. Co., 473 U.S. 568, 580-81 (1985). Although the Court may agree that bringing affiliates within the ambit of the Policy Requirement would raise serious constitutional questions, Defendants simply have not taken any concrete steps in this direction. The prospect that Defendants will scrutinize OSI's speech and activities and impute them to AOSI is speculative and may very well never take place. To issue a declaratory judgment on this issue would be premature, and if OSI continues to monitor its own speech in this fashion, it does so out of an overabundance of caution, and its self-enforced silence cannot properly be said to be caused by Defendants' actions. Accordingly, because Plaintiffs have

-112-

presented insufficient facts on this point to suggest that judicial intervention is required at this juncture, the Court declines to issue a declaratory judgment on this question.

B. <u>IRREPARABLE HARM</u>

Second Circuit precedent recognizes that, in light of our commitment to free speech, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." <u>Paulsen v. County of Nassau</u>, 925 F.2d 65, 68 (2d Cir. 1991) (<u>quoting</u> <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976)); <u>see</u> <u>also</u> <u>Green Party v. New York State Bd. of Elections</u>, 389 F.3d 411, 418 (2d Cir. 2004). Because the Policy Requirement, as interpreted by the Agencies, prohibits certain expressive activities and compels the Plaintiffs to speak in contravention of the First Amendment, Plaintiffs have satisfied this requirement for securing injunctive relief.

Plaintiffs have identified several specific examples of the irreparable harm they face by reason of their loss of First Amendment freedoms. In particular, Plaintiffs allege that AOSI is "chilled from fully planning and participating in a conference regarding sex work that it plans to co-sponsor in June of 2006." (Pl. Reply at 32; see also Suppl. Kushen Decl. ¶ 3 (stating that "AOSI continues to be severely constrained in the program activities we may undertake with our private funds . . . For example, AOSI plans to co-sponsor a

-113-

conference, slated for June 2006 . . . [at which] AOSI seeks to discuss further key policy issues . . . including the legal status of sex work . . . due to the pledge requirement, we are chilled from fully planning and participating in the conference").) Pathfinder has alleged that it cannot resume, with its private funding, its work with community organizations in Brazil that have sought legal reform of prostitution laws in that country in an effort to help prostitutes avoid exploitation and abuse. (Pellegrom Decl. ¶ 20.) One additional way in which Plaintiffs face irreparable harm by reason of the Policy Requirement is the potential effect that the requirement can have on Plaintiffs' private fund-raising activities. As is discussed in Section IV.A.2.a.iii, certain of Plaintiffs privately donated grants are potentially at risk to the extent that those funds are subject to conditions placed by private sources conflicting with those imposed by the Policy Requirement. For example, AOSI and OSI have, "as their principles of governance, an adherence to the principles of an open society, including opposition to adopting any policy positions that would lead to the stigmatization of socially marginalized groups." (Compl. ¶ 36.) Plaintiffs allege that adopting a policy opposing prostitution violates this principle. (Id.) Given these circumstances, the Court finds that Plaintiffs have made the necessary showing of irreparable harm.

-114-

## V. ORDER

For the reasons stated above, the Court concludes that absent a preliminary injunction, AOSI and Pathfinder will suffer irreparable harm from Defendants' enforcement of the Policy Requirement, which is likely to violate the First Amendment. Accordingly, it is hereby

**ORDERED** that the parties to submit to the Court, within fourteen days of the date of this Order, a proposed preliminary injunction conforming with the determinations in this Decision.

**SO ORDERED.**

Dated:   New York, New York
         9 May 2006

Victor Marrero
U.S.D.J.

-115-