## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____  )
                                )
DKT INTERNATIONAL, INC.         )
                                )
            Plaintiff,          )
                                )
                                )   Civ. No. 05-1604 (EGS)
        v.                      )
                                )
UNITED STATES AGENCY FOR        )
INTERNATIONAL DEVELOPMENT,      )
et al.,                         )
            Defendants.         )
_____  )
```

### MEMORANDUM OPINION

Plaintiff DKT International, Inc. ("DKT") commenced this action seeking declaratory and injunctive relief against the United States Agency for International Development and its Administrator, Andrew S. Natsios (collectively "USAID") to protect its First Amendment right to freedom of speech.  DKT challenges the constitutionality of the USAID's enforcement of the organizational eligibility restriction, *see* 22 U.S.C. § 7631(f), under the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Leadership Act"), *see* Pub. L. No. 108-25, 117 Stat. 711, codified at 22 U.S.C. § 7601-7682.  The organizational eligibility restriction prohibits USAID funds from being disbursed to any organization that does not have a policy explicitly opposing prostitution and sex trafficking. 22 U.S.C. § 7631(f).

USAID issued the Acquisition and Assistance Policy Directive 05-04 ("AAPD 05-04") to implement 22 U.S.C. §§ 7631(e) and (f). AAPD 05-04 requires recipients of Leadership Act funds to certify that they have a policy opposing prostitution and sex trafficking.  DKT does not have an institutional policy opposing prostitution or sex trafficking.  Thus, DKT argues that 22 U.S.C. § 7631(f) and AAPD 05-04 are unconstitutional as applied for they require DKT to adopt a policy and to certify that it has a policy explicitly opposing prostitution in contravention of DKT's First Amendment rights.

Pending before the Court are the plaintiff's Motion for Preliminary Injunction and the defendants' Motion to Dismiss. With the consent of the parties, their respective motions are consolidated with the proceedings on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. *See* Scheduling Order, Oct. 12, 2005, *DKT v. USAID, et al.* (CA 05-1604)(EGS). Hence, the parties' respective motions are construed as cross motions for summary judgment.  A hearing on these motions was held on December 20, 2005.  Upon careful consideration of the parties' cross motions, the responses and replies thereto, the briefs of the amici curiae, the oral arguments of counsel, and the entire record herein, as well as the governing statutory and case law, the Court concludes that 22 U.S.C. § 7631(f) is unconstitutional as applied to DKT to the extent that it requires

DKT to have a policy explicitly opposing prostitution and sex trafficking.  Further, AAPD 05-04 is unconstitutional as applied to DKT to the extent that it requires DKT to certify that it has a policy explicitly opposing prostitution and sex trafficking.  Accordingly, plaintiff's Motion for Summary Judgment is **GRANTED** and defendants' Motion for Summary Judgment is **DENIED.**

I.   **BACKGROUND**

   A.   **22 U.S.C. § 7631(f) and AAPD 05-04**

   Finding that "[d]uring the last 20 years, HIV/AIDS has assumed pandemic proportions, spreading from the most severely affected regions, sub-Saharan Africa and the Caribbean, to all corners of the world," 22 U.S.C. § 7601(1), Congress enacted the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Leadership Act") in May of 2003.  The Leadership Act created a $15 billion program dedicated to fighting the worldwide spread of HIV/AIDS. *See* 22 U.S.C. § 7601(1).  The introduction to the Leadership Act states that over 65 million people have been infected with HIV/AIDS since the epidemic began, and that "[w]omen are four times more vulnerable to infection than are men, and are becoming infected at increasingly high rates, in part because many societies do not provide poor women and young girls with the social, legal, and cultural protections against high risk activities that expose them to HIV/AIDS." *Id.* at § 7601(3)(B).  Recognizing that

3

"prostitution and other sexual victimization are degrading to
women and children," the Leadership Act provides that it is "the
policy of the United States to eradicate such practices." *Id*. at
§ 7601(23).

Organizations, otherwise eligible to receive funding under
the Leadership Act for their work in preventing, treating, and
monitoring the spread of HIV/AIDS, must abide by two limitations.
First, the Leadership Act provides that its funds may not "be
used to promote or advocate the legalization or practice of
prostitution or sex trafficking." *Id*. at § 7631(e) (hereinafter
the "funding restriction").  Second, the Leadership Act prohibits
its funds from being "used to provide assistance to any group or
organization that does not have a policy explicitly opposing
prostitution and sex trafficking." *Id*. at § 7631(f) (hereinafter
the "organizational eligibility restriction").  The principle
legal issue in this case arises from the second restriction on
funding – the organizational eligibility restriction of §
7631(f).

USAID is authorized to award grants, cooperative agreements
and contracts pursuant to the Leadership Act. *See* 22 U.S.C. §
2151 *et seq.*  On June 9, 2005, USAID issued AAPD 05-04 to
implement the Leadership Act.  AAPD 05-04 requires, among other
things, that HIV/AIDS grants and cooperative agreements with U.S.
and non-U.S. non-governmental organizations include a specific

4

provision entitled "Prohibition on the Promotion or Advocacy of the Legalization or Practice of Prostitution or Sex Trafficking" ("Standard Provision").  The Standard Provision requires recipients of HIV/AIDS treatment and prevention funds under the Leadership Act to have or to adopt a policy explicitly opposing prostitution and sex trafficking.  Specifically, AAPD 05-04 requires the following language to be included in all grants or cooperative agreements/sub-agreements funded with FY04-FY08 Leadership Act funds:

> The U.S. Government is opposed to prostitution and related activities, which are inherently harmful and dehumanizing, and contribute to the phenomenon of trafficking in persons. None of the funds made available under this agreement may be used to promote or advocate the legalization or practice of prostitution or sex trafficking . . . .
>
> Except as noted in the second sentence of this paragraph, as a condition of entering into this agreement or any sub-agreement, a non-governmental organization or public international organization recipient/subrecipient must have a policy explicitly opposing prostitution and sex trafficking. The following organizations are exempt from this paragraph: the Global Fund to Fight AIDS, Tuberculosis and Malaria; the World Health Organization; the International AIDS Vaccine Initiative; and any United Nations Agency.

AAPD 05-04 at 5.

Further, AAPD 05-04 requires all recipients of FY04-FY08 Leadership Act funds to provide to the USAID Agreement Officer a certification substantially as follows:

> [Recipient's name] certifies compliance as applicable with the standard provision entitled . . . "Prohibition on the Promotion or Advocacy of the Legalization or Practice of

Prostitution or Sex Trafficking" included in the referenced agreement.

AAPD 05-04 at 6 (hereinafter the "certification requirement").

**B.   Plaintiff DKT**

Plaintiff DKT is a not-for-profit organization that provides family planning and HIV/AIDS prevention programming in eleven different countries around the world, including Vietnam. Joint Statement of Undisputed Facts ("Joint Statement") ¶¶ 7, 8.  DKT has received USAID funding in the past for its HIV/AIDS prevention work, often as a subgrantee of other direct grantees of USAID. *Id*. at ¶ 9.  DKT also receives funding for its HIV/AIDS work from other donors from around the world, including private donors, foundations, international organizations, and other governments. *Id*. at ¶ 10.  USAID funding to DKT represents about 16 percent of DKT's total organizational budget. Compl. ¶ 26.

Since 1998, DKT has been implementing a condom distribution project in Vietnam with USAID funding called "100% Condom Access." Holzman Declaration ¶ 7.  Another non-governmental agency, Family Health International ("FHI"), was the direct grantee from USAID and, with USAID's permission, FHI executed a subgrant to DKT. *Id.*  The most recent grant under this program was awarded in July 2003, and it expired on June 30, 2005. *Id.* When some funds remained unspent at the end of the grant period, DKT requested from FHI a "no-cost extension" to permit it to use

the unspent grant funds on the condom distribution program for two additional months. *Id.* at ¶ 8.

On June 27, 2005, FHI sent to the DKT representative in Vietnam the relevant amendment to the sub-agreement for the no-cost extension, which had been approved by USAID. *Id.*  The DKT representative signed the no-cost extension amendment; however, he voided his signature when he saw that FHI and USAID required him to certify that DKT "has a policy explicitly opposing prostitution and sex trafficking." *Id.* at ¶ 9.  The no-cost extension amendment provided that the certification requirement "is an express term and condition of the agreement and any violation of it shall be grounds for unilateral termination of the agreement by FHI or USAID prior to the end of its term." Compl. ¶ 16.  The DKT representative refused to sign the no-cost extension amendment and sought a waiver of the certification requirement. Joint Statement ¶ 17.  The DKT representative was informed that the certification requirement could not be waived. Holzman Decl. ¶ 11.  On July 13, 2005, however, FHI informed DKT that the no-cost extension amendment could go forward without DKT's adherence to the certification requirement because "the funds for DKT's sub-agreement with FHI originated prior to the application of USAID guidance on anti-prostitution." Joint Statement ¶ 20.

Concurrently with the discussions regarding the no-cost

7

extension, on June 27, 2005, FHI notified DKT that FHI had received permission from USAID to fund a condom lubricant proposal in Vietnam, which DKT had submitted to FHI and USAID several months earlier. Joint Statement ¶ 20.  On June 28, 2005, FHI further informed DKT that it would provide $60,000 to DKT in USAID funds to undertake that proposal. Holzman Decl. ¶ 14; Complaint ¶ 14.  When the DKT representative refused to sign the sub-agreement with the certification requirement, FHI cancelled the grant for the condom-lubricant program.  FHI informed DKT that,

> [i]t is FHI's policy that its subrecipients commit, among other things, to not promoting the legalization or practice of prostitution or sex trafficking. You have indicated that DKT declines to sign the certification form provided to you to that effect.

> The FHI policy and certification requirement is in compliance with FHI's Agreement with USAID, including USAID Acquisition and Assistance Policy Directive 05-04 issued June 9, 2005.  Thus FHI is unable to provide additional funding to DKT.

Joint Statement ¶ 21.

DKT states that, as an organization, it does not have a policy either opposing or supporting prostitution. Holzman Decl. ¶ 18.  Further, DKT objects to, and will not adopt, a policy "opposing prostitution." *Id.*  DKT believes that a policy explicitly opposing prostitution will likely result in stigmatizing and alienating many of the people vulnerable to HIV/AIDS - the sex workers - and may result in limiting access to

the group DKT is trying to reach in its field work in Vietnam.[1]

*Id.* at ¶ 20.

---

[1] The Court notes that various organizations have moved to file as *amici curiae* in this case. The *amici curiae* have provided to the Court insightful arguments addressing the policy issues at the center of this case. The Court has permitted the following public health groups and non-governmental organizations that provide services or conduct programs, research or advocacy to combat HIV/AIDS to jointly file a memorandum of law in support of plaintiff's motion for summary judgment: AIDS Action; American Foundation for AIDS Research; American Humanist Association; the Center for Health and Gender Equality; the Center for Reproductive Rights; the Center for Women Policy Studies; the Community HIV/AIDS Mobilization Project; the Feminist Majority Foundation; the Gay men's Health Crisis; the Global AIDS Alliance; the Guttmacher Institute; the Human Rights Center, University of California, Berkeley; Human Rights Watch, the Institute of Human Rights at Emory University; International Planned Parenthood Federation, Western Hemisphere Region; the International Women's Health Coalition; Physicians for Human Right; Planned Parenthood Federation of America, Inc.; Population Action International; the Population Council; and the Religious Consultation on Population, Reproductive Health and Ethics.

The Court has also permitted the following organizations that provide services, including HIV/AIDS prevention services, to women, men, and children in prostitution, to jointly file a memorandum of law in support of defendants' motion for summary judgment: Apne Aap; Association IROKO; the Association of Women in Contemporary Society; BAGONG Kamalayan Collective; Bilateral Safety Corridor Coalition; Breaking Free; BUKLOD; Center for Counseling and Information on Sexual Violence (Stigamot); Girls Education and Mentoring Services (GEMS); International Union – Center for Foreign Citizens and Migrants Rights and Security; Kvinnefronten (Women's Front); Minorities and Survivors Improving Empowerment (MASIE); MiraMed Institute; Pandora; Prerana; Prostitution Research and Education; Standing Against Global Exploitation (SAGE); Shelter Movement Secretariat; and Veronica's Voice.

## II.   STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In ruling on cross-motions for summary judgment, the Court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975).

## III. DISCUSSION

The primary question before the Court is to what extent a recipient of United States government funds must adopt an explicit policy of the United States government in order to be eligible to receive federal funding.

### A.   Plaintiff's Arguments

DKT argues that requiring it to adopt and to certify that it has a policy explicitly opposing prostitution and sex trafficking as a condition of entering into an agreement (or sub-agreement) with USAID to receive funding for its HIV/AIDS prevention work constitutes viewpoint-based restriction on speech.  Further, DKT contends that such viewpoint-based restriction on speech is

10

subject to the highest level of scrutiny for it implicates First Amendment free speech rights.  Finally, DKT maintains that the restriction fails to withstand strict scrutiny for it is not narrowly tailored to further a compelling government interest.[2]

### B.   Defendants' Arguments

Defendants argue that § 7631(f) and its implementing directive, AAPD 05-04, are not subject to strict scrutiny under the First Amendment because conditions attached to federal funds by Congress do not directly restrain speech.  The Leadership Act expressly states that, if plaintiff or any organization like it, chooses to adopt a policy that is inimical to the federal goal of eradicating prostitution, which is a factor in and cause of the spread of HIV/AIDS, it is not eligible for government subsidies aimed at fighting HIV/AIDS.  Thus, defendants maintain, DKT is free to adopt any policy it wishes with respect to prostitution and sex trafficking; however, the government is not obligated to and will not subsidize the policy DKT has chosen to adopt.  Non-

---

[2] In its complaint, DKT alternatively alleges that the Leadership Act and AAPD 05-04 are unconstitutionally vague because DKT cannot reasonably predict whether its other activities funded by private donors might be deemed by USAID to insufficiently oppose prostitution. *See* Complaint ¶¶ 27, 28.  DKT does not assert the vagueness challenge in its preliminary injunction motion (now converted into a summary judgment motion). The government, however, has addressed the issue in its motion to dismiss (now converted into a summary judgment motion). The Court does not reach the merits of the vagueness claim for the Court has found that the speech restriction found in § 7631(f) and AAPD 05-04 are unconstitutional conditions as applied to DKT in violation of the First Amendment.

governmental organizations, like DKT, do not have an entitlement
or a right to government funds.  Thus, DKT's First Amendment
rights are not infringed.  Because DKT challenges the
government's refusal to fund its chosen activities, defendants
contend, the Spending Clause provides the proper framework for
evaluating the funding conditions in question, not the First
Amendment. *See* U.S. Const., Art. I, § 8, cl. 1 (empowering
Congress to "lay and collect Taxes, Duties, Imposts, and Excises,
to pay the Debts and provide for the common Defense and general
welfare of the United States").

Pursuant to its powers under the Spending Clause, the
government argues that it is implicitly authorized to legislate
funding eligibility restrictions.  Eligibility restrictions, such
as the one found at § 7631(f), ensure that (1) the government's
goals are not distorted and "garbled" by its grantees; (2)
government funds do not free up other funds the grantee may have
to pursue contrary or inconsistent goals; and (3) the government
speaks with a single, clear voice in the international arena
concerning its policy.[3]

---

[3] Defendants also make a jurisdictional argument that is
devoid of merit.  They contend that the Court lacks jurisdiction
to consider one of the plaintiff's requests for relief because
plaintiff is asking the Court to disburse funds controlled by
FHI, who is not before the Court.

Defendants' argument is based on a false premise because it
mischaracterizes plaintiff's request for relief. Plaintiff is not
asking the Court to compel USAID to instruct FHI to award a grant

## C.   Viewpoint and Content Based Discrimination

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995).  Simply put, "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Id.* Moreover, "[t]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  After all, "the right to speak and the right to refrain from speaking are complementary components of the broader concept of individual freedom of mind." *Id.*  Thus, all forms of viewpoint discrimination are "an egregious form of content based discrimination," *Rosenberger*, 515 U.S. at 828, and as such, "the government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker

---

to DKT; rather, if § 7631(f) and AAPD 05-04 are no longer applicable to DKT, it requests that USAID inform FHI that DKT need not be subject to the certification requirement prior to receiving USAID funds from FHI.  FHI may apply other criteria to its decision as to whether to award a subgrant to DKT, and the Court's order to USAID would not require FHI to award the grant to DKT.  Therefore, the Court has jurisdiction to hear this case and the case is ripe for adjudication.

is the rationale for the restriction." *Id.*

Further, the Supreme Court has repeatedly held that the government may not compel private individuals or organizations to speak in a content-specific, view-point specific manner as a condition of participating in a government program. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (holding that the state could not compel children to recite the pledge of allegiance as a condition of receiving a public school education); *Speiser v. Randall*, 357 U.S. 513 (1958) (striking down a California law that required veterans to pledge that they would not advocate for the overthrow of the government to qualify for a property-tax exemption as an unconstitutional restriction on their speech).

Nor does the fact that there is no "right" to participate in a government grant dictate a different result. *See Perry v. Sinderman*, 408 U.S. 593, 597 (1972) ("[t]his Court has made clear that even though a person has no 'right' to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely.  It may not deny a benefit to a person on a basis that infringes his constitutionally protected interest - especially, his interest in freedom of speech.  For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise

14

of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which it could not command directly.'")(internal citations omitted).

As a result, content-based restrictions on speech are constitutional only if they withstand strict scrutiny. *See Sable Commc'n of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989).  If a statute regulates speech on its content, it must be narrowly tailored to promote a compelling government interest. *Id.*  If a less restrictive alternative would serve the government's purpose, the legislature must use that alternative. *Id.*

The organizational eligibility restriction of the Leadership Act, 22 U.S.C. § 7631(f), and AAPD 05-04's certification requirement are not view-point neutral requirements.  They require the grantees, such as DKT, to adopt a policy and to certify that it has a policy "explicitly opposing prostitution," thus precluding grantees from maintaining silence or neutrality, or adopting a policy explicitly favoring the legalization of prostitution.  As such, they are view-point based funding restrictions, which, as applied to DKT, restrict its private speech.  *See FCC v. League of Women Voters of Ca.*, 468 U.S. 364, 384 (1984) (holding that a law that prohibited public radio stations that received federal funding from editorializing on air was a content-based restriction on speech for the regulation of speech was "motivated by nothing more than a desire to curtail

15

expression of a particular point of view on controversial issues of general interest").

### D. Narrowly Tailored to Further a Compelling Government Interest

Having concluded that § 7631(f) and AAPD 05-04 are viewpoint based funding requirements, DKT cannot be categorically compelled by the government to abide by such requirements as conditions of participating in a government program unless the requirements pass the highest level of First Amendment scrutiny. In other words, § 7631(f) and AAPD 05-04 must be narrowly tailored to further a compelling government interest in order to withstand constitutional scrutiny. *See Sable Commc'n,* 492 U.S. at 126.

The government maintains that § 7631(f) and AAPD 05-04 are narrowly tailored to further compelling government interests of preventing "garbling" of policy goals, maintaining the integrity of federally funded programs, and speaking in a single voice in the international arena.  Specifically, the government argues that "when the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." *Legal Serv. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001) (quoting *Rosenberger*, 515 U.S. at 833).  Also, it contends that its goals should not be undercut by its very own grantees.  For example, if grantees,

16

like DKT, are not required to have a policy opposing prostitution, they may use their private funds freed up by the receipt of government funds to pursue contrary or inconsistent policies and goals.

Finally, the government maintains that it has a compelling interest to speak in a single voice when it comes to important international issues such as HIV/AIDS prevention and treatment, not only with its words and funds, but also with its associations.  Thus, it argues, were it to affiliate with organizations that do not share its policy goals, the United States government's position as a world leader in the fight against HIV/AIDS would be undermined.  Accordingly, the United States government strives to be perceived as having a firm, unilateral policy toward HIV/AIDS treatment and prevention.

In the Court's view, despite the government's interests in ensuring that public funds are spent accordingly and that its message is not mixed or garbled, the organizational eligibility restriction of § 7631(f) and the certification requirement of AAPD 05-04 are not drawn as narrowly as possible to permit the government to control the use of its funds while infringing minimally on the exercise of constitutional rights.  The government's interest in preventing garbling of its message, maintaining integrity of federal programs, and speaking in a single voice cannot result in compelling organizations, like DKT,

to parrot the government's policies.  There is a less restrictive way in which the government can ensure that its message is not garbled or mixed, and its programs are maintained.  For example, § 7631(e) articulates the funding restriction of the Leadership Act.  The funding restriction mandates that government funds may not be used to promote or advocate the legalization or practice of prostitution or sex trafficking. *See* 22 U.S.C. § 7631(e).  In short, under § 7631(e), government funds earmarked for a particular purpose and goal will be utilized solely for that purpose and goal.  Federal money for federal programs in furtherance of government goals and polices, even if administered by private entities, will be spent accordingly, pursuant to § 7631(e).  Therefore, the government message is far from garbled; the integrity of federal programs is not jeopardized; and the U.S. government is not perceived as sending mixed messages.

In contrast, the organizational eligibility restriction of § 7631(f) takes the narrowly tailored restriction of § 7631(e) one step too far.  Because 7631(f) casts too wide a net and is not narrowly tailored, DKT's exercise of its private speech funded by private means is infringed.  In other words, because § 7631(f) is not narrowly tailored, it broadly and impermissibly binds both the private and public funds of DKT.  Since the government does not have a compelling interest in forcing private organizations to adopt its views in all instances, § 7631(f) is not narrowly

tailored to further a compelling government interest. *See Planned Parenthood of Central and Northern Ariz. v. Ariz.*, 718 F.2d 938, 945 (9th Cir. 1983) (holding that the statute withdrawing all state funds from  organizations performing abortion-related activities was not narrowly tailored, and pointing out that "a more narrowly tailored statute, which would accomplish the stated purpose of ensuring that state funds not be spent on activities the state legislature disfavors, would simply forbid entities receiving state funds from using those funds for abortions").

Moreover, the government's interest in speaking with one voice in the international arena is undercut by the language in § 7631(f) that explicitly exempts certain international organizations from the organizational eligibility restriction. Organizations such as the Global Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, and the International AIDS Vaccine Initiative are all recipients of U.S. funding, however, they are exempt from having to adopt a policy explicitly opposing prostitution and sex trafficking.  It could hardly be argued that the United States government's reputation as a world leader in the fight against HIV/AIDS has been tarnished or jeopardized by the fact that it aligns itself with these organizations who do not have explicit organizational policies against prostitution.

**E.    Congressional Spending Power**

The Supreme Court has clearly held that the spending power of Congress is not unlimited. *See South Dakota v. Dole*, 483 U.S. 203, 207 (1987). In fact, "constitutional provisions may provide an independent bar to the conditional grant of federal funds." *Id.* at 208.  After all, "financial inducements offered by Congress may be so coercive as to pass the point at which pressure turns into compulsion." *Id.* at 211.  Yet, the government, without violating the Constitution, can "selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). Government encouragement of another activity consonant with its legislative policy is not view-point based discrimination. *Id. See also Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right."). Moreover, view-point based funding decisions can be sustained in situations in which the government is itself the speaker, *see Bd. of Regents of Univ. of Wis. Sys. v. Southworth,* 529 U.S. 217, 229 (2000), or when the government is "us[ing] private speakers to transmit specific information pertaining to its own program." *Rosenberger*, 515 U.S. 819, 833 (1995).

20

The law is clear that when the government spends taxpayer funds, it can put limits on those funds to ensure that those funds establish the task the government intends.  One of the principle decisions elucidating this point is *Rust v. Sullivan,* 500 U.S. 173 (1991).  *Rust* is binding precedent and, to the extent that the parties cite to prior decisions of the Supreme Court or other courts that conflict with *Rust,* those cases have been expressly or impliedly overruled and do not bind this Court.

In *Rust*, the government provided grant money under Title X to public and nonprofit agencies to support domestic family planning projects, but with a caveat that Title X funds could not be used to fund programs where abortion was a method of family planning.  *Rust* held that the government can selectively fund a program  and can encourage one activity over another (i.e. abstinence and child birth over abortion) without violating the First Amendment because the government is allowed to exercise its preferences and goals.  In reaching its conclusions, the *Rust* Court clearly articulated that Title X did not require Title X grantees to give up their abortion related speech.  Rather Title X merely required its grantees to keep their abortion activities separate and distinct from Title X activities, both physically and financially.

> Title X expressly distinguishes between a *Title X grantee* and a *Title X project*. The grantee, which normally is a health care organization, may receive funds from a variety of sources for a variety of purposes.  The grantee receives

> Title X funds, however, for the specific and limited purpose
> of establishing and operating a Title X project.  The
> regulations govern the scope of the Title X project's
> activities and leave the grantee unfettered in its other
> activities. The Title X grantee can continue to provide
> abortion related services, and engage in abortion advocacy;
> it simply is required to conduct those activities through
> programs that are separate and independent from the project
> that receives Title X funds.

*Rust*, 500 U.S. at 196 (emphasis added).

The *Rust* Court further stated that cases involving "situations in which the government has placed a condition on the *recipient* of the subsidy, rather than on a particular *program or service*, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program," would constitute a case where unconstitutional conditions are placed on an organization in violation of the First Amendment.  *Id.* at 197 (emphasis added).

Plaintiff is not challenging the well-established holding of *Rust*.  What it is challenging, however, is the government's attempts to restrict the uses that DKT may make of its *own private funding*.  As a non-governmental, nonprofit organization, private donors and foundations are the primary sources of DKT's funding.  By mandating that DKT adopt an organizational-wide policy against prostitution, the government exceeds its ability to limit the use of government funds.  The government is effectively precluding DKT from taking any other position on the issue of prostitution in any other context, even with wholly

private funds.

Section 7631(f) and AAPD 05-04 are the types of speech-related conditions attached to government funds the *Rust* Court prescribed.  Section 7631(f) and AAPD 05-04 require grantees to explicitly adopt the government's policy and to be bound by that policy with regard to all of the grantees' other activities, even those outside the scope of the government project and program. It is significant that the Title X grantees in *Rust* continued to have the option of providing abortion-related services using other, non-governmental funds.  Even in circumstances where its speech is paid for by other donors, DKT cannot, according to the government, have the option of having a policy toward prostitution that is contrary to the government's policy or not having a policy at all and remaining silent on that issue.  Such a position is contrary to the holding of *Rust.*

The government urges the Court to read the holding of *Rust* more narrowly by arguing that the *Rust* Court merely upheld the general principle that government funds should be spent for the purposes for which they were authorized.[4]  Thus, the government

---

[4] The government also argues that *Rust* and *DKT Mem'l Fund v. Agency for Internat'l Dev.*, 887 F.2d 275 (D.C. Cir. 1989) stand for the proposition that cases concerning government funding should always be analyzed under the Spending Clause. This is incorrect. The applicable level of review is not based on whether the claims implicate the Spending Clause, but whether the statute and its companion regulation in question operate to restrict expression.  The Supreme Court in *FCC v. League of Women Voters*, 464 U.S. 364 (1984) and *Legal Services Corp. v.*

argues that Title X was meant for family planning activities and the health organizations that received Title X funds were obligated to use the money for family planning activities. According to the government, the Leadership Act is meant to assist in the eradication of prostitution and, in order to achieve that purpose, government funding should be made available only to those organizations that have a policy against prostitution.

By reading the holding of *Rust* narrowly, the government misconstrues it and misstates plaintiff's chief complaint - DKT is not asserting that the government cannot spend its funds for the purposes it targets; rather it challenges the nature of the government's condition, namely that it is a condition on the recipient and not on a particular program.

A case analogous to the situation at hand is *Stanford Univ. v. Sullivan*, 773 F. Supp. 472 (D.D.C. 1991), which was decided soon after *Rust* and followed the holding of *Rust*.  The Court in *Stanford Univ.* held that it was unconstitutional to require researchers to sign the confidentiality clause, which provided that researchers had to give the government advance notice of

_____

*Velazquez*, 531 U.S. 533 (2001) was faced with statutes that operated to restrict expression by conditioning government funding respectively on not editorializing on public radio stations and not challenging the legality of the existing welfare law.  The Court held in both cases that the funding restrictions violated the First Amendment.

their intent to publish their findings and allowed government to block such publications, as a condition to receiving government research funding.  The Court concluded that "[t]he regulations at issue in the instant case broadly bind the grantee and not merely the artificial heart project." 773 F. Supp. at 476.  Because the regulation "is not tailored to reach only the particular *program* that is in receipt of government funds; [rather] it broadly forbids the *recipients* of the funds from engaging in publishing activity related to artificial heart research at any time, under any auspices, and wholly apart from the particular program that is being aided," the government's confidentiality clause cannot withstand First Amendment strict scrutiny. *Id*.

One of the principle cases relied on by the government is *DKT Memorial Fund v. Agency for International Development*, 887 F.2d 275 (D.C. Cir. 1989) ("*DKT Memorial Fund*"), yet that case hardly supports defendants' position.[5]  The government argues that DKT is not actually asserting an infringement of its speech right, rather it is complaining of the government's refusal to fund.

In *DKT Memorial Fund*, the government, under the Foreign Assistance Act ("FAA"), restricted the use of its grant funds against abortions.  Domestic nonprofit organizations that

---

[5] It is noted that *DKT Memorial Fund* was decided prior to *Rust.*

received grant money under FAA had to certify that it "will not furnish assistance for family planning *under this grant* to any foreign non-governmental organization which performs or actively promotes abortion." 887 F.2d at 278.  Unlike AAPD 05-04, however, the certification requirement in *DKT Memorial Fund* did not restrict an organization's use of its private funds and did not demand that an organization become a mouthpiece for a government policy with its private funds. *Id.* at 283 n.5.  *DKT Memorial Fund* was clear that it dealt only with government funds and not with private funds of a private organization. *Id.*  In short, in *DKT Memorial Fund*, USAID placed "no obstacles in the way of those who would perform or promote abortion that were not there before the commencement of the FAA funding," *Id.* at 289, whereas here, USAID indeed has placed an obstacle in the way of DKT that was not there before it sought funding under the Leadership Act.

Finally, the government makes much of the argument that when the government decides not to subsidize the exercise of a fundamental right, that right is not violated, even though DKT does not challenge that legal proposition.  DKT is not demanding subsidies or benefits for the purpose of engaging in protected conduct, which the First Amendment does not require.  Rather it is seeking eligibility for already chosen subsidies or benefits, which the First Amendment precludes being conditioned on forfeiting constitutional rights.  In other words, DKT is not

26

asking the government to subsidize its speech or other protected
activities.  Rather, it seeks to apply for a benefit that already
exists without foregoing its right to free speech.[6]  *See Speiser,*
357 U.S. at 518 (finding that when a property tax exemption is
provided to only those veterans who sign an oath not to overthrow
the government, denying tax exemption to those who engage in
certain speech will necessarily have the effect of coercing the
veterans from the proscribed speech).

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that there
are no genuine issues of material fact in this case and that as a
matter of law, plaintiff DKT is entitled to summary judgment.  42
U.S.C. § 7631(f) and the certification requirement of AAPD 05-04
are unconstitutional under the First Amendment, as applied to
DKT, for they constitute view point based restrictions on speech
and they are not narrowly tailored to further a compelling
government interest.[7]  Therefore, defendant USAID is permanently

---

[6] Conversely, the requirements of § 7631(f) and AAPD 05-04
effectively require DKT to subsidize the government's speech with
DKT's private funds. The government clearly can not mandate such
subsidization.

[7] The Court notes that Judge Victor Marrero of the United
States District Court for the Southern District of New York
recently issued a Memorandum Opinion and Order enjoining USAID
from enforcing 22 U.S.C. § 7631(f) against the plaintiffs because
the requirement violated the First Amendment.  That Court
concluded that § 7631(f) constituted a viewpoint based funding
restriction and that under First Amendment heightened scrutiny,
the requirement was not narrowly tailored to achieve Congress'

**ENJOINED** from (1) requiring DKT to have a policy explicitly

opposing prostitution and sex trafficking under 42 U.S.C. §

7631(f); and (2) requiring DKT to certify that it has a policy

explicitly opposing prostitution under AAPD 05-04.  Accordingly,

the plaintiff's Motion for Summary Judgment is **GRANTED** and the

defendant's Motion for Summary Judgment is **DENIED**.  An appropriate

Order accompanies this Memorandum Opinion.


SIGNED:   **EMMET G. SULLIVAN**
          **UNITED STATES DISTRICT JUDGE**
          **May 18, 2006**

---

goals. *See Alliance for Open Society International, Inc. et al.,*
*v. USAID, et al.,* 2006 WL 1293686 (May 8, 2006).  Substantially
for the reasons articulated by Judge Marrero, this Court concurs
with his ruling.