# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 11, 2007          Decided February 27, 2007

No. 06-5225

DKT INTERNATIONAL, INC.
APPELLEE

v.

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT
AND
RANDALL L. TOBIAS, ADMINISTRATOR, UNITED STATES
AGENCY FOR INTERNATIONAL DEVELOPMENT, IN HIS OFFICIAL
CAPACITY,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 05cv01604)

———

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED    FEB 27 2007
CLERK

FILED
JUN 1 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*Gregory G. Katsas*, Principal Deputy Associate Attorney
General, U.S. Department of Justice, argued the cause for
appellants. With him on the briefs were *Peter D. Keisler*,
Assistant Attorney General, *Jeffrey A. Taylor*, U.S. Attorney,
and *Mark B. Stern*, *Michael S. Raab*, and *Sharon Swingle*,
Attorneys. *Vincent M. Garvey*, Attorney, entered an appearance.

2

*Julie M. Carpenter* argued the cause for appellee. With her on the brief were *Martina E. Vandenberg, Laura K. Abel*, and *David S. Udell*.

*Caroline M. Brown* was on the brief for *amici curiae* Population Council, Inc., et al. in support of appellee.

Before: HENDERSON, RANDOLPH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: The official position of the United States is that eradicating prostitution and sex trafficking is an integral part of the worldwide fight against HIV/AIDS. In awarding grants to private organizations for HIV/AIDS relief efforts, the government – through the U.S. Agency for International Development – only funds organizations that share this view. DKT International refused to certify that it has a policy opposing prostitution and sex trafficking, and therefore did not qualify for a grant. The district court struck down the funding condition on the ground that it violated DKT's freedom of speech under the First Amendment. We reverse.

In 2003 Congress enacted the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act, Pub. L. No. 108-25, 117 Stat 711, and the President proposed $15 billion for fighting the worldwide spread of HIV/AIDS, *see* 22 U.S.C. § 7601(28). The Act directs the President to establish programs "to treat individuals infected with HIV/AIDS," *id.* § 7611(a)(1), to "prevent the further spread of HIV infections," *id.*, and to "maximize United States capabilities in the areas of technical assistance and training and research, including vaccine research," *id.* § 7611(a)(8). The Act states that "the reduction of HIV/AIDS behavioral risks shall be a priority of all prevention

3

efforts in terms of funding, educational messages, and activities by promoting abstinence from sexual activity and substance abuse, encouraging monogamy and faithfulness, promoting the effective use of condoms, and eradicating prostitution, the sex trade, rape, sexual assault and sexual exploitation of women and children." *Id.* § 7611(a)(4).

Congress found that funding the relief efforts of private organizations was "critical to the success" of the international fight against HIV/AIDS. *Id.* § 7621(a)(4). Congress thus authorized the President to "furnish assistance, on such terms and conditions as the President may determine," to nongovermental organizations. *Id.* § 2151b-2(c)(1); *see id.* § 7631(b)(1). The Act requires, however, that funds go only to organizations that share the Act's disapproval of prostitution and sex trafficking. Organizations may not use funds granted under the Act to "promote or advocate the legalization or practice of prostitution or sex trafficking." *Id.* § 7631(e). And under § 7631(f), funds are unavailable "to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking," with the exception of four organizations, three of which are public organizations, and one of which deals only with vaccine research. It is the § 7631(f) condition – that an organization have a policy opposing prostitution and sex trafficking to be eligible for funding – that DKT challenges.

Congress authorized the U.S. Agency for International Development to administer grants, cooperative agreements, and contracts pursuant to the Act. *Id.* § 7602(6); *see* 22 C.F.R. part 226. The Agency implemented § 7631(f) by requiring a boilerplate provision in grant contracts and cooperative agreements, and a certification that applicants are in compliance with the provision. *See* OFFICE OF ACQUISITION & ASSISTANCE, U.S. AGENCY FOR INT'L DEV., AAPD 05-04, IMPLEMENTATION OF THE U.S. LEADERSHIP AGAINST HIV/AIDS, TUBERCULOSIS

4

AND MALARIA ACT OF 2003 – ELIGIBILITY LIMITATION ON THE USE OF FUNDS AND OPPOSITION TO PROSTITUTION AND SEX TRAFFICKING 5-6 (2005). The contractual provision states that recipient organizations and any subrecipients "must have a policy explicitly opposing prostitution and sex trafficking," *id.* at 5, but does not specify any particular language or format. The certification requirement applies only to the prime recipient, *id.* at 6, which must include the boilerplate provision in all subagreements, *id.* at 5. Violation of the provision may be used as a ground for terminating the underlying agreement between the Agency and the prime recipient. *Id.*

DKT International provides family planning and HIV/AIDS prevention programming in foreign countries, and receives about 16 percent of its total budget from Agency grants. DKT operates as a subgrantee under Family Health International (FHI) in Vietnam, where it distributes condoms and condom lubricant. In June 2005, FHI provided DKT with a subagreement to run an Agency-funded lubricant distribution program. Included in the subagreement was a certification that DKT "has a policy explicitly opposing prostitution and sex trafficking." The subagreement stated that the certification requirement "is an express term and condition of the agreement and any violation of it shall be grounds for unilateral termination of the agreement by FHI or [the Agency] prior to the end of its term." DKT did not, and does not, have a policy for or against prostitution and sex trafficking. It therefore refused to sign the subagreement with the certification requirement. FHI then cancelled the grant and informed DKT that FHI was "unable to provide additional funding to DKT."

DKT alleged that it refuses to adopt a policy opposing prostitution because this might result in "stigmatizing and alienating many of the people most vulnerable to HIV/AIDS – the sex workers . . . ." It claims that the certification requirement

5

in § 7631(f) violates the First Amendment because it constrains DKT's speech in other programs for which it does not receive federal funds and because it forces DKT to convey a message with which it does not necessarily agree.

The government may speak through elected representatives as well as other government officers and employees. Or it may hire private agents to speak for it, as in *Rust v. Sullivan*, 500 U.S. 173 (1991). When it communicates its message, either through public officials or private entities, the government can – and often must – discriminate on the basis of viewpoint. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995); *see also DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 289 (D.C. Cir. 1989). In sponsoring Nancy Reagan's "Just Say No" anti-drug campaign, the First Amendment did not require the government to sponsor simultaneously a "Just Say Yes" campaign. Or to repeat the example in *Rust*: "When Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles . . . it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism." 500 U.S. at 194; *see also DKT Mem'l*, 887 F.2d at 290.

In this case the government's objective is to eradicate HIV/AIDS. One of the means of accomplishing this objective is for the United States to speak out against legalizing prostitution in other countries. The Act's strategy in combating HIV/AIDS is not merely to ship condoms and medicine to regions where the disease is rampant. Repeatedly the Act speaks of fostering behavioral change, *see, e.g.*, 22 U.S.C. § 7601(22)(E), and spreading "educational messages," *id.* § 7611(a)(4). The Act's stated source of inspiration is the success in Uganda, where President Yoweri Museveni "spoke out early, breaking long-standing cultural taboos, and changed

widespread perceptions about the disease." *Id.* § 7601(20)(B). The Act details the program Museveni instituted, which primarily involved a "message" about "a fundamental change in sexual behavior." *Id.* § 7601(20)(C). "Uganda's success shows that behavior change . . . is a very successful way to prevent the spread of HIV." *Id.* § 7601(20)(D). Spending money to convince people at risk of HIV/AIDS to change their behavior is necessarily a message.

Everyone, including DKT, agrees that the government may bar grantees from using grant money to promote legalizing prostitution. But DKT complains that § 7631(f) constrains its speech in other programs, for which it does not receive federal funds.[1] That effect, DKT argues, makes the case like *FCC v. League of Women Voters of California*, 468 U.S. 364 (1984), and unlike *Rust v. Sullivan*. We think the opposite. The restriction struck down in *League of Women Voters* prohibited public broadcasting stations from editorializing. The Court pointed out that a public broadcasting station could not editorialize with its nonfederal funds even if its federal grants amounted to only a small fraction of its income. 468 U.S. at 400. Therefore the restriction did not simply govern the use of federal funds. *Id. Rust*, on the other hand, upheld regulations prohibiting federally funded family planning services from engaging in abortion counseling or in any way advocating abortion as a method of family planning. 500 U.S. at 178.

The difference between the two decisions, as the Court later explained, is that in *Rust* "the government did not create a

---

[1]   DKT assumes, as does the government, that if an organization signs a pledge in accordance with § 7631(f) and then goes out and advocates legalizing prostitution it will have violated the condition on its grant. Although neither the statute nor the regulations expressly say as much, we will accept the position of the parties.

7

program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program. We recognized that when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." *Rosenberger*, 515 U.S. at 833. Here too the government has not created "a program to encourage private speech," as it did in funding public broadcasting in *League of Women Voters*, 468 U.S. at 367-68, and as it did in *Rosenberger* in funding student publications, 515 U.S. at 823-25. In this case, as in *Rust*, "the government's own message is being delivered," *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001).[2]

Under *Rust*, as interpreted in *Rosenberger* and *Velazquez*, the government may thus constitutionally communicate a particular viewpoint through its agents and require those agents not convey contrary messages. We think it follows that in choosing its agents, the government may use criteria to ensure that its message is conveyed in an efficient and effective fashion. Our decision in *DKT Memorial Fund*, 887 F.2d at 290-91, so held. The Supreme Court has also recognized that the government may take "appropriate steps" to ensure that its

---

[2] Citing *Wooley v. Maynard*, 430 U.S. 705 (1977), *Speiser v. Randall*, 357 U.S. 513 (1958), and *West Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943), DKT argues that the government may not "compel a private organization to adopt government policy or speech as its own." In each of those cases, the penalty for refusing to propagate the message was denial of an already-existing public benefit. None involved the government's selective funding of organizations best equipped to communicate its message. Offering to fund organizations who agree with the government's viewpoint and will promote the government's program is far removed from cases in which the government coerced its citizens into promoting its message on pain of losing their public education, *Barnette*, 319 U.S. at 629, or access to public roads, *Wooley*, 430 U.S. at 715.

8

message is "neither garbled nor distorted." *Rosenberger*, 515 U.S. at 833. This is particularly true where the government is speaking on matters with foreign policy implications, as it is here. *See DKT Mem'l*, 887 F.2d at 289-91. The government's brief summarizes these points: "It would make little sense for the government to provide billions of dollars to encourage the reduction of HIV/AIDS behavioral risks, including prostitution and sex trafficking, and yet to engage as partners in this effort organizations that are neutral toward or even actively promote the same practices sought to be eradicated. The effectiveness of the government's viewpoint-based program would be substantially undermined, and the government's message confused, if the organizations hired to implement that program by providing HIV/AIDS programs and services to the public could advance an opposite viewpoint in their privately-funded operations."

*Rust* is different, DKT argues, because it involved funding restrictions only on *projects*, not on *grantees*. It is true that only project restrictions were before the Court in *Rust*, a point the Court stressed. *See Rust*, 500 U.S. at 196. The Court said the clinic in *Rust* could advocate abortion if it conducted that activity "through programs that are separate and independent from the project that receives Title X funds." *Id.* at 196 (citation omitted). *Rust* likened this to *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983), in which the Court upheld a tax exemption for non-profit groups, *see* 26 U.S.C. § 501(c)(3), that excluded lobbying activities. *Rust*, 500 U.S. at 197-98; *see Regan*, 461 U.S. at 544. *Regan* found that although the organization at issue did not qualify for a tax exemption under § 501(c)(3) for its lobbying activities, it could reorganize to a "dual structure" with a "§ 501(c)(3) organization for nonlobbying activities and a § 501(c)(4) organization for lobbying." *Regan*, 461 U.S. at 544. This, the Court held in *Rust*, stood in contrast to the "unconstitutional conditions" cases

9

in which the government "effectively prohibit[ed] the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Rust*, 500 U.S. at 197.[3] We see no difference here. Nothing prevents DKT from itself remaining neutral and setting up a subsidiary organization that certifies it has a policy opposing prostitution. As the government stated at oral argument,[4] the subsidiary would qualify for government funds as long as the two organizations' activities were kept

---

[3] In *League of Women Voters*, the Court made the same point: "Of course, if Congress were to adopt a revised version of § 399 that permitted noncommercial educational broadcasting stations to establish 'affiliate' organizations which could then use the station's facilities to editorialize with nonfederal funds, such a statutory mechanism would plainly be valid under the reasoning of [*Regan*]. Under such a statute, public broadcasting stations would be free, in the same way that the charitable organization in [*Regan*] was free, to make known its views on matters of public importance through its nonfederally funded, editorializing affiliate without losing federal grants for its noneditorializing broadcast activities." 468 U.S. at 400 (citation omitted).

[4] Note the following exchange at oral argument:

COURT: Suppose that DKT just spins off a subsidiary corporation, and the subsidiary takes the pledge, but the parent organization does not. Is that okay? There's nothing in the regulations that would prohibit that, is there?

GOVERNMENT COUNSEL: There's absolutely nothing in the regulations that could prohibit it. . . .. There's nothing preventing them from doing that.

COURT: All their complaints could be solved by a corporate reorganization?

GOVERNMENT COUNSEL: That's right.

Oral Argument, 8:10.

10

sufficiently separate. The parent organization need not adopt the policy.[5]

The Act does not compel DKT to advocate the government's position on prostitution and sex trafficking; it requires only that if DKT wishes to receive funds it must communicate the message the government chooses to fund. This does not violate the First Amendment. We therefore reverse the district court.

*So ordered.*

---

[5] DKT also points to the four organizations exempted from the certification requirement as evidence that the government is not actually concerned with private organizations' policies being imputed to the government. But the Act's underinclusiveness does not violate the First Amendment. *See Ruggiero v. FCC*, 317 F.3d 239, 250-51 (D.C. Cir. 2003) (Randolph, J., concurring). "[T]he relevance of a statute's underinclusiveness is that it may reveal discrimination on the basis of viewpoint or content, or may undercut the statute's purported non-discriminatory purpose." *Id.* Because viewpoint discrimination raises no First Amendment concerns when the government is speaking, the underinclusiveness of the certification requirement is immaterial.